POMERANTZ LLP
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALPHABET INC., GOOGLE LLC, SUNDAR PICHAI, RUTH M. PORAT, PHILIPP SCHINDLER, and KENT WALKER<br><br>Defendants. | Case No. 3:23-CV-01186-RS<br><br><br>Date: December 21, 2023<br>Time: 1:30 p.m.<br>Location: Courtroom 3 – 17th Floor<br>Judge: Richard Seeborg |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.    Google Favored Itself at the Expense of Publishers and Advertisers ............................. 2

        1.    Google Schemed to Eliminate "Header Bidding" .................................. 2

        2.    Google Improperly Tied Its Products .................................................... 4

    B.    Google Violated the Privacy of Over 750 Million Android Users.................................. 4

    C.    Google Engaged in Secretive Efforts to Curtail Privacy Regulation ............................. 4

ARGUMENT .......................................................................................................................... 5

    A.    Defendants Made Materially False and Misleading Statements About Google's Digital Ad Technology, Including the State of Digital Ad Competition ........................ 5

    B.    Defendants Made Materially False and Misleading Statements About Privacy ........... 13

    C.    The Complaint Adequately Pleads Defendants' Scienter ............................................. 16

        1.    The Complaint Adequately Alleges That Defendants Knowingly Misrepresented the Digital Ad Technology and the State of Competition .......... 16

        2.    The Complaint Adequately Alleges That Defendants Knowingly Misrepresented Defendants' Privacy Practices................................................... 20

    D.    The Complaint Adequately Pleads Loss Causation ....................................................... 21

CONCLUSION...................................................................................................................... 25

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acticon AG v. China N.E. Petroleum Holdings, Ltd.*,
   692 F.3d 34 (2d Cir. 2012).................................................................................... 25

*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   651 F.2d 615 (9th Cir. 1981) ................................................................................ 25

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
   2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ................................................. 9, 10, 11

*Brendon v. Allegiant Travel Co.*,
   412 F. Supp. 3d 1244 (D. Nev. 2019) .......................................................... 22, 23, 25

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   757 F. Supp. 2d 683 (E.D. Mich. 2010)..................................................................... 8

*Crago v. Charles Schwab & Co., Inc.*,
   2017 WL 6550507 (N.D. Cal. Dec. 5, 2017) ............................................................. 5

*Curry v. Yelp Inc.*,
   875 F.3d 1219 (9th Cir. 2017) .............................................................................. 22

*Cutler v. Kirchner*,
   696 F. App'x 809 (9th Cir. 2017) .......................................................................... 11

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................................... 21

*Eng v. Edison Int'l*,
   2017 WL 1857243 (S.D. Cal. May 5, 2017)............................................................. 25

*Erickson v. Corinthian Colls., Inc.*,
   2015 WL 12732435 (C.D. Cal. Apr. 22, 2015) ........................................................ 22

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ................................................................... 8, 9

*Green v. Occidental Petroleum Corp.*,
   541 F.2d 1335 (9th Cir. 1976) .............................................................................. 25

*Halford v. AtriCure, Inc.*,
   2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)......................................................... 10

ii

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ..................................................... 11, 14, 15, 17, 20, 21

*In re BioMarin Pharm. Inc. Sec. Litig.*,
    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ............................................................ 11

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ........................................................................... 21, 22

*In re ChoicePoint, Inc. Sec. Litig.*,
    2006 WL 8429145 (N.D. Ga. Nov. 21, 2006) ....................................................... 16

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) .............................................................................. 12

*In re CV Scis., Inc.*,
    2019 U.S. Dist. LEXIS 212562 (D. Nev. Dec. 10, 2019) ..................................... 25

*In re Eargo, Inc. Sec. Litig.*,
    2023 U.S. Dist. LEXIS 24984 (N.D. Cal. Feb. 14, 2023) .................................... 19

*In re: Facebook, Inc. Sec. Litig.*,
    2023 WL 6857600 (9th Cir. Oct. 18, 2023).................................................... 11, 22

*In re Facebook, Inc. Sec. Litig.*,
    477 F. Supp. 3d 980 (N.D. Cal. 2020), *aff'd in part, rev'd in part on other grounds*,
    2023 WL 6857600 (9th Cir. Oct. 18, 2023).......................................................... 15

*In re Firstenergy Corp.*,
    2022 WL 681320 (S.D. Ohio Mar. 7, 2022) ......................................................... 16

*In re Henry Schein, Inc. Sec. Litig.*,
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ....................................................... 9

*In re Infineon Techs. AG Sec. Litig.*,
    2006 WL 1329887 (N. D. Cal. May 22, 2006) ........................................................ 8

*In re Intuitive Surgical Sec. Litig.*,
    2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ....................................................... 9

*In re Invision Techs., Inc. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 12166 (N.D. Cal. Jan. 21, 2006) ..................................... 19

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005).................................................................................. 17

iii

*In re Musical Instruments and Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................................................. 9

*In re Nvidia Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ................................................................ 18

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) ...................................................... 9

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................... 25

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ..................................................................... 17

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ........................................... 8

*In re Syncor Int'l Corp. Sec. Litig.*,
   239 F. App'x 318 (9th Cir. 2007) ........................................................... 14

*In re Thoratec Corp. Sec. Litig.*,
   2006 WL 1305226 (N.D. Cal. May 11, 2006) .......................................... 11

*In re Tronox, Inc. Sec. Litig.*,
   2010 WL 2835545 (S.D.N.Y. June 28, 2010) .......................................... 25

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ................................................................... 9

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
   998 F.3d 397 (9th Cir. 2021) ................................................................. 23

*Jaeger v. Zillow Grp., Inc.*,
   644 F. Supp. 3d 857 (W.D. Wash. 2022) ................................................ 25

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018), *aff'd in part, rev'd in part on other grounds*, 805 F.
   App'x 525 (9th Cir. 2020) ......................................................... 10, 12, 13

*Lako v. LoanDepot, Inc.*,
   2023 WL 444151 (C.D. Cal. Jan. 24, 2023) ........................................... 23

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ........................................................... 11, 25

iv

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ............................................................................. 21, 22

*Luna v. Marvel Tech. Grp., Ltd.*,
  2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ............................................................ 25

*Mauss v. NuVasive, Inc.*,
  2016 WL 3681831 (S.D. Cal. July 12, 2016) ............................................................. 22

*McPhail v. First Command Fin. Plan., Inc.*,
  2006 WL 8455139 (S.D. Cal. July 27, 2006) ................................................ 2, 9, 16, 20

*Menkes v. Stolt-Nielsen S.A.*,
  2005 WL 3050970 (D. Conn. Nov. 10, 2005) ............................................................. 8

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ............................................................................. 18

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) ............................................................................. 13

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ............................................................................. 21

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................. 9, 16

*Nathanson v. Polycom, Inc.*,
  87 F. Supp. 3d 966 (N.D. Cal. 2015) ..................................................................... 25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................................... 8, 16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ............................................................................. 7

*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ............................................................ 20

*Roofers Loc. No. 149 Pension Fund v. DreamWorks*,
  677 F.App'x 376 (9th Cir. 2017) ........................................................................... 22

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ....................................................................... 10, 13, 14

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................... 20

v

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018) .................................................................................................. 10

*Sneed v. AcelRx Pharms., Inc.*,
   2023 U.S. Dist. LEXIS 116984 (N.D. Cal. July 7, 2023) .................................................... 19

*Teachers' Ret. Syst. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) .................................................................................................. 22

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................................................. 19

*Veal v. LendingClub Corp.*,
   423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................................................................... 19

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ........................................................................................ 19

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ............................................................................................... 23

**Statutes**

15 U.S.C. §78u-4 .......................................................................................................................... 5

15 U.S.C. §78u-5 ........................................................................................................................ 11

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
- 3:23-cv-01186-RS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

This is a federal securities class action on behalf of a class of defrauded investors that acquired Alphabet securities between February 4, 2020 and January 23, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws against Alphabet, Google, and certain of their top officials (collectively, "Defendants"). Alphabet is a multinational technology holding company whose lifeblood is Google, which functions as the dominant player in the field of digital advertising. Throughout the Class Period, Defendants issued numerous false and misleading statements to the market concerning Google's digital advertising technology tools and its business dealings with its advertisers and publishers. For example, Google represented to investors that no auction participants using Google-owned platforms receive any information about any other party's bids before the auction is completed, and that the highest bids win. It claimed that the channel through which a bid is received does not affect the determination of the winning bidder. In truth, however, these and other representations were false and misleading when made because, for example, Google was: maintaining visibility into the bids submitted by rival exchanges and using that information to inform its own trade decisions; trading ahead of rival exchanges; artificially manipulating the bids sent to rival ad exchanges so that Google's own exchange platform could win those transactions more often; and excluding competition by providing Google's own exchange platform with informational advantages that allowed it to trade ahead of bids submitted by competing bidding exchanges. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions, lawsuits, and reputational harm.

Just recently, following an antitrust investigation into Google's efforts to eliminate competition in the digital ad industry, the European Commission found that Google (i) favored its own ad exchange AdX in the ad selection auction run by its publisher ad server DFP by, for example, informing AdX in advance of the value of the best bid from competitors, which it had to beat to win the auction; and (ii) favored its ad exchange AdX in the way its ad buying tools Google Ads and DV360 place bids on ad exchanges by, for example, Google Ads avoiding competing ad

exchanges and mainly placing bids on AdX. ¶94.[1] Google is currently a defendant in cases brought by the Attorneys General of sixteen states and the U.S. Territory of Puerto Rico, and by the U.S. Department of Justice ("DoJ"). ¶¶211, 216. Alphabet and Google have also drawn the ire of regulators in the privacy space. The Attorneys General of several states accused Google of violating the privacy of over 750 million WhatsApp users employing Google's Android operating system. An internal Google memo exposed by the state regulators showed that Google was "opaquely" backing up users' WhatsApp communications to Google Drive, preventing users from learning that Google had access to their decrypted WhatsApp communications. With marching orders from its President of Global Affairs and Chief Legal Officer Kent Walker, Alphabet also secretly collaborated with competitors in the big tech space to kill privacy protection legislation.

When the truth about the companies' practices was eventually revealed through a series of corrective disclosures or materializations of risks, Plaintiffs and other members of the class of investors in Alphabet suffered significant damages.

## STATEMENT OF FACTS

### A.  Google Favored Itself at the Expense of Publishers and Advertisers
#### 1.  Google Schemed to Eliminate "Header Bidding"

Market participants used a technique called "header bidding" as a partial workaround to Google's self-preferential algorithms and ad tech restrictions. ¶51. Inside Google, header bidding was described as a "world of true, multi-sourced [real-time bidding]" without Google as the "authoritarian intermediary." ¶52. Internally, Google recognized that "[Google's ad server] has historically made it difficult for [ad exchanges] to compete on a level playing field with AdX [Google's own ad exchange]." ¶53. Header bidding substantially threatened Google exchange's ability to demand a very large—19 to 22 percent—cut on all advertising transactions. ¶57. Google deceptively told investors that "we don't see header bidding as a threat to our business. Not at all." ¶58. But, privately, Google executives described header bidding as an "existential threat" and referred to the company's efforts to kill header bidding as the "holy grail." ¶58. During the Class Period, Google secretly employed several techniques to kill header bidding. *First*, starting in 2019

---

[1] Citations to "¶__" refer to paragraphs in the Amended Complaint (Dkt. No. 46).

and continuing throughout the Class Period, Google employed a "Smart Bidding" algorithm to predict the bids of rivals for each impression. ¶68. With "Smart Bidding," Google collects the non-public bid history of advertisers, rival buying tools, and rival exchanges that participate on Google Ads, DV360, AdX, or Open Bidding and feeds that data into a machine learning algorithm that enables Google to predict rival bids with an alarming degree of accuracy. ¶68; *see also* ¶71.[2] Google's AdX exchange and other exchanges in Exchange Bidding used this information to adjust their own bidding strategy, trading ahead of exchanges participating in header bidding. ¶71.

*Second*, under code name Project Poirot, Google shifted transactions away from ad exchanges using header bidding to Google's AdX by artificially manipulating the bids sent to rival ad exchanges so that Google's AdX could win those transactions more often (even if that meant harming Google's own advertisers). ¶72. Google changed the settings of DV360 so that by default all advertising campaigns were opted into Project Poirot. ¶72. With Poirot, "spend on 3PEs [third-party ad exchanges] dropped by a whopping 32%." ¶77. By 2019, Google's Americas Partnership Finance Lead noted that on Google's ad exchange fee, "we should continue to hold the line, esp. given currently healthy growth levels, since project Poirot." ¶77.

*Third*, Google's New York-based product and engineering team developed an additional project, dubbed Elmo, designed to "protec[t] against header bidding." ¶80. Elmo reallocated ad spend away from rival ad exchanges engaged in header bidding. ¶80. The combined impact of these programs was on average a 21 percent revenue decrease on affected exchanges and a 16 percent increase in revenue or $300 million for Google's ad exchange. ¶82.

*Fourth*, in March 2019, leading into the Class Period, Google adopted Unified Pricing Rules to force more transactions through AdX. ¶87. The Rules proved extremely beneficial for Google. An internal Google analysis found that the Rules caused DV360 to win approximately 32% more impressions on AdX and led to a 6% increase in AdX revenue. ¶88. Other Google documents show that the Rules were "extremely self-serving" and accurately listed rival ad

---

[2] Google Ads is Google's buying tool for small advertisers; DV360 is Google's demand side platform; and AdX is Google's ad exchange. Google created Open Bidding, a process designed to preference Google's own tools.

exchanges as the "losers." ¶¶90-91. Google's internal modeling found that the Rules created the "primary benefit" of Google's bundled auction changes, and the "best guess" of the impact was an annual increase of $430 million in Google's gross revenues. ¶91.

### 2.  Google Improperly Tied Its Products

Throughout the Class Period, Google restricted publishers using non-Google ad servers from trading in Google's exchange. ¶97. Internally, Google recognized that an exchange should be more of "a public good used to facilitate buyers and sellers" and not "an immensely profitable business," as it is for Google. ¶99. Google, however, ensured that publishers and advertisers could not benefit from competition. ¶99. As a senior Google employee internally acknowledged, "Right now we are the … ad server ... for 90% of publishers … Unlike our competitors, pub[lisher]s have been viewing us as a necessary evil…" ¶99. Google publicly denied that it forced any tying of its products: "We don't force 'tying.'" ¶100.

### B.  Google Violated the Privacy of Over 750 Million Android Users

Facebook's messaging service WhatsApp has allowed Google-Android users to store messages and other information into Google's cloud back up service, Google Drive. ¶121. WhatsApp encrypted users' messages and informed its users that "WhatsApp's end-to-end encryption ensures only you and the person you're communicating with can read what is sent… only the recipient and you have the special key to unlock and read them." ¶121. Throughout the Class Period, Google represented on its website that WhatsApp backups were private backups inaccessible to third parties: "WhatsApp for Android lets you create a private backup of your chat history, voice messages, photos, and videos in Google Drive." ¶124. But according to an internal Google memo, Google was "opaquely" backing up users' WhatsApp communications to Google Drive. As a result, users could not log into Google Drive and learn that Google had access to their decrypted WhatsApp communications. ¶125.

### C.  Google Engaged in Secretive Efforts to Curtail Privacy Regulation

While it preached publicly that it was "heavily involved" in supporting privacy legislation, behind closed doors Google coordinated with its fellow big tech competitors to *undermine* user privacy. ¶105. For example, during a closed-door meeting held on August 6, 2019, between the

4

five Big Tech companies, including Facebook, Apple, and Microsoft, Google discussed forestalling consumer privacy efforts. ¶105. In a July 31, 2019 document prepared in advance of this meeting, Google memorialized that it had been "working behind the scenes hand in hand with the other companies," and had thus far "been successful in slowing down and delaying the [ePrivacy Regulation] process." ¶105.[3] Google's efforts to stall privacy protections continued throughout the Class Period, and to date have been wildly successful. ¶109. Unbeknownst to investors, Google also pushed the other big tech companies to prevent child privacy protections in proposed regulations. ¶110. Among other things, the proposed legislation would prohibit internet companies from collecting personal and location information from anyone under the age of thirteen without parental consent and from anyone 13- to 15-years old without the user's consent. ¶110.

Google denied that it worked to undermine privacy regulations. ¶119. Indeed, throughout the Class Period, Defendants misleadingly told investors that "privacy is very important, and we have called for comprehensive Federal privacy legislation." ¶119. Google lied. ¶119.

## ARGUMENT

### A. Defendants Made Materially False and Misleading Statements About Google's Digital Ad Technology, Including the State of Digital Ad Competition

The PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Plaintiffs' alleged statements meet these requirements. *See*, *e.g.*, *Crago v. Charles Schwab & Co., Inc.*, 2017 WL 6550507, at *3-5 (N.D. Cal. Dec. 5, 2017) (Seeborg, J.) (statements that a broker worked towards its clients' best interests in the execution process for trades were actionable where the complaint alleged the opposite was true). Here, the Complaint alleges that Defendants made several misrepresentations in connection with a bipartisan investigation by the House Judiciary Committee into the state of competition online. For example, Google misrepresented that:

- All participants in the unified auction, including those using Google-owned platforms, compete for each impression on a net basis, and no auction participant receives any

---

[3] Under the ePrivacy Regulation, Google would be required to obtain a clearer consent from its users before processing any data for online behavioral or targeted advertising. ¶106. In some instances, Google would be entirely barred from processing data for such purposes. ¶106. The proposed regulation would impose hefty fines on Google, fines that for the first time in history would have a significant impact on Google's bottom line. ¶106.

information about any other party's bids prior to completion of the auction. The highest net bid wins. The channel through which a bid is received does not otherwise affect the determination of the winning bidder.

¶138. These statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, for example, far from "no auction participant receiv[ing] any information about any other party's bids prior to completion of the auction," Google failed to disclose that it was, for example: maintaining visibility into the bids submitted by rival exchanges and using that information to inform its own trade decisions; trading ahead of rival exchanges in Open Bidding; artificially manipulating the bids sent to rival ad exchanges so that AdX could win those transactions more often; and excluding competition from header bidding by providing AdX and other exchanges in Open Bidding informational advantages that allowed them to trade ahead of bids submitted by header bidding exchanges. ¶139.

When asked by one House representative "what is Google's market share of the ad exchange," Google misleadingly responded that:

- Industry reports suggest that large advertisers on average are using four or more competing advertising technology tools at any given time, while large publishers on average are using six competing advertising technology tools at any given time…It is also common for publishers and advertisers to use several exchanges or even a combination of open and private exchanges.
- Our products face robust competition in a crowded advertising technology industry. Google Ad Manager competes within a large, diverse, and constantly evolving advertising marketplace and faces competition from hundreds of companies, including well-known tech companies with ad exchanges, supply side platforms (which are now largely functional equivalents), or those that sell their own inventory…

¶140. These representations were false and misleadingly incomplete because Google was inhibiting competition through, for example, forcing publishers to transact with DV360 and Google Ads in AdX; forcing publishers to license Google's DFP, and to trade in Google's ad exchange, AdX; preventing publishers from preferencing rival ad exchanges; and inhibiting advertisers from transacting through rival ad exchanges engaged in header bidding. ¶141. Google also claimed that:

- Google designs its products for advertisers to help them increase return on their ad spend, reach the right audiences at the right time, and avoid ad fraud. On the publisher side, Google designs its ad technology products to enable publishers to facilitate competition and increase revenues for their ad inventory . . . .

¶146. But far from designing its products to meet the needs of advertisers and publishers, Google was favoring its own ad exchange AdX in the ad selection auction run by its publisher ad server DFP and it was redirecting revenue and transactions back to Google's ad exchange, where it could charge very high fees. Google was secretly manipulating auctions and coercing publishers and advertisers to transact in AdX, and was coercing advertisers to exclusively use Google's ad buying tools. This also led to higher prices that advertisers had to pay. ¶147.

Google also claimed that "Open Bidding is a competitive response and improvement upon header bidding. We created an alternative to header bidding, called Open Bidding, that allows for the same competition." ¶162. In truth, however, Open Bidding excluded competition from header bidding by providing AdX and other exchanges in Open Bidding informational advantages that allowed them to trade ahead of bids submitted by header bidding exchanges, with AdX charging exorbitant fees, and by inhibiting advertisers from transacting through rival ad exchanges engaged in header bidding. ¶¶163, 57-71. Google also falsely represented that "[p]ublishers are free to use our ad exchange with different ad servers. Publishers can and do use our ad exchange with a different ad server." ¶164. This was untrue because, for example, Google was forcing publishers to transact with DV360 and Google Ads in AdX, which commanded exorbitant fees. ¶¶59, 165.[4]

### 1.    *Defendants' attacks on statements about competition fail*

Defendants attack several statements about competition (¶¶134, 136) but pluck them out of context. Dkt. No. 58 ("Mot.") at 4. This is improper. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("uncontroversial" that "general statements of

---

[4] The Complaint alleges other false and misleading representations, such as: "empirical evidence shows ad tech is highly competitive and dynamic. Ad Tech is a crowded marketplace at all levels" (¶131); "[a] competitive digital ad marketplace gives publishers and advertisers…an enormous amount of choice" (¶134); "we see robust choice for advertisers" and "we see robust competition in the marketplace." (¶136). The Complaint explains why these and other additional representations were inaccurate. *See* ¶¶132, 135, 137. The Complaint alleges that, in truth, Google worked to eliminate competition. Through Project Poirot, for example, Google changed the setting of DV360 so that by default all advertising campaigns were opted into Google's AdX, which extracted supracompetitive fees. These practices led to higher prices that advertisers had to pay to place their ads. *See, e.g.*, ¶¶130, 132. Google's actions harmed publishers as well by driving out rival publisher ad servers and limiting competition in the ad server market. *See, e.g.*, ¶¶49, 53.

optimism, when taken in context, may form a basis for a securities fraud claim") (citation omitted). Defendants likewise impermissibly rewrite the competition statements as "effectively attesting that 'we believe we are obeying federal antitrust law'" and then claim Plaintiffs are unable "to contest that Defendants' opinion was honestly held." (Mot. at 4-5). But Defendants cannot rewrite Plaintiffs' complaint nor manipulate the language of the alleged misstatements to their advantage. Courts have repeatedly held that a company makes a false statement where, as here, it asserts that it operates in a competitive industry while it engages in practices that stymie competition. *See*, *e.g.*, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 599 (N.D. Cal. 2019) (statements describing generic drug market as "competitive" were false and misleading where the complaint alleged that the market was rife with anticompetitive conduct); *In re Infineon Techs. AG Sec. Litig.*, 2006 WL 1329887, at *3, *6 (N. D. Cal. May 22, 2006) (sustaining statements that the company's business environment included "intense" and "significant" competition), *on reconsideration*, 2006 WL 2925680 (N.D. Cal. Sept. 11, 2006).[5] Thus, contrary to Defendants' empty assertion, Defendants' representations were not "banal expressions of their belief" that Google operates in a competitive market. (Mot. at 5).

Nor are Defendants' representations inactionable opinions. (Mot. at 5-7). First, Defendants did not preface the statements with words like "believe" or "think." *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) ("Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."). Second, even if a few statements were deemed opinions (they are not), "[a] statement of opinion is actionably misleading if it 'omits material

---

[5] *See also In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *4 n.2 (S.D.N.Y. Aug. 31, 2000) (statements that "[c]ompetition in the international art market is intense" were misleading when company engaged in collusive behavior); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 693, 711-12 (E.D. Mich. 2010) (sustaining statements concerning a "highly competitive" industry, including risk factor statements that a "highly competitive" market was one of defendant's "main business challenges"); *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *3, *10 (D. Conn. Nov. 10, 2005) (finding false statement that "[t]he competition in the tank container market is fragmented, although the relative size of the competition is increasing on a worldwide basis," because defendant "had a duty to disclose its alleged anti-competitive conduct arising from these statements").

facts' that 'conflict with what a reasonable investor would take from the statement itself.'"
*Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1023 (N.D. Cal. 2020); *see also Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) (Seeborg, J.) ("*Uber*") (opinion statements actionable where known facts showed otherwise); *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *14 (E.D.N.Y. Sept. 27, 2019) ("[E]ven if Defendants' statements about competition could be considered opinions, because the statements did not include disclosure of Defendants' allegedly anticompetitive behavior, they are actionable"). A reasonable investor "expects not just that the issuer believes the opinion, but that it fairly aligns with the material facts about the issuer's inquiry into or knowledge concerning a statement of opinion." *In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *2 (N.D. Cal. Sept. 29, 2017). It is plausible that an investor would find Defendants' claims that publishers and advertisers had robust choices as a result of intense competition did not "fairly align" with the fact that, for example, Defendants were coercing publishers and advertisers to transact in Google's AdX. *See* ¶135.[6]

Defendants also attack Plaintiffs for relying on allegations from the government antitrust lawsuits to allege falsity (Mot. at 5-7). But courts, including the Ninth Circuit, routinely consider complaints and other agency documents at the pleading stage. "Because the Ninth Circuit has relied on comparable documents when deciding motions to dismiss Section 10(b) and antitrust claims…it is appropriate to do so here." *Evanston Police Pension Fund*, 411 F. Supp. 3d at 593 (denying motion to dismiss); *see also In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706-07 (9th Cir. 2012) (reversing dismissal of 10(b) claims and relying on allegations in an SEC complaint incorporated into the plaintiff's pleadings); *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1199 (9th Cir. 2015) (relying on allegations in an FTC complaint and settlement); *McPhail v. First Command Fin. Plan., Inc.*, 2006 WL 8455139, at *3 n.5 (S.D. Cal. July 27, 2006) ("[C]ourts generally have allowed plaintiffs to satisfy particularity and scienter

---

[6] Even statements prefaced with opinion language are actionable where the underlying facts are, as here, "capable of being proven true or false." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 738-40 (N.D. Cal. 2022). Moreover, while "subjective falsity" (Mot. at 6-7) is not required here, the Complaint alleges that Defendant Pichai was personally briefed on Google's plan to kill header bidding. ¶61.

requirements with the findings of an administrative agency when the agency's findings are relevant to plaintiffs' claims."). Here, the government obtained internal documents on which Plaintiffs partly rely to support their falsity claims, and Defendants are not contesting their reliability. Plaintiffs conducted additional due diligence, including retaining independent investigators that contacted former Alphabet and Google employees who corroborate the government's findings.[7]

Defendants further claim that they have no duty to engage in "self-flagellation" by disclosing unproven allegations (Mot. at 6), but this misses the point. While the federal securities laws do not require companies to disclose every aspect of questionable conduct to investors, "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (citation omitted), *aff'd in part, rev'd in part on other grounds*, 805 F. App'x 525 (9th Cir. 2020); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (same); *Uber*, 2020 WL 4569846, at *7 (same). Defendants' disclosure obligations are not inextricably tied to an express finding of unlawful conduct or the actions of any government body. "It is the falsity of Defendants' statements which is critical, not whether the underlying activity is found to be illegal." *Halford v. AtriCure, Inc.*, 2010 WL 8973625, at *9 (S.D. Ohio Mar. 29, 2010). Here, Defendants face liability because the information they disclosed created an impression of a state of affairs that differed in a material way from what actually existed. *See, e.g.*, *Singer v. Reali*, 883 F.3d 425, 441-42 (4th Cir. 2018) ("duty to disclose may extend to uncharged and unadjudicated illegal conduct" when "the [company chooses] to speak about its practices ... without telling the whole, material truth").

Defendants also contend that Alphabet warned investors of regulatory scrutiny and competition, through general statements that "we are subject to increasing regulatory scrutiny" and

---

[7] Accordingly, independent corroboration is not required. In any event, the Complaint does plead allegations corroborating the findings exposed in the government complaints. For example, CW1 explained that Google was still peeking at rival bids when s/he left the company in 2021. ¶68. CW2 recounted that s/he saw internal Google documents showing that the company won 80% of the auctions hosted on AdX. ¶78. Corroborating the findings in the government's complaints are the findings by the European Commission. ¶94.

that "various regulatory agencies, including competition…and privacy authorities, are reviewing aspects of our products and services" and "investigations" "**may** in the future result in substantial fines and penalties." (Mot. at 7-8) (emphasis added). But Defendants failed to disclose that they **were already engaging** in the practices alleged, so their generic risk warnings failed to allow investors to make a reasonable assessment of the actual risks facing their investments. Defendants' representations were not accompanied by meaningful cautionary language. 15 U.S.C. §78u-5(c)(1)(A). To be meaningful, cautionary language must "discredit[] the allegedly misleading statement so obviously that the risk of real deception drops to nil." *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *7 (N.D. Cal. Jan. 6, 2022) (citation omitted). Cautionary language is not meaningful if it fails to disclose known, material facts or states that risks may occur that, in fact, *have already transpired. Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005). Here, Defendants' purported warnings were "misleading because they disclosed a risk 'in the abstract' but omitted the fact that it had 'already come to fruition.'" *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) (citation omitted); *see also In re: Facebook, Inc. Sec. Litig.*, 2023 WL 6857600, at *8-11 (9th Cir. Oct. 18, 2023) (finding warnings in the company's annual report that "failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data could result in the loss or misuse of such data"  and that if "third parties or developers fail to adopt or adhere to adequate data security practices … our data or our users' data may be improperly accessed, used, or disclosed" were false and misleading when the risks had already transpired); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702-04 (9th Cir. 2021) (statement that even unfounded concerns about Alphabet's "practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters" could damage the company's "reputation and adversely affect [its] operating results" were false and misleading for failure to disclose a "bug" that exposed users' profile data as well as other security vulnerabilities); *Uber*, 2020 WL 4569846, at *5-6 (same).[8] Moreover, for the "safe

---

[8] By arguing that certain "disclosures" prevented other statements from being misleading, Defendants also are effectively making a premature "truth-on-the-market" argument. *See In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at *4 (N.D. Cal. May 11, 2006) (citation omitted).

harbor" to apply, the statements must be both "forward-looking" and "identified as such." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111-12 (9th Cir. 2010). None of the statements are forward-looking or identified as such. *See* ¶¶131, 134, 136, 140, 142 (employing present or past tense).

> **2.** *Defendants' attacks on statements describing how Google helps publishers and advertisers are meritless*

Defendants again attempt to rewrite the Complaint when they argue that all the alleged misrepresentations regarding the companies' actions supposedly devised to help advertisers and publishers are statements of opinion. But none of those statements are accompanied by qualifying language.[9] Moreover, the statements omitted material facts conflicting with what a reasonable investor would understand from the representations. For example, it was misleading to state that "Google designs its [ad technology] products for advertisers to help them increase return on their ad spend, reach the right audiences at the right time, and avoid ad fraud," without also disclosing that Google was coercing advertisers to exclusively use its ad buying tools, resulting in higher prices that advertisers had to pay to place their ads. ¶¶146-47; *see also supra* at 6-7 (describing why statements that Google supposedly helped publishers compete were false and misleading).[10] Likewise, it was misleading for Google to represent that "there's a lot of intelligence in our auction to deliver great ROI [return on investment] for advertisers" without also disclosing that Google was manipulating auctions for its own benefit. ¶¶154-55. The remaining statements, when considered in the context of the Complaint's entire allegations, are likewise actionable.[11]

> **3.** *Defendants' remaining challenges fail*

Defendants argue that certain alleged misstatements provide only technical explanations that are supposedly indisputable, and claim that they had no obligation to disclose every detail about a business's operations. (Mot. at 10-11). But even "statements literally true on their face

---

[9] *See* ¶¶127, 129, 146, 148, 150, 152, 154, 156, 158, 160, 166.

[10] To the extent "subjective falsity" is required (it is not because the statements are not ones couched as opinion), the Complaint pleads it. *See*, *e.g.*, *supra* at n.6 and *infra* at 16-20.

[11] Accordingly, the Complaint does not plead "mere disagreement," but facts rendering Defendants' half-truths actionable. Defendants also argue that Plaintiffs distort earnings calls remarks (Mot. at 9-10) but, except for the earnings call on October 26, 2021, which Plaintiffs abandon, the remaining statements are at the very least ambiguous when viewed in context. At the pleading stage, courts resolve ambiguities in plaintiffs' favor. *See Khoja*, 899 F.3d at 1014.

may nonetheless be misleading." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *see also Khoja*, 899 F.3d at 1008-09. Indeed, "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 706. Here, moreover, the statements at ¶138 are not merely technical explanations; the context and language make this point crystal clear (analyzed *supra* at 5-6). Indeed, the statements were made in response to the House Committee's pointed question "[w]hat percentage of bids does Google win on its own ad exchanges?" ¶138.

Likewise, the statements at ¶144 address the House Committee's question "does Google run the auctions to determine which ad can fill a specific ad box?" and provide false and misleading answers that "Publishers use multiple platforms to sell ads and are not required to use Google" and otherwise misleadingly describe Google's ad auction as fair and dependent on legitimate factors, such as "the applicable floor price as set by the publisher" or "whether the publisher has blocked a certain advertiser." As alleged, these statements are actionable because Defendants failed to disclose that Google was, for example, forcing publishers to transact with DV360 and Google Ads in AdX; forcing publishers to license Google's DFP, and trade in Google's AdX; preventing publishers from preferencing rival ad exchanges; and inhibiting advertisers from transacting through rival ad exchanges engaged in header bidding. ¶145. Similarly false were Defendants' representations that "Open Bidding is a competitive response and improvement upon header bidding" that "allows for the same competition," and that "[p]ublishers are free to use our ad exchange with different ad servers. Publishers can and do use our ad exchange with a different ad server." *See* ¶¶162, 164.

**B.  Defendants Made Materially False and Misleading Statements About Privacy**

During the Class Period, Defendants misleadingly represented that "as always . . . we don't use information in apps where you primarily store personal content—such as…Drive—for advertising purposes," "we keep your personal information private, safe, and secure," and "anytime we associate data with users, we are transparent." ¶¶172, 186, 190. But, unbeknownst to

investors, Google was violating the privacy of over 750 million Android users backing up their personal information into Google Drive. ¶¶120-26. Google knew that "when WhatsApp media files are shared with 3rd parties such as Google Drive, the files are no longer encrypted by WhatsApp." ¶122. This fact was memorialized in an internal Google memo as early as June 2016. *Id*. Google also understood that the users were misled about the privacy of their communications. The same internal June 2016 memo recognized that "WhatsApp's current messaging around end-to-end encryption is not entirely accurate." ¶123. The memo underscored that "WhatsApp currently markets that all communications through its product are end-to-end encrypted, with keys that only the users possess. They have failed to elaborate that data shared from WhatsApp to 3rd party services does not get the same guarantee. This includes backups to Google Drive." *Id*.

Google also recognized the critical importance of this omitted information to WhatsApp-Google Drive users. The same June 2016 Google memo explicitly noted that "[i]t's important for users to know that when WhatsApp media files are shared with 3rd parties such as Drive, the files are no longer encrypted by WhatsApp." ¶124. Still, Google continued concealing this fact during the Class Period, intending to sign up more users to Google Drive. *Id*. Instead, in a blog posted on Google's website throughout the Class Period, Google continued to misrepresent that WhatsApp backups were private backups inaccessible to third parties: "WhatsApp for Android lets you create a private backup of your chat history, voice messages, photos, and videos in Google Drive." ¶¶125, 184-85. But according to an internal Google memo, Google was "opaquely" backing up users' WhatsApp communications to Google Drive. ¶125. As a result, users could not log into Google Drive and learn that Google had access to their decrypted WhatsApp communications. *Id*.[12]

---

[12] The statements need not contain the word "encryption" (Mot. at 13) to be rendered misleading. This would turn on its head the concept of misrepresentations by omission. *See*, *e.g.*, *In re Alphabet*, 1 F.4th at 702-03 (warnings about "practices with regard to the collection, use, disclosure or security of personal information or other privacy related matters" were false and misleading for failure to disclose "bug" that exposed users' personal information, and other security vulnerabilities); *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) ("By attributing Syncor's success solely to legitimate practices, defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success.").

Moreover, while claiming that none of the Complaint's allegations about privacy are actionable, Defendants again ignore context. Here, Defendants repeatedly told the market that user privacy is of utmost importance. Alphabet's annual report underscored that "[w]e continued to put privacy and security at the forefront of our products so that, every day, users are safe with Google." ¶202. Defendant Pichai insisted that "[p]rivacy is at the heart of everything we do" (¶172) and during Alphabet's Q2 2020 Earnings Call emphasized that "[d]oing even more to protect users' privacy, keep information safe and provide high quality information was *a key focus this quarter*." ¶180 (emphasis added). Pichai even testified before the House Judiciary Committee multiple times that "Google is committed to keeping your information safe, treating it responsibly" and that "more must be done to protect users across industries, *which is why we've long supported the creation of comprehensive federal privacy laws*." ¶¶176, 178, 190. At another House Committee hearing, Pichai bluntly represented that "I think privacy is very important, and we have called for comprehensive Federal privacy legislation." ¶200. Likewise, Defendant Walker tweeted that "[w]e continue to support comprehensive federal privacy legislation in the U.S. and are finding new ways to incorporate meaningful privacy controls into our products." ¶174; *see also* ¶182. And at a UBS Global Conference, Defendant Schindler said "[w]e're actively supporting and advocating for federal privacy legislation. So that's something we're heavily involved in." ¶194.

In truth, Defendants worked surreptitiously to *lessen* privacy protections, including fighting to prevent and diminish child privacy protections in proposed legislation. ¶¶105-19. Google was also violating the privacy of literally hundreds of millions of Android users. ¶¶120-26. When viewed in the context in which they were made, Defendants' representations are actionable. *See*, *e.g.*, *Alphabet*, 1 F.4th at 702-04 (statements that Alphabet's "practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters" could damage the company's "reputation and adversely affect [its] operating results" were actionable where defendants failed to disclose software glitch exposing user's data and other security vulnerabilities); *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1017 (N.D. Cal. 2020) (statement "[w]e respected the privacy settings that people had in place" was false and

15

misleading because Facebook continued to give certain third parties access to users' data), *aff'd in part, rev'd in part on other grounds*, 2023 WL 6857600 (9th Cir. Oct. 18, 2023).[13]

Defendants' argument that "many" of their representations are inactionable because a reasonable investor would not view them as material" (Mot. at 12) has no merit where, as here, Defendants repeatedly acknowledged their importance, including in testimony to Congress. Neither are these or the other privacy statements alleged in the Complaint mere "expressions of opinion that Plaintiffs' allegations fail to negate." (Mot. at 12). This is made plain by the very language of the statements, neither of each includes prefatory words of opinion. *Omnicare*, 575 U.S. at 183. To the extent any such statements constitute opinions (they do not), they remain actionable as omitting material facts conflicting with what an investor would understand. *Mulderrig*, 492 F. Supp. 3d at 1023. A reasonable investor would have no inkling that Alphabet was in fact actively conspiring to curtail privacy laws. *See also infra* at 20-21.

### C.  The Complaint Adequately Pleads Defendants' Scienter
#### 1.  The Complaint Adequately Alleges That Defendants Knowingly Misrepresented the Digital Ad Technology and the State of Competition

*First*, the Complaint alleges that several high-level employees at the companies, including Defendant Pichai, were acutely aware of Google's plans to kill header bidding. While publicly claiming that "we don't see header bidding as a threat to our business. Not at all," privately Google executives described header bidding as an "existential threat." ¶58. CW1 corroborated this point, recalling that s/he attended "quarterly summits" in 2016 and/or early 2017 when senior Google employees–including Bellack, the Director, Product Management–Publisher Ad Platforms, said header bidding "posed an existential threat" to Google's digital advertising ecosystem. ¶58. Competition from header bidding threatened AdX's ability to charge a supra-competitive 19% to 22% take rate. ¶59. CW1 corroborated that Google Ad Manager takes 20% of the revenue share.

---

[13] *See also In re Firstenergy Corp.*, 2022 WL 681320, at *12 (S.D. Ohio Mar. 7, 2022) (statements about pursuing "legislative or regulatory" solutions were actionable when the company was allegedly bribing public officials to achieve legislative relief); *In re ChoicePoint, Inc. Sec. Litig.*, 2006 WL 8429145, at *2, *6 (N.D. Ga. Nov. 21, 2006) (statements that the company "works to create a safer and more secure society through the responsible use of information while ensuring the protection of personal privacy" were actionable).

¶59. Google emails from November 2017 showed that Google employees thought that the exchange "margins will stabilize at around 5 percent. Maybe it will happen by this time next year or in early 2019. This creates an obvious dilemma for us. AdX is the lifeblood of our programmatic business…What do we do?" ¶59. Google was so concerned it launched a program called the "Header Bidding Observatory" to detect publisher adoption of header bidding. ¶60.[14]

Importantly, as the government's investigation eventually uncovered, Pichai was personally briefed in a document on Google's plan to kill header bidding, with Google's product leadership specifically recommending to Pichai the plan to "weaken the header bidding narrative in the marketplace." ¶61.[15] Indeed, knowledge of this plan was widespread among the top executives and senior employees. A Google executive even advised colleagues, "I would suggest being very careful here what we say to publishers. Remember, [Open Bidding] negatively impacting header bidding is a Google desired outcome. Publishers are likely fine with header bidding, they make more money with it." ¶66. Another senior employee admitted that the plan was deliberately designed to avoid price competition and will "generate[] suboptimal yields for publishers and serious risks of negative media coverage if exposed externally." ¶67. A 2019 Google planning document even outlined a plan to predict competitors' bids using pricing information obtained from publishers' sensitive clearing auction records. ¶¶68, 71. CW1 explained that Google was still conducting this auction prediction when s/he left in June 2021. ¶¶25, 68.

Additionally, Google's Director of Product Management for Display and Video Ads explained internally that Poirot's initial implementation in 2017 was "quite effective, resulting in [DV360] spending 7% more on AdX and reducing spend on most other ad exchanges." ¶77. Likewise, in 2019, Google's Americas Partnership Finance Lead noted that on Google's ad

---

[14] Pre-class period information is relevant when it "sheds light" on an element of plaintiffs' claims. *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (citation omitted); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (same).

[15] The Complaint need not contain confidential witnesses directly reporting to Defendants when Google's own documents demonstrate Pichai's knowledge. "[I]nformation from confidential witnesses [is] not needed where, as here, other allegations in the complaint raise a strong inference of scienter." *Alphabet*, 1 F.4th at 707. Moreover, Defendants' bald assertion that there was simply "disagreement within the corporation" (Mot. at 18) is belied by the Complaint's allegations.

exchange fee, "we should continue to hold the line, esp. given currently healthy growth levels, since project Poirot." ¶77. The fraction of DV360 spent on AdX dramatically increased from approximately 40% to 70% with Poirot. ¶78. A Google document stated that "Adx is now dominant to the point where we need to communicate to advertisers (and sometimes even to ad exchanges) why over 70% of [DV360] spend happens on Adx." ¶78. CW2 corroborates seeing internal documents at Google showing that the company was winning approximately 80% of the auctions hosted on AdX. ¶78. Another internal Google document prepared in the second quarter of 2019 explained that different pricing floors "drive DV360 to spend more on third party exchanges" and that a unified floor could achieve the "desired state" that "DV360 wins on AdX at higher margin." ¶85. Recognition of the flooring "problem" also was widespread within Google's display advertising leadership. ¶86. When one Google employee asked why DV360 was still winning inventory through rival ad exchanges, Google's Project Poirot architect explained that "the best guess is that the AdX [price] floors are higher." ¶86. He wrote that "[t]his is one big problem for the Adx team to try fixing so that more of the [DV360] buying will switch to Adx." ¶86. He observed that "if we figure out how to equalize floors (i.e., get the Adx floors down), as a buyer, we will start seeing benefits in terms of buying more through Adx and decreasing incrementality on 3PE [third-party ad exchanges]." ¶86. Google adopted the Unified Pricing Rules in 2019 so that publishers were no longer allowed to set different price floors that helped competition. ¶87.[16] Collectively, these allegations support a strong inference of Defendants' scienter.[17]

---

[16] These allegations, which Defendants largely ignore, are more than sufficiently particularized to give them notice of the misconduct.

[17] The facts presented in the cases cited by Defendants (Mot. at 15) bear no resemblance to those alleged here. In *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068-69 (9th Cir. 2008), plaintiffs' scienter allegations showed at best a mere disagreement with a technical GAAP violation and involved a statement that was subject to multiple interpretations. *Id.* And in *In re Nvidia Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014), a case involving product defects, the allegations actually showed that Nvidia properly "first investigat[ed] the root cause, and then the scope, of the [problem]" and "once it determined that its liability would exceed its normal reserves, NVIDIA disclosed the problem to investors." Here, in contrast, Defendants *admittedly schemed* to destroy the competitive header bidding process for their own advantage—as demonstrated in part by Google's own internal documents created before the beginning of the Class Period. That scheme was devised as early as 2016 and its implementation continued throughout the Class Period. Thus, Plaintiffs are not judging Defendants in hindsight.

*Second*, by the commencement of the Class Period, several U.S. attorneys generals were investigating Google, securing incriminating documents. *See, e.g.*, ¶205. The DoJ was conducting a similar investigation. ¶208. Around that time, the European Commission was also probing Google, eventually leading to formal proceedings.[18] The existence of government investigations is "one more piece of the scienter puzzle." *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) (same).[19] Indeed, CW2 explained that Defendant Schindler, who reported to Pichai, led Ad Council meetings, where Google planned its response to the antitrust charges. ¶240. CW2 said there were "weeks or months" of preparation within Google for the meetings, and CW2 prepared the materials for the meetings (together with Schindler, CW2 also attended Ad Council meetings focused on "product direction" for display ads, which involved "legal implications"). ¶¶240-42. The materials included proposals for what Google should charge on the buy and sell side of its digital advertising business, with Google knowing that it needed to become transparent in its pricing. *Id.* The materials also included "position papers" and slides supporting multiple scenarios for how Google might respond to antitrust cases. *Id.*

*Third*, Defendants repeatedly spoke about the topics at issue, including as part of the House Judiciary Committee's investigation, evidencing their familiarity with the topics. *Roberti v. OSI*

---

[18] *See* ¶94 & https://ec.europa.eu/commission/presscorner/detail/en/ip_23_3207.

[19] Defendants' cited cases (Mot. at 14-15) are inapposite. In *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806, 814-16 (N.D. Cal. 2019), plaintiffs attempted to establish scienter based on "hands-on management style" and failed to identify any information that would have alerted defendants that their public statements may have been misleading. Plaintiffs did not even allege what the substance of the FTC's investigation was. *Id.* at 806, 816. Similarly, in *Sneed v. AcelRx Pharms., Inc.*, 2023 U.S. Dist. LEXIS 116984, at *28-29 (N.D. Cal. July 7, 2023), just mere awareness "that the FDA was regulating its marketing," devoid of any details that would have put Defendants on notice of any potential misstatements, was insufficient. Likewise, in *In re Invision Techs., Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 12166, at *20-21 (N.D. Cal. Jan. 21, 2006), the complaint alleged only "general assertions about the Individual Defendants' roles and responsibilities" and generally stated that the "DOJ FCPA settlement agreement…contained language to the effect that InVision was aware of a high probability that potential FCPA violations were occurring." In *In re Eargo, Inc. Sec. Litig.*, 2023 U.S. Dist. LEXIS 24984, at *40-41 (N.D. Cal. Feb. 14, 2023), plaintiffs "merely speculate[d]" about the individual defendants' knowledge, their argument was based on a contested interpretation of an insurance policy, and plaintiffs only noted that an undescribed "internal review" was referenced in the settlement with the DoJ.

*Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("[A]n inference of scienter can be established by the fact that the Defendants touched on the specific issue in their public statements."); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017) (same).

*Fourth*, while not required, the Complaint also pleads motive. The improper practices were not disclosed to the public "in order to avoid or delay the impacts disclosure could have on regulatory scrutiny." *Alphabet*, 1 F.4th at 706-07; *see also* ¶4 (noting that the undisclosed practices "created a heightened risk of civil and regulatory investigations, regulatory enforcement actions, lawsuits, and reputational harm.").

### 2. The Complaint Adequately Alleges That Defendants Knowingly Misrepresented Defendants' Privacy Practices

*First*, the Complaint pleads that Defendant Walker gave the marching orders to defeat privacy protection regulations, including forestalling protections for children privacy. A July 31, 2019 document memorialized that Google has been "working behind the scenes hand in hand with the other companies," and has thus far "been successful in slowing down and delaying the [ePrivacy] Regulation process." ¶105. Google planned to "find areas of alignment and narrow gaps in our positions and priorities on child privacy and safety." ¶113. It was particularly concerned that Microsoft was not aligned with Google's efforts to impede child privacy protections, and pushed Microsoft to join the plot: "Whether at this meeting or at another forum, we may want to reinforce that this is an area of particular importance to have a coordinated approach," read the memo. ¶¶113, 115. Another Google document showed that Defendant Walker was in the driver's seat: "We have direction from Kent [Walker] to find alignment with MSFT [Microsoft] where we can but should be wary of their activity [in promoting privacy] and seek to gain as much intel as possible." ¶115. CW1 explained that Walker reports directly to Pichai, so it is more than plausible to infer that Pichai was aware of the efforts to curtail privacy protections since the proposed regulations would inhibit Google's ability to use customer's data for advertising purposes, Google's bread and butter. ¶¶106-07, 115 n.2; *see also Alphabet*, 1 F.4th at 706-07 (inferring that Pichai communicated alleged vulnerabilities to Page by "consider[ing] [the] senior executive's

role in [the] company" and that "Page was vitally concerned with Google's operations.")[20]

*Second*, the Complaint also pleads motive. It alleges that the proposed regulations present a serious threat to Google's adtech business, on which Google's survival depends. ¶¶106-08. Google derives a large portion of its revenue by tracking and profiling Internet users through their digital activity and other data sources that Google then uses to sell to advertisers. *Id.* (explaining the devastating business consequences on Google, with annual fines in the billions). By failing to disclose that the personal data of millions of Android users was accessible to Google, Google Drive was also able to gain hundreds of millions of additional accounts. ¶126.

### D.  The Complaint Adequately Pleads Loss Causation

A complaint need only provide the defendant with "some indication of the loss and the causal connection that the plaintiff has in mind." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).[21] Pleading loss causation therefore "'should not prove burdensome,' for even under Rule 9(b) the [] allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact.'" *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (citations omitted). Loss causation "requires no more than the familiar test for proximate cause," and there are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018). Allegations of a "'causal connection between the material misrepresentation and the loss'" suffice. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1211 (9th Cir. 2016). "At the pleading stage, it is generally inappropriate to dismiss

---

[20] The "scienter of the senior controlling officers of a corporation may be attributed to the corporation," even when such an individual did not actually "make" the statements. *Alphabet*, 1 F.4th at 705-06 & n.8. Here, the individual defendants made representations during earning calls, in testimony to the House Committee, on the companies' websites and on twitter, and signed certain company filings with the SEC. Their scienter is therefore imputed to Google and Alphabet.
[21] Defendants conflate transaction causation with loss causation (Mot. at 21), but they are separate elements of Plaintiffs' claims. *Dura*, 544 U.S. at 341-42 (stating a §10(b) claim's "basic elements" include both transaction causation and loss causation). Plaintiffs are not relying on facts supporting transaction causation to allege loss causation.

for failure to establish loss causation." *Facebook*, 2023 WL 6857600, at *13.[22]

Defendants argue that "unadjudicated claims" are not corrective disclosures. (Mot. at 21).[23] But a "corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency." *BofI*, 977 F.3d at 790. Here, the truth was gradually revealed through several partial disclosures, each of which is causally connected to the fraud and each of which caused a drop in Alphabet's stock prices. ¶¶205-22. The disclosures are not based on just the mere *announcement* of an investigation, but plead evidence of wrongdoing, which the government has laid bare through Defendants' own documents. That suffices. *See*, *e.g.*, *Erickson v. Corinthian Colls., Inc.*, 2015 WL 12732435, at *17 (C.D. Cal. Apr. 22, 2015) (loss causation pleaded where plaintiffs alleged that the AG complaint revealed undisclosed facts calling into question the company's alleged misrepresentations and omissions).[24]

Defendants also wrongly claim that the announcement that the DoJ accelerated its investigation of Google fails to establish loss causation (Mot. at 22). But Defendants ignore the

---

[22] Disclosures "need not precisely mirror the earlier misrepresentation." *BofI*, 977 F.3d at 790.

[23] Defendants' other cases are off-point. In *Roofers Loc. No. 149 Pension Fund v. DreamWorks*, 677 F.App'x 376 (9th Cir. 2017), the sole alleged corrective disclosure was the mere announcement of an SEC investigation, and "the SEC ended its investigation without taking enforcement action against Defendants." *Id*. at 377 (loss due to investors' disappointment rather than fraudulent practices). In *Teachers' Ret. Syst. of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007), the alleged corrective disclosure was a complaint entirely "devoid even of general allegations of [the fraud alleged]" and failed to disclose anything new to the market. *Id*. at 187-88. And in *Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017), plaintiffs "only cite[d] customer complaints to the FTC without a subsequent investigation," thus "rel[ying] on even less" that the mere announcement of an investigation. *Id*. at 1225. And, as the Ninth Circuit explained when it distinguished *Curry*, "[c]ritically," those customers "were outsiders who lacked any firsthand knowledge of the [the company's] practices," so plaintiffs were merely resting on the assertion that "where there is smoke, there must be fire." *BofI*, 977 F.3d at 793.

[24] Even an announcement of an investigation, when accompanied by other disclosures, suffices for loss causation. *Lloyd*, 811 F.3d at 1209-11; *see similarly Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1263-64 (D. Nev. 2019) (announcement of investigation corrective when combined with other disclosures such as a 60 Minutes report exposing new information and shedding new light on existing information); *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *9-12 (S.D. Cal. July 12, 2016) (announcements of regulatory investigations and related settlements sufficient).

22

rest of the paragraph, which *disclosed for the first time* that the DoJ was readying an antitrust lawsuit targeting Google's anticompetitive practices in the advertising technology business. The announcement of this lawsuit into the improper practices the Complaint alleges render Defendants' statements false and misleading qualifies as a corrective disclosure, particularly when combined with the remaining disclosures. *Brendon*, 412 F. Supp. 3d at 1263-64.[25]

Defendants argue that "the [p]rice [p]romptly [r]ebounded," which supposedly defeats loss causation. (Mot. at 22). They are wrong. The Ninth Circuit requires a "quick," *i.e.*, "***immediate***" (the next day) ***and*** "***sustained***" price recovery to defeat loss causation, and no such recovery occurred here for any of the corrective dates. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021)[26]; *see also Lako v. LoanDepot, Inc.*, 2023 WL 444151, at *10 (C.D. Cal. Jan. 24, 2023) (no sustained price recovery as required by *Wochos*). As to the first disclosure of December 16-17, 2020, Defendants concede that the stock did not rebound until twelve days later on December 28, 2020 (Dkt. No. 58, n.18), and the rebound was not sustained, as the price immediately fell below the December 15, 2020 pre-disclosure price the next day on December 29, 2020, and did not raise above that price until January 7, 2021. Exhibit 1 to the Declaration of Emma Gilmore ("Ex. 1") at 1-2. In fact, during the month following the disclosure (12/16/20- 1/15/20), the stock was above the pre-disclosure price (12/15/20) on only three trading days. *Id*. at 1-2. Moreover, Defendants ignore the fact that this so-called "rebound" could be attributed to the contemporaneous increase in the market, rather than investors' assessment of the alleged corrective disclosure twelve days

---

[25] *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397 (9th Cir. 2021) bears no resemblance to this case. There, plaintiff attempted to prove loss causation by reference to *transaction causation* (arguing that "mere inflation is enough to show loss causation"). *Id.* at 406. Plaintiff's efforts to plead loss causation through other revelations failed because those revelations were mere "general allegations" attributing Uber's reduced valuation to "corporate scandals generally." *Id.* at 408. Here, in contrast, the disclosures were causally connected to the alleged misconduct-Google's anticompetitive practices in the advertising technology business. ¶¶205-22.
[26] In *Wochos*, the truth was disclosed a month earlier than alleged. 985 F.3d at 1198 n.4

earlier. *Id*. at 1 (showing the Nasdaq went from 12,658.19 on December 16, 2020 to 12,899.42 on December 28, 2020, a 1.9% increase). As to the second disclosure of September 2, 2021, the stock did not rebound to above its pre-disclosure price. Rather, it was still "under [its] September 1 closing price" "five days" later. Dkt. No. 58, n. 18. In fact, the stock stayed below its September 1, 2021 pre-disclosure price for almost two months.  Ex. 1 at 6-7 (showing the Class A and Class C stock did not go above the September 1, 2021 price until October 27, 2021). Regarding the third disclosure of October 22, 2021, the stock did not rebound until five days later on October 27, 2021. *Id*. at 6-7. As to the fourth disclosure on February 11, 2022, Defendants concede that the stock did not "rebound" until over a month later on March 22, 2022. Dkt. No. 58, n.18. Notwithstanding the fact that this "rebound" was far from "immediate," Defendants ignore the fact that it could be attributed to the contemporaneous increase in the market. Ex. 1 at 8-9 (showing the Nasdaq went from 13,791.15 on February 11, 2022 to 14,108.82 on March 22, 2022, a 2.3% increase).

As to the fifth disclosure of January 24-25, 2023, Defendants concede that the stock did not "rebound" until "eight days" later on February 1, 2023 (Dkt. No. 58, n 18), and the "rebound" was not sustained as the stock was below the pre-disclosure price by February 8, 2023 and remained below this price until mid-March 2023. Ex. 1 at 14-15. Moreover, Defendants ignore the fact that this so-called "rebound" could be attributed to the contemporaneous increase in the market, rather than the investors' assessment of the alleged corrective disclosure eight days earlier. *Id*. at 14 (showing the Nasdaq went from 11,334.27 on January 24, 2023 to 11,816.32 on February 1, 2023, a 4.25% increase). As to the sixth disclosure of April 18, 2023, Defendants concede the so-called "rebound" did not occur until "six days" later on April 24, 2023 (Dkt. No. 58, n. 18), and the "rebound" was not sustained, as the price immediately fell below the pre-disclosure price the

next day, April 25, 2023. Ex. 1 at 16.[27] That there was no sustained recovery is also evident by the fact that the stock continued dropping after each corrective disclosures. ¶¶209-21 (reflecting the stock dropping from the second disclosure price of $143 to $138, $134, $96, and $105).[28]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion. Should the Court deem any portion of the Complaint insufficient, Plaintiffs respectfully request leave to amend. *See Livid Holdings*, 416 F.3d at 946.[29]

---

[27] Additionally, "'[b]asic economic principles preclude dismissing a complaint' on grounds that the stock price recovered after falling significantly because the rebound can often be explained by external events." *In re  CV Scis., Inc.*, 2019 U.S. Dist. LEXIS 212562, at *15-16 (D. Nev. Dec. 10, 2019); *Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) ("At this stage in the litigation, we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains."); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 984 (N.D. Cal. 2015) (same). "Later market gains unrelated to the fraud do not wipe out losses that resulted from the fraud." *Luna v. Marvel Tech. Grp., Ltd.*, 2017 WL 4865559, at *3 (N.D. Cal. Oct. 27, 2017) (citing *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 621 (9th Cir. 1981) & *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1344 (9th Cir. 1976)). Here, for many of the drop dates, the supposed "rebounds" can be explained by the upward movement in the Nasdaq market. Courts routinely reject the types of arguments Defendants raise at the pleading stage. *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 875 (W.D. Wash. 2022) (dismissal on ground that the stock price recovered is inappropriate); *Brendon*, 412 F. Supp. 3d at 1264 (same).

[28] A plaintiff is not required to plead statistical significance of corrective disclosures in a complaint, with courts explicitly rejecting the concept that expert testimony is required at that stage. *See, e.g.*, *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *13 (S.D.N.Y. June 28, 2010). *Eng v. Edison Int'l*, 2017 WL 1857243, at *4-5 (S.D. Cal. May 5, 2017), cited by Defendants, relied on *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010). That case, however, was decided on summary judgment after the development of a full factual record and the provision of expert reports, including damages reports, that addressed the statistical significance of the corrective disclosures at issue. *Id.* at 1266 (noting that "[i]n the context of a summary judgment motion," "plaintiffs often hire experts to opine on loss causation"). Further, Plaintiffs are unaware of any decision from within the Ninth Circuit—or any other circuit, other than *Eng*—that has held that in order to *plead* loss causation a plaintiff must obtain and provide an expert regression analysis on the statistical significance of corrective disclosures.

[29] The sole basis on which Defendants attack the sufficiency of Plaintiffs' §20(a) claims is failure to plead an underlying §10(b) claim (Mot. at 25 n.20). Thus, because the §10(b) claims are well pled, the §20(a) claims also survive. Defendants bizarrely argue that Plaintiffs fail to plead scheme liability (Mot. at 23-25), but the Complaint brings no such claims, as is evident by the Complaint's causes of action. *See* ¶¶271-85 (describing the two Counts alleged).

1

Dated:  November 6, 2023

Respectfully submitted,

2

**POMERANTZ LLP**

3

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman (admitted *pro hac vice*)

4

Emma Gilmore (admitted *pro hac vice*)

Dolgora Dorzhieva (admitted *pro hac vice*)

5

Villi Shteyn (admitted *pro hac vice*)

6

600 Third Avenue, 20th Floor

New York, New York 10016

7

Telephone: (212) 661-1100

Facsimile: (917) 463-1044

8

jalieberman@pomlaw.com

9

egilmore@pomlaw.com

ddorzhieva@pomlaw.com

10

vshteyn@pomlaw.com

11

Jennifer Pafiti (SBN 282790)

12

1100 Glendon Avenue, 15th Floor

Los Angeles, California 90024

13

Telephone: (310) 405-7190

jpafiti@pomlaw.com

14

15

Orly Guy

Eitan Lavie

16

Ariel Sharon 4, 34th Floor

Givatayim, Israel 5320047

17

Telephone: +972 (0) 3 624 0240

Facsimile: +972 (0) 3 624 0111

18

oguy@pomlaw.com

19

eitan@pomlaw.com

20

*Counsel for Plaintiffs and for the Proposed*

21

*Class*

22

**KLAUSNER KAUFMAN JENSEN &**

**LEVINSON**

23

Robert D. Klausner

24

7080 NW 4th Street

Plantation, FL 33317

25

Tel: (954) 916-1202

Fax: (954) 916-1232

26

bob@robertdklausner.com

27

28

26

*Additional Counsel for Plaintiff City of Fort
Lauderdale Police & Fire Retirement
System*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
- 3:23-cv-01186-RS

**PROOF OF SERVICE**

I hereby certify that on November 6, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
- 3:23-cv-01186-RS