**Pages 1 - 46**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

AMI - GOVERNMENT EMPLOYEES      )
PROVIDENT FUND MANAGEMENT       )
COMPANY, LTD., et al.,          )
                                )
          Plaintiffs,           )
                                )
  VS.                           )        **NO. C 23-01186 RFL**
                                )
ALPHABET, INC., et al,          )
                                )
          Defendants.           )
_____)

San Francisco, California
Tuesday, April 16, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
>               POMERANTZ LLP
>               600 Third Avenue - 20th Floor
>               New York, New York  10016
>           **BY:  EMMA GILMORE, ATTORNEY AT LAW**
>               **JEREMY A. LIEBERMAN, ATTORNEY AT LAW**
>               (via Zoom)

For Defendants:
>               FRESHFIELDS BRUCKHAUS DERINGER US LLP
>               855 Main Street
>               Redwood City, California  94063
>           **BY:  BORIS FELDMAN, ATTORNEY AT LAW**
>               **JON FOUGNER, ATTORNEY AT LAW**
>               **ELANA HADJIMICHAEL, ATTORNEY AT LAW**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    U.S. District Court - Official Reporter

**Tuesday - April 16, 2024**                                    **10:03 a.m.**

                               P R O C E E D I N G S

                                    ---oOo---

THE CLERK:  Court is now in session.  The Honorable Rita Lin now presiding.  Please be seated.

                          (Pause in proceedings.)

THE CLERK:  Actually, Counsel, come up to the podiums.

                          (Pause in the proceedings.)

THE CLERK:  Calling civil case 23-1186, AMI Government Employees Provident Fund Management Company Limited versus Alphabet, Inc. et al.

Counsel, please state your appearances for the record beginning with the Plaintiff.

MR. LIEBERMAN:  Good morning, Your Honor, Jeremy Lieberman from Pomerantz LLP on behalf of Plaintiffs.

And present in the courtroom is my partner Emma Gilmore.  And, Your Honor, thank you very much for making the accommodation with respect to the video teleconferencing.  I apologize for any inconvenience.

THE COURT:  Good morning.  I'm glad that you are back home safely after what sounds like a very trying evening.

MR. LIEBERMAN:  It was indeed, Your Honor.  Thank you.

MR. FELDMAN:  May it please the Court, Boris Feldman of Freshfields Bruckhaus Deringer in Silicon Valley.

I have two of my colleagues with me, Elana Hadjimichael

and Jon Fougner.

THE COURT:  Good morning to all of you.

I, before the hearing, had put out a notice of the Court's questions having to do with the motion.

I just want to make sure everybody has it.  I see a nod on the Defense side.

Mr. Lieberman, do you have -- I see you nodding too. Thank you.

MR. LIEBERMAN:  Yes, we do, Your Honor.

THE COURT:  Let's just go through the questions, and then I'm sure there is more that you would like to tell me; but I will make sure that you have an opportunity for that at the end.

Before I start with the first question, I just wanted to give you some context for why I ask these questions.

It seems to me generally that the allegations in the complaint describe a lot of representations that tend to be quite general.

And it is not clear to me that statements like "our advertising solutions help millions of companies" or statements about valuing privacy are false based on the allegations of the complaint; but there was one particular allegation, which most of my questions are focused on, that is much more specific and that contains a statement that I think could potentially be alleged to have been false.  And that's why so many of my

questions in the notice of questions are focused on that particular statement.

So I want to start with the first question because that statement arises in the context of a written response to questions from the House Judiciary Committee.

Plaintiffs rely on those responses, and I saw that the Defendants' reply brief argued that those statements are not in connection with the purchase or sale of a security.

So my question to Plaintiffs is on what basis should the Court infer that statements to the House Judiciary Committee are actually made in connection with the purchase or sale of a security and are there cases that support a position in which Congressional testimony would be treated as statements made in connection with the purchase or sale of the security?

**MR. LIEBERMAN:**  Sure Your Honor, thank you.

With respect to that question, Your Honor, we think there -- there should be no doubt that statements made in a Congressional hearing, which we think are clearly -- given the high profile nature of the government investigations, the high profile nature of the Congressional investigations into competition, into privacy, these are things that the public is clearly following.

And we start really with broad principles.  First, just *Basic, Inc. v. Levinson*, 485 U.S. 224, 247, note 24; and that's a 1988 Supreme Court case, which is a the premise for the

fraud-on-the-market theory, which all securities class actions are based upon.

The Supreme Court there noted that market professionals generally consider most publicly announced material statements about companies thereby affecting stock market prices.

And so that's a general recognition that's just about 40 years old that any publicly disseminated statement is something that is -- disseminated by the market impacts market price and, therefore, we believe is actionable.

But we don't need to only rely on the *Basic* case.  We are first just laying the foundation of the "in connection" phrase is something that Congress and that the courts have construed broadly.

And I'm citing now *In Re: Carter-Wallace, Inc. Sec. Litigation*, 150 F.3d, 153, pin cite 156, Second Circuit case, 1988, confirming that we have broadly construed the phrase "in connection with" holding that Congress in using the phrase intended only that device employed, whatever it might be, a sort that would cause reasonable investors to rely thereon and in connection there with so relying caused them to purchase or sell a corporation securities.

So that's, again, demonstrating that the "in connection with" requirement is something that is construed broadly.

Further quotes, Your Honor, another -- a Third Circuit case, *Semerenko v. Cendant Corp.*, 223 F.3d, 165, 176 pin cite,

Third Circuit, 2000.  Of course we will send these cases along right after the hearing.

And quoting the "in connection with" requirement satisfied, quote, simply by showing that the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely and they were material when disseminated.

So the real question that we think courts should be focusing on is is this a forum that is publicly available that the market would be paying attention to.

And we think when it comes to written testimony by a CEO of a company, the answer is undoubtedly yes.

But let's get even more specific for the Court because this specific question has been addressed by various district courts or similar analogous situations.

When it comes to Congressional testimony, I cite *Monk v. Johnson & Johnson*, it's a Westlaw citation, 2011 WL 6339824 at 21, DNJ 2001.

And the court specifically there found that a Congressional testimony was actionable under the "in connection with" securities requirements, and the court noted that -- this was a public hearing, reported to the public.  It was under oath.  And in this way Congressional hearing, it is reported publicly is similar to media statements or press releases, which courts have analyzed under Rule 10b-5.

So that's directly on point with respect to Congressional testimony.  Going even farther afield --

**THE COURT:**  Before you go further afield --

**MR. LIEBERMAN:**  Sure.

**THE COURT:**  -- let me ask -- and I really should have put this in the question -- I think one thing that makes Congressional testimony a little different is that it is compelled.

But obviously sometimes Congressional testimony is voluntary and is not compelled.  So, the case that you cited me, is that a situation in which the Congressional testimony was compelled?

**MR. LIEBERMAN:**  Your Honor, I -- I don't have that answer right now.  We didn't focus on whether it was compelled or not.  I don't think that really should change the calculus here.

A 20-F or a 13 or a 10-Q is also compelled statements by the SEC.  There are signs under Sarbanes Oxley and those requirements and so clearly those are actionable.

I don't see why the forum of compelled statements by Congress would also be subject to the "in connection with," and I never -- I'm not aware of any cases that make a distinction when it comes to "in connection with" whether the testimony or statement is compelled or not.  I'm not aware of that distinction being made.

**THE COURT:**  Thank you.

**MR. LIEBERMAN:**  Sure.  Your Honor, and just to quote a few more cases, the district -- Northern District of California, the *In Re: Volkswagen Clean Diesel Marketing, Sales Practices, and Products Liability Litigation*, 2017 Westlaw 66281 at 18, says that the "in connection with" the purchase of securities requirement satisfied because a reasonable investor could have considered the emissions stickers on Volkswagen vehicles to be material investing information.  Such an assessment is procurely one of the trier of fact.

So, you have here just simply emission stickers put on Volkswagen vehicles were deemed by the district court to be a -- to be a statement that was in connection with the purchase or sale of securities.

And I will just give the Court one more citation -- there are a number of them -- which is the *In Re: Facebook, Inc. Securities Litigation*, 405 F.Supp.3d 809, pin cite 822 to 23, Northern District of California 2019.

And allegedly false and misleading statements regarding Facebook's privacy policies, which were issued to consumers -- not to analysts -- those were deemed to be in connection with the purchase or sale of securities.

And I think those cases, like I said, I think are even farther afield.  They are not really something that the market is necessarily watching.  They are not -- these are things that

are really customer consumer related, interactions and statements, and those are held to be satisfied in connection.

I think clearly written testimony by CEO in one of the most high-profile Congressional investigations over the past several years is something that analysts and markets are going to absorb and, therefore, digest as far as setting the stock price for Alphabet stock during the class period.

If Your Honor -- I won't paraphrase but I will at least give two more cites that we will provide -- *SEC versus Stinson*, 2011, Westlaw 2462038, E.D. Pa. June 2011.

Also, it deals with statements regarding e-mail solicitations, a webinar sponsored by an IRA custodian and websites were deemed to satisfy the "in connection with" requirements.

And then in *SEC -- in Securities & Exchange Commission versus Gruder*, 2010 Westlaw 115 00092 at 5 through 6, Northern District of Georgia in 2010. And the court similarly found that statements regarding a stun gun being ATF certified, which appeared in magazine advertisements and postcards since the law enforcement authorities, also were deemed to be in connection with the purchase or sale of securities.

And so all of these cases go back to the point made earlier in my response was that this "in connection with" requirement is deemed to be viewed broadly, and I think the -- the type of testimony made by the CEO of Alphabet, Mr. Pichai,

in Congress and heavily watched audience and issued is something that squarely falls within the ambit of in connection with the purchase or sale of securities.

THE COURT: Thank you.  Let me give the Defense an opportunity to respond.

MR. FELDMAN: Your Honor, thank you for giving us these questions.  I had not thought I would get to the four questions until the Passover seder next Monday night, and you have brought the four questions forward by a full week.

The parties addressed in their briefs the "in connection with" requirement.  It was in our opening brief at 23 to 25 and in our reply at page 6.  It was in the opposition page 5.

The -- you focused on two paragraphs in the complaint, 68 and 138; 138 is this one.  The submission in response to questions from the House Committee was 58 pages single spaced. It contained detailed, technical responses to questions about how a variety of Google products worked, not just the ad bidding.  The answer on the ad tech was one paragraph that picked up in 138.

There is no allegation in the complaint that that paragraph was aimed at investors in Alphabet stock or had any impact on Alphabet stock price.

I'm going to come back to why those words are important from an authority in one -- one in this district, others in other district courts in the Ninth Circuit.

On the contrary, what the complaint alleges in the next paragraph, 139, with respect to the statement you picked out is, "These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm."  Not that the answer impacted Google's stock price.

The statutory language, as Counsel has indicated, is straightforward.  The 34 Act applies only to statements made "in connection with the purchase or sale of any security."  That's -- the statute is 15 U.S. Code 78J(b).

The instructive decision -- and there is a lot of language, as Mr. Lieberman has pointed out.  There are many dicta that say this is super broad.

There is a decision on point in this district from Judge Gonzalez-Rogers in 2019.  It is *In Re: Intel Corporation Securities Litigation*, 2019 U.S. District Lexis 54615, at page star 31, note 14.

The court dismissed the securities fraud complaint there and it ruled in -- with respect to "in connection with," quote, "the kinds of statements courts have found to satisfy the 'in connection with' requirement are typically documents directly targeted to investors or the investment community; namely, audit reports that would be included in SEC filings, annual and quarterly reports, press releases, conference calls and account statements and newsletters sent directly to investors."

"While Intel's product statements" -- and I would note product statements, not Congressional testimony -- "while Intel's product statements appear to be a far cry from the typical statements upon which an investor would presumably rely, the court agrees with plaintiff that, quote, 'there is no rule that only market related documents such as regulatory filings, public presentations, or press releases can contain actionable misstatements under Section 10(b).'"

"However, the CCAC" -- the operative complaint -- "does not allege that the product statements were directly targeted to investors or the investment community."

In the -- Judge Gonzalez-Rogers relies on two decisions -- we cite these in our brief -- *Di Donato*, D-O-N-A-T-O, against *Insys*, I-N-S-Y-S, *Therapeutics, Inc*. -- the cite is in our brief -- and *Bien*, B-I-E-N, against *Lifelock*, also in our brief.

The name looked familiar when I looked at it, and then I saw that I had argued that case.  So it was nice to have my past come back.

The same is true here.  With respect to this lengthy submission to Congress, Plaintiffs do not allege that any press stories picked up the answer; that any analyst did.

Over the weekend my poor colleague searched through the following week after the answers were submitted to Congress, they did an online search, and they found that no report

contained that answer.

The next month the House Committee issued a 449-page report, and it didn't mention that answer either.

This conclusion that -- again, conceding the breadth of "in connection with," we are honed in here on something more narrow.

We are honed in on allegations about market impact, but the context of paragraph 138, as Your Honor indicated, is very important in order to avoid a Noerr-Pennington issue, which ironically arose in the antitrust context before the securities.

So construing "in connection with" to cover the statement could give rise to a Noerr-Pennington issue.

The Ninth Circuit addressed this issue in *Nunag-Tanedo* N-U-N-A-G-T-A-N-E-D-O, against *East Baton Rouge Parish School Board*, 711 F.3d, 1136 at 1139, Ninth Circuit, 2013.

(As read:) "Under Noerr-Pennington, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct."

It goes on to say, "the doctrine was developed in the antitrust context."  It then says -- I'm omitting internal citations -- "today Noerr-Pennington stands for a generic rule of statutory construction applicable to any statutory interpretation that could implicate the right to protect it by the petition clause."

There's an instructive decision for the Court out of the Southern District of New York. *U.S. Football League against National Football League*, an antitrust case, 1986 U.S. District Lexis 25453 at star 2, SDNY 1986.

(As read:) "Testimony before Congress is a clear-cut example of solicitation of governmental action through the legislative process," protected under Noerr-Pennington.

So, it's not that we have a Noerr-Pennington problem. It's that construing "in connection with" to apply to the submission referenced in 138 would create a Noerr-Pennington problem.

And, as Your Honor knows from principles of statutory construction, better to avoid that if you can.

That's all I have on question one, Your Honor.

**THE COURT:** Thank you. Let's move to question 2. The second question is on September 14th, 2020 -- this is referencing what we have all been talking about -- in response to a question from a Congressional representative Google stated -- the question was: What percentage of bids does Google win on its own ad exchange?

And Google allegedly described Google's ad managers unified auction process as being one in which "no auction participant receives any information about any other parties' bids prior to completion of the auction."

By that time Google had allegedly replaced last look with

the smart bidding program.  To predict future bids with smart bidding was Google -- only alleged to be looking at bids from prior auctions, not bids in the uncompleted auction?

I'm focused here on whether the statement is really allegedly false, and this is really a question for Plaintiffs.

Is the allegation here that this is false?  And how is it false if Google is only looking at bids from prior auctions, not the auction that's under way?

(No response.)

**THE COURT:**  Mr. Lieberman, I think you are muted.

**MR. LIEBERMAN:**  Your Honor, it is correct that the smart bidding looked at historic -- wasn't looking at the, you know, bid itself.  It was looking at historical bids, but those historical bids could have even been instantaneously historical; i.e.,  we have instances cited in the complaint where they were sometimes, you know, looking and giving different bids for the same actual image and for the same actual impression.

And so really what you have is a scenario, as alleged in the complaint, is that Google is taking information regarding bid history from DVX -- non-public information from DVX360, from DFP, from the ad exchange, from all of its tools really where it dominated the echo system, put that into its algorithm and used that algorithm to predict and to win bids in auctions.

And so you have that scenario where really they have such

an informational advantage over any other player in the market and the company -- what we -- whether they had that information about an actual bid, you know, in advance or they knew what that bid would be based upon an algorithm, the distinction in our view doesn't really make a difference.

What we actually have testimony is that these algorithms were alarmingly accurate. It is important to understand that these bids are actually conducted by the purchasers, by DFP, also by algorithms. They set their bids by computations by algorithms.

If you know how the computation is going to spit out and if you have that advanced information, that's something that's going to clearly -- that's better information than actually knowing the bid itself.

You know how the game plays. Whether you know what someone is going to do three steps in advance because you have their playbook or you just know because he told you, it doesn't matter. You know what they are going to do three steps in advance. That's really the critical information here.

The 21st century doesn't really know -- we see that from generally the et seq business, it is -- more important is your history and patterns. That's really the valuable information. Whether your actual, you know, stated intent -- sometimes they know what you are going to do even before you know what you are going to do because they have that algorithm and information

set forth.

So, that's very clear from the record is that this information was alarmingly accurate.  We have also the complaint saying that they -- they were able to make up any revenue loss from last look within a short amount of time using the smart bidding.

And so, therefore, the difference as far as the marketplace went was non-existent.

Once they were able -- sorry, go ahead, Your Honor.

**THE COURT:**  I understand your argument from an antitrust perspective, but from the question of securities -- litigation securities fraud, it's really is the statement false or not; and I don't hear in your answer why the statement as written is false.

So, I just want to flag that for you and give you another opportunity to tell me if I'm missing something.

**MR. LIEBERMAN:**  Sure.  I mean, the statement is "no auction participant receives any information about other parties bids prior to completion of the auction."

And that statement is -- they may not be receiving that -- information regarding that particular bid, but they have all the information regarding the patterns of those bids.

And so either it's -- either it's a false statement on its own because it is -- historically they are receiving all of their historical information or it's false by just half truth

and omission where they are saying -- the implication is that we don't have any informational advantage over other bidders. Yet, they clearly have, you know, all the information -- informational advantage that's relevant.

And so when -- and we learn from *Moab Partners* -- I will get Your Honor a citation.  It just came down from the Supreme Court -- half truths are clearly actionable.

And so when you're making a statement implies that a bid -- and a bid process is fair and actually -- you are actually rigging it, maybe not in the way that you have the, you know, actual information about the bid before it is going to be made, but you know all of the information about the pattern of bids, that on its own is a half truth.

At the very least we think it is actually a false statement on its own given literally.

And you have other statements during the class period saying that the auctions are fair; saying that there is no informational advantage on these auctions.

And all of that, Your Honor, we do believe are rendered false by the allegations in the complaint.

**THE COURT:**  Okay.  Let me give the Defense an opportunity to respond.

**MR. FELDMAN:**  On behalf of Google I want to admit that they are very good at algorithms.  Change the world of search.

I want to commend you or perhaps your law clerks for

reading the footnotes in the opposition brief, which is how you caught this.

The opposition at 10, note 7 says, "For example, CW1 explained that Google was still peaking at rival bids when she left the company in 2021, paragraph 68."

So as they used to say, "Let's go to the videotape." Paragraph 68 -- I won't plague the court reporter by reading it.  It is lengthy.  I will just pick out the operative verbs -- to predict, predictively peak, to predict, bid history, to predict.

They were not cheating by looking at the other bids coming in.  And if you look -- remember the opposition said that CW1 said they are still peaking at rival bids.

But the last sentence of paragraph 68 says, "According to CW1, Google was still conducting the auction prediction when she left Google in 2021 with the only change that all auctions were based on the first price."

So, in this -- you have highlighted the two key paragraphs, 138 and 68.  And as to this one, 68, it's clear that there is no support for an allegation that they were cheating by looking at other bids as they came in.  Thank you.

**THE COURT:**  Let's move to question 3, which is really a question for Google.

In the same answer Google allegedly said (as read:) "the channel through which the bid is received does not otherwise

affect the determination of the winning bidder."

"However, Project Poirot allegedly reduced DV360 bids by either 10 through 90 percent were placed on rival ad exchanges that appeared to use header bidding while never applying such decreases to Google's own ad exchange."

And similarly, with ELMo the allegation is that it also decreased DV360 bids where a bid was sent to multiple exchanges suggesting the use of header bidding.

If those allegations are true, wouldn't that be a situation in which the channels through which the bid was received -- that is through a rival ad exchange employing header bidding -- the channel affected the determination of who won the bid?

**MR. FELDMAN:**  The answer, Your Honor, is no; and I have a simple explanation.  And then if you want to probe, I have a complicated one where I will probably screw it up but can try.

The simple answer is that the statement in 138 does not pertain to a rival ad exchanges.

The answer is only about how things work on Google's ad exchange.  Therefore, the statement would not be rendered false even if the allegations about Poirot and the ELMo were true.

So 138 is the answer to Representative Cicilline's question, not from any statement to investors.

The language in the answer addresses how AdX, which is

Google's ad exchange, how it evaluates bids from the tools that advertisers use to buy display ads.  Namely, DV360 in Google ads as well as their competitors.

There is no dispute in the complaint that it is the ad exchange itself that makes the "determination of the winning bidder."

The response in paragraph 138 was only about Google's own ad exchanges.  On AdX the highest net bid for a publisher's impression is the winning bid.

Google explained that beyond calculating the highest net bid, the channel through -- the "channel through which a bid is received" -- whether DV360 or any other buying tool -- "does not affect the determination of the winning bidder."

That statement does not address bids submitted by DV360 to rival ad exchanges, which is the subject of the allegations about Poirot and ELMo.  So --

**THE COURT:**  I understand that explanation, but what gives me pause about that explanation is that in Google's answer it begins with the statement "all participants in the unified auction including those using Google-owned platforms compete for each impression on a net basis;" and then it goes on to make the statement we talked about.

But "the unified auction," doesn't that refer to the concept not only of Google's own AdX product but the ecosystem, the whole unified auction process together?

Because Google's claim is that it brings together all of these different pieces of the competitive bidding process into one larger unified auction.

So doesn't that encompass something beyond just AdX itself?

MR. FELDMAN:  Yes.  So even if you look beyond AdX, Poirot and ELMo did not affect the determination of the winning bid for a given impression.

So this is the second layer -- and I need to get a little bit into how each one works.  It is a little complicated and they are different.

In Poirot, paragraph 74 of the complaint alleges that Poirot was designed "to avoid overpaying for an impression" and "lowered all DV360 bids to rival ad exchanges" that did not use "second price auctions."  That's the allegation in paragraph 74.

In order to optimize bidding on behalf of advertisers, it makes sense that Google would want to reduce a bid made on an ad exchange that does not use a second price auction.

And here is why:  Assume an exchange that uses first price auctions -- let's call it Exchange A -- the winning advertiser pays its own winning bid.  That's in paragraph 74.

In a second price auction for the same impression -- let's call it Exchange B -- the winning advertiser will pay not its own bid but the amount of the second highest bid or floor

price.

So if the advertiser made exactly the same bid, $1 on both exchanges, A and B, it would end up paying $1 if it won the impression on Exchange A but could pay less if it won the impression on Exchange B where there was a lower bid or floor price.

In order to avoid that scenario, Project Poirot decreased the bids made to ad exchanges like exchange A that do not use second price auctions because AdX -- I'm sorry -- because the complaint alleged that Google did run a second price auction -- that's paragraphs 74 and 89 -- Project Poirot did not reduce the value of bids made to AdX nor did Project Poirot reduce the value of bids made to any rival ad exchange that used second price auctions.

So the net/net on Poirot -- and then I will do ELMo -- Poirot did not "affect the determination of the winning bid." It just avoids overpayment.

Why would an advertiser want to pay a dollar if they can win with a lower bid?  So Poirot helped protect DV360 advertisers from paying more than they needed to to win. That's Poirot.

Then there is ELMo.  Paragraph 80 of the complaint alleges that ELMo "decreased DV360's overall ad spend on any ad exchange that it suspected of meaningfully engaging in header bidding."

The complaint does not allege that ELMo affected the value of bids that DV360 submitted on behalf of an advertiser for a given impression.

Therefore, neither does ELMo affect the determination of the winning bid.

I'm sorry that's complicated --

**THE COURT:**  I have two questions about that.

**MR. FELDMAN:**  Please.

**THE COURT:**  The first is I understand that you are saying that there are customer friendly reasons or advertiser friendly reasons why Google might want to adopt this practice; but the question is really, you know -- that's a question for a later stage of the litigation where there is a potentially innocent explanation for what Google did.

Really what I'm focused on in this stage of the litigation is whether the statement is false; that it does not affect the determination of the winning bidder.

And I hear you saying sometimes it might not matter.  Most of the time it might not make a difference as to who wins the bid or not, but I'm not hearing anything inconsistent with the concept that sometimes it can change who it is who wins the bid.

If DV360 is for rival ad exchanges reducing the amount of the spend each time, then in some instances that will mean that Google's ad exchange will win the bid and somebody else won't.

So doesn't that mean that the channel through which the ad is being marketed or being auctioned affects who wins the bid sometimes?

So the statement that "it does not affect the determination of the winning bidder" as a blanket statement would be false.  Help me understand --

**MR. FELDMAN:**  Yes.

**THE COURT:**  -- where I'm going wrong there.

**MR. FELDMAN:**  I think that you're reading more into the answer quoted in 138 than the answer itself contains.

Google was not answering about every impact of any of its ad tools on any rival exchange.

Representative Cicilline, who was the leader in sort of the anti-tech stuff in the House, was asking about how things worked on Ad X, and the answer related how things worked on Google's platform.

So, you can -- I won't say you can read the answer as well as I can.  You can read it better because you have the black robe and I don't, but I think a fair reading of 138 and the context of that is that Google was not saying "none of our tools impacts the outcome."

What they were saying -- and it is the specific question -- the actual question they said is:  What percentage of bids does Google win on its own ad exchanges.

But the point that the complaint highlights that you have

is the channel through which a bid is received does not otherwise reflect the determination of the winning bidder on Ad X.  That's what's not contained there.

THE COURT:  I understand the answer.  Let me give Plaintiff an opportunity to respond.

MR. LIEBERMAN:  Thank you, Your Honor.  I think that Mr. Feldman has artfully proposed a number of innocuous explanations for project ELMo and Poirot, and perhaps one day after discovery ends through summary judgment or at trial, he will be proven right.

But right now the -- the only, I think, or clear inference from saying that the channel through which a bid is received does not otherwise affect the determination of the winning bidder -- and you have two programs devised by Google to favor and put more money into one exchange over other exchanges that don't use header bidding -- when you put more dollars to one exchange, you automatically impact the outcomes of that exchange.  It's just a matter of math.  You give a greater value to the exchange.

It's just like, let's say, a stock exchange.  One is a robust stock exchange that everybody is invested in, like nice, and one is some very poorly known exchange and nobody puts their money there.  The valuations of those individual transactions naturally will be lower on the lesser favored exchange.

That's exactly what we have here.  And I think that the facts alleged in the complaint are that Poirot reduced investments by 360 in non-AdX exchanges by 32 percent, which is a staggering amount.  And then with respect to ELMo, it reduced it by another 44 percent.

And so that's -- that's the bottom line.  The bottom line is that there were programs put in place by Google to dissuade 360 from bidding on other exchanges.

And, therefore, less money is going to these other exchanges; and, therefore, less bids are won on those other exchanges and more bids are won on Ad X.  Therefore, just naturally, the prices of those bids are going to be higher.

If more money -- we can have the economics one day.  If more money is going into one market, those bids are going to be higher.  I think we can get any expert to testify to that.  So that's the bottom line as to how those were working.

At the end of the day, there was discussions within Google that we note in our complaint that there has to be an explanation as to why 70 percent of 360's auctions are going and dollars are going to Ad X and why are they winning 80 percent of the bids?

There is a discussion.  Maybe we have to lower down those numbers.  It might trigger regulatory scrutiny.

So all of that is going to -- this was a -- these are highly successful -- perhaps too successful programs, and they

clearly had the impact of raising the amounts of dollars bid on Ad X and lowering the amounts of monies and dollars that were bid on completing exchanges.

Now, is it because, as Mr. Feldman says, he gives the explanation, well, one is a second price look, one is a first price look, you know, maybe one day he will prove that to be -- that to be the reason.

We have already pled from a number of CWs and internal documents that the purpose was to kill header bidding, and this was part of a plan to kill header bidding and it was quite successful.

And so Mr. Feldman will have his day to offer these innocuous explanations.  Until then, the pleadings in the complaint have to stand on their own, we believe.

**THE COURT:**  Well, let me then move to question 4 because even assuming that statement that we have just been talking about is false, I want to understand what the Plaintiffs' theory exactly is of scienter.

The allegation for scienter on the statement is that some of the Defendants spoke about advertising to investors and that Google's product leadership recommended trying, as you were alluding to, to weaken header bidding.

But are there allegations that the Defendants were aware that this was being accomplished in this specific way through Project Poirot and project ELMo's reduction of the DV360 bids

to rival advertising exchanges that were likely to use header bidding?

It seems to me that this requires a pretty fine grain understanding of the technology in order to recognize that there was this problem where the bids from DV360 are going to be automatically lower on rival ad exchanges.

So what's the information that the Defendants in this case were aware of that specific information?

**MR. LIEBERMAN:** Well, I think the context of the statements being made are critical, Your Honor.  This was a written statement drafted by Defendant Pichai, presumably reviewed by legal and many other heads of division.  They wouldn't go and ensure that those statements -- when you are saying "we don't favor certain exchanges," paraphrase, that that isn't actually vetted throughout the company.

When you are lying -- strike that -- when you are testifying under oath, I think that strains plausibility.  He didn't just make these statements, Defendant Pichai, off the cuff.

This was a -- Congress had already put in a report accusing Google of various manipulations on their exchanges and on their ad tech ecosystem, and they denied those allegations.

And this was a written report in denial of those Congressional findings and in the wake of a number of investigations that were already occurring.

What he says in these points are critical.  I mean, worst case scenario is he goes to jail if he gets it wrong.

And so the facts -- to say that the CEO of the company isn't going to make sure that he fully vets with all of the material stakeholders in the company who would know about any efforts to favor one exchange or the other -- particularly these where there was such -- significant amounts of monies were going to these exchanges being siphoned off the rival exchanges -- I think it really doesn't withstand scrutiny, that type of suggestion.  That's one point.

**THE COURT:**  In response to Mr. Feldman's point that represent -- that the Representative's question was really focused on Ad X and not on the whole unified auction ecosystem.

So the statement isn't really false or if it is, it is kind of a sloppy response to what was -- really should be cabined to the question that was asked, which is about Ad X specifically.

**MR. LIEBERMAN:**  Well, let me just check one thing.

(Pause in proceedings.)

**MR. LIEBERMAN:**  Maybe I -- I do believe we alleged -- and I could be corrected -- these were written responses and so --

**THE COURT:**  It was alleged that they were written responses.

**MR. LIEBERMAN:**  Okay, thank you.  And so if these are

written responses, these aren't off-the-cuff written responses. That strains any plausibility.

I assure you unless Sundar Pichai is reckless, he vetted those written responses not just through legal but through, once again, anybody involved in any systems that would impact the amount of dollars that are spent on Ad X versus other exchanges and if there would be any programs that favor Ad X over other exchanges.

And so to say that Defendant Pichai would be -- somehow make off-the-cuff comments in a written report to Congress under penalty of perjury simply strains any credulity.  And simply if so, if true, he would be reckless in making the statements, and that would be the scienter right there because he would be reckless in making these statements without going through the various channels to make sure that they were, indeed, accurate.

Furthermore, a key issue regarding scienter is whether or not the individual has access to the information.  And so to the contrary information that that bears falsity on his statements, there were already regulatory investigations, Congressional investigations.  They were already under way when Defendant Pichai made these false written statements to Congress.

So he had access.  He knows which documents were ultimately produced to regulators.  We learned of our

allegations through those very same documents.

Now we don't allege yet -- and we can -- that those documents were already produced at the time that this written statement was made, but surely he had access to them.

The inference is that before Congress made those findings, they received a plethora of documents. They weren't withheld by Google.

So, those same documents were reviewed presumably by Google, by their legal team; summarized from that legal team to Defendant Pichai at the very least; and, therefore, he is either knowingly or recklessly making a false statement. And that's just one inference, Your Honor.

Another inference is that these -- header bidding was considered an existential threat to Google. It was considered the first weakened header bidding where it considered to be the Holy Grail. And at the end AdX was considered to be the lifeblood of Google.

And to say that the CEO of a company knowing how important AdX and is to Google's ecosystem, that he wouldn't be aware of the various highly successful efforts to weaken header bidding is again implausible.

And we cite -- I'm not sure if we cite it. I will then read it into the record -- we cite the *Nvidia* case where the court aptly states that -- excuse me -- I will give an exact citation.

The court aptly states that a CEO that doesn't know the key issues regarding the key revenue generates for a company either doesn't exist or is a reckless CEO, and that would be the same inference that applies to Defendant Pichai here as well.

I will get a cite for Your Honor, just a moment, once I find it.  Also the inference -- and that's from the *Alphabet* case that we cite in the Ninth Circuit in 2021 -- that Defendant Larry Page was deemed to know about critical issues impacting Alphabet because of his knowledge of the inner workings of the company.

And Defendant -- here we are not talking about Larry Page as the chairman.  We are dealing with Defendant Pichai who is the CEO.

And I'm just looking for that citation.  I believe I found it.

(Pause in proceedings.)

**MR. LIEBERMAN:**  Oh, okay, fine.  Your Honor, I will get it for Your Honor in a second, the citation to the any *Nvidia* case.

**THE COURT:**  I will give Mr. Feldman an opportunity to respond while you are looking for that.

**MR. FELDMAN:**  Will I try your patience if I go back to question 3 for a second?

**THE COURT:**  No.

**MR. FELDMAN:** I'm looking at the complaint, not at extraneous stuff.

The question from Representative Cicilline was: "What percentage of bids does Google win on its own ad exchanges?"

It was not about what Your Honor has referred to as the unified ad system.

How does this work on AdX? And that's what he described. So that last sentence, the channel through which a bid is received does not otherwise affect the determination of the winning bidder, that is a fact.

And we know that because if you go to paragraph 139, which gives you five reasons why that was false, it doesn't say that's untrue; that the channel through which a bid is received on the Google AdX system determines the winning bidder because that was a true statement.

In fact, at the end of 139, what they focus on again -- and it goes to "in connection with -- "these practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm."

These statements were not directed towards investors. The Congressmen and women had very detailed questions about how it worked for Google and that's what they answered.

With respect to scienter -- again, it's always good to go to the opposition brief. The question which we are referring to is that last sentence. Okay.

The scienter inquiry is not whether any of the Defendants understand how ad tech worked.  The inquiry is whether in light of their knowledge, they believed that statements they made to the investing public were false.

The complaint sets forth all the scienter allegations in paragraphs 224 through 255.

Fortunately for all of us, the opposition synthesizes those at pages 16 to 20 of the opposition, and it's not just with respect to 138.  It's their whole theory.

And they give four reasons -- symmetry with the four questions -- four reasons why they have established scienter under the very high bar of the Reform Act.

First, they say lots of Google employees wanted to eliminate header bidding.  That's in pages 16 to 18.  But there is no compelling basis for attributing that to Sundar Pichai, P-I-C-H-A-I, who is the CEO.

The opposition asserts -- and this is sort of their key thing.  It is the opposition at 17, line 6 -- "Importantly, as the government's investigation eventually uncovered, Pichai was personally briefed in a document on Google plan to kill header bidding with Google's product leadership specifically recommending to Pichai the plan to, quote, weaken the header bidding narrative in the marketplace, paragraph 61."

So again, let's go to the videotape.  Paragraph 61 of the complaint, this is the entire paragraph on this (as read:)

"Importantly, Google's CEO, Defendant Pichai, was briefed on Google's plan to kill header bidding with Google's product leadership specifically recommending to Pichai the plan to, quote, weaken the header bidding narrative in the marketplace."

Says who?  Typically in a securities fraud complaint where you have an allegation that an individual defendant acted with scienter, you really need the who, what, when, where, how.

This is nothing because it is stripped from one of the complaints, either from Texas or somewhere else, but that doesn't come close to the Ninth Circuit pleading standards for scienter.

For example, paragraph 58 of the complaint alleges that "the company's efforts to kill header bidding" began "in 2016 and/or early 2017."

So the allegation about executives who hated header bidding and wanted to discredit it in the marketplace, they don't shed any light on what Pichai's state of mind was when Google submitted the answers to the Congressional questions in September of 2020.  They just have no bearing on it.

The Plaintiffs try to serve up a former employee, CW1 -- this is in the opposition at page 16 -- but she doesn't claim that she ever had any contact on the subject with Pichai.

So the first element of scienter a lot of people in the company hated header bidding.  Doesn't establish fraudulent intent on Pichai's behalf.

Second -- and I'm not making this up -- they attribute scienter to the fact that lots of people have sued us.

Opposition at 19, "the existence of government investigations is one more piece of the scienter puzzle."

You have Silicon Valley in your district.  There are lots of people around the world making allegations against every great technology company.  That can't be enough under the law to establish fraudulent intent.

There is a doctrine that I learned about even before law school called innocent until proven guilty.

There are elaborate rules of res judicata and collateral estoppel about when a judgment is final enough to have an impact.

Certainly a complaint filed by Texas AG Ken Paxton doesn't establish scienter on the part of Sundar Pichai.

Most of the antitrust lawsuits didn't have anything to do with the ad tech.  As to those that are about the ad technology, portions have been dismissed in the Southern District in an MDL proceeding.  No summary judgment motions have been filed yet.  No trial has taken place.

So, to say, well, there is scienter because a lot of people sued them, it is not a serious basis.

Third -- and Mr. Lieberman just talked about this again -- "Defendants repeatedly spoke about the topics at issue including as part of the House Judiciary Committee's

investigation, evidencing their familiarity with the topics."

That's in the opposition at 19, line 16.  But that is at least equally consistent with Sundar Pichai believing the statements, which he made under oath -- as Mr. Lieberman said, you can go to jail for lying to them -- it doesn't help fraudulent intent.

And in any event, the opposition's third scienter rationale plops us right in the middle of Noerr-Pennington.

It's not an "in connection with" issue.  It's a Congressional hearing issue.  So the fact that they talked about these as part of a Congressional investigation, I think hurt the Plaintiffs' case.

Their fourth and final scienter point, opposition 20, line 4,  "the improper practices were not disclosed to the public in order to avoid or delay the impacts disclosure could have had on regulatory scrutiny."

To avoid the scienter requirement, the Plaintiffs have jumped smack dab in the middle of "in connection with."

If the purpose of the alleged misconduct was to avoid regulatory scrutiny, it is not an attempt to pump up the stock price.

Moreover, even Mr. Lieberman would give us credit.  It's a smart company with smart individuals.  So the notion that given intense regulatory scrutiny -- going back to 2010 -- that giving the wrong answer in writing about how ad tech works

would help the company avoid regulatory scrutiny, oh, were it only so easy.  That's it with respect to scienter, Your Honor.

THE COURT:  Let me can ask you about the Noerr-Pennington issue.  Is that something that you raised in the briefs?  I don't recall it from the briefing.

MR. FELDMAN:  It's not, Your Honor.  After you issued the questions, my think tank spent the weekend looking at the decisions.  And some of them -- in particular the *Intel* decision, which I think we did cite -- led us to the Noerr-Pennington decisions; but it was not something in the brief.  It arose in response to the question.

THE COURT:  And, Mr. Lieberman, I know that it wasn't in the briefing and you are probably hearing it for the first time today.  Did you have anything you wanted me to know about the Noerr-Pennington point that Counsel is making?

MR. LIEBERMAN:  Your Honor, this is the first time I'm hearing about it.  I do not know Noerr-Pennington to absolve any defendant from liability for making sworn testimony in Congress.  I'm simply not aware of such a decision.  And, quite frankly, this great point has been waived by not being raised either in the response in the reply.

So --

THE COURT:  Anything else the parties would like the Court to know before I take the matter under submission?

Let me give -- actually, let me start with Mr. Feldman

since it's your motion, you can let me know anything else.

**MR. FELDMAN:** If you would prefer Mr. Lieberman to go first -- he has had a rough 24 hours with the flight -- I'm happy to let him go first.

**THE COURT:** No. I think you should go first.

**MR. FELDMAN:** Okay. Thank you, Your Honor. I want to talk to you about context. That's a dangerous word to use since it got the president of Harvard fired, context.

But the context here is that Chief Judge Seeborg gave you two gifts to welcome you to the bench. He gave you a derivative lawsuit based on the antitrust cases against Alphabet.

That's 3-21 -- 3:21-CV-09388 RFL, those are derivative lawsuits alleging that Google executives breached their fiduciary duty by engaging in the alleged acts that gave rise to all the antitrust lawsuits by Kenny Paxton and the others. That's the substance of the alleged underlying conduct.

And then to double the pleasure, he gave you this suit, which is just about securities fraud.

It's not about is there any merit to the underlying antitrust claims. It's about did Google defraud investors between February of 2020 and January of 2023 with respect to the risks posed by antitrust enforcement actions in private lawsuits.

And as often happens, sometimes the briefing -- I think

helped along by the Court's questions -- joins the issue beautifully.

And so here -- the issue here is joined in the opposition at page 8, line 6, "a company makes a false statement where, as here, it asserts that it operates in a competitive industry while it engages in practices that stymie competition."

And I submit the law does not support that as a securities fraud claim.

The notion that investors in Alphabet/Google were unaware of the risks of antitrust claims until DOJ filed its ad tech suit on January 24th, 2023, it ignores a decade.  And that's the context I think is worth considering.

The antitrust attacks on Google began in Europe over a decade before the class period here.  The EU had been pursuing multiple antitrust claims against Google as it also had against every successful U.S. tech company since 2010 including over ad tech.

The EU imposed on Alphabet penalties of $9.4 billion all before the class period here even started.  I would note that each of those penalties is still under appeal and has not become final.

This triggered a U.S. shareholder lawsuit in 2016, derivative, not class, in Santa Clara Superior Court.  It was ultimately dismissed with prejudice for failure to state a claim, affirmed on appeal and reviewed/denied by the California

Supreme Court.

In the U.S., not EU, antitrust scrutiny of Google has gone back many, many years. And just with respect to ad tech, the DOJ launched its investigation in July 2019. That was soon followed by a multi State Attorney General investigation in September of 2019.

In December of 2020, multiple states filed suit against Google over ad tech, and that was MDL'ed into the Southern District of New York.

The shareholder derivative suit over ad tech, which is now before Your Honor, was filed in December 2021.

So the core notion here in this securities fraud case -- that investors in Alphabet couldn't size the risk of antitrust regulators going after the company until DOJ filed a copycat suit on January 2023 -- it lacks credulity.

We have laid out -- and I know Your Honor has read the three alternative bases for dismissal -- no false statement, no scienter, no loss causation -- I'm happy to address any of those, but I'm also happy to rest on our briefs. Thank you.

**THE COURT:**  Thank you.  Mr. Lieberman.

**MR. LIEBERMAN:**  Okay, Your Honor, the missing cite on the *Nvidia* case is 81 F.4th, 418, 940, Fourth Circuit 2023.

And just to address a few matters, Mr. Feldman discusses, you know, this long history of antitrust scrutiny of Google; and we would say that, first of all, the allegations in this

suit don't deal with those potentially stale matters.

Those deal with Project Poirot and Project ELMo, all of which began within a year or two years of the class period and are alleged to have continued throughout the class period.

So -- and the question is: Do investors know about those programs and plans and that a significant portion of the company's revenues were subject to illicit means and also were subject to the company to significant scrutiny and penalty.

As far as the results of the DOJ lawsuits and the EU commissions actions, the EU has found that Google with respect to both it's bidding on AdX and both to its mechanisms to push revenues to AdX, the company had violated various competitive laws and regulations.

With respect to the DOJ lawsuit, those suits were dismissed -- the dismissal was denied in their entirety. The court has held that those plaintiffs adequately alleged claims for Sherman Act violations with respect to AdX, with respect to the DV360 and the entire ecosystem.

Then, just points Your Honor to a few statements that may have been overlooked. Your Honor's four questions did point to some statements we believe are clearly false and misleading. There have been some others that I think bear noting that I think also are quite specific.

The company on its website when they denied the House Judiciary Committee's report stated (as read:) "We compete

fairly in a fast moving and a highly competitive industry.  We disagree with today's reports which feature outdated and inaccurate allegations from commercial rivals about search and other services."

So you have right there the company saying "we deny the allegations in the report."

And to the extent the allegations of that report are found to be plausibly alleged, that denial would be at the pleading stage false and misleading and, therefore, actionable.

On its -- in reaction to AG Paxton's lawsuit, the -- the company stated on their website, they said, "our auctions are fair."

They further stated "we don't force tying," and we do allege that there were contracts that tied DFP, which was the publisher's ad server, and AdX.  And you need to -- now by 2018 and going to 2019, '20, when those contracts now required you to both -- when you purchased DFP, you needed to also purchase a contract for AdX.  So that statement we hold as specific and false and misleading.

The company further said on its website in denial of these allegations -- it is very important to know that these are denials of specific allegations made by regulators, and so they are specific context driven statements that are on the company's website, which clearly we believe meets the "in connection with" requirements.

They state (as read:) "No one is forced to use our advertising technologies.  They choose to use them because they are effective.  In fact, publishers and advertisers typically work with multiple technologies simultaneously to reach customers and make more money."

What's not disclosed is that if we don't auction through AdX and if we do use header bidding in competing sources, then we are going to lose the bids and we are going to have less money going towards our bids; and we are going to have lower bids.  So, that's, in our view, clearly a false statement made by the company on its website.

The company further said in a blog post on January 17th, 2021, in response to the AG lawsuit they said "the use of header bidding doesn't factor into publisher search rankings."

Once again, a straight out false statement in response to a specific allegation, which we think is clearly not general and clearly put on the blog post as clearly in connection with the purchase and sale of securities.

So you have several statements.  We would also state, Your Honor, there are more general statements like regarding competition, we are -- you know, we are in a competitive environment.  The ad business is highly competitive.

Those statements are also being made in response to Congressional scrutiny, in response to regulatory complaints.

And those statements on their own have been held by the

*McKesson* court, by the *Sotheby's* court, which we cited in our brief, to be materially false and misleading because they are failing to disclose significant anticompetitive conduct.

Your Honor, unless Your Honor has any further questions, I'm happy to rest.

**THE COURT:**  Thank you all.  The argument today was very helpful, and I appreciate all of the time that you have spent with me.

I'm going to take the matter under submission and issue a written opinion.  Thank you.

**MS. GILMORE:**  Thank you, Your Honor.

**MR. FELDMAN:**  Thank you.

(Proceedings adjourned at 11:13 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    April 19, 2024

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter