UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., et al.,<br>Plaintiffs,<br>v.<br>ALPHABET INC., et al.,<br>Defendants. | Case No. 23-cv-01186-RFL<br>**ORDER GRANTING MOTION TO DISMISS AND DENYING REQUESTS FOR JUDICIAL NOTICE AS MOOT**<br>Re: Dkt. No. 58, 59, 62 |

In this securities fraud putative class action, Plaintiffs allege that Alphabet, Inc., Alphabet's subsidiary Google LLC, and their corporate officers (collectively, "Defendants"), violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, 17 C.F.R. § 240.10b-5. Those claims are based on alleged statements made by Defendants relating to Google's digital advertising technology ("ad tech") business, as well as Defendants' statements about Google's support of user privacy. Defendants' motion to dismiss is granted with leave to amend.

## I. ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

The First Amended Complaint ("FAC") alleges that Google manipulated bidding in auctions that took place on its ad tech platforms, and misrepresented its practices to investors, causing them to lose money when those practices were revealed. (Dkt. No. 46 ("FAC"), ¶¶ 4–6.) The following account is drawn from the allegations of the FAC, which the Court is required to

take as true at this stage of the proceedings.

Online publishers, such as *The New York Times*, have advertising space on their websites ("impressions") that can often be targeted to specific users at specific times and locations, so a single online publisher may have hundreds of thousands of impressions to sell. (*Id.* ¶ 31.) To help manage their ad inventory, publishers use ad servers to sell their impressions to advertisers, either through direct deals or through online auction systems known as ad exchanges. (*Id.* ¶¶ 33–34.) Google owns the leading publisher ad server, DoubleClick for Publishers ("DFP"), now known as Google Ad Manager. (*Id.* ¶ 33.)

Publisher ad servers will often solicit bids from advertisers through an ad exchange. (*Id.* ¶ 34.) Ad exchanges act as the middleman between publishers and advertisers, allowing publishers to offer their inventory of impressions for sale, and advertisers to bid on impressions they want to buy. (*Id.*) The exchanges match advertisers and publishers using an instantaneous electronic auction known as "real time bidding." (*Id.*) Google owns the industry's leading ad exchange, AdX. (*Id.* ¶ 35.) Smaller advertisers often use ad networks instead, which offer a scaled-down set of similar services. (*Id.* ¶ 37.) Google Ads, the leading ad network, became popular with advertisers by allowing them to place their ads next to Google's popular search engine results. (*Id.* ¶¶ 37, 40.)

Advertisers also have their own platform to help manage the process of purchasing ads, known as a demand side platform, which lets them control when and how they bid for ad inventory and decide which users to target. (*Id.* ¶ 36.) Google owns the United States' leading demand side platform, Display & Video 360 ("DV360"). (*Id.*)

After 2008, Google began requiring publishers who wanted to offer their impressions through Google Ads to also use its publisher ad server DFP and its ad exchange AdX. (*Id.* ¶¶ 43, 47.) As a result, publishers overwhelmingly flocked to DFP and AdX, and advertisers followed in order to have access to those publishers' impressions. (*Id.* ¶ 47.) Google also programmed the publisher ad server DFP to give its own ad exchange AdX the first chance to buy impressions before they were offered to other ad exchanges. (*Id.* ¶ 50.) Google then

profited by charging high fees on AdX, while neither advertisers nor publishers could leave for other ad exchanges without having access to one another. (*Id.*)

Publishers fought back with a technique called "header bidding," which involved inserting code into their webpages that allowed other non-Google ad exchanges to bid on their impressions before Google's hard-coded preference for AdX was triggered. (*Id.* ¶¶ 54–55.) Google saw header bidding as a major threat to its digital advertising dominance. (*Id.* ¶¶ 57–61.) In response, Google secretly set up DFP to peek at bids coming from rival ad exchanges that used header bidding and had AdX win the auction by bidding a penny more. (*Id.* ¶¶ 63–64.) This practice was known as "Last Look." (*Id.*) Then in June 2017, Google took the next step of launching "Open Bidding," which allowed publishers using DFP to send their impressions to multiple exchanges at the same time and receive bids from rival exchanges. (*Id.* ¶¶ 62, 65.) Ostensibly, this Open Bidding model would eliminate the need for header bidding, since publishers could get bids from multiple ad exchanges without using header bidding. (*Id.* ¶ 65.) However, Google continued to use Last Look, and also secretly rigged the auctions so that AdX would win even over another rival exchange's higher bid. (*Id.*)

Around 2019, Google replaced these programs with "Smart Bidding." (*Id.* ¶ 68.) This algorithmic model predicted the bids of rivals for each impression, based on Google's own non-public data from its ad tech business about the bid history of advertisers, rival buying tools, and rival exchanges. (*Id.*) Google used this information to allow AdX to bid slightly above rival buyers, and therefore win more auctions. (*Id.*)

As another response to header bidding, Google developed an initiative code-named Project Poirot to help AdX win more auctions over rival ad exchanges. (*Id.* ¶ 72.) Google changed the settings of its demand side platform DV360, so that advertisers using DV360 would bid less on certain rival ad exchanges than on AdX. (*Id.* ¶¶ 72, 74.) AdX uses a "second-price" auction. (*Id.* ¶ 74.) In a "first-price" auction, the winning bidder pays the amount of their own winning bid, whereas in a "second-price" auction, the winning bidder pays the amount of the second-place bid. (*Id.* ¶ 73.) Rival exchanges that employ header bidding use first-price

auctions. (*Id.* ¶ 76.) DV360 artificially reduced the amount on advertisers' bids in first-price auctions by between 10% and 90%, depending on the exchange, which meant that DV360's bids were much lower on rival exchanges using header bidding than on AdX. (*Id.* ¶ 74.) That ensured that AdX would win the auction over rival ad exchanges. (*Id.*)

Since 2020, a number of state attorneys general, the Department of Justice, and the European Commission have been investigating Google for anticompetitive ad tech practices, resulting in enforcement actions filed against Google. (*Id.* ¶ 235.) In the same litigation, several state attorneys general claimed that Google violated the privacy of customers who backed up WhatsApp messages and associated photos, videos, and audio files onto Google Drive, because those files would lose their encryption by WhatsApp. (*Id.* ¶¶ 122, 211.) Those complaints also alleged that Google secretly conspired with other large technology companies to weaken privacy regulations and laws. (*E.g.*, *id.* ¶ 105.)

Plaintiffs' suit does not allege anticompetitive conduct or consumer privacy violations. Instead, as discussed in further detail below, Plaintiffs allege that Defendants committed securities fraud through various public statements that (a) described Google's ad tech products as helping customers, (b) characterized the ad tech market as highly competitive, (c) claimed that Google supports privacy protections and protects its users' privacy, and (d) represented how Google's ad tech products operate.

## II. SECTION 10(B) AND RULE 10B-5 CLAIM

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes "formidable pleading requirements to properly state a claim" for securities fraud. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (citation omitted). To survive dismissal under the PSLRA, a complaint must plead, among other things, "detailed allegations compelling the inference that each statement was false and made with the requisite scienter." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016). The FAC does not meet these exacting pleading requirements.

### A. General Statements About How Google's Ad Tech Products Help Customers, Google's Support for User Privacy, and the Competitiveness of the Ad Tech Market

First, the statements touting how Google's ad tech products help advertisers and publishers, as well as Google's commitment to user privacy in its products, are not actionable material representations because they are puffery. Representative statements include "[o]ur advertising solutions help millions of companies grow their businesses" (FAC ¶ 127); Google's ad tech products "meet the needs of advertisers, publishers, and users" (*id.* ¶ 146); "[w]e have built world-class advertising technologies for advertisers, agencies, and publishers to power their digital marketing businesses" (*id.* ¶ 156); "[b]ringing greater transparency to advertisers, agencies and publishers is core to our approach" (*id.* ¶ 160); "Open Bidding is a competitive response and improvement upon header bidding" (*id.* ¶ 162); "there's a lot of intelligence in our auction to deliver great ROI . . . for advertisers" (*id.* ¶ 154); "[w]e . . . help publishers maximize their revenues," and "[m]any publishers and advertisers who use our services also use rival platforms" (*id.* ¶ 166); "we are working very closely with our partners, advertisers and so on across the world to help them optimize their conversion rates and their [operating income]" (*id.* ¶ 148); "[p]rivacy is at the heart of everything we do" (*id.* ¶ 172); "we're working with others to help build a more privacy-centric web" (*id.* ¶ 198); and "[w]e continued to put privacy and security at the forefront of our products so that, every day, users are safer with Google" (*id.* ¶ 202).

These general statements "are vague, highly subjective claims as opposed to specific, detailed factual assertions" capable of objective verification. *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (citation omitted); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). As such, they are similar to statements held to be inactionable puffery in *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687 (9th Cir. 2021), which included statements that Google "started working on [the European Union's General Data Protection Regulation] compliance over 18 months ago and ha[d] been very, very engaged on it"; Google has a "very robust and strong privacy program"; "Google has

a longstanding commitment to ensuring both that our users share their data only with developers they can trust, and that they understand how developers will use that data"; "Google was 'committed to protecting our users' data and prohibit[s] developers from requesting access to information they do not need'"; and Google "was taking 'great pains to make sure that people have great control and notice over their data.'" *Id.* at 708. These types of statements "amount to vague and generalized corporate commitments, aspirations, or puffery that cannot support liability under Section 10(b) and Rule 10b-5(b)." *Id.*

The same is true for Defendants' statements regarding the competitive nature of the ad tech market. Illustrative statements like Google "face[s] robust competition in a crowded advertising technology industry" (FAC ¶ 140) and "ad tech is highly competitive and dynamic" (*id.* ¶ 131) lack "specific, detailed factual assertions" that are objectively verifiable, instead amounting to vague and unmeasurable subjective assessments. *See Veal*, 423 F. Supp. 3d at 804; *Intuitive Surgical*, 759 F.3d at 1060.

Even if these statements about the ad tech market's competitiveness were not puffery, they are at best opinion statements.[1] Such statements of opinion are not actionable merely because the "belief turned out to be wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Rather, an opinion statement is only actionable if the speaker does not "actually hold[] the stated belief," if the statement "contain[s] embedded statements of fact" that are not true, or if the statement "omitted to state facts necessary to make its opinion . . . not misleading." *Id.* at 184–86 (cleaned up); *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017). Plaintiffs have not alleged sufficient facts to support a plausible inference that the challenged opinion statements were actionable on any of these grounds. While Plaintiffs allege that these statements were untrue because Google was "work[ing] to eliminate competition and

[1] Contrary to Plantiffs' argument, "not all statements of opinion include such qualifying language" like "'I believe' or 'I think.'" *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 169 (2d Cir. 2023) (citation omitted).

to self-preference its own advertising technology tools," there are no factual allegations stating a plausible basis to conclude that the ad tech market was not, in fact, "competitive" or "dynamic." (*E.g.*, FAC ¶¶ 131–32.)

Nor have Plaintiffs adequately pleaded that the opinion statements were misleading for not disclosing Google's allegedly anticompetitive practices, like Project Poirot, that were purported to reduce spend on rival ad exchanges using header bidding. "[S]ection 10(b)[] and Rule 10b-5 do not create an affirmative duty to disclose any and all material information," prohibiting "only misleading and untrue statements, not statements that are incomplete." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012); *see also Intuitive Surgical*, 759 F.3d at 1061 ("We have expressly declined to require a rule of completeness for securities disclosures because no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." (cleaned up)). Plaintiffs have not plausibly alleged that statements describing Defendants' views on the competitive state of the ad tech market generally "trigger[ed] a duty to disclose additional information" about Google's specific ad tech practices. *See Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1100 (9th Cir. 2022); *In re Rigel Pharms.*, 697 F.3d at 880 n.8.

Plaintiffs also contend that Defendants misled investors by representing that Google has "long supported" and "called for comprehensive Federal privacy legislation." (FAC ¶¶ 176, 200.) But the allegation that Google worked to oppose particular privacy measures, such as a child privacy protection bill, does not "directly contradict" the broad statements made by Defendants. *See Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citation omitted). Nor did Google's general expression of support for comprehensive federal privacy legislation require Defendants to affirmatively disclose their opposition to a specific bill. *See In re Rigel Pharms.*, 697 F.3d at 880 n.8.

Likewise, Plaintiffs have not adequately alleged falsity as to the statement that "WhatsApp for Android lets you create a private backup of your chat history, voice messages, photos, and videos in Google Drive." (FAC ¶ 124.) Even if Google knew that "when WhatsApp

media files are shared with [third] parties such as Google Drive, the files are no longer encrypted by WhatsApp" (*id.*), Plaintiffs fail to plausibly plead that the lack of encryption contradicts the statement that those files were "private." Encryption may be an excellent way to keep a file private, but it is not the only way. Nor did Defendants have a duty to disclose additional information about encryption based on a general statement about "private backups." *See Weston Fam.*, 29 F.4th at 622 ("A duty to provide information exists only where statements were made which were misleading *in light of the context* surrounding the statements." (cleaned up)); *cf. Jedrzejczyk v. Skillz, Inc.*, No. 23-15493, 2024 WL 1635568, at *1 (9th Cir. Apr. 16, 2024) ("The federal securities laws do not create an obligation to disclose all potential kinks in a software program and the failure to disclose such kinks does not render general positive statements about the program false.").

### B. Statements About How Google's Ad Tech Products Worked in Google's September 14, 2020 Written Responses Following Google CEO Sundar Pichai's Congressional Testimony

Plaintiffs do challenge some specific factual statements relating to the operation of Google's ad tech products, but their allegations do not sufficiently plead falsity for those responses, except for a sentence within a written response to Rep. David Cicilline's question. As to that sentence, however, Plaintiffs fail to adequately allege scienter.

#### 1. Response to Rep. David Cicilline's question

Rep. Cicillene asked Google, "[W]hat percentage of bids does Google win on its own ad exchanges?" (FAC ¶ 138.) Google responded:

> Publishers utilizing Google Ad Manager's auction to sell their ad inventory are able to solicit bids from Authorized Buyers (e.g., third-party demand side platforms ("DSPs"), ad networks, and trading desks) and Open Bidders (third-party ad networks and ad exchanges), as well as buyers utilizing Google-owned platforms such as Google Ads and Display & Video 360. These bidders compete in a unified auction against each other, the publisher's guaranteed sales, and other demand sources configured by the publisher. **All participants in the unified auction, including those using Google-owned platforms, compete for each impression on a net basis, and no auction participant receives any information about any other party's bids prior to completion of the auction. The highest net bid wins. The channel through which a bid is**

> **received does not otherwise affect the determination of the winning bidder**.

(*Id.*)

First, Plaintiffs challenge the statement that "[a]ll participants in the unified auction, including those using Google-owned platforms, compete for each impression on a net basis, and no auction participant receives any information about any other party's bids prior to completion of the auction." (*Id.*) However, Plaintiffs have not plausibly alleged that this statement was false at the time it was made. Plaintiffs allege that by September 14, 2020, Google had replaced its "Last Look" practice with a "Smart Bidding" algorithm. (*Id.* ¶ 68.) Whereas Last Look purportedly allowed Google to look at rival bids prior to submitting its own, Smart Bidding is only alleged to allow Google to predict rival bids by looking at bids from prior auctions, not bids in an uncompleted auction. (*Id.* ¶¶ 64, 68; *see also id.* ¶ 68 (alleging that a Google planning document stated, "If we knew our competitor's bid exactly, we can simply bid a cent above that[.] But we don't have this information before the auction, so we need to predict [the] competitor's bid." (alterations in original)). Smart Bidding therefore does not involve receiving information about another party's bid "prior to completion of the auction." Accordingly, Google's claims were not untrue "at the time they were made." *See In re Rigel Pharms.*, 697 F.3d at 876. Nor have Plantiffs plausibly alleged that Google's narrow response created an affirmative duty to disclose its use of Smart Bidding. *See id.* at 880 n.8; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011) (companies must disclose information "only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading," and "can control what they have to disclose . . . by controlling what they say to the market" (cleaned up)).

Second, Plaintiffs challenge Google's response that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder." (FAC ¶ 138.) Plaintiffs adequately allege falsity as to that statement at the time it was made. Plaintiffs plausibly plead that, through Project Poirot, Google's demand side platform DV360 submitted

higher bids to Google's AdX than to certain rival ad exchanges. (*Id.* at 4, ¶¶ 72–78.)[2] Google allegedly reduced DV360's bids between 10% and 90% when placed on certain rival ad exchanges suspected of using header bidding, while leaving the bids intact when being submitted to Google's own ad exchange. (*Id.* ¶ 74.) Allegedly, the same bid would be higher, and thus more likely to win, if it came through AdX rather than through a rival exchange. Those allegations support a plausible inference that the channel through which a bid was received did affect the determination of the winning bidder.[3] *See Weston Fam.*, 29 F.4th at 619.

At oral argument, Defendants contended that the statement did not describe DV360's bids on rival ad exchanges, because it was made in response to a question only about Google's own ad exchange. However, Google chose to frame its answer more broadly by discussing "[a]ll participants in the unified auction including those using Google-owned platforms" in its answer. (FAC ¶ 138.) The preceding sentences in Google's answer indicated that the "bidders [who] compete in the unified auction" include "third-party ad networks and ad exchanges" as well as "Google-owned platforms." (*Id.*)[4] Having chosen to speak about other rival ad exchanges, Google was "bound to do so in a manner that wouldn't mislead investors." *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

Even so, this statement cannot form the basis of a Section 10(b) or Rule 10b-5 claim because Plaintiffs fail to adequately plead that it was made with scienter. Under the PSLRA, "a

---

[2] Citations to page numbers refer to the ECF pagination.

[3] Plaintiffs also allege that Google devised an initiative code-named Project Elmo to "identify when it saw the same bid request across multiple ad exchanges" and "decreased DV360's overall ad spend" on those exchanges to decrease header bidding. (FAC ¶ 80.) Plaintiffs do not allege, however, how Project Elmo reduced the "overall ad spend" on those rival exchanges. Without those specifics, Plaintiffs have not pleaded with particularity the facts indicating that the channel through which the bid was received affected the winning bidder as a result of Project Elmo.

[4] Even in situations where the same advertiser wins the impression as would have won before Project Poirot, Plaintiffs adequately plead that the challenged statement is still not true, because the allegations raise the plausible inference that Project Poirot makes it more likely that the winning bid would be submitted through AdX rather than a rival exchange. Google's statement describes ad exchanges as submitting "bids" and calls those participants "bidders." It is plausibly alleged that the channel (that is, DV360) affects which ad exchange submits the winning bid.

complaint must state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 535 (9th Cir. 2024) (cleaned up). Under this "exacting pleading obligation," "a complaint will survive a motion to dismiss only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (cleaned up).

Plaintiffs have not met this high bar. While Plaintiffs include allegations that some Defendants spoke broadly about ad tech to investors, that Pichai testified before Congress, and that Google's product leadership recommended weakening header bidding to Pichai, the FAC lacks particularized facts that compel a strong inference that Pichai had knowledge that attempts to eliminate header bidding included Project Poirot's DV360 bid reduction to rival advertising exchanges. For example, Pichai was allegedly "briefed on Google's plan to kill header bidding" (FAC ¶ 61), but Plaintiffs do not allege that this briefing discussed Project Poirot's mechanics or otherwise contained anything that contradicted his public statement. *See Veal*, 423 F. Supp. 3d at 814 ("[The complaint] does not identify any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement at the time it was made. In short, Plaintiffs fails to allege *when* and *how* any of the Individual Defendants became aware of any facts giving rise to inference of scienter."); *cf. Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) ("allegations that senior management . . . closely reviewed [quarterly] accounting numbers . . . and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter). Without more, the FAC fails to compel a strong inference of even deliberate recklessness, let alone one that is "equally as cogent and as compelling as an innocent explanation." *See Espy*, 99 F.4th at 539; *see also id.* at 535 (deliberate recklessness "represents an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have

been aware of it" (cleaned up)).

**2. Response to Rep. Ken Buck's Question**

In response to Rep. Buck's question "[d]oes Google run the auctions to determine which ad can fill a specific ad box?" (FAC ¶ 144.) Google responded:

> Publishers using Google's publisher-side ad tech products (e.g., Google Ad Manager, AdMob, or AdSense) can, among other sales methods, use those products to sell their ad inventory via an auction. **Publishers use multiple platforms to sell ads and are not required to use Google. According to a recent independent survey, publishers use four to six different platforms to sell ads, while the top 100 advertisers use an average of four to seven platforms to buy ads.** This recent study is available at https://www.adexchanger.com/plaorms/google-ad-managerpolicy-changes-dont-hu-publishers-according-to-adveiser-perceptions/. Likewise, Google largely uses an auction format to sell ad inventory from its owned and operated properties. **Which ads can show for a particular impression depends on a variety of factors, including the set of eligible auction participants set by the publisher, whether the publisher has blocked a certain advertiser from showing ads on its inventory, and the applicable floor price as set by the publisher.**

(*Id.*)

Plaintiffs allege that the bolded statements were false. However, the FAC does not contain specifical factual allegations showing that publishers were "required" to use Google. Even assuming Google employed anticompetitive methods to make it difficult for publishers to choose rival ad tech products, that does not mean Google "required" the publishers to use its services. Moreover, the statement about the factors influencing which ads are shown for a particular impression is not adequately alleged to be false either. There is no allegation that the listed factors are irrelevant to which ads are shown, and the statement does not purport to list the complete set of factors that can influence which ads are shown.

**3. Response to Rep. Kelly Armstrong's Questions**

Rep. Armstrong asked Google, "[i]n 2018, Google restricted export of the DoubleClick ID through Google Data Transfer, correct? Did this action reduce competition from other digital advertising participants?" (*Id.* ¶ 142.) Google answered:

> **No. Advertisers remain free to (and do) choose from among**

> **Google's many competitors that facilitate the purchase of ad inventory (e.g., Amazon, Facebook, Snap, AT&T's Xandr, Adform, Sma, Twitter, Adobe, The Trade Desk, MediaMath, and Verizon Media, among others).** These companies have their own policies with respect to use of personal identifiers for ads reporting and measurement.

(*Id.*)

As with Google's response to Rep. Buck's question, Plaintiffs fail to allege that the above statements were false because there are no particularized facts showing that advertisers were either required to use Google or did not choose to use Google's competitors.

In sum, the FAC does not state a claim under Section 10(b) and Rule 10b-5. The Court does not reach the question of loss causation, because the FAC has failed to allege falsity and scienter for the sole statement that is plausibly alleged to be false. The dismissal is with leave to amend, as the Court cannot conclude at this juncture that amendment would be futile.[5]

## III. SECTION 20(A) CLAIMS

Because Plaintiffs have not adequately alleged a primary violation of Section 10(b) or Rule 10b-5, their control person claims under Section 20(a) necessarily fail. *See Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1113 (9th Cir. 2021).

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**. As this ruling does not rely on any of the materials submitted for judicial notice, consideration of which would not affect the outcome of this order, those requests are **DENIED** as moot. (*See* Dkt. Nos. 59, 62.)

If Plaintiffs wish to file an amended complaint correcting the deficiencies identified above, they shall do so within **21 days of the date of this order**. Plaintiffs may not add new causes of action or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15. If no amended complaint is filed by that date, the FAC will

[5] While Defendants contend that the FAC fails to adequately allege a claim for scheme liability, Plaintiffs confirm that they do not bring such a claim. (*See* Dkt. No. 60 at 32 n.29.)

remain dismissed, judgment will be entered in favor of Defendants, and the case will be closed.

**IT IS SO ORDERED.**

Dated: September 3, 2024

RITA F. LIN
United States District Judge