POMERANTZ LLP
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALPHABET INC., GOOGLE LLC, SUNDAR PICHAI, RUTH M. PORAT, PHILIPP SCHINDLER, and KENT WALKER<br><br>Defendants. | Case No. 3:23-CV-01186-RS<br><br>CLASS ACTION<br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE ............................................................................................ 6

PARTIES ............................................................................................................................... 6

THE CONFIDENTIAL WITNESSES ............................................................................... 10

SUBSTANTIVE ALLEGATIONS .................................................................................... 10

I.      GOOGLE'S DECEPTIVE CONDUCT IN THE DIGITAL ADVERTISING
INDUSTRY ................................................................................................ 10

    A.     RELEVANT BACKGROUND ...................................................... 10

        1.    Overview of the Digital Advertising Industry ............................ 10

            a)    How Digital Display Advertising Works ........................ 10

            b)    How Ad Tech Tools Work ............................................. 12

            c)     Google's Ad Tech Business ........................................... 14

    B.     UNBEKNOWNST TO INVESTORS, GOOGLE FAVORED ITSELF AT
THE EXPENSE OF PUBLISHERS AND ADVERTISERS ........................... 16

        1.    Google Schemed to Eliminate "Header Bidding" ..................... 16

            a)    Origins of Header Bidding ............................................. 16

            b)    Google Created Exchange or Open Bidding to Kill Header
Bidding and Used It Throughout the Class Period ...................... 19

            c)    To Eliminate Header Bidding, Google also Devised Projects
Poirot and Elmo, Which It Employed Throughout the Class
Period ............................................................................. 24

            d)    Unbeknownst to the Market, Google Had Other Advantages
Over Bidding Participants, Which It Shared With Facebook ........ 28

            e)    Google Implemented Unified Pricing Rules to Force More
Transactions Through Google's Ad Exchange and to Benefit
Google ............................................................................. 32

i

f) On June 14, 2023, the European Commission Issued Preliminary Findings That Google Engaged in Abusive Practices in the Online Advertising Technology................................................................35

2. Google Tied Its Products, Coercing Publishers to Use Its DFP Ad Server and Its AdX Exchange.................................................36

II. GOOGLE'S PRIVACY VIOLATIONS AND SECRETIVE EFFORTS TO CURTAIL PRIVACY PROTECTIONS.............................................................37

A. DEFENDANTS SECRETLY SCHEMED TO UNDERCUT PRIVACY PROTECTIONS ................................................................38

B. GOOGLE VIOLATED THE PRIVACY OF OVER 750 MILLION ANDROID USERS..........................................................................44

MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS CONCERNING DIGITAL ADVERTISING ...........................................................45

MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS CONCERNING PRIVACY POLICIES AND PRACTICES ...................................70

LOSS CAUSATION.....................................................................................................79

ADDITIONAL FACTS PROBATIVE OF SCIENTER........................................................83

PRESUMPTION OF RELIANCE....................................................................................98

NO SAFE HARBOR ...................................................................................................100

PLAINTIFFS' CLASS ACTION ALLEGATIONS..........................................................101

COUNT I ..................................................................................................................103

COUNT II .................................................................................................................105

PRAYER FOR RELIEF ..............................................................................................106

DEMAND FOR TRIAL BY JURY ................................................................................106

**GLOSSARY**

| Term | Definition |
|------|-----------|
| Ad Buying Tool | Demand-side platforms or "DSPs" for large advertisers. Google's DSP is called DV360. Google's buying tool for small advertisers is called Google Ads. |
| Ad Exchanges | Platforms enabling publisher Ad Servers to offer their inventory of impressions for sale, and advertisers to place bids on the impressions they wish to purchase. |
| Ad Network | An aggregator that collects ad inventory from multiple publishers and sells it to advertisers. |
| Ad Server | A software which allows publishers to sell their impressions and manage their online advertising sales. |
| Ad Tech Stack | The ad tech platforms: publisher ad server; ad exchange/ad network; ad buying tool, collectively called the ad tech stack. |
| AdX | Google's ad exchange |
| CCPA | California Consumer Privacy Act |
| CMA | United Kingdom's Competition and Markets Authority |
| CPM | For both direct and indirect sales, ad impressions are generally priced on a CPM basis, referring to cost-per-thousand (in Latin, "mille") per impression. CPM is the term used to denote the price of 1,000 ad impressions. An advertiser in a $10 CPM transaction pays $10 for displaying 1,000 impressions of its ad. |
| CW | Confidential Witness |
| DFP | DoubleClick for Publishers |
| DoJ | The U.S. Department of Justice |

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

| | |
|---|---|
| DSP | Demand side platform |
| DV360 | Google's demand side platform Display & Video 360 |
| EPC | The European Publishers Council |
| EU | The European Union |
| FAN | Facebook Audience Network |
| FTC | The Federal Trade Commission |
| GAM | Google Ad Manager: Google's AdX and DFP |
| GDN | Google Display Network |
| GDPR | General Data Protection Regulation |
| Google's AdMob | The tool which offers publisher Ad Server services in mobile apps as well as an in-app mediation tool. |
| Google's AdMob Network | Google's demand-side buying platform for ads on mobile applications. |
| Google Ads | Google's ad network |
| Google's AdSense | The tool which provides Ad Server services for small- and medium-size publishers, and purchases ad impressions from those publishers |
| HB | Header Bidding |
| SEC | The Securities and Exchange Commission |
| SSP | Supply side platform |

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

Lead Plaintiffs Menora Mivtachim Insurance Ltd. ("Menora Insurance") and Menora Mivtachim Pensions and Gemel Ltd. ("Menora Pensions and Gemel" and, together with Menora Insurance, "Menora") and additional Named Plaintiffs AMI - Government Employees Provident Fund Management Company Ltd., City of Fort Lauderdale Police & Fire Retirement System, and More Mutual Funds Management (2013) Ltd. (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Alphabet Inc. and Google LLC, analysts' reports and advisories about the companies, and information readily obtainable on the Internet.  Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Alphabet securities between February 4, 2020 and January 23, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Alphabet, Google, and certain of its top officials.

2.      Alphabet is a multinational technology conglomerate holding company.  It was created through a restructuring of Google Inc. in October 2015, at which point Alphabet became the parent company of Google and several former Google subsidiaries.  Alphabet is headquartered in Mountain View, California and incorporated in Delaware.  The Company's Class A and Class C shares trade on the NASDAQ under the ticker symbols "GOOGL" and "GOOG," respectively.

3.      Alphabet's subsidiary Google functions as the dominant player in the field of digital advertising.   Google now controls: (1) the technology used by nearly every major website publisher to offer advertising space for sale; (2) the leading tools used by advertisers to buy that advertising space; and (3) the largest ad exchange that matches publishers with advertisers each time that ad space is sold. Google's dominance in the entire ad tech industry has been questioned by its own digital advertising executives, at least one of whom aptly asked: "[I]s there a deeper issue with us owning the platform, the exchange, and a huge network? The analogy would be if Goldman or Citibank owned the NYSE."

4.      Throughout the Class Period, Defendants issued numerous false and misleading statements to the market concerning its digital advertising technology ("ad tech") tools and its business dealings with its advertisers and publishers. For example, Defendants portrayed their advertising technology tools as beneficial for advertisers and publishers. Google also represented to investors that no auction participants using Google-owned platforms receive any information about any other party's bids before the auction is completed, and that the highest bids win. It claimed that the channel through which a bid is received does not affect the determination of the winning bidder. In truth, however, these representations were false and misleading when made because, for example, Google was: (i) utilizing opaque auction programs to manipulate digital advertising auctions; (ii) maintaining visibility into the bids submitted by rival exchanges and using that information to inform its own trade decisions; (iii) trading ahead of rival exchanges; (iv) artificially manipulating the bids sent to rival ad exchanges so

that Google's own exchange platform could win those transactions more often; and (v) excluding competition by providing Google's own exchange platform with informational advantages that allowed it to trade ahead of bids submitted by competing bidding exchanges. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions, lawsuits, and reputational harm.

5.     Defendants Pichai and Schindler had specific knowledge about these practices. For example, Pichai and Schindler knew that Google had significant advantages over other bidding participants, including speed and informational advantages, and even a guaranteed "win rate." Pichai and Schindler agreed to give Facebook—one of the most important ad tech players—at least some of the same advantages to secure Facebook's participation in Google's platforms.

6.     During the Class Period, as detailed below, Defendants' false and misleading statements and the undisclosed actions Defendants were taking to benefit Alphabet and Google at the expense of publishers,  advertisers, and digital advertising technology competitors, had the effect of artificially inflating the price of Alphabet's securities. Thus, Plaintiffs and members of the Class purchased or otherwise acquired Alphabet securities throughout the Class Period at prices that were inflated by the fraud described herein.

7.     When the truth about Alphabet and Google's practices was eventually revealed through a series of corrective disclosures or materializations of risks, Plaintiffs and other members of the class of investors in Alphabet suffered significant damages. During the Class Period, Alphabet's Class A shares reached their peak closing at $149.84 per share on November 18, 2021. At the end of the Class Period, their value was just around $95.22 per share on January 25, 2023. Likewise, during the Class Period, Alphabet's Class C shares reached their peak closing at $150.71 per share on November 18, 2021. At the end of the Class Period, their value was just around $96.73 per share on January 25, 2023.

When the truth eventually emerged, Alphabet lost hundreds of billions of dollars in market capitalization.

8. Google's improper ad tech practices are the subject of several lawsuits brought by the U.S. Department of Justice ("DoJ") as well as the Attorneys General of over a dozen U.S. States. *See infra* at ¶¶266, 271. The trial in the DoJ case commenced on September 9, 2024 and is scheduled to last several weeks.

9. Google's improper ad tech practices are also under the microscope of several foreign regulators, including the United Kingdom's Competition and Markets Authority ("CMA") and the European Commission. Just recently, on September 6, 2024, after an investigation it conducted, the CMA provisionally found that "Google has abused its dominant positions through the operation of both its publisher ad server and buying tools to restrict competition." The findings "relate to how Google 'self-preferences' its own ad exchange—harming competition and, as a result, advertisers and publishers."

10. More specifically, the CMA found that "since at least 2015, Google has abused its dominant positions through the operation of both its buying tools and publisher ad server in order to strengthen AdX's market position and to protect AdX from competition from other exchanges." "Moreover, due to the highly integrated nature of Google's ad tech business, the CMA has provisionally found that Google's conduct has also prevented rival publisher ad servers from being able to compete effectively with DFP, harming competition in this market." The CMA explained that "Google has done this through various practices that give AdX competitive advantages, disadvantage Google's rivals, and are against the interests of Google's advertiser and publisher customers."

11. As the CMA found, "[t]hese practices have evolved over time and include, for example:

- providing AdX with exclusive or preferential access to advertisers that use Google Ads' platform;

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

- manipulating advertiser bids so that they have a higher value when submitted into AdX's auction than when submitted into rival exchanges' auctions; and

- allowing AdX to bid first in auctions run by DFP for online advertising space, effectively giving it a 'right of first refusal' - with rivals potentially not having any chance to submit bids."

12.     The CMA also found that Google continues to engage in these and other improper practices.

13.     Alphabet has also drawn the ire of regulators in the privacy space. Just recently, the Attorneys General of several states accused Google of violating the privacy of over 750 million WhatsApp users employing Google's Android operating system. An internal Google memo exposed by the state regulators showed that Google was "opaquely" backing up users' WhatsApp communications to Google Drive, preventing users from learning that Google had access to their decrypted WhatsApp communications.

14.     With marching orders from its President of Global Affairs and Chief Legal Officer Kent Walker, Alphabet also secretly collaborated with competitors in the big tech space to kill privacy protection regulations and legislation. Leading into the Class Period, in an internal July 31, 2019 document prepared in advance of a secret meeting with its competitors, Google memorialized that it is "working behind the scenes hand in hand with the other companies" and has so far "been successful in slowing down and delaying the [ePrivacy] Regulation process." Leading into and during the Class Period, Google also advocated behind the scenes to prevent and diminish child privacy protections, including fighting against proposed child privacy protections advanced by the Federal Trade Commission ("FTC") and against proposed federal legislation advanced by U.S. Senators Ed Markey and Josh Hawley. Publicly, however, Defendants insisted that "We continue to support comprehensive federal privacy legislation in the U.S. and are finding new ways to incorporate meaningful privacy

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

controls into our products."

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

17.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).   Alphabet and Google are headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19.     Lead Plaintiff Menora, as set forth in the Certifications previously submitted to the Court (Dkt. No. 22-5), acquired Alphabet securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20.     Additional Named Plaintiff AMI - Government Employees Provident Fund Management Company Ltd., as set forth in the Certification previously submitted to the Court (Dkt. Nos. 1-1 and 1-2), acquired Alphabet securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21.     Additional Named Plaintiff City of Fort Lauderdale Police & Fire Retirement System, as set forth in the attached Certification, acquired Alphabet securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22.     Additional Named Plaintiff More Mutual Funds Management (2013) Ltd., as set forth in the attached Certification, acquired Alphabet securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

23.     Alphabet Inc. ("Alphabet" or the "Company") is a Delaware corporation with principal executive offices located at 1600 Amphitheatre Parkway, Mountain View, California. The Company's securities trade in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbols "GOOGL" (Class A) and "GOOG" (Class C).

24.     Google LLC ("Google") is a subsidiary of Alphabet, with its principal place of business located at 1600 Amphitheater Parkway, Mountain View, California.

25.     Defendant Sundar Pichai ("Pichai") has served as Alphabet's and Google's Chief Executive Officer at all relevant times.

26.     Defendant Ruth M. Porat ("Porat") has served as Alphabet's and Google's Chief Financial Officer at all relevant times.

27.     Defendant Philipp Schindler ("Schindler") has served as Alphabet's and Google's Senior Vice President and Chief Business Officer at all relevant times. During that time, Schindler was also Google's Head of Advertising Sales and Operations.

28.     Defendant Kent Walker ("Walker) has served as Alphabet's Chief Legal Officer and President of Global Affairs since November 2021. He has served as Alphabet's Secretary since January 2020. Walker also served as the Chief Legal Officer at Google at all relevant times, and as the President

of Global Affairs and Secretary at Google since November 2021. Before November 2021, he was the Senior Vice President of Global Affairs at Google.

29.     Defendants Pichai, Porat, Schindler, and Walker are sometimes referred to herein as the "Individual Defendants." The Individual Defendants, together with Alphabet and Google, are sometimes referred to herein as "Defendants."

30.     The Individual Defendants possessed the power and authority to control, and did in fact control, the contents of Alphabet's and/or Google's public statements to the market, including in SEC filings, press releases, the Company's website, and other market communications.  The Individual Defendants were provided with copies of Alphabet's and/or Google's SEC filings and press releases, and market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

31.     Defendant Pichai also made false and misleading statements to Congress that mirrored or were nearly identical to those appearing on the Company's website.

32.     Testifying before a Congressional Committee or Subcommittee is a grave matter, requiring extensive preparation given the serious legal, financial, and reputational risks involved. According to compliance experts who consult and assist executives in providing testimony to Congress and/or other regulatory bodies, a witness appearing before or submitting answers to questions from Congressional committees typically consults with subject matter experts and legal specialists. The witness will also familiarize himself or herself with the underlying facts by gaining a full understanding of the matters probed by the Committee. The witness will invest the necessary time and resources to prepare truthful answers and provide documents. Preparing a witness to testify under oath and/or provide testimony and responses to questions requires consideration of how the answers may differ from the testimony of other witnesses and how the Committee, the media, and the public are likely to

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

respond to certain answers. Public facing statements, in hearing testimony or in responding to Congressional inquiries, must be thoroughly vetted for disclosure implications. Congressional investigations may result in a public report that spurs litigation or enforcement, and can also result in significant reputational harm to the company. Moreover, providing false testimony to Congress is a felony punishable with either jail time or fines. An executive will typically review several drafts of any sworn statements provided to Congress and utilize the Company's legal and relevant subject matter team to review such drafts before submission. *See also infra* at ¶¶282-92.

33.     In the high stakes investigation of Google's competitive practices with respect to ad tech, Pichai would have been reckless if he did not undertake this painstaking process to ensure that his testimony to Congress was accurate.

34.     Thus, in testifying and providing answers to the Congressional Committee on the Judiciary's investigation of Google's ad tech practices, Defendant Pichai was expected to have a full understanding and mastery of the facts underlying the Committee's probe. Those topics included, but were not limited to, how participants compete in a unified ad auction and how the determination of the winning bidder is made, particularly when those participants utilize Google-owned platforms, systems, or tools, such as Google's Open Bidding system, Google's Display & Video 360 tool, or Google Ads.

35.     Because of their positions with Alphabet and Google, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

## THE CONFIDENTIAL WITNESSES

36.     Confidential witness ("CW") CW1 worked for Google in digital advertising from January 2007 to June 2021. During CW1's tenure at Google, s/he held leadership positions at Google's DoubleClick Bid Manager and DoubleClick Ad Exchange. In those positions, s/he worked as an analyst for the entirety of the DoubleClick "stack," now called DV360 Campaign Manager. At DoubleClick Ad Exchange, s/he managed a team of experts focused on AdX and Exchange Bidding. CW1 worked in Google's New York City and Mountain View, California locations.

37.     CW2 worked for Google from June 2006 to January 2023. During CW2's tenure at Google, s/he held leadership positions at Google's Video and Mobile Development and Display Media. From 2013 to 2021, s/he held a leadership position of Google's "buy side," where s/he helped big box retailers and other advertisers with ad tech infrastructure and sought to increase money flowing through Google's digital advertising business. From 2021 to 2023, s/he managed the global product and sales strategy for Google's Display Ads. CW2 worked in Google's New York City and Chicago locations.

## SUBSTANTIVE ALLEGATIONS

I.     **GOOGLE'S DECEPTIVE CONDUCT IN THE DIGITAL ADVERTISING INDUSTRY**

    A.     **RELEVANT BACKGROUND**

        1.     **Overview of the Digital Advertising Industry**

            a)     **How Digital Display Advertising Works**

38.     Today, the Internet is essential to American commerce and would not exist without digital advertising revenue, at least not without numerous paywalls.  Image-based ads presented to a user when a webpage is displayed on the open internet are called **display ads**. A display ad may contain images, text, or multimedia. A single display ad shown to a single user on a single occasion is called an **impression**.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

39.     A website's owner, or an online media company is called a **publisher**. Publishers of news articles, for example, usually monetize their content with targeted display ads shown alongside the article. Internet **advertisers** include businesses, agencies of federal and state governments, charitable organizations, political candidates, public interest groups, and more. The money these advertisers spend on digital advertising creates an important stream of revenue for publishers to use in creating, developing, and publishing website content.

40.     Online publishers sell their inventory of display advertising to advertisers in one of two ways: (1) directly or (2) indirectly (through ad marketplaces). The "direct" sales method refers to ad campaigns that the publisher sells directly to advertisers. For example, *the New York Times*, as an online publisher, could negotiate directly with Apple, as an advertiser, to display Apple's ads atop *the New York Times* homepage one million times in a particular month. But a publisher cannot always predict how many of its ad spaces will be available to sell directly to advertisers because its inventory depends principally on how many users visit the publisher's website. Publishers can therefore find themselves with unsold surplus inventory.

41.     "Indirect" sales occur through centralized electronic trading hubs called **ad exchanges** (sometimes called a supply-side platform or **SSP**) and through **networks** of publishers and advertisers. Publishers can use an ad exchange to auction off some or all of their inventory to buyers in real time for a percentage fee, or sell their inventory to a network, which in turn will resell that inventory to an advertiser for an undisclosed markup.

42.     When online publishers sell their display inventory, these advertisements can target specific users at specific times and locations. When a user views a website, a buyer (whether an advertiser or an intermediary) can purchase the individual spaces for ads (or impressions) targeted to that particular user.

43.     Because display ads can be targeted to specific users in real time, online publishers and developers manage highly varied, or "heterogeneous," inventory. One might think that a website with three pages and three different ad slots (*i.e.*, impressions) per page would have a total of nine unique ad units to sell. But because online ads can be targeted at individual users, the same site with 1,000,000 readers has 9,000,000 different ad units to sell: each of the website's impressions targeted to each unique reader.

### b)      How Ad Tech Tools Work

44.     Publishers and advertisers depend on several distinct products for indirect sales of web display advertising. Publishers use software, called an **Ad Server**, to make their impressions available for sale. The publisher's Ad Server: (1) determines which ads to display on the publisher's website; (2) solicits and organizes bids from advertisers; (3) serves the ad to the reader; and (4) collects and reports on additional data such as impressions and clicks, which is used to determine the cost to the advertiser and the amount of money paid to the publisher. The functions of the Ad Server include (1) identifying the availability of impressions for sale, (2) determining how to sell such impressions (*e.g.*, through direct deals between publishers and advertisers, or by determining between multiple Ad Exchange or Ad Network options the publisher may elect), and (3) optimizing the revenue for the publisher using the Ad Server. Since 2008, Google has owned the industry's leading publisher ad server, **Google Ad Manager**, which is often still referred to by its former name, **DoubleClick for Publishers ("DFP").**

45.     **Ad Exchanges** are platforms enabling publisher Ad Servers to offer their inventory of impressions for sale, and advertisers to place bids on the impressions they wish to purchase. Ad Exchanges match advertisers and publishers programmatically using virtually instantaneous auctions known as "real time bidding." The ad exchange solicits bids on the impression from advertiser buying

tools, chooses the winning bid, and transmits information on the winning bid back to the publisher ad server.

46.     The Ad Exchange is the middleman that takes a cut of the price reached by the publisher and advertiser. However, Ad Exchanges are only available to larger publishers with substantial volumes of ad impressions for sale each month. Google presently owns the industry's leading ad exchange, called **AdX** (now packaged as part of **Google Ad Manager**).

47.     Large ad buyers, such as major advertising agencies or large businesses, frequently use a type of advertiser buying tool called a **demand side platform**. Demand side platforms provide sophisticated and customizable tools that allow the advertising agency or business to manage their advertising purchases. Advertisers using demand side platforms have extensive control over where and how they bid for ad inventory. They often use their own data, or data purchased from other entities, to target particular users for their ad campaign. Google owns the United States' leading demand side platform, **Display & Video 360 ("DV360")**.

48.     Smaller advertisers often rely on a type of advertiser buying tool with fewer, simpler options that are less customized. These advertiser buying tools are called **advertiser ad networks**. Smaller publishers with fewer page views and impressions than the Ad Exchange thresholds may use an **Ad Network** to sell their inventory of impressions. An Ad Network is an aggregator that collects ad inventory from multiple publishers and sells it to advertisers. Like Ad Exchanges, Ad Networks compete against one another on the basis of price for publisher inventory. Advertiser ad networks offer a self-service, easy-to-use technology solution, which as a practical matter is the only viable option for smaller advertisers, advertisers that prefer a simple "handsoff" approach, or advertisers that need the ad network's targeting data to buy ads effectively. Google offers the industry's leading ad network, **Google Ads**.

49.     The flow of display ad transactions through these platforms—collectively called the **ad tech stack**—is depicted below.



50.     A key consideration for publishers in selecting a publisher Ad Server is the demand (*i.e.*, the advertisers) the Ad Server can access—and on what terms. Publishers want their Ad Server to access the largest number of advertisers including those willing to submit the highest bids. Publishers also want their impressions to be available to multiple Ad Exchanges and Ad Networks because different Ad Exchanges and Ad Networks may have different data concerning the publisher's user that makes participating advertisers more interested in bidding on specific impressions. Moreover, once a publisher chooses a publisher Ad Server and embeds that technology in its website, there are high costs to publishers of switching Ad Servers because they become integral parts of publishers' websites.

### c)     Google's Ad Tech Business

51.     In 2000, Google launched **Google Ads**, a tool that allowed businesses to buy advertisements that could be seen by Google search users right alongside Google's popular search engine results. Businesses quickly learned the power of this instantaneous, highly-targeted advertising technique, and they flocked to Google Ads as a result.

52.     By the early 2000s, Google realized that these same advertisers would buy digital advertisements on third-party websites as well. So Google stepped in to profit (as a middleman) on digital advertising transactions having nothing to do with Google or its search engine by creating an advertiser ad tech tool for Google Ads' customers that wanted to buy ad space on third-party websites.

53.     Google sought to develop an ad tech tool called **a publisher ad server** that publishers would use to manage their online advertising sales. Google recognized that because publisher ad servers

set the rules for how and to whom publisher advertising opportunities are sold, owning a publisher ad server was key to having visibility into, and control over, the publisher side of digital advertising. By controlling the publisher ad server on the other end of the transaction, Google could further entrench its advertiser customer base by giving advertisers access to more advertising opportunities and pushing more transactions their way. According to Google's internal documents, with influence over advertising transactions end-to-end, Google realized it could become "the be-all, and end-all location for all ad serving."

54.     In early 2008, Google acquired the market-leading publisher ad server from an ad tech firm called DoubleClick. A July 2006 Google presentation suggested that, by acquiring DoubleClick, Google could obtain "self-reinforcing benefits" for Google's planned digital ad "ecosystem." Through the transaction, Google acquired a publisher ad server (**"DoubleClick for Publishers"** or **"DFP"**), which had a 60% market share at the time and complimented Google's existing tool for advertisers, Google Ads. It also acquired a nascent ad exchange (**"AdX"**) through which digital advertising space could be auctioned.

55.     In 2011, Google acquired and integrated Admeld, a yield optimization technology. Prior to its acquisition by Google, Admeld helped publishers efficiently route inventory to exchanges and networks. Post acquisition, Google used its new yield optimization technology to rank itself ahead of other exchanges in bidding for publisher inventory. According to CW1, before the Admeld acquisition, s/he "definitely remembered" discussion within Google that yield managers were a serious threat, especially Admeld. The risk was that if publishers started using Admeld for yield management, Google buyers "could lose out," s/he said.

56.     In 2018, Google bundled AdX and DFP into a single product called **Google Ad Manager ("GAM")**.

57.     Today, GAM controls over 90 percent of the digital advertising market in the United States. Essentially every major website uses GAM (including, *e.g.*, *USA Today*, *ESPN*, *CBS*, *Time*, *Walmart*, and *Weather.com*). According to CW1, "more than 90% of large publishers use Google Ad Manager."

**B.     UNBEKNOWNST TO INVESTORS, GOOGLE FAVORED ITSELF AT THE EXPENSE OF PUBLISHERS AND ADVERTISERS**

**1.     Google Schemed to Eliminate "Header Bidding"**

**a)   Origins of Header Bidding**

58.     After the DoubleClick acquisition, publishers had to adopt and stay on Google's DFP publisher ad server in order to have access to Google Ads' advertiser demand. This is because Google forged an exclusive link between Google Ads and DFP through the AdX ad exchange. If publishers wanted access to exclusive Google Ads' advertising demand, they had to use Google's publisher ad server (DFP) and ad exchange (AdX), rather than equivalent tools offered by Google's competitors. Because Google Ads provided critical advertising demand, for the vast majority of webpage publishers, DFP became the only realistic publisher ad server option. Indeed, by 2015, Google internally estimated that DFP's publisher ad server market share had grown to a remarkable 90%.

59.     Around the same time that Google tied its exclusive Google Ads' advertiser demand to its publisher ad server (DFP) through AdX, Google took two additional steps to make it more difficult for rivals to compete.

60.     *First*, Google configured Google Ads to bid on Google's AdX ad exchange in a way that actually increased the price of advertising, to the benefit of publishers and the detriment of Google's own advertiser customers. As one Google employee observed, Google Ads was effectively sending a "$3bn yearly check [to publishers] by overcharging our advertisers to ensure we're strong on the pub[lisher] side." In the short-term, this conduct locked publishers into Google's publisher ad server by

providing them a steady stream of intentionally-inflated prices for certain inventory, at the cost of Google's own advertiser customers. But in the long run, Google's actions harmed publishers as well by driving out rival publisher ad servers and limiting competition in the publisher ad server market. This conduct turned the entire purpose of the digital advertising industry on its head. Rather than helping to fund website publishing, Google was siphoning off advertising dollars for itself through the imposition of supracompetitive fees on its platforms. A rival publisher ad server could not compete with Google's inflated ad prices, especially without access to Google's captive advertiser demand from Google Ads.

61. *Second*, Google used its captive advertiser demand to give its AdX ad exchange an advantage over other ad exchanges through a mechanism known as dynamic allocation. Dynamic allocation was a means by which Google manipulated its publisher ad server to give the Google-owned AdX (and only AdX) the opportunity to buy publisher inventory before it was offered to any other ad exchange, and often to do so at artificially low prices. Google also programmed DFP, its publisher ad server, to prevent publishers from offering preferential terms to other ad exchanges or allowing those exchanges to operate in the same way with DFP. Google knew that dynamic allocation would inevitably advantage AdX, where Google could extract the largest fees. Google's scheme predictably reinforced publishers' dependence on both AdX and DFP. Publishers were effectively precluded from using rival ad servers or ad exchanges that might better suit their needs.

62. Publishers and competing ad tech providers, increasingly wary of Google's heavy-handed behavior, started to look for ways to circumvent Google's dominance. Between 2012 and 2013, market participants began using a technique called "header bidding" as a partial workaround to Google's self-preferential algorithms and ad tech restrictions. According to CW1, header bidding "started as backlash" to Google's dynamic allocation.

63.     As one Google employee explained, "[p]ublishers felt locked-in by dynamic allocation in [Google's ad server] which only gave [Google's ad exchange] the ability to compete, so HB [header bidding] was born." Internal Google documents confirm that Google understood header bidding to be a direct response to "circumvent dynamic allocation." Inside Google, header bidding was described as a "world of true, multi-sourced [real-time bidding]" without Google as the "authoritarian intermediary."

64.     Google privately admitted that "header bidding and header wrappers are BETTER than [Google's platforms] for buyers and sellers," and that increased competition between AdX and publishers using header bidding would increase publisher revenues by 30 to 40%, and would provide additional transparency to advertisers. As one Google employee explained, "[Header bidding] gives many publishers better yield, so it's a no-brainer for a publisher to adopt it." A late 2015 internal discussion somberly noted that Google "[did] not have incredibly robust arguments to discourage header bidding" and conceded that header bidding offered the competition Google had publicly preached but privately precluded:

> With AdX we've always advocated the more competition a pub has being considered with real time price competition the better the yield. Our competition is using this same argument for why header bidding makes sense. If they can submit a near real time price into DFP the[] competition with AdX is improved.

As another Google employee observed, "[Google's ad server] has historically made it difficult for [ad exchanges] to compete on a level playing field with AdX."

65.     Publishers used header bidding to take back some degree of power over their own advertising transactions. They inserted header bidding computer code onto their own websites to allow non-Google advertising exchanges an opportunity to bid for advertising inventory before Google's hard-coded preferences for its own ad exchange were triggered. Header bidding allowed publishers to ensure that multiple advertising exchanges—not just Google's AdX—could bid on their inventory, thereby increasing the chances that they could find the best match.

66.     Header bidding was wildly popular because this increase in exchange competition enabled publishers to solicit higher winning bids for their impressions; as a result, many publishers began to use header bidding. Advertisers also began migrating to header bidding in droves, as it increased their access to ad inventory, which they could bid on and purchase without suffering Google's exorbitant fees. By 2016, approximately 70 percent of major publishers in the United States were using header bidding to route their inventory to multiple exchanges.

67.     According to Google's own 2017 analysis, between January of 2016 and February of 2017, the average price publishers received for impressions sold through ad exchanges in header bidding was 80% higher than the average price publishers received for impressions sold through Google's AdX exchange.

**b)      Google Created Exchange or Open Bidding to Kill Header Bidding and Used It Throughout the Class Period**

68.     As explained above, publishers quickly adopted the header bidding protocol because as Google internally acknowledged, "pitting multiple exchanges against one another fostered price competition, which was good for [publishers'] business." Google quickly realized that header bidding substantially threatened its exchange's ability to demand a very large—19 to 22 percent—cut on all advertising transactions.

69.     Google deceptively told the public that "we don't see header bidding as a threat to our business. Not at all." But privately, Google's internal communications show that Google viewed header bidding as a major threat to the company. Google executives described header bidding as an "existential threat" and referred to the company's efforts to kill header bidding as the "holy grail." CW1 also recalled attending "quarterly summits" in 2016 and/or early 2017 when senior Google employees – including Jonathan Bellack, the Director, Product Management – Publisher Ad Platforms, said header bidding "posed an existential threat" to Google's digital advertising ecosystem.

70.     One reason behind Google's secret plan to destroy header bidding was to protect Google's high exchange take rates. As Google discussed internally, "20% for just sell-side platform/exchange isn't likely justified by value." According to CW1, Google Ad Manager takes 20% of the revenue share, while Google AdSense – the ad manager for smaller publishers – takes 32%. These numbers average out to Google taking about 30% of advertising spend, s/he said. Internal Google emails from November 2017 showed that Google employees thought that the exchange "margins will stabilize at around 5 percent. Maybe it will happen by this time next year or in early 2019. This creates an obvious dilemma for us. AdX is the lifeblood of our programmatic business. … What do we do?" Competition from header bidding threatened AdX's ability to charge a supracompetitive 19 to 22 percent take rate.

71.     Google internally discussed how competition from exchanges was a problem and deliberated over what to do about it. Google was so concerned it launched a program called the "Header Bidding Observatory" to monitor and detect publisher adoption of header bidding. According to CW1, "my frustration at the time was so many resources put into this header bidding product battle instead of the product that customers I represented worked with," s/he said, referring to the Authorized Buyers product, which at the time was DoubleClick Ad Exchange.

72.     Importantly, Google's CEO, Defendant Pichai, was briefed on Google's plan to kill header bidding, with Google's product leadership specifically recommending to Pichai the plan to "weaken the header bidding narrative in the marketplace."

73.     To eliminate header bidding, beginning in April 2016, DFP started to let publishers route their inventory to more than one exchange at a time to mimic the multi-exchange competition fostered by header bidding. DFP also permitted non-Google exchanges to return live, competitive bids for publishers' impressions, alongside AdX. Google called this "**Exchange Bidding**," later renamed "**Open Bidding**," and internally codenamed **"Jedi."** Internally, however, Google understood that the purpose

of Open Bidding was to "stem[] the bleeding" and "combat the risk of header bidding." Google understood that if it could stop header bidding's momentum, it could maintain its "control point and advantage" gained through its publisher ad server access to millions of small advertisers and ultimately "[g]et pub[lishers] to move away from header bidding back into our platform."

74.     In operating Open Bidding, however, Google maintained visibility into the bids submitted by rival exchanges and used that information to inform its own trade decisions. For instance, Google used the bids from competing exchanges in Open Bidding to operate secret auction manipulations. DFP excluded competition from header bidding by providing AdX and other exchanges in Open Bidding informational advantages that allowed them to trade ahead of the bids submitted by header bidding exchanges.

75.     From the earliest days of header bidding, DFP let AdX peek at the winning net bid from an exchange using header bidding, then displace the trade by paying one penny more. This practice was referred to as "Last Look." According to a confidential Google study evaluating the effects on competition, Last Look significantly re-routed trading from non-Google exchanges to AdX and Google's ad buying tools. Internally, Google itself admitted that "Last Look is inherently unfair."

76.     Starting with the official launch of Open Bidding in June of 2017, Google sought to lure exchanges away from header bidding by sharing its Last Look advantage with other exchanges participating in Open Bidding. These exchanges could now also peek at header bidding net bids and displace their trades by a penny.  Google also foreclosed the ad exchange competition by secretly rigging the Open Bidding program to let Google win. Google designed Open Bidding to provide Google's exchange a special "prioritization," which Google kept secret. Google made it so its own AdX exchange won publishers' inventory even over another exchange's higher bid. In the following email, a Google employee explained how the Open Bidding program returned results that were "suboptimal for pubs

21

yield": a Google AdX bid of $6 would win even though another exchange ("EB SSP") submitted a

higher $8 bid. In other words, Google's Open Bidding tool is able to beat publishers' header bidding

bids without Google's tool actually having a higher bid.

On Tue, Sep 27, 2016 at 12:40 PM ████████████████████████ wrote:

**First Issue: EB demand fully competing with AdX**
In the current EB implementation, AdX PA/PD have priority over the
all demand from EB SSPs (OA+Deals).
That generates suboptimal yields for publishers and serious risks of negative media coverage if
exposed externally.

Below the scenario
AdX OA - $4
EB SSP - $8 (this can be a deal or not, we don't know)
AdX PA/PD - $6
Outcome: AdX would win at $6, that is a suboptimal for pubs yield

The winner should have been EB SSP for $8

77.     A Google executive advised colleagues internally, "I would suggest being very careful

here what we say to publishers. Remember, Jedi [Open Bidding] negatively impacting header bidding

is a Google desired outcome. Publishers are likely fine with header bidding, they make more money

with it."

78.     Internally, Google employees grappled with the fact that Google was falsely telling

publishers that Google's header bidding alternative enabled competition and improved yield, when in

reality, Google created a program that advantaged itself at the expense of publishers. With this design,

Google's exchange could win an auction for a publisher's inventory even over another exchange's

higher bid. As one senior Google employee observed, Open Bidding's deliberate design is to avoid price

competition, which "generates suboptimal yields for publishers and serious risks of negative media

coverage if exposed externally."

79.     Around 2019, Google replaced Last Look with a "Smart Bidding" algorithm. This algorithmic model was used to predict the bids of rivals for each impression. In this way, Google could still predictively "peek" at its rivals' bids before submitting its own. Through Smart Bidding, Google uses the troves of data collected from its advantageous position in the ad tech market to allow AdX to predict the amount of rival bids and instruct Google buying tools to bid just slightly above what rival buyers are willing to pay. With "Smart Bidding," Google collects the non-public bid history of advertisers, rival buying tools, and rival exchanges that participate on Google Ads, DV360, AdX, or Open Bidding and feeds that data into a machine learning algorithm that enables Google to predict rival bids with an alarming degree of accuracy. As a Google planning document outlines: "If we knew our competitor's bid exactly, we can simply bid a cent above that[.] But we don't have this information before the auction, so we need to predict [the] competitor's bid." According to CW1, Google was still conducting the auction prediction when s/he left Google in 2021, with the only change that all auctions were based on the first price.

80.     Google's "Smart Bidding" secret bid optimization scheme wasn't disclosed to investors. To the contrary, Google publicly represented that it was running "a fair and transparent market for everyone." Google insisted that "every offer from programmatic buyers . . . compete[s] in the same unified auction, alongside inventory which is directly negotiated with advertisers. An advertising buyer's bid will not be shared with another buyer before the auction or be able to set the price for another buyer." This was false.

81.     Smart Bidding managed to fully offset the 30% drop in Google Ads revenue that Google projected when giving up Last Look. Google employed Smart Bidding throughout the Class Period.

82.     Starting with 2019, Google's DFP also began sharing sensitive pricing information obtained from publishers' sensitive clearing auction records (which Google called "Minimum Bid to

Win" data) with exchanges in Exchange Bidding. Google's AdX exchange and other exchanges in Exchange Bidding used this information to adjust their own bidding strategy, continuing to trade ahead of exchanges participating in header bidding, underpaying for publishers' impressions. Google and other bidders used Google's Minimum Bid to Win data immediately upon an auction closing to adjust their own pricing on their bids on millions of highly similar auctions. For example, Google was able to use the Minimum Bid to Win data from one auction to bid on another impression for the same user on the same page.

### c) To Eliminate Header Bidding, Google also Devised Projects Poirot and Elmo, Which It Employed Throughout the Class Period

83. Google worried that it needed to take additional steps to stem the competitive threat from header bidding. As such, Google considered additional options "for mitigating [the] growth of header bidding infrastructure." Under code name Project Poirot, Google shifted transactions away from ad exchanges using header bidding and to Google's AdX by artificially manipulating the bids sent to rival ad exchanges so that Google's AdX could win those transactions more often (even if that meant harming Google's own advertisers).  Or, as Google put it: "for HB [header bidding] we should win back more on AdX." Google changed the settings of DV360 so that by default all advertising campaigns were opted into Project Poirot; only 1% opted out.

84. By way of background, "first-price" and "second-price" auctions are common types of auctions used in various industries and contexts. Generally speaking, in a first-price auction, the buyer pays the amount of their own winning bid. As the name implies, the buyer in a second-price auction pays the amount of the second-highest bid (sometimes with a negligible additional amount, *e.g.*, one penny). A "third-price" auction, therefore, is one in which the buyer pays the amount of the third-highest bid.

85. Project Poirot worked by systematically lowering all DV360 bids to rival ad exchanges

that no longer employed second-price auctions—a proxy for identifying ad exchanges using header bidding. Google's algorithm relied on inputs from DV360's own bid data to detect and quantify any deviations from second-price auctions. Once detected, Poirot would typically adjust DV360's bid to avoid overpaying for an impression or providing the rival Ad Exchange with meaningful data about DV360's willingness to pay. Accordingly, DV360 intentionally bid less on rival exchanges and increased bids on its own ad exchange. For each ad exchange, Google set a percentage by which it reduced all DV360 bids to that ad exchange. Initially, Google reduced advertiser bids by 10% to 40%; later Google reduced bids for some ad exchanges by as much as 90%. Because Google's AdX did not participate in header bidding, none of DV360's bids on Google's ad exchange were decreased, even where DV360 bid on the same impression on both a rival ad exchange and Google's ad exchange. This manipulation of advertiser bids virtually ensured that Google's ad exchange would win the relevant auction by virtue of the deliberately decreased bids supplied to rival ad exchanges for the same impression.

86.     Google did not afford its advertisers a meaningful opportunity to choose whether Google could systematically lower their bids on rival ad exchanges. Instead, Google imposed these changes while providing virtually no information to its advertisers on the nature or extent of the program. Over 99% of advertising campaigns were subject to Poirot: all "automated bidding" campaigns on DV360 incorporated Poirot automatically, and Google opted in by default all "fixed CPM bidding" campaigns.[1]

---

[1] For both direct and indirect sales, ad impressions are generally priced on a CPM basis, referring to cost-per-thousand (in Latin, "mille") per impression. CPM is the term used to denote the price of 1,000 ad impressions. An advertiser in a $10 CPM transaction pays $10 for displaying 1,000 impressions of its ad.

Google's success with Poirot was possible because of Google's ability to control the auction process run by its publisher ad server and Google's last-look advantage.

87.     Google later extended Poirot to optimize bidding in first-price auction environments like the ones used by header bidding exchanges. As one Google employee noted, "[o]ur response to [header bidding] has been a multi-pronged effort, which includes … First-Price Auction Defenses in [DV360] (since all [header bidding] is transacted through first-price auctions)."

88.     This expansion of Poirot proved successful. As Google's Director of Product Management for Display and Video Ads explained internally, Poirot's initial implementation in 2017 was "quite effective, resulting in [DV360] spending 7% more on AdX and reducing spend on most other ad exchanges." One employee on Google's team explained that with Poirot, "spend on 3PEs [third-party ad exchanges] dropped by a whopping 32%." On information and belief, in 2017, for example, Poirot shifted approximately $200 million of DV360 advertiser spend away from rival ad exchanges and toward Google's. This spend was subjected to Google's 20% ad exchange revenue share fee—one of the highest in the industry—resulting in an additional $40 million in profit for Google. By 2019, Google's Americas Partnership Finance Lead noted that on Google's ad exchange fee, "we should continue to hold the line, esp. given currently healthy growth levels, since project Poirot."

89.     Poirot dramatically redirected DV360 advertiser spend away from rival ad exchanges, notwithstanding the fact that header bidding had briefly created competition between ad exchanges. The fraction of DV360 spend on AdX later increased from approximately 40% to 70% due to Project Poirot. An internal Google document stated that "Adx is now dominant to the point where we need to communicate to advertisers (and sometimes even to ad exchanges) why over 70% of [DV360] spend happens on Adx." CW2 saw internal documents at Google showing that the company wins 80% of the

auctions hosted on AdX. S/he stated that "competitors should win more" of the auctions because Google represents less than 50% of the demand.

90.   Google secretly employed Project Poirot throughout the Class Period.

91.   In addition to Poirot, Google's New York-based product and engineering gTrade team developed an additional project designed to "protec[t] against header bidding." This  project was dubbed Elmo. Google employed Elmo throughout the Class Period. Elmo reallocated ad spend away from rival ad exchanges engaged in header bidding. As explained above, a major feature of header bidding is that it increased competition by routing a bid request across multiple exchanges, allowing those participating ad exchanges to engage in a real time, competitive auction against each other. Google devised project Elmo to help DV360 identify when it saw the same bid request across multiple ad exchanges, and it decreased DV360's overall ad spend on any ad exchange that it suspected of meaningfully engaging in header bidding.

92.   More specifically, Elmo worked by using "cookies" to detect when a single impression was being routed to multiple exchanges at the same time. Because client-side Header Bidding solicited bids from multiple exchanges simultaneously, Elmo was able to identify when an impression was being routed through Header Bidding. With Elmo, DV360 throttled (reduced) its spending on exchanges that were found to engage in Header Bidding, rendering those exchanges much less likely to win bids. Internal Google emails from March 2018 note that Elmo decreased the amount of revenue publishers could make and was "leveraging cookies to manage budget" to reduce ad spend on exchanges using Header Bidding. Those emails acknowledged that Elmo's purpose was "protecting against header bidding." Internal Google documents from 2018 and 2020 also describe Elmo as a program that used cookies to throttle ad spend budgets. Thus, the channel through which the bid was received, *i.e.*, DV360, throttled spending in Header Bidding and shifted winning bids to Google's AdX. Internal Google emails

from March 2018 confirm Elmo's success, noting "impact of elmo is another 7.8% increase on AdX. so another 220M shifting," similar to Project Poirot's benefits.

93.     Elmo achieved its objectives. By March of 2018, as explained, Elmo had decreased DV360 ad spend on the largest user of header bidding by 25 percent alone, while also bringing in at least an additional 7.8 percent increase to DV360 spend on Google's ad exchange, or $220 million. Just four months later, one internal Google document showed that Elmo had accomplished a reduction of 44 percent in spend across major rival exchanges overall.

94.     Taken together, Poirot, Elmo, and other strategies to reduce spend on rival exchanges undermined the success of header bidding and starved rival exchanges of their primary source of demand. According to one Google employee, the combined impact of these programs was on average a 21 percent revenue decrease on affected exchanges and a 16 percent increase in revenue or $300 million for Google's ad exchange.

### d)     Unbeknownst to the Market, Google Had Other Advantages Over Bidding Participants, Which It Shared With Facebook

95.     Before Header Bidding emerged, Google had singled out Facebook— one of the biggest ad buyers on the internet—as a potential competitive threat. As advertisers multiplied exponentially on Facebook's owned and operated digital properties, such as Facebook Blue and Instagram apps, demand was outpacing inventory. To satisfy this advertising need, Facebook aimed to secure publisher inventory elsewhere. In 2014, it launched Facebook Audience Network ("FAN"), a tool akin to Google's DV360, Google Ads, and AdMob network, which it described as the "power of Facebook ads, off-Facebook." By 2016, FAN became a very large ad network connected to millions of Facebook advertisers in search for publisher inventory. In March 2017, Facebook announced it planned to participate in Header Bidding. At that time it also took a jab at Google, saying "third-party middlemen who make the rules

and obfuscate the truth" have profiteered from the digital ad industry. Joining Header Bidding would permit Facebook advertisers to bypass Google's platform, chipping away at Google's revenues.

96.     Facebook knew that Google deemed Facebook's participation in Header Bidding a major threat. A February 2, 2017 Facebook document highlighted "What Google wants: To kill header bidding (us baptizing their product will help significantly."). In an October 30, 2017 email, senior Facebook executives discussed how "[Google] want[s] [a] deal [with Facebook] to kill header bidding." Internally, Facebook recognized that "we have significant leverage over [negotiating with] google because of header bidding . . ." Facebook internally noted that, among other things, partnering with Google "will mean sharing a small % of our margin but with the benefit of getting the same level of access as [Google] (in a Google world, this means we will get the same treatment as GDN [Google Display Network, which includes Google Ads] gets in the DFP/AdMob ecosystem."[2] Facebook thus memorialized it would be afforded special treatment by Google, *i.e.*, "Google DFP and AdMob providing their own demand via AdX with preferential treatment."

97.     For its part, Google planned to lure Facebook into Google's Open Bidding system in an attempt to reduce Facebook's participation in Header Bidding. In an internal presentation, a Google executive jotted the "top priorities" for 2017: "Need to fight off the existential threat posed by Header Bidding and FAN [Facebook Audience Network]. This is my personal #1 priority. If we do nothing else, this needs to be an all hands on deck approach." Google decided to partner with Facebook to "protect" Google's "leadership position in 3P [third party] ad buying/selling."

---

[2] The Google Display Network is a collection of websites, apps, and Google-owned properties where advertisers can place ads.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

98.     Google's product leadership team explicitly explained to CEO Pichai that with a Google-Facebook deal, "[f]or web inventory, we will move [FAN's] demand off of header bidding set up and further weaken the header bidding narrative in the marketplace."

99.     To induce Facebook's participation in Open Bidding, Google agreed to give Facebook significant auction advantages not afforded to other participants. An internal Google memo titled "FAN deal discussion" acknowledged that "FAN requires special deal terms, but it is worth it to cement our value." The advantages Google gave Facebook remained in place throughout the Class Period, and were akin to those Google was affording to itself. As described below, those perks included information, speed, and price advantages, and even a guaranteed "win rate."

100.     Google extended its own speed advantages to Facebook. Google gave Facebook 300 milliseconds to bid for ads, while the other participants in Open Bidding were afforded just 160 milliseconds or less to bid. Participants have complained that 160 milliseconds is not enough time to recognize users and return bids. The longer timeouts Facebook extracted were designed to help it win auctions over other participants.

101.     Google also shared some of its own auction matching advantages with Facebook. Specifically, Google agreed to help Facebook understand who would be shown the ads by helping it identify 80 percent of mobile users and 60 percent of web users, a process that significantly improved the match rates for Facebook.

102.     Google had another informational advantage over other participants, which it agreed to share with Facebook. Google committed to inform Facebook which impressions were targeted to spam, such as to bots, rather than humans, so Facebook would not have to pay for those useless impressions.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

103.    Facebook extracted another advantage over other participants that Google had: a direct billing and contractual relationship with publishers. Google controlled pricing information and hid from participants other than Facebook how much of winning bids sites received.

104.    Facebook also received price concessions off the 10% fee Google was charging other participants, depending on the volume of impressions Facebook purchased from publishers. Internally, Facebook treated the deal as a 50% discount.

105.    Google also agreed to give Facebook another auction advantage Google had over other participants: a predetermined "win rate" of at least 10%. The win rate was defined as the percentage of auctions that Facebook wins out of the total number of bids it submits.

106.    Facebook demanded and secured Google's commitment to abstain from using Facebook's bidding history, to which Google had access, to manipulate auctions in Google's favor.

107.    For its part, Facebook promised to bid on at least 90 percent of auctions when it could identify the end user, and committed to spending a certain amount of money—as much as $500 million a year by the fourth year of the agreement.

108.    Significantly, the negotiations between Google and Facebook involved the top echelon at both companies, including CEO Pichai and Sr. VP and Chief Business Officer Schindler from Google, and CEO Mark Zuckerberg and COO Sheryl Sandberg from Facebook. The negotiations culminated in an agreement executed between Facebook and Google in September 2018. Google's Pichai and Schindler personally executed the agreement. Sandberg signed the agreement on behalf of Facebook. Google internally coined the agreement "Jedi Blue." The Star Wars "Jedi" codename refers to Google, and "Blue" to Facebook, the color of Facebook's logo.

109.    Throughout the Class Period, Defendants publicly denied affording Google or Facebook preferential treatment, insisting that "[a]ll participants in the unified auction . . . compete equally for

each impression, and insisted that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder."

### e)   Google Implemented Unified Pricing Rules to Force More Transactions Through Google's Ad Exchange and to Benefit Google

110.   Historically, publishers set different price floors for different exchanges and different buyers in the publisher ad server. Large publishers often invested considerable resources in fine-tuning and managing hundreds upon hundreds of different floors for various buyers and exchanges. Publishers undertook this effort for two main reasons: first, to increase revenue and second, to improve the quality of ads returned to their site.

111.   Setting higher price floors for AdX and Google's buying tools permitted publishers to combat (but not solve) the problem of adverse selection caused by Google, thereby encouraging exchange and buyer participation (including those engaged in header bidding) and increasing overall yield. Publishers also set higher price floors for AdX and Google's buying tools to improve the quality of the ads returned to their site and displayed to consumers. Google observed that the higher floors that publishers routinely set for AdX and Google buying tools were an impediment to Google increasing its market share in the exchange and buying tool markets.

112.   Publishers' use of floors to disadvantage Google became something Google needed to "fix": "We should look at all real issues that we are aware of which incentivizes publishers to use other platforms (header bidding and pricing floors cutting off access etc.) that we should try to fix as soon as possible." Google's internal documents reveal that Google knew publishers were using floors to increase yield. In adopting the Unified Pricing floors, Google schemed to shift transactions to AdX. For example, an internal Google document from the second quarter of 2019 identified that differentiated floors "drive DV360 to spend more on third party exchanges" and that a unified floor could achieve the "desired state" that "DV360 wins on AdX at higher margin." Google's Director of Global Partnership

and Publisher Solutions explained: "Pub[lishers] are also rational[] when they decide to diversify their source of revenues" using floors given that "[i]t help[s] them to keep Google at bay and put pressure on us (similar to any industry)." By using different price floors, publishers expressed a willingness to occasionally accept a slightly lower price from a rival ad exchange than from Google's ad exchange for the same inventory.

113.    Recognition of the flooring "problem" was widespread within Google's display advertising leadership. When one Google employee asked why DV360 was still winning inventory through rival ad exchanges, Google's Project Poirot architect explained that "the best guess is that the AdX [price] floors are higher." He went on to note that "[t]his is one big problem for the Adx team to try fixing so that more of the [DV360] buying will switch to Adx." He suggested that "if we figure out how to equalize floors (i.e., get the Adx floors down), as a buyer, we will start seeing benefits in terms of buying more through Adx and decreasing incrementality on 3PE." (third-party ad exchanges).

114.    In March 2019, leading into the Class Period, Google adopted Unified Pricing Rules. Under Unified Pricing Rules, publishers were no longer allowed to set different price floors for Google's ad exchange or advertiser buying tools versus other ad exchanges or advertiser buying tools. Previously, publishers could choose to transact with DV360 only in non-Google exchanges by increasing DV360's price floors in AdX. Unified Pricing Rules ended this practice and forced publishers to transact with DV360 and Google Ads in AdX.

115.    Internal Google experiments found that Unified Pricing Rules increased DV360 and Google Ads' spend on AdX and decreased spend on rival ad exchanges. One analysis found that Unified Pricing Rules caused DV360 to win approximately 32% more impressions on AdX and led to a 6% increase in AdX revenue.

116.    Google bundled its imposition of Unified Pricing Rules with other changes to provide

cover. As one employee explained, Google "bundled . . . a bunch of contentious changes," such as the "overhauled pricing rules," with less objectionable changes "to make the contentious ones more stomachable." For example, Google changed its ad exchange from a second-price auction to a first-price auction, which altered some of the ways price floors impacted auctions. Google used the auction format change to contend that the only legitimate reason for differential price floors in its view—to increase the clearing price of a second-price auction—had been eliminated. Google also claimed that the granular price control feature of its ad server only confused its publisher base—even the sophisticated publishers most likely to use price floors. Google asserted that it was doing those customers a favor by eliminating the function.

117.    In reality, Google's internal documents demonstrate that these were pretextual justifications for the true driver of Unified Pricing Rules: preventing publishers from preferencing rival ad exchanges. Google internally acknowledged that the change in auction format alone "would have achieved most of what we desperately need to fix our ecosystem," irrespective of changes to price floors. But the Google ad exchange "team wanted to use this migration [to a first-price auction] as an opportunity to significantly limit the ability of publishers to set floor-prices per buyers (which is a good goal to have)." Externally, Google told publishers and others that the combined changes would "simplify programmatic buying," "reduce complexity and create a fair and transparent market for everyone." Internally, Google acknowledged that getting rid of higher price floors for Google's ad exchange was the "primary internal objective for the entire launch" of bundled changes and its "key driver." Internally, Google also admitted that Unified Pricing was "extremely self-serving."

118.    Internal Google documents explained that the changes "will be a shift in DV360 spend patterns away from [third-party ad exchanges]." Internal Google documents identified the "winner" of the new rules to be AdX, its own ad exchange, and accurately listed rival ad exchanges to be the "losers"

under the new rules. Google's internal modeling found that the Unified Pricing Rules created the "primary benefit" of Google's bundled auction changes, and the "best guess" of the impact was an annual increase of $430 million in Google's gross revenues and $118 million in Google's net revenues.

119.    Most importantly for Google's overall strategy, Unified Pricing Rules had a "negative effect on 3P SSP [ad exchange] spend." For example, one ad exchange competitor complained to Google that its win rate had decreased by 6% during the launch of Unified Pricing Rules. Internally, Google employees attributed the decrease to Unified Pricing Rules and warned others not to share this "extremely sensitive" information externally.

120.    Google's implementation of Unified Pricing Rules to force transactions through its own AdX continued throughout the Class Period.

>    **f)    On June 14, 2023, the European Commission Issued Preliminary Findings That Google Engaged in Abusive Practices in the Online Advertising Technology**

121.    Just recently, on June 14, 2023, following an antitrust investigation into Google's efforts to kill header bidding, the European Commission found that Google (i) favored its own ad exchange AdX in the ad selection auction run by its publisher ad server DFP by, for example, informing AdX in advance of the value of the best bid from competitors, which it had to beat to win the auction; and (ii) favored its ad exchange AdX in the way its ad buying tools Google Ads and DV360 place bids on ad exchanges by, for example, Google Ads avoiding competing ad exchanges and mainly placing bids on AdX, thus making it the most attractive ad exchange.

122.    Google responded that it disagreed with the regulator's findings.

>    **2.    Google Tied Its Products, Coercing Publishers to Use Its DFP Ad Server and Its AdX Exchange**

123.    Publishers need Google's exchange to access the treasure trove of small advertisers purchasing ads through Google. The collective pool of advertisers bidding through Google Ads on AdX

35

accounts for at least 44 billion web display transactions per month in the United States and about 30 percent of monthly transactions across all exchanges in the United States. As Google's former head of global strategy and commercialization explained: "When [advertiser] demand can only be found through certain sources, it compels publishers to work with that product."

124.    Throughout the Class Period, Google restricted publishers using non-Google ad servers to trade through Google's exchange, only permitting publishers licensing Google's ad server to receive live, competitive bids from its exchange. Many publishers cannot afford to use a rival publisher ad server because they cannot afford to lose the revenue that Google's exclusively-linked platforms could provide. In essence, Google dictates publishers' choice of each key ad tech tool used to sell their inventory: publishers must make their inventory available through Google's publisher ad server and ad exchange to get the opportunity to sell a portion of it to Google's extremely valuable Google Ads' advertisers. Indeed, leading into the Class Period, more than 30 percent of all exchange-traded transactions between 2018 and 2019 comprised of transactions involving such small advertisers. Throughout the Class Period, Google's AdX  restricted the trading capabilities of publishers who did not use Google's ad server.

125.    Starting with 2018 and continuing throughout the Class Period, Google also began renegotiating publisher contracts requiring publishers to sign a combined contract that included both Google's DFP ad server and Google's AdX exchange. Google decided to contractually "jam[] DFP and AdX together to ensure that we take the best of both worlds." To accomplish this objective, Google aimed to have "100% of AdX-only accounts to sign DRX [combined ad server] contract, or be terminated by EOQ2 '18." Google later confirmed "all [self-service] contracts have either been signed or are going through the termination process."

126.    Internally, Google admits that an exchange should be more of "a public good used to facilitate buyers and sellers" and not "an immensely profitable business," as it is for Google. Google, however, ensured that publishers and advertisers could not benefit from competition. As a senior Google employee acknowledged, "Right now we are the … ad server ... for 90% of publishers . . . . Unlike our competitors, pub[lisher]s have been viewing us as a necessary evil, instead of a responsive, innovative partner. . . . Google simply isn't leading, and we aren't giving customers confidence that they can and should trust in us to build the right things and solve the right problems."

127.    Google denies that it forces any tying of its products: "We don't force 'tying.'"

## II.    GOOGLE'S PRIVACY VIOLATIONS AND SECRETIVE EFFORTS TO CURTAIL PRIVACY PROTECTIONS

128.    Publicly, Defendants represented that user privacy is of utmost importance to the companies. Defendant Pichai insisted that "[p]rivacy is at the heart of everything we do [.]" According to Pichai, "I've always believed that privacy is a universal right and Google is committed to keeping your information safe, treating it responsibly, putting you in control. And we've long supported the creation of comprehensive federal privacy laws." These messages were repeated and reinforced by Defendants Walker and Schindler throughout the Class Period. For example, at a UBS Global Conference held in December 2020, Defendant Schindler said "[w]e're actively supporting and advocating for federal privacy legislation. So that's something we're heavily involved in." Defendant Walker amplified that message, claiming that the company "continue[s] to support comprehensive federal privacy legislation in the U.S. and [is] finding new ways to incorporate meaningful privacy controls into [its] products."

129.    Likewise, a series of tweets by GoogleDrive made throughout the Class Period insisted that "[i]n Google Drive, users privacy and security are our top priority."

130.    In truth, however, the Defendants worked surreptitiously to lessen privacy protections, including fighting to prevent and diminish child privacy protections in proposed regulations and legislation.

131.    Google was also violating the privacy of literally hundreds of millions of Android users.

A.    **DEFENDANTS SECRETLY SCHEMED TO UNDERCUT PRIVACY PROTECTIONS**

132.    While it preached publicly that it was "heavily involved" in supporting privacy regulations and legislation, behind closed doors Google coordinated with its fellow big tech competitors to *undermine* user privacy. For example (and as revealed in detail in an unredacted complaint filed on October 22, 2021 by several Attorneys General), during a closed-door meeting held on August 6, 2019, between the five Big Tech companies, including Facebook, Apple, and Microsoft, Google discussed forestalling consumer privacy efforts. In a July 31, 2019 document prepared in advance of this meeting, Google memorialized that it had been "***working behind the scenes hand in hand with the other companies***," and had thus far "***been successful in slowing down and delaying the [ePrivacy Regulation] process***."  (emphasis added).

133.    The ePrivacy Regulation is a proposed European Union regulation regarding online privacy, which aims to ensure confidentiality of communications and privacy controls through electronic consent and easier-to-navigate browser cookie settings. Under the proposed Regulation, Google would be required to obtain a clearer consent from its users before processing any data for online behavioral or targeted advertising. In some instances, Google would be entirely barred from processing data for such purposes. The proposed regulation would impose hefty fines on Google, fines that for the first time in history would have a significant impact on Google's bottom line.

134.    Google has been tracking user activity across the lion's share of its products, or the majority of the mainstream web, via data-gathering tools like Google Analytics, Maps, and

YouTube. The rules covering how Internet users can be tracked and profiled for behavioral ads are the subject of the ePrivacy Regulation proposal, presenting a serious threat to Google's adtech business, on which Google's survival depends. Google derives a large portion of its revenue by tracking and profiling Internet users through their digital activity and other data sources that Google then uses to sell to advertisers.

135.    A law firm analyzing the consequences of ePrivacy for Facebook and Google concluded in late 2017 that "[t]he steps required by the current draft Regulation for Facebook and Google to obtain the requisite consent would require an overhaul of their current practices and would likely significantly curtail the scale at which they collect data." It explained in a white paper that "if adopted, the ePrivacy Regulation would impact the entire online advertising ecosystem, but most dramatically the businesses of data juggernauts Facebook and Google, which have not been subject to similar regulatory requirements in the past." "Under the new draft Regulation, Facebook and Google would be required to obtain more clearly demonstrable consent from their users prior to processing any data (not just personal data) for online behavioral or targeted advertising purposes and, in some instances, would be completely barred from processing data for such purposes." The white paper explained that "[t]he steps required by the current draft Regulation for Facebook and Google to obtain the requisite consent would require an overhaul of their current practices and would likely significantly curtail the scale at which they collect data. Should they fail to update their privacy practices in a more consumer-friendly way as required by the draft Regulation, Facebook and Google will either be (a) prohibited from using the unprecedented amounts of data already in their control; or (b) subject to fines and penalties that will, for the first time in history, have a significant impact on their bottom lines." It concluded that "[b]ased on their reported revenue in 2016, Facebook and Google could face annual fines up to $1.07 billion and $3.58 billion, respectively."

136.   Google's efforts to stall privacy protections continued throughout the Class Period, and to date have been wildly successful.  A shadow rapporteur of the European Parliament involved in the ePrivacy dialogues, Patrick Breyer, remarked recently that the European Council has "succumbed to lobbying to a degree that rather than accept this it would be far better to abandon the reform altogether." Breyer said that "[i]ndustry (including the ad business and publishers) and national governments have colluded to block ePrivacy rules which the European Parliament wants to ban surveillance tracking walls and eliminate the cookie banner nuisance by making browser signals mandatory, among other things." Breyer noted that "[t]he online activities of an individual allow for deep insights into their (past and future) behaviour and make it possible to manipulate them. Users have a right not to be subject to pervasive tracking when using digital services." The reason why lobbying is "so easy to do is precisely because Council members refuse to publish lobby meetings (unlike, to some degree, Parliament and Commission)," Breyer added.

137.   Unbeknownst to investors, Google *also pushed the other big tech companies to prevent and diminish child privacy protections in proposed regulations by the FTC and in proposed legislation advanced by U.S. Senators Ed Markey and Josh Hawley*. The proposed legislation would prohibit internet companies from collecting personal and location information from anyone under the age of thirteen without parental consent and from anyone 13- to 15-years old without the user's consent. The proposed legislation also creates an "Eraser Button," so parents and kids can delete personal information, and a "Digital Marketing Bill of Rights for Minors" that limits the collection of personal information. The bill also proposed establishing a first-of-its-kind Youth Privacy and Marketing Division at the FTC, which would be responsible for addressing the privacy of children and minors and marketing directed at children and minors.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

138.    Google's continued work behind the scenes to forestall privacy protections for children is particularly egregious given its commitment in 2019 to provide new protections for children in response to a year-long investigation and unprecedented fines slapped on the company by the FTC and the New York State Attorney General for violating children's privacy. That investigation culminated with Google agreeing to pay in September 2019 a record $170 million fine and make changes to protect children's privacy on YouTube (which is owned by Google), as regulators said the video site had knowingly and illegally harvested personal information from children and used it to profit by targeting them with ads.

139.    The regulators found that YouTube had illegally collected children's data, including identification codes used to track web browsing, without their parents' consent. YouTube also marketed itself to advertisers as a top destination for young children, even as it told some advertising firms that they did not have to comply with the children's privacy law because YouTube did not have viewers under the age of thirteen. Through this maneuver, the regulators found, YouTube made millions of dollars using the information illegally gathered from children to target them with ads.

140.    Still, Googled remained undeterred. According to the same July 31, 2019 document prepared ahead of the August 6 meeting, Google planned to use the upcoming meeting with the other big tech firms to "find areas of alignment and narrow gaps in our positions and priorities on child privacy and safety." Google was particularly concerned that Microsoft was not aligned with Google in its efforts to impede child privacy protections, and pushed Microsoft to join in the plot: "Whether at this meeting or at another forum, we may want to reinforce that this is an area of particular importance to have a coordinated approach," read the memo.

141.    Google also vented at Facebook for resisting its plan to forestall privacy regulations, lamenting that Facebook was concerned about its reputation more than its bottom line: "We've had

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

difficulty getting FB to align on our privacy goals and strategy, as they have at time[s] prioritized winning on reputation over its business interest in legislative debates," said Google.

142.    Google also pushed Microsoft not to compete with Google on privacy and to stop directing "subtle privacy attacks" at Google and other big tech companies, which Google described as "their industry colleagues." Google urged Microsoft to join them in their quest to diminish privacy protections.  An internal Google document showed that Defendant Walker was in the driver's seat: "***We have direction from Kent [Walker] to find alignment with MSFT where we can but should be wary of their activity [in promoting privacy] and seek to gain as much intel as possible***."[3]

143.    Senator Markey, one of the leading advocates for children's privacy legislation, said the recent revelations about the 2019 meeting where Google pressed to diminish privacy protections show that "Big Tech and its army of lobbyists are working hard to block Congress' efforts to enact privacy legislation because it would cost them money." "Even when it comes to children, these companies put their bottom line before their users' well-being," Markey said.  Indeed, it was just a week before the 2019 meeting that the FTC announced that it was considering making changes to its interpretation of the Children's Online Privacy Protection Act, which prohibits companies from collecting information about kids under the age of thirteen without parental permission.

144.    Defendants' efforts to curtain privacy protections include donations to tech groups lobbying heavily against privacy protections. For example, it was recently exposed that Google donated to NetChoice, a tech industry group lobbying against the federal legislation advanced by Senator Markey. Just recently, NetChoice also sued to block a landmark California law requiring tech companies to adopt new policies to protect children's privacy online. Google, along with fellow tech giants Amazon

---

[3] CW1 explained that Kent Walker reports to CEO Pichai. According to CW1, Walker and other C-suite executives held weekly meetings that included "all of the senior VPs" and the "C-suite."

and Meta, fund millions of dollars to NetChoice. NetChoice also received support from Eric Goldman, a law professor at Santa Clara University. Goldman is a faculty member at the university's Markkula Center for Applied Ethics, which received funding from Google as part of a *cy pres* legal settlement involving Google Buzz.

145.    The California Age-Appropriate Design Code Act, set to take effect in July 2024, will require companies like Google, which  provide online products or services that are "likely to be accessed" by kids under 18, to adopt a variety of safety measures. It was modeled on a U.K. law that came into force in 2020. The California law would, among other things, require tech platforms to turn on the highest privacy settings by default for kids; proactively consider how the design of products could endanger minors; alert minors when their location is being monitored; and prohibit the use of "dark patterns" that trick minors into giving up personal information. NetChoice argued in its lawsuit that the law aimed to protect children's privacy violates the First Amendment, and that tech companies have the right under the U.S. Constitution to make "editorial decisions" about what content they wish to publish.

146.    Google denied that it worked to undermine privacy regulations, stating for example that the complaint brought by the Attorneys General makes "inaccurate and inflammatory allegations." Indeed, throughout the Class Period, Defendants told the market that "privacy is very important, and we have called for comprehensive Federal privacy legislation." Google lied.

### B.    GOOGLE VIOLATED THE PRIVACY OF OVER 750 MILLION ANDROID USERS

147.    Google also failed to disclose that it could access the personal information of users' WhatsApp communications.

148.    By way of background, in mid-2015, Google executed an agreement with Facebook's messaging service WhatsApp that allowed Google-Android users to store messages and other

information into Google's cloud back up service, Google Drive. WhatsApp users using Google-Android devices were given the option to back up their WhatsApp messaging history, photos, video, and other files to Google Drive. WhatsApp encrypted users' messages and informed its users that "WhatsApp's end-to-end encryption ensures only you and the person you're communicating with can read what is sent . . . only the recipient and you have the special key to unlock and read them."

149.   But Google knew that "when WhatsApp media files are shared with 3rd parties such as Google Drive, the files are no longer encrypted by WhatsApp." This fact was memorialized in an internal Google memo as early as June 2016, as exposed in the complaint filed by the Attorneys General against Google. The memo also noted that, "[f]or clarity, all of the [WhatsApp] data stored in Drive is currently encrypted with Google holding the keys."

150.   Google also understood that the users were misled about the privacy of their communications. The same internal June 2016 memo recognized that "WhatsApp's current messaging around end-to-end encryption is not entirely accurate." The memo also underscored that "WhatsApp currently markets that all communications through its product are end-to-end encrypted, with keys that only the users possess. They have failed to elaborate that data shared from WhatsApp to 3rd party services does not get the same guarantee. This includes backups to Google Drive."

151.   Google also recognized the critical importance of this omitted information to WhatsApp-Google Drive users. The same June 2016 Google memo explicitly noted that "[i]t's important for users to know that when WhatsApp media files are shared with 3rd parties such as Drive, the files are no longer encrypted by WhatsApp." Still, Google continued concealing this fact during the Class Period, intending to sign up more users to Google Drive. Instead, in a blog posted on Google's website throughout the Class Period, Google continued to represent that WhatsApp backups were private backups inaccessible to third parties: "WhatsApp for Android lets you create a private backup of your

chat history, voice messages, photos, and videos in Google Drive."

152. But according to an internal Google memo, Google was "opaquely" backing up users' WhatsApp communications to Google Drive. As a result, users could not log into Google Drive and learn that Google had access to their decrypted WhatsApp communications.

153. Google's machinations worked. Unaware that their data was "opaquely" accessed by Google, WhatsApp users continued to sign up for Google Drive en masse. By June of 2016, about 434 million WhatsApp users backed up approximately 345 billion WhatsApp files to Google Drive, giving Google Drive about a quarter of a billion new Google Drive customers. By May of 2017, Google Drive had gained approximately 750 million new WhatsApp backup accounts. During the Class Period, WhatsApp users continued to flock to Google Drive.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS CONCERNING DIGITAL ADVERTISING

### 1.     2019 Form 10-K

154. On February 4, 2020, Alphabet filed its 2019 Form 10-K with the SEC. The 2019 Form 10-K was signed by Defendants Pichai and Porat. In the 2019 Form 10-K, the Company stated:

> The goal of our advertising products is to deliver relevant ads at just the right time and to give people useful commercial information, regardless of the device they're using. **We also provide advertisers with tools that help them better attribute and measure their advertising campaigns. Our advertising solutions help millions of companies grow their businesses, and we offer a wide range of products across devices and formats.**

155. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, for example, instead of helping advertisers, Alphabet and/or Google were secretly manipulating auctions and coercing advertisers to transact in AdX and to exclusively use Google's buying tools. For example, through Project Poirot, Google changed the setting of DV360 so that by default all advertising campaigns were opted into Google's AdX, which extracted exorbitant fees. These practices led to higher

prices that advertisers had to pay to place their ads. They also decreased the access the advertisers had to ad inventory. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 2.     April 28, 2020 Quarterly Earnings Call

156.    On April 28, 2020, Alphabet hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call"). During this call, Defendant Porat stated: "**We are redoubling our efforts to help our advertising customers and partners by sharing insights and developing new tools to keep them connected to their customers and help them be best positioned for recovery.**"

157.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, for example, instead of helping advertisers, Alphabet and/or Google were secretly manipulating auctions and coercing advertisers to transact in AdX and to exclusively use Google's buying tools. For example, through Project Poirot, Google changed the setting of DV360 so that by default all advertising campaigns were opted into Google's AdX, which extracted exorbitant fees. These practices led to higher prices that advertisers had to pay to place their ads. They also decreased the access the advertisers had to ad inventory. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 3.     May 5, 2020 Google Report "Clearing Up Misconception About Google's Ad Tech Business"

158.    In the May 5, 2020 Google Report "Clearing Up Misconception About Google's Ad Tech Business" by Daniel Bitton and Stephen Lewis, Google stated: **"Empirical evidence shows ad tech is highly competitive and dynamic. Ad Tech is a crowded marketplace at all levels."**

159.    The statements in the preceding paragraph  were materially false and misleading when

made, or omitted to state material facts necessary to make the statements not misleading because, in truth, Google worked to eliminate competition and to self-preference its own advertising technology tools by engaging in multiple efforts to destroy header bidding, including through the use of Exchange or Open Bidding, through the use of Projects Poirot and Elmo, and through the implementation of Unified Pricing Rules. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 4. July 29, 2020 – Written Testimony of Sundar Pichai before the House Judiciary Committee

160.    On or around June 3, 2019, the U.S. House Committee on the Judiciary (the "House Judiciary Committee") initiated a bipartisan investigation into the state of competition online.  The investigation, led by the Subcommittee on Antitrust, Commercial and Administrative Law, examined the business practices and market dominance of Google, Amazon, Facebook, and Apple. During the course of the investigation, the House Judiciary Committee held several oversight hearings in which various officers of the above referenced companies, including their respective CEOs, offered witness testimony on topics such as the market dominance of the firms under investigation.

161.    On July 29, 2020, Defendant Pichai submitted a written testimony to the House Judiciary Committee for the hearing "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google," ("July 29, 2020 Hearing."). Defendant Pichai stated:

> Google operates in highly competitive and dynamic global markets, in which prices are free or falling, and products are constantly improving. **A competitive digital ad marketplace gives publishers and advertisers,** and therefore consumers, **an enormous amount of choice.** For example, competition in ads — from Twitter, Instagram, Pinterest, Comcast and others — **has helped lower online advertising costs by 40% over the last 10 years, with these savings passed down to consumers through lower prices.**

162.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in

47

truth, Google worked to eliminate competition and to self-preference its own advertising technology tools by engaging in multiple efforts to destroy header bidding, including through the use of Exchange or Open Bidding, through the use of Projects Poirot and Elmo, and through the implementation of Unified Pricing Rules. Instead of helping advertisers and publishers, Alphabet was secretly manipulating auctions and coercing publishers and advertisers to transact in AdX, and was coercing them to exclusively use Google's ad buying tools. These practices led to higher prices that advertisers had to pay to place their ads. These practices also led to artificially lower prices for ad impressions and to Google extracting higher tolls on publishers. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 5. July 29, 2020 – Pichai's House Judiciary Committee Testimony

163. On July 29, 2020, Defendant Pichai testified before the House Judiciary Committee.[4] Defendant Pichai stated:

> Congressman, **we see robust choice for advertisers. There are several alternatives. There is obviously Facebook suite of products, there's Amazon with their apps marketplace, there are companies like Snapchat, Pinterest, Twitter, there are new competitors who have emerged. And this is why we have seen advertising cost decline by 40% in the last 10 years and so we see dynamism in the marketplace we are focused on…**

*      *      *

> Just as America's technology leadership is not inevitable, Google's continued success is not guaranteed. **New competitors emerge every day**. And today users have more access to information than ever before. **Competition drives us to innovate, and it also leads to better products, lower choices, and more choices for everyone. For example, competition help lower online advertising cost by 40% over the last decade. But savings pass down to consumers.**

---

[4] In connection with his testimony before the House Judiciary Committee, Pichai signed a Truth in Testimony Disclosure Form as a "witness," stating that he is the CEO of Google and that he is Google's representative.

\*       \*       \*

Congressman, to just give you a sense of the **robust competition** we see, **ad prices have fallen down by 40% in the past 10 years.** And in fact, in the US, advertising as a share of GDP has come down from 1.4% in 1992, to less than 1% today. **So we see robust competition in the marketplace.**

164.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth,  Google worked to eliminate competition and to self-preference its own advertising technology tools by engaging in multiple efforts to destroy header bidding, including through the use of Exchange or Open Bidding, through the use of Projects Poirot and Elmo, and through the implementation of Unified Pricing Rules. Moreover, instead of helping advertisers, Alphabet was secretly manipulating auctions and coercing advertisers to transact in AdX, and to exclusively use Google's ad buying tools. These practices led to higher prices that advertisers had to pay to place their ads. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 6.    September 14, 2020 – Google and Pichai's Submission in Response to the House Judiciary Committee's Questions for the Record Following July 29, 2020 Hearing

165.    On September 14, 2020, Google and Pichai submitted written responses to the House Judiciary Committee's questions following the July 29, 2020 hearing. According to the U.S. House of Representatives Committee's Repository, Pichai submitted the Responses to the Questions for the record on September 14, 2020.[5]

166.    In response to Rep. David Cicilline's question **"[w]hat percentage of bids does Google win on its own ad exchanges**?**"** Google and Pichai responded:

Publishers utilizing Google Ad Manager's auction to sell their ad inventory are able to

---

[5] *See* https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=110883.

49

solicit bids from Authorized Buyers (e.g., third-party demand side platforms ("DSPs"), ad networks, and trading desks) and Open Bidders (third-party ad networks and ad exchanges), as well as buyers utilizing Google-owned platforms such as Google Ads and Display & Video 360. These bidders compete in a unified auction against each other, the publisher's guaranteed sales, and other demand sources configured by the publisher. **All participants in the unified auction, including those using Google-owned platforms, compete for each impression on a net basis, and no auction participant receives any information about any other party's bids prior to completion of the auction. The highest net bid wins. The channel through which a bid is received does not otherwise affect the determination of the winning bidder.[6]**

167.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, for example, far from "no auction participant receiv[ing] any information about any other party's bids prior to completion of the auction," Google and Pichai failed to disclose that it was: (i) utilizing opaque auction programs to manipulate digital advertising auctions; (ii) maintaining visibility into the bids submitted by rival exchanges and using that information to inform its own trade decisions; (iii) trading ahead of rival exchanges in Open Bidding; (iv) artificially manipulating the bids sent to rival ad exchanges so that AdX could win those transactions more often (such as through Project Poirot and Project Elmo); and (v) excluding competition from header bidding by providing AdX and other exchanges in Open Bidding informational advantages that allowed them to trade ahead of bids submitted by header bidding exchanges.

168.   For example, through Project Poirot, DV360 intentionally bid less on rival exchanges and increased bids on Google's AdX, resulting in more winning bids in AdX. Google reduced DV360's

---

[6] Google has provided some examples of "channels" through which bids are received, such as ad buying tools including but not limited to: Google Ads; Display & Video 360; Third-party Authorized Buyers; Open Bidding yield partners; and Remnant line items. Other channels include Google's AdMob network.

bids between 10% and 90% when placed on certain rival ad exchanges suspected of using Header Bidding, while leaving bids intact when being submitted to Google's own ad exchange.

169.    For example, through Project Elmo, using "cookies" DV360 intentionally throttled (reduced) its spending on exchanges that were found to be engaged in Header Bidding, resulting in more bids being won in AdX. Internal Google emails from March 2018 confirm Elmo's success, noting "impact of elmo is another 7.8% increase on AdX. so another 220M shifting."

170.    The statements were materially false and misleading for the additional reason that, in truth, when Facebook used its ad buying tool FAN in Google's Open Bidding system or in other auctions run by Google, Facebook was given a minimum guaranteed fixed "win rate" by Google, along with other information and speed advantages that helped it win over other bidders, so the channel through which a bid was received did in fact affect the determination of the winning bidder. Likewise, through Google's DV360, Google Ads, or Google's AdMob network, Google gave itself a minimum guaranteed fixed "win rate," along with other information and speed advantages that improved Google's chances of winning bids over other participants, so the channel through which a bid was received did affect the determination of the winning bidder. More specifically, Google and Facebook had a fixed minimum "win rate" of at least 10% in the auctions. Google and Facebook were also able to identify 80 percent of mobile users and 60 percent of web users, a process that improved the match rates for these entities. The guarantees Google gave Facebook also shifted transactions  to Google's own Open Bidding system or to other auctions run by Google, and to Google's AdX or AdMob. These practices created a heightened risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, and reputational harm.

171.    In response to Rep. Pramila Jayapal's question **"[w]hat is Google's market share of the ad exchange?"** Google and Pichai responded:

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

**Industry reports suggest that large advertisers on average are using four or more competing advertising technology tools at any given time, while large publishers on average are using six competing advertising technology tools at any given time.** For more information on publishers' use of multiple advertising technology tools, see https://www.adexchanger.com/plaorms/google-admanager-policy-changes-dont-hu-publishers-according-to-adveiser-perceptions/. **Some publishers like *The Wall Street Journal*, *The New York Times*, and *The Washington Post*, for example, use even more.** (See, for example, ads.txt specifications publicly disclosed by those publishers at wsj.com/ads.txt, nyt.com/ads.txt, and washingtonpost.com/ads.txt.) **It is also common for publishers and advertisers to use several exchanges or even a combination of open and private exchanges.**

*     *     *

**Our products face robust competition in a crowded advertising technology industry. Google Ad Manager competes within a large, diverse, and constantly evolving advertising marketplace and faces competition from hundreds of companies, including well-known tech companies with ad exchanges, supply side platforms (which are now largely functional equivalents), or those that sell their own inventory, such as Amazon, Facebook, Adform, and Twitter.**

172.    The statements in the preceding paragraph  were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, far from "fac[ing] robust competition in a crowded advertising technology industry," and far from a wide gamut of competing tools for publishers and advertisers, Google was, for example, (i) forcing publishers to transact with DV360 and Google Ads in AdX; (ii) forcing publishers to license Google's ad server, DFP, and to trade in Google's ad exchange, AdX; (iii) preventing publishers from preferencing rival ad exchanges; and (iv) inhibiting advertisers from transacting through rival ad exchanges engaged in header bidding. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

173.    In response to Rep. Kelly Armstrong's questions "**in 2018, Google restricted export of the DoubleClick ID through Google Data Transfer, correct? Did this action reduce competition from other digital advertising participants?**" Google and Pichai responded:

**No. Advertisers remain free to (and do) choose from among Google's many competitors that facilitate the purchase of ad inventory (e.g., Amazon, Facebook, Snap, AT&T's Xandr, Adform, Sma, Twitter, Adobe, The Trade Desk, MediaMath, and Verizon Media, among others).** These companies have their own policies with respect to use of personal identifiers for ads reporting and measurement.

174.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, for example, Google was coercing advertisers to transact in AdX, and to exclusively use Google's buying tools. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

175.    In response to Rep. Ken Buck's question "**[d]oes Google run the auctions to determine which ad can fill a specific ad box?**" Google and Pichai responded:

Publishers using Google's publisher-side ad tech products (e.g., Google Ad Manager, AdMob, or AdSense) can, among other sales methods, use those products to sell their ad inventory via an auction. **Publishers use multiple platforms to sell ads and are not required to use Google. According to a recent independent survey, publishers use four to six different platforms to sell ads, while the top 100 advertisers use an average of four to seven platforms to buy ads.** This recent study is available at https://www.adexchanger.com/plaorms/google-ad-managerpolicy-changes-dont-hu-publishers-according-to-adveiser-perceptions/. Likewise, Google largely uses an auction format to sell ad inventory from its owned and operated properties. **Which ads can show for a particular impression depends on a variety of factors, including the set of eligible auction participants set by the publisher, whether the publisher has blocked a certain advertiser from showing ads on its inventory, and the applicable floor price as set by the publisher.**

176.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from not requiring publishers and advertisers to use Google, Google and Pichai failed to disclose that Google was: (i) forcing publishers to transact with DV360 and Google Ads in AdX; (ii) forcing publishers to license Google's ad server, DFP, and trade in Google's ad exchange, AdX; (iii) preventing publishers from preferencing rival ad exchanges; (iv) inhibiting advertisers from transacting through

rival ad exchanges engaged in header bidding; and (v) utilizing opaque auction programs to manipulate digital advertising auctions. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

177.  In response to Rep. Pramila Jayapal's question **"[w]hat policies and practices does Google use to ensure that it is serving the interests of businesses selling and buying ad space?"** Google and Pichai responded:

> **Google designs its advertising technology products to meet the needs of advertisers, publishers, and users, all of whom benefit from a healthy ad-supported Internet ecosystem. Google designs its products for advertisers to help them increase return on their ad spend, reach the right audiences at the right time, and avoid ad fraud. On the publisher side, Google designs its ad technology products to enable publishers to facilitate competition and increase revenues for their ad inventory**, while protecting their site or app from fraud, malware, and unsafe or inappropriate ads.

178.  The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from "meet[ing] the needs of advertisers, publishers, and users," Google and Pichai failed to disclose, for example, that Google was favoring its own ad exchange AdX in the ad selection auction run by its publisher ad server DFP and it was redirecting revenue and transactions back to Google's ad exchange, where it could charge high fees. Google was secretly manipulating auctions and coercing publishers and advertisers to transact in AdX, and was coercing advertisers to exclusively use Google's ad buying tools. This led to higher prices that advertisers had to pay to place their ads. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

**7.     September 29, 2020 Statements About Channels Through Which Bids Are Received**

179.  On September 29, 2020, Google and Pichai made the following representations on the Company's website, when describing "How Open Bidding works":

1
2

The channel through which a bid is received (for example, whether through Google Ads or Display & Video 360, a third-party Authorized Buyer, Open Bidding yield partner, or a remnant line item) does not otherwise affect the determination of the winning bidder.

3
4

These representations were also made by Google and Pichai on the Company's website on October 6,

5

2020, and November 25, 2020.

6
7
8
9

180.    These statements mirrored or were nearly identical to those that Pichai had made in written testimony to Congress. Pichai was therefore highly involved in preparing, reviewing and approving these statements. He possessed the power and authority to control the content of these statements.

10
11
12
13
14
15
16

181.    The statements were materially false and misleading, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that, for example, through Project Poirot, DV360 intentionally bid less on rival exchanges and increased bids on Google's AdX, resulting in more winning bids in AdX. Google reduced DV360's bids between 10% and 90% when placed on certain rival ad exchanges suspected of using Header Bidding, while leaving bids intact when being submitted to Google's own ad exchange.

17
18
19
20
21
22
23

182.    The statements were materially false and misleading, or omitted to state material facts necessary to make the statements not misleading, because they also failed to disclose that, for example, through Project Elmo, using "cookies" DV360 intentionally throttled (reduced) its spending on exchanges engaged in Header Bidding, resulting in more bids being won in AdX. Internal Google emails from March 2018 confirm Elmo's success, noting "impact of elmo is another 7.8% increase on AdX. so another 220M shifting."

24
25
26
27

183.    The statements were materially false and misleading for the additional reason that, in truth, when Facebook used its ad buying tool FAN in Google's Open Bidding system or in other auctions run by Google, Facebook was given a minimum guaranteed fixed "win rate" by Google, along with

28

other information and speed advantages that helped it win over other bidders, so the channel through which a bid was received did in fact affect the determination of the winning bidder. Likewise, through Google's DV360, Google Ads, or Google's AdMob network, Google gave itself a minimum guaranteed fixed "win rate," along with other information and speed advantages that improved Google's chances of winning bids over other participants, so the channel through which a bid was received did affect the determination of the winning bidder. More specifically, Google and Facebook had a fixed minimum "win rate" of at least 10% in the auctions. Google and Facebook were also able to identify 80 percent of mobile users and 60 percent of web users, a process that improved the match rates for these entities. The guarantees Google gave Facebook also shifted transactions to Google's own Open Bidding system or to other auctions run by Google, and to Google's AdX or AdMob. These practices created a heightened risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, and reputational harm.

### 8.    September 29, 2020 Statements About Equal Competition in the Unified Auction

184.    On September 29, 2020, Google and Pichai made the following representations on the Company's website, when describing "How Open Bidding works":

> All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis [*i.e.*, after all the fees have been taken out].

These representations were also made by Google and Pichai on the Company's website on October 6, 2020, and November 25, 2020.

185.    These statements mirrored or were nearly identical to those that Pichai had made in written testimony to Congress. Pichai was therefore highly involved in preparing, reviewing and approving these statements. He possessed the power and authority to control the content of these statements.

186.     The statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because not all participants in the unified auction competed equally for each impression. For example, Google and Facebook had profound advantages not granted to other participants, such as speed and information advantages. Among other things, while Google gave participants 160 millisecond timeouts, it nearly doubled that amount for itself and for Facebook, to 300 milliseconds. Google and Facebook enjoyed other special privileges not available to other participants, such as the ability to detect which impressions were likely targeted to spam (and were therefore useless), as well as the ability to recognize users and bid and win more often. Google and Facebook also ensured that they had a guaranteed "win rate" of at least 10% in the auctions. Moreover, Google agreed to restrict its use of Facebook's bid data to beat it in the auctions. As the government's investigation uncovered, "this was a stark departure from Google's usual practices of spying and trading based on other bidders' past behavior." Google and Facebook also had the advantage of having a direct billing and contractual relationship with publishers, another perk not extended to other participants. Indeed, one advertising competitor compared Google's business terms to a "gag order." These practices created a heightened risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, and reputational harm.

        **9.      February 1, 2021 Statements About Channels Through Which Bids Are Received**

187.     On or around February 1, 2021, Google and Pichai made the following representations on the Company's website, when describing "How Open Bidding works":

        The channel through which a bid is received (for example, whether through Google Ads or Display & Video 360, a third-party Authorized Buyer, Open Bidding yield partner, or a remnant line item) does not otherwise affect the determination of the winning bidder.

These representations were also made by Google and Pichai on the Company's website on April 29, 2021, May 17, 2021, July 25, 2021, September 29, 2021, October 6, 2021, and November 25, 2021.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

188.    These statements mirrored or were nearly identical to those that Pichai had made in written testimony to Congress. Pichai was therefore highly involved in preparing, reviewing and approving these statements. He possessed the power and authority to control the content of these statements.

189.    The statements were materially false and misleading, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that, for example, through Project Poirot, DV360 intentionally bid less on rival exchanges and increased bids on Google's AdX, resulting in more winning bids in AdX. Google reduced DV360's bids between 10% and 90% when placed on certain rival ad exchanges suspected of using Header Bidding, while leaving bids intact when being submitted to Google's own ad exchange.

190.    The statements were materially false and misleading, or omitted to state material facts necessary to make the statements not misleading, because they also failed to disclose that, for example, through Project Elmo, using "cookies" DV360 intentionally throttled (reduced) its spending on exchanges that were found to be engaged in Header Bidding, resulting in more bids being won in AdX. Internal Google emails from March 2018 confirm Elmo's success, noting "impact of elmo is another 7.8% increase on AdX. so another 220M shifting."

191.    The statements were materially false and misleading for the additional reason that, in truth, when Facebook used its ad buying tool FAN in Google's Open Bidding system or in other auctions run by Google, Facebook was given a minimum guaranteed fixed "win rate" by Google, along with other information and speed advantages that helped it win over other bidders, so the channel through which a bid was received did in fact affect the determination of the winning bidder. Likewise, through Google's DV360, Google Ads, or Google's AdMob network, Google gave itself a minimum guaranteed fixed "win rate," along with other information and speed advantages that improved Google's chances

of winning bids over other participants, so the channel through which a bid was received did affect the determination of the winning bidder. More specifically, Google and Facebook had a fixed minimum "win rate" of at least 10% in the auctions. Google and Facebook were also able to identify 80 percent of mobile users and 60 percent of web users, a process that improved the match rates for these entities. The guarantees Google gave Facebook also shifted transactions  to Google's own Open Bidding system or to other auctions run by Google, and to Google's AdX or AdMob. These practices created a heightened risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, and reputational harm.

### 10. February 1, 2021 Statements About Equal Competition in the Unified Auction

192.   On or around February 1, 2021, Google and Pichai made the following representations on the Company's website, when describing "How Open Bidding works":

> All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis [*i.e.*, after all the fees have been taken out].

These representations were also made by Google and Pichai on the Company's website on April 29, 2021, May 17, 2021, July 25, 2021, September 29, 2021, October 6, 2021, and November 25, 2021.

193.   These statements mirrored or were nearly identical to those that Pichai had made in written testimony to Congress. Pichai was therefore highly involved in preparing, reviewing and approving these statements. He possessed the power and authority to control the content of these statements.

194.   The statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because not all participants in the unified auction competed equally for each impression. For example, Google and Facebook had profound advantages not granted to other participants, such as speed and information advantages. Among other

59

things, while Google gave participants 160 millisecond timeouts, it nearly doubled that amount for itself and for Facebook, to 300 milliseconds. Google and Facebook enjoyed other special privileges not available to other participants, such as the ability to detect which impressions were likely targeted to spam (and were therefore useless), as well as the ability to recognize users and bid and win more often. Google and Facebook also ensured that they had a guaranteed "win rate" of at least 10% in the auctions. Moreover, Google agreed to restrict its use of Facebook's bid data to beat it in the auctions. As the government's investigation uncovered, "this was a stark departure from Google's usual practices of spying and trading based on other bidders' past behavior." Google and Facebook also had the advantage of having a direct billing and contractual relationship with publishers, another perk not extended to other participants. Indeed, one advertising competitor compared Google's business terms to a "gag order." These practices created a heightened risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, and reputational harm.

### 11.    April 27, 2021 Quarterly Earnings Call

195.    On April 27, 2021, Alphabet hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call"). During this call, Defendant Schindler stated: "**So we are working very closely with our partners, advertisers and so on across the world to help them optimize their conversion rates and their O/I.**"

196.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from helping Alphabet's advertising partners to "optimize . . . their O/I [operating income]," Schindler failed to disclose that Alphabet was, for example: (i) redirecting revenue and transactions back to Google's ad exchange, where it could charge supracompetitive fees; (ii) causing a decrease to publisher revenue overall; and (iii) opting all advertising campaigns into Project Poirot by default. These practices

created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 12.    July 27, 2021 Quarterly Earnings Call

197.    On July 27, 2021, Alphabet hosted an earnings call with investors and analysts to discuss the Company's Q2 2021 results (the "Q2 2021 Earnings Call"). During this call, Defendant Schindler stated: "**We know today that more than 80% of our advertisers use automated bidding. Using ML, our Ads products are more efficiently connecting businesses with their customers, taking the guesswork out of getting the right message at the right time to the right customer, all in the privacy-first way.**"

198.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from conducting Alphabet's automated bidding auctions "in the privacy-first way," Schindler failed to disclose that Alphabet was: (i) utilizing opaque auction programs to manipulate digital advertising auctions; (ii) maintaining visibility into the bids submitted by rival exchanges and using that information to inform its own trade decisions; (iii) trading ahead of rival exchanges in Open Bidding; and (iv) excluding competition from header bidding by providing AdX and other exchanges in Open Bidding informational advantages that allow them to trade ahead of bids submitted by header bidding exchanges. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 13.    October 26, 2021 Quarterly Earnings Call

199.    On October 26, 2021, Alphabet hosted an earnings call with investors and analysts to discuss the Company's Q3 2021 results (the "Q3 2021 Earnings Call"). During this call, Defendant

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

Schindler stated: "**Our focus is on supporting developers, small and large advertisers, creators publishers, so that they're able to mitigate impact to their businesses**."

200.     The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from supporting Alphabet's advertisers and publishers, Schindler failed to disclose that Alphabet was, for example: (i) in the online advertising space, favoring its own ad exchange AdX in the ad selection auction run by its dominant publisher ad server DFP; (ii) forcing publishers to transact with DV360 and Google Ads in AdX; (iii) forcing publishers to license Google's ad server, DFP, and trade in Google's ad exchange, AdX; (iv) preventing publishers from preferencing rival ad exchanges; (v) inhibiting advertisers from transacting through rival ad exchanges engaged in header bidding; (vi) charging an exorbitant take rate; (vii) causing publishes to accept lower bids; and (viii) opting all advertising campaigns into Project Poirot by default. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 14.     February 1, 2022 Quarterly Earnings Call

201.     On February 1, 2022, Alphabet hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call"). During this call, Defendant Schindler stated:

> **And there's a lot of intelligence in our auction to deliver great ROI [return on investment] for advertisers,** but there's always more we can do.

202.     The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from "deliver[ing] great ROI for advertisers," Schindler failed to disclose that Alphabet was secretly manipulating auctions and coercing advertisers to transact in AdX, and to exclusively use Google's ad buying tools. For example, through Project Poirot, Google changed the setting of DV360 so that by

default all advertising campaigns were opted into Google's AdX, which extracted exorbitant fees. These practices led to higher prices that advertisers had to pay to place their ads. They also decreased the access the advertisers had to ad inventory. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 15. February 1, 2022 Statements About Channels Through Which Bids Are Received

203.    On February 1, 2022, Google and Pichai made the following representations on the Company's website, when describing "How Open Bidding works":

> The channel through which a bid is received (for example, whether through Google Ads or Display & Video 360, a third-party Authorized Buyer, Open Bidding yield partner, or a remnant line item) does not otherwise affect the determination of the winning bidder.

These representations were also made by Google and Pichai on the Company's website on April 29, 2022, May 17, 2022, July 25, 2022, September 29, 2022, October 6, 2022, and November 25, 2022.

204.    These statements mirrored or were nearly identical to those that Pichai had made in written testimony to Congress. Pichai was therefore highly involved in preparing, reviewing and approving these statements. He possessed the power and authority to control the content of these statements.

205.    The statements were materially false and misleading, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that, for example, through Project Poirot, DV360 intentionally bid less on rival exchanges and increased bids on Google's AdX, resulting in more winning bids in AdX. Google reduced DV360's bids between 10% and 90% when placed on certain rival ad exchanges suspected of using Header Bidding, while leaving bids intact when being submitted to Google's own ad exchange.

206.    The statements were materially false and misleading, or omitted to state material facts necessary to make the statements not misleading, because they also failed to disclose that, for example,

through Project Elmo, using "cookies" DV360 intentionally throttled (reduced) its spending on exchanges that were found to be engaged in Header Bidding, resulting in more bids being won in AdX. Internal Google emails from March 2018 confirm Elmo's success, noting "impact of elmo is another 7.8% increase on AdX. so another 220M shifting."

207.    The statements were materially false and misleading for the additional reason that, in truth, when Facebook used its ad buying tool FAN in Google's Open Bidding system or in other auctions run by Google, Facebook was given a minimum guaranteed fixed "win rate" by Google, along with other information and speed advantages that helped it win over other bidders, so the channel through which a bid was received did in fact affect the determination of the winning bidder. Likewise, through Google's DV360, Google Ads, or Google's AdMob network, Google gave itself a minimum guaranteed fixed "win rate," along with other information and speed advantages that improved Google's chances of winning bids over other participants, so the channel through which a bid was received did affect the determination of the winning bidder. More specifically, Google and Facebook had a fixed minimum "win rate" of at least 10% in the auctions. Google and Facebook were also able to identify 80 percent of mobile users and 60 percent of web users, a process that improved the match rates for these entities. The guarantees Google gave Facebook also shifted transactions  to Google's own Open Bidding system or to other auctions run by Google, and to Google's AdX or AdMob. These practices created a heightened risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, and reputational harm.

### 16.    February 1, 2022 Statements About Equal Competition in the Unified Auction

208.    On February 1, 2022, Google and Pichai made the following representations on the Company's website, when describing "How Open Bidding works":

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

> All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis [*i.e.*, after all the fees have been taken out].

These representations were also made by Google and Pichai on the Company's website on April 29, 2022, May 17, 2022, July 25, 2022, September 29, 2022, October 6, 2022, and November 25, 2022.

209.    These statements mirrored or were nearly identical to those that Pichai had made in written testimony to Congress. Pichai was therefore highly involved in preparing, reviewing and approving these statements. He possessed the power and authority to control the content of these statements.

210.    The statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because not all participants in the unified auction competed equally for each impression. For example, Google and Facebook had profound advantages not granted to other participants, such as speed and information advantages. Among other things, while Google gave participants 160 millisecond timeouts, it nearly doubled that amount for itself and for Facebook, to 300 milliseconds. Google and Facebook enjoyed other special privileges not available to other participants, such as the ability to detect which impressions were likely targeted to spam (and were therefore useless), as well as the ability to recognize users and bid and win more often. Google and Facebook also ensured that they had a guaranteed "win rate" of at least 10% in the auctions. Moreover, Google agreed to restrict its use of Facebook's bid data to beat it in the auctions. As the government's investigation uncovered, "this was a stark departure from Google's usual practices of spying and trading based on other bidders' past behavior." Google and Facebook also had the advantage of having a direct billing and contractual relationship with publishers, another perk not extended to other participants. Indeed, one advertising competitor compared Google's business terms to a "gag order."

These practices created a heightened risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, and reputational harm.

### 17.     2021 Form 10-K

211.     On February 2, 2022, Alphabet filed its 2021 Form 10-K with the SEC. The 2021 Form 10-K was signed by Defendants Pichai and Porat. In the 2021 Form 10-K, the Company stated:

> **We have built world-class advertising technologies for advertisers**, agencies, **and publishers to power their digital marketing businesses. Our advertising solutions help millions of companies grow their businesses through our wide range of products across devices and formats,** and we aim to ensure positive user experiences by serving the right ads at the right time and by building deep partnerships with brands and agencies.

212.     The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, for example, Defendants failed to disclose that instead of helping advertisers and publishers, Alphabet and/or Google was favoring its own ad exchange AdX in the ad selection auction run by its publisher ad server DFP and it was redirecting revenue and transactions back to Google's ad exchange, where it could charge high fees. Alphabet was secretly manipulating auctions and coercing publishers and advertisers to transact in AdX, and was coercing advertisers to exclusively use Google's ad buying tools. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 18.     July 26, 2022 Quarterly Earnings Call

213.     On July 26, 2022, Alphabet hosted an earnings call with investors and analysts to discuss the Company's Q2 2022 results (the "Q2 2022 Earnings Call"). During this call, Defendant Schindler stated:

> But in the end, **our mingle is on** delivering great experiences for our users and **driving incremental ROI for advertisers and then making them successful across all this big universe of sectors** I just talked about.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

214.     The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, far from "driving incremental ROI for advertisers and then making them successful," Schindler failed to disclose that Alphabet was secretly manipulating auctions and coercing publishers and advertisers to transact in AdX, and was coercing advertisers to exclusively use Google's ad buying tools. For example, through Project Poirot, Google changed the setting of DV360 so that by default all advertising campaigns were opted into Google's AdX, which extracted exorbitant fees. These practices led to higher prices that advertisers had to pay to place their ads. They also decreased the access the advertisers had to ad inventory. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

### 19.     July 27, 2022 Google Ads Newsroom Statement

215.     On or around July 27, 2022, Google posted on its official website the following statement concerning its Google Ads business: "**Bringing greater transparency to advertisers, agencies and publishers is core to our approach**."

216.     The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, for example, Google failed to disclose that it was self-preferencing its own advertising technology tools, was using opaque auction programs to manipulate digital advertising auctions in its favor, and was secretly manipulating auctions and coercing publishers and advertisers to transact in AdX, as well as coercing advertisers to exclusively use Google's ad buying tools. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

**20.     January 24, 2023 Google Newsroom Statement**

217.     On or around January 24, 2023, Google posted on its official website the following statements concerning its open bidding process:

**Open Bidding is a competitive response and improvement upon header bidding.**

**We created an alternative to header bidding, called Open Bidding, that allows for the same competition,** but runs within the ad server instead of on your device.

218.     The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, far from being a competitive response and supposed improvement to header bidding, for example, Open Bidding excluded competition from header bidding by providing AdX and other exchanges in Open Bidding informational advantages that allowed them to trade ahead of bids submitted by header bidding exchanges, with AdX charging exorbitant fees, and by inhibiting advertisers from transacting through rival ad exchanges engaged in header bidding. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

219.     On or around January 24, 2023, Google posted on its official website the following statements concerning its advertising technology business:

**Publishers are free to use our ad exchange with different ad servers. Publishers can and do use our ad exchange with a different ad server.**

220.     The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, for example, Google was forcing publishers to transact with DV360 and Google Ads in AdX, it was forcing publishers to license Google's ad server, DFP, and to trade in AdX. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

221.    On or around January 24, 2023, Google posted on its official website the following statements concerning its advertising technology business:

**Our tools help advertisers bid more efficiently and help publishers make more money.**

**We offer publishers many ways to optimize the inventory they sell using Google Ad Manager to help them make more money from their ad space. We implement optimizations like this frequently, specifically to help publishers maximize their revenues.**

**[W]e've built our advertising technologies to interoperate with 80 competing platforms for publishers and even more for advertisers. Many publishers and advertisers who use our services also use rival platforms.**

222.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because, Google failed to disclose that it was, for example,  forcing publishers to transact with DV360 and Google Ads in AdX, forcing publishers to license Google's ad server, DFP, and trade in Google's ad exchange, AdX, which extracted exorbitant fees and causing a decrease in publisher revenues, and it was inhibiting advertisers from transacting through rival ad exchanges engaged in header bidding. Google was also opting all advertising campaigns into Project Poirot by default. These practices created a heightened risk of civil and regulatory investigations, regulatory enforcement actions and reputational harm.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS CONCERNING PRIVACY POLICIES AND PRACTICES

### 1.    2019 Form 10-K

223.    On February 4, 2020, Alphabet filed its 2019 Form 10-K with the SEC. The 2019 Form 10-K was signed by Defendants Pichai and Porat. In the 2019 Form 10-K, the Company stated: "Key to building helpful products for users is our commitment to keeping their data safe online. As the Internet evolves, we continue to invest in our industry-leading security technologies and privacy tools, such as the addition of auto-delete controls to enable users to automatically delete activity after 3 or 18 months

and incognito mode in YouTube and Maps."

224.   The statements in the preceding paragraph were misleadingly incomplete when made because they failed to disclose that Google had gained access to Android users' WhatsApp backups on Google Drive. In truth, Google was "opaquely" backing up users' WhatsApp communications to Google Drive. This practice created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 2.   April 28, 2020 - Quarterly Earnings Call

225.   On April 28, 2020, Alphabet hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call"). During the Q1 2020 Earnings Call, Defendant Pichai stated "At Google, we'll continue to be focused on the four key areas that I outlined . . .  providing the most trusted experiences for our users. This includes . . . our work to safeguard consumer privacy."

226.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 3.   June 24, 2020 - Blog Post by CEO Pichai

227.   On June 24, 2020, in a blog post published on the Google website titled "Keeping your private information private," Defendant Pichai stated:

> Privacy is at the heart of everything we do [.]

***

70

As always, we don't sell your information to anyone, and we don't use information in apps where you primarily store personal content—such as Gmail, Drive, Calendar and Photos—for advertising purposes, period.

228.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that (i)  Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections; and (ii) Google had gained access to Android users' WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 4.    June 24, 2020 – Tweet by Kent Walker

229.    Also on June 24, 2020, Defendant Walker stated the following on his Twitter account: "We continue to support comprehensive federal privacy legislation in the U.S. and are finding new ways to incorporate meaningful privacy controls into our products."

230.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 5.    July 29, 2020 – Pichai's House Judiciary Committee Testimony

231.    On July 29, 2020, Defendant Pichai testified before the House Judiciary Committee for the hearing "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google," ("July 29, 2020 Hearing."). Defendant Pichai stated:

Competition also sets higher standards for privacy and security. I've always believed that privacy is a universal right and Google is committed to keeping your information safe,

71

treating it responsibly, putting you in control. And we've long supported the creation of comprehensive federal privacy laws.

232.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that (i)  Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections; and (ii) Google had gained access to Android users' WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 6.    July 29, 2020 – Written Testimony of Sundar Pichai before the House Judiciary Committee

233.    On July 29, 2020, Defendant Pichai also submitted written testimony to the same Congressional hearing, where  he stated:

> Competition also sets higher standards for privacy and security. I've always believed that privacy is a universal right and should be available to everyone, and ***Google is committed to keeping your information safe, treating it responsibly***, and putting you in control of what you choose to share. We also never sell user information to third parties. But more must be done to protect users across industries, which is why ***we've long supported the creation of comprehensive federal privacy laws***.

234.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that  (i)  Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections; and (ii) Google had gained access to Android users' WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

72

### 7. July 30, 2020 – Quarterly Earnings Call

235.    On July 30, 2020, Alphabet hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results (the "Q2 2020 Earnings Call"). During the Q2 2020 Earnings Call, Defendant Pichai stated:

> Today, I'll review the quarter by walking through the four key areas for 2020 that you've heard me mention over the last several quarters . . . providing trusted experiences for our users. ***Doing even more to protect users' privacy, keep information safe and provide high quality information was a key focus this quarter.*** In one important update, we now set people's Location History and Web and App Activity to delete automatically after 18 months as the default. We also integrated Password Checkup into our core security checkup to help people detect any instance of their online accounts being compromised. More than 100 million people have used it.

236.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose  that (i)  Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections; and (ii) Google had gained access to Android users' WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 8. October 7, 2020 – Tweet by Kent Walker

237.    On October 7, 2020, Defendant Walker stated the following on his Twitter account: "Even as we continue to support comprehensive Federal Privacy legislation, we're building privacy and security into every Google Account and the products you use every day."

238.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that  (i)  Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections; and (ii) Google had gained access to Android users'

WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 9.   Google's October 7, 2020 Blog Post

239.   On or around October 7, 2020  Google published a blog post explaining the WhatsApp-Google Drive partnership. The blog post stated "WhatsApp for Android lets you create a private backup of your chat history, voice messages, photos, and videos in Google Drive." This post appeared in the same form on Google's website on or around October 7, 2021 and on or around October 7, 2022.

240.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Google had gained access to Android users' WhatsApp backups on Google Drive. In truth, Google was "opaquely" backing up users' WhatsApp communications to Google Drive. This practice created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 10.   Google's Security & Privacy Page

241.   On Google's Security & Privacy page, the following statement appeared each month from at least October 8, 2020 until the end of the Class Period: "We keep your personal information private, safe, and secure."

242.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose Google had gained access to Android users' WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These

practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 11. Google Drive Twitter Account

243.    The Google Drive Twitter account, in a series of tweets starting October 17, 2020 and repeated throughout the Class Period, stated: "In Google Drive, users privacy and security are our top priority."

244.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that  Google had gained access to Android users' WhatsApp backups on Google Drive. In truth, Google was "opaquely" backing up users' WhatsApp communications to Google Drive. This practice created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 12. October 28, 2020 – Testimony of Pichai at Senate Commerce Committee Hearing

245.    On October 28, 2020, in a Senate Commerce Committee Hearing, Defendant Pichai stated:

> When it comes to privacy, we are committed to keeping your information safe, treating it responsibly and putting you in control. ***We continue to make privacy improvements*** like the changes I announced earlier this year to keep less data by default, ***and support the creation of comprehensive federal privacy laws***.
>
> *        *        *
>
> Privacy is one of the most important areas we invest in as a company. Have thousands of engineers working on it. We believe in giving users control, choice, and transparency. ***And anytime we associate data with users, we are transparent.*** They can go see what data is there. We give them delete controls. We give data portability options.

246.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

Defendants failed to disclose that  (i)  Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections; and (ii) Google had gained access to Android users' WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 13.    October 28, 2020 – Written Testimony of Pichai to Senate Commerce Committee Hearing

247.    In written testimony submitted to that same Senate hearing the same day, Defendant Pichai stated:

> When it comes to privacy we are committed to keeping your information safe, treating it responsibly, and putting you in control. ***We continue to make privacy improvements*** — like the changes I announced earlier this year to keep less data by default—***and support the creation of comprehensive federal privacy laws***.

248.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 14.    December 9, 2020 – UBS Global TMT Virtual Conference

249.    On December 9, 2020, at the UBS Global TMT Virtual Conference, Defendant Schindler said:

> And when you take the example of CCPA [California Consumer Privacy Act] that you mentioned, we're complying actually with all CCPA requirements, the same way we've complied with all the GDPR [General Data Protection Regulation] requirements. We've actually made our tools and the system and the way we look at it available across the globe, so not just in California if you take the CCPA example. We've led in a lot of different areas. ***We're actively supporting and advocating for federal privacy legislation. So that's something we're heavily involved in.***

250.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 15.    December 9, 2020 – Tweet by Kent Walker

251.    Also on December 9, 2020, Defendant Walker stated the following on his Twitter account: "Take a look at Chrome's latest security & privacy improvements. We continue to support comprehensive national privacy legislation in the #US, and continue to build security and privacy into our products."

252.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that (i)  Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections; and (ii) Google had gained access to Android users' WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 16.    March 3, 2021 – Tweet by Kent Walker

253.    On March 3, 2021, Defendant Walker stated the following on his Twitter account: "We build protections into every Google Account and the products you use every day. Now we're working with others to help build a more privacy-centric web."

254.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because

Defendants failed to disclose that (i) Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections; and (ii) Google had gained access to Android users' WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 17. March 25, 2021 – Testimony of Pichai at U.S. House Committee on Energy & Commerce

255. On March 25, 2021, in a hearing before the U.S. House Committee on Energy & Commerce, Defendant Pichai said:

> I think privacy is very important, and we have called for comprehensive Federal privacy legislation.

256. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

### 18. April 22, 2021 – 2020 Annual Report

257. On April 22, 2021, in Alphabet's 2020 Annual Report, the following statement appeared: "We continued to put privacy and security at the forefront of our products so that, every day, users are safer with Google."

258. The statement in the preceding paragraph was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading because Defendants failed to disclose that (i) Google was secretly pushing to forestall and impede consumer privacy efforts, including child privacy protections; and (ii) Google had gained access to Android users'

WhatsApp backups on Google Drive, and was "opaquely" backing up users' WhatsApp communications to Google Drive. These practices created a heightened risk of civil and regulatory investigations, litigation, regulatory enforcement actions and reputational harm.

## **LOSS CAUSATION**

259.    During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Alphabet securities, and operated as a fraud or deceit on Class Period purchasers of Alphabet securities, by misrepresenting Alphabet and Google's business and prospects and failing to disclose the adverse facts detailed herein. Plaintiffs and members of the Class purchased or otherwise acquired Alphabet securities throughout the Class Period at prices that were inflated by the fraud described herein.

260.    On December 16, 2020, the State Attorneys General of ten U.S. states filed an antitrust complaint against Google, in *The State Of Texas, et al v. Google, LLC*, Docket No. 4:20-cv-00957 (E.D. Tex. Dec 16, 2020) (Dkt. No. 1). The complaint targeted Google for alleged anti-competitive conduct that violated the antitrust laws in the field of digital advertising and contained allegations about, among other things, Google's anticompetitive practices, rigging of auctions, and controlling of pricing.

261.    On this news, Alphabet's Class A shares fell $1.02 per share over two days, or 1.16%, to close at $87.03 per share, while its Class C shares fell $0.99 per share over two days, or 1.12%, to close at $87.40 per share, on December 17, 2020.

262.    *Reuters* reported that Alphabet shares declined as a result of this news.

263.    On September 1, 2021 news broke post-market that the Department of Justice was readying an antitrust lawsuit targeting Google's anticompetitive practices in the advertising technology business. It was reported that the Justice Department had accelerated its investigation of Google's digital advertising practices and that a lawsuit was imminent.

264.    On this news, Alphabet's Class A shares fell $1.93 per share, or 1.33%, to close at $143.29 per share, while its Class C shares fell $1.62 per share, or 1.11%, to close at $144.22 per share, on September 2, 2021.

265.    *Bloomberg* reported that Alphabet shares declined as a result of this news.

266.    On October 22, 2021, the Attorneys General filed an unredacted second amended complaint, adding Attorneys General from other states (representing a total of sixteen U.S. states and the U.S. Territory Puerto Rico). *In re: Google Digital Advertising Antitrust Litigation*, Docket No. 1:21-md-03010 (S.D.N.Y. Oct. 22, 2021) (Dkt. No. 152). The judge overseeing the case had ordered the complaint unsealed at the request of 23 news media outlets. This complaint unredacted certain portions of the second amended complaint, exposing additional details of the alleged anticompetitive conduct undertaken by Google, and exposing more details about Google's privacy violations and its efforts to forestall or curtail privacy protections. The unredacted portions revealed, among other things, the specific cut of the ad spending market that Google was able to extract using its improper conduct, and showed the portion of various digital advertising markets that Google controlled through such means. The unredacted complaint also revealed that Google's top brass was working surreptitiously to undermine privacy protections, including child privacy protections. And it exposed the fact that Google was knowingly violating the privacy of over 750 million WhatsApp users on Google-Android devices that backed up their WhatsApp messaging history, photos, videos, and audio files to Google Drive.

267.    On this news, Alphabet's Class A shares fell $4.32 per share, or 3.04%, to close at $137.57 per share, while its Class C shares fell $4.15 per share, or 2.91%, to close at $138.63 per share, on October 22, 2021.

268.    *Barrons* reported that Alphabet's stock declined on the news.

269.    On February 11, 2022, the European Publishers Council ("EPC") filed an antitrust

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

complaint against Google with the European Commission. The EPC accused Google of prioritizing its own self-interest at the expense of the very customers it was supposed to serve, harming publishers, advertisers, and consumers, in the form of supracompetitive fees and lower quality of service. The EPC also alleged that Google's conduct has actively depressed publisher revenue.

270.    On this news, Alphabet's Class A shares fell $4.34 per share, or 3.13%, to close at $134.28 per share, while its Class C shares fell $4.47 per share, or 3.23%, to close at $134.13 per share, on February 11, 2022.

271.    On January 24, 2023, the Department of Justice issued a press release entitled "Justice Department Sues Google for Monopolizing Digital Advertising Technologies." The DoJ's press release announced that the DoJ and Attorneys General of eight states filed a civil antitrust lawsuit against Google for monopolizing multiple digital advertising technology products in violation of antitrust laws. The lawsuit accused Google of "wielding its dominance across digital advertising markets to force more publishers and advertisers to use its products; and thwarting the ability to use competing products." Google was charged with "forcing adoption of Google's tools such as its publisher ad server and ad exchange, limiting real-time bidding on publisher inventory on its ad exchange and preventing rival exchanges from competing, and manipulating auctions to Google's benefit in a manner that inhibits competing technology from emerging." These "anticompetitive activities allow Google to extract over 30% or more of the advertising dollars flowing through its digital advertising products and have allowed it to stamp out alternative competing technologies."

272.    An analyst report from *BNP Paribas* titled "Death by a thousand cuts: Regulatory pressures intensify," published on January 24, 2023, underscored the risks for Alphabet from the filing of the DoJ lawsuit. The report highlighted potential "highly disruptive interventionist measures the DoJ could impose on Google, including divestiture of Google Ad Manager and 'breaking up' the AdTech

stack," and "the fundamental disruption to Google's business model, which has been integrated along the AdTech stack across SSP (Supply Side), Ad servers, AdExchange and DSP (Demand Side)."

273. On this news, Alphabet's Class A shares fell $4.57 per share over two days, or 4.58%, to close at $95.22 per share, while its Class C shares fell $4.48 per share over two days, or 4.43%, to close at $96.73 per share, on January 25, 2023.

274. According to a *Bloomberg* article and a *Yahoo! Finance* article from January 24, 2023, Alphabet's stock declined on the news. According to a *Benzinga Newswire* article from January 25, 2023, Alphabet shares traded lower amid the news.

275. On April 17, 2023, post-market, nine more State Attorneys General joined the January 24, 2023 DoJ antitrust lawsuit against Alphabet.

276. On this news, Alphabet's Class A shares fell $1.47 per share, or 1.39%, to close at $104.50 per share, while its Class C shares fell $1.30 per share, or 1.22%, to close at $105.12 per share, on April 18, 2023.

277. The *New York Post* reported that Alphabet's stock sank on the news.

278. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

279. The Individual Defendants acted with scienter because at the time they issued public documents and other statements in Alphabet's and/or Google's name, they knew, or with extreme recklessness disregarded the fact that such statements were materially false and misleading or omitted material facts. The Individual Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those

misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

280.    The Individual Defendants received information reflecting the true facts regarding Alphabet and Google, their operations and business practices, had control over and/or received the companies' materially misleading misstatements, and/or their associations with the companies made them privy to confidential proprietary information concerning Alphabet and Google.  Accordingly, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein. The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

281.    These facts, in conjunction with the additional indicia of scienter alleged in ¶282 through ¶327, collectively support a strong inference that throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.

### 1.    The Fact Searching Exercise Involved in Preparing Defendant Pichai's Testimony To Congress Made Pichai at Least Highly Reckless in Issuing the False and Misleading Statements

282.    According to compliance experts knowledgeable about the process of preparing a witness to testify before Congress and/or other regulatory bodies, investigations by federal agencies, other arms of the federal government, self-regulatory organizations and state agencies, are all serious matters of the highest order. While investigations can differ in their potential impact on a company, it is well known in the corporate world that external investigations of almost any kind can result in material adverse effects on a company. There are numerous examples of companies suffering material adverse consequences of investigations, and in some cases companies have not survived investigations where

particularly egregious conduct has been uncovered. Given the potential negative impacts of investigations, it is the standard practice of companies, both public and private, to respond to investigations with the utmost seriousness and competence.

283.   Any company, no matter the size, will typically establish detailed response protocols to investigations, but that is particularly the case with a large company such as Alphabet/Google, which has almost unlimited resources to properly respond. The goal of the protocols is to ensure that the company responds accurately and completely to investigation inquiries. It is well known in the corporate world that while the underlying issues may be a problem, the failure to respond to inquiries forthrightly can exacerbate the situation. As the expression goes, sometimes the coverup is worse than the crime.

284.   Given the stakes, companies under investigation establish well-resourced protocols to ensure a proper response. Protocols include the establishment of a highly qualified team to respond to the investigation, including (i) employees directly involved in the issue at hand, (ii) employees who bring expertise to the matter, (iii) internal counsel, (iv) outside counsel, and (v) possibly other outside professionals.

285.   The core function of the response team is to ensure that any responses, whether in-person testimony or written responses, are accurate and complete. While it is the responsibility of the team to help prepare the witness, it is the responsibility of the witness to ensure that his or her testimony meets the standards of accuracy and completeness. Under industry custom and practice, the individual preparation by the witness, and of the witness by the response team, should be diligent and thorough. There should be sufficient diligence by the witness individually, and sufficient meetings between the witness and the response team, to ensure the witness can testify truthfully about the matters at hand. If the witness has any doubt about his or her understanding of the facts or issues, the witness should ensure he or she asks enough questions of the response team to get things right.

286.     As with Board members, senior executives have fiduciary duties to the company and its shareholders, including a duty of care. Senior executives must use care and be diligent when taking actions. The diligence must be sufficient to ensure that the actions taken are carefully considered and in the best interests of the company.  Inaccurate responses would not, of course, be in the best interests of a company, as such responses could result in further legal issues for a company and lead to reputational damage, among other consequences. Accordingly, the mandate under the duty of care with respect to investigatory inquiries is to do whatever is necessary to ensure accurate responses.

287.     Here, given the resources of Alphabet, one of the most valuable companies in the world, Pichai had access to an experienced and capable response team to assist with the preparation for his testimony, and to help oversee the written responses to the Judiciary Committee's follow-up questions. The Judiciary Committee inquiries focused on systems at Google itself, so the most capable experts in such systems were employed by or otherwise affiliated with Google.  Pichai had these experts at hand. He was in fact their boss, so he could request whatever information he needed to prepare properly for his testimony, and to ensure the written responses were correct.

288.     While Pichai as CEO would not be expected to read an enormous amount of material to ensure that Google's and his submission statements to Congress were accurate, he would be expected, under industry custom and practice, to read enough material, and engage sufficiently with the response team, to ensure the accuracy of the statements. In particular, Pichai would be expected to read his response submission statements, which were in direct response to questions raised by his testimony before the Judiciary Committee.

289.     Pichai, as CEO, was not ancillarily involved in the Judiciary Committee investigation, as he may have been with respect to other significant events at Google, he was directly involved in the Judiciary Committee investigation. The response submission was in effect an extension of Pichai's

testimony as the questions arose from the testimony, and the responses were designed to supplement the testimony. It was incumbent on Pichai to take the actions needed, consistent with his duty of care, to ensure the accuracy of his responses to Congress.

290.    This situation is not, for example, like a merger negotiation process, where the duty of care applies, and a CEO and the other senior executives would not be expected to read the entire merger agreement and other merger documents. In that case, management should review enough material to gain a sufficient understanding of the material terms and conditions of the deal so as to recommend an approval or disapproval of the merger.

291.    In this case, however, involving testimony and responses to the Judiciary Committee, there were no distinctions between material and non-material responses. Every word of Pichai's testimony was material and subject to scrutiny, as was every word of the submission.  Every word of the testimony and of the submission had to be verified by the response team, and Pichai had to ensure he had enough information to stand behind every statement therein.

292.    Accordingly, Plaintiffs submit that Pichai's inaccurate investigatory responses were either made knowingly or with a high degree of recklessness.

## 2.    The Advertising Technology Business and Privacy Are at the Core of Alphabet's and Google's Business and Defendants Discussed These Topics, Showing Their Familiarity With the Issues

293.    The advertising technology business is at the core of Alphabet and Google's overall business. The advertising technology business was critical to Alphabet's future growth and at the heart of its revenues. Privacy was also at the heart of the companies' business.

294.    Indeed, during the Class Period, the Individual Defendants frequently discussed these topics, showing their unique familiarity with them. The Defendants' repeated and detailed statements regarding the advertising technology business and privacy provide further strong evidence that they

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

were receiving specific information about the companies' advertising technology business and privacy practices.

295.    For example, on July 29, 2020, at a hearing before the House Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law on "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google," Defendant Pichai admitted that "I review, at a high level, all the important decisions we make."

296.    Defendant Pichai also authored a blog post discussing privacy, which was published to Google's website during the Class Period (*See* ¶227), and he has testified before Congress on no less than three occasions during the Class Period about privacy issues (*See* ¶¶231, 233, 245, 247). He also spoke on the issue at multiple earnings call conferences. *See* ¶¶225, 235. Defendant Pichai also testified before Congress regarding the advertising technology issues on July 29, 2020 and submitted written testimony to Congress about the topic. *See* ¶¶160-61, 163.

297.    Defendant Schindler has also made specific privacy statements at a UBS conference. *See* ¶249. Furthermore, he made specific statements about the advertising technology business at earnings call conferences. *See* ¶¶195, 197, 199, 201, 213.

298.    Defendant Porat also made specific statements about the advertising technology business at an earnings call conference. *See* ¶156.

299.    Defendant Walker personally commented on the Company's privacy efforts and even touted the companies' alleged efforts to support privacy legislation, when behind the scenes he was running a campaign to thwart privacy protections. *See* ¶¶229, 237, 251, 253.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

3.     **Governmental Investigations into Alphabet and/or Google Support a Strong Inference of Scienter**

300.     As detailed above, several governmental investigations into Alphabet and/or Google should have alerted Defendants to carefully evaluate and monitor the companies' practices vis-à-vis digital advertisement and privacy.

301.     As detailed above, the DoJ, numerous State Attorney Generals, and the European Commission have been investigating Alphabet and/or Google for misconduct concerning its anticompetitive practices in the digital ad space since at least 2020. These investigations culminated into legal actions against Alphabet and/or Google. *See, e.g.*, *United States et al v. Google LLC*, Docket No. 1:23-cv-00108 (E.D. Va. Jan 24, 2023) (Dkt. No. 120).

302.     These practices are also the subject of numerous private complaints in the U.S. and abroad by publishers and advertisers. *See*, *e.g*., European Publishers Council Complaint, referenced *supra* at ¶269; Advertiser Class Action Complaint; Newspaper Plaintiffs Complaint; Publishers' Class Action Complaint, *In re: Google Digital Advertising Antitrust Litigation*, Docket No. 1:21-md-03010 (S.D.N.Y. 2021) (Dkt. Nos. 399, 401, 408).

303.     On September 13, 2022, Google's motion to dismiss the Attorneys General's complaint was largely denied. *In re: Google Digital Advertising Antitrust Litigation*, Docket No. 1:21-md-03010 (S.D.N.Y. Sept. 13, 2022) (Dkt. No. 308). The court held that (a) "The states have plausibly alleged that Google has used its market power in the ad-exchange market to coerce publishers to license its publisher ad server and thus stated a claim for an unlawful tying arrangement in violation of Section 2"; (b) "The States have plausibly alleged a monopolization claim under section 2 in the nationwide markets for (1) publisher ad servers, (2) ad exchanges and (3) ad-buying tools for small advertisers"; and (c) "The States have plausibly alleged an attempt-to-monopolize claim under section 2 in the nationwide market for ad

buying tools for large advertisers and an alternative claim for attempt to monopolize the markets for ad exchanges and ad-buying tools for small advertisers." *Id.*

304.   On April 28, 2023, Google's motion to dismiss the DoJ's complaint was denied in its entirety. *United States et al v. Google LLC*, Docket No. 1:23-cv-00108 (E.D. Va. Apr. 28, 2023) (Dkt. No. 163). The court upheld all five claims against Google: (a) Monopolization of the Publisher Ad Server Market in Violation of Sherman Act § 2; (b) Monopolization of the Ad Exchange Market in Violation of Sherman Act § 2 or, in the alternative, Attempted Monopolization of the Ad Exchange Market in Violation of Sherman Act § 2; (c) Monopolization of the Advertiser Ad Network Market in Violation of Sherman Act § 2; (d) Unlawful Tying in Violation of Sherman Act §§ 1 and 2; and (e) Damages Incurred by the United States by Reason of Google's Violations of the Antitrust Laws, 15 U.S.C. § 15a. The court found that "the allegations are sufficiently specific to support all five of the claims[.]" April 28, 2023 Hearing Transcript in *United States et al v. Google LLC*, Docket No. 1:23-cv-00108 (E.D. Va. Apr. 28, 2023) (Dkt. No. 164). The court was "satisfied that there are enough specific allegations, including various quotes from people within Google, . . . referring to some competitors as presenting existential threats." *Id.*

305.   Each of these investigations and lawsuits can severely affect Google's core business, advertising, and result in significant penalties. For example, the European Commission alone can levy a fine of up to 10% of the company's annual revenue in the event it is found to have violated antitrust laws. There can be no credible argument that the Individual Defendants were not aware of these investigations and their underlying allegations and/or findings.

306.   According to CW2, Defendant Schindler and Vice President/General Manager – Ads Jerry Dischler led Ad Council meetings, or ACMs, where Google planned its response to the antitrust lawsuits. According to CW2, there were "weeks or months" of preparation within Google for the

meetings. Google also had "OC Privacy Councils" that always tried to anticipate antitrust lawsuits or other regulatory actions before they happened.

307. CW2 attended an Ad Council meeting focused on "product direction" for display ads, which involved "legal implications." Defendant Schindler and Dischler also attended this meeting. CW2 added that Defendant Schindler and Dischler report to Defendant Pichai. According to CW2, in such meetings and discussions, the "threat of the regulatory environment" was "never not" present – even when the "main topic was not regulatory." Everyone who attended the Ad Council meetings was briefed in advance about "two or three options or scenarios" for Google. CW2 said the meetings were "kind of like a staged play," where people read "scripts" describing the various scenarios that were prepared. "Everyone knows what's going to happen" because they're following along with the script, s/he said. This all leads up to the point of a "big decision," which occurs either during the meeting or afterward by Defendant Schindler and/or Dischler.

308. Although CW2 did not participate in any of the Ad Council meetings that were focused on antitrust cases, s/he put together preparatory materials on ad pricing for the Ad Council meetings focused on antitrust cases. These "pre-reads" materials were given to Defendant Schindler and Dischler. The materials included proposals for what Google should charge on the buy and sell side of its digital advertising business, with Google knowing that it needed to become transparent in its pricing. The materials CW2 helped prepare for the Ad Council meetings also included "position papers" and slides to support multiple scenarios for how Google might respond to antitrust cases. CW2 also added "I can't see how [Pichai and Porat] weren't in the know" about the Ad Council meetings. CW2 also stated that each of the big participants of the Ad Council meetings had their own staff meetings, during which the antitrust issues were likely discussed. For example, there were "P staff," or the staff of Defendant Philipp Schindler; "J staff," or the staff of Jerry Dischler, and so on.

309.     According to CW2, Google wins 80% of the auctions hosted on AdX. CW2 stated that Google wanted to decrease this figure because of the antitrust and legal implications, adding that there were discussions and "product work" and "workflows" carried out to try to get the number down. The company's remedial measures are also indicative of scienter.

### 4.     Alphabet Is a Highly Scrutinized Company

310.     Alphabet is the largest internet company in the world.  Because of this, Alphabet's and Google's business practices have drawn intense public interest on numerous fronts—something that was well-known, or should have been known, to members of senior management, including the Individual Defendants.  Throughout the Class Period, reporters and financial analysts frequently published articles and reports regarding the companies' business practices and growth, as well as the companies' anticompetitive practices and privacy concerns, and the companies' alleged violations of applicable laws *vis-à-vis* its dealings in the advertising technology market and relating to user privacy. Defendants were, or should have been, acutely aware that these matters were important to the public at large.  And, as companies hyper-focused on maintaining a certain image, it is reasonable to infer that Alphabet  and Google, and its executive management team, were closely tracking the same issues that had piqued the interest of so many outside of Alphabet and Google, including the media.

311.     Ultimately, when viewed collectively, as required by applicable law, Plaintiffs' allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the very least, the strong inference that Defendants' conduct was highly unreasonable and an extreme departure from standards of ordinary care.  In either case, Plaintiffs have adequately pleaded scienter.

### 5.     Defendants' Denials Support An Inference of Scienter

312.     Defendants repeatedly denied any allegations of misconduct.

313.    For example, on October 6, 2020, the House Judiciary Committee issued a report "Investigation of Competition in Digital Markets," finding that "With a sizable share in the ad exchange market and the ad intermediary market, and as a leading supplier of ad space, Google simultaneously acts on behalf of publishers and advertisers, while also trading for itself—a set of conflicting interests that market participants say enable Google to favor itself and create significant information asymmetries from which Google benefits." On or around October 6, 2020, Google posted on its official website the following statements vigorously denying claims that Google is self-preferencing its ad tech exchange and buying tools: "We compete fairly in a fast-moving and highly competitive industry. We disagree with today's reports, which feature outdated and inaccurate allegations from commercial rivals about Search and other services."

314.    On January 17, 2021, in a blog post by Director of Economic Policy Adam Cohen, and in direct response to the State Attorneys General case, the following statements appeared:

For example, as we've built our ad tech products, we have given people granular controls over how their information is used to personalize ads and limited the sharing of personal data to safeguard people's privacy.

\*\*\*

Myth: "Google uses privacy concerns to advantage itself."
Fact: Consumers expect us to secure their data—and we do.

AG Paxton misrepresents our privacy initiatives. We're committed to operating our advertising business in a way that gives people transparency into and control over how their data is used. Consumers also increasingly expect, and data privacy laws require, strict controls over ad tracking tools like cookies and ad identifiers. So we're focused on meeting those expectations and requirements. As we do so, we've created privacy-protecting solutions that enable other ad tech companies to continue to operate and introduced an open and collaborative industry initiative called the Privacy Sandbox, which is working on alternatives to cookies that preserve privacy while protecting free content. Other web browsers have likewise taken similar steps to limit the use of cookies and protect user privacy.

315.     In the January 17, 2021 blog post, Google also described AG Paxton's allegations as "wrong" and added the following:

> AMP supports a range of monetization options, including header bidding. Publishers are free to use both AMP and header bidding technologies together if they choose. The use of header bidding doesn't factor into publisher search rankings.
>
> Myth: We force partners to use Google tools.
> Fact: Partners can readily use our tools and other technologies side by side.
>
> This claim isn't accurate either.
>
> ***
>
> We don't require either advertisers or publishers to use our whole "stack," and many don't.
>
> ***
>
> Myth: Google forecloses competition by using exclusive access to historic bid information to win auctions.
> Fact: Google Ads bidding technology does not have exclusive access to historic bid information from the Google Ad Exchange.
>
> AG Paxton mischaracterizes one of many improvements Google Ads has made to optimize advertiser bids.

316.     On October 22, 2021, in response to the unredacted Attorneys General complaint released that day, a Google spokesman said in a statement that just because Texas Attorney General Ken Paxton "says something doesn't make it true." "We've been clear about our support for consistent privacy rules around the globe," the spokesman said.

317.     On September 1, 2021, in response to the report that the DoJ was readying a suit targeting Google's anticompetitive practices in the advertising technology business, the company stated that "Our advertising technologies help websites and apps fund their content, enable small businesses to grow, and protect users from exploitative privacy practices and bad ad experiences." "There is enormous

competition in advertising tools, which has made online ads more relevant, reduced fees, and expanded options for publishers and advertisers."

318.    On January 21, 2022, Google issued other statements on its official website in another blog post by Director of Economic Policy Adam Cohen, and in response to the Attorneys General's lawsuit. Google said it was "Correcting AG Paxton's false and misleading allegations. AG Paxton overlooks, or misstates, a litany of clear facts. We want to publicly and unequivocally refute the more egregious allegations. We don't force 'tying.' Header bidding is thriving. Our auctions are fair. But quite simply, we have – provably – done none of these things . . . ."

319.    On September 13, 2022, Google issued another statement on its official website characterizing the lawsuit as "deeply flawed."

320.    On or around January 24, 2023, Google posted on its official website several statements denying the allegations in the Department of Justice's lawsuit. Among other claims, Defendants stated that "Our advertising technologies are built to work with our competitors' products. We make it easy for partners to choose the products and services they want to use . . . ," and "No one is forced to use our advertising technologies – they choose to use them because they're effective. In fact, publishers and advertisers typically work with multiple technologies simultaneously to reach customers and make more money."

321.    Ultimately, when viewed collectively, Plaintiffs' allegations support a strong inference of fraudulent intent on the part of the Individual Defendants or, at the very least, a strong inference that their conduct was highly unreasonable and an extreme departure from standards of ordinary care. In either case, Plaintiffs have adequately pleaded scienter.

### 6. Defendants' Attempt to Hinder the DoJ Investigation and Cover Up Wrongdoing Contributes to a Strong Inference of Scienter

322.    In the high-profile lawsuit the DoJ brought against Google for violations of antitrust laws related to Google's alleged monopolization of key digital advertising technology, the Justice Department accused Google of "destroy[ing] a significant volume of relevant chats" the Company was under a duty to preserve. The DoJ explained that Google employees regularly communicated about business matters relevant to the case, such as Google's ad tech products and business, through internal "chats" on their computers and mobile devices. The information Google destroyed is highly relevant to Plaintiffs' claims here (which also involve Google's misconduct in the ad tech industry) and covers the entirety of the Class Period.

323.    The DoJ found that "aware of the risks of 'several significant legal and regulatory matters,' Google—from the highest levels of the organization—trained its employees to channel discussion of 'hot topics' that 'may be used against [Google]' . . . to Google internal instant-message chat tools." Google "instituted a policy that, absent manual intervention by business employees on a chat-by-chat basis, all internal chat communications would be automatically destroyed after 24 hours." Thus, the default setting for chats was "history off," meaning all chats were deleted after 24 hours. Google also trained its employees to "Communicate with Care" so that "sensitive" information would be "less likely . . . [to] be discovered by an adversary and used against . . . Google." The result of Google's spoliation was that "litigants, including the United States and its co-Plaintiffs were deprived of valuable, likely irreplaceable, discovery."

324.    Directing Google employees to keep "history off" came from the highest levels of the organization--CEO Pichai. In an October 2021 chat with one of his top lieutenants, Pichai instructed "can we change the setting of this group to history off," ahead of a "leaders circle" meeting. Nine seconds later, Pichai tried to delete his message. When asked later under oath about his attempt to

95

destroy the message, Pichai answered "I don't recall." Moreover, Google's corporate representative, Genaro Lopez, testified that the CEO had to approve document retention policies, including those regarding Google Chats, so Pichai approved the 24-hour deletion policy on relevant chats.

325.    In addition to destroying evidence, the DoJ also told the court that "Google stretched and weaponized the attorney-client privilege and its protections" by crafting emails that appear[ed] to be subject to the attorney-client privilege."

326.    Pichai himself testified in another recent case that he sometimes "marked e-mails privileged, not because [he was] seeking legal advice but just to indicate that they were confidential."[7] In that case, the Honorable James Donato of the U.S. District Court for the Northern District of California sanctioned Google for destroying discoverable evidence. *See In re Google Play Store Antitrust Litig.,* 664 F. Supp. 3d 981 (N.D. Cal. 2023). Judge Donato found, *inter alia,* that "Google employees routinely used Chat to discuss substantive business topics" and that Google "intentional[ly] manifested at every level within Google to hide the ball with respect to Chat." *Id.* at 986-993. The Court remarked that "Google intended to subvert the discovery process, and . . . Chat evidence was lost with the intent to prevent its use in litigation and with the intent to deprive another party of the information's use in the litigation." *Id.* at 993-94. Judge Donato found Google's conduct "egregious" and "the most serious and disturbing evidence I have ever seen in my decade on the bench with respect to a party intentionally suppressing potentially relevant evidence in litigation," calling it "a frontal assault on the

---

[7] *In re: Google Play Store Antitrust Litigation,* Docket No. 3:21-md-02981, Trial Tr. (Vol. 7) at 1321:17-24, 1323:5-17, ECF No. 840.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

fair administration of justice."[8] Accordingly, the Court instructed the jury that it could conclude that the destroyed chats contained information harming Google's case.

327.    Google's customary spoliation tactics have recently come in the crosshairs of another federal court, in *United States v. Google*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024 ) ("*Search*"). There, the Honorable Amit Mehta of the U.S. District Court for the District of Columbia was "taken aback by the lengths to which Google goes to avoid creating a paper trail for regulators and litigants," remarking that "[i]t is no wonder then that this case has lacked the kind of nakedly anticompetitive communications seen in" *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), "and other Section 2 cases." *Search*, 2024 WL 3647498, at *134.  After trial, Judge Mehta found that Google illegally monopolized online search by paying Apple, Samsung, Mozilla, and others billions of dollars to make Google the default search engine on their devices and browsers. The court did not rule on the government's motion for spoliation, having found Google liable for antitrust violations.

## PRESUMPTION OF RELIANCE

328.    Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine established in *Basic v. Levinson*, 485 U.S. 224 (1998), and the presumption of reliance for omissions set forth in *Affiliate Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

329.    The presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)     the Defendants made public misrepresentations or failed to disclose material facts necessary to make the statements that were made not misleading during the Class Period;

(b)     the misrepresentations and/or omissions were material;

---

[8] *In re: Google Play Store Antitrust Litigation,* Docket No. 3:21-md-02981, Trial Tr. (Vol. 16), 3228:19-3229:1, ECF No. 849

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

(c)     the Company's Class A and Class C stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's Class A and Class C stock; and

(e)     Plaintiffs and other members of the Class purchased Alphabet securities between the time Defendants misrepresented or failed to disclose material facts necessary to make the statements that were made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

330.    At all relevant times, the market for Alphabet's securities was efficient for the following reasons, among others:

(a)     Alphabet's Class A and Class C stock met the requirements for listing on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Alphabet filed periodic public reports with the SEC;

(c)     throughout the Class Period, Alphabet's Class A and Class C stock were highly liquid, with an average daily trading volume of 35.105 million shares for Class A stock and 30.418 million shares for Class C stock;

(d)     Alphabet regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)     Alphabet was followed by numerous securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(f)    unexpected company-specific news was reflected and incorporated into the stock price for Alphabet's Class A and Class C stock.

331.    As a result of the foregoing, the market for Alphabet securities promptly digested current information regarding Alphabet from publicly available sources and reflected such information in Alphabet's securities prices.  Under these circumstances, all purchasers of Alphabet securities during the Class Period suffered similar injury through their purchase of Alphabet securities at artificially inflated prices and the presumption of reliance applies.

332.    In addition, a presumption of reliance is also appropriate under *Affiliated Ute* because the claims asserted herein are grounded in material omissions.  As this action involves Defendants' failure to disclose material adverse information regarding Alphabet's business operations—information that the Defendants were obligated to disclose in light of the statements they made on these very topics and/or applicable SEC rules and regulations—positive proof of reliance is not a prerequisite to recovery.

## NO SAFE HARBOR

333.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein.

334.    None of the statements alleged herein to be false or misleading are forward-looking statements.  Rather, the statements alleged herein to be false or misleading all relate to facts and conditions existing at the time the statements were made.  None of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

335.    To the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Indeed, given the then-existing facts contradicting Defendants' statements, the boilerplate and generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.  In addition, the safe harbor does not apply because, at the time each purportedly "forward looking statement" was made, the speaker knew that the forward-looking statement was false or misleading when made, and/or the forward-looking statement was authorized or approved by an executive officer of Alphabet and/or Google who knew that the statement was materially false or misleading when made.

336.    Moreover, to the extent Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaged in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining the hypothetical nature of such disclosures.  In other words, the supposed "risks" that Defendants attempted to warn about had already materialized.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

337.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded stock of Alphabet during the period between February 4, 2020 and January 23, 2023, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are: Defendants; members of the immediate families of the Individual Defendants; the

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

338.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of January 26, 2023 (just three days from the end of the Class Period), the Company had approximately 5.956 billion shares of Class A stock outstanding and approximately 5.968 billion shares of Class C stock outstanding. Class A stock and Class C stock were actively trading on the NASDAQ throughout the Class Period.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

339.   Plaintiffs' claims are typical of the claims of members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

340.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

341.   Common questions of law and fact that exist as to all members of the Class predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

101

(a)      Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)      Whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)      Whether and to what extent the market price of Alphabet's securities was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(d)      Whether Defendants acted with the requisite level of scienter;

(e)      Whether the Individual Defendants were controlling persons of Alphabet and/or Google;

(f)      Whether reliance may be presumed; and

(g)      Whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

342.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

343.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

102

344.   This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of the Class against Alphabet, Google, and the Individual Defendants.

345.   As alleged herein, throughout the Class Period, the Defendants, individually and in concert, disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

346.   The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)   employed devices, schemes, and artifices to defraud;

(b)   made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Alphabet securities during the Class Period.

347.   As set forth above, the Individual Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Alphabet and Google personnel to members of the investing public, including Plaintiffs and the other members of the Class.

348.    Alphabet and Google are liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

349.    As a result of the foregoing, the market price of Alphabet securities was artificially inflated during the Class Period.  Plaintiffs and Class members relied on the integrity of the market price for Alphabet securities during the Class Period and paid prices for Alphabet securities that were artificially inflated as a result of the false and misleading statements described herein.  Plaintiffs and the Class members would not have purchased Alphabet securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the misleading statements and/or the material adverse information which the Defendants did not disclose.

350.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Alphabet securities during the Class Period.

351.    By reason of the foregoing, Defendants Alphabet, Google, Pichai, Porat, Schindler, and Walker are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

352.    Plaintiffs repeat, and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

353.    This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of the Class against the Individual Defendants. During the Class Period, the Individual Defendants directed involvement in the day-to-day operations of Alphabet and Google, and conducted

and participated, directly and indirectly, in the conduct of Alphabet and Google's business affairs. Because of their positions of power and control, they knew of or recklessly disregarded the adverse non-public information about Alphabet and Google's business practices.

354.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be false or misleading prior to and/or shortly after those statements were made, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

355.   By virtue of their positions of control and authority as senior officers and/or directors, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Alphabet and Google, including the contents of public statements during the Class Period.

356.   The Individual Defendants, therefore, were "controlling persons" of Alphabet and Google within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Alphabet securities.

357.   By reason of such conduct, the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A.   Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives and Plaintiffs' counsel as lead counsel under Rule 23 of the Federal Rules of Civil Procedure;

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

B.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.    Granting such other and further relief as the Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  September 24, 2024

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman (admitted *pro hac vice* )
Emma Gilmore (admitted *pro hac vice)*
Villi Shteyn (admitted *pro hac vice)*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Orly Guy
Eitan Lavie
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240

106

Facsimile: +972 (0) 3 624 0111
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
7080 NW 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Plaintiff City of Fort Lauderdale Police & Fire Retirement System*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS

1

PROOF OF SERVICE

2

I hereby certify that on September 24, 2024, a copy of the foregoing was filed electronically and

3

served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail

4

to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept

5

electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through

6

the Court's CM/ECF System.

7

8

9

                                       */s/ Jeremy A. Lieberman*
                                         Jeremy A. Lieberman

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-CV-01186-RS