1  BORIS FELDMAN, State Bar No. 128838
   boris.feldman@freshfields.com
2  DORU GAVRIL, State Bar No. 282309
   doru.gavril@freshfields.com
3  ELISE LOPEZ, State Bar No. 324199
   elise.lopez@freshfields.com
4  ELENA HADJIMICHAEL, State Bar No. 355715
   elena.hadjimichael@freshfields.com
5  J. MIA TSUI, State Bar No. 344251
   mia.tsui@freshfields.com
6  FRESHFIELDS US LLP
   855 Main Street
7  Redwood City, CA 94063
   Telephone: (650) 618-9250

8

9  *Attorneys for Defendants Alphabet Inc., Google LLC,*
   *Sundar Pichai, Ruth M. Porat, Philipp Schindler,*
10 *and Kent Walker*

11

12                   UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15 | AMI - GOVERNMENT EMPLOYEES | Case No.: 3:23-cv-01186-RFL

PROVIDENT FUND MANAGEMENT
16 COMPANY LTD., Individually and on Behalf of
   All Others Similarly Situated,
17                                            **DEFENDANTS' NOTICE OF MOTION
                                              AND MOTION TO DISMISS SECOND
                Plaintiff,                     AMENDED COMPLAINT**
18

19        v.
                                              Date:      Tuesday, Feb. 11, 2025
20 ALPHABET INC., GOOGLE LLC, SUNDAR          Time:      10:00 AM
   PICHAI, RUTH M. PORAT, PHILIPP             Location:  Courtroom 15 – 18th Floor
21 SCHINDLER, and KENT WALKER,                Judge:     Rita F. Lin

                Defendants.
22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION................................................................................1

STATEMENT OF ISSUES................................................................................................1

INTRODUCTION................................................................................................................1

BACKGROUND..................................................................................................................2

    A. Ad Tech & Google's Products................................................................................2

    B. Google Offers Optimized Bidding Through Project Poirot.................................2

        1. Optimal bidding strategies in first-price and second-price auctions.................2

        2. Project Poirot helps advertisers optimize bids and avoid overpayment............3

    C. Facebook–Google Agreement Connects Facebook Ad Network to Inventory.....................4

    D. Google Launches a Unified Auction Model................................................................4

ARGUMENT......................................................................................................................5

    I. PLAINTIFFS STILL FAIL TO PLEAD MATERIALLY FALSE OR MISLEADING STATEMENTS.................................................................................5

    A. SAC Repleads Without Alteration Statements Court Already Dismissed.............5

    B. Slight Variation of an Earlier Dismissed Statement Still Fails.............................6

        1. Plaintiffs allege terms contradicted by the Agreement and irrelevant to falsity..............6

        2. Terms that are in the Agreement evince no falsity..........................................8

        3. Plaintiffs neglect to plead materiality of webpage statement.........................9

    C. Isolated Sentence Concerning Unified Auction "[D]etermination of the [W]inning [B]idder" Is Not False..................................................................10

        1. Plaintiffs attempt to manufacture falsity by removing a single technical sentence from its context..................................................................10

        2. Plaintiffs do not plead how Poirot and Elmo advantaged AdX relative to other exchanges.................................................................11

        3. Invented and actual Facebook Agreement terms have no bearing on "determination of the winning bidder"................................................13

    II. PLAINTIFFS STILL FAIL TO PLEAD SCIENTER.....................................14

    A. Additional Generalized Congressional Testimony Allegations Fail...................14

        1. Plaintiffs allege hypotheticals in place of facts...........................................14

        2. Plaintiffs plead no facts about the contents of alleged briefing.....................15

    B. Alleged Involvement with Facebook Agreement Similarly Fails.........................16

        1. Execution of Agreement fails to support scienter........................................16

        2. Ambiguous "involvement" with negotiations does not support scienter.......16

        3. No scienter without falsity..........................................................................17

    C. Tacking "and Pichai" onto Previously Dismissed Statements Fails to Plead Scienter.........17

    D. Attenuated Spoliation Theory Cuts Against Scienter............................................18

    E. Repleaded Scienter Allegations Previously Deemed Insufficient Fail Again.......18

        1. Unreliable claims of recycled CWs do not satisfy the Ninth Circuit's requirements.....18

        2. Regulatory investigations and lawsuits do not show scienter........................19

DEFS' MOTION TO DISMISS SECOND AMENDED COMPL.
CASE NO. 3:23-CV-01186-RFL

3. Resort to "core operations" does not rescue deficient scienter argument.......................19

4. Plaintiffs make no new allegations whatsoever regarding privacy claims......................19

III. PLAINTIFFS STILL FAIL TO PLEAD LOSS CAUSATION...............................................19

CONCLUSION.........................................................................................................................20

DEFS' MOTION TO DISMISS SECOND AMENDED COMPL.
CASE NO. 3:23-CV-01186-RS

**Cases**                                                                                              **Page**

*Applestein v. Medivation, Inc.*,
    561 F. App'x 598 (9th Cir. 2014) …………………………………………………………..14

*Armijo v. ILWU-PMA Welfare Plan*,
    2016 U.S. Dist. LEXIS 194172 (C.D. Cal. Feb. 3, 2016) …………………………………..…..19

*In re AT&T/DirecTV Now Sec. Litig.*,
    480 F. Supp. 3d 507 (S.D.N.Y. 2020) ……………………………………………………….9

*Blehm v. DC Shoes, Inc.*,
    2006 U.S. Dist. LEXIS 104987 (S.D. Cal. Feb. 23, 2006) …………………………………..16

*Buhrke Fam. Revocable Tr. v. U.S. Bancorp*,
    2024 U.S. Dist. LEXIS 60623 (S.D.N.Y. Mar. 28, 2024) …………………………………...15

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047 (9th Cir. 2011) ……………………………………………………………...10

*In re Citigroup Auction Rate Sec. Litig.*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009) ………………………………………………..……..18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) …………………………………………………………..5, 16

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013)
    *aff'd*, 691 F. App'x 393 (9th Cir. 2017)……………………………………………..7, 11

*Colyer v. AcelRx Pharms., Inc*,
    2015 U.S. Dist. LEXIS 159640 (N.D. Cal. Nov. 25, 2015) …………….………………….. 15

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) …………………………………………….…………..16, 20

*In re Daou Sys., Inc*,
    411 F.3d 1006 (9th Cir. 2005) ……………………………………………..……………….7

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) …………………………..………..……………………….. 19, 20

*Eng v. Edison Int'l*,
    2018 U.S. Dist. LEXIS 43629 (S.D. Cal. Mar. 16, 2018) …………………………………. 20

*Golub v. Gigamon Inc.*,
    2019 U.S. Dist. LEXIS 149898 (N.D. Cal. Sep. 3, 2019) …………………………………. 5

|  |  | Page |
|---|---|---|
| *In re Google Digit. Advert. Antitrust Litig.*, | | |
| 627 F. Supp. 3d 346 (S.D.N.Y. 2022) ………………………..…………………… 4 | | |
| *In re Hansen Nat. Corp. Sec. Litig.*, | | |
| 527 F. Supp. 2d 1142 (C.D. Cal. 2007) ……………………………………….... 15, 16 | | |
| *Huei-Ting Kang v. Paypal Holdings, Inc.*, | | |
| 620 F. Supp. 3d 884 (N.D. Cal. 2022) ……………………………..…………… 7 | | |
| *Ikeda v. Baidu, Inc.*, | | |
| 2021 LEXIS 67829 (N.D. Cal. Apr. 7, 2021) ………………………………… 11 | | |
| *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, | | |
| 998 F.3d 397 (9th Cir. 2021) …………………………………….……….......20 | | |
| *Knollenberg v. Harmonic, Inc.*, | | |
| 152 Fed. App'x 674 (9th Cir. 2005) …………...………………………… 14 | | |
| *Koller v. Monsanto Co.*, | | |
| 2023 U.S. Dist. LEXIS 215333 (N.D. Cal. Dec. 4, 2023) …………………………….6 | | |
| *Lipton v. Pathogenesis Corp*, | | |
| 284 F.3d 1027 (9th Cir. 2002) …………………………………...…………16 | | |
| *In re Leapfrog Enter., Inc. Sec. Litig.*, | | |
| 200 F. Supp. 3d 987 (N.D. Cal. 2016) ………………………………….…….. 8 | | |
| *Loos v. Immersion Corp.*, | | |
| 762 F.3d 880 (9th Cir. 2014) …………………………………….…………20 | | |
| *Mauss v. NuVasive, Inc.*, | | |
| 2014 U.S. Dist. LEXIS 170441 (S.D. Cal. Dec. 9, 2014) …………………………. 17 | | |
| *In re Mellanox Techs., Ltd.*, | | |
| 2014 U.S. Dist. LEXIS 175142 (N.D. Cal. Dec. 17, 2014) ……………………………*passim* | | |
| *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, | | |
| 540 F.3d 1049 (9th Cir. 2008) …………………………………………….9, 19, 20 | | |
| *Mulquin v. Nektar Therapeutics*, | | |
| 510 F. Supp. 3d 854 (N.D. Cal. 2020) …………………...……….………… 11, 12 | | |
| *In re Nektar Therapeutics Sec. Litig.*, | | |
| 34 F.4th 828 (9th Cir. 2022) …………………….4……………………………...9 | | |

DEFS' MOTION TO DISMISS SECOND AMENDED COMPL.
CASE NO. 3:23-CV-01186-RFL

*Ng v. Berkeley Lights, Inc.*,
   2024 U.S. Dist. LEXIS 28776 (N.D. Cal. Feb. 20, 2024) …………..………………………7

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ………………………………………………………19

*Paciga v. Invuity, Inc.*,
   2020 U.S. Dist. LEXIS 263005 (N.D. Cal. Nov. 23, 2020) ………………………… 5, 6

*Payne v. DeLuca*,
   433 F. Supp. 2d 547 (W.D. Pa. 2006) ………………………………………….…… 11

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) …………………….……………………………………19

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) ………………………………………...………….15, 16, 18

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013) ………………………………………………………18

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ……………………………………….…………………9

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
   2024 U.S. Dist. LEXIS 125258 (N.D. Cal. July 16, 2024) ……………….…………… 15

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) …………………………………………………….......8

*Rok v. Identiv, Inc.*,
   2017 U.S. Dist. LEXIS 1019 (N.D. Cal. Jan. 4, 2017) …………………...……………19

*Roofers Loc. No. 149 Pension Fund v. Dreamworks Animation SKG, Inc.*,
   677 F. App'x 376 (9th Cir. 2017) …………………………………………………… 20

*Sapssov v. Hlth. Mgmt. Assocs.*,
   608 F. App'x 855 (11th Cir. 2015) ………………………………………………………20

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) …………………………………………….. 7

*In re Splash Tech. Holdings Sec. Litig.*,
   2001 U.S. Dist. LEXIS 16252 (N.D. Cal. Aug. 28, 2001) …..……………..…………. 15, 16, 18

Page

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) …………………...…………………………………..6

*In re SunPower Corp. Sec. Litig.*,
    2018 U.S. Dist. LEXIS 173777 (N.D. Cal. Oct. 9, 2018) …………………………..…… 18

*In re Talis Biomedical Corp. Sec. Litig.*,
    2022 LEXIS 222835 (N.D. Cal. Dec. 9, 2022) …………….……………………..……… 13

*Tellabs Inc. v. Major Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) …………………………………..…….…...………… 15, 18, 19

*In re Tibco Software Sec. Litig.*,
    2006 U.S. Dist. LEXIS 36666 (N.D. Cal. May 24, 2006) …………………..…………………14

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. Nov. 4, 2019) …………………...…...………….……... 17, 18, 19

*Veal v. LendingClub Corp.*,
    2020 U.S. Dist. LEXIS 104229 (N.D. Cal. June 12, 2020) …………………….…….……..6

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020) ………………………………...…………….…...17

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ………………………...…..………………………14, 18, 19

DEFS' MOTION TO DISMISS SECOND AMENDED COMPL.
CASE NO. 3:23-CV-01186-RFL

**TABLE OF ABBREVIATIONS**

| Abbreviation | Meaning |
|---|---|
| Ad Manager | Google Ad Manager, Google's ad server |
| AdX | Google's ad exchange |
| Agreement | September 2018 Network Bidding Agreement |
| Defendants | Alphabet Inc., Google LLC, Sundar Pichai, Ruth M. Porat, Philipp Schindler, and Kent Walker |
| DFP | DoubleClick for Publishers |
| DoJ's ad tech lawsuit | *U.S. v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.) |
| DV360 | Display & Video 360 |
| FAC | Plaintiffs' First Amended Complaint for Violations of the Federal Securities Laws, filed August 7, 2023 (ECF No. 46) |
| FAN | Facebook Audience Network |
| Order | Court's Order granting Defendants' motion to dismiss, filed September 3, 2024 (ECF No. 86) |
| Plaintiffs | Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., AMI - Government Employees Provident Fund Management Company Ltd., City of Fort Lauderdale Police & Fire Retirement System, and More Mutual Funds Management (2013) Ltd. |
| Rules | Federal Rules of Civil Procedure |
| SAC or ¶ | Plaintiffs' Second Amended Complaint for Violations of the Federal Securities Laws, filed September 24, 2024 (ECF No. 87) |

Herein, emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

DEFS' MOTION TO DISMISS SECOND AMENDED COMPL.
CASE NO. 3:23-CV-01186-RFL

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that at the time and place noted above, Defendants will and hereby do move to dismiss Plaintiffs' Second Amended Complaint pursuant to Rules 12(b)(6), 8(a), and 9(b).

### STATEMENT OF ISSUES

Do Plaintiffs state claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934?

### INTRODUCTION

Plaintiffs have run out of ideas for ways to shoehorn antitrust lawsuits into a securities fraud lawsuit. They mined the underlying antitrust lawsuits for any material on which to build a Section 10(b) claim, including even allegations dismissed by the courts overseeing those suits. *Infra* 4. Their hope was that the Court would ignore that *none* of those allegations, even if proven true, supports *securities* fraud. They also hoped that the complex subject of the allegations—programmatic advertising—might provide enough minutiae to get this lawsuit past the pleadings stage. But as the Motion illustrates, Plaintiffs' allegations remain inactionable—a regurgitation of familiar tropes that remain unparticularized, incorrect, or both. They are still unable to plead three elements of a securities fraud claim, each of which is an independent reason to dismiss.

**No Falsity:** Plaintiffs challenge the same statements, despite the Court's having rejected all but one of them as inactionable or insufficiently pleaded. They even concede that their six "new" statements "mirror[] or [a]re nearly identical" to two of the statements previously challenged. As to *why* the statements are false, plaintiffs offer: (1) pre-Class Period allegations of the effects of bid and budget optimization tools that are contradicted by their own pleadings, and (2) an inaccurate summary of the terms of a network bidding agreement with Facebook. Neither supports falsity. For good measure, Plaintiffs also copy their failed privacy allegations again, with no amplification.

**No Scienter:** To their failed scienter argument, Plaintiffs tack on even more generalized and conclusory theories. First, they double down on hypotheticals about what they imagine Mr. Pichai's preparation for congressional testimony may have been like; a theory which this Court already addressed and rejected. Second, they plead without particularity that Mr. Pichai and Mr. Schindler's signing[1] and involvement with the negotiation of the Facebook Agreement supports falsity. Third,

---

[1] Mr. Pichai did not, in fact, execute the Agreement. *See infra* 16–17.

they invoke a tenuous spoliation theory. As a last resort, they hope to impute scienter to Mr. Pichai by simply inserting his name into already-failed falsity allegations. These allegations fall well short of the required standard.

**No Loss Causation:** Plaintiffs also fail to plead loss causation, instead equating the impetus of the DoJ's ad tech lawsuit with a corrective disclosure. The Ninth Circuit has rejected such theories as insufficient to plead loss causation.

This third iteration of the complaint should be dismissed with prejudice.

**BACKGROUND**

**A.    Ad Tech & Google's Products**

Display advertising is a type of digital advertising that incorporates images, text, video, and multimedia to present visual ads. ¶ 38. A single instance of a display ad being shown to a single user is known as an **impression**. *Id.* Content publishers with display ad space on their websites have a supply of impressions they can sell to advertisers. ¶ 39.

A variety of digital advertising technology ("ad tech") tools, including specialized platforms, enable publishers and advertisers to buy and sell display ads. ¶¶ 44–49. Publishers use **ad servers** to help sell their inventory of impressions to advertisers, either through direct sales or indirectly through ad exchanges. ¶ 44. An **ad exchange** is a centralized digital marketplace that allows advertisers and publishers to buy and sell display ad space in real-time auctions. ¶ 45. To manage their ad purchases, buyers use platforms known as **advertiser buying tools**. ¶ 47. These include **demand side platforms**, which offer customizable options and use data to target particular users, ¶ 47, and **ad networks**, which are less customizable, ¶ 48.

Google offers the full spectrum of ad tech solutions including through its ad server, originally called DFP; its ad exchange, AdX; and its advertiser buying tools, DV360 and Google Ads, among others. ¶¶ 44–48, 51–56. In 2018, Google rebranded DFP and AdX as Google Ad Manager ("Ad Manager"). ¶ 56.

**B.    Google Offers Optimized Bidding Through Project Poirot**

**1.    Optimal bidding strategies in first-price and second-price auctions**

Auctions held on ad exchanges can be classified into various types. ¶ 84. Common types

-2-

include first-price and second-price auctions. *Id.* In a first-price auction, the winning buyer must pay the amount of their own winning bid. *Id.* In a second-price auction, the winning buyer pays only the amount of the second-highest bid. *Id.*[2]

Different auction types require different bidder strategies to optimize profit and avoid overpayment. *See* ¶ 85. In a **first-price auction**, a rational bidder will reduce (or "shade") their bid. *See id.*; Lopez Decl., Ex. A, at 1–2. As an illustration, imagine Buyer A is bidding on ad space that she values at $2. In a first-price auction, Buyer A gains nothing by bidding the full $2. If she won, she would pay $2 for ad space worth $2 to her, resulting in 0 surplus value. Buyer A can only generate surplus (for reinvesting, buying more, or profit) if she bids under $2, but she risks losing if she bids too low. The precise amount by which she should reduce her bid will depend on the behavior of other auction participants. Thus, Buyer A must analyze various factors to predict how other bidders will behave and optimize her own bid. The optimal strategy in a **second-price auction** is much simpler: to optimize her chances of winning at the right price, Buyer A can just bid her true valuation of $2, regardless of what other bidders do. Lopez Decl., Ex. A, at 1. From the perspective of an ad exchange (that usually takes a percentage of the winning price as its cut), a first-price auction is more lucrative than a second-price auction since it generates higher winning prices. *Id.*

### 2. Project Poirot helps advertisers optimize bids and avoid overpayment

Launched in 2017, a DV360 feature known internally as "Project Poirot" ("Poirot") allowed advertisers to optimize bidding across multiple ad exchanges that used different auction types.

Poirot worked by using DV360's bid data to detect when an ad exchange was using anything other than second-price auctions. ¶ 85. Once it had identified such an exchange, Poirot would help advertisers optimize their bidding strategy in first-price auctions by "shading" their bids placed via DV360 on that exchange. *Id*. Meanwhile, Poirot did not affect DV360 bids placed on ad exchanges using second-price auctions, where the winning bidder paid only the second-highest bid. ¶ 85. AdX was one such exchange until Google transitioned to a first-price auction in 2019. ¶¶ 85, 114, 116.

In short, Poirot helped advertisers to "avoid overpaying for an impression" in first-price auctions. ¶ 85. Poirot's bid optimization feature was enabled by default for certain advertising

---

[2] In second-price auctions where the publisher has the option to set a floor price, the winning buyer pays the higher of the floor price and the second-highest bid. *See* ¶¶ 110–111, 117.

-3-

campaigns on DV360, but advertisers could opt out. ¶¶ 83, 86. Only 1% chose to do so. ¶ 83. No facet of Poirot enabled Google to guarantee the outcome of an auction. Whether an advertiser won an impression (and, if so, on which exchange) depended on the behavior of the other bidders on each of the ad exchanges. *See* ¶ 84 (describing how winners are selected).

### C. Facebook–Google Agreement Connects Facebook Ad Network to Inventory

In September 2018, Facebook and Google entered an agreement ("Agreement") that aimed to connect demand from advertisers on Facebook's ad network—Facebook Audience Network ("FAN")—with the supply of publisher inventory available on Google's platforms. ¶¶ 95, 108; Lopez Decl., Ex. B. The Agreement extended Facebook certain benefits, ¶¶ 99–107, including a fee discount if Facebook reached a certain level of spend via Google's platform. ¶ 104.

Among other things, the Agreement required Facebook to bid high enough to attempt to win at least 10% of the auctions in which it participated. Lopez Decl., Ex. B, at 33. This provision did not reflect any obligation on Google's part and did not guarantee Facebook any particular win rate. Rather, *Facebook* agreed to bid sufficiently high to achieve the stated percentage of wins. *Id.* Judge Castel, of the Southern District of New York, noted this distinction in his opinion dismissing antitrust claims relating to the Agreement: "[T]he win-rate provision ***does not on its face predetermine the outcome of any auction***. It ensures that Facebook submits competitive bids, not throwaway ones." *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 376 (S.D.N.Y. 2022).

### D. Google Launches a Unified Auction Model

In March 2019, Google announced that it would be transitioning to a unified first-price auction for publisher inventory on Ad Manager—a single product that combined Google's ad server, DFP, with its ad exchange, AdX. *See* ¶¶ 56, 114, 116; Lopez Decl., Ex. C. Google deployed its first-price auction later that year. Lopez Decl., Ex. D.

The unified auction allows buyers to compete in a single auction for ad inventory. Lopez Decl., Ex. H, at 1–2. Through Open Bidding, Ad Manager allows publishers to solicit bids from various channels, which may include third-party ad exchanges and ad networks in addition to Google-owned platforms such as DV360 and Google Ads. *Id.* at 3; ¶ 166. Participating ad exchanges run their own auctions independently and return their highest bids to Ad Manager. Lopez Decl., Ex.

-4-

H, at 1–2. Ad Manager hosts a unified auction and selects a winner. *Id.* All participants in the unified auction compete equally on a net basis (i.e., net of fees), and the highest net bid wins. *Id.* at 3; ¶ 166.

## ARGUMENT

"[T]hose [few] aspects of the third amended complaint which are new are insufficient to propel this case over the pleading bar set by the PSLRA."[3] *In re Mellanox Techs., Ltd.*, 2014 U.S. Dist. LEXIS 175142, at *4 (N.D. Cal. Dec. 17, 2014). Plaintiffs *still* fail to plead: (1) a material misrepresentation or omission, (2) scienter, and (3) loss causation. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017).

## I. PLAINTIFFS STILL FAIL TO PLEAD MATERIALLY FALSE OR MISLEADING STATEMENTS

The SAC repeats all the statements challenged in the FAC. Even the six additional challenged statements "mirror[] or [a]re nearly identical to" two statements challenged in the FAC. *See* ¶¶ 180, 185, 188, 193, 204, 209. With respect to *why* any of the "statements were false *when made*," Plaintiffs offer the exact same anachronistic allegations and add a few more that are inaccurate, irrelevant, or both. *Mellanox*, 2014 U.S. Dist. LEXIS 175142, at *8.

### A. SAC Repleads Without Alteration Statements Court Already Dismissed

Plaintiffs ignore the Court's Order dismissing all but one of the statements challenged in the FAC and replead them *without adding or subtracting a single word.*[4] Plaintiffs have completely failed to address the reasoning in the prior Order that the statements are either "not actionable," Order at 5, or "not sufficiently plead[ed]," *id.* at 8.[5] *See Golub v. Gigamon Inc.*, 2019 U.S. Dist. LEXIS 149898, at *35 (N.D. Cal. Sept. 3, 2019) (dismissing without leave to amend because plaintiff "failed to address the reasoning in the prior Order"). "Because the newly-amended complaint . . . repeats verbatim the allegations of the previously-dismissed complaint[] . . . the Court [may] find[], on the same bases, that such claims are again insufficient." *Paciga v. Invuity, Inc.*, 2020 U.S. Dist. LEXIS

---

[3] Defendants avoid burdening the court by repeating them here, but the arguments set forth in their first motion to dismiss, ECF 58, apply with equal force to those allegations copied from the FAC.
[4] These include: (1) "[g]eneral [s]tatements [a]bout [h]ow Google's [a]d [t]ech [p]roducts [h]elp [c]ustomers, Google's [s]upport for [u]ser [p]rivacy, and the [c]ompetitiveness of the [a]d [t]ech [m]arket," Order at 5–8, and (2) "specific factual statements relating to the operation of Google's ad tech products," *id.* at 8–9.
[5] *Compare* FAC ¶¶ 127, 129, 131, 134, 136, 140, 142, 144, 146, 148, 150, 152, 154, 156, 158, 160, 162, 164, 166, 168, 170, 172, 174, 176, 178, 180, 182, 184, 186, 188, 190, 192, 194, 196, 198, 200, 202, *with* ¶¶ 154, 156, 158, 161, 163, 171, 173, 175, 177, 195, 197, 199, 201, 211, 213, 215, 217, 219, 221, 223, 225, 227, 229, 231, 233, 235, 237, 239, 241, 243, 245, 247, 249, 251, 253, 255, 257.

263005, at *4 (N.D. Cal. Nov. 23, 2020) (dismissing with prejudice); *see also Veal v. LendingClub Corp.*, 2020 U.S. Dist. LEXIS 104229, at *39 (N.D. Cal. June 12, 2020) (dismissing with prejudice statement previously held to be "non-actionable puffery" because "analysis d[id] not change").

### B. Slight Variation of an Earlier Dismissed Statement Still Fails

In addition to the previously dismissed statements, Plaintiffs now challenge three occurrences of a sentence from a Google webpage describing "How Open Bidding Works": "All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis [i.e., after all the fees have been taken out]." ¶¶ 184, 192, 208. Plaintiffs concede that the sentence is "***nearly identical to*** *a sentence from congressional testimony previously dismissed by the Court*.[6] *See, e.g.*, ¶ 185. Yet they contend that the word "equally" misled due to "profound advantages" conferred on Facebook via the alleged terms of the Agreement. *See, e.g.*, ¶ 186. But Plaintiffs' allegations are contradicted by the publicly-filed Agreement, have no bearing on falsity, or both. Plaintiffs also fail to plead the statement's materiality.

#### 1. Plaintiffs allege terms contradicted by the Agreement *and* irrelevant to falsity

"[W]here," as here, the "[C]omplaint makes conclusory allegations that are ***contradicted by documents referred to or incorporated in the [C]omplaint***, a court may decline to accept such conclusory allegations as true." *Koller v. Monsanto Co.*, 2023 U.S. Dist. LEXIS 215333, at *16 (N.D. Cal. Dec. 4, 2023); *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice"). Where those allegations also do not support falsity, the Court is doubly justified in rejecting them. *See Mellanox*, 2014 U.S. Dist. LEXIS 198759, at *50 (dismissing where allegation "has no bearing on whether the challenged statements were objectively false when made").

**No "guaranteed 'win rate.'"** Far from Google giving Facebook "a guaranteed 'win rate' of at least 10% of auctions," *see, e.g.*, ¶ 186, Facebook committed *to Google* to "bid high enough" to attempt to win 10% of auctions in which it participated, Lopez Decl., Ex. B at 33; *see also supra* 4

---

[6] *Compare* Order at 8–9 (addressing and dismissing FAC ¶ 138 challenged congressional testimony: "All participants in the unified auction, including those using Google-owned platforms, compete for each impression on a net basis"), *with* ¶¶ 184, 192, 208 ("All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis [i.e., after all the fees have been taken out]").

DEFS' MOTION TO DISMISS SECOND AMENDED COMPL.
CASE NO. 3:23-CV-01186-RFL

(Judge Castel explaining distinction). "Here, the incorporated document[] do[es] not 'dispute facts stated in a well-pleaded complaint,' but instead properly provide[s] a basis for [Defendants'] argument that ***Plaintiffs . . . inaccurately characterize the contents of th[at] document[]***." *Huei-Ting Kang v. Paypal Holdings, Inc.*, 620 F. Supp. 3d 884, 896 (N.D. Cal. 2022).

**No longer "timeout" provision.** Additionally, there is no provision in the Agreement addressing a "timeout" period at all, much less one that "doubled th[e] amount" that other channels were permitted. *See, e.g.*, ¶ 186. Nor do Plaintiffs provide any other basis for alleging one. "[T]his circuit . . . strictly adhere[s] to the PSLRA's mandate that the complaint state with particularity all facts on which a belief is formed, and in so doing, ***requires that a plaintiff reveal the sources of her information***." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Plaintiffs' unsupported allegations should not be credited.

Even if this provision existed, it would have no bearing on falsity. The challenged sentence is extracted from a paragraph explaining "auction dynamics" for "participants in the unified auction." *See* Lopez Decl., Ex. E, at 2. It does not concern *hypothetical* bids that were never submitted to "the unified auction" for the particular ad inventory. Nor does it concern the myriad reasons why potential channels would be unable, *or choose not*, to bid for a particular impression. *Ng v. Berkeley Lights, Inc.*, 2024 U.S. Dist. LEXIS 28776, at *23 (N.D. Cal. Feb. 20, 2024) (complaint "fails to adequately allege a link between any of Defendants' specific representations and Plaintiffs' generalized allegations . . . so as to plausibly plead that omitting information regarding these topics affirmatively led [Plaintiffs] in a wrong direction (rather than merely omitted to discuss certain matters)."). "Plaintiff[s'] interpretation of the statement . . . is implausible as a matter of law." *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020) (statement not false "[w]hen reading the full statement, together with the surrounding context"); *see also City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1128 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ("[I]t is [] clear that Plaintiff either misconstrues or ignores the context in which Defendants' allegedly false statements were made").

**No "ability to detect . . . spam."** Plaintiffs similarly allege that the Agreement gave Facebook "the ability to detect which impressions were likely targeted to spam." *See, e.g.*, ¶ 186.

Again, there is no such term. There *is* a term that "provide[s] . . . **aggregate data** . . . to validate billable impressions" *post hoc* "to determine the amount to be paid to Publishers." Lopez Decl., Ex. B, at 18. But even as *inaccurately* alleged, the term has nothing to do with the challenged statement. An ability to detect spam *in advance of submitting a bid* could only affect whether Facebook chose to "participa[te] in the unified auction" in the first place. If anything, it would cause Facebook to refrain from entering the auction, not to win it. *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1008 (N.D. Cal. 2016) (no falsity where facts alleged "actually support[] Defendants' statement").

### 2. Terms that *are* in the Agreement evince no falsity

Plaintiffs allege several terms that were in the Agreement, but "simply fail to connect the dots to show why the failure to disclose those alleged facts made what was said [on the webpage] misleading." *Mellanox*, 2014 U.S. Dist. LEXIS 175142, at *13. "When there is no such connection, there is no affirmative duty to disclose." *Id.*

**Ability to recognize users.** Plaintiffs fail to allege with particularity how Facebook's ability to detect its "End Users" would increase its likelihood of winning "the unified auction." *See, e.g.*, ¶ 186. Again, such ability would only affect whether it chose to be a participant in the unified auction at all, and whether it would *endeavor* to win the auction. It could not ensure a winning result.

**Restriction on use of Facebook data.** Plaintiffs also allege that Agreement terms "restrict[ing] . . . use of Facebook's" data constituted an advantage relative to other unified auction participants, because Google could not use such "bid data to beat [Facebook] in the auctions." *See, e.g.*, ¶ 186. Similar to Plaintiffs' allegations regarding "Smart Bidding," which "alleged[ly] . . . allow[ed] Google to predict rival bids by looking at bids from prior auctions," Order at 9, Plaintiffs fail to explain why *restriction* on such data from Facebook-originating bids was something Google was compelled to disclose under the *securities* laws. "Plaintiffs [have not] plausibly alleged that Google's narrow [statement] created an affirmative duty to disclose its [restricted] use of" Facebook bid data. *Id.* Nor do they explain how disclosure of that information would have negated the narrow statement challenged. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 881 (9th Cir. 2012) (alleged undisclosed information did not render statements false).

**Direct billing and contractual relationships.** Last, Plaintiffs allege that direct billing

relationships with publishers was "another perk not extended to other participants," *see, e.g.*, ¶ 186, but fail to articulate *any* theory for how this "perk" advantaged Facebook-originating bids in "the unified auction."[7] *Id.*; *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not [state a claim under the PSLRA]").

### 3. Plaintiffs neglect to plead materiality of webpage statement

In trying to identify *some* false statement, Plaintiffs may have searched too hard. Their argument is essentially quibbling over one phrase on Google's sprawling website. Alphabet is an over $2 trillion company with multiple subsidiaries and multiple products under each of those. "It simply cannot be that a reasonable investor's decision would conceivably have been affected by" the use of the word "equally" on a technical webpage directed to consumers of Google's ad server product. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1277 (9th Cir. 2017) (failure to plead materiality of mundane information on company website).

Similarly, in *In re AT&T*, the court found it "important to **contextualize the scale of AT&T's business**, and the relative significance of" its video streaming service, which was the subject of the challenged statements. 480 F. Supp. 3d 507, 527 (S.D.N.Y. 2020). "AT&T, during the relevant period, had four main business segments, one of which was Entertainment, which, in turn, include[d] video, internet, and advertising[;] DTVN [wa]s just one of several products within video." *Id.* The court concluded that, "[e]ven assuming" the alleged undisclosed "misconduct was known within the upper reaches of AT&T, a fact not adequately pleaded, Plaintiffs have not plausibly pleaded that the failure to disclose [it] would be material to a reasonable investor." *Id.* at 528. Here, Plaintiffs similarly fail to plead why use of the word "equally" in light of the terms of the Agreement is material to investors.

Courts have explained that "context matters in determining the falsity of statements based on highly technical information." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022). Plaintiffs are unable to plead how the Agreement would affect the outcome of a single unified auction like that described in the challenged statement and, crucially, how that effect would be

---

[7] Plaintiffs vaguely plead that Google *also* had advantages relative to other auction participants. But they do not plead any basis for that allegation other than asserting that "[t]he advantages Google gave Facebook . . . were akin to those Google was affording itself." ¶ 99.

DEFS' MOTION TO DISMISS SECOND AMENDED COMPL.
CASE NO. 3:23-CV-01186-RFL

material to investors so as to create a *securities* violation. *Nektar Therapeutics* plaintiffs alleged that a chart showing Phase I results for the company's anti-cancer drug was materially misleading because it purportedly included outlier patient data. *Id.* at 831–32. But as the court explained in affirming dismissal: "Even assuming [plaintiffs] had adequately alleged what the [Phase I results] would have been without [outlier patient] data, they . . . failed to explain why that difference would be material to a reasonable investor." *Id.* at 837. So too here. The dangers of attempting to retrofit an antitrust argument into the federal securities regime is apparent here, where Plaintiffs are at a loss to articulate even one of the basic building blocks of securities claims: materiality.

### C. Isolated Sentence Concerning Unified Auction "[D]etermination of the [W]inning [B]idder" Is Not False

Plaintiffs also repeat their challenge of congressional testimony that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder." *Compare* FAC ¶ 139, *with* ¶ 166. Additionally, they challenge several iterations of a "nearly identical" statement, *see, e.g.*, ¶ 180, from the same "How Open Bidding Works" webpage describing "participants in the unified auction," *see* Lopez Decl., Exs. E, F, G, at 2. *See* ¶¶ 179, 187, 203.[8] The Court may dismiss all challenged iterations of this statement for three reasons: (1) the statement is divorced from its context, which readily shows it not to be false; (2) Plaintiffs' allegations with respect to Projects Poirot and Elmo ("Elmo") do not show the statement was false when made; and (3) the SAC's new allegations regarding Facebook are inaccurate, inapplicable, or both.

#### 1. Plaintiffs attempt to manufacture falsity by removing a single technical sentence from its context

Plaintiffs contend that the challenged statement, which concerns the "determination of the winning bidder" from amongst bids submitted to the "the unified auction," is false because some channels enjoy advantages that make them more likely to win the unified auction. *See, e.g.*, ¶ 183.

First, Plaintiffs fail to allege these advantages with particularity. *See supra* 6–9 (discussing Facebook allegations); *infra* 11–13 (discussing Poirot and Elmo allegations); *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (under Rule 9(b), a plaintiff must "identify the 'who, what, when, where, and how' of the fraudulent misconduct").

---

[8] "The channel through which a bid is received (for example, whether through Google Ads or DV360, a third-party Authorized Buyer, Open Bidding yield partner, or a remnant line item) does not otherwise affect the determination of the winning bidder." ¶¶ 179, 187, 203.

Second, and even more damning, the context of this narrow technical statement makes clear that it concerns only the determination of the winning bid in a *single* unified auction for a particular impression. It does not speak about historical outcomes or the probability of winning the unified auction. Nor does it speak about the potential variation in any individual buying tool or exchange's information, bidding strategy, fee structure, or any other factor that might affect the bid submitted into the unified auction. It only conveys that, *after* bids are submitted to the unified auction, all channels compete equally within the unified auction from that point onward. But Plaintiffs do not challenge the truth of that narrow concept. Instead, Plaintiffs attempt to claim that the statement also implicates the *likelihood* that a Google-affiliated channel will win, based on transactions occurring *before* bids are ever submitted to the unified auction. In short, Plaintiffs impute far more meaning to the statement than is plausibly there. *See Sterling Fin. Corp.*, 963 F. Supp. 2d at 1128 ("[P]laintiff either misconstrues or ignores the context in which [the] allegedly false statements were made"); *Ikeda v. Baidu, Inc.*, 2021 U.S. Dist. LEXIS 67829, at *23–31 (N.D. Cal. Apr. 7, 2021) (same).

### 2. Plaintiffs do not plead how Poirot and Elmo advantaged AdX relative to other exchanges

Even accepting Plaintiffs' implausible interpretation that the statement speaks to the probability of winning the unified auction, the SAC's repleaded allegations regarding Poirot and Elmo do not support that the challenged statement was false when made.

**Poirot theory is contradicted by the SAC.** Plaintiffs allege that Poirot caused DV360 to shade bids to "ad exchanges that no longer employed second-price auctions" and leave "bids intact when . . . submitted to Google's own ad exchange," which used second-price auctions. ¶¶ 85, 168. But Plaintiffs gloss over the fact that "Google changed its ad exchange . . . to a first-price auction" in 2019, ¶¶ 114–116; *see also* ¶ 79 ("when [CW1] left Google in 2021 . . . all auctions were based on the first price"), and that from then on AdX was an "ad exchange[] that no longer employed second-price auctions," to which Poirot would submit reduced bids, ¶ 85. Thus, it does not logically follow that, post-2019 (i.e., during the Class Period), Poirot "virtually ensured that Google's ad exchange would win the relevant auction." ¶ 85. Plaintiffs' "self-contradictory" allegations are "a defect which is fatal to their claims." *Payne v. DeLuca*, 433 F. Supp. 547, 612 (W.D. Pa. 2006); *see also Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 864 (N.D. Cal. 2020) (courts "do not

-11-

accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences"). Besides, Poirot was merely a tool that optimized bidding based on auction *type*—regardless of the *identity* of the exchange. When AdX fell within the categories of auctions for which Poirot shaded bids, it did so without regard to the exchange's identity. Poirot was not a tool designed to help Google overcome competitors, but a tool to help advertisers optimize their bidding. Plaintiffs simply do not understand how Poirot worked and why it did what it did.

**Poirot is not alleged to affect the unified auction.** Even setting aside their contradictory nature, the Poirot allegations do not render the challenged statement about the unified auction false. These allegations only concern DV360 bids submitted both to AdX and to third-party exchanges. They have no bearing on the subject of the challenged statement: whether the determination of the highest net bid in Ad Manager's *unified auction* is channel-agnostic.

Indeed, the Poirot allegations do not even support Plaintiffs' conclusory assertion that Poirot "virtually ensured that [AdX] would win the relevant auction." ¶ 85. Poirot's purported impact on auction outcomes has no basis in Plaintiff's actual allegations. Plaintiffs never allege that an "intact" DV360 bid submitted to a second-price auction would be more likely to win than a reduced bid submitted to a first-price auction for the same inventory. (Nor would such an allegation be plausible. *See supra* 11–12.) Whether a bid wins or loses in its respective auction depends on the behavior of other participants. And Plaintiffs do not allege that Poirot controlled the behavior of any non-DV360 bidders participating in the same auctions as DV360 bidders.

Poirot thus could not "ensure" that a DV360 bidder would win an impression on AdX *but not* on any other exchange.[9] Poirot could not even "ensure" that a DV360 advertiser would win the AdX auction in the first place. Even if a DV360 advertiser *did* win the AdX auction (causing AdX to pass their bid on to Ad Manager), they had no special advantage in the unified auction: Poirot could not "ensure" that the AdX bid was the highest net bid, as Ad Manager solicited bids not only from exchanges but also from various non-Google participants outside of Poirot's reach. *See supra* 3–4.

---

[9] Plaintiffs allege that DV360 ad spend on AdX increased from "40% to 70% due to Project Poirot." ¶ 89. But *ad spend* is not the same as individual auction wins. Plaintiffs next attempt to rely on the recollections of a former employee, CW2, who allegedly "saw internal documents at Google showing that the company wins 80% of the auctions hosted on AdX." *Id*. But CW2 did not report that these documents attributed the company's win rate *to Poirot*.

-12-

In short, Poirot—merely a bid optimization feature in DV360—could not guarantee the outcome of any ad exchange auction, nor the determination of the winning bid in the unified auction. The Poirot allegations therefore fail to contradict the challenged statement.

**Elmo is not alleged to affect bids.** Plaintiffs again allege that Elmo reduced spend from DV360 to ad exchanges suspected of engaging in Header Bidding. ¶ 92. That is irrelevant: they still fail to allege with particularity how Elmo affected the *bids* submitted to these other exchanges. The challenged statement concerns "determination of the winning bidder" from among "received" bids. *See In re Talis Biomedical Corp. Sec. Litig.*, 2022 U.S. Dist. LEXIS 222835, at *45 (N.D. Cal. Dec. 9, 2022) (allegation that "delays in launching the [product] were due to it being expensive to manufacture . . . does not render false the statement that 'We *designed* the [product] to be low cost'").

### 3. Invented and actual Facebook Agreement terms have no bearing on "determination of the winning bidder"

Plaintiffs again allege terms in the Facebook Agreement that they claim caused the challenged statement to be false. *See, e.g.*, ¶ 183. But as with the statement concerning "equal[]" competition amongst bids in a unified auction, they fail to satisfy their burden of pleading falsity with particularity. As explained, Facebook was not guaranteed to win any percentage of auctions. *Compare* ¶ 183, *with supra* 7. Other alleged terms would only affect whether Facebook chose to submit a bid in the first place, not whether its bid would be "determin[ed] . . the winning bidder." *See* ¶ 183; *see supra* 8 (ability to recognize users).

Moreover, "[i]t is not the case that any mention of the word '[channel]' automatically triggers a duty on [D]efendants' part to disclose any and all potential" factors that distinguish various channels prior to their submitting bids to the unified auction. *Mellanox*, 2014 U.S. Dist. LEXIS 175142, at *13–14. "Putting aside the question of whether [D]efendants even knew about these alleged [channel advantages] at the time of their statements (as well as whether the [channel advantages] themselves are pled with sufficient detail), there simply is no affirmative duty under the case law to disclose any and all material information . . . [t]he duty to disclose is triggered only if and when [D]efendants make a statement that would be rendered false or misleading because of the alleged omission. Like the other statements, [this statement] is not such a statement." *Id.* at *14.

## II.  PLAINTIFFS STILL FAIL TO PLEAD SCIENTER

Plaintiffs also ignore the Court's directive that they plead scienter with particularity. Order at 10–11. They instead urge the Court to infer it, indirectly, from (1) hypothetical assertions about Mr. Pichai's preparation for congressional testimony, (2) generalized allegations of his and and Mr. Schindler's "involvement" in Facebook Agreement negotiations, (3) insertions of Mr. Pichai's name next to recycled allegations, and (4) a tenuous spoliation theory.[10] The Court already dismissed the first of these arguments, Order at 11, and all lack factual particularity. "[A]llegations that . . . [Mr. Pichai] 'must have known' . . . certain unspecified 'adverse undisclosed information' because of [his] position[] [as CEO] . . . are insufficient to establish a strong showing of scienter *as a matter of law*." *In re Tibco Software Sec. Litig.*, 2006 U.S. Dist. LEXIS 36666, at *51 (N.D. Cal. May 24, 2006); *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 601 (9th Cir. 2014) ("Plaintiff relie[d] heavily on the inference that, due to their positions, the defendants must have known about" unreliable study results, but that "is entirely speculative and does not rise to the required strong inference").

In addition, Plaintiffs replead verbatim the failed allegations of their prior complaint.[11] Plaintiffs' "fail[ure] to correct these deficiencies" pointed out by the Court is grounds for dismissal with prejudice, as it represents a "strong indication that the plaintiffs have no additional facts to plead." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).

### A.  Additional Generalized Congressional Testimony Allegations Fail

This Court has already rejected "that Pichai testified before Congress" as a basis for inferring scienter. Order at 11. The SAC pleads the same theory again.

#### 1.  Plaintiffs allege hypotheticals in place of facts

"Claims that a defendant 'could have' or 'should have' known that the statements were false are insufficient to [satisfy] the standard" for scienter. *Knollenberg v. Harmonic, Inc.*, 152 Fed. App'x 674, 678 (9th Cir. 2005) (affirming dismissal). The SAC's additional platitudes about the "serious[ness]" of congressional testimony plead exactly that. *See* ¶¶ 282–292.

Suggesting that Mr. Pichai "should" have received "diligent and thorough" preparation does

---

[10] Plaintiffs add no allegations of scienter with respect to the other Individual Defendants or the challenged privacy related statements. Those Defendants should be dismissed on this basis alone.
[11] *Compare* FAC ¶¶ 224–254, *with* ¶¶ 279–281, 293–321.

DEFS' MOTION TO DISMISS SECOND AMENDED COMPL.
CASE NO. 3:23-CV-01186-RFL

not even plead with particularity *that* Mr. Pichai was briefed, much less *what* the contents of that briefing may have been. ¶ 285; *see also* ¶ 288 (alleging Mr. Pichai "would be expected" to be briefed). In *Splash*, claims that failed to plead details about "when exactly [] meetings were held, who attended them, what information was provided or discussed, or what reports were distributed . . . lack[ed] the requisite specificity and, therefore, [could not] create a strong inference of deliberate recklessness." *In re Splash Tech. Holdings Sec. Litig.*, 2001 U.S. Dist. LEXIS 16252, at *40–41 (N.D. Cal. Aug. 28, 2001); *see also In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1159 (C.D. Cal. 2007) ("Plaintiff cannot base an inference of scienter on unspecified documents and conversations"). The SAC alleges even less.

Pleading variously that "[u]nder *industry custom and practice*," "*[a]ccording to compliance experts*," "*[a]ny company* . . . will *typically* establish detailed response protocols," Plaintiffs do not allege a single fact concerning any actual Defendant. ¶¶ 282–285; *see Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1110 (9th Cir. 2021) ("industry custom" not a substitute for particularized facts alleging what a defendant knew). Absent "additional detailed allegations about Defendants' **actual exposure to information**," the SAC "fall[s] short of the PSLRA standard." *Id.* at 1109. Moreover, that Mr. Pichai was fully briefed supports the opposite inference to what Plaintiffs suggest: it supports that Mr. Pichai relied on such briefing and believed he was testifying truthfully. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (a "strong" inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent"); *see also Colyer v. AcelRx Pharms., Inc*, 2015 U.S. Dist. LEXIS 159640, at *48–49 (N.D. Cal. Nov. 25, 2015) (that executives acted "in good faith" was "equally if not more compelling" than inference of scienter).[12]

### 2. Plaintiffs plead no facts about the contents of alleged briefing

Additionally, "access to" "resources" is "insufficient to establish scienter." *Compare* ¶ 287, *with Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 2024 U.S. Dist. LEXIS 125258, at *20 (N.D. Cal. July 16, 2024) ("access to [] data alone" failed to plead scienter).

---

[12] The allegation about Mr. Pichai's "Truth in Testimony Disclosure Form", ¶ 163 n. 4, also fails *Tellabs*. "Plaintiffs have not provided specific allegations to demonstrate that [Mr. Pichai] w[as] exposed to information" during the signing of such a "certification[], nor do[es that] certification[] somehow establish that [he] w[as] aware of any such information." *Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 2024 U.S. Dist. LEXIS 60623, at *83–84 (S.D.N.Y. Mar. 28, 2024).

Plaintiffs' allegations mirror those that the Ninth Circuit rejected in *Lipton v. Pathogenesis Corp.* There, "[p]laintiffs d[id] not [] plead, in any detail, the contents of" internal reports to which they alleged Defendants had "access." 284 F.3d 1027, 1036 (9th Cir. 2002). Similarly, the SAC's generalizations rely only on "unspecified [] documents, unspecified conversations [and] attendance at unspecified [] meetings" rather than plead particularized facts. *Splash*, 2001 U.S. Dist. LEXIS 16252, at *34–35. The SAC's claims, which do not even "allege[] that [Mr. Pichai] *personally accessed*" information, *Align Tech.*, 856 F.3d at 620, are more generalized than those the Court already rejected in the FAC. *Compare* ¶¶ 282–292 (abstract hypotheticals about "any companies[']" "standard practice[s]"), *with* Order at 11 ("allegations that some Defendants spoke broadly about ad tech to investors" "lack[ed] particularized facts").

## B. Alleged Involvement with Facebook Agreement Similarly Fails

Generalized allegations regarding the Agreement similarly lack the "additional . . . specific information" required to plead scienter. *Curry v. Yelp Inc.*, 875 F.3d 1219, 1227–28 (9th Cir. 2017).

### 1. Execution of Agreement fails to support scienter

Contrary to Plaintiffs' allegations, Mr. Pichai did not sign the Agreement. *See* Lopez Decl., Ex. B, at 31. Regardless, allegations that Google's "top echelon" "executed" the Agreement, ¶¶ 5, 108, do not establish scienter. *See Yelp*, 875 F.3d at 1227; *see also Hansen Nat. Corp.*, 527 F.Supp.2d at 1159 (imputing scienter from signatures would "eviscerat[e] the pleading requirements for scienter"). In *Prodanova*, the Ninth Circuit affirmed that plaintiffs failed to plead scienter based on a similar allegation that defendant "COO . . . drafted, negotiated, and executed [an] [a]greement." *Compare* 993 F.3d at 1109–10, *with* ¶ 108 ("negotiations between Google and Facebook involved . . . CEO Pichai" and "Pichai and Schindler personally executed the [A]greement"). Likewise here, "there is not enough factual support for a plausible inference of scienter." *Prodanova*, 993 F.3d at 1110.

### 2. Ambiguous "involvement" with negotiations does not support scienter

Allegations that Mr. Pichai was briefed on the Agreement are analogous to FAC claims that this Court has already rejected. Order at 11; *see also Blehm v. DC Shoes, Inc.,* 2006 U.S. Dist. LEXIS 104987, at *20 (S.D. Cal. Feb. 23, 2006) (alleging "participat[ion] in the alleged negotiations" "without [additional] details" fails to plead scienter). The FAC's generalized claim that "*Google's*

*product leadership specifically recommend[ed] to Pichai* the plan to '*weaken the header bidding narrative in the marketplace,*'" FAC ¶ 61, failed to allege that Mr. Pichai knew that "attempts to eliminate header bidding *included Project Poirot's DV360 bid reduction* to rival advertising exchanges." Order at 11. For this reason, it "lacked particularized facts" "compel[ling] a strong inference" of scienter. *Id.* So too here. That "*Google's product leadership team explicitly explained to CEO Pichai* that with a Google-Facebook deal, '[f]or web inventory, we will move [FAN's] demand off of header bidding set up and *further weaken the header bidding narrative in the marketplace*'" does not supply the missing link. ¶ 98. As before, the SAC does not "identify any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement at the time it was made." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019).

### 3. No scienter without falsity

Separately, because Plaintiffs "fail to plead falsity, *a fortiori* they have not established that [D]efendants knew those statements were false." *Mauss v. NuVasive, Inc.*, 2014 U.S. Dist. LEXIS 170441, at *21 (S.D. Cal. Dec. 9, 2014); *see supra* 2–14.

### C. Tacking "and Pichai" onto Previously Dismissed Statements Fails to Plead Scienter

Plaintiffs next attempt to to attribute statements personally to Mr. Pichai by inserting his name into allegations concerning Google's responses to Congress, most of which were already dismissed by the Court. ¶¶ 165–166, 171–78. They then allege that because statements on Google's website "mirrored" those made to Congress, Mr. "Pichai was therefore highly involved in preparing, reviewing and approving" them. *See* ¶¶ 31, 179–209. These circular arguments add nothing to the Court's existing understanding "that Pichai testified before Congress[.]" Order at 11.

First, adding Mr. Pichai's name to deficient falsity allegations does not show scienter. "Under Plaintiffs' theory, merely naming senior executives as defendants would fulfill the . . . scienter element." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 259 (S.D.N.Y. 2020). This "would effectively vitiate scienter standards for any securities class action" and "contradict[] the . . . PSLRA." *Id.* "[T]he SAC [still] does not identify a single specific communication between specific [individuals,] . . . the date on which any such communication occurred, . . . or specifics concerning

information provided or received[.]" *Splash*, 2001 U.S. Dist. LEXIS 16252, at *38.

Nor may Plaintiffs bootstrap a deficient scienter theory by asserting that Mr. Pichai had the "power and authority" to control statements published on Google's website. *Prodanova*, 993 F.3d at 1109 (claims of officer's "important role in the company [without] additional detailed allegations" fail to plead scienter). None of the allegations plausibly suggests that the CEO of Google—a $2.1 trillion company—directed the content of a support page for one of multiple advertising products.

### D. Attenuated Spoliation Theory Cuts Against Scienter

Still failing to plead what knowledge Mr. Pichai had and how he had it, Plaintiffs ask the Court to infer on the basis of the Company's document retention policy for chats that Mr. Pichai possessed knowledge contradicting his statements before Congress. *Compare* ¶¶ 322–327, *with Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) (no scienter when there was no "way of knowing what was discussed in [alleged] closed-door meetings"). The very nonexistence of such chats, that Mr. Pichai neither sent nor received, compels an opposing inference "at least as cogent as" the one that Plaintiffs seek—that Mr. Pichai would not know what they contained. *Tellabs*, 551 U.S. at 319*; see also In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 304 n.4 (S.D.N.Y. 2009) (rejecting scienter argument based on allegations of spoliation).[13]

### E. Repleaded Scienter Allegations Previously Deemed Insufficient Fail Again

The remaining scienter allegations, repeated verbatim and already rejected by the Court, warrant dismissal.[14] *See In re SunPower Corp. Sec. Litig.*, 2018 U.S. Dist. LEXIS 173777, at *15 (N.D. Cal. Oct. 9, 2018) (SAC asserted "[i]n essence . . . the same averments in the prior complaint").

#### 1. Unreliable claims of recycled CWs do not satisfy the Ninth Circuit's requirements

Both the identities of, and statements reported by, the FAC's CWs, repeated in the SAC, lack the requisite credibility. *See Zucco*, 552 F. 3d. at 995 (CWs must be "described with sufficient particularity" and CW statements "must themselves be indicative of scienter"). Of hundreds of thousands of employees, Plaintiffs could marshall only two CWs, ¶¶ 36–37, neither of whom offered relevant "contact with any of the Individual Defendants." *LendingClub*, 423 F.Supp. 3d at 814. The

---

[13] Plaintiffs also re-allege that "repeated[] deni[al of] any allegations of misconduct" supports scienter. ¶¶ 312–21. That is absurd: one could only refute scienter by agreeing with Plaintiffs' allegations.
[14] *Compare* FAC ¶¶ 224–226, *with* ¶¶ 279–281; *id.* ¶¶ 227–254, *with* ¶¶ 293–321.

CWs "therefore cannot provide reliable insight into the Defendants' state of mind." *Id.*

### 2. Regulatory investigations and lawsuits do not show scienter

"[S]econd-hand allegations" fail to plead Defendants' contemporaneous mental states. *Id.* at 817. Plaintiffs cannot plead scienter without "connecting" the non-disclosure of regulatory proceedings "with [a] statement . . . rendered false or misleading due to the omission." *Compare, e.g.* ¶¶ 300–311, 155 *et seq.*, *with Metzler*, 540 F.3d at 1071; *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) (later-filed legal proceeding does not impute scienter of underlying facts).

### 3. Resort to "core operations" does not rescue deficient scienter argument

Stale allegations that ad tech "was . . . at the heart of [Alphabet's] revenues" and that "[p]rivacy was also at the heart of the companies' business," ¶ 293, fall far short of what is required to invoke core operations. *LendingClub*, 423 F. Supp. 3d at 817 ("every piece of information within the Company that relates" to ad tech or privacy is not "critical to the business's core operations"). Plaintiffs do not allege that Defendants had "involvement in the minutia," *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014), or "in every detail," *Zucco*, 552 F.3d at 1000, as the Ninth Circuit requires.

### 4. Plaintiffs make no new allegations whatsoever regarding privacy claims

The FAC did not allege scienter as to Plaintiffs' privacy claims. *See* ¶ 306 (single CW allegation regarding privacy asserted that Google had privacy-related meetings—meetings that CW did not attend). The SAC pleads no new facts to elevate the FAC's scant privacy allegations to an inference of scienter "at least as cogent" as the PSLRA requires. *Tellabs*, 551 U.S. at 314.

## III. PLAINTIFFS STILL FAIL TO PLEAD LOSS CAUSATION

Copied "word-for-word" from the FAC, the SAC's loss causation argument fails again. *Armijo v. ILWU-PMA Welfare Plan*, 2016 U.S. Dist. LEXIS 194172, at *28 (C.D. Cal. Feb. 3, 2016); *compare* FAC ¶¶ 204–223, *with* ¶¶ 259–278.

**No requisite link.** Plaintiffs allege no "causal connection" between the alleged misstatements and the alleged injury suffered. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *see also Rok v. Identiv, Inc.*, 2017 U.S. Dist. LEXIS 1019, at *50 (N.D. Cal. Jan. 4, 2017) ("defendant's misstatement, *as opposed to some other fact*," must have "*foreseeably* caused the plaintiff's loss.").

**Unadjudicated allegations and bad news are not corrective.** "[L]awsuit[s], and [] government investigations[,]" *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021), do "not reveal to the market the pertinent truth of anything." *Roofers Loc. No. 149 Pension Fund v. Dreamworks Animation SKG, Inc.*, 677 F. App'x 376, 377 (9th Cir. 2017); *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (same). Similarly, bad news "reveal[ing only] a risk or potential for [] fraudulent conduct" is "insufficient to establish loss causation." *Yelp*, 875 F.3d at 1225–26. The Supreme Court rejects efforts to turn a "private securities action into a partial downside insurance policy[,]" *Dura Pharms.*, 544 U.S. at 347–48, by seeking recovery for events that are not "corrective." *Sapssov v. Hlth. Mgmt. Assocs.*, 608 F. App'x 855, 863 (11th Cir. 2015) ("corrective disclosure must reveal a previously concealed truth").

**No statistical significance, and prompt rebound in stock price.** Without claiming that the alleged "decline in stock price [was] statistically significant[,]" Plaintiffs fail to plead their loss with particularity. *Eng v. Edison Int'l*, 2018 U.S. Dist. LEXIS 43629, at *6–7 (S.D. Cal. Mar. 16, 2018) ("It is not sufficient to simply allege a defendant's stock price declined"). Each of the alleged corrective disclosures was also followed by a prompt rebound in the price of Alphabet stock. *See* Lopez Decl., Ex. I; *see also Metzler*, 540 F.3d at 1065 (discrediting loss causation allegation where "stock quickly recovered from the 10% drop").[15]

## CONCLUSION

For the foregoing reasons, the Second Amended Complaint should be dismissed.


Dated: November 8, 2024                     FRESHFIELDS US LLP

                                            By: */s/ Boris Feldman*
                                                Boris Feldman

                                            *Attorneys for Defendants*

---

[15] "Without a primary violation under Section 10(b), the claim under Section 20(a) for 'control person liability' similarly fails." *Mellanox*, 2014 U.S. Dist. LEXIS 175142, at *16.

DEFS' MOTION TO DISMISS SECOND AMENDED COMPL.
CASE NO. 3:23-CV-01186-RFL