POMERANTZ LLP
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>ALPHABET INC., GOOGLE LLC, SUNDAR PICHAI, RUTH M. PORAT, PHILIPP SCHINDLER, and KENT WALKER<br><br>                    Defendants. | Case No. 3:23-CV-01186-RFL<br><br><br>Date:        Tuesday, Feb. 11, 2025<br>Time:        10:00 AM<br>Location:   Courtroom 15 – 18th Floor<br>Judge:       Rita F. Lin |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................ 2

    I.     The SAC Alleges Materially False and Misleading Statements ...........................2

          A.     As the Court Held, the Complaint Alleges Materially False and Misleading Statements About "the Channel Through Which a Bid Is Received" ...........................................................................................2

          B.     The Statement That "All Participants in the Unified Auction . . . Compete Equally for Each Impression" Is Materially False and Misleading ...................................................................................7

    II.    The SAC Alleges a Strong Inference of Scienter ................................................12

          A.     Pichai's Direct Involvement in Negotiating the Google-Facebook Deal Demonstrates His Scienter ................................................12

          B.     Pichai's Access to Information and the Importance of Securing Facebook's Participation in Open Bidding Support a Strong Inference of Scienter ...........................................................................................14

          C.     Pichai's Micromanagement of Important Transactions Reinforces Scienter ...........................................................................................15

          D.     Pichai's Testimony to Congress Contributes to a Strong Inference of Scienter ...........................................................................................15

          E.     The Existence of Multiple Government Investigations Bolsters Scienter ...........................................................................................17

          F.     Defendants' Destruction and Concealment of Evidence Reinforce Scienter ...........................................................................................17

          G.     Pichai's Scienter Is Imputed to Google/Alphabet.......................................18

    III.   The SAC Pleads Loss Causation ........................................................................19

CONCLUSION................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020)......................................................................17

*Curry v. Hansen Med., Inc.*,
    2012 WL 3242447 (N.D. Cal. Aug. 10, 2012) ...............................................18, 19

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) .................................................................................19

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................................19

*Eng v. Edison Int'l*,
    2017 WL 1857243 (S.D. Cal. May 5, 2017).............................................................20

*Erickson v. Corinthian Colls., Inc.*,
    2015 WL 12732435 (C.D. Cal. Apr. 22, 2015) .......................................................19

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019).....................................................................16

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ..............................................................11, 12, 18, 19

*In re AT&T Sec. Litig.*,
    480 F.Supp.3d 507 (S.D.N.Y. 2020)........................................................................12

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ..................................................................................19

*In re Cadence Design Sys., Inc. Sec. Litig.*,
    692 F. Supp. 2d 1181 (N.D. Cal. 2010) ..................................................................13

*In re Google Digit. Advert. Antitrust Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022)........................................................................9

*In re: Google Digital Advertising Antitrust Litig.*,
    No. 1:21-md-03010, Dkt. No. 541 (S.D.N.Y.) ................................................11, 13

*In re Google Play Store Antitrust Litig.*,
    664 F. Supp. 3d 981 (N.D. Cal. 2023) ....................................................................18

ii

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ....................................................................12

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) .....................................................20

*In re Robinhood Ord. Flow Litig.*,
   2022 WL 9765563 (N.D. Cal. Oct. 13, 2022) .....................................12, 13

*In re Rocket Fuel, Inc. Sec. Litig.*,
   2015 WL 9311921 (N.D. Cal. Dec. 23, 2015) ...........................................18

*In re Toyota Motor Corp. Sec. Litig.*,
   2011 WL 2675395 (C.D. Cal. July 7, 2011) ..............................................17

*In re Tronox, Inc. Sec. Litig.*,
   2010 WL 2835545 (S.D.N.Y. June 28, 2010) ...........................................20

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) ...........................................16

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
   2017 WL 1658822 (D.N.J. Apr. 28, 2017) ................................................16

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
   2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021) ..........................................16

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
   998 F.3d 397 (9th Cir. 2021) ..............................................................19, 20

*Lako v. LoanDepot, Inc.*,
   2023 WL 444151 (C.D. Cal. Jan. 24, 2023) .............................................20

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.l3d 940  (9th Cir. 2005) ..................................................................20

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ..................................................................19

*Longo v. OSI Sys., Inc.*,
   2021 WL 1232678 (C.D. Cal. March 31, 2021) .......................................13

*Mauss v. NuVasive, Inc.*,
   2016 WL 3681831 (S.D. Cal. July 12, 2016) ...........................................19

*Morgan v. AXT, Inc.*,
   2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) .........................................12

iii

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...............................................................12, 15

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
   2024 WL 4353049 (N.D. Cal. Sept. 30, 2024) ...............................................12

*Pampena v. Musk*,
   705 F. Supp. 3d 1018 (N.D. Cal. 2023) ...........................................................13

*Prodanova v. H.C. Wainwright & Co.*,
   993 F.3d 1097 (9th Cir. 2021) .........................................................................13

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2024) ...........................................................................14

*Retail Wholesale v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) .........................................................................12

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741 (9th Cir. 2006) ...........................................................................10

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)..................................................15

*Roofers Loc. No. 149 Pension Fund v. DreamWorks*,
   677 F. App'x 376 (9th Cir. 2017) ....................................................................19

*The State of Texas, et al., v. Google LLC*,
   No. 4:20-cv-00957 (E.D. Tex.)..........................................................10, 11, 13

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...........................................................17

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)........................................................................................12

*United States v. Google LLC*,
   No. 1:23-cv-00108, Dkt. No. 1342 (E.D. Va.)...............................................2, 14

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
   2013 WL 2247394 (C.D. Cal. May 9, 2013) .....................................................3

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) .........................................................................20

*Youngers v. Virtus Inv. Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016)..............................................................17

iv

**Statutes**

15 U.S.C. §78j(b) ..................................................................................................20

15 U.S.C. §78t(a) ..................................................................................................20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

In its Order (Dkt. No. 86) ("Order"), the Court held that Plaintiffs' first amended complaint adequately pleaded that Defendant Pichai made false and misleading statements to Congress when he represented that "the channel through which a bid is received does not otherwise affect the determination of the winning bidder." Order at 9-10. But it found that the complaint failed to plead that the representation was made with scienter. *Id*. at 11. While Pichai was "briefed on Google's plan to kill header bidding," Plaintiffs "d[id] not allege that this briefing discussed Project Poirot's mechanics or otherwise contained anything that contradicted his public statement." *Id*. The Court granted leave to amend. *Id*. at 13. Plaintiffs have marshalled additional facts demonstrating Pichai's knowledge of ***specific steps Google took*** to destroy Header Bidding, rendering the representations false. The Second Amended Complaint ("SAC") (Dkt. No. 87) pleads additional false and misleading statements that are accompanied by powerful indicia of Pichai's scienter.

For example, the SAC alleges that before Header Bidding emerged, Google had singled out Facebook—one of the biggest ad buyers on the internet—as a competitive threat. ¶95. In March 2017, Facebook announced it planned to participate in Header Bidding, permitting its advertisers to bypass Google's platform, chipping away at its revenues. *Id*. Crushing the "existential threat" posed by Header Bidding and Facebook became a major priority inside Google. SAC ¶97. Securing Facebook's participation in Google's Open Bidding system was so critical that Pichai personally negotiated a deal to convince Facebook to abandon Header Bidding. SAC ¶108. Enticing Facebook required significant concessions, with Google agreeing to give Facebook the same benefits it maintained over other bidding participants. Those perks included additional time to bid for ads; auction matching advantages; the ability to detect which impressions were targeted to bots; and a predetermined "win rate." SAC ¶¶99-105. In the meantime, Defendants publicly insisted that, with Open Bidding, "[a]ll participants in the unified auction … compete equally for each impression" (*e.g.*, SAC ¶184), and represented that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder." SAC ¶166. Those representations were false.

Notably, Google's representation that all participants compete "equally" is also at the crux of a deceptive trade practices claim brought against Google by seventeen U.S. states, where the special arrangement between Google and Facebook has been the subject of extensive discovery. Moreover, in the DoJ litigation against Google, the evidence showed that Poirot increased DV360 spend to AdX, and that Facebook's partnership with Google contemplated that Facebook extracts the same benefits as Google in Open Bidding.[1] And just recently, the U.K. Competition and Markets Authority found that, since at least 2015, Google harmed both advertisers and publishers by, among other practices, "manipulating advertiser bids so that they have a higher value when submitted into AdX's auction than when submitted into rival exchanges' auctions." SAC ¶¶10-12.

Defendants raise a number of arguments, none of which have merit.

## ARGUMENT

### I.    The SAC Alleges Materially False and Misleading Statements

#### A. As the Court Held, the Complaint Alleges Materially False and Misleading Statements About "the Channel Through Which a Bid Is Received"

In their prior complaint, Plaintiffs challenged Google and Pichai's statement to Congress that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder." FAC ¶138.[2] The Court held that "Plaintiffs adequately alleged falsity as to that statement at the time it was made." Order at 9. The Court explained that "Plaintiffs plausibly plead that, through Project Poirot, Google's demand side platform DV360 submitted higher bids to Google's AdX than to certain rival ad exchanges." *Id*. at 9-10. "Google allegedly reduced DV360's bids between 10% and 90% when placed on certain rival ad exchanges suspected of using header bidding, while leaving the bids intact when being submitted to Google's own ad

---

[1]  *United States v. Google LLC*, No. 1:23-cv-00108, Dkt. No. 1342 (E.D. Va.) ("DoJ Action"); https://www.justice.gov/atr/us-and-plaintiff-states-v-google-llc-2023-trial-exhibits, PTX0580.

[2] The SAC alleges that the same or nearly identical statements appeared on the Company's website throughout the Class Period. ¶¶179-83, 187-91, 203-07.

exchange." *Id.* at 10. As the Court noted, "[a]llegedly, the same bid would be higher, and thus more likely to win, if it came through AdX rather than through a rival exchange." *Id.* "Those allegations support a plausible inference that the channel through which a bid was received did affect the determination of the winning bidder." *Id.*[3]

The Court also explained that "[e]ven in situations where the same advertiser wins the impression as would have won before Project Poirot, Plaintiffs adequately plead that the challenged statement is still not true, because the allegations raise the plausible inference that Project Poirot makes it more likely that the winning bid would be submitted through AdX rather than a rival exchange." *Id.* at 10 n.4. "Google's statement describes ad exchanges as submitting 'bids' and calls those participants 'bidders.'" *Id.* Thus, "[i]t is plausibly alleged that the channel (that is, DV360) affects which ad exchange submits the winning bid." *Id.*[4]

Mounting several baseless attacks, Defendants ignore the Court's ruling. But its holding is the law of the case and cannot be relitigated. *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2013 WL 2247394, at *7 (C.D. Cal. May 9, 2013). Moreover, Defendants' arguments have no merit. *First*, Defendants claim that the "Poirot theory is contradicted by the SAC." Dkt. No. 93 ("Mot.") at 11. They argue that "Plaintiffs allege that Poirot caused DV360 to shade bids to 'ad exchanges

---

[3] The Court rejected Defendants' contention that the statement did not describe DV360's bids on rival ad exchanges because supposedly it was made in response to a question only about Google's own ad exchange. *Id.* The Court observed that "Google chose to frame its answer more broadly by discussing '[a]ll participants in the unified auction including those using Google-owned platforms' in its answer." *Id.* It reasoned that "[t]he preceding sentences in Google's answer indicated that the 'bidders [who] compete in the unified auction' include 'third-party ad networks and ad exchanges' as well as 'Google-owned platforms.'" *Id.* It found that "[h]aving chosen to speak about other rival ad exchanges, Google was 'bound to do so in a manner that wouldn't mislead investors.'" *Id.* (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)).

[4] Google has provided some examples of "channels" through which bids are received, such as ad buying tools including but not limited to: Google Ads; Display & Video 360 (DV360); Third-party Authorized Buyers; Open Bidding yield partners; and Remnant line items. SAC ¶¶166 n.6. Other channels include Google's AdMob network. *Id.*

1   that no longer employed second-price auctions' and leave bids intact when . . . submitted to

2   Google's own ad exchange,' which used second-price auctions." *Id*. Defendants contend that

3   "Plaintiffs gloss over the fact that 'Google changed its ad exchange . . . to a first-price auction' in

4   2019." *Id*. But the SAC, like the FAC, alleges that after its initial adoption, Google expanded Poirot

5   to first price auctions, and that Poirot was applied throughout the Class Period (*i.e.*, by lowering

6   DV360 bids on rival ad exchanges and increasing bids on AdX). *See*, *e.g.*, SAC ¶¶87, 90.

7        This point is confirmed by the DoJ's investigation. Dkt. No. 1 ("DoJ Compl.") ¶230. As

8   the DoJ uncovered, Poirot's application continues today and is a tool designed to "shift[] spend to

9   Google's ad exchange with its higher revenue share fee; deprive[] competing ad exchanges of

10  scale, auction pressure, and higher win rates; lower[] publisher payouts; and limit[] advertisers'

11  ability to fully and effectively spend their budgets." *Id*. That Poirot's application continued

12  throughout the Class Period is also corroborated by the CMA's probe, which found that Google

13  *still* preferences its AdX by "manipulating advertiser bids so that they have a higher value when

14  submitted into AdX's auction than when submitted into rival exchanges' auctions." SAC ¶¶10-12.

15       *Second*, Defendants contend that Poirot is not alleged to affect the unified auction because

16  it "could not 'ensure' that a DV360 bidder would win an impression on AdX but not on any other

17  exchange." Mot. at 12. But Defendants represented that "the channel through which a bid is

18  received does not otherwise **affect** the determination of the winning bidder," not that the channel

19  "**ensured**" the winning bidder, a term Defendants concoct. As the Court held, because Poirot,

20  through Google's DV360, intentionally bid less on rival exchanges and increased bids on Google's

21  own exchange, "[t]hose allegations support a plausible inference that the channel through which a

22  bid was received did **affect** the determination of the winning bidder." Order at 10. (emphasis

23  added). The DoJ also found that Poirot worked "by artificially manipulating the bids sent to rival

24

25

26

27

28

ad exchanges so that Google's AdX could win those transactions more often (even if that meant harming Google's own advertisers)." DoJ Compl. ¶216; SAC ¶83. Indeed, the DoJ's investigation uncovered that "[t]his manipulation of advertiser bids *virtually ensured that Google's ad exchange would win the relevant auction* by virtue of the deliberately decreased bids supplied to rival ad exchanges for the same impression." ¶217; ¶85. Google's own documents memorialized this point: "for HB [header bidding] we should win back more on AdX." ¶216; ¶83.

*Third*, Defendants claim that Project Elmo is not alleged to affect bids (Mot. at 13), but the SAC alleges that Elmo rendered other exchanges much less likely to win bids. SAC ¶92. In its Order, the Court noted that Elmo purportedly was designed to "identify when it saw the same bid request across multiple ad exchanges" and "decreased DV360's overall ad spend" on those exchanges to decrease header bidding. Order at 10 n.3. But it found that Plaintiffs "did not allege, however, how Project Elmo reduced the 'overall ad spend' on those rival exchanges," and thus did not plead with particularity that the channel through which the bid was received affected the winning bidder. *Id*. The SAC fixes this deficiency. It explains that Elmo, which Defendants employed throughout the Class Period, worked by using "cookies" to detect when a single impression was being routed to multiple exchanges at the same time. SAC ¶¶91-92. Because client-side Header Bidding solicited bids from multiple exchanges simultaneously, Elmo was able to identify when an impression was being routed through Header Bidding. *Id*. With Elmo, DV360 throttled (reduced) its spending on exchanges that were found to engage in Header Bidding, rendering those exchanges much less likely to win bids. *Id*. Internal Google emails from March 2018 note that Elmo decreased the amount of revenue publishers could make and was "leveraging cookies to manage budget" to reduce ad spend on exchanges using Header Bidding. *Id*. Those emails acknowledged that Elmo's purpose was "protecting against header bidding." *Id*. Google

documents dated 2018 and 2020 also describe Elmo as a program that used cookies to throttle ad spend budgets. *Id*. Thus, the channel through which the bid was received, *i.e.*, DV360, throttled spending in Header Bidding and shifted winning bids to Google's AdX. *Id*.[5]

Defendants baselessly argue that the "invented" and "actual [Agreement] terms" with Facebook have no bearing on the determination of the winning bidder. Mot. at 13. Far from being "invented" perks with no impact on bids, the DoJ *and* the Attorneys General of multiple states each uncovered that Google had critical advantages over other bidding participants that it extended to Facebook in exchange for securing its participation in auctions run by Google. Those advantages are described with painstaking precision and include significantly improved match rates over other participants to "ensure" that Google's and Facebook's match rate was at least 80% for mobile app users and at least 60% for web users. SAC ¶¶101, 183. Google and Facebook also had significant speed advantages—almost double—over other participants, securing for themselves 300 milliseconds to bid for ads as opposed to just 160 milliseconds given to other bidders. ¶¶100, 183. Participants in Google's Open Bidding have complained that 160 milliseconds is not enough time to recognize users and return bids. ¶100. Moreover, Google gave itself a minimum guaranteed fixed "win rate" of at least 10%, which it also granted Facebook. ¶¶105, 183. Accordingly, through Google's DV360, Google Ads, or Google's AdMob network, Google secured information and speed advantages that improved its chances of winning bids over other participants, so the channel through which a bid was received did affect the determination of the winning bidder. *See, e.g.*, ¶170. Likewise, when Facebook used its ad buying tool in Google's Open Bidding system, it was given information and speed advantages that helped it win over other bidders, so the channel

---

[5] Google emails dated March 2018 confirm Elmo's success, noting "impact of elmo is another 7.8% increase on AdX. so another 220M shifting," similar to Project Poirot's benefits.

through which a bid was received did in fact affect the determination of the winning bidder. *Id*.

Defendants contend that the alleged advantages "would only affect whether Facebook *chose to submit a bid in the first place*, not whether its bid would be 'determined . . . the winning bidder.'" Mot. at 13. Defendants' interpretation contradicts the SAC's allegations. The extra time Google and Facebook secured for themselves provided them enough time to recognize users and return bids ahead of other bidders, and were designed precisely to help them win auctions over other participants. *See*, *e.g.*, SAC ¶100. The same is true for the improved match rates and the minimum guaranteed win rates. ¶¶101, 105. Google and Facebook had to play (*i.e.*, bid) to win and the perks were designed to give them a leg up in securing a winning bid.

Defendants raise the same strawman argument as they did with Poirot, *i.e.,* that "Facebook was not *guaranteed* to win any percentage of auctions," but whether Facebook or Google were "guaranteed" to win is not the point. Defendants represented that "the channel through which a bid is received does not otherwise *affect* the determination of the winning bidder." That statement is false because the channel through which the bids from Google and Facebook were received did "affect" the determination of the winning bidder, as the speed and match rates afforded through the use of Google-owned channels made it more likely for Google and Facebook to win. Having chosen to discuss whether channels could affect the determination of the winning bidder, Defendants were "bound to do so in a manner that wouldn't misled investors." Order at 10.

### B. The Statement That "All Participants in the Unified Auction . . . Compete Equally for Each Impression" Is Materially False and Misleading

During the Class Period, Google told investors that "[a]ll participants in the unified auction, including Authorized Buyers and third-party yield partners, *compete equally* for each impression on a net basis [*i.e.*, after all the fees have been taken out]." SAC ¶¶184, 192 (emphasis added). This representation was false, as Google and Facebook had profound advantages not granted to

7

other participants, such as speed, information advantages, and even a guaranteed "win rate." ¶¶ 105, 186, 194, 210. *See supra* at 6. Google also agreed to restrict its use of Facebook's bid data to beat it in the auctions. As the government uncovered, "this was a stark departure from Google's usual practices of spying and trading based on other bidders' past behavior."[6] ¶186. Defendants assert that the misstatement is almost identical to the one Defendant Pichai made to Congress, which the Court dismissed (Mot. at 6), but the statement differs in one critical respect. It clarifies that all participants "compete ***equally***" in Google's Open Bidding. That representation was literally false when made because, as multiple government investigations uncovered and as pleaded in the SAC, Google and Facebook had secured for themselves important advantages enabling them to extract a competitive edge over other participants.

Like the argument leveled at the other misstatements discussed above, Defendants baselessly contend that even if a speed advantage existed (and the SAC alleges it *did*), it does not concern "hypothetical bids that were never submitted to 'the unified auction' for the particular ad inventory," so it has no bearing on falsity. Mot. at 7. Defendants make similar arguments with respect to the ability to recognize users and to detect spam. Mot. at 7-8. These arguments fail. On its face, the statement that "all participants in the unified auction . . . compete equally for each impression" unquestionably applies with equal force to situations where *bids were submitted* in the Unified Auction (with Google and Facebook having competitive advantages due to speed and

---

[6] Defendants invoke the Court's Order to argue that the restriction on the use of Facebook's data cannot render the statement false and misleading for that reason. Mot. at 8. But the Court's ruling dealt with an ***entirely different*** representation that it found too narrow to trigger an obligation to disclose Google's use of Smart Bidding. More specifically, the Court found the statement that "no auction participant receives any information about any other party's bid prior to completion" inactionable because "Smart Bidding [was] only alleged to allow Google to predict rival bids by looking at bids from prior auctions, not bids in an uncompleted auction." Order at 9. While no such duty may have arisen with respect to *that* statement, one clearly arises here.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

match rates), as well as to instances where bidders such as Google and Facebook, armed with the ability to detect bots, *refrained from bidding* on useless impressions. In either situation, Google and Facebook did not compete "equally" with other bidders.[7]

Defendants next claim that Plaintiffs inaccurately describe the content of the Agreement because there was no "guaranteed 'win rate.'" Mot. at 6-7. But the Agreement specifically contemplates so: "For the duration of Phase 1, and Phase 2, Facebook **will ensure** *that the Win Rate is at least 10%*. During Phase 3, Facebook will use commercially reasonable efforts **to ensure** *that the Win Rate is at least 10%*." Agreement (Dkt. No. 94-2) at 33, Item 5. Defendants make much of the fact that Judge Castel dismissed an *antitrust claim* related to the Agreement in the lawsuit brought by the Attorneys General.  Mot. at 4, 6-7. In fact, Judge Castel *sustained* antitrust claims against Google, finding only that the States failed to allege a §1 violation of the Sherman Act. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346 (S.D.N.Y. 2022). That was because the §1 claim contained insufficient allegations that the conduct "had an adverse effect on competition as a whole in a relevant market." *Id.* at 377. Judge Castel's observation that the "win-rate provision does not on its face predetermine the outcome of any auction" was made in the context of the Court explaining that the provision did not necessarily constrain Google from participating in other auctions. *Id.* at 376. But Plaintiffs here do not allege a §1 violation of the Sherman Act. Plaintiffs' *securities fraud* claims center on Defendants' misrepresentations, *i.e.*, that "all participants in the unified auction compete equally for each impression." This distinction matters, as Plaintiffs have no obligation to plead or prove "an adverse effect on competition as a whole in a relevant market." Indeed, in his opinion, Judge Castel expressly acknowledged that,

---

[7] Defendants' argument that the "ability to detect spam" is not a term memorialized in the Agreement (Mot. at 8) is misplaced because not all terms were memorialized.

9

"by threatening to disrupt and then cutting a deal with Google, ***Facebook was able to achieve <u>what others could not</u>: an opportunity to compete against Google*** for publishers' and developers' inventory ***on equal terms***." *Id.* (emphasis added). Accordingly, Judge Castel's decision helps *Plaintiffs* as it expressly acknowledges that Google and Facebook did not compete on equal footing with ***other*** bidding participants.

It is curious that Defendants fixate on Judge Castel's decision but neglect to bring to the Court's attention subsequent developments in the Attorneys General action after it was transferred to the Eastern District of Texas.[8] The Attorneys General accused Google not only of violating state and federal antitrust laws, but also of engaging in deceptive trade practices based on the misrepresentation that all participants in Google's unified auction "compete equally" for each impression. The District Court overseeing the case permitted extensive discovery into the negotiation, execution, and operation of the Agreement, as well as the resulting partnership between Google and Facebook, because they shed light on Google's false representation that *all* auction participants were on equal footing. AGs' Action, Dkt. Nos. 288, 308, 327.[9] In seeking discovery about the additional perks not memorialized in the Agreement, the States highlighted that they "ha[d] shown that materials relevant to their DTPA [deceptive trade practices act] claims . . . lie outside the 'four corners' of the [Agreement]." *Id.*, Dkt. No. 308 at 2-4. Granting discovery, the Court specifically noted that Judge Castel "did not consider whether the NBA violated various States' Deceptive Trade Practices ("DTPA") statutes." *Id.*, Dkt. No. 327 at 2. Thus, Judge Castel's discussion about the "win rate" had no impact on the *deceptive trade practices* act claims. Likewise, it should not foreclose Plaintiffs' claims here.

---

[8] *The State of Texas, et al., v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex.) ("AGs' Action").
[9] The Court can take judicial notice of court filings. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

Defendants misleadingly argue that the alleged "terms" are contradicted by the Agreement Mot. at 6-7. But the SAC nowhere pleads that every single advantage Google gave Facebook was memorialized as a "term" in the Agreement. After all, wrongdoers do not always reduce their understanding to writing. While certain terms were memorialized, such as the "match rate" and the "win rate," other advantages such as speed and the ability to detect bots were not. These additional perks, which are described with precision—300 milliseconds v. 160 milliseconds, match rates of 80 percent for mobile users and of 60 percent for web users—were uncovered by the government's investigations into Google's misconduct.[10] Defendants raised the same unsuccessful argument when they failed to block the States' discovery into the "unwritten, illegal, secretly-agreed-upon terms of that" deal with Facebook. AGs' Action, Dkts. Nos. 308 at 3-4, 327.

Defendants next attempt to trivialize the representations that all bidding participants in the Unified Auction compete "equally." But far from being just "mundane information" on a company's website supposedly directed only to "consumers" (Mot. at 9), these representations are center-stage in several government lawsuits and were also the subject of Congressional scrutiny. The government lawsuits pose grave risks to Google's ability to maintain its competitive market position, and subject it to significant financial penalties and reputational harm. *See, e.g.*, SAC ¶¶4, 170, 305. Accordingly, a reasonable investor in Google/Alphabet would surely be concerned about these practices. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702-03 (9th Cir. 2021) (omissions were material given "increased regulatory and governmental scrutiny, both in the United States and abroad"). The media coverage and the market's reaction when the truth was revealed through

---

[10] *See In re: Google Digital Advertising Antitrust Litig.*, No. 1:21-md-03010, S.D.N.Y., Dkt. No. 541 ("State AG Compl.") ¶429 (describing the speed advantage "designed to aid FAN in winning more auctions"); ¶431 (describing the "leg up over the competition in Google-run auctions" through Facebook's ability to know "which impressions sold through Google are fake and worthless"); ¶¶26, 77 (describing speed advantages).

11

1  a series of corrective disclosures (SAC ¶¶259-77) further support materiality. *Id*. at 703.[11]

2       That these statements appeared on the Company's website strengthens their materiality.[12]

3  Indeed, Defendants routinely used the website to communicate important matters to investors,

4  including to deny allegations of misconduct. *See*, *e.g.*, SAC ¶313 (website statement vigorously

5  denying claims that Google is self-preferencing its AdX and its buying tools); ¶318 (stating on

6  website that the Attorneys' General lawsuit contains "false and misleading allegations" and that

7  "We want to publicly and unequivocally refute the more egregious allegations . . . Header bidding

8  is thriving. Our auctions are fair"); ¶319 (on website, characterizing the Attorneys' General lawsuit

9  as "deeply flawed"); ¶320 (on website, denying the DoJ allegations).[13]

10

## II.    The SAC Alleges a Strong Inference of Scienter

### A.    Pichai's Direct Involvement in Negotiating the Google-Facebook Deal Demonstrates His Scienter

Pichai's scienter is incontrovertible. The "most direct way" to allege scienter is to plead

facts showing knowledge of contradictory "[c]ontemporaneous" information. *See Nursing Home*

---

[11] Dismissal for immateriality is only appropriate where a statement is so obviously unimportant to an investor that "reasonable minds cannot differ on the question of materiality." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *Morgan v. AXT, Inc.*, 2005 WL 2347125, at *10 (N.D. Cal. Sept. 23, 2005) (whether defendants' "quality statements" are material "would require the Court to make factual findings," which are inappropriate at the motion to dismiss stage).

[12] Courts routinely find website statements actionable. *See*, *e.g.*, *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, at *11 (N.D. Cal. Sept. 30, 2024) (statements on the official blog on the company's website); *In re Robinhood Ord. Flow Litig.*, 2022 WL 9765563, at *7 (N.D. Cal. Oct. 13, 2022) (website FAQs and answers).

[13] Defendants' cases are inapposite. *Retail Wholesale v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276-77 (9th Cir. 2017) involved an "inherently aspirational" code of conduct incapable of objective verification, and its substance and online publication were mandated by the SEC. In *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 832 (9th Cir. 2022), plaintiffs alleged that the company misleadingly relied on outlier data when it announced positive results from a drug's clinical trial, but failed to explain what the trial could have shown without the outlier data (it "could have still shown excellent results"). *In re AT&T Sec. Litig.*, 480 F.Supp.3d 507, 527 (S.D.N.Y. 2020), an out-of-circuit decision, dealt with "isolated [low level sales] employee misconduct." And neither case involved government lawsuits accusing the companies of misconduct.

12

*Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). As the government uncovered and the SAC alleges, ***Pichai himself negotiated*** the arrangement between Google and Facebook. SAC ¶108; DoJ Compl. ¶194; State AG Compl. ¶424. Accordingly, there can be no legitimate question as to Pichai's scienter. *See Pampena v. Musk*, 705 F. Supp. 3d 1018, 1048-49 (N.D. Cal. 2023) (scienter because defendant negotiated the merger agreement and, "[e]ven if he truly believed that Twitter had the contractual obligation to provide details about the company's spam and bot data . . . it was at least deliberately reckless to not investigate that obligation . . . before making his statement."); *Robinhood*, 2022 WL 9765563, at *10-11 (allegations that defendant was involved in the negotiations at issue supported a strong inference of scienter); *Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *8 (C.D. Cal. March 31, 2021) (same); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1191-93 (N.D. Cal. 2010) (strong inference of scienter for executive vice president because he "was, more likely than not, involved at some level in the formation of the 1Q and 2Q agreements").[14] Indeed, in the Attorneys' General lawsuit, the District Court ordered Pichai's deposition because he "played an active role in the negotiations surrounding the [deal with Facebook]" and had "unique, personal knowledge about those discussions." AGs' Action, Dkt. No. 535 at 21-24 & n.8.

Google executives identified Facebook's participation in Header Bidding an "existential threat" requiring "an all hands on deck approach." SAC ¶97. As the government uncovered and

---

[14] The facts in *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1103-10 (9th Cir. 2021) bear no resemblance to those alleged here. There, an investment bank analyst published a report setting a $7 target price for a company's stock. Later that evening, the bank announced it will act as the placing agent for an offering that priced the stock at $6. Plaintiffs claimed that the bank's COO possessed scienter because it allegedly drafted, negotiated, and executed the placement agreement. But the complaint was devoid of *any* allegations linking the COO's knowledge with the existence of the analyst report, and the company separated its investment banking and research departments through informational barriers. Here, in contrast, the SAC alleges that Pichai personally negotiated the arrangement with Facebook.

13

the SAC alleges, ***Google's product leadership team explicitly explained to CEO Pichai that with a Google-Facebook deal, "[f]or web inventory, we will move [FAN's] demand off of header bidding set up and further weaken the header bidding narrative in the marketplace***." ¶98; DoJ Compl. ¶193.[15] To secure Facebook's participation in Google's Open Bidding system and away from Header Bidding, Google had to extend Facebook special bidding advantages. An internal Google memo titled "FAN deal discussion" acknowledged that "***FAN requires special deal terms***, but it is worth it to cement our value." SAC ¶99. Pichai's negotiation of the deal with Facebook necessarily alerted him to all the advantages that Google had over other bidding participants as those perks were shared with Facebook. Facebook itself also memorialized this point internally: "***we have significant leverage*** over [negotiating with] google because of header bidding" and partnering with Google "will mean sharing a small % of our margin ***but with the benefit of getting the same level of access as [Google]*** (in a Google world, this means we will get the same treatment as GDN [Google Display Network, which includes Google Ads] gets in the DFP/AdMob ecosystem." ¶96. As Judge Castel also noted, Facebook secured for itself what other bidding participants lacked: the ***ability to compete with Google on equal terms***. *See supra* at 10.

**B. Pichai's Access to Information and the Importance of Securing Facebook's Participation in Open Bidding Support a Strong Inference of Scienter**

Allegations regarding management's roles support scienter where: (i) "they are particular and suggest that defendants had actual access to the disputed information"; *or* (ii) "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 575-76 (9th Cir. 2024).

---

[15] Defendants wrongly claim these allegations "are analogous to FAC claims that this Court has already rejected," Mot. at 16, but the SAC specifically links Pichai's knowledge to the Google-Facebook deal.

Plaintiffs plead both scenarios. The SAC alleges even more than a managerial role by Pichai: he personally negotiated the deal.

The importance of securing Facebook's participation in Open Bidding is underscored by the fact that ***the two top executives at both Google and Facebook were directly involved in the negotiations***. The negotiations involved CEO Pichai and Sr. Vice President and Chief Business Officer Schindler for Google, and CEO Mark Zuckerberg and Chief Operations Officer Sheryl Sandberg for Facebook. SAC ¶108. The significance of the deal was even memorialized internally at both companies. *See*, *e.g.*, ¶97 (Google describing Facebook's participation in Header Bidding as the ***"#1 priority"*** necessary to "protect" Google's "leadership position in 3P [third party] ad buying/selling"); ¶96 (Facebook memorializing "[w]hat Google wants: To kill header bidding (us baptizing their product ***will help significantly***"). Thus, it is "absurd to suggest" that Pichai was not aware of issues relating to the Facebook deal—particularly given his direct involvement. *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015).

### C.  Pichai's Micromanagement of Important Transactions Reinforces Scienter

Facts establishing that Pichai micromanaged important arrangements—like the deal between Google and Facebook—contribute to a strong inference of scienter. *See Oracle*, 380 F.3d at 1234 (scienter inferred from detailed-oriented management style). Here, Pichai admitted under oath that "I review, at a high level, all the important decisions we make." SAC ¶295. As explained above, the plan to kill Header Bidding was a highly consequential decision.

### D.  Pichai's Testimony to Congress Contributes to a Strong Inference of Scienter

According to compliance experts assisting executives in providing testimony to Congress, a witness appearing before or submitting answers to questions from Congressional committees will familiarize himself with the underlying facts by gaining a full understanding of the matters

probed. ¶32. Thus, in providing answers, Pichai was expected to have a full mastery of the facts underlying the Committee's probe. ¶34. Those topics included, but were not limited to, how the determination of the winning bidder is made. *Id*. Custom and practices information is relevant to scienter. *See In re Twitter, Inc. Sec. Litig.*, 2020 WL 9073168, at *10 (N.D. Cal. Apr. 20, 2020); *cf. Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) (scienter supported by speaking "so knowledgeably" on the topic, the defendant "must have educated himself," where information was also subject to a "comprehensive DOJ review") (quoting *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012)). Contrary to Defendants' assertion (Mot. at 14-15), Pichai did have actual exposure to particularized facts regarding Poirot and Elmo because, at the time he provided written testimony to Congress, ***internal Google documents*** discussed Poirot's and Elmo's ***inner workings and benefits***. SAC ¶¶88-89, 92-93. Significantly, these documents were not prepared by a low-level employee, but by the top echelon, including Google's Director of Product Management for Display and Video Ads, and Google's Americas Partnership Finance Lead, so Pichai would have been expected to know their contents. ¶88. In the high stakes investigation of Google's competitive practices with respect to ad tech, Pichai would have been reckless if he did not educate himself by reviewing relevant documents and discussing the issue with those intimately involved to ensure that his testimony to Congress was accurate. ¶33.

The Court already held that Pichai made misleading statements to Congress. Order at 8-10. Misleading testimony in Congressional hearings provides further indicia that Pichai possessed the requisite scienter. *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *19 (M.D. Tenn. Apr. 8, 2021); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *8, *11 (D.N.J. Apr. 28, 2017).

### E. The Existence of Multiple Government Investigations Bolsters Scienter

The existence of government investigations is "one more piece of the scienter puzzle." *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016). By the commencement of the Class Period, several Attorneys General were investigating Google, securing incriminating documents in Google's possession. SAC ¶260. The DoJ was conducting a similar investigation. ¶263. Around that time, the European Commission was also probing Google. ¶¶121, 301. CW2 explained that Defendant Schindler, who reported to Pichai, led Ad Council meetings, where Google planned its response to the antitrust charges. ¶306.

### F. Defendants' Destruction and Concealment of Evidence Reinforce Scienter

Defendants' deletion of relevant information and their misuse of the attorney-client privilege to shield evidence from discovery buttress their scienter. *See In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *4 n.8 (C.D. Cal. July 7, 2011) (scienter pled because "the NHTSA found that [defendant] obstructed its investigations"); *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 517 (S.D.N.Y. 2016) (asking employees to "destroy materials" after SEC initiated investigation supported scienter).[16] The DoJ accused Google of "***destroy[ing] a significant volume of relevant chats***" the ***Company was under a duty to preserve*** in the government's case charging Google with monopolizing key digital advertising technology. SAC ¶322-23. ***The deleted evidence is highly relevant to Plaintiffs' claims***—which also involve Google's misconduct in the ad tech industry. *Id*. It was ***Pichai*** who directed Google employees to keep "history off." ¶324. ***Pichai*** also approved the 24-hour deletion policy on relevant chats. *Id*.

---

[16] *See also Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 548 (S.D.N.Y. 2020) (defendant's "effort to obstruct the internal investigation is circumstantial evidence of scienter" and the complaint pleads he "stonewalled and lied to . . . investigators by, for example, deleting text messages").

17

The DoJ also found that "Google stretched and weaponized the attorney-client privilege … by crafting emails that appear[ed] to be subject to the attorney-client privilege." ¶325. ***Pichai himself testified*** in another recent case that ***he sometimes "marked e-mails privileged, not because [he was] seeking legal advice but just to indicate that they were confidential***." ¶326. There, the Court sanctioned Google for destroying discoverable evidence. *See In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 993-94 (N.D. Cal. 2023) (finding Google's conduct "egregious" and "the most serious and disturbing evidence I have ever seen in my decade on the bench…").

### G.  Pichai's Scienter Is Imputed to Google/Alphabet

As the CEO of Alphabet/Google, Pichai's scienter is imputed to Alphabet/Google itself. *See Curry v. Hansen Med., Inc.*, 2012 WL 3242447, at *13 (N.D. Cal. Aug. 10, 2012) (collecting cases).[17] The representations on Google's website that all participants in the unified auction compete "equally" for each impression and that the channel through which bids are received does not affect the determination of the winning bidder were also made with scienter because Pichai knew facts related to the Google-Facebook deal, as well as Projects Poirot and Elmo (through preparing his testimony to Congress) that rendered those representations false. Google repeatedly used its website to communicate critical matters to investors at the time it was being probed by Congress, the DoJ, and the Attorneys General. Those topics were the focus of the DoJ and

---

[17] The "scienter of the senior controlling officers of a corporation may be attributed to the corporation," even when such an individual did not actually "make" the statements. *Alphabet,* 1 F.4th at 705-06 & n.8; *In re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) ("[P]laintiffs may also attribute the [website] statement to the company itself, which is also named as a defendant."). Separately, the website statements can also be attributed to Pichai, as the SAC alleges that he "possessed the power and authority" to control the content of those statements (SAC ¶¶30-31)—which mirrored almost word for word Pichai's statement to Congress but added the important qualifier "equally" on the website. *Rocket Fuel*, 2015 WL 9311921, at *10 ("plaintiffs have adequately alleged that the [individual] defendant had 'ultimate authority' over the statements" because the complaint alleged that he "possessed the power and authority to control the contents" of the website posting).

18

numerous Attorneys' General's investigations, and were also the subject of Pichai's testimony to Congress. *See* ¶166 (Pichai testifying on these exact points).[18]

### III.    The SAC Pleads Loss Causation

Pleading loss causation is "not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). A "corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). Here, the truth was gradually revealed through several partial disclosures, each of which is causally connected to the fraud and each of which caused a drop in Alphabet's stock prices. SAC ¶¶260-77. The disclosures are not based on just the mere announcement of an investigation, but reveal evidence of wrongdoing, which the government has laid bare through Defendants' own documents. That suffices.[19] *See Erickson v. Corinthian Colls., Inc.*, 2015 WL 12732435, at *17 (C.D. Cal. Apr. 22, 2015) (loss causation pleaded where plaintiffs alleged that an Attorney General complaint revealed undisclosed facts questioning the company's alleged misrepresentations).[20]

---

[18] While not required, the SAC also pleads motive. The improper practices were not disclosed to the public "in order to avoid or delay the impacts disclosure could have on regulatory scrutiny." *Alphabet*, 1 F.4th at 706-07.

[19] An announcement of an investigation, when accompanied by *other* disclosures, as here, satisfies loss causation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-11 (9th Cir. 2016); *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *9-12 (S.D. Cal. July 12, 2016) (announcements of regulatory investigations and related settlements sufficient).

[20] Defendants' cases are off-point. In *Roofers Loc. No. 149 Pension Fund v. DreamWorks*, 677 F. App'x 376 (9th Cir. 2017), the sole alleged corrective disclosure was the mere announcement of an SEC investigation, and "the SEC ended its investigation without taking enforcement action against Defendants." *Id.* at 377 (loss due to investors' disappointment rather than fraudulent practices). In *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017), plaintiffs "only cite[d] customer complaints to the FTC without a subsequent investigation," thus "rel[ying] on even less" than the mere announcement of an investigation. And, as the Ninth Circuit explained when it distinguished *Curry*, "[c]ritically," those customers "were outsiders who lacked any firsthand knowledge of [the company's] practices," so plaintiffs were merely resting on the assertion that "where there is smoke, there must be fire." *BofI*, 977 F.3d at 793. In *Irving Firemen's Relief &*

1
2
3
4
5
6
7
8
9
10
11
12

Defendants claim that each corrective disclosure was accompanied by a "prompt" rebound in the stock price, defeating loss causation. They are wrong. The Ninth Circuit requires a "quick," *i.e.*, **"immediate[]"** (the next day) **and "sustained"** price recovery to defeat loss causation, and no such recovery occurred here for any of the corrective dates. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021); *Lako v. LoanDepot, Inc.*, 2023 WL 444151, at *10 (C.D. Cal. Jan. 24, 2023) (no sustained price recovery as required by *Wochos*); *see also* Dkt. No. 60 at 23-25 (detailing the lack of immediate and sustained recovery for each corrective disclosure). And a plaintiff is not required to plead statistical significance of corrective disclosures in a complaint, with courts explicitly rejecting the concept that expert testimony is necessary at the pleading stage. *See*, *e.g.*, *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *13 (S.D.N.Y. June 28, 2010).[21]

13

## CONCLUSION

14
15
16

Defendants' Motion should be denied. Should the Court deem any portion of the SAC insufficient, Plaintiffs respectfully request leave to amend. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.l3d 940, 946 (9th Cir. 2005).[22]

17

18
19
20
21
22
23
24
25
26
27

*Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397 (9th Cir. 2021), plaintiff attempted to prove the element of loss causation by reference to another element, *transaction causation* (arguing that "mere inflation is enough to show loss causation"). *Id.* at 406. Plaintiff's efforts to plead loss causation through other revelations failed because they were mere "general allegations" attributing Uber's reduced valuation to "corporate scandals generally." *Id.* at 408. Here, in contrast, the disclosures were causally connected to the alleged misconduct—*Google's* anticompetitive practices in the advertising technology business.

[21] *Eng v. Edison Int'l*, 2017 WL 1857243, at *4-5 (S.D. Cal. May 5, 2017), cited by Defendants, relied on *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010). That case, however, was decided on summary judgment after the development of a full factual record and the provision of expert reports, including damages reports, that addressed the statistical significance of the corrective disclosures at issue. *Id.* at 1266 (noting that "[i]n the context of a summary judgment motion," "plaintiffs often hire experts to opine on loss causation"). Further, Plaintiffs are unaware of any decision from within the Ninth Circuit—or any other circuit, other than *Eng*— that has held that in order to *plead* loss causation a plaintiff must obtain and provide an expert regression analysis on the statistical significance of corrective disclosures.

[22] Because the §10(b) claims are well pled, the §20(a) claims also survive.

28

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  December 23, 2024

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Orly Guy
Eitan Lavie
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
7080 NW 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Plaintiff City of Fort Lauderdale Police & Fire Retirement System*

21