**Pages 1 - 37**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., et al., )<br><br>          Plaintiffs, )<br><br>  VS. )<br><br>ALPHABET, INC., et al., )<br><br>          Defendants. ) | **NO. 3:23-CV-01186-RFL** |

San Francisco, California
Tuesday, March 4, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

POMERANTZ, LLP
600 Third Avenue, 20th Floor
New York, NY 10016
**BY:  JEREMY A. LIEBERMAN
EMMA GILMORE
ATTORNEYS AT LAW**

For Defendants:

FRESHFIELDS, U.S., LLP
855 Main Street
Redwood City, CA 94063
**BY:  BORIS FELDMAN
ELISE M. LOPEZ
MAI TSUI
MAX HAN
ATTORNEYS AT LAW**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter

**Tuesday - March 4, 2025**                    **11:13 a.m.**

<strong>P R O C E E D I N G S</strong>

---o0o---

**THE COURTROOM DEPUTY:**  Calling civil case 23-1186, AMI Government Employees Provident Fund Management Company Limited versus Alphabet, Inc., et al.  Counsel please come to the podiums and state your appearances for the record beginning with the plaintiff.

**MR. LIEBERMAN:**  Good morning, Your Honor.  Jeremy Lieberman, Pomerantz, LLP on behalf of plaintiffs.

**MR. FELDMAN:**  May it please the Court.  Boris Feldman for the defendants, and I brought my brain trust with me because your questions are quite sophisticated, and I hope you'll forgive me if I need to get help from some of my team. Joining me are Elise Lopez, Elena Madjimichael, Mia Tsui and Max Han.

**MR. LIEBERMAN:**  Your Honor, I neglected to introduce my partner, Emma Gilmore.

**THE COURT:**  Good morning.  Good morning to all of you.

I did put out questions last week.  I gather that you have them, so let's just march through them.  I know there's a lot, but I promise I'll have a little bit of time at the end for you to tell me anything else you think I need to know.

So let's just start with question 1.  I won't read the whole question, but essentially there is a representation that

all participants in the unified auction, quote:  Compete equally for each impression on a net basis.  And I understand Google to be making the argument that "compete equally" really refers to somebody being guaranteed to win the auction or a situation where someone other than the highest net bidder wins the auctions.

Is that really the right way to interpret "compete equally"?  This is really a question for Google.

**MR. FELDMAN:**  Thank you, Your Honor.

So the document is exhibit E, which you have.  It's part of the user website for entities that want to place ads, and there are two statements in it that the case now boils down to.  The overall section is about the open bidding process, which walks customers who want to use it through that, and then in auction dynamics it's described how you get to this, what people do to search for ad opportunities and to bid.  And then it says:  All participants in the unified auction, including authorized buyers and third-party yield partners, is compete equally for each impression on a net basis.  Participating exchanges run their own auction independently and then submit their bid into the unified auction.

You already dismissed a similar statement to this based on the congressional answers.  Here the plaintiffs, when they amended, added "equally".  I don't think it adds anything to the truth or falsity of it.  As you found in the prior order,

this describes not the fairness or equitable nature of everything involving ad technology, it involves what happens when you submit a bid.  There's no allegation, nor could there be, that the selection by the machine of the winning bid is skewed; it isn't.  The highest bid net of the fee wins the auction.

So I don't think that inserting the word "equal" changes any of that.  The challenged statement does not speak to any intermediary processes that occur before the bids are submitted to the unified auction.

There is some indication in the opposition that somehow Facebook had an alleged advantage prior to submission of a bid, but that doesn't impact the fact that once, through the Facebook advertising network, a bid is submitted, if it's the highest bid, it wins, and if it isn't, it doesn't.

THE COURT:  But if you think about the analogy to a in-person auction, like an art auction or something, and you imagine some of the bidders have more time to put in their bid or some of the bidders can see the item clearly and others have to see it through some kind of screen where they can't see a lot of the details of the art, it would seem to me just intuitively that the participants in that auction are not competing equally if their bid submission process isn't on equal footing.  Help me understand why that intuition is wrong.

MR. FELDMAN:  It's a good intuition in that context,

but here it's one sentence and a long detailed description of the processed.  The caption for that section is Auction Dynamics, and they're talking about realtime bids.  I won't bore you with the preceding paragraph, but it lays out how the realtime bids work.

So even if the allegations that Facebook has more time to decide what it wants to bid, even if that were true, you don't need to adjudicate that, Your Honor.  The fact is once the bids are submitted they compete equally, and there's no basis for reading this more broadly than that.  It can't be that putting in the word "equally" undermines your decision last time about the identical sentence in the answer to Representative Cicilline.

There is also, if you got beyond the falsity point on this, it begs credulity to think that Sundar Pichai, managing a $2 trillion company, was editing product inserts buried on a web page.

**THE COURT:**  Let me give plaintiffs an opportunity to respond.

**MR. LIEBERMAN:**  Your Honor, we just have to look at the words that are stated by the company.  It doesn't say all bids, once they're submitted, are equal and are treated equally.  It says:  All participants in the unified auction, including authorized buyers, third-party partners, compete equally.  Everybody here who participates in this unified

auction is competing equally.  That could only mean some don't have advantages over others.

And as we alleged and as Your Honor noted, there are time advantages, there's informational advantages, there's match rate advantages.  Facebook doesn't have its information being scoped out by Google to predict bids like the other participants have.  So you have all those advantages that Facebook has and Google has, as well, regarding smart bidding and other advantages that they have, which simply don't apply to the other participants.

So we just have to look at the -- we have to look at the wording that's used, and the benefit of that is to the plaintiffs here, Your Honor, and it is implausible that someone, a reasonable investor, would understand this to mean that everybody participating in this auction is competing equally is clearly what a reasonable investor would take from this.

As to Mr. Feldman's point regarding, well, does it make sense that Mr. Pichai would look at this statement.  He issued virtually the same statements to Congress.  So he's clearly the master of this statement.  He knows it.  He issued that same statement to Congress.  He's obviously aware of what is being said, how it's being said.  Either he -- either Google took that statement and put it on their website with his authority -- clearly they didn't do it behind his back and

fudge it and change it -- or he took it from the website and made it to Congress.  But clearly he's aware of this statement.  He knows the import, because he's making that same statement in response to an inquiry by Congress.  Congress is investigating this.  They're making this statement in response to in the background of congressional investigations, and they're exactly asking, Congress is asking one question:  Are there advantages here; are you guys somehow rigging the system.

And in the context of that statement they state baldly and boldly everyone here is competing equally.  And then he kind of fudges the statement when he goes back to Congress and says, competes.  And so the question is what do we do with that, as we would say, fudging?  Did he just, you know, omit the word, or did he when he -- maybe when he was giving something under penalty of perjury he said, maybe I should take that one out.  But he let it stay on the website.  He didn't stop it from being -- you know, staying on the website.  And we'll get on to whether or not that's attributable to him.

But clearly if he's either -- he either furnished it, or he saw it, let it be said and took that to Congress and took out a very important word.  And what he should have done if he got the statement from the website and he saw, hey, competing equally is not true, he should have taken that statement off the website.  He had the control and authority under *Janus* to take that statement off the website.

**THE COURT:** Let's skip to question 3, actually, because I think we covered question 2 already in terms of the informational advantages. Tell me what your theory is of attribution.

**MR. LIEBERMAN:** Sure.

I mean, we'll get to -- when we look at attribution, we have to look at *Janus*. *Janus*, a Supreme Court precedent, says you need control and authority over the statement. So then you have -- you have -- who -- if we were to choose anybody in Google who would have control and authority over the statement that's made, the only one that's ever issued a similar statement like the one here is defendant Pichai. Now, like I said earlier, either Pichai issued that statement on the website and then he kind of fudged it and changed it and changed it to Congress to take out a very critical word, or he saw it on the website, took it and said, hey, maybe I got to take out a word here. But the fact that he let it remain, he had every power and authority to allow that statement to be made on the website, and the fact that he --

**THE COURT:** Why would I infer he's the one who saw it on the website? I mean, I'm sure Pichai is not the one who prepared his congressional testimony all by himself. I'm sure he worked with other folks to prepare the testimony. So why is it a fair inference that he's the one who went to the product website himself, took the sentence out and then took out the

word "equally" when he had to say it under penalty of perjury?

**MR. LIEBERMAN:**  Because, Your Honor, the only person here who's issued a statement like that ever before is Pichai, and he's issuing the same exact words.  Clearly he's responsible for the statements he makes to Congress.  Clearly he signed off on that statement.  And to say he's completely ignorant of a virtually identical statement on the website I think is a very large leap.  And in any event, you have case law stating that statements on a website are attributable to senior officers and directors.

And we have the case, cases that we cite, if Your Honor will bear with me.  The *Rocket Fuel* case, where statements on a website were attributable to the senior officers and directors.  You have the *Farridy* (phonetic) case where it's press releases, unissued press releases were attributable to the senior officers and directors.  And you have the *Solerance* (phonetic) case, which was statements on a website were attributable to the senior officers and directors.

So then I refer to a case, *Sgalambo on versus McKenzie*, 739 F.Supp.2d 453, where the Court held that if plaintiffs -- in that particular case plaintiffs didn't allege that, but if plaintiffs alleged that virtually this identical statements were being made by the defendants in a similar context, then you could infer that, oh, those other unissued statements were also made by the defendant.

So as far as attribution, I mean, he clearly has control and authority over the website. He's clearly involved in making this statement. If you get to the point anybody in the company who has control of authority, he's uttering those same words except for that pearl of a word, "equally". He's the one who knows about that statement. He's -- and clearly you would make an inquiry, whether did you get the statement from. I mean, he signed off on it. Didn't he ask anyone? You know, how did you get the statement, where'd it come from, a basic level of inquiry.

And then we have, Your Honor -- let's say Your Honor doesn't buy it. Let's say Your Honor --

(Reporter clarification.)

**MR. LIEBERMAN:** -- we're on a website, I don't think that Pichai could be attributed to them. This circuit, in the *Alphabet* case, the Ninth Circuit -- I'll give Your Honor the cite, but it's cited in our brief, has stated, it's 1 4th (sic) 687, 2021 case against Alphabet, and there it's Larry Page, and they held that: Unattributed statements by Google, where the scienter was attributable to the higher excessive there, Larry Page, even though he didn't sign it, but he was -- his scienter regarding the falsity of the statements was sufficient to find liability in that case.

Then you have other cases, the *Rocket Fuel* case, where you have the -- excuse me. *Rocket Fuel* -- you have the *Virgin*

*Galactic* case where the Court held -- and that's 639 F.Supp.2d 350, and the Court held when you had a situation where an individual had made the very same -- virtually the same statement in other contexts, then you could attribute the scienter at least, not necessarily the statement, but the scienter to those other words, as well, that were uttered in other contexts.

And you have the *Southland Securities Corp versus Inspire*, 365 F.3d 353, where the Court held that if you furnish information regarding a statements (sic) and furnish -- helped draft the statement, even if you actually didn't attribute it to yourself, you could also be held liable for scienter.

So we have a scenario where --

**THE COURT:**  Do any of these cases deal with this unusual situation we have where somebody's made -- Pichai has made the statement in front of Congress that doesn't have this keyword "equally"?  And I do think the word is key, because it's the difference between it being a false statement and it not being a false statement in my view.  I understand that that's not the view that plaintiffs have, but this "equally" word appears in the website but not in Pichai's testimony to Congress.  So how can I conclude that these two statements are similar enough that I can attribute the later one or the website one to Pichai, even though it doesn't have the keyword?

**MR. LIEBERMAN:**  Your Honor, how did that word, that

keyword, for saying it's a critical word, how did that word all of a sudden just fall out of the statement?

**THE COURT:** Do you have a case in any way similar to that, or is this just a one-off that's --

**MR. LIEBERMAN:** It is certainly a one-off, and I think the one-off of it does speak to scienter, Your Honor. If it doesn't speak to attribution, it speaks to scienter. How did that word get out of there? What's the difference between that statement being made on a website versus being made to Congress? Was that because one was under penalty of perjury and one's not? And if that's the case, who's the one deciding to omit the word? Is Pichai just gonna say, you know, on my -- statements that are made on my website that are virtually similar to what I'm saying I'm not liable for because, hey, someone else drafted it? And there are courts have addressed that, as well.

But we have *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, pin cite 48, footnote 217, where the Court had held that substantially similar statements could be attributed to the maker of the unattributed statement.

And for scienter purposes you've got the *Rocket Fuel* case, where he made a similar -- you know, the individual defendant made very similar statements in one instance, and then those -- and then another situation unattributed statements were made with similar words, and the Court held that was sufficient for

attribution as to the statements.

And then we have, Your Honor, all that, even if we throw out attribution of the statements for imputing scienter, you have this whole case law, you have the *Alphabet* case, Ninth Circuit, that says statements on a website are attributable to the senior directors, and you have -- particularly then you have the *Virgin Galactic* case that says statements that are very similar to the statements being made by defendants, the scienter then can be attributed to defendant.  Because it's not necessary that you have the scienter of the speaker itself.  It is sufficient in the Ninth Circuit and several circuits in this country that the CEO or the chief executives have scienter contradicting statements made even not in their name.  And clearly we have the facts that contradict this, given Pichai, and which we'll discuss, given Pichai's negotiation and signing off on the Facebook deal.

**THE COURT:**  Let me give Google an opportunity to respond.

**MR. FELDMAN:**  It's pronounced Pichai, P-i-c-h-a-i.

I want to talk about scienter first, but then I want to take another run at you on falsity, because I think, respectfully, there is an alternative way of reading the statement.

On falsely, what Mr. Lieberman ended by saying is the case law doesn't hold that you have to find scienter on the part of

the person speaking.  That's wrong.  You already ruled here that as to the one statement about the channels that you found might be actionable, that they hadn't established scienter as to Pichai.  It's not enough to say, well, someone else in the organization must have known.  So that statement on the law is wrong.

You need to look at, as Your Honor knows better than any of us, the standard is a strong inference of scienter.  It's a very tough pleading standard.  So your question ended with a misstatement.  How can scienter as to Google be inferred from Pichai's negotiation of the agreement, meaning the Facebook agreement?  He did not negotiate the Facebook agreement, and that is key.  So it -- I'm sorry.

**THE COURT:**  Let's just assume for the sake of argument -- I should have been clearer in my question.  Assuming for the sake of argument that he had -- that I could infer that he had negotiated the Facebook agreement.  Then would that mean that scienter could be inferred as to Google as a whole?  Just because he's CEO, now everything he -- that's in his head is inferred to Google in a way that is different from say, you know, a random software engineer who happens to be working on a particular project?

**MR. FELDMAN:**  But the Court can't, in my opinion, assume away each of the building blocks that plaintiff has offered for scienter.

So in paragraph 108 they say there was scienter because, quote: The negotiations culminated in an agreement executed between Facebook and Google in September 2018. Google's Pichai and Schindler personally executed the agreement, closed quote. And you know that's not true because the agreement is an exhibit. Schindler signed it; Pichai didn't. For Facebook, Sandberg signed it, not Zuckerberg. So this whole notion that one can insert words and say, well, it was high level, therefore the scienter has to be imputed to him is incorrect.

Similarly, without getting into the falsity issue yet, which I hope you'll let me, we made a mistake. We should have attached as an exhibit the submission to Congress. But fortunately if you or your clerk Googles the following, "Google's submission in response to subcommittee questions," you'll pull up the document. And out of neutrality, I tried it on Bing and DuckDuckGo. So you can use the search tool of your preference, and it will pull up 58 pages of answers.

They're not just to representative Cicilline, who is the subcommittee chair. It was to everyone on the committee who had sent Google questions. And what you will find -- I did not do a quantitative analysis, but just flipping through the 58 pages, you'll see that the operation of the ad tech tools was a very small part of it. They had many questions about Chrome, about Android, about Search, about YouTube. This was not Pichai sitting in front of the Congressmen and saying,

senators, I'm here to represent to you there's no reason for concern, if I may borrow from the preceding argument.

This was 58 pages of technical answers.  There's no basis at all for thinking that the CEO wrote those 58 pages any more than there's a basis for thinking that he scrutinized the hundreds of thousands, if not millions of pages on Google's website describing products.

I want to just try one more time with you if you'll indulge me, why the word "equal, equally" does not change what you previously ruled not to be actionable to become actionable. We are not construing a statute or interpreting the Talmud.  It is a page of instructions on a product.  In our prior argument a year ago we had an interesting engagement on "in connection with the purchase or sale of a security," if you recall, which is what 10(b)(5) is about.  Nothing about that page remotely relates to purchase or sale of a security.

There is no allegation in the complaint, whether from a CW or anyone else, that there was a deliberate decision to insert "equally" on the website, but not in the staff's answer to the questions.  So I think if you look at that page from the website fairly, it was not purporting to be Pichai's representation that everything about the process was treated fairly at every point.

One other point on Facebook, and then it may come up later, as well, but then I won't repeat it.  This relates to

the channel affecting the bidder.  Can I address that now, or do you want me to wait?

THE COURT:  Let's just wait on the channel.

MR. FELDMAN:  Okay.  Thank you.

THE COURT:  But let's go to question 4, because I think that's where you started to get into this issue of Pichai and whether I can infer from the allegations of the complaint whether that he personally negotiated the agreement on behalf of Google.  I hear you saying on the Sheryl Sandberg point that just because she's high level doesn't mean Pichai was involved in the negotiations, because Mark Zuckerberg, for example, there's no indication that he signed it.  But there are these other allegations where Pichai is saying that he reviews at a high level these important decisions, and people on both sides are discussing the possibility of the FAN as this existential threat.

And so is that enough to kind of put meat on the bones of an otherwise conclusory allegation that Pichai was involved in the negotiations personally?

MR. FELDMAN:  It -- I think that the argument by the plaintiffs may have misled you.  It was not that Facebook was viewed as a threat.  That's part of -- the plaintiffs throw in a lot in the complaint about Facebook.  It's important -- and as you recognize, this complaint is built on the antitrust complaints in the underlying cases.

In the MDL, which is the main ad tech case in the Southern District of New York, the judge largely dismissed the Facebook allegations.  So this notion that Pichai was lying because, in fact, Facebook had an unfair advantage, among other things the complaint alleges, quote:  Facebook was given a guaranteed fixed win rate by Google, closed quote.  So that sort of goes to your equal point.  Are they equal competitors if we've guaranteed a win rate for Facebook?  But when you go beyond the sort of word salad, the agreement itself, which is exhibit B to the Lopez declaration, it required Facebook to bid high enough to try to win at least 10 percent of the auctions it participated in.  It didn't contain any obligation on Google's part.  It didn't guarantee any win rate for Facebook.

So Judge Castel, in the Southern District, when he dismissed the Facebook allegations from the antitrust case, said, quote:  The win rate provision does not on its face predetermine the outcome of any auction.  It ensures that Facebook submits competitive bids, not throw-away bids.

So even if Pichai had full awareness of the terms of the Facebook agreement, nothing in the complaint suggests that that caused him to believe that the two statements remaining in the case were false.  To say that he's in charge, of course he's in charge as the CEO of a $2 trillion company that has search, maps, YouTube, Waymo, lots of other stuff.

None of the case law -- we could -- I'm happy to go case

by case with Your Honor, I really am. But none of the case law suggests that on the product page of a website as to whether one word was inserted or not, you can keep a securities fraud case going on the theory that the CEO had ultimate authority. The fact that it was Schiller who signed instead of Pichai actually I think undermines their scienter argument. If you've got the EVP of the company on top of it, and you're the CEO and you're managing everything in the world going on around you, you can let your staff do that.

So in the end -- you've had many securities cases. In the end, they have to make you feel pretty much that when the CEO, or whichever officer, when the officer said the allegedly false statement, he had a pretty good sense that he was lying. Here he neither made the statement in the 58-page response, it was a corporate work product, nor did he say the thing in the website.

So I have had plenty of cases where what I have to defend is what the CFO or CEO said, what did she know when she said it. But here we don't get past of the first point of attribution, and there's nothing other than, well, they had a lot of power and high-level execs were involved in this to attribute scienter to him. I agree with you that if he had scienter that would be attributable to the corporate entity, but it doesn't work the other way. If you say somebody in the company must have known therefore you've alleged scienter as to

him, that's never been the law.

**THE COURT:** The question I have is, then, if the corporation is responsible for the statement on the website in general, and then Pichai -- let's assume for the sake of argument Pichai had scienter.  Then Pichai's scienter would be attributable to the company as a whole, right?  So there would be a viable claim against Google for the website statement based on Pichai's scienter.

**MR. FELDMAN:**  It is so --

**THE COURT:**  Am I correct?

**MR. FELDMAN:**  I'm sorry, Your Honor.

**THE COURT:**  Go ahead.

**MR. FELDMAN:**  It is so far from reality that I hate to answer it yes or no, but you're wearing the black robe and I'm not.

If you had a situation in which a company made a statement that the CEO was aware of and knew was false, her scienter would be attributed to the corporate entity.  Nothing about this relates to any of that.

**THE COURT:**  But what if the CEO wasn't aware of the statement on the website, didn't know that the website said this thing that was totally wrong, but knew facts that would indicate that in fact the statement was wrong, they just didn't know the statement had been made by the company?

**MR. FELDMAN:**  No liability.  You could argue --

**THE COURT:** Do you agree with that?

**MR. LIEBERMAN:** Absolutely not, Your Honor.

I think Mr. Feldman actually said it right himself. If Pichai knows facts contradicting statements that are being made by the company, the scienter, Pichai's scienter is then attributable to the company. That's exactly the case, and we have allegations. I could address Your Honor --

**THE COURT:** Hold on. Let me just go back to Mr. Feldman for a minute.

Do you have a case that you'd point me to on that issue just to make sure I'm getting that exactly right? Because I think I hear you two saying something different on this, and it's not a topic I've delved into before the hearing.

**MR. FELDMAN:** My friend misstated my position. It is not that if an officer knows facts that contradict something on a website that they're liable. It's that if, in your hypothetical, if the CEO knows of a statement the company is making and knows that it is untrue, then her scienter can be attributed to the company.

He three-card Monte'd it to be if the CEO knows facts that contradict a statement, without adding "knowing that it makes it false or knowing that it is being made." So it's a totally different situation.

On the authority, I'm hoping that my village will give me some before we leave.

**THE COURT:** Let's let me go to plaintiffs for a minute just to give you an opportunity to respond on the issue of Pichai's personal negotiation of the agreement on behalf of Google.

**MR. LIEBERMAN:** Absolutely, Your Honor.

Paragraph 108 of the complaint alleges that he negotiated the agreement.

Even stronger, Your Honor, is the Attorney General's complaints. Paragraph 424 says, and I quote: The ultimate outcome of these negotiations was in September 2018, Google-Facebook agreement signed by Phillip Schindler, senior vice president, head of advertising, sales, and Ms. -- Facebook's chief operating officer, presumably Ms. Sandberg, a member of the board of directors, and then it says, last sentence: Going's CEO, Sundar Pichai, also personally signed off on the terms of the deal, period. He signed off on the terms of the deal. That's an allegation made from the Attorney Generals, and it's repeated by the DOJ.

In paragraph 194 of their complaint it says: Ultimately in September 2018, after a long negotiation and approvals by each company's top brass, including Pichai, Mark Zuckerberg and Sheryl Sandberg, Google and Facebook entered into a network bidding agreement. So there it says that these were approvals made by the company's top brass, including Pichai, Zuckerberg and Sandberg. There's no other way to say it. Pichai signed

off on the deal.  So that's it.  And he negotiated it, as well. So then he knows of its terms.  And if he knows of its terms, then his scienter then is attributable to the company and to the -- and the company's false statements.

And then Mr. Feldman is now coming up with a little exception to the scienter argument.  Google, 2021 -- the *Alphabet* case, excuse me, says that the scienter of the company's top brass can be attributed to the company.  It doesn't say only if you know that the statement was issued.  It doesn't say that.  His scienter, his knowledge of adverse facts is attributable to the company.

Now, Mr. Feldman is now coming up with a new exception to the *Alphabet*.  It's the new theory, which is that only if you know the statement's being made.  And then I'll say even if we adopt this theory, which is not stated anywhere under Ninth Circuit law, what is it that the -- that the likelihood that Mr. Pichai doesn't know this statement's being made?  He signs off on the document.  If that document --

**THE COURT:**  I understand.

**MR. LIEBERMAN:**  Okay.  Fine.

**THE COURT:**  So let's just go to question 5, which is about the channel in which the bid was received.  The statement is that:  The channel through which the bid is received does not otherwise affect the determination of the winning bidder.

So I understand that one of the arguments that plaintiffs

are making is based on this Facebook agreement.  I understand plaintiffs' argument that the agreement gives Facebook advantages in bidding in the unified auction, but how does the channel through which Facebook's bids are set affect the determination of the winning bidder?

**MR. LIEBERMAN:**  Because, Your Honor, as alleged in paragraph 95 of the second amended complaint, FAN, Facebook Audience Network, which is the advertising/buying tool for Facebook, is akin, it's a tool akin to Google's DV 360.  FAN is a channel.  That's the channel through which the bid is received.  The bids come through FAN.  And it's alleged specifically in paragraph 95 of the complaint it is not in any way disputed in any detail by Alphabet, and so that's the channel.  FAN is a channel just like DV 360 is a channel.  And so therefore FAN has all these advantages, and so does DV 360, by the way, and these are the channels that submits the bids, and so they all have fundamental --

**THE COURT:**  Okay.  I understand now.

So the argument is when a bid comes through FAN, it has all these timing and other advantages that would ultimately affect who wins the -- who wins the auction in the end, even if it doesn't, as Google points out, necessarily change the way the auction itself is conducted.  Because they get more time and these information advantages, they have a higher probability of winning the bid.  Is that basically the --

**MR. LIEBERMAN:** A different set of rules apply to Google and 360 than apply to the other participants, and it says specifically in our complaint that these advantages were made to help Google win. Otherwise, why would you negotiate for the advantage? So that's the whole purpose.

**THE COURT:** Let me give Google an opportunity to respond.

**MR. FELDMAN:** FAN, the Facebook Audience Network, is a channel. Once Facebook submits through its channel a bid, it either wins or loses if it's the highest bid. So which channel it came from doesn't affect the winning bid.

**THE COURT:** I understand that argument, which was made in the briefing, too.

Let me just move to question 6, then, which is about Project Poirot, that's plaintiffs' other theory. This is a question for plaintiffs.

So I read the complaint as saying that Project Poirot operated by reducing the bids in first-price auctions as compared to second-price auctions, and the allegation is this was a covert way to get at the header bidding issue. But then there's an allegation that in 2019, Google switched its Ad Exchange from second-price auction to first-price auction. So how specifically is Poirot alleged to have operated to affect the determination of the winning bidder, then, if it's not through this first-price, second-price difference?

**MR. LIEBERMAN:**  And, Your Honor, paragraph 87 of the complaint discusses that Poirot was extended to optimize bidding in first-price auction environments like the ones used by heading bidder exchanges.  So at some point they also extend that, and we don't have it in the complaint, there was a Poirot 2.0 that occurs in 2019 which then extends the advantages to first-price auctions.  Because as we know, DV 360 and Ad Ex are now working as first-price auction environments.  And so that -- but we nevertheless say that those advantages and that Project Poirot continued through the class period.  And we have then the allegation of the paragraph 230 of the DOJ complaint which says:  Poirot, which continues in some form today, shifted spend to Google's Ad Exchange with its high revenue share fee, deprived competing ad exchanges of scale, auction pressure and higher win rates, lower publisher payouts and limited advertisers' ability to fully and effectively spend their budgets all without any improvements to Google's own Ad Exchange.

So we have this Poirot.  We have that they continued to shift bids and spends towards Ad Ex.  And so those are the allegations in the claim.  If Your Honor's asking the exact mechanism, what was the trick in the algorithm that did it, Your Honor, we don't have that allegation.  I can say that on the record.  We don't have that allegation.  We do have the allegation that Poirot was developed to shift money to Ad Ex.

We have that that was very successful. We have that that continued through the class period. It had the impact of shifting money from Ad Ex and disadvantaging other exchanges. We have the allegations that it lowered bids to competing exchanges by as much as 32 percent, and that it had shifted $200 million-worth of ad spend away from third-party exchanges. But if Your Honor's asking for the exact mechanism post-2019 of how that was done, what was the algorithm or what was the, you know, little cookies trick, I don't know, Your Honor. I don't have that. I don't have it.

**THE COURT:** So you don't know how it happened after 2019, just it was extended in some way after 2019 that added an advantage to Google in some unspecified way, even --

**MR. LIEBERMAN:** They continued to shift bids to Ad Ex. They continued this project, and that's -- we believe that's alleging specificity of the continued shift to spend and monies and bids to Ad Ex to the disadvantage of other exchanges.

**THE COURT:** Is that enough to plead with particularity under 9(b)?

**MR. LIEBERMAN:** I think given the impact of Poirot, given the -- given this impact, given the allegations that are combined, that are verified by Attorney Generals and state AGs, and given all the other allegations in the complaint, Your Honor, we think it does meet the plausible allegations required by the PSLRA.

**THE COURT:** Let me ask you about Elmo also. So question 7 is about Elmo: What allegations support Pichai's knowledge of the implementation of Elmo or its mode of operation at the time of the alleged misstatements.

**MR. LIEBERMAN:** Right.

**THE COURT:** So this was the issue the first time around.

I have to say I'm not seeing how Pichai knows that that's his description of how the bidding process works. How does he know that that's wrong? I mean, it seems like he would have to have a pretty fine-grained understanding of how Elmo works in order to understand why what he said isn't quite right. Help me understand why there's still scienter.

**MR. LIEBERMAN:** Of course.

Your Honor, so this has to be in the context of Google's overall plan to kill bidding, which we allege with specificity. We allege that he signed off on the Facebook deal. We also alleged that part of the Facebook deal was to put FAN on an equal footing as Google and DV 360.

So the -- it would strain credulity to say that -- you know, Pichai, he knows about the Facebook deal. He knows we gave all these specific advantages to Facebook which we think we allege with flying colors, Your Honor, but he doesn't know how Google's advantaging itself? Somehow he didn't ask that question? Hey, guys, what are we doing to -- we know we're

advantaging Facebook, but what are we doing for ourselves?  Are we doing anything, guys?  I can't imagine that, particularly, Your Honor, when he's making statements to Congress on that very issue.  Well, I know that we gave Facebook these advantages, and I know that we were supposed to give them even the same advantages that we have and put them on an equal footing with us, but can I ask were we doing anything here to point the ads in our direction?  To even say that Pichai wouldn't ask that question, Your Honor, a CEO who is looking to profit his company, and that he wouldn't know about then about Elmo and then about Poirot, particularly when Congress is asking him about these issues under penalty of perjury, that he wouldn't take those steps, just like the DOJ found about this information, the AGs, they did it through subpoenas, they did it through depositions, Pichai has all those same powers as the CEO of the company.

And so when he's under penalty of perjury, he clearly in our view, Your Honor, he knows how to phrase words very carefully in Congress to make sure that he perhaps doesn't run afoul of the penalty of perjury.  He would also know, Your Honor, to ask questions, what are we doing, are we doing anything here to advantage ourselves.  Because I know about Facebook, and I know we have a lot of different -- and Facebook gave specifically certain advantages regarding the timing, regarding the use of information, regarding match rates.  They

put Facebook on their same level.  So he knows we're doing some things here to manipulate the bidding, and we're giving Facebook some of those similar advantages.  Are we doing anything else, guys?  Is there anything else we're doing here to advantage ourselves?  What else are we doing?  Because I'm writing to Congress here and I'm under penalty of perjury.  I really want to get this right.  And if he didn't do that, Your Honor, he's reckless in not doing it.

**THE COURT:**  Let me give Google an opportunity to respond, and then I think we're going to be wrapping up the hearing.

**MR. FELDMAN:**  It's the weakest scienter argument I've ever heard in a securities fraud case, he was giving answers to Congress, so he didn't need subpoenas, he should'a dug harder.  That's not scienter under 9(b0, much less under the reform act.

On Poirot -- and for the reporter, it's P-o-i-r-o-t -- fortunately they didn't call it project Clouseau, which would be much harder to spell.  And fortunately they called it Elmo, not Cookie Monster.  Cookie Monster could have raised GPRD issues.

Your Honor's question number 6 suggests to me that the Court now understands why as to the one statement it held might be actionable, it actually is not.  Until 2019, Ad Ex was a second-party exchange.  After 2019, according to the complaint, it became a first-party exchange, or what's known as a non-

second-price exchange.  Therefore, there was no conceivable advantage from Project Poirot to Ad Ex.  It knocks that out as a false claim, because both the 58-page submission to Congress and the website came after that.  So it -- Poirot doesn't establish falsity.

In response to the Court's probing, Mr. Lieberman said, well, we know Poirot continued in some way, so it must have still given them advantages.

Your Honor asked for authority, and I'd like to invoke my authority for that, Ms. Lopez.

THE COURT:  Come on up to the podium, please.

Good morning.

MS. LOPEZ:  Good morning.  Thank you, Your Honor.

I just wanted to return really quickly to the challenged statement that contains the word "equally," because I think it's really important.  It's an incredibly narrow statement, and the complaint really wants to take it out of its context to project onto it a lot of meaning that's not there.

So if you look at our exhibit E that actually contains that challenged statement where it says "they compete equally for each impression on a net basis," as Mr. Feldman said, this is in a subsection specifically talking about the dynamics in the unified auction.  And even within the sentence that is challenged in the complaint it says:  Compete equally for each impression on a net basis.  So all that the statement is saying

is that once the fees are taking out by Ad Manager, it's evaluating the numbers before it and in that respect they compete equally.

So it's so incredibly narrow. And I think that's really important, because you have to allege falsity in order for scienter to even be relevant, and this statement, even if you take out the word "equally," it means the same thing, that they are competing on a net basis, that there is no boost or demerit that the unified auction is giving the bids once they're in the unified auction. It's simply evaluating the numbers. In that respect they compete equally. So I think that's really important.

One other point, too. I think that co-counsel misrepresented the DOJ complaint. If you look at the actual complaint, it does not say that it continued to shift spend, et cetera, to Ad Ex. It says -- it speaks in the past tense. And that's crucial, because he has to show that there is contemporaneous falsity; that during the class period that Poirot continued to operate in a way that disadvantaged other exchanges relative to Ad Ex, and it simply doesn't.

Thank you, Your Honor.

**MR. LIEBERMAN:** Your Honor, with respect to the "compete equally," how defendants have tried to make this such an unimportant statement, I mean, it's so unimportant that for some reason almost word for word that statement is given in a

congressional answer.

**THE COURT:**  But what's your response about that "equally on a net basis point," that this term "equally" is modified by the later phrase "on a net basis?"  So they're just saying that that is -- whoever has the highest bid wins the auction, and this word "compete," this phrase "compete equally" is actually really a narrow phrase.  What is your response to that?

**MR. LIEBERMAN:**  Because they don't -- because it doesn't say whoever has the highest bid wins.  What they say is -- one second.  Let me get the exact statement.

**THE COURT:**  "Compete equally for each impression on a net basis."

**MR. LIEBERMAN:**  But they're not competing equally for each impression because they have all of these advantages.  So it's not an equal competition.  It's a factually false statement, and in context it's even more false.

**THE COURT:**  So if we were interpreting a statute, then I would be asking, you know, so then would "on a net basis" be surplusage?  Why does it even say "on a net basis" if it's intended to mean "compete equally for each impression," period?  Like what does "on a net basis" add?

**MR. LIEBERMAN:**  What wouldn't a base -- a net basis is a somewhat fuzzy phrase.  It isn't that precise but doesn't take away the company's obligation to actually, when they state

that, that the bidders are competing equally, that they actually are competing equally. So there's just nothing saying -- and if they wanted to make that -- somehow cabin that into a much less meaningful statement, which for some reason they pass on to Congress, as well, in a very important submission, they should have been a whole lot more careful in that, Your Honor.

THE COURT: Thank you.

I will -- unless there's any last item that anyone wants to address, I can take this under submission.

MS. LOPEZ: I'll yield my time to my co-counsel.

MS. TSUI: Hi. Good morning, Your Honor.

Just in response to your question regarding authority for the point on scienter.

THE COURT: Good morning. Will you also just say your name for the court reporter.

MS. TSUI: Yes, I'm Mia Tsui.

THE COURT: Thank you.

MS. TSUI: So in *Metzler V. Corinthian Colleges*, which is 540 F.3d 1049, and this is at 1071, that sets forth this standard. To meet this pleading requirement, the complaint must allege specific contemporaneous statements or conditions that demonstrate the intentional or deliberately reckless false or misleading -- excuse me, misleading nature of the statements meant when made. So what *Corinthian Colleges* is requiring is

that when the statements are made, there's contemporaneous knowledge that those statements are false.

If plaintiffs are -- if plaintiffs fail to allege that Pichai made the statements on the website, which I'm going to speak to briefly in one moment, then it's not possible to meet the Ninth Circuit's standard set forth in *Corinthian Colleges* because he cannot have contemporaneous, intentional or recklessness as to the falsity of a statement if he's unaware that it's being made.

In our motion to dismiss and in our briefings we also cite *Sneed versus AcelRx,* that's 2024 U.S. Lexis 83250. That case also discusses that, you know, different opinions and attitudes held by employees within the company are insufficient to attribute those opinions and attitudes to an individual defendant absent particularized facts explaining that that individualized defendant had held those opinions and that knowledge.

And just one -- oh, excuse me. Plaintiffs' cases, as well as my colleague, Mr. Feldman, said before, the cases that plaintiffs cite do not permit the reverse attribution of scienter, and if you look at each of the cases that they cite -- so that's *Alphabet*, that's *Rocket Reach* and that's *Curry versus Hansen*, they all involve scienter pleaded as to an individual defendant then being attributed to the corporate entity.

And then the last point.  We've heard multiple times our counter-party here describing that "compete equally" language, the word "equally" being omitted from the congressional testimony, oh, Mr. Pichai was testifying under perjury and decided to omit the language.  As Your Honor I think is already aware, the congressional testimony occurred prior to any appearance of this language on Google's website that plaintiffs allege in the complaint.  The congressional testimony was on September 14th of 2020, and the first allegation regarding the statement on Google's website is not until September 29th of 2020.  Thank you, Your Honor.

**THE COURT:**  Last word for plaintiff.

**MR. LIEBERMAN:**  If the statement appears only after the congressional testimony, I think then the only one it could be attributed to then is to Pichai.  I mean, it's his words, his statement.  So is the inference then that someone took his statements from testimony, this very important statement being made under penalty of perjury, and without his permission slapped it on the website?  We just think the inference of that is very, very unlikely, Your Honor.

And just again to, you know, revert to the false statement regarding "compete equally," it says:  All participants in the unified auction, including authorized buyers and third-party yield partners, compete equally for each impression on a net basis, i.e. after fees have been taken out."  There's nothing

in that language that's limited.  There's nothing in that language that says it's only talking about after you submit the bid.  It just says everybody, once you -- maybe certain people have certain fees that are different than others.  Maybe there's different fee -- you know, fee scales based upon deals that are made.  But once all -- once everyone -- as far as the bidding process goes, everyone is competing equally except for that one issue.  That's all it says.  It doesn't limit it in any other way.  And particularly in this context, Your Honor, we think, then, it should be read plainly on its literal meaning.

**THE COURT:**  Thank you all.  Very well argued and very well briefed.  I really appreciate the help.  I'll take the matter under submission and issue a written order.  Be well.

(Proceedings concluded at 12:08 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.
DATE:  Friday, March 14, 2025

_____

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court