UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALPHABET INC., et al.,<br><br>Defendants. | Case No.  23-cv-01186-RFL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND GRANTING IN PART REQUEST FOR JUDICIAL NOTICE**<br><br>Re: Dkt. No. 93; 95 |

In this securities fraud putative class action, Plaintiffs allege that Alphabet, Inc., Alphabet's subsidiary Google LLC (collectively, "Google"), and their corporate officers (together with Google, "Defendants"), violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Those claims are based on alleged statements made by Defendants relating to Google's digital advertising technology ("ad tech") business, as well as Defendants' statements about Google's support of user privacy.  The Court previously dismissed Plaintiffs' First Amended Complaint with leave to amend.  *AMI – Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, No. 23-cv-01186-RFL, 2024 WL 4353637, at *7 (N.D. Cal. Sept. 3, 2024) ("*AMI*").  Defendants now move to dismiss the Second Amended Complaint ("SAC") on the grounds that Plaintiffs allege neither falsity nor scienter with the requisite particularity as to the alleged misstatements.  (Dkt. No. 93, "MTD.") Defendants also challenge Plaintiffs' loss causation allegations.  (*Id.*)

For the reasons discussed below, Defendants' Motion to Dismiss is **DENIED** as to Google CEO Sundar Pichai's written testimony to Congress on September 14, 2020.  In that

testimony, Pichai represented that, in Google's ad auction platform, the "channel through which a bid is received does not otherwise affect the determination of the winning bidder."  Plaintiffs have adequately alleged that this was false.  Plaintiffs allege that Google's ad auctions in fact favored bids submitted through Google-owned platforms or the Facebook Advertising Network ("FAN"), which had a special agreement with Google.  Allegedly, bidders operating through those channels received extra time, additional nonpublic information, and other advantages.  Plaintiffs have further adequately alleged that Pichai was sufficiently involved in the negotiation regarding FAN that he was well-aware of these advantages when he represented otherwise in his September 2020 statement.  Defendants' Motion to Dismiss is otherwise **GRANTED WITHOUT LEAVE TO AMEND** as to Plaintiffs' other alleged misstatements.[1]

## I.   ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

The Second Amended Complaint alleges that Google manipulated bidding in auctions that took place on its ad tech platforms, and misrepresented its practices to investors, causing them to lose money when those practices were revealed.  (Dkt. No. 87, "SAC.")  The following account is drawn from the allegations of the SAC, which the Court is required to take as true at this stage of the proceedings.

Online publishers have advertising space on their websites ("impressions") that can often be targeted to specific users at specific times and locations, so a single online publisher may have hundreds of thousands of impressions to sell.  (*Id.* ¶ 42.)  To help manage their ad inventory, publishers use ad servers to sell their impressions to advertisers, either through direct deals or through online auction systems known as ad exchanges.  (*Id.* ¶¶ 44-45.)  Google owns the leading publisher ad server, DoubleClick for Publishers ("DFP"), now known as Google Ad Manager.  (*Id.* ¶ 44.)

---

[1] In support of their motion to dismiss, Defendants requested judicial notice of the Google webpages containing the alleged misstatements as well as the written FAN Agreement.  (Dkt. No. 95 at 4-6.)  The Court grants Defendants' request as to these documents because they are incorporated by reference and relied upon in the SAC.  Defendants' request is otherwise denied as moot because none of the other documents are pertinent to this ruling on the motion to dismiss.

Publisher ad servers will often solicit bids from advertisers through an ad exchange. (*Id.* ¶ 45.) The exchanges match advertisers and publishers using an instantaneous electronic auction known as "real time bidding." (*Id.*) Google owns the industry's leading ad exchange, AdX. (*Id.* ¶ 46.) Smaller advertisers often use ad networks, which offer a scaled-down set of similar services. (*Id.* ¶ 48.) Google Ads, the leading ad network, became popular with advertisers by allowing them to place their ads next to Google's popular search engine results. (*Id.* ¶¶ 48, 51.) Advertisers can also use a demand side platform, which lets them to control when and how they bid for ad inventory and decide which users to target. (*Id.* ¶ 47.) Google owns the United States' leading demand side platform, Display & Video 360 ("DV360"). (*Id.*) In 2014, Facebook—one of the biggest ad buyers on the internet—launched its own ad network called Facebook Advertising Network, with features similar to DV360 and Google Ads. (*Id.* ¶ 95.)

After 2008, Google began requiring publishers who wanted to offer their impressions through Google Ads to also use its publisher ad server DFP and its ad exchange AdX. (*Id.* ¶¶ 54, 58.) As a result, publishers overwhelmingly flocked to DFP and AdX, and advertisers followed in order to have access to those publishers' impressions. (*Id.* ¶ 58.) Google also programmed the publisher ad server DFP to give its own ad exchange AdX the first chance to buy impressions before they were offered to other ad exchanges. (*Id.* ¶ 61.) Google then profited by charging high fees on AdX, while neither advertisers nor publishers could leave for other ad exchanges without having access to one another. (*Id.*)

Publishers fought back with a technique called "header bidding," which involved inserting code into their webpages that allowed other non-Google ad exchanges to bid on their impressions before Google's hard-coded preference for AdX was triggered. (*Id.* ¶¶ 65-66.) Google saw header bidding as a major threat to its digital advertising dominance. (*Id.* ¶¶ 68-71.) In March 2017, Facebook announced that FAN planned to participate in header bidding, a fact that one Google executive described as an "existential threat" in his personal notes. (*Id.* ¶¶ 95, 97.)

In June 2017, Google launched "Open Bidding," which allowed publishers using DFP to

send their impressions to multiple exchanges at the same time and receive bids from rival exchanges. (*Id.* ¶ 73.)  Ostensibly, this Open Bidding model would eliminate the need for header bidding, since publishers could get bids from multiple ad exchanges without using header bidding. (*Id.*)  However, during this time Google continued to use several practices to secure informational advantages—some of which it shared with FAN.

Google secretly set up DFP to peek at bids coming from rival ad exchanges that used header bidding and had AdX win the auction by bidding a penny more. (*Id.* ¶¶ 74–75.)  This practice was known as "Last Look." (*Id.*)  Google also changed the settings of its demand side platform DV360, so that advertisers using DV360 would bid less on certain rival ad exchanges than on AdX, using a program called Project Poirot. (*Id.* ¶¶ 83, 85.)  Poirot allowed DV360 to distinguish between a "second-price" auction (used by AdX) and a "first-price" auction (used by rival exchanges). (*Id.*)  DV360 artificially reduced the amount on advertisers' bids in first-price auctions by between 10% and 90%, depending on the exchange, which meant that DV360's bids were much lower on rival exchanges using header bidding than on AdX. (*Id.* ¶ 85.)  That helped AdX would win the auction over rival ad exchanges. (*Id.*)  Project Elmo, another program implemented during this period, similarly "reallocated ad spend away from rival ad exchanges engaged in header bidding." (*Id.* ¶ 91.)

In September 2018, Facebook and Google entered into an agreement whereby Google extended benefits to FAN in exchange for its participation in Open Bidding (the "FAN Agreement"). (*Id.* ¶¶ 100, 108; *see also* Dkt. No. 94-2 at 32.)[2]  The written agreement was signed by Defendant Schindler on behalf of Google and by Sheryl Sandberg on behalf of Facebook. (*Id.*)  Plaintiffs contend that not all terms were memorialized in the written agreement. (Dkt. No. 98, "Opp." at 15 n. 7.)  Among other terms, Google and Facebook allegedly agreed that:

- FAN would share Google's "speed advantage[]," allowing it nearly twice as much

---

[2] All references to page numbers refer to ECF pagination.

>    time to bid as compared to other participants.  (SAC ¶ 100.)
>
> - FAN would share some of Google's informational advantages to help it identify "who would be shown the ads" and recognize "impressions targeted to spam." (*Id.* ¶¶ 101-02.)
> - FAN was guaranteed a predetermined "win rate" of at least 10%.  (*Id.* ¶ 105.)
> - Google would abstain from using Facebook's bidding history to manipulate auctions in Google's favor.  (*Id.* ¶ 106.)

Plaintiffs allege that the FAN Agreement and practices described above continued during the class period with two exceptions.  First, in 2019, Google transitioned AdX to a first-price auction.  (*Id.* ¶¶ 79, 116.)  Plaintiffs allege that Poirot nonetheless continued to extend unspecified advantages to AdX during the class period.  (*Id.* ¶ 87.)  Second, around the same time, Google replaced the Last Look program with Smart Bidding.  (*Id.* ¶ 79.)  Smart Bidding was an algorithmic model that predicted the bids of rivals for each impression, based on Google's own non-public data from its ad tech business about the bid history of advertisers, rival buying tools, and rival exchanges.  (*Id.*)  Google used this information to allow AdX to bid slightly above rival buyers, and therefore win more auctions.  (*Id.*)

Since 2020, a number of state attorneys general, the Department of Justice, and the European Commission have been investigating Google for anticompetitive ad tech practices, resulting in enforcement actions filed against Google.  (*Id.* ¶ 301.)

Plaintiffs allege that Defendants committed securities fraud through various public statements that (a) described Google's ad tech products as helping customers, (b) characterized the ad tech market as highly competitive, (c) claimed that Google supports privacy protections and protects its users' privacy, and (d) represented how Google's ad tech products operate.

## II.     SECTION 10(B) AND RULE 10B-5 CLAIM

To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014)

(citation omitted).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

In addition to these plausibility requirements, the allegations here must "satisfy both the pleading requirements of the PSLRA and the heightened pleading standard of Rule 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud.'" *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057-58 (9th Cir. 2014).  The elements of a Rule 10b-5(b) claim include, among other things, (1) a material misrepresentation or omission, (2) scienter, and (3) loss causation.  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022).  To plead falsity, the allegations must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" and contain particularized allegations of contemporaneous facts showing statements were false when made.  15 U.S.C. § 78u-4(b)(1)(B).  To plead scienter, the allegations must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which is "an 'intent to deceive, manipulate, or defraud,' or . . . deliberate recklessness."  *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1106 (9th Cir. 2021).  "A complaint will survive a motion to dismiss 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).  Lastly, to plead loss causation, "the complaint must allege that the defendant's 'share price fell significantly after the truth became known.'"  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (internal citation omitted).

Plaintiffs' opposition to Defendants' motion to dismiss identifies only two sets of alleged misstatements in the SAC that Plaintiffs contend survive dismissal.  The first set of alleged misstatements were made on September 14, 2020, in a written response to a question posed by Representative David Cicilline to Google and Google CEO Sundar Pichai after Pichai testified before Congress.  (SAC ¶¶ 165-66.)  The second set of alleged misstatements were first posted to

Google's website on September 29, 2020, under the heading "Learn the basics: How Open Bidding works." (SAC ¶¶ 179, 184.)[3] The post containing the website statements is not signed or otherwise attributed to any individual, but contains language that is similar to Google and Pichai's written congressional testimony. Each set of statements is addressed in turn below.

### A. Statements About How Google's Ad Tech Products Worked in Google's September 14, 2020, Written Responses Following Google CEO Sundar Pichai's Congressional Testimony

Rep. Cicilline asked Google, "[W]hat percentage of bids does Google win on its own ad exchanges?" (FAC ¶ 138.) Google, through Pichai, responded:

> Publishers utilizing Google Ad Manager's auction to sell their ad inventory are able to solicit bids from Authorized Buyers (e.g., third-party demand side platforms ("DSPs"), ad networks, and trading desks) and Open Bidders (third-party ad networks and ad exchanges), as well as buyers utilizing Google-owned platforms such as Google Ads and Display & Video 360. These bidders compete in a unified auction against each other, the publisher's guaranteed sales, and other demand sources configured by the publisher. **All participants in the unified auction, including those using Google-owned platforms, compete for each impression on a net basis, and no auction participant receives any information about any other party's bids prior to completion of the auction. The highest net bid wins. The channel through which a bid is received does not otherwise affect the determination of the winning bidder**.

(*Id.*) Plaintiffs allege two representations within the response were false.

#### 1. Representation that "[a]ll participants in the unified auction" "compete for each impression on a net basis, and no auction participant receives any information about any other party's bids prior to completion of the auction"

The Court previously considered this statement and found that "Plaintiffs have not plausibly alleged that this statement was false at the time it was made." *AMI*, 2024 WL 4353637, at *5. None of the new allegations in the SAC change the Court's determination.

The SAC does not provide a basis to infer that the statement that "no auction participant receives any information about any other party's bids prior to completion of the auction" was

---

[3] Plaintiffs allege that the website statement was re-published verbatim multiple times in 2020, 2021, and 2022.

7

false at the time it was made.  Plaintiffs do not allege that, as of September 14, 2020, auction participants received such information.  First, Plaintiffs allege that as of the putative Class Period—February 4, 2020, through January 23, 2023—the Last Look practice had been discontinued.  (*Id.*; SAC ¶ 68.)  Second, none of the alleged benefits conferred by the FAN Agreement provide Facebook with "information about any other party's bids prior to completion of the auction."  While the terms of the FAN Agreement allegedly give Facebook information about impressions and shield Facebook's bid data from Google, Plaintiffs do not allege that Facebook was ever given access to other parties' bid data.

The more generalized statement that participants "compete for each impression on a net basis" is not plausibly alleged to be misleading either.  While Plaintiffs allege that Facebook and Google had advantages when entering bids—and therefore participants submitting bids through FAN or a Google-owned platforms did not compete *equally*—Plaintiffs do not allege that FAN and Google did not compete at all on a net basis.  Plaintiffs allege that Facebook was "guaranteed" a ten percent win rate (FAC ¶¶ 99, 105), but the Court does not find this allegation plausibly pled.  The provision of the FAN Agreement that Plaintiffs identify in support of a "win rate" obligates *Facebook* to use "commercially reasonable efforts" to win a certain percentage of bids.  (Opp. at 15 (citing Dkt. No. 94-2 at 33).)  The provision does not guarantee Facebook a win or suggest that Google must do anything to make Facebook win a certain percentage of bids.  Accordingly, Plaintiffs fail to plead that this statement was untrue "at the time [it was] made." *See In re Rigel Pharms., Inc. Sec. Litig.,* 697 F.3d 869, 876, 882 (9th Cir. 2012).

### 2. Representation that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder"

The parties agree that FAN and DV360 are both "channels" within the meaning of the statement.  (Dkt. No. 107 at 24:6-24, 25:8-9.)  Therefore, the Court considers whether the fact that a bid was submitted through FAN or DV360—and not through a third-party platform or ad network—could "affect the determination of the winning bidder" in the unified auction.  Plaintiffs have alleged sufficient particularized contemporaneous facts to plead that the statement

"[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder" was false.

The Court previously found that the statement was plausibly false because Poirot allegedly caused DV360 to submit higher bids to AdX and devalue bids to rival exchanges between 10% and 90%. *AMI*, 2024 WL 4353637, at *5-6. Therefore, bids made through the channel of DV306 to AdX were more likely to be the winning bid. (*Id.*)[4] However, Google now argues for the first time that the Poirot allegations are fatally flawed because the SAC does not explain how Poirot (which allegedly worked by favoring second-price over first-price auctions) would have operated after AdX shifted to a first-price auction in 2019. (MTD at 19-20.) At argument, Plaintiffs recognized that the SAC states only that the Poirot was "extended" to "optimize bidding in first-price auction" (SAC ¶ 87), but does not allege how it operated after 2019. (Dkt. No. 107 at 26:19-24.) With the benefit of this new argument, the Court finds that with respect to Poirot, Plaintiffs fail to allege with the requisite specificity that the September 14, 2020, statement was false. The SAC contains no allegations regarding how Poirot affected "[t]he channel through which a bid was received" in September 2020. However, as discussed below, Plaintiffs' new allegations regarding the FAN Agreement are sufficient to allege falsity.

Plaintiffs allege that—due to the terms of the FAN Agreement—a bid placed through FAN was significantly more likely to win the unified auction than a bid placed through other third-party platforms. The benefits extended to Facebook allegedly included: additional time to submit bids, greater access to information about the consumer to whom the impression was targeted, and having their bid data shielded from Google's *post hoc* bid analysis so that Google

---

[4] The Court previously rejected Plaintiffs' allegations regarding Project Elmo because they lacked particularity. *AMI*, 2024 WL 4353637, at *5 n. 3. While the SAC now alleges that Elmo used "cookies" to identify header bidding, it still fails to explain how Elmo reduced the "overall ad spend" on rival exchanges. (SAC ¶ 92.) For example, Plaintiffs do not allege whether Elmo caused DV360 to reduce the value of its bids (similar to Poirot), reduced the total number of bids placed, or did something else entirely. Without such particularized factual allegations, falsity has not been adequately pled.

9

could not use Last Look or Smart Bidding to beat out Facebook. (SAC ¶¶ 100-06.)[5] Plaintiffs argue that the cumulative value of these many advantages meant that FAN's more timely, more informed, and better shielded bids were significantly more likely to win valuable impressions at the unified auction. (*Id.*) Plaintiffs allege that Google shared all these advantages, as well as its unique Smart Bidding advantage. (*Id.*) Therefore, contrary to Pichai and Google's statement, Plaintiffs allege that "[t]he channel through which a bid is received" *did* "affect the determination of the winning bidder."

Defendants counter that the statement only relates to what happens after bids are submitted to the unified auction and does not address "the probability of winning the unified auction" or "the potential variation in any individual buying tool or exchange's information, bidding strategy, [or] fee structure." (MTD at 19.) In other words, Defendants argue that so long as the highest bid wins, the statement is true, and the Court should simply disregard the alleged benefits that FAN and Google received. But taking Plaintiffs' specific factual allegations as true, they support a plausible inference that the statement is false. Plaintiffs have alleged that FAN and DV360, armed with better information and more time than other third-party channels, would have been able to submit winning bids to the unified auction at a far higher rate than would have been possible without their timing and informational advantages. On a bid-by-bid basis, this would plausibly "affect" the determination of the winning bidder because—without these advantages—FAN or DV360 would often have been outbid by a competitor.

Moreover, scienter is adequately alleged as to that statement. Plaintiffs sufficiently allege that Pichai was aware of the terms of the FAN Agreement, and thus of the advantages that FAN received, and therefore knew his statement was false. Drawing Facebook into Open Bidding was

---

[5] Defendants dispute Plaintiffs' interpretation of the deal terms and challenge Plaintiffs' assertion that not all deal terms were memorialized in the final written agreement. (MTD at 14-17.) With the exception of the win rate allegation, discussed above, Plaintiffs' allegations regarding the deal terms are not directly "contradicted" by the written agreement, and are taken as true at the pleadings stage. *Kang v. Paypal Holdings, Inc.*, 620 F. Supp. 3d 884, 896 (N.D. Cal. 2022). The factual allegation that these "special deal terms" were documented in an internal Google memo about the FAN deal indicates a plausible basis for Plaintiffs' claims. (SAC ¶ 99.)

10

allegedly a top priority for Google in 2017: a senior Google executive considered FAN's planned participation in header bidding to be an "existential threat" to Google (SAC ¶ 97) and Facebook executives saw themselves as having "significant leverage . . . over [G]oogle because of header bidding." (*Id.* ¶ 96.)  Understandably, then, the negotiations between Google and Facebook allegedly "involved the top echelon at both companies," including "CEO Pichai and Sr. VP and Chief Business Officer Schindler from Google, and CEO Mark Zuckerberg and COO Sheryl Sandberg from Facebook." (*Id.* ¶ 108.)  Sandberg executed the FAN Agreement on behalf of Facebook, and Schindler signed on behalf of Google.[6]  Pichai was allegedly informed that "we will move [FAN's] demand off of header bidding" through the FAN Agreement.  (*Id.* ¶ 98.)  Pichai also admitted, "under oath that 'I review, at a high level, all the important decisions we make.'"  (*Id.* ¶ 295.)  Finally, on July 29, 2020, Pichai testified orally before Congress alongside Facebook CEO Mark Zuckerberg on issues including "how participants compete in a unified ad auction and how the determination of the winning bidder is made."  (*Id.* ¶ 34.)[7]

       Taken together, these allegations provide sufficient circumstantial evidence to create a strong inference of scienter as to Pichai and, by extension, Google.  Because the FAN Agreement was "existential" to Google in 2017, it is a fair inference that the CEO of Google—who admits that he reviews "at a high level [] all the important decisions" Google makes—would have been aware of the basic terms of the FAN Agreement at the time it was being negotiated.  The strength of this inference is further bolstered by the fact that Plaintiffs allege Pichai received at least some briefing about the agreement, even if they have not alleged what specific terms he was briefed on.  Likewise, the relative seniority of the individuals who signed the agreement evidences its significance to both companies, making it one of the "important decisions" that Pichai would have reviewed.  Finally, although not enough on its own to create a strong inference of scienter,

---

[6] Although the SAC alleges that Pichai "personally executed" the agreement (SAC ¶ 108), the signed copy of the agreement shows that it was only signed by Schindler for Google.  (Dkt. No. 94-2 at 32.)

[7] *See also* SAC at 49 n. 5 (citing https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=110883).

the fact that Pichai prepared to testify to Congress about the unified auction further suggests that in 2020 he continued to be aware of the FAN Agreement and its terms.  Plaintiffs allege significantly more than "corporate management's general awareness of the day-to-day workings of the company's business."  *See Curry v. Yelp Inc*., 875 F.3d 1219, 1227 (9th Cir. 2017).

Defendants argue that the evidence is not enough.  They cite *Prodanova* for the proposition that the Ninth Circuit has rejected allegations of scienter even as to the signer of an agreement.  MTD at 24.  But *Prodanova* is inapposite.  There, the defendant bank's COO signed an agreement whereby the bank would act as a company's placing agent for an offering of shares at $6 per share.  *Prodanova*, 993 F.3d at 1104, 1110 n. 5.  Before the deal was announced, an analyst at the same bank issued a report setting a $7 buy target for the company's shares.  *Id.* at 1104.  The Ninth Circuit found that even if the COO had signed the *agreement*, the plaintiff had not alleged that the COO knew the content of the *report* when it was issued.  *Id.* at 1109-10.  Here, it is the terms of the agreement, not some other document, that create a strong inference of scienter as to the contrary statement.

Defendants also argue that Plaintiffs' allegations of Pichai's participation in negotiating the FAN Agreement are too generalized to support a strong inference of scienter.  (Dkt. No. 101, "Reply" at 17-18.)  While this is a closer call, viewed holistically, the SAC adequately alleges scienter.  Although unspecified allegations of participation in negotiating the agreement alone would not be enough, *see Reckstin Fam. Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 984 (N.D. Cal. 2024), Plaintiffs allege more.  They allege the existential nature of the FAN Agreement, Pichai's briefing on the Agreement and its purpose, Pichai's acknowledgment that he reviews important decisions, and his testimony before Congress on a subject closely intertwined with the FAN Agreement.  Taken together, these allegations are sufficient to make an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Prodanova*, 993 F.3d at 1106.

B.      **Statements on Google's Website**

1.      **Representation that "[a]ll participants in the unified auction" "compete equally for each impression on a net basis"**

Plaintiffs adequately allege falsity as to the following statement that appeared on the "support" webpage of Google's website starting on September 29, 2020: "All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis [i.e., after all the fees have been taken out]." (SAC ¶¶ 184, 192, 208.) While the statement is similar to the statement made by Pichai and Google in written responses to Congress on September 14, 2020, it is different in two important respects. First, the sentence does not include the final clause "no auction participant receives any information about any other party's bids prior to completion of the auction." Second, it replaced the term "compete" with "compete equally."

Because the clause addressing the Last Look program is not present on the webpage version of the statement, the term "compete equally" is not limited to addressing the Last Look program and whether certain participants knew in advance what others were bidding. More importantly, the addition of the word "equally" is a significant change to the meaning of the statement. While participants may "compete" for impressions even on unequal terms, the phrase "compete equally" clearly requires more. As detailed above, the FAN Agreement allegedly provided participants in the unified auction who submitted their bids through FAN significant advantages, which Google also shared. FAN and DV360 could better determine the value of the impression they were bidding on and had more time to submit bids. AdX also used Smart Bidding to out-bid competitor exchanges (with the exception of FAN). Given these advantages, Plaintiffs have adequately alleged that participants did not "compete equally for each impression on a net basis."

Defendants argue that this statement goes only to whether the highest bid wins, and the Court should disregard any advantages that come into play before a bid is submitted. (MTD at 16-17; Reply at 10.) But the statement at issue is not that the "highest bid on a net basis wins" the unified auction, it is that the "participants in the unified auction . . . compete equally on a net

13

basis."  Where some participants have significant informational and time advantages in preparing their bid, they do not compete equally, even if the highest bid ultimately wins.

Plaintiffs have also alleged materiality as to the webpage statements.  The statements were on Google's own website and relate to issues that were the subject of near-contemporaneous congressional testimony by Google's CEO and which implicated one of Google's top revenue sources.  The Court cannot find as a matter of law that they would not be relevant to a reasonable investor.  *See In re Robinhood Ord. Flow Litig.*, 20-cv-9328-YGR, 2022 WL 9765563, at *7 (N.D. Cal. Oct. 13, 2022) (FAQ webpage plausibly contained a material misrepresentation); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021) ("resolving materiality as a matter of law is generally appropriate 'only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ.'") (citing *Fecht v. Price Co.,* 70 F.3d 1078, 1080 (9th Cir. 1995)).

### 2. Representation that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder"

Plaintiffs have adequately alleged that this statement, which mirrors Pichai and Google's written testimony to Congress, is false for the same reasons discussed above.

### 3. Plaintiffs fail to plead scienter as to the website statements

However, Plaintiffs' claim based on the webpage statements fails because the SAC does not adequately allege scienter.  "To support a 'strong inference' of scienter under the PSLRA, a complaint must allege that ***the defendant made*** false or misleading statements with an intent to deceive, manipulate, or defraud, or with deliberate recklessness." *Prodanova*, 993 F.3d at 1106 (emphasis added).  "Because Rule 10b-5 makes it unlawful '[t]o *make* any untrue statement' or to omit material facts necessary to make 'the statements *made*' not misleading, 17 C.F.R. § 240.10b-5(b)," the court "must first determine who was the maker of the statement for purposes of Section 10(b) and Rule 10b-5(b) and whether the complaint adequately alleged that the maker omitted material information knowingly, intentionally, or with deliberate recklessness." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 705 (emphasis in original).

The allegations of the SAC do not satisfy this requirement. Plaintiffs argue that Pichai is the "maker" of the webpage statements because they are similar to the written response he submitted to Congress and because he "possessed the power and authority" to control the content of statements on Google's website. (Opp. at 24 n. 17.) Plaintiffs have not alleged with particularity that Pichai has "ultimate authority over the statement, including its content and whether and how to communicate it." *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Under Plaintiffs' theory, Pichai's role as CEO makes him the *de facto* "maker" of every single statement on Google's website. This is not the law. As the majority of courts in this Circuit have held, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles. *See, e.g., In re New Century*, 588 F. Supp. 2d 1206, 1224 (C.D. Cal. 2008).

Furthermore, that the two challenged sentences on Google's website are similar to sentences attributable to Pichai is not sufficient on its own to make him the "maker" of the unattributed statement. The webpage statements were published more than two weeks after the congressional testimony. The challenged sentences on the webpage are surrounded by sentences that do not appear in the relevant portion of the Congressional testimony. (*See* Dkt. No. 94-5 at 3.) Plaintiffs do not allege any facts to suggest that Pichai was personally involved in drafting, updating, or approving Google's "support" webpage. Finally, with respect to the "compete equally" statement, it is precisely on the basis of the *differences* between Pichai's statement and the Google website statement that Plaintiffs adequately plead falsity. Plaintiffs have not alleged any facts from which the Court can infer that Pichai was responsible for making the key changes to the statement before it was posted to the webpage.

Plaintiffs alternatively suggest that Pichai has scienter that is attributable to Google, who was the "maker" of the statement. But this theory fares no better. There are no factual allegations from which it can be plausibly inferred that Pichai knew of the statement on Google's webpage, much less that he contributed to putting it there. Obviously, a company does not commit securities fraud every time there is a significant error somewhere on its website that is

inconsistent with facts known to the CEO. The CEO must have some knowledge of the allegedly false statement to have developed the requisite state of mind as to the statement.[8] *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 696 n. 1, 705-06 (imputing scienter to the company where, allegedly, the CEO signed a 10-Q containing a misleading statement while aware of facts that made that statement false).

Because Plaintiffs have not submitted any basis for the Court to conclude that these deficiencies as to scienter could be cured through amendment, and Plaintiffs have already had multiple opportunities for amendment, the dismissal as to the website statements is without further leave to amend.

### C.     Loss Causation

A securities fraud complaint must allege that the "truth became known" "in whole or in part," and that the "revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Securities Litigation*, 977 F.3d 781, 789, 791 (9th Cir. 2020). "Plaintiff's task is to allege with particularity facts 'plausibly suggesting' that both showings can be made." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A corrective disclosure can come from any source, and can take any form from which the market can absorb" the truth, including news reports, investigations, and complaints. *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014). "It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding, Inc.*, 977 F.3d at 790.

Plaintiffs have adequately alleged loss causation as to the surviving misstatement. For example, Plaintiffs allege that on December 16, 2020, State Attorneys General of ten U.S. states filed a complaint related to Google's digital advertising and alleging the "rigging of auctions"

---

[8] Plaintiffs do not allege collective scienter, and even if they did, the doctrine is inapplicable. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (opining that the doctrine might be applicable where the public statements "were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication.") (emphasis in original).

and "controlling of pricing." (SAC ¶ 260.) The filing of the AG complaint was followed by a stock price decline and public reporting. (*Id.* ¶¶ 261-62.) Plaintiffs allege that unredacted portions of the second amended AG complaint in 2021 revealed, among other things, "the portion of various digital advertising markets that Google controlled," and resulted in a further stock price drop. (SAC ¶¶ 266-67.) At the pleading stage, Plaintiffs have sufficiently alleged facts plausibly suggesting that the AG complaints and other government investigations revealed, at least in part, facts showing that the statement "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder" in the unified auction was false. *See In re BofI Holding*, *Inc.*, 977 F.3d at 790.

### D. Previously Dismissed Statements

Plaintiffs replead their previously dismissed statements in the SAC, but they do not amend their allegations or provide any argument for changing the Court's prior determination. Therefore, all remaining claims are dismissed with prejudice for the reasons explained in *AMI*, 2024 WL 4353637, at *7. *See Veal v. LendingClub Corp.*, No. 18-cv-02599-BLF, 2020 WL 3128909, at *17 (N.D. Cal. June 12, 2020) (dismissing without leave to amend).

Likewise, the SAC does not allege that Defendants Ruth Porat, Philipp Schindler, or Kent Walker were aware of Pichai and Google's statement to Congress or that the statement should be attributable to any of them. Therefore, all claims are dismissed as to Porat, Schindler, and Walker.

### III. SECTION 20(A) CLAIMS

Defendants' motion to dismiss these claims is wholly derivative of their arguments to dismiss the Rule 10b-5(b) claim, and is granted in part and denied in part on the same grounds explained above.

### IV. CONCLUSION

For the reasons discussed below, Defendants' Motion to Dismiss is **DENIED** as to the September 14, 2020 "channels" statement and is **GRANTED WITHOUT LEAVE TO AMEND** as to Plaintiffs' other alleged misstatements. The Clerk of the Court is directed to

17

enter judgment in favor of Defendants Porat, Schindler, and Walker.

**IT IS SO ORDERED.**

Dated: March 24, 2025

RITA F. LIN
United States District Judge