POMERANTZ LLP
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALPHABET INC., GOOGLE LLC, and SUNDAR PICHAI<br><br>Defendants. | Case No. 3:23-CV-01186-RFL<br><br>Date: April 14, 2026<br>Time: 10:00 AM<br>Location: Courtroom 15 – 18th Floor<br>Judge: Rita F. Lin |

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS


NOTICE OF MOTION AND MOTION ..... 1

STATEMENT OF ISSUES ..... 1

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 3

PROCEDURAL HISTORY ..... 4

ARGUMENT ..... 5

I. THE CLASS SHOULD BE CERTIFIED PURSUANT TO RULE 23 ..... 5

A. The Rule 23(a) Requirements Are Satisfied ..... 7

1. The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable ..... 7

2. Questions of Law or Fact Are Common to the Class ..... 8

3. Plaintiffs' Claims Are Typical of the Class ..... 9

4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class ..... 10

B. The Requirements of Rule 23(b)(3) Are Satisfied ..... 10

1. Common Questions of Law and Fact Predominate ..... 11

2. Plaintiffs and the Class Are Entitled to a Presumption of Reliance Because Alphabet's Class A and Class C Shares Traded in an Efficient Market ..... 12

a. NASDAQ Listing Is Strong Evidence of Market Efficiency ..... 12

b. The Five *Cammer* Factors Confirm Market Efficiency ..... 13

c. Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance ..... 17

d. Reliance Is Also Presumed Under *Affiliated Ute* ..... 18

3. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy ..... 19

II. POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL ..... 20

CONCLUSION ..... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972) .......... 18

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 5, 10, 11

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .......... 2, 6, 12

*Angley v. UTI Worldwide Inc.*,
311 F. Supp. 3d 1117 (C.D. Cal. 2018) .......... 17

*Baker v. SeaWorld Ent., Inc.*,
2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) .......... 9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......... 11, 12

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) .......... 12

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) .......... 8

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) .......... 19

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......... 2

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .......... *passim*

*Cheney v. Cyberguard Corp.*,
213 F.R.D. 484 (S.D. Fla. 2003) .......... 14

*Connecticut Retirement Plans & Trust Funds v. Amgen*,
2009 WL 2633743 (C.D. Cal. Aug. 12, 2009) .......... 9

*Edwards v. First Am. Corp.*,
798 F.3d 1172 (9th Cir. 2015) .......... 11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................6, 11, 18

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)....................9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)....................11, 12, 13, 16

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)....................8, 10

*Harris v. Palm Springs Alpine Estates, Inc.*,
339 F.2d 909 (9th Cir.1964)....................7

*Hatamian v. Advanced Micro Devices, Inc.*,
2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)....................9, 18

*Hodges v. Akeena Solar, Inc.*,
274 F.R.D. 259 (N.D. Cal. 2011)....................12

*In re AST Rsch. Sec. Litig.*,
1994 WL 722888 (C.D. Cal. Nov. 8, 1994)....................6

*In re Banc of California Sec. Litig.*,
326 F.R.D. 640 (C.D. Cal. 2018)....................11

*In re BofI Holding, Inc. Sec. Litig.*,
2021 WL 3742924 (S.D. Cal. Aug. 24, 2021)....................6, 9, 10, 11

*In re Cooper Companies Inc. Sec. Litig.*,
254 F.R.D. 628 (C.D. Cal. 2009)....................2, 6, 7

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009)....................14

*In re Diamond Foods, Inc.*,
295 F.R.D. 240 (N.D. Cal. 2013)....................12, 18

*In re Hebron Tech. Co. Sec. Litig.*,
2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020)....................20

*In re LDK Solar Sec. Litig.*,
255 F.R.D. 519 (N.D. Cal. 2009)....................8

*In re Lendingclub Sec. Litig.*,
282 F.Supp. 3d 1171 (N.D. Cal. 2017)....................8, 18

*In re Montage Tech. Grp. Ltd. Secs. Litig.*, 2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ....12, 19

*In re: Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016), *aff'd in part, vacated in part on other grounds sub nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) ....20

*In re Portal Software, Inc. Sec. Litig.*, 2007 WL 1991529 (N.D. Cal. June 30, 2007) ....6

*In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556 (S.D.N.Y. 2008)....20

*In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209 (C.D. Cal. 2019) ....7, 18

*In re THQ Inc. Sec. Litig.*, 2002 WL 1832145 (C.D. Cal. Mar. 22, 2002) ....6

*In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619 (N.D. Cal. 2018)....7, 18

*In re UTStarcom, Inc. Sec. Litig,* 2010 WL 1945737 (N.D. Cal. May 12, 2010) ....8

*In re Verisign, Inc. Sec. Litig.*, 2005 WL 7877645 (N.D. Cal. Jan. 13, 2005) ....7, 11

*In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y. 2003) ....19

*In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005)....14

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ....17

*Leyva v. Medline Indus.*, 716 F.3d 510 (9th Cir. 2013) ....17, 18

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742 (2d Cir. 1992)....18

*Loritz v. Exide Techs.*, 2015 WL 6790247 (C.D. Cal. July 21, 2015)....15

*Lumen v. Anderson*, 280 F.R.D. 451 (W.D. Mo. 2012) ....13

*Luna v. Marvell Tech. Grp., Ltd.*,
2017 WL 4865559 (N.D. Cal. Oct. 27, 2017)....8

*Phillips Petroleum Co. v. Shutts*,
105 S. Ct. 2965 (1985)....6

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)....2

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010)....18

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
335 F.R.D. 276 (N.D. Cal. 2020)....12, 18

*Sec. & Exch. Comm'n v. Jensen*,
2013 WL 12129377 (C.D. Cal. Mar. 13, 2013)....16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....19

*Todd v. STAAR Surgical Co.*,
2017 WL 821662 (C.D. Cal. Jan. 5, 2017)....6, 14

*Vaquero v. Ashley Furniture Indus.*,
824 F.3d 1150 (9th Cir. 2016)....18

*Vinh Nguyen v. Radient Pharms. Corp.*,
287 F.R.D. 563 (C.D. Cal. 2012)....13, 14, 19

**Statutes**

15 U.S.C. §78j(b)....8, 9, 11

15 U.S.C. §78t(b)....8, 9

**Rules**

Fed. R. Civ. P. 23.... *passim*

**Other Authorities**

William B. Rubenstein, 1 Newberg on Class Actions § 3:12 (5th ed.)....7

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that at the time and place noted above, Lead Plaintiffs Menora Mivtachim Insurance Ltd. ("Menora Insurance") and Menora Mivtachim Pensions and Gemel Ltd. ("Menora Pensions and Gemel" and, together with Menora Insurance, "Menora") and additional Named Plaintiffs AMI - Government Employees Provident Fund Management Company Ltd. and City of Fort Lauderdale Police & Fire Retirement System (collectively, "Plaintiffs")[1], will and hereby do move for an order (1) certifying this action as a class action pursuant to Federal Rules of Civil Procedure ("Rule") 23(a) and 23(b)(3) and certifying the class defined below, (2) appointing Plaintiffs as Class Representatives pursuant to Rules 23(a) and 23(b)(3), and (3) appointing Lead Counsel Pomerantz LLP as Class Counsel pursuant to Rule 23(g).

## STATEMENT OF ISSUES

1. Whether the Court should certify this action as a class action pursuant to Rules 23(a) and 23(b)(3) and certify the Class defined below.
2. Whether the Court should appoint Plaintiffs as Class Representatives pursuant to Rules 23(a) and 23(b)(3).
3. Whether the Court should appoint Lead Counsel Pomerantz LLP as Class Counsel pursuant to Rule 23(g).

## INTRODUCTION

Plaintiffs seek certification of the following Class:

> All persons and entities other than Defendants,[2] members of the immediate family of the Individual Defendant, Alphabet Inc.'s ("Alphabet" or the "Company") subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity, who purchased or otherwise acquired Alphabet's Class A and/or Class C shares between September 14, 2020 and January 23, 2023, both dates inclusive (the "Class Period") on (i) any stock exchanges located in the

[1] Additional named plaintiff More Mutual Funds Management (2013) Ltd. will seek voluntary dismissal from this action.

[2] The Defendants are Alphabet Inc., Google LLC, and Sundar Pichai.

United States, (ii) on any alternative trading systems located in the United States, or (iii) pursuant to other domestic transactions, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Alphabet, Google LLC ("Google"), and Sundar Pichai.

This lawsuit is a textbook example of a case warranting class action treatment. Plaintiffs seek to prove that, like other Class members, they were injured by a common course of misconduct—the issuance of a false and misleading statement and/or material omission by Defendants on September 14, 2020 (¶¶ 165-66[3]), while Defendants were in possession of material information undermining the accuracy of their statement. The questions of law and fact relevant to the merits—issuance of false and misleading statements, reliance, materiality, scienter, loss causation and economic loss—are identical for each and every member of the putative Class. Indeed, class action treatment is especially appropriate because many members of the putative Class have relatively small losses, making it unfair and inefficient to force them to vindicate their claims individually.

As detailed below, this action satisfies all the requirements for class certification under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and superiority of a class action over other available methods for adjudication. Thus, class certification is warranted.

The use of class action procedures to adjudicate claims under federal securities law has been upheld by the Supreme Court. *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 701 (1979); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available."). The Supreme Court has warned against imposing restrictions on certification of federal securities claims where it is not mandated by the text of *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013). Finally, the class action mechanism is the superior method for fairly and efficiently adjudicating all Class members' claims. In short, this securities case fits Rule 23's certification requirements "like a glove." *In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D.

[3] Unless otherwise noted, citations to "¶__" refer to the Second Amended Complaint ("SAC" or "Complaint"). ECF No. 87.

628, 632 (C.D. Cal. 2009) (quoting *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995)). As such, Plaintiffs respectfully submit that this motion be granted in all respects.

**STATEMENT OF FACTS**

Alphabet is a multinational technology holding company whose lifeblood is Google, which functions as the worldwide dominant player in the field of digital advertising. The Company's Class A and Class C shares trade in an efficient market on the NASDAQ under the ticker symbols "GOOGL" and "GOOG," respectively. ¶2. The SAC alleges that, unbeknownst to investors, during the relevant time—and as uncovered by, for example, the United States Department of Justice ("DoJ") and the Attorneys General of multiple states—Google had critical advantages over other bidding participants in Open Bidding. Those advantages included significantly improved match rates over other participants to "ensure" that Google's match rate was at least 80% for mobile app users and at least 60% for web users. *See, e.g.*, ¶¶101, 183. Google also had significant speed advantages—almost double—over other participants, securing for itself 300 milliseconds to bid for ads as opposed to just 160 milliseconds given to other bidders. ¶¶100, 183. Participants in Google's Open Bidding[4] have complained that 160 milliseconds is not enough time to recognize users and return bids. ¶100. Moreover, Google gave itself a minimum guaranteed fixed "win rate" of at least 10%. ¶¶105, 183.

The SAC also alleges that before Header Bidding[5] emerged as a workaround to Google's dominance in the advertising technology space, Google had singled out Facebook—one of the biggest ad buyers on the internet—as a competitive threat. Crushing the "existential threat" posed by Header Bidding and Facebook became a major priority inside Google. Enticing Facebook required significant concessions, with Google agreeing to give Facebook the same benefits it maintained over other bidding participants. Those perks included additional time to bid for ads; auction matching advantages; the ability to detect

[4] "Header Bidding" refers to using code embedded in a webpage's "header" section to run real-time auctions amongst competing non-Google exchanges before (or even without) the publisher's ad server inviting Google's ad exchange to bid.

[5] "Open Bidding" refers to Google's analog to Header Bidding, whereby publishers are allowed to route their inventory to more than one exchange at a time and non-Google exchanges are permitted to return live, competitive bids for publishers' impressions, alongside Google's ad exchange AdX.

which impressions were targeted to bots; and restrictions on Google's use of Facebook's bid data to beat it in the auctions. These advantages were given to Facebook Audience Network ("FAN"), a tool akin to Google's Display & Video 360 ("DV360"), which were both demand side platforms used to bid for digital advertising impressions.

Plaintiffs allege that on September 14, 2020, in a written response to Congress following CEO Pichai's Congressional testimony, Google and Pichai made the following false and misleading statement about how Google's advertising technology products worked: *"[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder."* The Court found that the SAC sufficiently pled that this representation was materially false and misleading when made because the special advantages Google enjoyed over other bidding participants, and which it extended to Facebook, meant that DV360 and FAN (the channels) were more likely to win impressions in the unified auction. ECF. No. 108 at 9-10.

The Court also found that the alleged misrepresentation was made with scienter based on a number of circumstantial factors. ECF. No. 108 at 10-12. The Court found scienter sufficiently pleaded based on a holistic analysis involving *several* factors, including that: the FAN Agreement was "existential" to Google in 2017; Pichai admitted under oath that he reviews "at a high level[] all the important decisions" Google makes; Pichai received at least some briefing about the agreement; the relative seniority of the individuals who signed the agreement evidences its significance to both companies, making it one of the most "important decisions" that Pichai would have reviewed; and Pichai prepared to testify before Congress about the unified auction. ECF No. 108 at 11-12.

The SAC alleges that Plaintiffs and the proposed Class suffered significant losses as a result of Defendants' misrepresentations when the truth about the company's practices was eventually revealed through a series of corrective disclosures or materializations of risks. The Court found loss causation sufficiently alleged. ECF. No. 108 at 16-17.

**PROCEDURAL HISTORY**

On March 16, 2023, plaintiff AMI-Government Employees Provident Fund Management Company Ltd. filed a putative securities class action complaint against defendants Alphabet Inc., Sundar

Pichai, Ruth M. Porat, and Philipp Schindler. ECF No. 1. Two motions for appointment as lead plaintiff were filed. ECF Nos. 19, 22. On May 30, 2023, the only other movant withdrew his motion (ECF No. 27), and on June 9, 2023, the Court appointed Menora as Lead Plaintiff and Pomerantz LLP as lead counsel. ECF No. 29.

On August 7, 2023, Plaintiffs filed the first Amended Complaint, adding Google and Kent Walker as defendants. ECF No. 46. Defendants moved to dismiss Plaintiffs' First Amended Complaint on September 21, 2023. ECF No. 58. Plaintiffs opposed that motion and briefing was completed on December 11, 2023. ECF Nos. 60, 67. On December 20, 2023, the case was reassigned to the Hon. Judge Rita F. Lin. ECF No. 70. A hearing on the motion to dismiss took place on April 16, 2024. Subsequently, on September 4, 2024, the Court granted Defendants' motion to dismiss but gave Plaintiffs leave to amend their complaint. (ECF No. 86). After Plaintiffs filed the SAC on September 24, 2024, Defendants moved to dismiss on November 8, 2024. ECF. No. 93. Briefing was completed on January 21, 2025. ECF Nos. 98, 101. After a hearing on the motion to dismiss the SAC on March 4, 2025, the Court issued an order granting in part and denying in part Defendants' motion to dismiss the SAC on March 24, 2025, dismissing individual defendants Kent Walker, Ruth M. Porat, and Philipp Schindler but sustaining claims against Defendants Alphabet, Google, and Sundar Pichai. ECF. No. 108.

On May 12, 2025, Defendants filed a motion to certify the motion to dismiss order (ECF No. 108) for interlocutory appeal. ECF No. 118. Plaintiffs opposed that motion and briefing was completed on July 8, 2025. ECF Nos. 122-23. The Court denied the motion on September 5, 2025. ECF No. 130.

After the parties submitted a joint case management statement and Rule 26(f) report (ECF. No. 117), the Court issued a scheduling order on May 15, 2025. ECF No. 121.

## ARGUMENT

### I. THE CLASS SHOULD BE CERTIFIED PURSUANT TO RULE 23

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). In addition, the Court must determine whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3). *Id.* at 614. "Class

actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 105 S. Ct. 2965, 2973 (1985).

"The Ninth Circuit has recognized explicitly that 'class actions . . . have 'proved useful where a large number of purchasers or holders of securities claim to have been defrauded by a common course of dealing on the part of the defendants . . . .''" *In re AST Rsch. Sec. Litig.*, 1994 WL 722888, at *2 (C.D. Cal. Nov. 8, 1994) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 339 F.2d 909, 913 (9th Cir.1964)). "As the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a glove.'" *Cooper*, 254 F.R.D. at 632 (quoting *Epstein*, 50 F.3d at 668). Recognizing the value of class actions in the securities law context, courts in the Ninth Circuit "liberally construe" the requirements of Rule 23 in favor of certification. *See In re THQ Inc. Sec. Litig.*, 2002 WL 1832145, at *2 (C.D. Cal. Mar. 22, 2002) "Especially in the case of a class action alleging securities fraud, then, '[a]ny doubts a court has about class certification should be resolved in favor of certification.'" *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *3 (C.D. Cal. Jan. 5, 2017). Accordingly, courts throughout the Ninth Circuit regularly grant class certification in cases like this one. *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *10 (S.D. Cal. Aug. 24, 2021) (*BofI II*).

"A Rule 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail on the substantive merits of its claim." *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 1991529, at *2 (N.D. Cal. June 30, 2007). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466. Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not appropriate to delve into merits issues such as scienter, materiality, or loss causation. *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011) ("*Halliburton I*"); *Amgen*, 568 U.S. at 464–65.

### A. The Rule 23(a) Requirements Are Satisfied

#### 1. The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable." Fed. R. Civ. P. 23(a)(1). Impracticable does not mean impossible, only that it would be difficult or inconvenient to join all members of the class. *Harris*, 329 F.2d at 913-14. "No exact numerical cut-off is required; rather, the specific facts of each case must be considered." *Cooper*, 254 F.R.D. at 633. In securities cases, numerosity is presumed when millions of shares are traded during the proposed class period. *Id*. "[C]ourts are quite willing to accept common sense assumptions in order to support a finding of numerosity, often looking at the number of shares traded or transactions completed rather than seeking to determine directly the number of potential class members involved." *In re Verisign, Inc. Sec. Litig*., 2005 WL 7877645, at *4 (N.D. Cal. Jan. 13, 2005).

During the Class Period, Class A and Class C shares of Alphabet were listed on the NASDAQ and traded under the ticker symbols "GOOGL" and "GOOG," respectively. ¶2; Declaration of Emma Gilmore ("Gilmore Decl.") Exhibit 1, Nye Report ¶14. On average, over 158 million shares of Alphabet Class A shares and over 133 million shares of Alphabet Class C shares were traded by investors each week. *Id*. ¶28. Because Alphabet "has millions of shares trading on a national exchange" the Court "'may infer that' the numerosity requirement is met." *In re Twitter Inc. Sec. Litig*., 326 F.R.D. 619, 626 (N.D. Cal. 2018); *see also In re Snap Inc. Sec. Litig*., 334 F.R.D. 209, 226 (C.D. Cal. 2019) ("Courts generally find that 'the numerosity requirement is met in securities fraud suits involving nationally traded stocks.'"); William B. Rubenstein, 1 Newberg on Class Actions § 3:12 (5th ed.) (updated Dec. 2020) ("[I]n class actions involving nationally traded securities, courts generally presume that the numerosity requirement is met.").

Although Plaintiffs have not at this time ascertained the precise number of potential Class members, they believe that there are many thousands of geographically dispersed members of the proposed Class. The precise identity of the members can be readily identified from the securities brokerage and nominee firms' books and records. Clearly, the proposed Class consists of a sufficient number of persons (*i.e*., more than 40) to make joinder impracticable.

**2. Questions of Law or Fact Are Common to the Class**

The "commonality" requirement under Rule 23(a) is met if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Ninth Circuit construes this requirement "permissively." *In re UTStarcom, Inc. Sec. Litig*, 2010 WL 1945737, at *4 (N.D. Cal. May 12, 2010) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)). Both "[t]he existence of shared legal issues with divergent factual predicates" and "a common core of salient facts coupled with disparate legal remedies" suffice. *Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559, at *2 (N.D. Cal. Oct. 27, 2017) (quoting *Hanlon*, 150 F.3d at 1019). A single common question is enough. *In re Lendingclub Sec. Litig.*, 282 F.Supp. 3d 1171, 1179 (N.D. Cal. 2017) (quoting *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014)) (plaintiff "need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement.").

There are many common factual and legal questions in this case. All Class members are "unified by an interest in proving the same common course of conduct regarding [Defendants'] allegedly fraudulent . . . representations." *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009). Common proof will be used to answer many questions of law and fact, including, *inter alia*: (i) whether federal securities laws were violated by Defendants' conduct as alleged; (ii) whether Defendants made a false and misleading statement; (iii) whether Defendants acted with the requisite level of scienter under Section 10(b) of the Exchange Act; (iv) whether Defendants engaged in a scheme to defraud investors; (v) whether the Individual Defendant was a controlling person of Alphabet and Google under Section 20(a) of the Exchange Act; (vi) whether and to what extent the prices of Alphabet's Class A and Class C shares were artificially inflated during the Class Period due to the alleged false and misleading statements or omissions; (vii) whether reliance is presumed under the fraud-on-the-market doctrine; and; (viii) whether Plaintiffs and other members of the Class suffered damages, as well as the appropriate measure thereof.

These common issues are more than enough to satisfy the commonality requirement. *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a class of purchasers allegedly defrauded

over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest…, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit."); *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *4 (N.D. Cal. Mar. 16, 2016) ("The Ninth Circuit recognizes that public disclosures alleged to contain material misrepresentations and omissions . . . present common questions of law and fact.").

### 3. Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiffs be typical of the claims of the class. The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Rule 23(a)'s "typicality" requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Connecticut Retirement Plans & Trust Funds v. Amgen*, 2009 WL 2633743, at *5 (C.D. Cal. Aug. 12, 2009) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members [of the class] have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542, at *6 (S.D. Cal. Nov. 29, 2017) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)).

Typicality is established here. Plaintiffs and Class members all purchased Alphabet Class A and/or Class C shares and assert the same Section 10(b) claims, based on the same misstatements/omissions and fraudulent scheme by Defendants, and the same Section 20(a) claim of "control person" liability. Plaintiffs' claims will be proven using the same evidence and legal theories that apply to the Class as a whole. The nature of damages is also typical: when the truth about Alphabet was revealed through the various disclosures, the price of Alphabet Class A and Class C shares declined. For these reasons, typicality is established. *See, e.g., BofI II*, 2021 WL 3742924, at *3 (finding typicality where the plaintiff's claim was "essentially the same as that of the proposed class members.").

**4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class**

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met. Courts have established a two-prong test for this requirement: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Both prongs are met here. Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem*, 521 U.S. at 594, and no actual or potential conflicts exist. Plaintiffs and all Class members have suffered losses from purchasing Alphabet securities at artificially inflated prices. They have been injured by the identical wrongful underlying misrepresentation/omission and scheme of Defendants. Plaintiffs have been involved in this litigation, have communicated with counsel throughout the course of this action, understand their duties as Class representatives and are willing and able to serve as representatives on behalf of the Class and prosecute this action on behalf of the Class to a successful conclusion. *See* Gilmore Decl. Exhibits 2-4. Accordingly, Plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see, e.g.*, *BofI II*, 2021 WL 3742924, at *3–4 (stating that the plaintiff and the lead counsel satisfied the adequacy requirements because they actively participated in the litigation of the case and there was no evidence that their interests were in conflict with other Class members).

Plaintiffs have engaged qualified, experienced and capable attorneys. Proposed Class Counsel are highly experienced in complex class litigation, especially securities fraud actions, and have the ability and willingness to prosecute this action vigorously. Gilmore Decl. Exhibit 5 (firm resume). Lead Counsel's vigorous pursuit of the Class's interests is well documented in their advancement of the Class's claims in this Action, including, *inter alia*, in their partial defeat of the Defendants' motion to dismiss.

**B. The Requirements of Rule 23(b)(3) Are Satisfied**

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the

incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617. "Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants." *In re Verisign, Inc. Sec. Litig*., 2005 WL 7877645, at *9.

**1. Common Questions of Law and Fact Predominate**

"Predominance is a test readily met in certain cases alleging consumer or securities fraud…." *Amchem*, 521 U.S. at 625. "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Halliburton I* at 809. "Common issues predominate over individual issues when the common issues 'represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'" *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015).

To establish liability under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must show "(1) a material misrepresentation or omission of fact by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*"). Most of the elements at issue—falsity, materiality, scienter, and loss causation—present questions "necessarily common to the class" because "they depend on defendants' actions, not those of any class member." *In re Banc of California Sec. Litig.*, 326 F.R.D. 640, 648 (C.D. Cal. 2018); *see also BofI II*, 2021 WL 3742924, at *4 (stating that "the materiality of the misrepresentation and the defendant's scienter are issues that would require the same proof for any class member"). Thus, whether common questions predominate for Section 10(b) claims "turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.

Plaintiffs will demonstrate Class-wide reliance under the "fraud-on-the-market" presumption of reliance, which dispenses with the requirement that each Class member must prove individual reliance upon Defendants' alleged misstatements. Under *Basic* and *Halliburton II*, plaintiffs may "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of a stock traded in an efficient market, and that anyone who

purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283–84; *see Basic Inc. v. Levinson*, 485 U.S. 224, 241–42 (1988). As explained below, Alphabet Class A and Class C shares traded in an efficient market, such that the presumption applies.

**2. Plaintiffs and the Class Are Entitled to a Presumption of Reliance Because Alphabet's Class A and Class C Shares Traded in an Efficient Market**

To invoke the fraud-on-the-market presumption of reliance, a plaintiff must establish that "(1) the alleged misrepresentations were publicly known, (2) the stock traded in an efficient market, and (3) the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 247 (N.D. Cal. 2013) (quoting *Halliburton I*, 563 U.S. at 811). Where the presumption applies, "a plaintiff need not prove that it read or heard the misrepresentation that underlies its securities claim"—that is, a plaintiff need not prove individual reliance. *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 283 (N.D. Cal. 2020).

In this case, Defendants' misrepresentation was public and Plaintiffs purchased or acquired Alphabet securities during the Class Period after the alleged misrepresentation and before the truth was revealed. And materiality is not litigated at class certification. *Amgen*, 568 U.S. at 459. Thus, the only determinative question is whether Alphabet's Class A and Class C shares traded in an efficient market.

**a. NASDAQ Listing Is Strong Evidence of Market Efficiency**

"To determine whether a particular security traded in an efficient market, the Ninth Circuit looks to the nonexclusive factors set out in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989))." *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (adopting the *Cammer* approach). *See, e.g., In re Montage Tech. Grp. Ltd. Secs. Litig.*, 2016 WL 1598666, *8 (N.D. Cal. Apr. 21, 2016). The five *Cammer* factors are whether: (1) the stock trades at high weekly volume; (2) securities analysts follow and report on the stock; (3) the stock has market makers and arbitrageurs; (4) the company is eligible to file a Form S–3 registration statement with the SEC; and (5) there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 268 (N.D. Cal. 2011).

In *Halliburton II*, the Supreme Court confirmed that market efficiency for the fraud-on-the-market presumption is not tied to any academic strain of market efficiency. *Id*. at 2408 (rejecting that efficiency is related to "any particular theory of how quickly and completely publicly available information is reflected in market price."). Instead, it is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id*. (quotation and citation omitted). Accordingly, "[d]ebates about the precise degree to which stock prices accurately reflect public information are thus largely beside the point." *Id*. at 2410.

At all relevant times, Alphabet Class A and Class C shares were listed and traded on the NASDAQ. Nye Report ¶¶14, 21. "[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency." *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 573 n.7 (C.D. Cal. 2012). This supports invoking the presumption of reliance. Nye Report ¶¶24-25. *See also Lumen v. Anderson*, 280 F.R.D. 451, 459-60 (W.D. Mo. 2012) (cases "too numerous to cite[] establish the NYSE and NASDAQ are at least entitled to a *presumption* of efficiency—making it incumbent upon Defendants to rebut the presumption.").

**b. The Five *Cammer* Factors Confirm Market Efficiency**

Dr. Nye's holistic analysis of the *Cammer* factors and other indicia of market efficiency demonstrate beyond dispute that Alphabet's Class A and Class C shares traded in an efficient market during the Class Period.

**Factor One—Weekly Trading Volume:** "[A] large weekly volume of stock trades…implies significant investor interest in the company [which] implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. During the Class Period, the average weekly trading volume of Alphabet's shares listed on the NASDAQ as a percentage of shares outstanding was 2.6% for Class A shares and 2.1% for Class C shares. Nye Report ¶28. Thus, the average weekly reported trading volume of the Company's stock during the Class Period exceeds the 2% "strong presumption" of market efficiency in *Cammer*.

**Factor Two—Analyst Coverage:** Analyst coverage on a stock implies that information about the company is rapidly reflected in the stock price. *Cammer*, 711 F. Supp. at 1286. During the Class Period,

at least 35 well-known investment firms followed and published reports on Alphabet. Nye Report ¶32. More than 1,500 analysts' reports on the Company were issued during the Class Period. *Id.* In addition, during the Class Period, financial information was further disseminated to investors via media coverage, investor conferences, trade magazines, the Company's presentations and SEC filings. *Id.* ¶33. Furthermore, the Company's filings with the SEC were publicly available online during the Class Period at no cost. *Id.* ¶34. This volume of news coverage supports an inference that the stock traded on an efficient market. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (524 news items over two years showed efficient market); *STAAR Surgical*, 2017 WL 821662, at *7 (finding market efficiency where "[a]t least six different securities analysts covered STAAR and provided investment recommendations regarding its stock").

**Factor Three—Market Makers and the Potential for Arbitrage:** A market maker is an entity that agrees to purchase or sell securities on demand, to support a liquid market for the shares. *In re Xcelera.com Sec. Litig*., 430 F.3d 503, 515 (1st Cir. 2005); *In re Countrywide Fin. Corp. Sec. Litig*., 273 F.R.D. 586, 613–14 (C.D. Cal. 2009). *Cammer* noted that the "existence of market makers . . . would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." 711 F. Supp. at 1286–87. During the Class Period, Alphabet had over 160 market makers that traded their shares on the NASDAQ. Nye Report ¶38. This factor supports market efficiency. *See Radient*, 287 F.R.D. at 572-73 (at least one market maker supported market efficiency); *Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers justifies substantial presumption of efficiency).

The existence of arbitrageurs, who are generally understood to be sophisticated investors who can act rapidly to take advantage of pricing discrepancies and thus ensure that market prices reflect all public information, is the fundamental hallmark of market efficiency. Nye Report ¶¶39-40. During the Class Period, arbitrageurs were not constrained in their ability to short shares of the Company's shares. *Id.* ¶41. Additionally, during the Class Period, institutional holdings were between 79.3% and 82.6% of the public float for the Class A stock and between 68.8% and 76.5% of the public float for the Class C stock. Nye Report ¶¶42-43. There were between 4,040 and 5,240 institutions holding Class A shares and between

3,530 and 4,430 institutions holding Class C shares during the Class Period. *Id*. *See, e.g.*, *Loritz v. Exide Techs*., 2015 WL 6790247, at *16 (C.D. Cal. July 21, 2015) (finding market efficiency where the defendants' notes were held by 88 institutions). Furthermore, the fact that reported institutional holdings, on average, were over 92 and 102 times the level of short interest in the Class A and Class C stocks, respectively, during the Class Period, implies that short selling was not constrained. *Id*. Thus, the fact that arbitrage opportunities could have been exploited during the Class Period is evidence in support of market efficiency. *Id.* ¶36.[6]

**Factor Four—S-3 Eligibility:** The *Cammer* Court found that a company's eligibility to file a short-form registration statement, *i.e.*, Form S-3, supports a finding of an efficient market. *Cammer*, 711 F. Supp. at 1285. A company is entitled to S-3 registration if it meets certain requirements. Nye Report ¶47. It is the SEC's view that these S-3 eligible companies—those that disclose financial information to the SEC and issue press releases to the public—have already disseminated information to the marketplace, and, therefore, that the market operates efficiently for them. *Id.* ¶48. Alphabet filed Form S-3 with the SEC before, during, and after the Class Period, indicating that the Company was eligible to file Form S-3 throughout the Class Period, which further supports market efficiency. *Id.* ¶49. *See Cammer*, 711 F. Supp. at 1287 ("it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S–3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.").

[6] Similarly, the cost of trading and arbitrage opportunity for the Company, showed by the "bid-ask" spread, demonstrates that it traded in an efficient market. Nye Report ¶¶44-45. Bid/ask spreads are a measure of transaction costs and low transaction costs indicate that arbitrage opportunities can be exploited readily. *Id*. ¶44. During the Class Period, the Company's NASDAQ-listed stock had an average and median bid-ask spread of 0.05%/0.04% for Class A shares and 0.04%/0.04% for Class C shares, which was smaller than the average and median bid-ask spread of a random sample of stocks also listed on the NASDAQ, 0.32%/0.25%. *Id*. This further supports the conclusion that the Company's common stock traded in an efficient market during the Class Period. *Id*. ¶45.

**Factor Five—Cause and Effect Relationship of Unexpected Material News and Stock price:** This factor requires showing that there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. Dr. Nye employed an event study to determine the impact of new material information on the Company's stock price. *See* Nye Report ¶52. In an efficient market, it would be expected that the price of a stock would respond to news. *Id.* ¶¶18, 54. The event study is a multiple step process to test this response. *Id.* ¶51. Those steps include: "(i) the *a priori* definition and selection of events to study; (ii) identification of a study period; (iii) estimation of a regression model to remove non-company-specific effects from the security's return; (iv) testing for statistical significance; and (v) interpretation of empirical results." *Id.* To determine which events to study in his analysis, Dr. Nye relied on a large body of event study literature that has evaluated what types of information affect stock prices. *Id.* ¶53.[7]

Consistent with this literature, Dr. Nye examined nine dates during the Class Period consisting of dates on which the Company released quarterly or year-end financial results and/or guidance. *Id.* ¶¶53-55. Such earnings-related announcements are an objective set of events to examine, which has been shown in the academic finance literature to impact securities' prices. *Id*. ¶53. Out of the nine events examined, all (*i.e.*, 100%) are associated with a statistically significant Company-specific return at or above the 95% confidence level. *Id.* ¶55. At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time. *Id*. Thus, one should expect a random sample of nine days to contain 0.45 days with a return that is statistically significant at the 95% confidence level. *Id*. Given that Dr. Nye's sample contained 20 times as many statistically significant dates as should be expected from a randomly selected nine-day sample (at or above the 95% confidence level), Dr. Nye's analysis confirms that Alphabet's stock price typically reacted more strongly on event dates than on non-event dates. *Id*.

[7] Event studies seek "to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280. "[E]vent studies . . . are generally accepted by both the academic community and the courts as a reliable principle or method for determining whether a particular announcement by a company has caused the price of the company's stock to decline." *Sec. & Exch. Comm'n v. Jensen*, 2013 WL 12129377, at *5 (C.D. Cal. Mar. 13, 2013).

Moreover, while evidence of "directionality" is not required to show general market efficiency for purposes of a securities class action, Dr. Nye also analyzed the directionality of the movements in Alphabet's stock price. *Id.* ¶56. Dr. Nye's review of the news and analysts' reports demonstrates that the direction of the Company-specific returns observed on each event date was consistent with that expected in an efficient market, thereby providing additional evidence of efficiency. *Id.* Specifically, the event dates on which predominantly *positive* Company-specific news reached the market were associated with statistically significant *positive* returns, and the event dates on which predominantly *negative* Company-specific news reached the market were associated with statistically significant *negative* returns. *Id.* Thus, Dr. Nye's event study found that a strong cause-and-effect relationship existed between the information disclosed on the event dates and resulting stock price movements *Id.*

Based on his analysis, Dr. Nye concluded that for the Class Period (1) "the prices of the Class A and Class C stock typically reacted more strongly on event dates than on non-event dates" (*Id.* ¶55); (2) the event study shows "a strong cause-and-effect relationship existed between the information disclosed on the event dates and resulting stock price movements" (*Id.* ¶56); and (3) the Company's stock price "promptly responded to the disclosure of new, material, unexpected information," supporting his conclusion that "the markets for both stocks were efficient throughout the Class Period." *Id.* ¶57.[8]

#### c. Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance

For damages questions to predominate, Plaintiffs must "show that their damages stemmed from the defendant's actions that created the legal liability" and can "feasibly and efficiently be calculated once the common liability questions are adjudicated." *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir.

[8] In addition to these *Cammer* factors, courts have also relied on three supplemental factors enumerated in *Krogman v. Sterritt*: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')." 202 F.R.D. 467, 474 (N.D. Tex. 2001). Dr. Nye's analysis found these three factors to also support market efficiency. Nye Report ¶¶58-64. *See, e.g.*, *Angley v. UTI Worldwide Inc.*, 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018) (considering evidence of market capitalization among other *Krogman* factors and finding market efficiency). Dr. Nye also compared the markets for the Class A and Class C shares and found the fact that they traded in lockstep during the Class Period and the high degree of relative informational efficiency between each class of stock also support market efficiency. *Id.* ¶¶65-67.

2013). "[T]he need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1155 (9th Cir. 2016). This is especially true in securities cases, where "the process of computing individual damages will be virtually a mechanical task." *Diamond Foods, Inc.*, 295 F.R.D. at 252." "Because each investor's loss usually can be established mechanically, common questions predominate and class certification is routine, if a suitable representative steps forward." *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010).

Dr. Nye's report demonstrates that per-share damages can be determined on a Class-wide basis by a well-established and formulaic "out-of-pocket" method of calculating damages for all Class members. Nye Report ¶¶68-73. That is sufficient at this stage. *Leyva*, 716 F.3d at 514; *Twitter*, 326 F.R.D. at 630. "Rule 23(b)(3) requires only that plaintiffs be able to show that their damages stemmed from the defendant's actions that created the legal liability." *In re Snap Inc. Sec. Litig.*, 334 F.R.D. at 217–18 (cleaned up). Thus, Plaintiffs need not, at this stage of the proceedings, provide a loss causation model or actually calculate damages. *See Halliburton I*, 563 U.S. at 809–15; *see also Hatamian*, 2016 WL 1042502, at *9 ("Plaintiffs need not show loss causation as a condition of class certification.").

Because the evidence and methodology for calculating the daily artificial inflation, and thus damages, are both common to the Class and applicable on a classwide basis, common issues predominate. *See SEB*, 335 F.R.D. at 288; *In re Lendingclub*, 282 F.Supp.3d at 1184.

**d. Reliance Is Also Presumed Under *Affiliated Ute***

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), the Supreme Court held that reliance is presumed where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992). In such circumstances, individual reliance need not be proven. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131. Here, reliance may be presumed under *Affiliated Ute* based on Defendants' omissions of material information.

### 3. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

The superiority inquiry "calls for a comparative assessment of the costs and benefits of class adjudication, including the availability of 'other methods' for resolving the controversy." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017). "If united by a common core of facts, and a presumption of reliance on an efficient market, class actions are the superior way to litigate a case alleging violations of securities fraud." *Radient*, 287 F.R.D. at 575.

Here, the superiority of class treatment is evident upon consideration of the four factors set forth in Rule 23(b)(3): "(1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Montage*, 2016 WL 1598666, at *13. Class members are too numerous and too geographically dispersed, and the typical claim too small, for individual actions to be feasible. *See Id.*

The members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered economic loss of *de minimus* value). A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("Nothing in the PSLRA, we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses' — a matter crucial to the integrity of domestic capital markets." (citation omitted)). Moreover, there are thousands of class members. "Litigating each case separately would be

wasteful, and result in delay and an inefficient expenditure of judicial resources." *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008). It would also "risk disparate results among those seeking redress." *Id*. Finally, there is no reason to expect any difficulties in managing this case as a class action. Indeed, class actions of this size and complexity are common.

## II. POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL

In confirming its appointment of Lead Counsel as Class Counsel, this Court must consider the factors enumerated in Rule 23(g)(1)(A):

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Under these criteria, the Pomerantz firm is eminently qualified, and this Court should confirm their appointment as Class Counsel in this case. Gilmore Decl. Exhibit 5 (firm resume). For over eighty-five years, Pomerantz has been a leader in litigating securities fraud cases on behalf of investors in both class and individual actions, setting important precedents. *See, e.g., In re Hebron Tech. Co. Sec. Litig.*, 2020 WL 5548856, at *6 (S.D.N.Y. Sept. 16, 2020) (noting that Pomerantz has "extensive experience as lead counsel in securities class actions"); *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 362 (S.D.N.Y. 2016) ("There is no real dispute that Pomerantz is an established firm with considerable class action experience, and the [c]ourt has now had multiple opportunities to observe Pomerantz's performance. The [c]ourt finds that the Pomerantz firm has both the skill and resources to represent the Classes adequately."), *aff'd in part, vacated in part on other grounds sub nom*. *In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017).

Pomerantz has committed substantial time and resources to representing the Class, has worked vigorously to prosecute this action, and has and will continue to zealously and competently represent the interests of the members of the Class. Lead Counsel have effectively used their experience to vigorously pursue the interests of all Class members including filing factually detailed complaints, mounting a successful defense of the allegations in response to the Defendants' motion to dismiss and motion for interlocutory appeal, and engaging Defendants in the discovery process. Thus, Plaintiffs have satisfied

Rule 23(g).

**CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiffs as the Class Representatives; (3) appointing Pomerantz LLP as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: October 30, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Emma Gilmore*

Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice)*
Villi Shteyn (admitted *pro hac vice)*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Orly Guy
Eitan Lavie
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
7080 NW 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Plaintiff City of Fort Lauderdale Police & Fire Retirement System*