BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
ELENA HADJIMICHAEL, State Bar No. 355715
elena.hadjimichael@freshfields.com
CARL HUDSON, State Bar No. 317201
carl.hudson@freshfields.com
J. MIA TSUI, State Bar No. 344251
mia.tsui@freshfields.com
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALPHABET INC., et al.,<br><br>Defendants. | Case No.: 3:23-cv-01186-RFL<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:        April 14, 2026<br>Time:        10:00 AM<br>Location:   Courtroom 15 – 18th Floor<br>Judge:      The Hon. Rita F. Lin |

**TABLE OF CONTENTS**

                                                                                            **Page**

TABLE OF AUTHORITIES..............................................................................................ii

TABLE OF ABBREVIATIONS........................................................................................v

INTRODUCTION............................................................................................................ 1

BACKGROUND.............................................................................................................. 3

    A. Google's Ad Tech Is Publicly Investigated and Cleared of Antitrust Concerns.................... 3

    B. Google Cooperates with Congressional "Big Tech" Inquiry........................................ 3

    C. Ken Paxton Lawsuit Sets Off Antitrust Litigation Against Google.....................................4

    D. Plaintiffs' Lawsuit and Motion Rehash Long-Public Regulator Action..............................6

ARGUMENT.................................................................................................................... 7

    I. PLAINTIFFS FAIL TO SHOW PREDOMINANCE BECAUSE THEY CANNOT INVOKE THE PRESUMPTION OF RELIANCE ON MARKET PRICE......................................................... 8

    A. Economic Evidence of a Lack of Price Impact Rebuts the Presumption of Reliance........... 9

    B. The Challenged Statement Had No Impact on Alphabet's Stock Price............................... 10

    C. No Corrective Disclosure Had an Impact on Alphabet's Stock Price................................. 11

        1. No Price Impact from the December 16, 2020 Republican State AGs' Lawsuit............12

        2. No Price Impact Resulted from September 1, 2021 Report of Potential DOJ Lawsuit.. 15

        3. No Price Impact Resulted from the October 22, 2021 Unredaction............................... 17

        4. No Price Impact Resulted from the February 11, 2022 EPC Filing................................19

        5. No Price Impact Resulted from the January 24, 2023 DOJ Complaint........................ 21

    II. PLAINTIFFS CANNOT EVADE THE LACK OF PRICE IMPACT BY RECASTING THE CHALLENGED STATEMENT AS AN OMISSION................................................................23

    III. PLAINTIFFS FAIL THEIR BURDEN OF PROVIDING A CLASS-WIDE DAMAGES MODEL.......................................................................................................................... 24

CONCLUSION............................................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**                                                                                                **Page**

*Abraham v. WPX Energy Prod., LLC*,
    322 F.R.D. 592 (D.N.M. 2017)............................................................................................... 25

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972).................................................................................................................23, 24

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023).......................................................................................... 9, 12, 14, 15

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)......................................................................................................*passim*

*Black Lives Matter L.A. v. City of L.A.*,
    113 F.4th 1249 (9th Cir. 2024)................................................................................................. 7

*Bratya SPRL v. Bed Bath & Beyond Corp.*,
    752 F. Supp. 3d 34 (D.D.C. Sept. 27, 2024),
    *recons. denied*, 2025 WL 721770 (D.D.C. Mar. 6, 2025)..................................................13

*Britton v. Servicelink Field Servs., LLC*,
    2019 WL 3400683 (E.D. Wash. July 26, 2019).............................................................. 24

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..................................................................................................................8, 24

*In re Concho Res., Inc. Sec. Litig.*,
    2025 WL 1040379 (S.D. Tex. Apr. 7, 2025)........................................................................13

*Dean v. China Agritech*,
    2012 WL 1835708 (C.D. Cal. May 3, 2012)...................................................................... 13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)............................................................................................................8, 9

*Erica P. John Fund v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015)....................................................................................13, 22

*In re Fibrogen Sec. Litig.*,
    2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)................................................................. 16, 22

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)........................................................................*passim*

*Fleming v. Select Portfolio Servicing*,
    342 F.R.D. 361 (D. Mass. 2022)........................................................................................ 25

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    594 U.S. 113 (2021)............................................................................................................*passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)...................................................................................................7, 8, 20

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
    2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024)..................................................................15

*Kreek v. Wells Fargo & Co.*,
    652 F. Supp. 2d 1053 (N.D. Cal. 2009)............................................................................14

*Kronenberg v. Allstate Ins. Co.*,
    743 F. Supp. 3d 465 (E.D.N.Y. 2024)..............................................................................25

*Lilly v. Jamba Juice Co.*,
    308 F.R.D. 231 (N.D. Cal. 2014)................................................................................24–25

*Loritz v. Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015)..................................................................24

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011)...............................................................................13, 20

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
    710 F. Supp. 3d 1090 (D. Utah 2023)..............................................................................25

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)................................................................13

*Omori v. Brandeis Univ.*,
    673 F. Supp. 3d 21 (D. Mass. 2023).................................................................................25

*Oztimurlenk v. United States*,
    162 Fed. Cl. 658 (2022)....................................................................................................25

*Payne v. Tri-State CareFlight, LLC*,
    328 F.R.D. 601 (D.N.M. 2018).........................................................................................25

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996)..........................................................................................19

*In re Redback Networks, Inc. Sec. Litig.*,
    2007 WL 963958 (N.D. Cal. Mar. 30, 2007)...................................................................15

*Shin v. Sanyo Foods Corp. of Am.*,
    348 F.R.D. 477 (C.D. Cal. 2025)................................................................................24, 25

*Shupe v. Rocket Cos.*,
    752 F. Supp. 3d 735 (E.D. Mich. 2024)...........................................................................14

*Sicav v. Jun Wang*,
   2015 WL 268855 (S.D.N.Y. Jan. 21, 2015)...............................................................25

*Stanaford v. Genovese*,
   2016 WL 4198146 (S.D. Fla. Mar. 11, 2016)...........................................................13

*In re Versata, Inc. Sec. Litig.*,
   2001 WL 34012374 (N.D. Cal. Aug. 20, 2001)...........................................................7

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)...............................................................................9, 10

*Vizcarra v. Unilever United States, Inc.*,
   339 F.R.D. 530 (N.D. Cal. 2021)......................................................................24, 25

*In re Volkswagen Mktg., Sales Practices, & Prods. Liab. Litig.*,
   2 F.4th 1199 (9th Cir. 2021)........................................................................2, 23, 24

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)...............................................................................................7

*Ward v. Apple Inc.*,
   784 F. App'x 539 (9th Cir. 2019)......................................................................24, 25

**Statutes & Rules**

28 U.S.C. § 1658(b)(1)..............................................................................................15

Fed. R. Civ. P. 23....................................................................................................7, 8

Fed. R. Civ. P. 23(b)...................................................................................................23

Fed. R. Civ. P. 23(b)(3)........................................................................................1, 7, 24

**Other Authorities**

*Death by a thousand cuts: Regulatory pressures intensify*, BNP Paribas (Jan. 24, 2023)....................22

Jill E. Fisch & Jonah B. Gelbach, *Power and Statistical Significance in Securities
   Fraud Litigation*, 11 Harv. Bus. L. Rev. 55, 57 (2021)................................................13

Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities
   Fraud Cases: Applications at the Securities & Exchange Commission*,
   49 Bus. Law. 545 (1994)........................................................................................10

**TABLE OF ABBREVIATIONS**

| Abbreviation | Meaning |
|---|---|
| ¶ or SAC | Plaintiffs' Second Amended Complaint for Violations of the Federal Securities Laws, filed September 24, 2024 (ECF No. 87) |
| Ad Tech | Advertising Technology |
| AG(s) | Attorney(s) General |
| Bloomberg article | September 1, 2021 Bloomberg article reporting potential antitrust lawsuit against Google by DOJ |
| Class Period | September 14, 2020 through January 23, 2023, both dates inclusive |
| Defendants | Alphabet Inc., Google LLC, and Sundar Pichai |
| DOJ | United States Department of Justice |
| DOJ Complaint | Complaint, *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. Jan. 24, 2023) (ECF No. 1) |
| EPC Complaint | European Publishers Council's February 11, 2022 Complaint |
| FAC | Plaintiffs' First Amended Complaint for Violations of the Federal Securities Laws, filed August 7, 2023 (ECF No. 46) |
| Ferrell Rep. | Concurrently filed Rebuttal Report of Professor Allen Ferrell, Hudson Decl., Ex. 1. |
| FINRA | Financial Industry Regulatory Authority |
| Fort Lauderdale | Plaintiff City of Fort Lauderdale Police & Fire Retirement System |
| FTC | United States Federal Trade Commission |
| Hudson Decl. | Concurrently filed Declaration of Carl Hudson |
| Lead Plaintiffs or Menora | Menora Mivtachim Insurance Ltd. and Menora Mivtachim Pensions and Gemel Ltd. |
| Motion or Mot. | Plaintiffs' Notice of Motion and Motion for Class Certification, filed October 30, 2025 (ECF No. 134) |
| MTD Order | Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part Request for Judicial Notice, filed Mar. 24, 2025 (ECF 108) |
| NBA | September 2018 Network Bidding Agreement |

| Nye Rep. | Expert Report of Zachary Nye, Ph.D., filed October 30, 2025 (ECF No. 134-2) |
|---|---|
| Order | Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part Request for Judicial Notice, filed March 24, 2025 (ECF No. 108) |
| Plaintiffs | Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., AMI - Government Employees Provident Fund Management Company Ltd., and City of Fort Lauderdale Police & Fire Retirement System |
| Republican State AG Complaint or State AG Complaint | Complaint filed by Republican States' Attorneys General on December 16, 2020 against Google |
| Subcommittee | House Judiciary's Subcommittee on Antitrust, Commercial and Administrative Law |
| QFR | Questions for the Record, sent by Congress |
| QFR Responses | Google's Responses to Congressional Questions for the Record, published September 14, 2020 |

Emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted, and certain formatting has been modified.

**INTRODUCTION**

This lawsuit is quite an anomaly: a stock-drop case without a stock drop. Securities class actions are meant to recover economic damages due to a decline in a company's stock price, allegedly caused by fraud. But Alphabet's stock did not decline on any of the five dates Plaintiffs claim as "corrective disclosures" that "revealed" the purported fraud. In fact, no market participant identified this imaginary fraud. And, when testifying under oath, Plaintiffs' own representatives admitted they had not identified any fraud until Plaintiffs' counsel proposed a lawsuit to them. Plaintiffs have tried to explain these flaws away. What they cannot escape, however, is mathematical truth: if the stock did not drop, there is no lawsuit to bring. *That* is a problem.

A few years ago, the Supreme Court announced a dramatic shift in how district courts examine motions to certify classes in securities actions. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021). *Goldman* adjusted the historical practice for evaluating Rule 23(b)(3)'s predominance requirement in the unique context of securities class actions. One of the elements of the claim is reliance. *See infra* § I. But having to prove reliance on an individual basis would always defeat Rule 23(b)(3)'s predominance requirement. For decades, the Supreme Court permitted plaintiffs to invoke a presumption that, in an efficient market, an investor relies on the integrity of statements made to the market. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). An efficient market such as Nasdaq, on which Alphabet stock trades, incorporates new information nearly instantaneously. Under the *Basic* presumption, securities class actions were certified almost automatically.

*Goldman* changed this regime to correct for perceived abuse of the *Basic* presumption, under which district courts did not always scrutinize whether the market was reacting to the allegedly false information nor to the alleged corrective disclosures that purportedly revealed the truth. In response to this laxness, in 2021, the Supreme Court announced the new *Goldman* standard. Now, under *Goldman*, district courts must consider and weigh evidence at the class certification stage. *Infra* § Argument. District courts must also consider evidence propounded by Defendants that shows that the alleged false information or the corrective disclosures did not impact the market price of the stock. Leading to *Goldman*, courts had begun to confront an uneasy reality: some securities class actions were not based on actionable stock drops resulting from fraud, but simply tried to exploit random variability in stock

prices. *Goldman* closed this loophole.

Plaintiffs try to pivot away from these standards, which they cannot satisfy. Knowing they cannot meet the *Goldman* standard for invoking the *Basic* presumption, Plaintiffs cite an older case dealing with a narrow form of omission claim. But Plaintiffs have not alleged an actionable omission. Instead, they pursue the exact theory of omission that courts have repeatedly rejected: that *every* misrepresentation is an omission, because it omits the fact that it is untrue. *In re Volkswagen Marketing* ("*VW*"), 2 F.4th 1199 (9th Cir. 2021) forecloses this attempt.

Under these standards, class certification should be denied for three reasons.

First, under *Goldman*, Defendants prove based on market evidence, analyst reports, and the expert report of Harvard professor Allen Ferrell, that the sole alleged false statement remaining in this case had no impact on Alphabet's stock. *Infra* § I. It makes sense too: the alleged false statement was a single sentence in 58 pages of response that Google, Alphabet's subsidiary, sent to Congress. No analyst picked it up. Anticipating a common plaintiff argument, Professor Ferrell also considered the impact of the five "corrective disclosures" Plaintiffs allege. (Plaintiffs often try to show that the stock dropped on negative news and try to impute that drop as the "price impact" they would attribute to the alleged false statement.) But the math is clear: on each of the days when the "corrective disclosures" entered the market, Alphabet's stock did not react in any statistically significant fashion. To show this, Professor Ferrell created a statistical model of Alphabet's stock to account for variability in the stock market and movements affecting the entire industry in which Alphabet operates. Once those factors are accounted for, the stark reality became clear: not a single "corrective disclosure" impacted Alphabet's stock price. In fact, on a few occasions, Alphabet's stock outperformed the market on those days, profiting rather than hurting Plaintiffs. To counter this reality, Plaintiffs engage in a variety of contortions, including counting stock drops over multiple days or failing to inform the Court of other confounding events and announcements impacting Alphabet's stock. But none of these extreme measures can obscure the economic evidence.

Second, to the extent Plaintiffs try to avoid the showing required to activate the *Basic* presumption, they fail in their attempt to recast the alleged false statement as an omission. The Ninth Circuit's ruling in *VW* quickly disposes of their arguments. *Infra* § II.

Third, Plaintiffs' certification bid fails for an independent reason: their expert cannot provide a model of class-wide damages, requiring individualized inquiries. *Infra* § III. Taking a step back, this makes sense: Plaintiffs' expert is reduced to speculating about how a damages model *might* look because he cannot actually construct one. It is impossible to build a damages model without damages.

Class certification should be denied. Defendants anticipate bringing a summary judgment motion to dispose of the rest of the case on an individual basis in short order.

## BACKGROUND

### A. Google's Ad Tech Is Publicly Investigated and Cleared of Antitrust Concerns

For over two decades, Google has addressed and resolved periodic antitrust scrutiny. In 2007, Google faced public regulator attention for its acquisition of the digital advertising company DoubleClick. Hudson Decl., Ex. 25, at 1. The FTC opened an investigation into that acquisition in May 2007, and closed it later that year, concluding "Google's proposed acquisition of DoubleClick [wa]s unlikely to substantially lessen competition." *Id.* at Ex. 18, at 1. DoubleClick then became part of the technologies constituting the current Google Ad Manager. ¶ 54. Later, in 2013, the FTC closed an investigation into Google's search platform. Hudson Decl., Ex. 19, at 1.

### B. Google Cooperates with Congressional "Big Tech" Inquiry

Even though the FTC had cleared Google's business practices, some argued for further regulation and even legal action against large technology companies. *E.g.*, *id.* at Ex. 26 (then-Berkeley professor Robert Reich critiquing, *inter alia*, the FTC's decision not to pursue Google in 2013). Even President Trump commented in 2018, "We are looking at [antitrust] very seriously . . . . Look, that doesn't mean we're doing it, but we're certainly looking and I think most people surmise that, I would imagine." *Id.* at Ex. 27, at 2. As public pressure grew, Congress was criticized for failing to implement related legislation. *E.g.*, *id.* at Ex. 29.

Congress ultimately responded. As relevant here, the House Judiciary Committee announced a "bipartisan investigation into competition in digital markets" on June 3, 2019. *Id.* at Ex. 20, at 1. Google was one of several targets. Representatives from Apple, Amazon, Facebook, and Google all testified before the House Judiciary's Subcommittee on Antitrust, Commercial and Administrative

Law (the "Subcommittee") on July 16, 2019. *Id.* at Ex. 3, at 1. Related document requests were sent to each of those companies on September 13, 2019. *Id.* at Ex. 21, at 1.

After delays due to the COVID-19 pandemic, the CEOs of Apple, Amazon, Facebook, and Google—Tim Cook, Jeff Bezos, Mark Zuckerberg, and Sundar Pichai—were invited to testify before Congress on July 29, 2020. *Id.* at Ex. 4, at 1. Following that oral testimony, the Subcommittee sent Questions for the Record ("QFRs") to each of these companies. Eighty-five QFRs were directed to Google. *Id.* at Ex. 6. On September 11, 2020, Google—not Mr. Pichai himself—submitted a 58-page written response to these QFRs (the "QFR Responses"). *Id.* at Ex. 6, A-1. Congress published the QFR Responses to its website on September 14, 2020, at 4:13PM. *Id.* at Ex. 5, at 2.

Only one of these 85 QFRs is at issue in this case. *See* ¶¶ 166–167. It asks, "What percentage of bids does Google win on its own ad exchanges?" Hudson Decl, Ex. 6, at A-5. Google submitted a one-paragraph response, ending with the sentence: "The channel through which a bid is received does not otherwise affect the determination of the winning bidder." *Id*. at A-6. This one sentence is the only challenged statement remaining in Plaintiffs' lawsuit. *See* MTD Order at 8–12, 17–18.

There was no market reaction affecting Alphabet's stock price after Congress published Google's QFR Responses. *Infra* § I.B. The market cap for Alphabet stock, which trades on Nasdaq in two classes, fluctuated minimally. It dropped from $1.033T on September 11, 2020 to $1.030T on September 14. Hudson Decl., Ex. 2, at 10. It then changed to $1.046T on September 15, only to drop again to $1.031T on September 16. *Id*. There is no evidence that the market considered the QFR Responses meaningful to a decision to invest in Alphabet. *Infra* § I.B. Nor, apparently, did Plaintiffs. Menora's Head of Global Equities colorfully described Google's congressional testimony as "a cure for insomnia" in his deposition. Hudson Decl., Ex. 11, at 198:15–199:1. He further stated the testimony is not something Menora would track beyond "what was reported in the financial news." *Id.*

**C. Ken Paxton Lawsuit Sets Off Antitrust Litigation Against Google**

Regulatory action against Google continued to be in the news thereafter. On December 16, 2020, a bloc of Republican States' AGs, led by Texas Attorney General Ken Paxton, filed suit in the Eastern District of Texas. *Id.* at Ex. 28, at 1.[1] That lawsuit accused Google of antitrust violations

---

[1] This was not even the first lawsuit making antitrust allegations as to Google's Ad Tech business. Three ad purchaser companies filed a lawsuit against Alphabet, on May 27, 2020. Hudson Decl., Ex.

related to its ad tech practices. *Id*. Alphabet's stock price did not react. Again, the market cap for Alphabet stock changed only from $1.193T on December 15 to $1.191T on December 16. *Id.* at Ex. 2, at 9. On September 1, 2021, Bloomberg reported that the U.S. DOJ was planning to file its own antitrust lawsuit. *Id.* at Ex. 30, at 1. Alphabet's market cap changed from $1.940T to $1.917T. *Id.* at Ex. 2, at 6. On October 22, 2021, the Republican State AGs filed an amended complaint,[2] unredacting certain allegations relating to the negotiations of the Network Bidding Agreement (the "NBA") with Facebook.[3] *Id.* at Ex. 16, ¶¶ 203–234. Alphabet's negotiations with Facebook had already been discussed in the original complaint. *Id.* at Ex. 14, ¶¶ 171–196. In amending, the Republican State AGs unredacted references to certain internal documents, to attempt to show Facebook received special benefits. *Id.* at Ex. 16, ¶¶ 217, 225, 234.[4] A similarly slight change in Alphabet's market cap resulted: from $1.898T on October 21 to $1.841T on October 22. *Id.* at Ex. 2, at 6.

As relevant here, two other lawsuits followed a considerable time after the Republican State AGs'. First, on February 11, 2022, the European Publishers Council filed an antitrust complaint with the European Commission. *Id.* at Ex. 23. That complaint itself was not made public, nor has it been since then, but an executive summary was published online, alleging harms to non-Google ad buyers. *Id.* at Ex. 24. Alphabet's market cap changed from $1.832T on February 10, to $1.774T on February 11. *Id.* at Ex. 2, at 5. A DOJ-led antitrust lawsuit related to ad tech was filed on January 24, 2023, over a year after the initial press release. *Id.* at Ex. 17. Alphabet's market cap changed, once again, minimally, from $1.300T on January 23 to $1.274T on January 24. *Id.* at Ex. 2, at 1. It has more than tripled since that time, to approximately $4.1T. *Id.* at Ex. 22, at 2.[5]

---

13. That complaint alleged, before the Republican State AGs' lawsuit was even filed, competitive advantages to Google in its ad auctions. *Id.* at ¶¶ 47–56.

[2] The Republican State AGs previously amended the lawsuit to include one Democratic State AG, Aaron D. Ford of Nevada, several other Republican State AGs, and the AG of Puerto Rico (neither a Democrat nor a Republican). Hudson Decl., Ex. 15, ¶ 1.

[3] The Court discussed the alleged terms of the NBA in its order on Defendants' motion to dismiss. MTD Order at 4–5.

[4] Notably, Judge Castel ultimately dismissed from that case the allegations relating to Google's agreement with Facebook. Hudson Decl., Ex. 32, at 1–2.

[5] Plaintiffs have shared in Google's continued success, continuing to hold and actively purchase its stock. *See* Hudson Decl., Exs. 7, 8 (for instance, Lead Plaintiffs purchased 300 shares of Alphabet stock on September 30, 2020; 15,000 shares on February 11, 2021; 17,000 shares on October 21, 2021; 12,900 shares on November 10, 2021; and 10,615 shares on March 16, 2022).

**D. Plaintiffs' Lawsuit and Motion Rehash Long-Public Regulator Action**

Plaintiffs filed their lawsuit on March 16, 2023, two months after the DOJ's. ECF No. 1. After Plaintiffs filed a first amended complaint against Google, Mr. Pichai, and certain other Google officers, the Court granted Defendants' motion to dismiss with leave to amend on September 3, 2024. ECF No. 84. Plaintiffs filed the operative complaint on September 24, 2024. ECF No. 85.

After briefing on a second motion to dismiss, this Court dismissed Plaintiffs' allegations for failure to allege falsity and scienter with respect to all challenged statements save one: the statement in Google's QFR Responses that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder."[6] MTD Order at 8–12. As a result, the Court dismissed the case as to each of the 37 other statements. *See* ¶¶ 154–258. The Court also dismissed the other individual defendants, leaving only Google and Mr. Pichai. MTD Order at 17.

Plaintiffs filed their Motion for Class Certification on October 30, 2025. ECF No. 134. Central to the Motion's theory of class-wide damages is the notion that the fraudulent nature of the challenged statement from Google's QFR Responses was revealed over several "corrective" disclosures:

| | |
|---|---|
| December 16, 2020 | AGs for 10 Republican states, led by Texas AG Ken Paxton, file complaint against Google in the Eastern District of Texas. |
| September 1, 2021 | Bloomberg reports that DOJ is preparing a potential antitrust lawsuit with respect to Google's ad tech business. |
| October 22, 2021 | Republican State AGs file an amended, unredacted complaint in the Eastern District of Texas. |
| February 11, 2022 | European Publishers Council, representing ad buyers in Europe, files complaint against Google with the European Commission. |
| January 24, 2023 | DOJ and 8 state AGs file complaint against Google in the Eastern District of Virginia. |

*See* Mot. at 4. Curiously, given the purported revelation of fraud as early as 2020, Plaintiffs did not sue until 2023. *Infra* § I.C.1.

Plaintiffs initially alleged that these five disclosures were corrective of *all* the original 38 challenged statements. ¶¶ 259–278. Though the Court has since dismissed 37 of the 38, MTD Order at 17, Plaintiffs nonetheless maintain that each of these disclosures is "corrective" without specifying

---

[6] Similar language on Google's website also survived that motion. MTD Order at 14.

whether—or how—they correct the sole *remaining* challenged statement, specifically.[7] *See* Mot. at 4.

Plaintiffs have also pursued this case at odds with the PSLRA's objective of "eliminat[ing] lawyer-driven litigation." *In re Versata, Inc. Sec. Litig.*, 2001 WL 34012374, at *4 (N.D. Cal. Aug. 20, 2001). For instance, Lead Plaintiffs' representative explained that securities "lawsuits are brought to our attention by [our] external legal counsel"—typically Pomerantz—and that Pomerantz, not Lead Plaintiffs themselves, performed the investigation into this lawsuit before "present[ing]" it to Lead Plaintiffs. Hudson Decl., Ex. 10, at 33:4–8, 84:6–10. In a similar vein, Plaintiffs' testimony indicates that they did not become aware of the QFR Responses until after they were approached by counsel. Fort Lauderdale's representative testified that it did not "become aware about [the] written testimony presented to Congress" until "May [or] June 2023." *Id.* at Ex. 12, at 228:19–23. Lead Plaintiffs' representative, the person responsible for investment strategy, was likewise unaware of Google's written testimony during the Class Period. *See id.* at Ex. 11, at 198:22–24 ("Viewing congressional testimony is not something I would want to do myself," or even "wish on my enemies.").

Given these facts, class certification is not appropriate.

### ARGUMENT

Certification of securities class actions is not a perfunctory step. Plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including . . . the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Courts may not certify a class unless they are satisfied, following a "rigorous analysis" of the evidence, that all prerequisites of Rule 23 are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1257 (9th Cir. 2024) (vacating certification where "the district court did not conduct a rigorous analysis"). To meet this considerable burden, Plaintiffs needed to prove that common questions as to the elements of their securities fraud claim "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). For three reasons, Plaintiffs failed to do so.

Section I proves that neither the challenged statement itself, nor any purportedly "corrective" disclosure, had an impact on Alphabet's stock price. This defeats the presumption of class-wide

---

[7] Plaintiffs initially alleged a further corrective disclosure on April 17, 2023. ¶ 272. They have not moved for class certification as to this alleged corrective disclosure. *See* Mot. at 1.

reliance on market price on which Plaintiffs' predominance showing depends. Anticipating this, and fully aware of the deficiencies of their position, Plaintiffs try to mislabel the affirmative statement they challenge as an omission, but that too fails. As described in Section II, the Ninth Circuit has specifically rejected this very approach. Section III shows that Plaintiffs lack a class-wide damages model, as required by the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) to establish predominance.

Because Plaintiffs have not proved that their proposed class satisfies Rule 23's requirements, their request for certification must be denied.

## I. PLAINTIFFS FAIL TO SHOW PREDOMINANCE BECAUSE THEY CANNOT INVOKE THE PRESUMPTION OF RELIANCE ON MARKET PRICE

The inquiry into whether Plaintiffs have met their burden to show that "questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). For Plaintiffs' securities fraud claim,[8] predominance of common questions turns on "the element of reliance." *Goldman*, 594 U.S. at 118. Plaintiffs argue that they are excused from proving individual reliance on Google's challenged statement by each class member, and are entitled instead to the presumption of reliance established in *Basic*. *See* Mot. at 11–12.

But the *Basic* presumption is not absolute. It involves a series of inferences that must remain unbroken in order for the presumption to apply. First, it requires courts to apply the "fraud-on-the-market theory," which assumes that the price of "stock traded in an efficient market" promptly "incorporates all of the company's public misrepresentations." *Goldman*, 594 U.S. at 117–18. Should that theory hold true, courts may then assume that an investor's "decision to trade at a fair market price" reflects reliance on the "price received (or paid)" for a security. *Id*. at 118. And in turn, courts may treat reliance on the "integrity of the market price" as a proxy for individual reliance on the purported misstatement challenged in the securities action. *Halliburton*, 573 U.S. at 276.

The *Basic* presumption also comes with an important caveat: It is rebuttable with "*any* showing that severs the link" between these required inferences. *Id.* at 269.

---

[8] To establish liability under Section 10(b) of the Exchange Act, Plaintiffs must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton*, 573 U.S. at 267.

DEFS' OPP. TO CLASS CERT.                    8
CASE NO. 3:23-CV-01186-RFL

Because economic evidence shows that the market price of Alphabet's stock was not impacted by Google's purported misstatement or by any "corrective" disclosure, that chain of inferences is broken here. As a result, Plaintiffs cannot invoke the presumption of reliance to prove predominance.

**A. Economic Evidence of a Lack of Price Impact Rebuts the Presumption of Reliance**

For the *Basic* presumption to apply, an alleged misstatement must have had an impact on a price of a company's stock, measured by the price change "between the time the misrepresentations were made and the time the truth was revealed." *Halliburton*, 563 U.S. at 811. A defendant can therefore "rebut the presumption and defeat class certification by demonstrating, by a preponderance of the evidence, that the misrepresentations did not actually affect" the stock price. *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023). This could include showing that the challenged statement "did not have an impact on market price or that the plaintiff was indifferent to the alleged misrepresentation." *Goldman*, 594 U.S. at 134 (Gorsuch, J., concurring in part).

The standard method that economic experts use to demonstrate lack of price impact in a securities class action is known as an "event study." *Goldman*, 77 F.4th at 86. "The methodology of event studies has been sustained by many circuits." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016). To conduct an event study, the expert creates a statistical model that "isolates the stock price movement attributable to" a specific event, "as opposed to market-wide or industry-wide movements." *Goldman*, 77 F.4th at 86 n.5. The expert uses this model to "examine[]," for each relevant disclosure, "whether the price movement on a given date is outside the range of typical random stock price fluctuations observed for that stock." *Id.* If the "stock price movement" on the date of an event "is indistinguishable from random price fluctuations," then the price impact "cannot be attributed to company-specific information announced on [that] date." *Id.*

Economic expert Professor Allen Ferrell performed an event study of this kind, as detailed in his report.[9] *See generally* Hudson Decl., Ex. 1 ("Ferrell Rep."). Professor Ferrell analyzed the movement of Alphabet's stock price at the time of Google's challenged statement and each of the five

---

[9] Professor Ferrell is the Greenfield Professor of Securities Law at Harvard Law School and a faculty associate at the Kennedy School of Government. Ferrell Rep. ¶ 1. He received his Ph.D. in economics from MIT, his J.D. from Harvard Law School, and his B.A. and M.A. from Brown University. *Id.* His Ph.D. dissertation concerned the relationship between stock prices and financial disclosures. *Id.* Professor Ferrell previously served as a member of the Board of Economic Advisors to FINRA. *Id.*

alleged "corrective" disclosures. *See id.* ¶ 46. To calculate statistical significance for each movement, he compared changes in Alphabet's stock price to market and industry-wide stock price movement, using an index of comparable companies. *Id.* ¶ 47. This enabled Professor Ferrell to "disentangle the effects" on Alphabet's stock price "of two types of information"—(1) "information that is specific to" Alphabet and (2) "information that is likely to affect stock prices marketwide." *Vivendi*, 838 F.3d at 253 (quoting Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases*, 49 Bus. Law. 545, 556–57 (1994)). After calculating the differential between industry-wide and Alphabet-specific stock movement, he evaluated the statistical significance of the remainder—also referred to as the "abnormal return"—to compute "whether, and the extent to which, the release of" information contained in the challenged statement or alleged corrective disclosures caused Alphabet's stock price to fall. *Id.*

Professor Ferrell's event study results prove that neither the challenged statement itself nor any of the subsequent disclosures impacted Alphabet's stock price, rebutting the *Basic* presumption.

## B. The Challenged Statement Had No Impact on Alphabet's Stock Price

If the alleged misstatement challenged by Plaintiffs "did not actually affect the market price" of a stock, investors' reliance on the market price is no longer an effective proxy for reliance on the challenged statement, and "the presumption drops from the case." *Goldman*, 594 U.S. at 131–32 (Gorsuch, J., concurring in part). That is the case here. As illustrated by Professor Ferrell's event study, no impact on Alphabet's stock price resulted when, on September 14, 2020, the challenged statement was made available to the market.[10] This is evident for at least two reasons.

*First*, Alphabet's stock price did not change by a statistically significant amount the day the challenged statement was first made public. Ferrell Rep. ¶ 55. Without a "statistically significant price increase" in Alphabet's stock "following [Google's] statements," there can be "no price impact." *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *8 (N.D. Cal. Dec. 5, 2017) (dismissing). Plaintiffs' own expert, Dr. Zachary Nye, did not find that Alphabet's stock price increased by a statistically

---

[10] The challenged statement was released after market close on September 14, 2020. The class thus should exclude purchasers of Alphabet stock before the time of its release. *See* Ferrell Rep. ¶ 27 n.67 ("I note that because the market had closed before the alleged misstatement was made on September 14, 2020, investors who traded beforehand, including during the trading day on September 14, 2020, could not have relied on the alleged misstatement because it had not occurred yet.").

DEFS' OPP. TO CLASS CERT.                    10
CASE NO. 3:23-CV-01186-RFL

significant amount between September 14th and 15th, 2020. *See* Nye Rep. Exs. 11B, at 1; 11D, at 1. Plaintiffs therefore may not rely on any *direct* inflation in Alphabet's stock price attributable to the challenged statement.

*Second*, further evidence of the lack of price impact can be gleaned from the market's reaction to the challenged statement: **utter silence**. *See* Ferrell Rep. ¶ 57. Professor Ferrell analyzed over 1,000 news articles and fourteen analyst reports covering Google and Alphabet published in the two weeks after publication of the challenged statement. *Id*. at n.107. No analyst or media outlet so much as mentioned the alleged misstatement. *Id.* ¶ 57. This silence is telling. As Professor Ferrell explains, the dearth of analyst commentary about the challenged statement confirms that it "lacked value-relevance to investors" in Alphabet. *Id.*

The market's nonreaction to Google's purported misstatement comes as little surprise when one considers its source—a dense, 58-page written submission to the House Judiciary Committee, of which the challenged statement represents only one sentence. *Supra* § B. The QFR Responses address over 80 multi-part questions regarding myriad issues. Hudson Decl., Ex. 6. The challenged statement is a single sentence of a single paragraph of a single answer to a single question. *See supra* § B. Its subject matter is narrower still; the statement describes how the winning bidder is determined in an auction conducted on Google Ad Manager. Hudson Decl., Ex. 6, at A-6. That this discrete, technical language had scant "value-relevance to investors," Ferrell Rep. ¶ 57, is readily understandable.

Plaintiffs themselves confirmed their indifference to Google's statement in depositions. Both AMI and Fort Lauderdale testified that they did not make *any* decisions regarding their holdings in Alphabet stock, let alone based on the challenged statement. Hudson Decl., Ex. 12, at 93:19–94:9; *id.* at Ex. 9, at 108:20–109:6, 151:23–152:6. Lead Plaintiffs went further, saying they were not familiar with Google's congressional testimony nor inclined, as a matter of practice, to track a portfolio company's congressional testimony beyond what was reported in "financial news." *Supra* § B.

C. **No Corrective Disclosure Had an Impact on Alphabet's Stock Price**

Because Plaintiffs cannot show direct price impact resulting from the challenged statement itself, they try a different tack, attempting to "prove the amount of inflation indirectly," using an "inflation-maintenance theory"—that Alphabet's "stock's price would have fallen" in the absence of

Google's "false statement." *Goldman*, 594 U.S. at 123. But this attempt, too, fails.

To show price inflation under such a theory, Plaintiffs need to (1) "point to a negative disclosure about [Alphabet] and an associated drop in its stock price," (2) "allege that the disclosure corrected [Google's] earlier misrepresentation," and then (3) "claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id*. Each link in this chain of inferences must withstand a "searching price impact analysis." *Goldman*, 77 F.4th at 102. Plaintiffs' inferential chain collapses immediately.

Each of Plaintiffs' alleged corrective disclosures is defective at every stage of the required sequence of inferences. For each one, Plaintiffs fail the very first prong of their inflation-maintenance theory because there is no "associated drop in . . . stock price." *Goldman*, 594 U.S. at 123; *infra* §§ I.C.1–5. Based on the results of Plaintiffs' own economic expert's event study methodology, not a single one of the five allegedly "corrective" disclosures led to a statistically significant decline in Alphabet's stock price. *Id.* Plaintiffs also fail the second prong, because they are unable to identify a single piece of information in any purportedly corrective disclosure "correcting"—or even remotely bearing on—the challenged statement regarding Google's ad auction technology. *Id*. Because the contents of Plaintiffs' purported corrective disclosures do not *match* those of the challenged statement, as the Supreme Court requires, *id.*, there is no basis for a claim that *any* alleged price drop reflects the challenged statement's alleged inflationary effect. *Goldman*, 594 U.S. at 123. Plaintiffs therefore fail the third prong, too. Without a market reaction to "corrective" information, "*Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Id*. at 119.

### 1. No Price Impact from the December 16, 2020 Republican State AGs' Lawsuit

***No statistical significance.*** Plaintiffs claim that the initial complaint filed by the Republican State AGs on December 16, 2020—which alleged that Google engaged in "anticompetitive practices, rigging of auctions, and controlling of pricing"—somehow revealed to the market the falsity of Google's statement regarding the channel-agnostic selection of winning bids in an auction conducted on Google Ad Manager. ¶ 260; *see also* Mot. at 9. Even if this were true (which Plaintiffs have not shown), it cannot prove price impact on its own.

As the term suggests, "price impact" requires a showing that the allegedly corrective effect of a

disclosure had an impact on the value of a stock's price. Proving such an impact would require Plaintiffs to show movement in Alphabet's "stock price . . . exceed[ing] the magnitude of 95% of movements that occur only by chance." Jill E. Fisch & Jonah B. Gelbach, *Power and Statistical Significance in Securities Fraud Litigation*, 11 Harv. Bus. L. Rev. 55, 57 (2021).[11] Absent statistical significance at "the conventional statistical measure of a 95% confidence level," there "is not sufficient evidence of a link between the corrective disclosure and the price" to show price impact. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (denying class certification).

Although "[s]tatistical significance . . . is essential to give meaning to statistical evidence," both Plaintiffs and their expert are silent as to the statistical significance of any decline in Alphabet's stock price following the State AG complaint. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *11 (N.D. Ohio Aug. 14, 2018). Professor Ferrell's analysis explains why: no statistically significant movement in Alphabet's stock price followed the State AG complaint. Ferrell Rep. ¶¶ 60–64. Professor Ferrell applied Dr. Nye's event study methodology,[12] to calculate an abnormal return of -1.61% for Class A and -1.51% for Class C. *Id.* ¶ 63. Because these values are 95% likely to be within the range of random market fluctuation, the abnormal return is not statistically significant. *Id.*; *see id.* ¶¶ 37–39 (describing calculations needed to compute statistical significance). The absence of statistical significance means that the stock drop "cannot be attributed to" any "company-specific information announced" by the State AG complaint. *Goldman*, 77 F.4th at 86 n.5.

*No confounding positive news.* In response, Plaintiffs may protest that the State AGs'

---

[11] Statistical significance at a 95% confidence level is required in the Ninth Circuit and beyond. *See Finisar*, 2017 WL 6026244, at *8–9 ("no price impact" where "challenged statements did not result in a statistically significant" stock price increase); *Dean v. China Agritech*, 2012 WL 1835708, at *7 (C.D. Cal. May 3, 2012) (without statistically significant "movement in the price of [defendants'] stock," "Plaintiffs have not satisfied their burden to show conclusive evidence of a causal relationship"); *Bratya SPRL v. Bed Bath & Beyond Corp.*, 752 F. Supp. 3d 34, 64–65 (D.D.C. Sept. 27, 2024) ("no price impact" where residual return was "not statistically significant" at 95% confidence level), *recons. denied*, 2025 WL 721770 (D.D.C. Mar. 6, 2025); *Stanaford v. Genovese*, 2016 WL 4198146, at *7 (S.D. Fla. Mar. 11, 2016) (denying class certification where "none of the disclosures had a corresponding, statistically-significant reaction of [the company]'s stock price."); *In re Concho Res., Inc. Sec. Litig.*, 2025 WL 1040379, at *11 (S.D. Tex. Apr. 7, 2025) (similar); *Erica P. John Fund v. Halliburton Co.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015) (similar).

[12] Professor Ferrell adopted Dr. Nye's methodology and applied one adjustment to the industry index model to which Dr. Nye compares fluctuations in Alphabet stock price. Ferrell Rep. ¶ 47 nn.91–92. That adjustment corrects for Dr. Nye's inexplicable exclusion of one of Alphabet's main industry peers, Meta. *Id.* Professor Ferrell also excluded the event dates at issue from his analysis to analyze the price impact of each one, which Dr. Nye did not do. *Id.* ¶ 47.

allegations had a negative impact beyond what is reflected in the net movement in Alphabet stock price. Making this argument, however, would require Plaintiffs to prove the existence of confounding positive information and determine the extent to which this positive information offset the actual negative impact of the State AGs' complaint. *See* Ferrell Rep. ¶¶ 61 n.111, 63. Plaintiffs and Dr. Nye do not quantify the effect of (or even identify) any positive confounding news. As Defendants' "direct, more salient evidence show[s]," the challenged statement "did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply." *Goldman*, 77 F.4th at 86.

*No market commentary regarding challenged statement.* Professor Ferrell also considered analyst reports published in the weeks following the State AGs' lawsuit. *See* Ferrell Rep. ¶ 62. Fewer than half of those published addressed the complaint's filing and none analyzed the allegations. *Id*. Within this body of market commentary, Professor Ferrell has not found a single reference to the challenged statement, or the alleged revelation of any fraud. *Id*.

Considering the extensive volume of market coverage that Alphabet receives, it would be truly remarkable for fraud on the scale Plaintiffs allege to have been so unremarkable to analysts in the aftermath of its supposed revelation. Plaintiffs make no effort to address this conundrum, nor does Dr. Nye. That Plaintiffs' economic expert cannot point to even one reference to the purportedly "corrected" statement in the analyst commentary is "largely dispositive" of the question of price impact. *Shupe v. Rocket Cos.*, 752 F. Supp. 3d 735, 779 (E.D. Mich. 2024). Analyst commentary that discusses a corrective disclosure without referring back to the challenged statement "cannot be enough" to support price impact. *Goldman*, 77 F.4th at 104; *see also In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *12 (S.D.N.Y. Mar. 29, 2024) (same).

*Statute of limitations.* The December 16, 2020 disclosure is defective for the additional reason that it occurred more than two years before Plaintiffs filed their complaint on March 16, 2023, exceeding the statute of limitations. 28 U.S.C. § 1658(b)(1). That alone warrants its exclusion from class treatment. *See Kreek v. Wells Fargo & Co.*, 652 F. Supp. 2d 1053, 1059 (N.D. Cal. 2009) (dismissing class allegations).

Plaintiffs' search for a stock drop, *supra* § I.C., explains the long gap between their initial "discovery of the facts constituting the violation" on December 16, 2020, and the complaint that

DEFS' OPP. TO CLASS CERT.                                      14
CASE NO. 3:23-CV-01186-RFL

followed more than two years later. 28 U.S.C. § 1658(b)(1). The market did not react to the initial "revelation" of any fraud in 2020, so to claim any recovery, Plaintiffs needed to bootstrap their claims to the more substantial stock drop that accompanied their last corrective disclosure—also more than two years later—on January 24, 2023. Yet Plaintiffs challenge a single statement, describing one function in the ad auction launched in 2019. *Supra* § I.B. An efficient market, such as Plaintiffs claim, should not take more than two years to determine whether the channel through which a bid was received did, or did not, affect the selection of the winning bid in Google's ad auction. *See* Mot. at 12–17. "Plaintiffs cannot have it both ways." *In re Redback Networks, Inc. Sec. Litig.*, 2007 WL 963958, at *4 (N.D. Cal. Mar. 30, 2007) (dismissing). Either the efficient market learned corrective news in December 2020 and did not react, or it did not learn of any alleged fraud before January 2023, if at all. In either case, there is no basis for class treatment of the December 16, 2020 corrective disclosure. *See Kirkland*, 2024 WL 1342800, at *10, *12 (denying class certification).

### 2. No Price Impact Resulted from September 1, 2021 Report of Potential DOJ Lawsuit

***No statistical significance.*** Plaintiffs allege that a September 1, 2021 Bloomberg article "reported that . . . a lawsuit" against Google by the DOJ "was imminent." ¶ 263. The change in Alphabet stock price following this disclosure was not statistically significant. Ferrell Rep. ¶ 66. Where there is "no statistically significant price" movement, there is "no price impact." *Finisar*, 2017 WL 6026244, at *8.

***No new or corrective information.*** Even setting aside that the price movement on this day was insignificant, the Bloomberg article also fails to support a finding of price impact because it presented no fresh information correcting the challenged statement.

Where an alleged misrepresentation has no perceptible impact on stock price at the time it was made, courts can in some cases still infer "front-end" price inflation by the misrepresentation, based on the "back-end" price impact of a subsequent corrective disclosure. *Goldman*, 594 U.S. at 123. In such cases, the drop in stock price following a disclosure that corrected an earlier misrepresentation (back-end impact) reflects the amount by which the price was originally inflated by the misrepresentation (front-end inflation). *Id.*

For a back-end drop to support an inference of front-end inflation, the corrective disclosure must have actually revealed that the challenged statement was false. *In re Fibrogen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) (citing *Goldman*, 594 U.S. at 121). No such revelation occurred here. The Bloomberg article did not even address the challenged statement, let alone reveal it was false. Hudson Decl., Ex. 30. Instead, the article highlighted the DOJ's history of regulatory scrutiny over Google and summarized the State AGs' complaint. *Id*. This stale information was neither "unknown to the market," *see supra* § I.C.1., nor "corrective of" the challenged statement. *Fibrogen*, 2024 WL 1064665, at *12. As a result, any back-end market reaction that occurred in the wake of the Bloomberg article's publication cannot support an inference of front-end price inflation.

*Mismatch*. Because there is no connection between the contents of the Bloomberg article and the challenged statement, this alleged corrective disclosure fails the matching requirement that the Supreme Court set forth in *Goldman*. *Goldman*, 594 U.S. at 123. Under *Goldman*, Plaintiffs cannot maintain their price impact theory where, as here, "there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id*. That is because an inference "that the back-end price drop equals front-end inflation" on which Plaintiffs' price maintenance theory depends, requires that the alleged corrective disclosure "actually corrected" the alleged misrepresentation. *Id*. at 125. *Goldman* plaintiffs alleged corrective disclosures that were too "specific" to correct the "generic statements" they challenged. *Id*. at 120, 122. The link between Plaintiffs' alleged corrective disclosures and the challenged statement is even more tenuous: the Bloomberg article has nothing to do with the challenged statement at all. *Supra* § I.C.1. Just as in *Goldman*, "expert testimony and . . . common sense" confirm that the Bloomberg article is not a useful indicator of the alleged "amount that [Alphabet's] stock[] price would have fallen without the false statement." 594 U.S. at 122–23. This reality "severs the link" between the alleged corrective disclosure and any alleged price inflation. *Id*. at 125.

The Bloomberg article did not impact the price of Alphabet stock. No statistically significant movement in Alphabet's stock price followed it, and no analyst mentioned the challenged statement in commentary following the DOJ press release. *Supra* § I.C.1; Ferrell Rep. ¶ 65. For good reason, the Court's MTD Order also did not credit this alleged corrective disclosure. MTD Order at 16–17.

Because the article "had no price impact," the presumption of reliance is "rebutted," and "the predominance requirement for class certification has not been met" as to the September 1, 2021 date. *Finisar*, 2017 WL 6026244, at *9.

### 3.  No Price Impact Resulted from the October 22, 2021 Unredaction

*No statistical significance.* Plaintiffs allege that the unsealing of certain portions of the Republican State AGs' complaint on October 22, 2021 was also a corrective disclosure. ¶ 80. Their expert concludes that a statistically significant drop in Alphabet's stock price occurred on this date. Nye Rep., Ex. 11A, at 7. To arrive at this conclusion, however, Plaintiffs needed to engage in a variety of contortions—all improper. Once these are stripped away, no statistical significant stock drop can be attributed to the State AGs' unsealed complaint.

Plaintiffs muddy the water by utterly ignoring an unrelated disclosure that caused market reverberations affecting Alphabet's stock price. Dr. Nye's report and the Motion neglect to mention that at 4:10PM on October 21, 2021, after the market had closed, Snap, Inc. disclosed that its revenues had been affected by "privacy changes implemented by Apple Inc. on iOS devices" that affected advertising metrics on iPhones. Ferrell Rep. ¶ 74. In the wake of this announcement, Snap "stock tumbled 27%, wiping out about $32 billion of" market value. Hudson Decl., Ex. 33, at 1.

The Snap news caused a wave of declines in stocks that, like Alphabet, relate to digital advertising. Analysts immediately linked the impact of Snap's first-mover announcement to other affected firms, noting that "Google-owner Alphabet Inc., Facebook Inc., Twitter Inc. and Pinterest Inc., [all] fell between 3% and 5% each" within hours of Snap's announcement. *Id*. Bloomberg noted that the market lost a total of $142 billion in under 24 hours in the "social-media selloff" that followed "Snap's [r]ecord [r]out." *Id*. at 1–2.

Analyst commentary explicitly recognized the decline in Alphabet's share price as having "more to do with Snapchat-parent Snap than the lawsuit." Hudson Decl., Ex. 34, at 1. One analyst explained that after years of antitrust exposure and heavy fines, "one more antitrust headline doesn't really move the needle . . . Wall Street certainly isn't all that worried about antitrust when it comes to Google." *Id*. at 1–2. Instead, many analysts agreed that "[t]he spillover from Snap's warning Thursday evening . . . is doing much more to pressure internet advertising stocks industrywide." *Id*. at 1.

The impacts of the Snap announcement are made especially clear when considering the intraday movement in the stock prices of companies it affected, which Dr. Nye failed to analyze. As Professor Ferrell's analysis illustrates, a substantial amount of activity took place between trading hours, after the post-market Snap announcement on October 21 and before the State AGs' unredacted complaint was filed at 9:00AM October 22, prior to the market opening at 9:30AM. Ferrell Rep. ¶ 75. Overnight, the most significant decline occurred between 4:00 and 4:30PM, after Snap filed its earnings. *Id*. In this timeframe, Alphabet stock dropped 2.6% for Class A and 2.5% for Class C. The pre-market movement from 8:59AM to market open the next morning was considerably less pronounced: in fact, Alphabet's stock price movements were 0% for Class A and 0.1% for Class C. *Id*. From market open to 10:30AM on October 22, Alphabet's stock price declined modestly by 0.2% for Class A and 0.6% for Class C. *Id*.

Dr. Nye's report makes no attempt to disaggregate the confounding effects of the Snap announcement on Alphabet's stock price. He merely notes that a drop of $4.32 occurred between close on October 21 and close on October 22. Nye Rep., Ex. 3B, at 6. But Dr. Nye cannot attribute value to the effects Plaintiffs allege without disaggregating them from the unrelated effects of the Snap announcement that same day. Ferrell Rep. ¶ 71–72. When compared with other affected firms, Alphabet's stock outperformed, recovering by market close on October 22 to just 2.8% below its value at market close on October 21, in contrast to drops ranging from 5% (Meta and Twitter, Pinterest), 9% (Trade Desk), and >25% (Snap). Analysts noted this comparatively strong performance, comparing Alphabet's 2.8% slide to "the biggest decliners . . . sinking more than 6% in postmarket trading." Hudson Decl., Ex. 31, at 1–2. After disaggregating the effect of the Snap announcement, the remaining stock price change of -1.21% for Class A shares and -1.22% for Class C shares is not statistically significant. Ferrell Rep. ¶ 79.

Professor Ferrell performed an additional layer of analysis to account for the outsized effects of the Snap announcement on companies impacted by changes to advertising revenue. *Id*. ¶ 78. He applied Dr. Nye's event study methodology to an index that included not only Meta, which Dr. Nye omitted, *see supra* § I.C.1., but also the other firms that experienced a strong reaction to the Snap

announcement. Ferrell Rep. ¶ 78. The resulting computation of abnormal price movement in Alphabet stock, of -1.2% for each class, is not statistically significant. *Id*.

*Mismatch.* The market's mild reaction to the unsealing of the Republican State AG complaint is unsurprising when considered with "a good dose of common sense." *Goldman*, 594 U.S. at 122. The market was unimpressed by the initial allegations of purported discrepancies in information, timing, and data usage in the ad auction. *Supra* § I.C.1. By the time the complaint was unsealed, the market had been aware of the State AGs' allegations for almost a year. *Supra* I.C.3. The market "[can]not be misled" by information it already knew. *Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996).

In addition to unsealed details about pre-existing allegations, the unredacted version does contain a handful of additional allegations. *See* Hudson Decl., Ex. 16. But neither these, nor the unredacted portions of prior allegations, convey anything new about the challenged statement. Plaintiffs insist, for example, that the unsealed complaint "revealed, among other things, the specific cut of the ad spending market that Google was able to extract using its improper conduct, and showed the portion of various digital advertising markets that Google controlled." ¶ 266. But Plaintiffs fail to explain how details about Google's marketshare—which may relate to its competitive position—are relevant here to a challenged statement discussing the technical functionality of its display ad auction. As Plaintiffs' observation illustrates, the only additional information the amended complaint provides, if any, are further details about Google and Facebook's auction "advantages"—the very same advantages already alleged by the prior sealed complaint. It is unclear how or why these additional details about existing allegations would elicit a market reaction, when the market did not react to the allegations about disparate advantages in the first place.

**4.  No Price Impact Resulted from the February 11, 2022 EPC Filing**

*No statistical significance.* On February 11, 2022, the European Publishers Council filed a non-public antitrust complaint against Google (the "EPC Complaint"). The EPC also issued two public-facing press releases in connection with their complaint: a 3-page executive summary and a short press release. No statistically significant movement in Alphabet stock price resulted, defeating price impact. Ferrell Rep. ¶ 84–85. Just like the September 1, 2021 Bloomberg article, the EPC

Complaint likewise cannot support price impact because (1) it conveyed no information about the challenged statement, and (2) its "contents" are therefore mismatched with the challenged statement's.

*Mismatch.* The market's non-reaction to the EPC Complaint is unsurprising considering that it was not publicly available. Plaintiffs have not offered any explanation of how non-public information could possibly have impacted the market's perception of the challenged statement's truthfulness. *See Halliburton*, 573 U.S. at 278 (information that "was not publicly known" "could not have distorted the stock's market price"); *Moody's*, 274 F.R.D. at 487 (corrective disclosure must be "some *public* statement . . . [that] reveals to the market the falsity of a prior representation"). Even the contents of the short public press releases announcing the EPC Complaint, which Plaintiffs do *not* claim as corrective disclosures, provide no reason to believe that the EPC Complaint's allegations had any bearing on the alleged falsity of the challenged statement at all.

For example, neither press release mentioned any of the alleged advantages. Hudson Decl., Exs. 23, 24. Neither addressed any allegations about the Network Bidding Agreement nor mentioned Facebook whatsoever. *Id*. Confirming the absence of any information relevant to the market, no news sources or analysts even discussed the *filing* of the EPC complaint. Ferrell Rep. ¶ 83 n.148 (describing analysis of over 1,000 articles and analyst reports published after the EPC complaint). The Court's MTD Order also declined to credit this alleged corrective disclosure. MTD Order at 16–17.

In *Goldman*, the Supreme Court rejected price impact for corrective disclosures whose contents were too specific to ground an inference of "front-end price inflation—that is, price impact," for a generic challenged statement. *Goldman*, 594 U.S. at 123. There, at least, one of those generic challenged statements *addressed* conflict of interest, while the overly-specific alleged corrective disclosure took the form of a purportedly conflicted transaction. *Id*. at 120. By contrast here, the EPC Complaint and the challenged statement are not just mismatched in their respective degrees of specificity: one simply contains no information related to the other. The mere fact that the EPC Complaint was filed does not even provide "contents" to compare to the challenged statement. *See id*. at 123. Because it did not convey any corrective information to the market, and the market had no perceptible reaction to it, the EPC Complaint and the challenged statement are "mismatch[ed]." *Id*. Any price impact inference therefore "break[s] down." *Id*.

DEFS' OPP. TO CLASS CERT.                                        20
CASE NO. 3:23-CV-01186-RFL

**5. No Price Impact Resulted from the January 24, 2023 DOJ Complaint**

*No statistical significance.* On January 24, 2023, the DOJ filed a new antitrust lawsuit against Google. *See* Hudson Decl., Ex. 17. Using Plaintiffs' typical method for assessing Alphabet's stock price movement—a one-day, close-to-close analysis—yields no finding of price impact. Between January 23 and January 24, the change in Alphabet's stock price was -1.85% for Class A shares and -1.73% for Class C shares, which is not statistically significant. Ferrell Rep. ¶ 90.

Seeking to avoid this result, Plaintiffs abandon their normal methodology. For this disclosure, exceptionally, they stretch their analysis over a two-day window. Only by analyzing the period between January 23 and January 25 can Plaintiffs claim that the purported continued impact of the DOJ filing led to a statistically significant decline in Alphabet stock price. ¶ 273. Neither Plaintiffs nor Dr. Nye provide an explanation for why a one-day period sufficed for other disclosures but not for the DOJ Complaint. Neither identifies special factors warranting a prolonged window of analysis.

Plaintiffs' approach is perplexing for an additional reason: it does not square with Dr. Nye's own conclusions about market efficiency. As Dr. Nye explicitly argues in his report, the market for Alphabet stock is efficient—and, therefore, should absorb information near-instantly. Claiming that the market needed two days to digest the DOJ Complaint runs contrary to that conclusion. To the extent Plaintiffs seek to infer price impact without a statistically significant price movement following the DOJ Complaint, the alleged inflationary effect of the challenged statement is non-existent.

*Mismatch.* The DOJ Complaint fails to support a finding of price impact because it did not reveal any new corrective information. *See* Hudson Decl., Ex. 17. In particular, the DOJ Complaint contained no new allegations related to the challenged statement. *See id*. Rather, it merely repurposed allegations from previous actions. *See id*. And as Plaintiffs themselves allege, the September 21, 2021 Bloomberg article already informed the market that the DOJ lawsuit was forthcoming. *Supra* § I.C.2. But the market did not react then, either. *Id*.

Because the DOJ Complaint does not reveal any new information related to the challenged statement, it fails *Goldman*'s matching requirement. *Goldman*, 594 U.S. at 123 (a corrective disclosure must "actually correct[]" the challenged statement to satisfy matching). Such a "mismatch between the" challenged statement and the DOJ Complaint "break[s] down" any inference that the DOJ

Complaint caused a "back-end price drop" equivalent to "front-end inflation." *Id.*; *see supra* § I.C.3. Any back-end drop that occurred upon its filing does not support an inference of front-end inflation. *Fibrogen*, 2024 WL 1064665, at *12 (citing *Goldman*, 594 U.S. at 121).

An alternative explanation tells a far more realistic story: To the extent the market reacted, it did so in response to an analyst report cautioning that the DOJ would consider breaking up Google's ad tech stack. *See Death by a thousand cuts: Regulatory pressures intensify*, BNP Paribas (Jan. 24, 2023). Plaintiffs unwittingly concede that this report, not the DOJ Complaint itself, is what caused the alleged stock drop. *See* ¶ 272. Unable to identify any new facts alleged in the DOJ Complaint, Plaintiffs were forced to acknowledge reality: the information that triggered the market reaction was the discussion of the DOJ's potential enforcement measures, including the "highly disruptive" possibility that the DOJ might "break[] up the AdTech stack." *Id*. The explanation that the market did not react to the DOJ Complaint itself is consistent with the fact that any stock drop was neither immediate nor statistically significant. Ferrell Rep. ¶¶ 89–93; *Finisar*, 2017 WL 6026244, at *7 ("An efficient market is said to digest or impound news into the stock price *in a matter of minutes*." (citing *Halliburton*, 309 F.R.D. at 269)). It is also consistent with the fact that each prior disclosure of regulatory risk failed to result in a statistically significant market reaction. *Supra* §§ I.C.1–2; Ferrell Rep. ¶¶ 61, 66, 78, 84, 90. And, as a matter of common sense, the possibility that the government would upend one of Google's core business products would explain a market reaction. *See id*.

\* \* \*

Plaintiffs' theory goes something like this: First, Alphabet decides to inflate its stock price by ~~burying~~ buoying false information in 58 pages' worth of responses to Congress. The market shows no reaction. Next, an assortment of AGs sue Google, in the process allegedly uncovering "advantages" in the display ad auction which reveal Google's prior statement was false. The market again does not react. Later, portions of the State AG complaint, which further detail the already-disclosed purported auction "advantages," are unredacted. On the same day, tech stocks fall industry-wide after Snap announces changes in iOS privacy policies that dramatically affect advertising revenue. Alphabet stock dips, too. Along the way, other announcements that regulatory bodies have accused Google of anticompetitive behaviour meet tepid market reactions. Over two years after the supposed false

statement was submitted to Congress, the DOJ files an antitrust complaint against Google, reprising many of the AGs' allegations. Even then, there is no statistically significant market reaction. Yet only then, Plaintiffs contend, is the fraud fully revealed! The market's absorption of public statements, made by the third-largest company in the world, then takes *five separate* alleged corrective disclosures, over *two years*. This far-fetched hypothesis is not only at odds with "a good dose of common sense"—it also contradicts the efficient market theory undergirding the fraud-on-the-market presumption upon which Plaintiffs rely. *Goldman*, 594 U.S. at 122; *see also* Nye Rep. ¶ 52.

The absence of price impact resulting from the challenged statement, or any corrective disclosure, defeats the presumption of reliance. *Goldman*, 594 U.S. at 119. Plaintiffs fail to prove predominance, and cannot carry their burden under Rule 23(b).

## II.    PLAINTIFFS CANNOT EVADE THE LACK OF PRICE IMPACT BY RECASTING THE CHALLENGED STATEMENT AS AN OMISSION

Unable to invoke the *Basic* presumption of reliance, *supra* § I, Plaintiffs try to eschew their obligation to prove predominance entirely by restyling the affirmative statement they challenge as an "omission." *See* Mot. at 18 (invoking, as an alternative to the *Basic* presumption, the exception for omissions established by *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)). This attempt fails. The Ninth Circuit expressly forecloses the *Affiliated Ute* presumption where, as here, the only alleged omission "is the truth that the statement misrepresents." *VW*, 2 F.4th at 1208.

Plaintiffs do not allege "primarily a failure to disclose," as would be required for the *Affiliated Ute* presumption to apply. *Affiliated Ute*, 406 U.S. at 153. Instead, Plaintiffs have consistently characterized the single remaining challenged statement as an affirmative misstatement. *See, e.g.*, ¶¶ 166–167 (challenging Google's affirmative statement); Mot. at 4, 10, 18 (describing the statement as a "misrepresentation"). The challenged statement positively represents that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder" in an auction conducted on Google Ad Manager. ¶ 166. Plaintiffs claim that this statement is untrue because "[t]he channel through which a bid is received" ***does***, in fact, "affect the determination of the winning bidder." ¶ 170; *see also* MTD Order at 10. In short, what Plaintiffs allege is a "positive [mis]representation"—not any failure to disclose. *Affiliated Ute*, 406 U.S. at 153.

To date, Plaintiffs identify no material information that the challenged statement failed to disclose. Nor have Plaintiffs amended their complaint to add an omissions theory. Yet now, at the class certification stage, Plaintiffs try for the first time to frame their claim as omissions-based, which would conveniently "make the presumption applicable." *VW*, 2 F.4th at 1204; *see* Mot. at 18. This transparent effort to fit the *Affiliated Ute* mold is unavailing. Anticipating end-runs of precisely this nature, the Ninth Circuit has confirmed that no exception is available where, as here, the purported "omission" is "simply the inverse of [an] affirmative misrepresentation." *VW*, 2 F.4th at 1208–09. For that reason, the *Affiliated Ute* exception is "unavailable" here. *Id.* at 1204–05.

## III. PLAINTIFFS FAIL THEIR BURDEN OF PROVIDING A CLASS-WIDE DAMAGES MODEL

Plaintiffs must also establish that "damages are susceptible of measurement across the entire class" to prove that common issues predominate. *Comcast*, 569 U.S. at 35 (citing Fed. R. Civ. P. 23(b)(3)). Doing so requires Plaintiffs to set forth a "model purporting to serve as evidence of damages in the [putative] class action" that "measure[s] *only* those damages attributable to [their] theory." *Id.* at 28, 35. Plaintiffs do not, nor can they. Instead of supplying the required model at all, Plaintiffs' expert merely posits, hypothetically, the proposed methodologies for a potential future model. Nye Rep. ¶ 68. That is insufficient. *Ward v. Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019). Dr. Nye's vague proposal illustrates that he cannot create a viable class-wide damages model applicable to the facts in this case. *See* Nye Rep. ¶¶ 68–72; Ferrell Rep. ¶¶ 93–96.

It is clear error to grant class certification when, as here, Plaintiffs have failed to meet the most fundamental of requirements of *Comcast*. *See Vizcarra v. Unilever United States, Inc.*, 339 F.R.D. 530, 554 (N.D. Cal. 2021). Courts have rejected proposed classes where, as here, plaintiffs fail to put forth a "viable class-wide" damages model. *See, e.g. Britton v. Servicelink Field Servs., LLC*, 2019 WL 3400683, at *6 (E.D. Wash. July 26, 2019) (denying class certification under *Comcast*); *Vizcarra*, 339 F.R.D. at 554–56 (same); *Shin v. Sanyo Foods Corp. of Am.*, 348 F.R.D. 447, 484–85 (C.D. Cal. 2025) (denying class certification due to hypothetical damages model); *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (similar); *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231 (N.D.

Cal. 2014) (similar).[13] Dr. Nye's brief overview of what a potential model he "would be able to develop . . . at some point in the future" *would* do is insufficient to carry Plaintiffs' burden. *Apple*, 784 F. App'x at 540.

Plaintiffs cannot prove predominance "[m]erely [by] gesturing at a model" for calculating damages. *Shin*, 348 F.R.D. at 484. Yet that is exactly what Dr. Nye does. At best, his cursory gesture towards the "methodologies [he] *would propose* to use," Nye Rep. ¶ 68, "describ[es] a general method" for calculating damages, *Shin*, 348 F.R.D. at 484. That "will not suffice." *Id*.

Dr. Nye cannot "demonstrate that the proposed method will be viable as applied to the facts of" this case for the same reasons that Plaintiffs cannot support reliance: there is no statistically significant stock price movement attributable to any corrective disclosure date. *Shin*, 348 F.R.D. at 484; *see* Ferrell Rep. ¶¶ 94–98; *see also supra* § I.C. Dr. Nye's proposed methodology for calculating damages on each of the same alleged corrective disclosure dates depends on the same event study model that shows there is no price impact on any one of them. Nye Rep. ¶ 70; Ferrell Rep. ¶¶ 61, 66, 78, 84, 90. Dr. Nye also does not even attempt to explain how his proposed model could "isolate the premium attributable only to the alleged misleading . . . statement" without a statistically significant stock price movement to begin with. *See* Nye Rep. ¶¶ 68–73; *Vizcarra*, 339 F.R.D. at 554. "Class certification can be denied under *Comcast*" on this basis. *Vizcarra*, 339 F.R.D. at 554.

Plaintiffs' "promise of a model to come" does not satisfy *Comcast*'s imperative. For this additional and independent reason, class certification is not appropriate and must be denied.

## CONCLUSION

Defendants respectfully request that the Court deny class certification.

---

[13] Courts in other circuits do the same. *See, e.g.*, *Omori v. Brandeis Univ.*, 673 F. Supp. 3d 21, 26 (D. Mass. 2023) (denying class certification under *Comcast*); *Fleming v. Select Portfolio Servicing*, 342 F.R.D. 361, 367 (D. Mass. 2022) (same); *Kronenberg v. Allstate Ins. Co.*, 743 F. Supp. 3d 465, 500 (E.D.N.Y. 2024) (same); *Sicav v. Jun Wang*, 2015 WL 268855, at *4, *6 (S.D.N.Y. Jan. 21, 2015) (same); *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 710 F. Supp. 3d 1090, 1112 (D. Utah 2023) (same); *Payne v. Tri-State CareFlight, LLC*, 328 F.R.D. 601, 628 (D.N.M. 2018) (same); *Abraham v. WPX Energy Prod.*, LLC, 322 F.R.D. 592, 623 (D.N.M. 2017) (same); *Oztimurlenk v. United States*, 162 Fed. Cl. 658, 693 (2022) (same).

Dated: January 13, 2026

FRESHFIELDS US LLP

By: */s/ Doru Gavril*
        Doru Gavril

*Attorneys for Defendants*

DEFS' OPP. TO CLASS CERT.                    26
CASE NO. 3:23-CV-01186-RFL