# EXHIBIT 13

Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| GRAND ATLAS TOURS, SUREFREIGHT GLOBAL LLC DBA PRANA PETS, and HANSON LAW FIRM, PC, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC and ALPHABET INC., <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT
CASE NO.

Plaintiffs, on behalf of themselves and all others similarly situated, bring this class action for treble damages and equitable relief under the Sherman Act, 15 U.S.C. § 2, and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*.

## I.   SUMMARY OF THE ACTION

1.   Search-engine giant Google has through unlawful means acquired and maintained a monopoly in digital advertising markets.  Over the past several years, Google leveraged its stranglehold on online search and search advertising to gain an illegal monopoly in brokering display advertising on other companies' websites.  Google achieved this market dominance in part by acquiring rivals in the online advertising space, conditioning access to its search-results data and YouTube video advertising platform upon the purchase of its separate display advertising services, and ensuring those systems were not compatible with those of its competitors in online advertising.

2.   Because of Google's pervasive monopoly conduct, companies who wish to place online advertisements have little choice but to pay Google for its advertising services.  The result of Google's extraction of monopoly rents has been higher advertising prices, higher consumer prices, lower payments to publishers of online advertisements, and reduced competition in the purchase and placement of online advertisements.

3.   Like the other class members, Plaintiffs dealt directly with Google in its capacity as digital advertising broker, having placed online advertisements using Google's services.  Plaintiffs, like the other class members, overpaid or otherwise suffered economic losses due to Google's monopolization of these markets, and therefore sue for damages and appropriate injunctive relief.

## II.   JURISDICTION AND VENUE

4.   This Court has original jurisdiction over Plaintiffs' federal antitrust claim under the Clayton Act, 15 U.S.C. § 15.  The Court also has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendants, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

5.   Venue is proper in this District under 28 U.S.C. § 1391.  Google's principal place of business is in this District, and it regularly conducts business here.  A substantial part of the events

CLASS ACTION COMPLAINT
CASE NO.

giving rise to Plaintiffs' causes of action occurred in or emanated from this District.

6.      Assignment to the San Jose Division is appropriate under Local Rule 3-2(c) because a substantial part of the conduct at issue in this case occurred in Santa Clara County.

## III.   PARTIES

### A.   Plaintiffs

7.      Plaintiff Grand Atlas Tours is a private guided tour business based in Washington, D.C. Grand Atlas purchased digital advertising directly from Google during the class period.

8.      Plaintiff Surefreight Global LLC DBA Prana Pets is an herbal remedy company based in Delray Beach, Florida.  Prana Pets purchased digital advertising directly from Google during the class period.

9.      Plaintiff Hanson Law Firm, PC is a law firm based in San Francisco, California.  Hanson Law purchased digital advertising directly from Google during the class period.

### B.   Defendants

10.      Google LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Mountain View, California.  Google LLC is a technology company that provides internet-related services and products, including online advertising technologies and a search engine.

11.      Alphabet Inc. is a corporation organized under the laws of Delaware with its principal place of business in Mountain View, California.  Google LLC is a wholly-owned subsidiary of Alphabet.

12.      Google LLC and Alphabet Inc. are collectively referred to herein as "Google."

## IV.   FACTUAL ALLEGATIONS

### A.   Overview of Digital Advertising

13.      Businesses have long relied on advertising to promote their products, generate brand awareness, and increase sales.  While television, radio, and print advertising enabled businesses to reach broad audiences, the internet now allows them to target potential customers with greater precision, significantly increasing the effectiveness of advertising.

14.      Digital advertising is the promotion of products and services via the internet through

2

CLASS ACTION COMPLAINT
CASE NO.

search engines, websites, social media, and other platforms that can be accessed online.  Digital advertising is now the fastest growing segment of the advertising business in the United States.  More than half of all advertising money in the United States is now spent on digital advertising—approximately $129 billion in 2019.

15.    Digital advertising comes in two main forms: search advertising and display advertising.

16.    Search advertising, which accounts for more than half of the U.S. digital advertising market, is the advertising that appears on the results page after a user runs a search on a search engine.  On Google Search, these ads appear as text immediately above or below the actual or "organic" search results.

17.    Search advertising is designed to reach consumers who have already shown an interest in purchasing a product or service and may be close to making a purchasing decision.  Because it allows for a more targeted audience and an advertiser only pays when a user clicks on their ad, search advertising is especially attractive for local and small businesses not seeking to reach a broad audience and businesses with a limited advertising budget.

18.    If, for example, a citizen finds himself locked out of his house and searches for nearby locksmiths on Google Search, search advertising will place ads for local locksmith services above the organic search results.  Search advertising also appears on other Google platforms, such as Google Play and Google Maps, and on other search platforms, such as Microsoft's Bing search engine.

19.    Display advertising, in contrast, is the advertising that appears alongside content on websites themselves.  Unlike search advertising, which is generally limited to text, display advertising comes in many forms, including banners, images, and videos.  Visitors to popular websites such as the *New York Times* or Reddit will typically see multiple display ads placed on designated spaces on a web page.

20.    The key to effective display advertising is ensuring that an advertiser's products or services are placed on websites likely to be viewed by the advertiser's target audience.  A running shoe company, for instance, would prefer to have its advertisements appear on sporting goods websites as opposed to websites selling car parts.  Display advertising comprises about 40% of the digital

3

CLASS ACTION COMPLAINT
CASE NO.

advertising market, and many web publishers rely on display advertising for a major source of their revenue.

21. Unlike search advertising, display advertising does not require a user to actively search for a similar product or service. Its primary purpose is not to generate immediate sales, in the manner of search advertising, but instead to raise brand awareness and reach new audiences.

22. Because search advertising and display advertising serve different purposes in influencing a consumer's purchasing decisions, advertisers do not regard them as substitutes for each other.

**B.      Google Dominates Both Search and Display Advertising Services Online**

23. Digital advertising accounted for more than 70% of Google's revenue in 2018. Google is the dominant supplier in the search advertising market and has moved rapidly to control all stages of the display advertising market.

24. The amount of revenue Google earns from digital advertising is a function of the number of ads it sells, the price of those ads, and Google's percentage margin, also known as the "take rate"—i.e., the differential between what an advertiser pays for an ad and what the publisher of the ad receives. When an ad is viewed through a third-party publisher (such as the *New York Times* website), Google must pay the publisher a share of the amount the advertiser paid for placing the ad. Google's take rate as an intermediary is typically 40%, but when the traffic is entirely generated through a Google product, such as Google Search or YouTube, Google keeps the entire price of the ad.

25. Google therefore has a strong incentive to increase the number of ads placed on its proprietary sites, to charge advertisers higher prices, and to pay as little as possible to publishers displaying ads placed through Google on their own websites.

**1.      Search Advertising**

26. As the owner of the dominant online search platform, Google is by far the largest supplier of digital search advertising in the United States. Over the last ten years, Google's share of the digital search advertising supply has ranged between 89% and 93%.

27. Google makes space on its search result pages available to advertisers through an auction process that occurs each time a user runs a search. Google starts the auction by first finding all

4

the ads with keywords matching the search. It then excludes ads that are considered ineligible based on certain criteria, such as country restrictions. Google then only displays ads with a sufficiently high "rank" based on a combination of factors, such as the advertiser's bid, the quality of the ad, user location, and the device the user is using. Because the auction process is repeated for every search performed on Google Search, different auctions may lead to different advertisements being displayed.

28. Although Google claims that it prices its search advertising through an auction, Google controls (and frequently raises) the price of its search advertising by setting a high reserve price. Doing so enables Google to directly set the price of its search advertisements because an ad will not sell unless its price meets or exceeds the reserve price, which thus operates as a floor. A majority of the winning bids for Google Search ads are at the reserve price.

### 2. Display Advertising

29. Google is also a major supplier of display advertising and owns multiple products that supply it. YouTube, owned by Google, alone accounts for about 10% of the supply of display advertising. Other major Google products, such as Google Maps and Google Play, also offer display advertisements.

30. Suppliers of display advertising are commonly known as publishers. Publishers employ third-party tools to find advertisers and sell advertising space available on their own websites.

31. Display advertising suppliers employ technology called publisher ad servers (PAS) to accept, store, and manage ads, choose where and when ads appear, and track the effectiveness of advertising campaigns. The placement of ads is typically determined based on bids from advertisers and any arrangements publishers may have with advertisers. Publishers also rely on supply side platforms (SSPs) to run auctions, interface directly with their demand side equivalents, and optimize their available inventory.

32. The demand side is comprised of advertisers and media agencies running advertising campaigns for businesses. These entities use advertiser ad servers (AAS) to store ads, deliver them to publishers, and record transactions. Advertisers also employ demand side platforms (DSPs) to purchase digital advertising by bidding in auctions and to manage their bids.

33. Together these services comprise what is known as the "ad tech stack." Until fairly

5

CLASS ACTION COMPLAINT
CASE NO.

recently, different firms provided the various services in the ad tech stack. Publishers must either sell their available display supply through the ad tech stack or by dealing directly with advertisers.

34. By connecting publishers and advertisers, an ad stack provider functions as an intermediary in the display advertising market. In the past, publishers like newspapers relied on intermediaries to connect them with advertisers, and these intermediaries did not own the publisher or the advertiser. But that is no longer the case in the display advertising market—Google now dominates and controls the ad tech stack after a series of acquisitions of smaller firms. Since 2007, Google has made at least nine acquisitions in the interest of gaining control of the entire ad tech stack.

35. On the supply side, Google now holds at least 90% of the PAS market through multiple products such as Google Ad Manager and Google DoubleClick for Publishers (the latter of which Google acquired in 2008). Google's AdX product alone holds approximately half the SSP market.

36. Likewise, on the demand side, Google controls a substantial majority of the DSP market (reportedly over 62%), and it also holds a substantial share of the AAS market.

37. In addition to these products, Google also offers a product known as Ads Data Hub (ADH). This product allows advertisers to view data from ad campaigns, see which users were reached by search advertisement campaigns, and combine the data with internal or third-party data to set or adjust display advertising strategy. Google imposes restrictions, however, on advertisers' ability to use this data, which can only be sent to another Google service and cannot otherwise be exported.

38. By consolidating key portions of the ad tech stack for display advertising, Google can now readily broker transactions on both sides of the display advertising market and steer advertisers to its own display supply platforms, such as YouTube.

39. In addition, advertising is more effective when it displays products or services a user is likely to want. Accordingly, information about the user, including gender, age, location, and browsing history, influences not just the types of ads a user will see but also the price that advertisers are willing to pay for an ad. Google has an enormous advantage over advertisers and publishers due to the sheer volume of information it obtains about consumers through its extensive products and services. This data includes browsing history from Google Search and Google's Chrome web browser and location data from Google Maps, Waze, and its Android operating system embedded in hundreds of millions of

6

CLASS ACTION COMPLAINT
CASE NO.

smartphones. As former CEO Eric Schmidt boasted, "We know where you are. We know where you've been. We can more or less know what you're thinking about."

40. As described below, Google's acquisitions and its access to every level of the display advertising service industry have enabled it to eliminate competition through a variety of anticompetitive policies and activities.

41. Because of Google's near-complete market dominance, publishers and advertisers have little choice but to use Google's display advertising services.

42. Nexstar Media Group—the largest local news company in the United States—tested what would happen to its business if it stopped using Google's technology to place ads on its websites. In just a few days, Nexstar saw a drastic decline in its video ad sales, causing what it described as a "huge revenue hit." Nexstar promptly switched back to using Google's display advertising services.

**C.** **Google Uses Its Dominance in Search Advertising and Other Products to Create and Maintain a Monopoly for Display Advertising Services**

43. Google operates the default internet search platform in the United States; at least 90% of all internet searches are conducted through Google Search. Consequently, Google is the dominant source for search advertising. Companies seeking to promote their products or services online are *de facto* required to purchase search advertising space from Google. Google has taken advantage of this dominance in the search advertising market to drive out competition in the separate market for display advertising services.

44. When a Google Ads account is established for use in placing search advertisements, Google Ads is set as the default account for placing both search and display advertisements. And to disadvantage rivals, Google restricts access to data concerning web searches performed on Google Search. When consumers run Google searches, Google collects and retains data related to the searches. DSPs and advertisers use this information to craft more effective advertising campaigns. Google, however, withholds this information from rival DSPs and advertisers using rival service providers. The result of this policy is that, in order to gain access to the search data over which Google has monopoly control, an advertiser must agree to use Google's products in the separate display advertising services market.

7

CLASS ACTION COMPLAINT
CASE NO.

45.     Google similarly uses its dominance in the video-ad publishing market segment to coerce advertisers to use Google's display advertising services.  Google-owned YouTube runs up to 50% of all video display ads not appearing on Facebook and Amazon.  After Google purchased YouTube, it initially made YouTube's inventory of display advertisements available to any advertising service provider.  But in 2015, Google prevented non-Google advertising service providers from purchasing advertising space on YouTube.  As a result, if an advertiser wants to purchase any of the valuable advertising space on YouTube, it must use Google's advertising services and cannot use any of Google's rivals' advertising services.  The *Wall Street Journal* depicted this coercive arrangement in the following graphic:



One rival described Google's requirement that Google services be used to place ads on YouTube as "the beginning of the end," noting that "Google used its monopoly on YouTube to put its hand on the scale" unfairly.

CLASS ACTION COMPLAINT
CASE NO.

46.     Google's leveraging of its position in forums in which it is the dominant ad publisher restrains competition with an enhanced effect because advertisers generally use a single DSP for an entire advertising campaign.  If an advertiser wished to advertise on YouTube, Google Search, *and* other publisher websites, the advertiser would bear significant costs and inefficiencies from selecting a different advertising service provider to broker distribution of the ad campaign into each forum.  Thus, by conditioning advertisers' access to Google's search data and YouTube's advertising platform on their purchase of Google's advertising services, Google also effectively forces advertisers to use Google for all aspects of their campaigns.

**D.      Google Created and Has Maintained its Monopoly for Display Advertising Services by Restricting the Ability of Rivals to Compete on Equal Footing**

47.     Google has engaged in a number of anticompetitive practices to disadvantage its rivals and cement its dominance in the display advertising services market.

48.     For instance, using Google's ad server, DoubleClick for Publishers, has long been the only way to obtain full access to Google's AdX exchange.  Such access is critical for many publishers because AdX connects to AdWords, and the ability to access AdWords greatly increases publishers' access to advertisers as a result of Google's dominance in search.  As the *Wall Street Journal* reported, "[f]or many years, Google's AdX was the only ad exchange that had access to" Google's AdWords platform and its many advertisers.  Thus, for example, when News Corp considered switching from Google to a different company to facilitate its ad-serving business, it reportedly "felt it would jeopardize the 40% to 60% of advertising demand it gets from Google's ad marketplaces . . . ."  According to the *Journal*, Google in 2018 merged DoubleClick for Publishers and AdX "into a single product called Google Ad Manager, making it plain to the industry that they are indeed linked . . . ."  Hence, Google used its dominance in search advertising to pursue a monopoly in display advertising.

49.     Moreover, a primary monopolistic practice that Google employs is denying interoperability, i.e., the ability of its advertising service systems to interface with the systems of rival advertising service providers.  While Google has publicly claimed that publishers can "mix and match technology partners," that is false in several important respects.

50.     Google, for example, denies interoperability with its rivals to squelch competition that

CLASS ACTION COMPLAINT
CASE NO.

would otherwise occur within Google's SSP system. When accepting bids from advertising services, Google's SSP is designed to operate more efficiently with Google's own advertising service. Although Google's SSP can accept bids from non-Google advertising services, Google's SSP is inefficient at processing those bids, and they are therefore disadvantaged as compared to bids submitted by Google's own advertising service.

51. Another example of Google's exclusionary conduct involves technology called header bidding, a system that directly competes with Google's own display advertising exchange. Google prevented its systems from working with the code that publishers generally placed on their websites to enable header bidding. The result of this lack of compatibility was that the publisher would first notify non-Google exchanges and the winning bid would be sent to Google as if it were a pre-existing contract price. Thus, instead of submitting a blind bid to the publisher for how much the publisher would be paid to place an ad on its website, Google would separately receive the bids submitted by *other* service providers and then submit its *own* bid, knowing the minimum price it would need to outbid its rivals. This rigging gave Google a distinct advantage over its rivals because, unlike Google, they would need to submit aggressive bids to ensure their bid was the most attractive—and even then Google could outbid them to win display advertising business. Moreover, because Google would need to beat the prices of existing bids, Google's interoperability strategy caused online advertising prices to increase.

52. Google's rivals lacked Google's market dominance, and they thus could not make their systems incompatible with header bidding as Google did. Had they done so, a publisher simply would not have received bids from them. Even after Google permitted non-Google service providers to integrate with Google's "Open Bidding" system, it charged the winning bidder 5-10% of the winning bid to do so, which increased the costs to Google's rivals of merely attempting to compete with Google. And when Google launched its Accelerated Mobile Pages, or "AMP," it made the pages incompatible with client-side header bidding, thereby forcing publishers to use Google's Open Bidding system. Google further discouraged header bidding by refusing to provide bidders with the "minimum bid to win" information it provided to other bidders who used its Open Bidding system.

10

CLASS ACTION COMPLAINT
CASE NO.

**E. Google Engages in Various Other Forms of Anticompetitive Conduct**

53. Google also routinely engages in other anticompetitive conduct such as hiding key market information from publishers, advertisers, and potential competitors, and designing auctions to entrench its market dominance and drive up costs for its rivals.

54. As discussed above, Google has ready access to enormous amounts of consumer data. At the same time, it has acted to make it harder for its competitors to obtain similar information. In early 2020, for instance, Google announced that it would "phase out" third-party cookies that helped advertisers target consumers based on demographics, past browsing history, and other information. Without third-party cookies, it is much harder for advertisers and competitors to efficiently bid on ads. That is not true for Google, which continues to have other sources for gleaning robust data on consumers.

55. Similarly, in 2016, Google launched AMP for the stated purpose of loading web pages faster on mobile devices. But while AMP pages are listed first in a search, encouraging publishers to use them, the pages are *Google* pages—meaning publishers are unable to gather data about their own users.

56. Google refuses to disclose even basic information to other participants in the ad tech stack, causing market-distorting inefficiencies that further solidify its grip on digital advertising. Google fails to consistently provide information about the performance of ads on its platforms, such as how many impressions are shown to actual users, as opposed to bots. This failure prevents advertisers from knowing if they are wasting some of their ad spend. Google also refuses to disclose basic information about the fees it collects along the ad tech stack, making it harder for publishers to negotiate with advertisers, and for potential competitors to compete with Google. Google likewise removed time-stamp information on bids, which publishers had used to optimize their own pricing.

**F. Government Investigations into Google's Monopolistic Activities**

57. In July 2019, the U.S. Department of Justice announced that it had opened an investigation into whether Google is committing illegal monopolistic acts. The DOJ stated that its probe would focus on whether and how Google and other leading online platforms "have achieved market power and are engaging in practices that have reduced competition, stifled innovation, or

11

CLASS ACTION COMPLAINT
CASE NO.

otherwise harmed consumers."

58. In September 2019, 48 state attorneys general, led by Texas Attorney General Ken Paxton, disclosed their own probe into whether Google is violating the antitrust laws. In announcing the investigation, Paxton referred to "evidence that Google's business practices may have undermined consumer choice, stifled innovation, violated users' privacy, and put Google in control of the flow and dissemination of online information."

59. On May 15, 2020, the *Wall Street Journal* reported—based on information from "people familiar with the matter"—that both the DOJ and the state attorneys general likely will file antitrust lawsuits against Google as soon as the summer and are well into planning for such litigation. The *Journal* reported that "all signs point toward [the DOJ] bringing a case" and that "[m]uch of the states' investigation has focused on Google's online advertising business. The company owns the dominant tool at every link in the complex chain between online publishers and advertisers."

60. Google has also faced regulatory action in Europe. The European Commission fined Google $2.7 billion in 2017 for rigging search results to favor its own online shopping portal and $1.7 billion in 2019 for dictating to other websites how they can display search results from Google's competitors.

61. In December 2019, France's competition authority fined Google $166 million following a lengthy investigation into Google's online advertising practices. France sanctioned Google for adopting "opaque and difficult to understand" rules for its ad platform and for applying them in an "unfair and random manner." According to *TechCrunch*, the French governing body also found that "another element of Google ad rules could lead sites to favor a content policy aligned with its own ad-funded services—thereby pushing online publishers to adopt an economic model that deeds and benefits its own." The French governing body summarized its bases for fining Google as follows:

> [T]he French Competition Authority considers that the Google Ads operating rules imposed by Google on advertisers are established and applied under non-objective, non-transparent and discriminatory conditions. The opacity and lack of objectivity of these rules make it very difficult for advertisers to apply them, while Google has all the discretion to modify its interpretation of the rules in a way that is difficult to predict, and decide accordingly whether the sites comply with them or not. This allows Google to apply them in a

12

CLASS ACTION COMPLAINT
CASE NO.

discriminatory or inconsistent manner. This leads to damage both for advertisers and for search engine users.

## V. INTERSTATE TRADE AND COMMERCE

62. Google's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

63. At all material times, Google participated in the marketing, promotion, distribution, and sale of publication and advertising services for display advertisements in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

64. Google's conduct also had substantial intrastate effects in that, among other things, Google's publication and advertising services for display advertisements were sold in each state, including California. At least thousands of individuals in each state, including California, were impacted by Google's anticompetitive conduct. As alleged below, absent Google's unlawful conduct, Plaintiffs and class members within each state, including California, would have paid less for digital advertising services.

## VI. RELEVANT MARKET

65. Google's anticompetitive conduct has restrained competition in the market for digital advertising services (encompassing the overall process that connects advertisers and publishers, including Google) as well as in several distinct markets within this larger market.

66. Google is the dominant provider of online search and search advertising in the United States—roughly 90% of internet searches are performed on Google's search engine—and used its dominant position in those markets to restrict competition in the market for search advertising services. Google also has established itself as the dominant provider in the broad market for display advertising services (encompassing all of the various steps that are necessary to facilitate placement of digital advertisements into the available supply of display advertising space made available by publishers).

67. The display advertising services market contains distinct components, such as advertising services and platforms, and publishing services and platforms, and Google has wielded its market power to integrate each such component into a single set of bundled services and to prevent or

13

CLASS ACTION COMPLAINT
CASE NO.

discourage competitors (i.e., other display advertising service providers), publishers, and advertisers from selecting advertising service providers on a component-by-component basis. In short, Google's anticompetitive activity has frustrated the ability of each segment of the display advertising services process to function as a free and independent market.

68. Google has also monopolized each of the relevant submarkets of the overall market for digital advertising services, including the broader markets for search advertising services and display advertising services, and the subsidiary markets for publisher ad servers, supply side platforms, demand side platforms, and advertiser ad servers. Its conduct had the intent and effect of suppressing competition in the search and display advertising services markets as well as in each of their component submarkets.

69. There are no reasonable substitutes for search advertising services or display advertising services, respectively. While an advertiser may connect directly with a publisher to negotiate the placement of advertisements onto the publisher's supply of advertising space, for the vast majority of advertisers and publishers doing so is impractical. Aside from the limited circumstances in which publishers and advertisers negotiate directly, publishers and advertisers must use third-party display advertising services.

70. There are high barriers to entry for both the search advertising services market, the display advertising market, and the component display advertising submarkets. Entering any of these markets requires a substantial investment to develop and implement the technology necessary to compete. Google's conduct, such as leveraging its internet search platform dominance and denying interoperability in several respects, as described above, has made it exponentially more difficult for would-be market participants to effectively enter these markets and compete with Google. Google has accordingly used its market dominance to ensure that market entry by would-be competitors is infeasible. And Google's conduct has made it impractical for existing market participants to compete, which has resulted in large numbers of companies exiting the relevant markets.

71. The digital advertising services markets are distinct from the market for advertisement inventory—i.e., the spaces on websites that publishers make available for advertisers to purchase. At least thousands of companies act as publishers with display advertisement inventory, but in general,

14

CLASS ACTION COMPLAINT
CASE NO.

these companies do not offer the services that facilitate placement of advertisements into the supply of display advertising space. Only a few companies—Google chief among them—provide display advertising services.

72. Although Facebook and Amazon also display a large amount of advertising content, they do not operate in the same display advertising services market as Google. The display advertising services Google provides *connects* independent entities—advertisers and publishers. In other words, advertisers use display advertising services to gain access to a range of publication options. And publishers, in turn, use display advertising services to access a range of potential advertisers. Google operates in an open-ended market in which it facilitates the transactions between advertisers and publishers. Companies like Facebook and Amazon, by contrast, have their own close-ended in-house display advertising systems that they use to publish advertisements on their websites. Those services are not available to other publishers, and an advertiser wishing to advertise on websites other than Facebook and Amazon would need to use an open-ended display advertising service like Google's. The close-ended advertising services offered by Facebook and Amazon are not, therefore, reasonable substitutes for the open-ended system that Google offers.

## VII. ANTITRUST IMPACT

73. The purpose and effect of Google's conduct was to forestall competition in the relevant markets. Absent Google's conduct, each component of the digital advertising market would have been more competitive and class members would have financially benefited from the increased competition.

74. More vigorous competition would have benefited both the advertisers and the publishers that use digital advertising services.

75. Firms that provide digital advertising services make money in a variety of ways, including by retaining the difference between (1) what an advertiser pays the provider to place ads, and (2) the portion of that payment that the provider remits to a publisher for placing the ads on its website. With increased competition, advertisers would have paid less to have their ads placed, and publishers would have received more for placing the ads on their websites. But with Google stifling competition and extracting monopoly rents as the dominant intermediary, both advertisers and publishers lost money. As the antitrust economist Fiona Scott Morton recently explained:

15

> If advertisers had more choices in the but-for world about where and through whom to place their ads, they would not continue to give their business to Google in the face of an overcharge. Google would have to choose between losing advertisers' business to rivals whose auctions were fair, or adopting an auction design that generated competitive (lower) prices for advertisers.

The decrease in competition caused by Google's conduct has thus harmed Plaintiffs and class members in their business and property because advertisers have paid more than they otherwise would have and publishers have been paid less than they otherwise would have.

## VIII.  TOLLING OF THE STATUTE OF LIMITATIONS

### A.  The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

76.  Plaintiffs and class members had no knowledge of Google's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

77.  Plaintiffs and class members paid for digital advertising at artificially inflated prices or otherwise suffered economic loss as a result of Google's wrongful exercise of monopoly power in the relevant market.  Other than dealing directly with Google when using its digital advertising services, Plaintiffs had no direct contact or interaction with Google and had no means from which they could have discovered its wrongful conduct.

78.  Throughout the class period, and continuing thereafter, there was no information in the public domain sufficient to put Plaintiffs and class members on notice that Google had wrongfully acquired a digital advertising monopoly or was using its monopoly power to charge supra-competitive digital advertising prices.

79.  It was reasonable for Plaintiffs and class members not to suspect that Google was engaging in any unlawful anticompetitive behavior.

80.  Plaintiffs allege a continuing course of unlawful conduct by Google, including conduct within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

81.  For these reasons, the statutes of limitations applicable to Plaintiffs' and class members'

16

CLASS ACTION COMPLAINT
CASE NO.

claims have been tolled with respect to the claims asserted herein.

**B.      Google's Fraudulent Concealment Tolled the Statute of Limitations**

82.      Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims.  Plaintiffs and class members had no knowledge of Google's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place them on inquiry notice of their claims, during the class period and continuing thereafter.  No information in the public domain or otherwise available to Plaintiffs and class members during the class period suggested that Google had wrongfully acquired a digital advertising monopoly or was using its monopoly power to charge supra-competitive digital advertising prices.

83.      Google concealed its illicit conduct, both by failing to disclose its wrongful acquisition and maintenance of a digital advertising monopoly through exclusionary acts in the relevant market, and by affirmatively denying that it was engaged in such conduct.  Google has (repeatedly) publicly denied allegations by U.S. and foreign regulators that it was abusing its market power in the digital advertising market.  When the French Competition Authority fined Google $166 million in late 2019, Google publicly defended its policies as purportedly needed to "protect[ people] from exploitative and abusive ads."  Similarly, in response to recent news reports of impending antitrust actions against it by federal and state officials for monopolization, Google stated publicly that "[c]ompetition is flourishing, and publishers and marketers have enormous choice" when that was plainly incorrect.

84.      Further, Google's anticompetitive monopoly conduct was inherently self-concealing because, as Google knew, its disclosure likely would have led to governmental enforcement activity or civil liability.  Digital advertising is subject to antitrust regulation, so it was reasonable for Plaintiffs and class members to presume that digital advertising was sold in a competitive market.  A reasonable person under the circumstances would not have had occasion to suspect digital advertising was being sold at supra-competitive prices at any time during the class period.

85.      Because Google's antitrust violations were self-concealing and affirmatively concealed by Google, Plaintiffs and class members had no knowledge of Google's antitrust violations or of any facts or information that would have caused a reasonably diligent person to suspect Google of having wrongfully acquired and maintained monopoly power during the class period.

CLASS ACTION COMPLAINT
CASE NO.

86. Therefore, by operation of Google's fraudulent concealment, the statutes of limitations applicable to Plaintiffs' and class members' claims were tolled throughout the class period.

## IX. CLASS ACTION ALLEGATIONS

87. Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of the following class:

> All persons and entities in the United States that, from January 1, 2016 to the present, used Google's digital advertising services to (1) place an ad on a website operated by another entity (advertisers) or (2) place an ad from a third party on their own website (publishers).

88. The following persons and entities are excluded from the proposed classes: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

89. The proposed class meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4).

90. The members of the class are so numerous that joinder is impracticable. The class includes at least hundreds of thousands of members that are widely dispersed throughout the country.

91. Plaintiffs' claims are typical of the claims of all class members. Plaintiffs' claims arise out of a common course of conduct that gives rise to the claims of all other class members. Plaintiffs and all class members were and will continue to be damaged by the same wrongful conduct, namely Google's unfair business practices and monopolization of digital advertising services markets.

92. Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.

93. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with antitrust litigation.

94. Questions of law and fact common to the classes include:

    a. Whether Google holds monopoly power in digital advertising services markets;

    b. Whether Google unlawfully acquired and maintained monopoly power in digital

CLASS ACTION COMPLAINT
CASE NO.

advertising services markets;

c.     Whether Google engaged in unfair business practices that reduced competition in digital advertising services markets;

d.     The amount of damages owed the class as a result of Google's illegal activity;

e.     The form and content of injunctive relief.

95.     Questions of law and fact common to members of the class will predominate over any questions that may affect only individual class members because Google acted on grounds generally applicable to the class as a whole.  For the same reason, class certification for purposes of adjudicating Plaintiffs' claims for injunctive relief is appropriate.

96.     Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of a class action. Class treatment is manageable, and Plaintiffs know of no management difficulties that would preclude class certification in this matter.

97.     Plaintiffs reserve the right to seek class certification with respect to common issues, including issues related to Google's duties or conduct.

## X.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT
### 15 U.S.C. § 2

98.     Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

99.     Google wrongfully acquired and unlawfully maintained monopoly power in the relevant markets through the conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful

CLASS ACTION COMPLAINT
CASE NO.

tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

100. As a direct and proximate cause of Google's conduct, Plaintiffs and members of the class have suffered antitrust injury. Plaintiffs and the class members paid significantly higher prices than they would have but for Google's unlawful conduct. That conduct also deprived Plaintiffs and class members of improved quality and innovation in the relevant markets.

101. Plaintiffs and members of the class are entitled to damages, including treble damages, sustained as a result of Google's monopolistic acts and practices.

102. Plaintiffs and members of the class are entitled to equitable relief as appropriate to cure Google's monopoly conduct and restore competition in the relevant markets. Members of the class are regular users of digital advertising services and will continue to purchase such services and suffer further injury if Google's monopoly in digital advertising is not ended.

## SECOND CAUSE OF ACTION
### VIOLATIONS OF THE UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)

103. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

104. Google's conduct is unlawful in violation of the UCL because it violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

105. Google has engaged in unfair business practices through the conduct alleged herein, which has restrained competition. Google's conduct is unfair, in violation of the UCL, because it violates California's clearly established public policy forbidding monopolistic acts. Google wrongfully acquired and unlawfully maintained monopoly power in the relevant markets through the conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

106. Google's practices also are unlawful in violation of the UCL because they offend public

CLASS ACTION COMPLAINT
CASE NO.

policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including in the form of artificially inflated prices, that greatly outweighs any possible utility from the practices.

107. Google's conduct actually and proximately caused Plaintiffs and class members to lose money or property. On behalf of the class, Plaintiffs seek restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the class, pray that this Court:

A. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given to the class, appoint Plaintiffs as named representatives of the class, and appoint the undersigned Plaintiffs' counsel as class counsel;

B. Enter judgment against Google and in favor of Plaintiffs and the class;

C. Award damages (including treble damages, as provided by law) and restitution to the class in an amount to be determined at trial, plus interest in accordance with law;

D. Enter injunctive relief to restore competition in the relevant markets;

E. Award Plaintiffs and the class their costs of suit, including reasonable attorneys' fees, as provided by law; and

F. Award such further and additional relief as is necessary to redress the harm caused by Google's unlawful conduct and as the Court may deem just and proper under the circumstances.

## XII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 27, 2020

Respectfully submitted,

By: ___ /s/ *Christina C. Sharp* _____

21

CLASS ACTION COMPLAINT
CASE NO.

Christina C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

Scott L. Silver (*pro hac vice* forthcoming)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
Tel: (954) 755-4799
ssilver@silverlaw.com

*Attorneys for Plaintiffs*

22

CLASS ACTION COMPLAINT
CASE NO.