# EXHIBIT 19

**Statement of the Federal Trade Commission Regarding**
**Google's Search Practices**
*In the Matter of Google Inc.*
**FTC File Number 111-0163**
January 3, 2013

The Federal Trade Commission has today completed a wide-ranging investigation of alleged anticompetitive conduct by Google Inc. ("Google"). We issue this Statement to explain the Commission's unanimous decision to close the portion of its investigation relating to allegations that Google unfairly preferences its own content on the Google search results page and selectively demotes its competitors' content from those results. Some parties refer to this alleged practice as "search bias."[1]

The Commission conducted a comprehensive investigation of the search bias allegations against Google. Commission staff reviewed over nine million pages of documents from Google and other relevant parties. Staff interviewed numerous industry participants and conducted many investigational hearings of key Google executives. Staff economists conducted empirical analyses to investigate the impact of Google's design changes on search engine traffic and user click-through behavior. The Commission also considered the many white papers, letters, and presentations made by industry participants, consumer organizations, and other stakeholders. In addition, we worked closely with, and had the active assistance of, five state attorneys general, who conducted parallel investigations into Google's search practices.

## I.     Overview of the Search Bias Allegations

As is well known, when a user types a word or words into a Google search box, Google, guided by proprietary algorithms, searches its index of the Internet and assembles a ranked listing of relevant websites, known as "organic" search results. These organic results – together with advertising, links to Google products, and other information judged to be relevant to the user's query – are returned to the user as the Google search results page. Google is a "horizontal," or general purpose, search engine because it seeks to cover the Internet as completely as possible, delivering a comprehensive list of results to any query. General purpose search engines are distinct from "vertical" search engines, which focus on narrowly defined categories of content such as shopping or travel. Although vertical search engines are not wholesale substitutes for general purpose search engines, they present consumers with an alternative to Google for specific categories of searches.

Some vertical websites alleged that Google unfairly promoted its own vertical properties through changes in its search results page, such as the introduction of the "Universal Search" box, which prominently displayed Google vertical search results in response to certain types of queries, including shopping and local. Prominent display of Google's proprietary content had the collateral effect of pushing the "ten blue links" of organic search results that Google had traditionally displayed farther down the search results page. Complainants also charged that

---

[1] Although Commissioner Rosch concurs in the decision to close the investigation, he does not join this Statement and has issued a separate statement expressing his views.

Google manipulated its search algorithms in order to demote vertical websites that competed against Google's own vertical properties.

## II.      The Commission's Investigation

The Commission may intervene and challenge business practices if it has reason to believe that such practices violate Section 5's prohibition on unfair methods of competition, and create a likelihood of significant injury to competition, including monopolization or attempted monopolization actionable under Section 2 of the Sherman Act.  To determine whether Google violated Section 5 with respect to these search bias allegations, the Commission considered whether Google manipulated its search algorithms and search results page in order to impede a competitive threat posed by vertical search engines.

A key issue for the Commission was to determine whether Google changed its search results primarily to exclude actual or potential competitors and inhibit the competitive process, or on the other hand, to improve the quality of its search product and the overall user experience. The totality of the evidence indicates that, in the main, Google adopted the design changes that the Commission investigated to improve the quality of its search results, and that any negative impact on actual or potential competitors was incidental to that purpose.  While some of Google's rivals may have lost sales due to an improvement in Google's product, these types of adverse effects on particular competitors from vigorous rivalry are a common byproduct of "competition on the merits" and the competitive process that the law encourages.

While Google's prominent display of its own vertical search results on its search results page had the effect in some cases of pushing other results "below the fold," the evidence suggests that Google's primary goal in introducing this content was to quickly answer, and better satisfy, its users' search queries by providing directly relevant information.  Notably, the documents, testimony and quantitative evidence the Commission examined are largely consistent with the conclusion that Google likely benefited consumers by prominently displaying its vertical content on its search results page.  For example, contemporaneous evidence demonstrates that Google would typically test, monitor, and carefully consider the effect of introducing its vertical content on the quality of its general search results, and would demote its own content to a less prominent location when a higher ranking adversely affected the user experience.  Analyses of "click through" data showing how consumers reacted to the proprietary content displayed by Google also suggest that users benefited from these changes to Google's search results.  We also note that other competing general search engines adopted many similar design changes, suggesting that these changes are a quality improvement with no necessary connection to the anticompetitive exclusion of rivals.

We nonetheless recognize that some of Google's algorithm and design changes resulted in the demotion of websites that could, collectively, be considered threats to Google's search business.  For example, for shopping queries, Google demoted all but one or two comparison shopping properties from the first page of Google's search results to a later page.  Demoting comparison shopping properties had the effect of elevating to page one certain merchant and other websites.  These changes resulted in significant traffic loss to the demoted comparison shopping properties, arguably weakening those websites as rivals to Google's own shopping

2

vertical.  On the other hand, these changes to Google's search algorithm could reasonably be viewed as improving the overall quality of Google's search results because the first search page now presented the user with a greater diversity of websites.

Product design is an important dimension of competition and condemning legitimate product improvements risks harming consumers.  Reasonable minds may differ as to the best way to design a search results page and the best way to allocate space among organic links, paid advertisements, and other features.  And reasonable search algorithms may differ as to how best to rank any given website.  Challenging Google's product design decisions in this case would require the Commission – or a court – to second-guess a firm's product design decisions where plausible procompetitive justifications have been offered, and where those justifications are supported by ample evidence.  Based on this evidence, we do not find Google's business practices with respect to the claimed search bias to be, on balance, demonstrably anticompetitive, and do not at this time have reason to believe that these practices violate Section 5.[2]

### III.    Conclusion

In sum, we find that the evidence presented at this time does not support the allegation that Google's display of its own vertical content at or near the top of its search results page was a product design change undertaken without a legitimate business justification.  Rather, we conclude that Google's display of its own content could plausibly be viewed as an improvement in the overall quality of Google's search product.  Similarly, we have not found sufficient evidence that Google manipulates its search algorithms to unfairly disadvantage vertical websites that compete with Google-owned vertical properties.  Although at points in time various vertical

---

[2] The Commission also investigated allegations that Google had unfairly "scraped," or misappropriated, the content of certain competing websites, passed this content off as its own, and then threatened to delist these rivals entirely from Google's search results when they protested the misappropriation of their content.  The Commission considered whether this conduct could have diminished the incentive of Google's rivals to invest in bringing new and innovative content and services to the Internet in the future or reduced Google's own incentive to innovate in the relevant markets, and if so whether this conduct was actionable as an unfair method of competition within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.  Chairman Leibowitz, Commissioner Brill and Commissioner Ramirez found the record evidence to support strong concerns about Google's conduct in this regard, and Google has committed to refrain from this conduct in the future.  In addition, the Commission investigated allegations that Google placed unreasonable restrictions on the ability of advertisers to simultaneously advertise on Google and competing search engines, or "multihome."  The Commission considered whether these restrictions raised the cost of dealing with Google's rivals for advertisers, particularly small businesses who might multihome less due to the restrictions, whether these effects were material, and if so whether this conduct was actionable as an unfair method of competition under Section 5.  Chairman Leibowitz and Commissioner Brill found the record evidence to support strong concerns about Google's conduct in this regard, and Google has committed to refrain from this conduct in the future.

While Commissioner Ramirez is pleased that Google has decided to change certain of its practices, she objects to the form of the commitments made by Google.

Chairman Leibowitz and Commissioner Brill support the enforceable commitments made by Google.  In this case, the commitments made by Google are appropriate and consistent with past practice at the Commission.  See Statement of Commissioners Orson Swindle and Thomas B. Leary, In re General Mills, Inc./Diageo plc/Pillsbury Co. FTC File No. 001-0213, *available at* http://www.ftc.gov/os/2001/10/gmstmtswinleary.htm.  Chairman Leibowitz and Commissioner Brill expect the Commission to enforce vigorously Google's commitments with respect to scraping and API restrictions.

websites have experienced demotions, we find that this was a consequence of algorithm changes that also could plausibly be viewed as an improvement in the overall quality of Google's search results.

Although our careful review of the evidence in this matter supports our decision to close this investigation, we will remain vigilant and continue to monitor Google for conduct that may harm competition and consumers.