# EXHIBIT 24



**Executive Summary Complaint of the European Publishers Council**

**against**

**Google LLC, Alphabet Inc., Google Ireland Ltd., and YouTube LLC ("Google")**

**regarding Google's ad tech practices**

**11 February 2022**

Almost fifteen years ago, Google announced it would acquire DoubleClick for $ 3.1 billion. At the time, the advertising technology ("ad tech") space was competitive, with companies such as Microsoft, Yahoo!, and AOL competing vigorously against each other. In this context, several third parties raised concerns over Google's proposed acquisition, predicting that the merged entity would use DoubleClick's leading ad serving tools to distort competition in the provision of ad tech services, to the detriment of online publishers, marketers, and consumers. Regulators, including the European Commission nevertheless dismissed such concerns and cleared the transaction, holding that Google would have neither the ability nor the incentive to engage in foreclosure tactics and interfere with the "neutrality" of DoubleClick's ad serving technology.

Today, the state of competition in ad tech does not even remotely resemble that of 2008. Household names including Yahoo! and AOL have either exited the market or scaled down their activities, while **Google has come to monopolize virtually every step of the ad tech value chain, boasting market shares as high as 90-100%**. Google did not do so by competing on the merits, for example by offering better products or charging lower fees. Rather, following its acquisition of DoubleClick, Google engaged in a pattern of conduct to foreclose rivals and lock customers into its products, confirming the worst of fears expressed by third parties that had opposed the transaction. While constantly mutating, Google's tactics have remained in purpose and effect the same, namely depriving rivals of scale and revenue while locking customers to Google's products so that Google can then charge supra-competitive rates. This pattern of conduct has set in motion a virtuous cycle for Google and a vicious one for everybody else.

As for DoubleClick's "neutrality", it ended the day it was acquired by Google, for the latter used DoubleClick's ad serving technology to systematically prefer its ad intermediation activities, all while depressing publisher revenue. **From a tool meant to advance the interests of publishers, DoubleClick's ad server ended up a tool advancing the interests of Google in monopolizing the ad tech value chain**.

EPC    Chairman > **Christian Van Thillo**
chairman@epceurope.eu

Executive Director > **Angela C. Mills Wade**
angela.mills-wade@epceurope.eu

EPC > Avenue Des Arts 43, 5th floor, 1040, Brussels, Belgium | Tel +32 (0) 2231 12 99

www.epceurope.eu



Google now controls the largest ad exchange in the world, processing about 11 billion transactions a day. At the same time, Google owns the largest buy-side and sell-side brokers. In the words of a senior Google employee, "[t]he analogy would be if Goldman or Citibank owned the NYSE." Google's ad tech suite is rife with **conflicts of interests**, as Google represents the buyer and the seller in the same transaction, while also operating the auction house in the middle. Far from managing its conflicts, **Google has time and again taken advantage of its position to prioritize its own interests at the expense of the very customers it is supposed to serve**, safe in the knowledge that the latter cannot react, locked as they are in Google's products.

Google's anticompetitive pattern of conduct continues to cause considerable harm to European press publishers, advertisers, and consumers, in the form of supra-competitive fees, lower quality of service, and less innovation. Google's monopolistic pattern of conduct has actively **depressed publisher revenue**. What follows is an illustrative list of examples:

- For years, **Google prevented publishers from pitting their ad exchange partners against each other to foster price competition**. The revenue depressing effect of Google's conduct was made clear once publishers started resorting to Header Bidding (a rival technology). Google's own analysis in 2017 found that, between January of 2016 and February of 2017, the average price publishers received for impressions sold through ad exchanges in Header Bidding were **80% higher** than the average price publishers received for impressions sold through Google's AdX ad exchange.

- Google charges a **supra-competitive 20% revenue share** for its AdX ad exchange, despite the fact rivals have slashed their fees and Google's own employees recognize that such a fee is not justified by value. In addition, Google has introduced features which have allowed AdX to sell impressions that would have otherwise been sold by rival exchanges charging a lower revenue share, thus **further reducing** publisher revenue.

- As part of its switch to a first-price auction in 2019, Google has removed publishers' ability to set **buyer-specific floors**, with a view to favouring its AdX ad exchange and its ad buying tools. As a result, Google's ad buying tools now purchase an ever-greater portion of publisher inventory at even lower prices, further depressing publisher revenue.

- Google has utilized opaque auction programs to manipulate auctions and depress publisher revenue. According to Google's own estimates, one of its secret auction programs dropped any given publisher's revenue by **upwards of 40%**. A subsequent iteration of this program penalizes publishers that have not granted AdX preferential access to their inventory, by dropping Google's bids for their inventory.

- Google plans to remove third party cookies from Chrome, which, in the absence of an effective replacement, is projected to **further diminish** publisher revenue in the short term by up to **70%**.

www.epceurope.eu

**2**

www.epceurope.eu

Taken together, the **cumulative impact** of these practices has been **devastating for publisher revenue**. Less advertising revenue means press publishers have fewer resources to invest in news content and fulfil their socially important mission of informing the general public and holding those in power accountable. This is intolerable at a point in time where many press publishers are struggling. Supra-competitive ad tech fees are also borne by advertisers, which they may pass on to consumers in the form of higher prices for advertised goods or services. A lack of effective competition in the provision of ad tech services has thus **significant consumer welfare implications.**

As the EPC has a clear interest in ensuring fair, undistorted competition in the provision of ad tech services, it has decided to bring this Complaint before the Commission. The Commission is uniquely positioned to act on the Complaint, and it should do so. The Commission can leverage the findings of a number of competition authorities, including the French Autorité de la concurrence ("ADLC"), the UK Competition and Markets Authority ("CMA"), and the Australian Competition and Consumer Commission ("ACCC"), as well as the findings in the lawsuit filed by a coalition of US States against Google. In this respect, **the EPC urges the Commission to request from Google to produce all the documents and information it has provided to the US States and the US Department of Justice**. Considering the opacity of Google's practices, it is very likely that these documents will contain shocking evidence of wrongdoing concerning European press publishers – evidence which may have been ignored in the US.

The Complaint presents a unique opportunity for the Commission to rectify the problems that have arisen as a result of the clearance of the Google/DoubleClick merger, by imposing effective remedies that will restore competition in ad tech, to the benefit of European press publishers, marketers, and consumers.

****