# EXHIBIT 29

# How Washington fumbled the future

**P** politico.com/news/2021/03/16/google-files-ftc-antitrust-investigation-475573

Leah Nylen                                                                    March 16, 2021

[the google files](#)

A decade ago, a surging Silicon Valley giant was making plans to dominate the internet. Given a chance to stop it, regulators chosen by Barack Obama misread the evidence in front of their eyes.



Few moments in the power struggle between Washington and Silicon Valley have inspired more anger and bafflement than one in January 2013, when [antitrust regulators appointed by former President Barack Obama declined to sue Google](#).

The decision still rankles the company's rivals, who have watched the search giant continue to amass power over smartphones, data-hoovering devices and wide swaths of the internet, unimpeded by laws meant to deter monopolies. It has fueled [some lawmakers' calls to overhaul the Federal Trade Commission](#), the agency that spent 19 months investigating Google's efforts to overpower the competition — and critics say, blinked.

The commission has never disclosed the full scope of its probe nor explained all its reasons for letting Google's behavior slide.

But 312 pages of confidential internal memos obtained by POLITICO reveal what the FTC's lawyers and economics experts were thinking — including assumptions that were contradictory at the time and many that turned out to be incorrect about the internet's future, Google's efforts to dominate it and the harm its rivals said they were suffering from the company's actions. The memos show that at a crucial moment when Washington's regulators might have had a

chance to stem the growth of tech's biggest giants, preventing a handful of trillion-dollar corporations from dominating a rising share of the economy, they misread the evidence in front of them and left much of the digital future in Google's hands.

The documents also add to doubts about whether Washington is any more capable today of reining in the tech industry's titans, despite efforts by a new generation of antitrust enforcers to turn up the heat on Google, Facebook, Apple and Amazon — all of which now rank among the United States' wealthiest companies. That will be a crucial test awaiting President Joe Biden's regulators, including the outspoken Silicon Valley critic he plans to nominate to an open slot on the FTC's five-person board.

The Google Files explained

3:00

Nearly a decade ago, the documents show, the FTC's investigators uncovered evidence of how far Google was willing to go to ensure the primacy of the search engine that is the key to its fortunes, including tactics that European regulators and the U.S. Justice Department would later label antitrust violations. But the FTC's economists successfully argued against suing the company, and the agency's staff experts made a series of predictions that would fail to match where the online world was headed:

— They saw only "limited potential for growth" in ads that track users across the web — now the backbone of Google parent company Alphabet's $182.5 billion in annual revenue.

— They expected consumers to continue relying mainly on computers to search for information. Today, about 62 percent of those queries take place on mobile phones and tablets, nearly all of which use Google's search engine as the default.

— They thought rivals like Microsoft, Mozilla or Amazon would offer viable competition to Google in the market for the software that runs smartphones. Instead, nearly all U.S. smartphones run on Google's Android and Apple's iOS.

— They underestimated Google's market share, a heft that gave it power over advertisers as well as companies like Yelp and Tripadvisor that rely on search results for traffic.

The FTC's decision to let Google off the hook reflected an era when the Obama administration had a close relationship with Silicon Valley and Americans held largely positive views toward the emerging tech giants. But the documents also

demonstrate how the Obama-era FTC took a cautious approach to antitrust enforcement, deferring to the wisdom of the agency's economists over its lawyers — an attitude anti-monopoly advocates are now questioning as Congress considers sweeping changes to antitrust laws.

The FTC's antitrust lawyers took a harder line in urging the commission to sue Google over its efforts to own the U.S. mobile search market, the memos reveal — advice the agency never disclosed to the public. But the five commissioners rejected that recommendation.

- The FTC's original investigation
- **2011**
  - June 13: The FTC's commissioners vote to demand information from Google as part of an antitrust probe into whether the company had altered its search results to disfavor rivals.

**2012**
  - May to June: FTC lawyers interview Google co-founder Sergey Brin and CEO Eric Schmidt. A scheduled interview with Google's other co-founder, Larry Page, is canceled after Page loses his voice.

Google's mobile search deals later became the centerpiece of the antitrust suit that the Trump administration's Justice Department filed against Google last October. By now, though, Google has become an even more powerful adversary for the government than it would have been in 2013: It's the undisputed leader in both online and mobile search, dominates the global market for online ads and has tentacles in a host of other product lines, from the world's most popular web browser to maps, music, a cable-like streaming TV service, Fitbit fitness watches and its own phones, computers and smart speakers.

The outcome of the FTC's probe wasn't lost on the rest of the industry, said veteran Silicon Valley antitrust lawyer Gary Reback, who represented eight companies that had complained to the commission about Google. He said he remains "bitter to this day" about the decision not to sue.

"We wouldn't be in the situation we are today with any of these big companies if [the FTC] had done something then," Reback said. "If they had stopped that in its tracks, the world would be a different place."

Another individual who cooperated with the FTC probe on behalf of companies aggrieved by Google's conduct agreed.

20:23

[The top 5 interview moments of 2025 | The Conversation](#)

"This sent a message to Facebook and Apple and Amazon," the individual said. For the FTC, the person added, "it was such a swing and a miss."

Google has long portrayed the FTC's decision to close the antitrust probe as a vindication for its business practices. It echoed that sentiment Monday after POLITICO asked for comment on the newly obtained documents.

"This is old news. A bipartisan FTC voted unanimously to close its investigation into Google nearly a decade ago — supported by recommendations by all of the FTC divisions including the Bureau of Competition, the Bureau of Economics and the Office of General Counsel," said Peter Schottenfels, a Google spokesperson. "In closing its investigation, the FTC stated that our changes to Google Search were procompetitive and benefited consumers. And in the eight years since, competition in search has only increased as people have more ways than ever to access information online, including through an array of dedicated mobile apps."

In a more detailed response Tuesday, Google maintained that the complete documents show that the FTC got it right in 2013."These documents show why, after a comprehensive review, the Federal Trade Commissioners all voted to close their investigation nearly a decade ago," competition legal director Rosie Lipscomb wrote in a blog post.

**[POLITICO Dispatch:](#) March 16**

New documents obtained by POLITICO shed light on the FTC's decision not to file an antitrust suit against Google in 2013, allowing the company to grow into the giant that it is today.

[Subscribe on Apple Podcasts](#) | [Subscribe on Google Podcasts](#)

## Google's big reprieve

The FTC spent 19 months investigating Google over allegations that the search giant was violating antitrust laws by favoring its own products over those of rival content providers, including eBay, Yelp, Tripadvisor, [Facebook and Amazon](#). The probe focused on Google's control over online search and search advertising, as well as the company's [growing dominance in mobile phone software](#).



1. [92-year-old judge handling Maduro case 'doesn't give a s--t what anyone thinks about him'](#)
2. [DeSantis says Florida looking 'very seriously' at bringing state charges against Maduro](#)
3. [Trump May Have Accidentally Pardoned the Jan. 6 Pipe Bomber](#)
4. [Trump says his Greenland fixation is about national security. Europeans are skeptical.](#)
5. [The House GOP confronts a shocking loss and a difficult road ahead](#)

The probe was the most serious threat to date for Google, a company that had begun in the 1990s as a research project at Stanford University aimed at perfecting what was then the [unreliable art of finding information on the internet](#). But the danger soon dissipated.

In a memo for the five commissioners in August 2012, the FTC's antitrust lawyers advised suing Google over most of the allegations — but not the most serious one, that the company had changed its search algorithm to prefer its own products.

In a separate memo, the economists recommended closing the probe without taking any action. So did the FTC's advertising lawyers, who examined whether Google had misled consumers about the difference between ads and so-called organic search results.

- How Google changed its search results
- **2000s**
    - April 18, 2007: Google [introduces Google Product Search](#), which displays shopping listings above its organic search results, as a replacement for Froogle, the company's poorly performing shopping service.

- May 16, 2007: Google introduces Universal Search results, combining all its niche results like news, stocks or images and general web results into one.
- July 2007: Google changes its algorithm to automatically demote rival comparison shopping sites if more than two appear in the top 10 links.
- July 2008: Following complaints that Google was putting its own, less useful shopping site at the top of search results for products, Google changes the algorithm so that the Google Product Search box appears more frequently in the fourth spot instead of at the top, effectively demoting its own offerings. It reverses this change the next year.

The five lawyers who served as the FTC's commissioners, four of them placed on the agency by Obama, announced their decision in January 2013. At a news conference, former FTC Chair Jon Leibowitz said the agency determined that Google had changed its search results not to harm competition but to improve search results for consumers. He made no mention of the FTC's findings on Google's mobile contracts.

FTC investigation memos are closely guarded within the agency and not subject to public release under the Freedom of Information Act. In 2015, however, 80 pages of the antitrust lawyers' memo became public when the FTC accidentally gave The Wall Street Journal a redacted version containing every other page.

POLITICO obtained an unredacted copy of all nine memos, which also contain recommendations from more senior FTC officials. These include, for the first time, the economists' arguments for not taking Google to court.

The FTC always assigns both lawyers and economists to its antitrust investigations, and each group offers its own conclusions about what action the agency should take. The economists tend to be more conservative and less likely to recommend litigation than the FTC's lawyers, said Charlotte Slaiman, who joined the agency after the Google case but worked in the same unit that spearheaded the investigation.

"The Bureau of Economics is often more skeptical about bringing cases," said Slaiman, now director of competition policy at the advocacy group Public Knowledge, which accepts some funding from Google.

When the FTC first started looking into Google in 2011, the company was much smaller than it is today. (Its parent, Alphabet, is now one of a handful of U.S. companies worth more than $1 trillion, smaller than only Apple, Microsoft and

Amazon.) But Google already had the dominant search engine, was reaping a windfall from online ads and was rapidly expanding into other markets.

Its 7-year-old Gmail service was gaining on Microsoft's Hotmail, then the world's largest email provider. Thirty-five percent of U.S. adults owned a smartphone, and Google's Android operating system had just overtaken BlackBerry as the most popular software platform for mobile devices. Its ambitions were seemingly limitless: Cars with Google's logo were traversing cities around the world to shoot street-level photos, while the company's Chrome software powered a new breed of inexpensive laptops and its Google+ social network debuted in 2011 with hopes of supplanting Facebook.

Concerns about Google's size were growing too: Europe opened an antitrust probe in 2010, examining allegations over bias in search results, as did a group of U.S. state attorneys general. (The EU would eventually fine Google €2.42 billion for antitrust violations; Google is appealing that decision. The states dropped their antitrust probe after the FTC closed its own.)

Either of the United States' two federal antitrust agencies — the FTC or the Justice Department — could have investigated Google. Justice, in fact, had had some experience scrutinizing the company's search business. But after some wrangling over jurisdiction, the two agencies agreed that the FTC would take this new case on, in a probe that soon extended well beyond search.

The hurdles soon became apparent.

## An old-school view of advertising

One immediate question for the FTC then was: What's an ad?

Google sells many types, as the commission's antitrust lawyers outlined in the first pages of their 160-page memo from August 2012. These included display advertising — graphical ads that often appear on web pages alongside content — and search advertising, the text ads that appear at the top or side of a search engine's results page.

The FTC lawyers looked at both targeted ads, based on a user's online browsing history, and specifically social media advertising, which is based on a user's interests on platforms like Twitter and Facebook.

While the lawyers noted that online advertising "continues to evolve," they concluded that these targeted products "do not account for a significant portion of online advertising and, today, with the exception of social media advertising, appear to have only limited potential for growth." In a footnote, the lawyers wrote that users were unlikely to allow themselves to be tracked by

a significant number of the small data pieces known as "cookies" that are crucial for making such ads work, and therefore targeted ads would require "guesswork and heavy analysis on the part of the advertiser." As evidence, the lawyers cited a 2012 Forbes article about General Motors pulling back on Facebook advertising.

Today, targeted advertising online accounts for $63.3 billion in spending in the U.S., more than half of the $121 billion spent on digital ads, according to Statista.

The FTC lawyers' failure to imagine the future importance of targeted advertising contradicted some of the agency's own previous research. In 2010, an FTC report on privacy found that targeted ads were helping fuel an increase in collection of consumer data. That report gained new attention in February 2012, when a lengthy article in The Atlantic on online tracking cited the FTC's earlier findings along with several privacy initiatives by industry and the Obama administration.

The two FTC economists assigned to the Google probe also made several questionable assertions about advertising markets. In their memo, the economists said it wasn't clear that Google had market power over search advertising despite finding that the company controlled 65 percent of paid clicks for those kinds of ads.

The pair suggested that advertisers had plenty of alternatives to doing business with Google: Display ads could take the place of search ads, or companies could move their advertising to offline sources like radio or television. For both those assertions, the economists cited a study by Google and two academic papers funded by grants from Google.

Those conclusions contradicted testimony by Google executives like Susan Wojcicki, then the company's senior vice president of advertising, that are cited in other sections of the memos. Display ads and search ads "are such different products that you do not measure them against one another and the technology behind the products is different," she told FTC investigators. (She is now the CEO of Google's video streaming platform YouTube.)

## Downplaying Google's market share

The FTC's economists and lawyers also came to sharply different conclusions on how much sway Google had over the web traffic for rival shopping and local review sites.

The economists, relying on data from the market analytics firm Comscore, found that Google had only limited impact. They estimated that between 10 and 20 percent of traffic to those types of sites generally came from the search engine.

FTC attorneys, though, used numbers provided by Yelp and found that 92 percent of users visited local review sites from Google. For shopping sites like eBay and TheFind, the referral rate from Google was between 67 and 73 percent.

The FTC's attorneys also expressed concerns about the reliability of the Comscore data, saying it was "staggeringly inconsistent" with internal numbers offered by Yahoo and Microsoft.

Top Google executives told the FTC about Comscore's tendency to miscalculate the company's market share. Google's former CEO and then-Chair Eric Schmidt told FTC staffers in sworn testimony that Google's view was that Comscore numbers were always wrong. Hal Varian, Google's chief economist, said in a 2011 email that Comscore data didn't accurately represent the search engine's share of the market.

"I would agree that ComScore is unreliable, it's not at all obvious to me that this matters much to us," he said. "From an antitrust perspective, I'm happy to see them underestimate our share." (The Wall Street Journal's 2015 story included a portion of Varian's quote but not the wider context.)

## Mobile phones aren't such a big deal

The economists also made some predictions that didn't pan out when advising against suing over the company's efforts to dominate search on smartphones.

True, the economists noted, Google's Android and Apple's iOS controlled about 77 percent of the market at the end of 2011, up from 30 percent two years before. And yes, Google had signed contracts with Android smartphone manufacturers, the United States' four major telecom carriers and Apple to ensure that its search engine was the default on a big chunk of the market.

But the economists maintained that rivals like Microsoft and Yahoo could make inroads. They pointed to Mozilla's plan to offer an alternative operating system for Android phones, Firefox OS and rumors that Amazon would seek to enter the market. "Barriers to entry are not particularly high in mobile phones and other mobile devices," they said.

Those expectations proved short-lived. While both Firefox and Amazon entered the mobile market, both announced in 2015 that they were discontinuing their smartphone products. Today, Google's Android and Apple's iOS account for 99.8 percent of U.S. smartphones, according to analytics firm StatCounter.

Although phone operating systems from Nokia, BlackBerry and Microsoft still had some share in 2012, the market was already trending toward today's Google-Apple duopoly, said Greg Sterling, an industry analyst specializing in search and advertising.

"Back in 2011 and 2012, the direction of the market was pretty clear," he said.

BlackBerry peaked in 2011 and had already declined, Sterling said, though it had loyal holdouts in the business world and Washington, where employers including the federal government prized the security of the company's phones.

The FTC's economists also focused heavily on the mobile devices' then-small share of the search market, which they estimated to be about 8 percent. While acknowledging that mobile search was "a growing distribution channel," the economists said mobile "represents a relatively small percentage of overall queries and an even smaller percentage of search ad revenues."

Ken Heyer, a more senior FTC economist, said that preventing Google from paying to be the default search engine for phones and browsers could harm the market.

"Competition for default status doubtless redounds to the benefit of smartphone manufacturers," he wrote. "Any such benefits would be sacrificed if such competition were prohibited."

By the end of 2013, mobile accounted for 33 percent of the search market, according to analytics firm Statista. In May 2015, Google announced that mobile searches had surpassed those on desktop. The share was 62 percent at the end of last year, Statista estimated.

Even in 2012, however, there was no question that mobile was the future of search, said Sterling, who wrote for the industry publication Search Engine Land for 14 years.

"More and more people were getting smartphones," he said. "You could plot the graph out."

## Trying to understand the market

To help gain the needed expertise, FTC lawyers interviewed more than a dozen Google executives as part of the probe, including Schmidt, co-founder Sergey Brin and Andy Rubin, Google's head of Android. They also spoke to former Yahoo chief economist Preston McAfee, who had joined Google in 2012, and Microsoft economist Susan Athey.

The agency also hired some technology help for the Google probe: Ed Felten, a Princeton computer scientist who served as the FTC's first chief technologist from January 2011 through August 2012, and Tim Wu, who joined the FTC as a senior adviser in February 2011 and left in early 2012. (Biden recently tapped Wu to serve as a technology adviser on the White House National Economic Council.) Neither are mentioned in the memos, and both left the agency by the summer of 2012, when the FTC began to consider how to resolve the Google case.

## The decision

The FTC's commissioners met for a closed-door meeting with staff on Sept. 7, 2012. None of the staff advocated for a case challenging Google over search bias, and the two Republican FTC commissioners and Democrat Edith Ramirez were skeptical of bringing a complaint on other aspects of Google's conduct, according to three individuals involved in the case, who spoke anonymously to discuss confidential deliberations.

Leibowitz, a George W. Bush nominee reupped for a second term by Obama, was hoping to garner bipartisan support for an eventual lawsuit or settlement with Google. But any such deal faced a deadline: Leibowitz informed colleagues that he intended to leave the agency in early 2013, news of which leaked before the end of September. Meanwhile, Republican Commissioner Tom Rosch's term expired, though he was allowed to remain until the Senate confirmed his successor.

Four former FTC officials involved in the discussions said those departures sped up the timing of the case, because Leibowitz hoped to get Rosch's support for the final outcome. Another complicating factor: The then-73-year-old Rosch was in the early stages of Alzheimer's and would experience periods of forgetfulness and irritability, three former officials confirmed.

Throughout October 2012, many of the companies that complained about Google's conduct visited the FTC's commissioners to plead their case. Google also met with commissioners, though the company never sought a meeting with Democrat Julie Brill, a second former FTC official said.

On Nov. 7, 2012 the day after Obama won a second term, Google's lawyers offered a set of "voluntary commitments" to settle the probe — an unusual form of settlement that the FTC almost never accepts, preferring instead to use legally binding consent decrees. Google offered remedies that were tangential to the main complaints about search, for instance a pledge to stop scraping content from rival websites.

On Jan. 3, 2013, Leibowitz announced that the commission had voted to close the search probe. The agency found "some evidence" that Google had changed its search algorithm to impair competition, he told reporters, but "on balance we did not believe that the evidence supported an FTC challenge to this aspect of Google's business under American law."

Rosch died in 2016. Brill and then-Republican Commissioner Maureen Ohlhausen case declined to comment about their views of 8-year-old probe. Ramirez, who took over as FTC chair after Leibowitz's departure, didn't respond to multiple requests for comment.



[How Washington fumbled the future](#)



[The government's lawyers saw a Google monopoly coming. Their bosses refused to sue.](#)

How Washington fumbled the future - POLITICO



[The Google Files: 4 things the documents reveal](#)



[The Google Files: Power players](#)

Email

Employer

Job Title

By signing up, you acknowledge and agree to our [Privacy Policy](#) and [Terms of Service](#). You may unsubscribe at any time by following the directions at the bottom of the email or by [contacting us here](#). This site is protected by reCAPTCHA and the Google [Privacy Policy](#) and [Terms of Service](#) apply.

SPONSORED CONTENT