# EXHIBIT B

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| AMI – GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) | Case No. 3:23-CV-01186-RFL |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| ALPHABET, INC., GOOGLE LLC, et al. | ) ) | |
| Defendants. | ) ) | |

**AMENDED REBUTTAL REPORT OF PROFESSOR ALLEN FERRELL**

**January 1326, 2026**

## I.    Qualifications

1.    I am an economist and the Greenfield Professor of Securities Law at Harvard Law School. I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School. My Ph.D. dissertation concerned the relationship between stock prices and financial disclosures. After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.    I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, a research associate at the National Bureau of Economic Research, and a visiting professor at Stanford. I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which was responsible for advising the Harvard Corporation on how to vote shares held by its endowment), the ABA Task Force on Corporate Governance, American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.    I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the Structured Products Association, and the National Bureau of Economic Research. I have published approximately 30 articles in leading law and finance journals. I have also been an expert witness in a variety of securities matters. My

1

testimony in the last four years and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

4.      I have been assisted by Compass Lexecon staff in this matter. My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report. I currently am being compensated for my work on this matter at an hourly rate of $1,700 including for any testimony I may provide in this matter. I receive other compensation from Compass Lexecon based on a portion of staff billings. My compensation is not contingent upon my opinions and conclusions, or the outcome of this matter.

## II.      Assignment and Executive Summary of Opinions

5.      I have been asked by counsel for the Defendants[1] to analyze the economic evidence to determine whether the Alleged Misstatement had an impact on Alphabet's stock prices.[2] I also was asked to review and respond to the claim by Plaintiffs' expert that alleged damages in this matter can be measured on a class-wide basis consistent with Plaintiffs' theory of liability.

6.      Based on my analysis to date,[3] as well as my professional experience, education, and training, I have principally concluded that:

- There is no reliable economic basis to conclude that the Alleged Misstatement[4] impacted Alphabet's stock prices either when made or when purportedly corrected by the Alleged Corrective Disclosures;[5] and

---

[1]   I understand that the remaining Defendants are Alphabet, Google, and Sundar Pichai. *See* Order Granting in Part and Denying in Part Motion To Dismiss and Granting in Part Request for Judicial Notice, March 24, 2025 ("Order"), p. 17. Mr. Pichai, a longtime Google senior executive, became the Chief Executive Officer ("CEO") of Alphabet in December 2019. *See* Alphabet Inc. Form 8-K, December 4, 2019.

[2]   A list of materials I have considered in preparing this report is attached as **Appendix B**.

[3]   My work on this matter is ongoing. I reserve my ability to update and amend this report based upon additional information provided to me.

[4]   *See* ¶25 below for the definition of Alleged Misstatement.

[5]   *See* ¶23 below for the definition of Alleged Corrective Disclosures.

- Plaintiffs' expert has not demonstrated that alleged damages in this matter can be calculated subject to a common and reliable methodology consistent with Plaintiffs' theory of liability.

7. I provide relevant background information and elaborate on the above conclusions in the remainder of this report.

## III. Background and Summary of Allegations

### A. Relevant Factual Background

8. Alphabet Inc. ("Alphabet") is a collection of businesses whose mission is "to organize the world's information and make it universally accessible and useful."[6] The largest of Alphabet's businesses is Google, which among many other products operates an "ad technology ["ad tech"] platform for advertisers, agencies, and publishers."[7] Alphabet has two publicly-traded classes of stock: "Class A common stock has one vote per share, and [] Class C capital stock has no voting rights;"[8] I refer to them collectively as "Alphabet Stock."

9. Item 1A. in Alphabet's SEC Forms 10-K is a list of risk factors detailing various risks and uncertainties that could harm its business, reputation, financial condition, and operating results, including risks related to regulatory scrutiny.[9] In particular, it states:

> **We are subject to increasing regulatory scrutiny as well as changes in public policies governing a wide range of topics that may negatively affect our business.** We and other companies in the technology industry are experiencing increased regulatory scrutiny. For instance, various regulatory agencies, including competition, consumer protection, and privacy authorities, are reviewing aspects of our products and services. We continue to cooperate with these investigations. Prior,

---

[6]   Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2019 ("2019 10-K"), p. 5.
[7]   2019 10-K, pp. 5 and 6.
[8]   2019 10-K, pp. 18 and 23. Class A common stock (ticker: GOOGL) and Class C capital stock (ticker: GOOG) traded on the NASDAQ stock market. *See*, e.g., Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2020 ("2020 10-K"), p. 26.
[9]   *See*, e.g. 2019 10-K, ppp. 9-22.

existing, and new investigations have in the past and may in the future result in substantial fines and penalties, changes to our products and services, alterations to our business operations, and civil litigation, all of which could harm our business, reputation, financial condition, and operating results.[10]

**We are subject to claims, suits, government investigations, and other proceedings that may harm our business, financial condition, and operating results.** We are subject to claims, suits, and government investigations involving competition... Any of these types of legal proceedings can have an adverse effect on us because of legal costs, diversion of management resources, negative publicity and other factors.... The resolution of one or more such proceedings has resulted in, and may in the future result in, additional substantial fines, penalties, injunctions, and other sanctions that could harm our business, financial condition, and operating results.[11]

Alphabet also discussed ongoing regulatory investigations and actions in its SEC filings. For example:

From time to time we are subject to formal and informal inquiries and investigations by competition authorities in the United States, Europe, and other jurisdictions. For example, **in August 2019, we began receiving civil investigative demands from the U.S. Department of Justice requesting information and documents relating to our prior antitrust investigations and certain of our business practices. Attorneys general from 51 U.S. states and territories have also opened antitrust investigations into certain of our business practices.** We continue to cooperate with federal and state regulators in the United States, and other regulators around the world.[12]

10.     In 2019, the press reported that Google was under scrutiny by the U.S. Department of Justice ("DOJ") and U.S. state attorneys general ("AGs") regarding potential antitrust violations, including in its ad tech business. In particular:

---

[10]     2019 10-K, p. 15 (emphasis in original).
[11]     2019 10-K, p. 16 (emphasis in original).
[12]     2019 10-K, p. 79 (emphasis added).

a. On May 31, 2019, after market close, *The New York Times* reported:[13]

> ~~the~~**The** **[DOJ] is exploring whether to open a case against Google for potential antitrust violations**, putting renewed scrutiny on the company… [A] new antitrust task force … **had been looking into Google's advertising practices and influence in the online advertising industry… and was also looking into its search practices**.

b. On July 23, 2019, after market close, *Dow Jones Institutional News* reported:[14]

> ~~the~~**The** **[DOJ] is opening a broad antitrust review into whether dominant technology firms are unlawfully stifling competition**.… **There is no defined end-goal yet for the Big Tech review other than to understand whether there are antitrust problems that need addressing**, but a broad range of options are on the table, the officials said. The department's inquiry could eventually lead to more focused investigations of specific company conduct, they said.

c. On September 6, 2019, after market close, at 5:04 PM,[15] Alphabet announced:[16]

> **On August 30, 2019, Alphabet received a civil investigative demand from the DOJ requesting information and documents relating to our prior antitrust investigations in the United States and elsewhere. We expect to receive in the future similar investigative demands from state attorneys general.** We continue to cooperate with the DOJ, federal and state regulators in the United States, and other regulators around the world.

---

[13] "Justice Dept. Explores Google Antitrust Case," *NYTimes.com Feed*, May 31, 2019, 9:10 PM (emphasis added). *Also see* "Justice Department Is Preparing Antitrust Investigation of Google," *Dow Jones Institutional News*, May 31, 2019, 8:45 PM ("The Justice Department is gearing up for an antitrust investigation of Alphabet Inc.'s Google, a move that could present a major new layer of regulatory scrutiny for the search giant.…[T]he department is preparing to closely examine Google's business practices related to its search and other businesses."); "Justice moves to begin antitrust probe of Google," *The Washington Post*, June 1, 2019 (Saturday) ("The probe could threaten Google with a harsh examination of its sprawling digital empire, which includes its dominant position in search and advertising...").

[14] "Justice Department to Open Broad, New Antitrust Review of Big Tech Companies—Update," *Dow Jones Institutional News*, July 23, 2019, 5:34 PM. (emphasis added).

[15] Unless otherwise noted, all time cited in this report reflect Eastern Standard Time.

[16] Alphabet Inc., Form 8-K, September 6, 2019, 5:04 PM (emphasis added).

d.  On September 9, 2019, at 2:12 PM, *Business Insider* reported that[17]

**Fifty state attorneys general have banded together to launch an investigation into Google**... **The probe** [] is being led by Texas Attorney General Ken Paxton and **will first focus on the company's advertising business**…. [Paxton said that this] "is an investigation to determine the facts. **Right now we're looking at advertising, but the facts will lead where the facts will lead.**"

11.  On May 15, 2020, after market close, *The Wall Street Journal* reported:[18]

**Justice Department, State Attorneys General Likely to Bring Antitrust Lawsuits Against Google; Both the federal and state investigations are focused on Google's ad business**…Both the Justice Department and a group of state attorneys general are likely to file antitrust lawsuits against Alphabet Inc.'s Google—and are well into planning for litigation... The Justice Department is moving toward bringing a case as soon as this summer... At least some state attorneys general—led by Texas Attorney General Ken Paxton, a Republican—are likely to file a case, probably in the fall... Much of the states' investigation has focused on Google's online advertising business.… **The Justice Department likewise is making Google's ad technology one of its points of emphasis. But it is also focusing more broadly on concerns that Google uses its dominant search business to stifle competition, people familiar with the matter said.**

12.  On July 29, 2020, the U.S. House Judiciary's Subcommittee on Antitrust, Commercial and Administrative Law held a hearing regarding the "anti-competitive practices allegedly deployed by Amazon…Alphabet, Facebook and Apple."[19] On September 14, 2020 at

---

[17]  "50 state attorneys general have launched a formal probe into whether Google has engaged in anti-competitive practices in its ads business (GOOG, GOOGL)," *Business Insider*, September 9, 2019, 2:12 PM (emphasis added). *Also see* "Attorneys General Launch Probe of Google," *Dow Jones Institutional News*, September 9, 2019, 3:10 PM ("The states for months had been making plans for the investigation, which were previously reported by The Wall Street Journal.")

[18]  "Justice Department, State Attorneys General Likely to Bring Antitrust Lawsuits Against Google; Both the federal and state investigations are focused on Google's ad business," *The Wall Street Journal*, May 15, 2020, 4:32 PM (emphasis added).

[19]  "Lawmakers just raked Big Tech CEOs over the coals," *latimes.com*, July 29, 2020.

4:13 PM (i.e., after the market closed), Google's written responses to the U.S. House Judiciary Committee's questions from the July 29, 2020 hearing were made public on Congress' website.[20] There were over 85 questions and responses in total.[21] Specifically, in response to the question "[w]hat percentage of bids does Google win on its own ad exchanges?", Google responded:[22]

> Publishers utilizing Google Ad Manager's auction to sell their ad inventory are able to solicit bids from Authorized Buyers (e.g., third-party demand side platforms ("DSPs"), ad networks, and trading desks) and Open Bidders (third-party ad networks and ad exchanges), as well as buyers utilizing Google-owned platforms such as Google Ads and Display & Video 360. These bidders compete in a unified auction against each other, the publisher's guaranteed sales, and other demand sources configured by the publisher. All participants in the unified auction, including those using Google-owned platforms, compete for each impression on a net basis, and no auction participant receives any information about any other party's bids prior to completion of the auction. The highest net bid wins. The channel through which a bid is received does not otherwise affect the determination of the winning bidder.

13.    On October 20, 2020 at 10:12 AM, the DOJ filed an antitrust complaint alleging that Google engaged in anticompetitive conduct to preserve a monopoly for its search engine and related advertising business.[23] I refer to this complaint as the "DOJ Search Complaint."

---

[20]    Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google | Committee Repository | U.S. House of Representatives (showing that the responses were published at 4:13 PM); Google's Submission in Response to Subcommittee Questions for the Record Following July 29, 2020 Hearing, September 14, 2020 (HHRG-116-JU05-20200729-QFR051-U1.pdf).

[21]    Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google | Committee Repository | U.S. House of Representatives; Google's Submission in Response to Subcommittee Questions for the Record Following July 29, 2020 Hearing, September 14, 2020 (HHRG-116-JU05-20200729-QFR051-U1.pdf).

[22]    Google's Submission in Response to Subcommittee Questions for the Record Following July 29, 2020 Hearing, September 14, 2020 (HHRG-116-JU05-20200729-QFR051-U1.pdf).

[23]    Pacer; *see also* "Justice Department Files Long-Awaited Antitrust Suit Against Google -- 2nd Update," *Dow Jones Institutional News*, October 20, 2020, 2:22 PM; United States of America et al. v. Google LLC, Complaint, October 20, 2020.

14.    On December 15, 2020, after market close at 7:20 PM, *Reuters* reported: [24]

> The Texas attorney general's office… would face off against Alphabet's Google in **an expected antitrust lawsuit**…. Texas, backed by other states, has **long been expected** to follow the Justice Department's lawsuit against Google…. The Texas led group has been focusing on Google's ad-tech dominance.

15.    On December 16, 2020 at 1:59 PM, *Bloomberg News* reported that the Texas Attorney General was suing Google.[25] On the same day at 3:35 PM, the Texas AG along with ~~ten~~nine other state AGs filed a partially redacted antitrust complaint against Google.[26] The complaint alleges that Google violated antitrust laws by manipulating digital advertising markets.[27] I refer to this complaint as the "AG Redacted Ad Tech Complaint."

16.    According to the AG Redacted Ad Tech Complaint, the online advertising business is set up as a series of tools and platforms connecting website publishers, who sell space on their websites for ads, with advertisers who purchase the space.[28] This complaint contains privacy allegations and allegations about Google's advertising business that I understand are unrelated to the claims at issues in this matter such as various measures to force market participants to reroute bidding through Google.[29] In addition, the AGs claim that Google's ad buying tools had certain advantages when bidding in the auctions.[30] The AGs further claim that to exclude competition from other bidders, Google shared its own speed and information

---

[24]    "Texas hiring two law firms for Google probe team," *Reuters*, December 15, 2020, 7:20 PM (emphasis added).

[25]    "Texas AG: Filing Lawsuit Vs. Google for Anticompetitive Conduct," *Bloomberg News,* December 16, 2020, 1:59 PM.

[26]    Pacer; The State of Texas et al. v. Google LLC, Complaint, December 16, 2020 ("AG Redacted Ad Tech Complaint"). The state AGs bringing the lawsuit included those from Texas, Arkansas, Idaho, Indiana, Kentucky, Mississippi, Missouri, North Dakota, South Dakota and Utah.

[27]    AG Redacted Ad Tech Complaint. The AG Redacted Ad Tech Complaint did not name Facebook as a defendant.

[28]    AG Redacted Ad Tech Complaint, ¶¶ 33-60.

[29]    AG Redacted Ad Tech Complaint, ¶¶ 140-143, 197-200, 202-234.

[30]    *See* e.g. AG Redacted Ad Tech Complaint, ¶ 59.

advantages in auctions with Facebook but not with other bidding participants.[31] I refer to these advantages as "Alleged Bidding Advantages."

17.     On December 17, 2020, after market close at 4:36 PM, 38 state attorneys general, led by the Colorado Attorney General, filed another antitrust complaint against Google.[32] This complaint alleges Google engaged in anticompetitive conduct to maintain monopoly power for its search engine.[33] I refer to this complaint as the "AG Search Complaint."

18.     On July 7, 2021 at 3:56 PM, state attorneys general, led by the Utah Attorney General, filed yet another antitrust complaint against Google.[34] The allegations in this complaint relate to the practices of the Google Play app store.[35] I refer to this complaint as the "AG Google Play Complaint."

19.     On October 22, 2021, before the market opened at 9:00 AM, the Texas Attorney General and other attorneys general filed an unredacted second amended complaint, adding attorneys general from six more states and Puerto Rico.[36] Among other things, this complaint provides additional details on existing allegations in the AG Redacted Ad Tech Complaint,

---

[31]     *See* e.g. AG Redacted Ad Tech Complaint, ¶¶ 57, 184-196.

[32]     Pacer; State of Colorado et al. v. Google LLC, Complaint, December 17, 2020; although the AG Search Complaint was filed after market close, news sources appeared to have obtained and quoted from the complaint prior to market close. *See*, e.g., "States File Antitrust Lawsuit Against Google," *Dow Jones Institutional News*, December 17, 2020, 1:20 PM ("'As the gateway to the internet, Google has systematically degraded the ability of other companies to access consumers,' the states said in a wide-ranging complaint making allegations about Google's search and advertising businesses.").

[33]     State of Colorado et al. v. Google LLC, Complaint, December 17, 2020.

[34]     Pacer; *see also* "States Target Google Play Store in Antitrust Suit," *Dow Jones Institutional News*, July 7, 2021, 6:10 PM.

[35]     State of Utah et al. v. Google LLC, Complaint, July 7, 2021.

[36]     Pacer; State of Texas et al. v. Google ~~Inc.,~~LLC, Complaint, October 22, 2021 ("AG Unredacted and Amended Ad Tech Complaint"); *see also*, "Google Charges More than Twice Its Rivals in Ad Deals, Wins 80% of Its Own Auctions, Court Documents Say -- 4th Update," *Dow Jones Institutional News*, October 22, 2021, 3:11 PM. The additional six states are Alaska, Florida, Louisiana, Montana, Nevada and South Carolina.

including with regard to the Alleged Bidding Advantages.[37] I refer to this complaint as the "AG Unredacted and Amended Ad Tech Complaint."

20.     On January 23, 2023, after market close at 7:16 PM, *Bloomberg News* reported that the DOJ was "poised to sue Google over digital ad market dominance."[38]

21.     On January 24, 2023, the DOJ issued a press release titled "Justice Department Sues Google for Monopolizing Digital Advertising Technologies."[39] On the same day, at 12:18 PM, the DOJ filed a complaint against Google (the "DOJ Ad Tech Complaint").[40] An analyst commented that "the [DOJ Ad Tech Complaint] mirrors a lawsuit filed in Dec. 2020 by a number of state AGs led by TX AG Ken Paxton (R)."[41] Another analyst stated: "In the search suit, the DOJ is seeking behavioral remedies and fines. In the ad tech suit, the DOJ goes further, seeking fines, remedies and divestment."[42]

### B.  Summary of Plaintiffs' Allegations

22.     I understand that Plaintiffs initially claimed that Alphabet, Google, Alphabet's CEO Sundar Pichai, and others[43] made a series of 20 "materially false and misleading statements

---

[37]     *See* e.g. AG Unredacted and Amended Ad Tech Complaint ¶¶ 185-234. Again, I understand that the AG Unredacted and Amended Ad Tech Complaint did not name Facebook as a defendant.

[38]     "DOJ Poised to Sue Google over Digital Ad Market Dominance," *Bloomberg News*, January 23, 2023, 7:16 PM.

[39]     "Justice Department Sues Google for Monopolizing Digital Advertising Technologies," DOJ Press Release, January 24, 2023 (time stamp unknown).

[40]     Pacer; United States of America et al. v. Google LLC, Complaint, January 24, 2023. The attorneys general from Virginia, California, Colorado, Connecticut, New Jersey, New York, Rhode Island and Tennessee joined the suit. I understand that the complaint did not name Facebook as a defendant.

[41]     "TMT Policy — DOJ's GOOGL Ad Tech Suit Could Lead to Divestiture, but Presents Bargaining Opportunity," Compass Point, January 25, 2023, p. 1.

[42]     "Antitrust Tuesday Was More Bark Than Bite for LYV, GOOG and Tech," Rosenblatt, January 25, 2023, p. 1.

[43]     I understand that the originally named Defendants are Alphabet, Google, Sundar Pichai, Ruth M. Porat, Philipp Schindler, and Kent Walker. *See* In re Alphabet, Inc. Securities Litigation, Second Amended Complaint for Violations of the Federal Securities Laws, filed on September 24, 2024, Case No. 3:23-CV-01186-RS, ("Second Amended Complaint") ¶¶ 23-28.

and/or omissions concerning digital advertising" and 18 "materially false and misleading statements and/or omissions concerning privacy policies and practices."[44] Plaintiffs alleged that these purported misstatements and/or omissions concealed relevant practices that "created a heightened risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, and reputational harm."[45] Plaintiffs further claimed that all alleged misstatements and/or omissions were corrected by five disclosures,[46] and that "[w]hen the truth about Alphabet and Google's practices was eventually revealed through a series of [five] corrective disclosures or materializations of risks, Plaintiffs and other members of the class of investors in Alphabet suffered significant damages."[47]

23.    The five alleged corrective disclosures are:

a.    On December 16, 2020, the AG Redacted Ad Tech Complaint was filed.[48] Plaintiffs stated that the complaint "targeted Google for alleged anti-competitive conduct that violated the antitrust laws in the field of digital advertising and contained allegations about, among other things, Google's anticompetitive practices, rigging of auctions, and controlling of pricing."[49] Plaintiffs claim that "[o]n this news, Alphabet's Class A shares fell $1.02 per share over two days, or 1.16%, to close at $87.03 per share, while its Class C shares fell $0.99 per share over two days, or 1.12%, to close at $87.40 per share, on December 17, 2020."[50]

b.    Plaintiffs state that on September 1, 2021, after market close, news reported that the DOJ "was readying an antitrust lawsuit targeting Google's anticompetitive practices in the advertising technology business" and "had

---

[44]    Second Amended Complaint ¶¶ 154-258.
[45]    *See*. e.g., Second Amended Complaint ¶ 170.
[46]    Second Amended Complaint ¶¶ 259-274. In the Loss Causation section of the Second Amended Complaint, Plaintiffs state: "On April 17, 2023, post-market, nine more State Attorneys General joined the January 24, 2023 DoJ antitrust lawsuit against Alphabet. On this news, Alphabet's Class A shares fell $1.47 per share, or 1.39%, to close at $104.50 per share, while its Class C shares fell $1.30 per share, or 1.22%, to close at $105.12 per share, on April 18, 2023." *See* Second Amended Complaint ¶¶ 275-276. I understand that this is not an Alleged Corrective Disclosure at issue.
[47]    Second Amended Complaint ¶ 7.
[48]    *See* ¶ 15 above.
[49]    Second Amended Complaint ¶ 260.
[50]    Second Amended Complaint ¶ 261.

accelerated its investigation of Google's digital advertising practices" and "that a lawsuit was imminent."[51] Plaintiffs claim "[o]n this news, Alphabet's Class A shares fell $1.93 per share, or 1.33%, to close at $143.29 per share, while its Class C shares fell $1.62 per share, or 1.11%, to close at $144.22 per share, on September 2, 2021."[52]

    c.   On October 22, 2021, the AG Unredacted and Amended Ad Tech Complaint was filed.[53] Plaintiffs allege that it exposed "additional details of the alleged anticompetitive conduct undertaken by Google, and … more details about Google's privacy violations and its efforts to forestall or curtail privacy protections. The unredacted portions revealed, among other things, the specific cut of the ad spending market that Google was able to extract using its improper conduct, and showed the portion of various digital advertising markets that Google controlled through such means. The unredacted complaint also revealed that Google's top brass was working surreptitiously to undermine privacy protections, including child privacy protections. And it exposed the fact that Google was knowingly violating the privacy of over 750 million WhatsApp users on Google-Android devices that backed up their WhatsApp messaging history, photos, videos, and audio files to Google Drive."[54] Plaintiffs further allege that "[o]n this news, Alphabet's Class A shares fell $4.32 per share, or 3.04%, to close at $137.57 per share, while its Class C shares fell $4.15 per share, or 2.91%, to close at $138.63 per share, on October 22, 2021."[55]

    d.   Plaintiffs state that on February 11, 2022, "the European Publishers Council ("EPC") filed an antitrust complaint against Google with the European Commission. The EPC accused Google of prioritizing its own self-interest at the expense of the very customers it was supposed to serve, harming publishers, advertisers, and consumers, in the form of supracompetitive fees and lower quality of service. The EPC also alleged that Google's conduct has actively depressed publisher revenue."[56] Plaintiffs claim that "[o]n this news,

---

[51]   Second Amended Complaint ¶ 263. *Also see* "U.S. DOJ Readies Google Antitrust Lawsuit over Ad-tech Business." *Bloomberg News*, September 1, 2021, 4:47 PM. "Justice Dept. Is Said to Accelerate Google Advertising Inquiry," *The New York Times*, September 1, 2021, 7:59 PM ("The Department of Justice has accelerated an investigation into Google's digital advertising practices and may file an antitrust lawsuit against the internet giant before the end of the year, two people with knowledge of the government's thinking said on Wednesday... The agency is looking into allegations that Google and Facebook entered into an illegal agreement to manipulate the online auctions, the people with knowledge of the situation said.").

[52]   Second Amended Complaint ¶¶ 263-264.

[53]   *See* ¶ 19 above.

[54]   Second Amended Complaint ¶ 266.

[55]   Second Amended Complaint ¶ 267.

[56]   Second Amended Complaint ¶ 269. European Publishers Council is "[a] high-level group of Chairmen and CEOs of leading European media groups representing companies which are active

Alphabet's Class A shares fell $4.34 per share, or 3.13%, to close at $134.28 per share, while its Class C shares fell $4.47 per share, or 3.23%, to close at $134.13 per share, on February 11, 2022."[57]

e.  Plaintiffs state that on January 24, 2023, the DOJ issued a press release that "announced that the DoJ and Attorneys General of eight states filed a civil antitrust lawsuit against Google for monopolizing multiple digital advertising technology products in violation of antitrust laws. The lawsuit accused Google of 'wielding its dominance across digital advertising markets to force more publishers and advertisers to use its products; and thwarting the ability to use competing products.' Google was charged with 'forcing adoption of Google's tools such as its publisher ad server and ad exchange, limiting real-time bidding on publisher inventory on its ad exchange and preventing rival exchanges from competing, and manipulating auctions to Google's benefit in a manner that inhibits competing technology from emerging.' These 'anticompetitive activities allow Google to extract over 30% or more of the advertising dollars flowing through its digital advertising products and have allowed it to stamp out alternative competing technologies.'"[58] Plaintiffs also allege that "[o]n this news, Alphabet's Class A shares fell $4.57 per share over two days, or 4.58%, to close at $95.22 per share, while its Class C shares fell $4.48 per share over two days, or 4.43%, to close at $96.73 per share, on January 25, 2023."[59]

I refer to these disclosures collectively as the "Alleged Corrective Disclosures."[60]

---

[57] in news media, television, radio, digital market places, journals, eLearning, databases and books." *See* https://www.epceurope.eu/. *Also see* "Google's advertising tech targeted in European publishers' complaint," *Reuters*, February 11, 2022, 3:00 AM; "Executive Summary Complaint of the European Publishers Council against Google LLC, Alphabet Inc., Google Ireland Ltd., and YouTube LLC ("Google") regarding Google's ad tech practices," European Publishers Council, February 11, 2022; EPC's complaint is not publicly available.

[57] Second Amended Complaint ¶ 270.

[58] Second Amended Complaint ¶ 271. *Also see* Second Amended Complaint ¶ 272 ("An analyst report from BNP Paribas titled 'Death by a thousand cuts: Regulatory pressures intensify,' published on January 24, 2023, underscored the risks for Alphabet from the filing of the DoJ lawsuit. The report highlighted potential 'highly disruptive interventionist measures the DoJ could impose on Google, including divestiture of Google Ad Manager and 'breaking up' the AdTech stack,' and 'the fundamental disruption to Google's business model, which has been integrated along the AdTech stack across SSP (Supply Side), Ad servers, AdExchange and DSP (Demand Side).'").

[59] Second Amended Complaint ¶ 273.

[60] Plaintiffs' Alleged Corrective Disclosures are all regulatory investigations and lawsuits. However, Plaintiffs ignore other regulatory investigations during the Class Period when Alphabet stock prices (i.e., both Classes A and C) did not decrease. For example, on June 22, 2021, the European Union antitrust regulator announced its investigation into Google's digital advertising

13

24.     I further understand that on March 24, 2025, the Court in this matter issued the Order dismissing all 18 alleged false and misleading statements concerning privacy policies and practices and all but one of the 20 alleged false and misleading statements concerning digital advertising.[61]

25.     The remaining alleged misstatement occurred on September 14, 2020 at 4:13 PM (i.e., after the market closed) when Google's written responses to the U.S. House Judiciary Committee's questions from the July 29, 2020 hearing ~~was~~were made public on Congress' website.[62] Of more than 85 questions and responses,[63] only one part of one answer is allegedly misstated. Specifically, in response to the question "[w]hat percentage of bids does Google win on its own ad exchanges?", Google responded in part that in a unified auction, **"[t]he channel through which a bid [for an ad] is received does not otherwise affect the determination of the winning bidder"** (the "Alleged Misstatement").[64] Plaintiffs claim that due to the Alleged Bidding Advantages, "the channel through which a bid was received did in fact affect the

---

business. *See* "EU antitrust regulators to investigate Google's adtech business," *Reuters*, June 22, 2021, 5:45 AM. Google's Class A stock price return on June 22, 2021 was 0.43% and its Class C stock price return was 0.43%. Nye Class Cert Report Exhibits 11B and 11D. On May 26, 2022, UK antitrust regulators opened an investigation into Google's ad tech chain. *See* "Britain launches second probe into Google's ad practices," *Reuters*, May 26, 2022, 6:19 AM. Google's Class A stock price return on May 26, 2022 was 1.88% and its Class C stock price return was 2.32%. Nye Class Cert Report Exhibits 11B and 11D.

61     Second Amended Complaint ¶¶ 154-258; Order, p. 17.
62     Second Amended Complaint ¶¶ 161, 165 and 166; Google's Submission in Response to Subcommittee Questions for the Record Following July 29, 2020 Hearing, September 14, 2020 (HHRG-116-JU05-20200729-QFR051-U1.pdf).
63     Google's Submission in Response to Subcommittee Questions for the Record Following July 29, 2020 Hearing, September 14, 2020 (HHRG-116-JU05-20200729-QFR051-U1.pdf).
64     Second Amended Complaint ¶ 166 (emphasis in original). In a unified auction, "bidders compete in a single auction, under one set of rules that apply to all comers, instead of multiple independent auctions run by publishers on a variety of exchanges." *See* "How Google is rewriting the rules of ad auctions; Publishers evaluate their ad tech ecosystems as the internet giant creates a 'unified' world," *Ad Age*, May 28, 2019.

determination of the winning bidder."[65]

26.     I understand Plaintiffs claim that the one remaining alleged misstatement was corrected by all of the five Alleged Corrective Disclosures that were initially alleged, i.e., when all of the alleged misrepresentations or omissions were pleaded in the case.

### C.  Plaintiffs' Motion for Class Certification

27.     On October 30, 2025, Plaintiffs filed a motion seeking class certification.[66] Plaintiffs define the class as those "who purchased or otherwise acquired Alphabet's Class A and/or Class C shares between September 14, 2020 and January 23, 2023, both dates inclusive (the 'Class Period')".[67]

28.     In support of their motion, Plaintiffs submitted the Expert Report of Zachary Nye, Ph.D. dated October 30, 2025 (the "Nye Class Cert Report"). Dr. Nye "~~concludes~~conclude[s] that the markets for Alphabet's Class A stock and Class C stock were efficient throughout the Class Period."[68] To support his opinion, Dr. Nye "performed a standard event study for Alphabet Class A stock and Class C stock to determine whether new, material corporate events or financial releases promptly caused a measurable stock price reaction after accounting for

---

[65]     Second Amended Complaint ¶ 170. In other words, according to the Order: "Plaintiffs have alleged that FAN [Facebook's ad buying tool] and DV360 [Google's ad buying tool], armed with better information and more time than other third-party channels, would have been able to submit winning bids to the unified auction at a far higher rate than would have been possible without their timing and informational advantages. On a bid-by-bid basis, this would plausibly 'affect' the determination of the winning bidder because—without these advantages—FAN or DV360 would often have been outbid by a competitor." Order, p. 10.

[66]     In re Alphabet, Inc. Securities Litigation Plaintiffs' Notice of Motion and Motion for Class Certification, October 30, 2025 ("Class Cert Motion").

[67]     Class Cert Motion, p. 1. I note that because the market had closed before the alleged misstatement was made on September 14, 2020, investors who traded beforehand, including during the trading day on September 14, 2020, could not have relied on the alleged misstatement because it had not occurred yet.

[68]     Nye Class Cert Report ¶ 8.

contemporaneous market and industry effects."[69] Dr. Nye determined that the price reaction to an event is statistically significant if the associated residual, or "abnormal," return (i.e., after accounting for the effects of market and industry factors) in Alphabet's stock from his event study is at or above the 95% confidence level.[70]

29.     Dr. Nye also opines that "damages under Section 10(b) of the Exchange Act, for investors who purchased or otherwise acquired Alphabet's Class A stock and Class C stock during the Class Period, can be calculated using a methodology that is common to all members of the Class and in a manner that is consistent with Plaintiffs' theory of liability."[71]

## IV.     Scientific Foundations for Price Impact Analysis

30.     I begin by providing an overview of stock price behavior and efficient markets before turning to the appropriate analytical framework for conducting a price impact analysis.

### A.  Stock Price Behavior and Efficient Markets

31.     In an efficient market, finance theory dictates that stock prices reflect the expected future cash flows of a company.[72] These expectations are influenced by market, industry, and company-specific factors. The efficient market hypothesis states that stock prices reflect the total mix of publicly available information regarding these expected future cash flows.[73] Publicly available information containing such value-relevant information can encompass everything from a company's public SEC filings to newspaper articles.

---

[69]     Nye Class Cert Report ¶ 52.
[70]     Nye Class Cert Report ¶ 55. Alphabet's residual, or abnormal, returns are a measure of the change in the stock price due to company-specific events and are calculated as the difference between Alphabet's actual return and its expected return. Nye Class Cert Report ¶ 80.
[71]     Nye Class Cert Report ¶ 9.
[72]     R. Brealey and S. Myers, 2003, *Principles of Corporate Finance,* McGraw-Hill/Irwin, pp. 60-61.
[73]     Z. Bodie, A. Kane, and A. Marcus, 2018, *Investments,* McGraw-Hill, Glossary, p. G-4.

32.     A central tenet of the efficient market hypothesis is that as new information becomes public, stock prices "quickly and fully" reflect that information.[74] Therefore, only disclosures of information that significantly alter the total mix of publicly available information impact the price of a stock. Only new public information will necessitate a revision of the company's expected future cash flows and the risk thereof and, hence, result in a changed stock price. In other words, only new information is "news" in an efficient market, as previously known or expected information would have already been incorporated into the stock price of a security in an efficient market.[75] Moreover, in an efficient market, new relevant information would be expected to impact any company to which such information is value relevant, regardless of who released the information.[76]

33.     For the purposes of my analysis and consistent with Dr. Nye's opinion, I have assumed that Alphabet common stocks traded in efficient markets where stock prices quickly reflect the total mix of publicly available information.[77] The academic literature has explored how "quickly" new information is "fully" reflected in the stock price in an efficient market. Numerous academic studies indicate that an efficient market's reaction to new events is immediate and unbiased.[78]

---

[74]     C. Jones, 2013, *Investments: Analysis and Management,* John Wiley & Sons, Inc. p. 320.
[75]     E. Elton, M. Gruber, S. Brown, and W. Goetzmann, 2003, *Modern Portfolio Theory and Investment Analysis,* John Wiley & Sons, Inc. pp. 402, 414.
[76]     *See., e.g.,* G.W. Schwert, 1981, "Using Financial Data to Measure Effects of Regulation*," Journal of Law and Economics*, 24:121-158, pp. 121-122.
[77]     *See*, e.g., R. Brealey, S. Myers, and A. Marcus, 2004, *Fundamentals of Corporate Finance*, McGraw-Hill/Irwin, p. 165.
[78]     *See,* e.g., S.P. Kothari, 2001, "Capital Markets Research in Accounting," *Journal of Accounting and Economics*, 31:105-231, pp.192-193 ("Evidence suggests the market's reaction to news events is immediate and unbiased … Lee (1992) uses intra-day return and trading volume data. He ~~observed~~observes a statistically significant price reaction of the same sign as the earnings surprise. The reaction occurs within 30 min of the earnings announcement, with no statistically discernible price effect thereafter."); J.M. Patell & M. A. Wolfson, 1984, "The Intraday Speed of

34.    There is a widely used and generally accepted statistical framework known as an event study for testing whether there was, in fact, a stock price movement associated with the disclosure of new value-relevant public information.[79] An event study controls for market and industry effects by employing a regression analysis to predict the company's stock return based on the observed market and industry returns and the historical relationship between those returns and the company's stock return. The abnormal return is the difference between the company's actual stock return and the return predicted by the regression model, thereby isolating the portion of the stock price movement that is company-specific (the "abnormal return").[80]

35.    The event study examines whether the observed abnormal, or company-specific, return of a stock over a given time interval (i.e., "event window") is outside the range of typical

---

Adjustments of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* (1984), 13:223-252, p. 249 ("The("[T]he price reaction to earnings and dividend announcements begins very quickly. The reaction is evident in the first pair of price changes (i.e., within at most a few minutes) of the appearance of the news release on BoardBroad Tape monitors … the largest portion of the price response occurs in the first five to fifteen minutes after the disclosure."); L. Ederington, and J.H. Lee, 1995, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis,* 30:117-134, p. 130 ("The market price begins adjusting almost immediately following a news release – generally within the first 10 seconds. The price adjusts in a series of small, but rapid, price changes, so it is clear that some trades occur at nonequilibrium prices. However, the major adjustment to the initial release is basically complete within 40 seconds, certainly 50 seconds, of the release."); A. McWilliams, and D. Siegel, 1997, "Event Studies in Management Research: Theoretical and Empirical Issues," *The Academy of Management Journal* 40(3):626-657, p. 636  ("In the absence of uncertainty about when information is actually revealed to the market, it is difficult to justify a long window. As noted earlier, the assumption of market efficiency implies almost instantaneous adjustment in stock price to the arrival of new information."); N. Visaltanachoti and T. Yang, 2010, "Speed of Convergence to Market Efficiency for NYSE-listed Foreign Stocks," *Journal of Banking and Finance,* 34:594-605, p. 604 ("("[On] average, it takes between 30 and 60 min for a foreign stock to achieve market efficiency. For a comparable US stock listed on the same exchange, it takes only 10 to 15 min.").

[79]    *See,* e.g.*,* A. Ferrell and A. Saha, 2007, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo," *The Business Lawyer,* 63: 163-186.

[80]    *See*, e.g., R. Weil, et al., 2017, *Litigation Services Handbook: The Role of the Financial Expert*, John Wiley & Sons, Inc., Appendix A, pp. 27.18-27.20.

random fluctuations observed for that stock's abnormal returns.[81] The most commonly-employed event window, indeed the window used by Dr. Nye himself to support his opinions,[82] compares the abnormal return from the close on the prior day to the close on the day on which the new information was disclosed.[83] It is not appropriate to use a two-day event window for an efficiently traded stock when a disclosure occurs at a known date and time.[84] The mere restatement of previously disclosed information or analyst commentary on that information the next day, which would have already been impounded into the company's stock price, does not add new information to the market and therefore does not warrant the use of longer event windows. Moreover, using an inappropriately lengthy event window can distort the statistical significance of price movement, showing purported statistically significant price movement where none exists.

36.    Conventional event study analysis tests the "null hypothesis" that the abnormal return on the event date (e.g., the first day the market trades after an alleged corrective disclosure) is zero against the alternative hypothesis that the abnormal return is different from zero.[85] Put differently, the analysis tests the null hypothesis that the event at hand had no impact

---

[81]    *See*, e.g., R. Weil, et al., 2017, *Litigation Services Handbook: The Role of the Financial Expert*, John Wiley & Sons, Inc., Appendix A, pp. 27.18-27.21.

[82]    Nye Class Cert Report at ¶ 80 and Exhibit 11.

[83]    A different event window than the typical close-to-close window may be appropriate depending on the facts and circumstances. *See,* e.g., L. Ederington and J.H. Lee, 1995, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis,* 30:117-134.

[84]    *See,* e.g., A. McWilliams, and D. Siegel, 1997, "Event Studies in Management Research: Theoretical and Empirical Issues," *The Academy of Management Journal* 40(3):626-657, p. 636 ("In the absence of uncertainty about when information is actually revealed to the market, it is difficult to justify a long window. As noted earlier, the assumption of market efficiency implies almost instantaneous adjustment in stock price to the arrival of new information.").

[85]    *See,* e.g., J. Campbell, A. Lo, and A.C. MacKinlay, 1997, *The Econometrics of Financial Markets*, Princeton University Press, pp. 150, 162 and 167 ("[T]his("This chapter explains the econometric methodology of event studies…. [U]nder the null hypothesis the expectation of the

on the relevant company's stock price against the alternative hypothesis that the event at hand is associated with a change in the company's stock price.

37.    If the abnormal return falls outside the range that accounts for its typical random fluctuations (i.e., a "confidence interval"), it is considered to be statistically significant, and the null hypothesis is rejected. If the abnormal return falls within the confidence interval, then the stock price movement is indistinguishable from random fluctuations and not considered to be significantly different from zero, and the null hypothesis cannot be rejected. In other words, the movement is fully explainable by contemporaneous movements in the market and industry and/or by the stock's random abnormal return fluctuations, and thus cannot be attributed to the new company-specific information announced on the event date.[86] Under these circumstances, one cannot conclude that the event at hand had an impact on the relevant company's stock price.

38.    An abnormal return is typically considered "statistically significant" in an event study if it lies outside the 95% confidence interval (i.e., lies outside the range that accounts for 95% of random price fluctuations). Using a 95% confidence interval for determining statistical significance is a standard metric for event studies.[87] An abnormal return that falls outside of the

---

abnormal returns is zero…. that the given event has no impact on the behavior of security returns."), A.C. MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature,* 35:13-39, pp. 20, 21 and 24 ("Under the null hypothesis, conditional on the event window market returns, the abnormal returns will be jointly normally distributed with a zero conditional mean and conditional variance…. Inferences about the cumulative abnormal returns can be drawn…to test the null hypothesis that the abnormal returns are zero."), G.W. Schwert, 1981, "Using Financial Data to Measure Effects of Regulation," *Journal of Law and Economics*, 24:121-158, p. 150 ("An alternative strategy which has been followed by most analysts of securities regulation is to examine the statistical behavior of security returns before and after the advent of regulation. The null hypothesis for these tests is that the change in regulation has no impact on the pricing of securities.").

[86]    *See,* e.g., C. Corrado, 2011, "Event Studies: A methodology review," *Accounting and Finance*, 51:207-234, pp. 209-211.

[87]    As discussed in ¶ 28 above, Dr. Nye also uses the 95% confidence level to determine whether a residual return is statistically significant. *Also See* Nye Class Cert Report ¶ 55.

95% confidence interval is considered to be significant at the 5% level. According to Federal

Judicial Center's *Reference Manual on Scientific Evidence*,

> In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%.[88]

39.     To test whether an observed abnormal return is significant at the 5% level, a

"t-statistic" is calculated by dividing the abnormal return by the standard error of the

regression.[89] The probability of observing a given t-statistic by random market fluctuations is

then measured. This probability is known as a "p-value." The lower the p-value, the less likely it

is that the price movement is a result of random market fluctuations. Thus, an abnormal return

with a p-value of 5% (i.e., 0.05) or lower is considered statistically significant.

40.     The analysis of stock price behavior does not end with a finding of a statistically

significant abnormal return from an event study. Suppose that an event study finds a statistically

significant abnormal return that is contemporaneous with a public disclosure of firm-specific

information. To attribute the stock price movement to the public disclosure, there is still another

crucial step in the analysis. As one textbook explains:

> An event study can tell us that something happened, but it can't tell us *why*. To explain positive or negative abnormal returns, we must closely examine the events and institutions involved…The event study technique does not eliminate the need to assess cause through deductive reasoning; it only…helps delineate what needs to be explained.[90]

41.     For example, if the particular disclosure at issue was simply repeating information

---

[88]     Federal Judicial Center, 2011, "*Reference Manual on Scientific Evidence*," National Academies Press, p. 320.

[89]     *See*, e.g., J. Wooldridge, 2013, *Introductory Econometrics: A Modern Approach*, Cengage Learning, p. 130.

[90]     R. Gilson and B. Black, 1995, *The Law and Finance of Corporate Acquisitions,* Foundation Press, p. 223221 (emphasis in original).

21

already known to the market, a researcher could not attribute, consistent with efficient markets, an abnormal return – regardless of whether it happens to be statistically significant – to such a disclosure. Disclosures that simply repeat information already known to the market or that pertain to matters that are irrelevant to market participants would not cause a revision in the company's expected future cash flows or the risks thereof and, hence, would not affect its stock price.

42.     Furthermore, firm-specific factors can impact a security's price following a public disclosure for many reasons that do not support allegations that value-relevant information was misstated or improperly omitted and caused investor losses, including the materialization of known risks, the timely disclosure of information, and the disclosure of information that is unrelated to the allegations. Consequently, it is a mistake to conclude that a finding of statistical significance by itself proves anything other than that the totality of the newly-disclosed company-specific information could have impacted a security's price, and so further analysis is required.

43.     Finally, when there are multiple pieces of information disclosed contemporaneously on a day when an event study finds a statistically significant price movement, an event study analysis alone cannot determine which piece of information was value-relevant. Even when there are multiple pieces of value-relevant information, an event study analysis cannot parse out the price impact of the multiple pieces of information.

### B.  Price Impact and the Alleged Truth

44.     The price impact inquiry is focused on stock price reactions to a particular type of disclosure: the alleged truth. Specifically, the price impact inquiry consists of analyzing the following hypothetical: if the company had revealed to the market the alleged truth – rather than

22

concealing it by making the alleged misleading statements/omissions – would such a disclosure have resulted in a stock price movement? If so, the alleged misleading statements/omissions impact the price. It is crucial to emphasize that the "alleged truth" that could and should have been disclosed earlier – the focal point of the price impact inquiry – is a function of Plaintiffs' theory of liability. Once the purported truth has been identified by Plaintiffs, a financial economist can then apply the scientific framework discussed above to test for price impact.

45.    To apply this scientific framework to a price impact inquiry, the standard approach is to analyze the stock price behavior when the alleged misleading statements/omissions and purportedly related disclosures actually occurred. If the alleged misleading statements/omissions in fact caused the market to view the company more favorably than before (and presumably more favorably than if it had been told the alleged truth that was being concealed), then one would expect to observe a positive and statistically significant abnormal return on the first day the market trades after such information is disclosed. In a similar vein, a researcher should analyze stock price behavior when the alleged truth was purportedly disclosed (the "corrective disclosures").

46.    I will now apply the scientific framework discussed above to assess whether there was a price impact on Alphabet's stock associated with the Alleged Misstatement. I will do so in two steps. First, I will assess whether the Alleged Misstatement impacted Alphabet's stock prices when made by analyzing whether it caused a positive and statistically significant abnormal return on September 1415, 2020. Second, I will assess whether the Alleged Corrective Disclosures on December 16, 2020, September 1, 2021, October 22, 2021, February 11, 2022, and January 24, 2023 that supposedly revealed the alleged truth impacted Alphabet's stock prices at the time they were made.

23

47.     For purposes of my analyses in this report, I use Dr. Nye's event study methodology.[91] He controlled for the effect of market- and industry-related factors on Alphabet's stock prices using the S&P 500 Index and a value-weighted portfolio of the constituent stocks in the RDG Internet Composite Index (exclusive of Alphabet and Meta), respectively.[92] Dr. Nye

---

[91]     I reviewed Dr. Nye's methodology and concluded that ~~they are~~it is reasonable and ~~provide~~provides a reliable basis for my opinions in this matter, hence I use it to minimize disputes about the appropriate event study model for Alphabet and the conclusions that can be derived from it. *See also* ¶ 47 n.92 below.

[92]     Nye Class Cert Report ¶¶ 78-79. On October 28, 2021, Facebook, Inc. changed its corporate name to Meta Platforms, Inc. *See* Meta Platforms, Inc. Form 8-K, October 28, 2021. In its Forms 10-K, Alphabet compares its common stock price performance with the NASDAQ Composite Index, the S&P 500 Index, and the RDG Internet Composite Index. 2019 10-K, pp. 24-25; 2020 10-K, pp. 27-28; Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2021, pp. 26-27; Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2022, pp. 24-25; Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2023, pp. 27-28. I corrected errors in Dr. Nye's industry index return calculations. First, I kept Meta in the RDG Internet Composite Index even though Dr. Nye excluded it because he did not explain why he excluded it, and there is no economic evidence supporting its exclusion: (1) I understand that none of the Alleged Corrective Disclosures name Facebook as a defendant, and the second and fourth Alleged Corrective Disclosures do not even mention Facebook. Moreover, I reviewed contemporaneous news articles and analyst reports available to me for commentary that discussed the value-relevance of the AG Redacted Ad Tech Complaint and the AG Unredacted and Amended Ad Tech Complaint to Meta and found none; specifically, my news search includes over 2,000 articles from December 15, 2020 (the trading date before the disclosure) ~~and~~to December 18, 2020 (~~the~~two trading ~~date~~dates after the disclosure) and over 3,000 articles from October 21, 2021 (the trading date before the disclosure) to October 25, 2021 (the trading date after the disclosure). This includes all sources in Factiva news search (with "Facebook" or "Meta" in the headline or lead paragraph) including all major newspapers, newswires, and other major publications, articles from Bloomberg (equity ticker=META and search term=attorneys general), and Facebook Inc. SEC filings. For analyst reports, I searched FactSet (identifier=META), LSEG (company=Meta Platforms Inc.), Capital IQ (primary company=META), and Bloomberg (equity ticker=META) for analyst reports from December 16, 2020 to December 22, 2020 and October 22, 2021 to October 28, 2021, and resulting in seven and 56 analyst reports, respectively. I also searched for earnings transcripts from October 21, 2021 to October 28, 2021 and there was one on October 25, 2021~~.~~; (2) including Meta in the estimation periods explains more of Alphabet's stock price movements on days when no allegation-related information is disclosed, demonstrating that Meta's stock price movements increase the explanatory power of Dr. Nye's event study model. Specifically, Dr. Nye's event study model for Alphabet's Class A (Class C) stock excluding Meta from the RDG Internet Composite Index has an average adjusted r-squared of 73.3% (72.6%) for non-event dates during the Class Period, which is lower than the adjusted r-squared for the same model including Meta of 74.7% (74.1%). *See* D. Ruppert, 2004, *Statistics and Finance: An Introduction*, Springer, pp. 178 (R-squared "measures the proportion of the total variation in [the dependent variable] that can be linearly predicted by [the independent variables].") and 184 ("As we have

24

estimated the historical relationship between Alphabet's stock returns and these controls using the estimation period of one year prior to each event he analyzed.[93] Dr. Nye explains that he excludes the "events under study," i.e., the stock price returns on the dates the market reacted to information he analyzes, from the data used in his regression models.[94] Accordingly, I exclude the stock price returns on event dates I analyze.[95]

## V.    There Is No Reliable Economic Basis to Conclude that the Alleged Misstatement Impacted Alphabet's Stock Prices

48.    As described above, Plaintiffs claim that the purported practices allegedly

---

seen, the adjusted $R^2$ statistic is adjusted to remove biases and can be used to select models."); Source: Nye Class Cert Report Production (NYE0006981, NYE0006997, NYE0007002-7006, NYE0007008, NYE0011890, and NYE0011892) and Bloomberg; and (3) consistent with this finding and as discussed below (*see* **Section V.B.c**), the economic evidence demonstrates that the stock prices of Meta and Alphabet declined due to industry factors unrelated to the allegations at issue. I note that the conclusions from using Dr. Nye's event study methodology do not depend on whether Meta is excluded. Second, I corrected Dr. Nye's double counting of Zillow Group, Inc.'s constituent weight. Zillow Group had two classes of stock—Class A (ticker: ZG) and Class C (ticker: Z)—both of which were included as constituents in Dr. Nye's industry index. However, when calculating the weight for each class, Dr. Nye used Zillow's combined market capitalization for both Class A and Class C. As a result, the weights for both Zillow Class A and Class C were overstated. Third, I corrected Dr. Nye's use of incorrect pricing data for Trip.com Group Ltd. Dr. Nye mistakenly used the pricing data of an unrelated company, Chewy, Inc., to calculate Trip.com Group's returns. *See* Nye Class Cert Report Production (NYE0007002-7005, NYE0007008, and NYE0011890).

[93]    Nye Class Cert Report ¶ 77.

[94]    Nye Class Cert Report ¶ 77. Dr. Nye excluded Alphabet's returns for each earnings announcement date that falls within the estimation period for each event date. *See* ¶ 77 and Exhibit 12.

[95]    The event dates excluded are related to: (1) the Alleged Misstatement – September 15, 2020 (the reaction date of the Alleged Misstatement) (*see* ¶ 25 above); (2) the Alleged Corrective Disclosures – December 16, 2020 (*see* ¶ 23 above), September 2, 2021 (the reaction date of the September 1, 2021 Alleged Corrective Disclosure) (*see* ¶ 23 above), October 22, 2021 (*see* ¶ 23 above), February 11, 2022 (*see* ¶ 23 above), January 24, 2023 (*see* ¶ 23 above); (3) other events under study – June 3, 2019  (reaction date to news of potential DOJ investigation) (*see* ¶ 10 above), October 20, 2020 (the filing date of DOJ Search Complaint) (*see* ¶ 13 above), December 18, 2020 (the reaction date to the filing of the AG Search Complaint) (*see* ¶ 17 above), July 7, 2021 (the filing date of AG Google Play Complaint) (*see* ¶ 18 above); and (4) additional claims made by Plaintiffs – December 17, 2020 (the day after the December 16, 2020 Alleged Corrective Disclosure) (*see* ¶ 23 above) and January 25, 2023 (the day after the January 24, 2023 Alleged Corrective Disclosure) (*see* ¶ 23 above). I note that my conclusions do not change if I only exclude the event dates in categories (1) and (2).

25

concealed by the Alleged Misstatement "created a heightened risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, ~~lawsuits,~~ and reputational harm" and was corrected by five disclosures. As explained in the following sections, there is no reliable economic basis to conclude that the Alleged Misstatement impacted Alphabet's stock prices either when made or when purportedly corrected by the Alleged Corrective Disclosures. Neither the Alleged Misstatement nor any of the allegedly corrective information in these five disclosures caused a statistically significant abnormal return, which as explained above is a critical requirement to determine whether information had a price impact. These results are not surprising for three powerful reasons.

49.    First, the risk of antitrust actions against Alphabet was already "heightened" before the Class Period began because Alphabet previously had disclosed the risks of the actions taken in the Alleged Corrective Disclosures, as well as the fact that it was being investigated by the DOJ and AGs.[96] Moreover, public information about the advancement of these investigations also was disclosed prior to the Class Period.[97] Therefore, in the efficient markets in which Alphabet Stocks traded, these risks were fully reflected in the stock prices before the Alleged Misstatement was made.

50.    Indeed, as shown in **Exhibit 1**, Alphabet's abnormal returns were negative and statistically significant on June 3, 2019, the first trading day after it was reported that the DOJ was exploring opening a case against Google for potential antitrust violations that included, among other things, its advertising practices and influence on the online advertising industry.[98]

---

[96]    *See* ¶ 9 above.
[97]    *See* ¶¶ 10-11 above.
[98]    *See* ¶ 10 above. Market participants attributed the declines in Alphabet's stock prices on June 3, 2019 to the news. *See*, e.g., "UPDATE 1-Alphabet shares slide 6% on possible DoJ antitrust

**Exhibit 1**
**Stock Price Reactions of Alphabet on June 3, 2019**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -6.12% | -6.11% |
| Predicted Return | [B] | -2.12% | -2.10% |
| Abnormal Return | [C = A - B] | -4.00% | -4.00% |
| t-Statistic | [D] | -4.18 | -4.16 |
| Statistically Significant? |  | Yes | Yes |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

Market participants recognized that the risk of regulatory antitrust actions were reflected in Alphabet's stock prices. For example, after 50 state AGs announced an investigation into Google focusing on company's advertising business on September 9, 2019,[99] MKM Partners commented: "Bottom Line: Despite fairly turbulent headlines coupled with choppy markets, GOOGL shares were down 0.1% yesterday (vs. S&P 500 -0.01%). **We view such a 'non-reaction' as the near-term risk of rising regulatory overhang being largely priced in to Alphabet shares**."[100]

51.    Because the "heightened risk" of regulatory antitrust actions was disclosed and

---

probe," *Reuters*, June 3, 2019, 5:29 PM ("Alphabet Inc's shares closed 6% down on Monday following reports that the U.S. Justice Department may investigate Google for hampering competition.").

[99]    *See* ¶ 10 above.

[100]    "In Google We Trust? Antitrust Investigation Is the Beginning of a New Era in Big Tech vs. Govt.," MKM Partners, September 910, 2019, p. 1 (emphasis added) ("On Monday [September 9, 2019], 50 attorneys general from 48 U.S. states plus Washington D.C. and Puerto Rico signed onto an antitrust investigation into Alphabet... Is yesterday's announcement surprising? No. On Friday [September 6, 2019], Alphabet filed an 8-K form with the SEC indicating that the company "received a civil investigative demand from the DOJ requesting information and documents relating to our prior antitrust investigations in the United States and elsewhere. We expect to receive in the future similar investigative demands from state attorneys general.". However, we are surprised with the scale of the coordination across states. For context, we believe roughly 24 states' attorneys generals filed the initial investigation vs. Microsoft (MSFT-Not Rated) in 1998.").

27

understood by market participants, the price impact of an allegedly *undisclosed* additional risk would represent a marginal increase, if any, above the amount already reflected in Alphabet's stock prices. In other words, the supposed "heightened risk" purportedly concealed by the Alleged Misstatement would have to have an additional impact on the stock prices beyond what was already reflected in them. The results from Dr. Nye's own event study methodology demonstrate that there is no reliable economic evidence to support Plaintiffs' claim that the allegedly undisclosed marginal increase in risk of regulatory action, if any, had an impact on Alphabet's stock prices because: 1) the Alleged Misstatement is not associated with a statistically significant price increase that revised the market's understanding of the "heightened risk"; and 2) there is no economic basis to associate the Alleged Corrective Disclosures with statistically significant declines that would reflect the price impact of allegedly undisclosed additional risks.[101]

52.    Second, the economic evidence is further inconsistent with a claim that Class Period disclosures of detailed allegations regarding alleged antitrust wrongdoing enumerated in complaints filed by the DOJ and AGs negatively impacted Alphabet's stock prices. To see why, note that the pre-Class Period disclosures of antitrust investigations were not limited to Google's advertising business.[102] In fact, three other regulatory complaints were filed during the Class Period alleging antitrust violations by Google for businesses unrelated to advertising.[103] As shown in **Exhibit 2** below, none of these complaints ~~were~~was accompanied by negative and

---

[101]    Even if there had been evidence of price impact, which there is not, at least a portion of the impact would reflect the materialization of the known risks and would not solely reflect the materialization of the allegedly undisclosed risks, if any.

[102]    *See* ¶ 10 above.

[103]    Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2023, pp. 77-78; "States File Antitrust Lawsuit Against Google," *Dow Jones Institutional News*, December 17, 2020, 1:20 PM.

statistically significant abnormal returns.[104]

**Exhibit 2**
**Stock Price Reactions of Alphabet on Unrelated Antitrust Complaint Filing Dates**

| | Time Stamp [A] | Event [B] | Statistics [C] | Class A [D] | Class C [E] |
|---|---|---|---|---|---|
| 1 | 10/20/20 10:12 AM | DOJ Search Complaint | Abnormal Return<br>t-Statistic<br>Stat. Significant? | 0.94%<br>0.93<br>No | 0.95%<br>0.93<br>No |
| 2 | 12/17/20 4:36 PM (Price Reaction Date 12/18/20) | AG Search Complaint | Abnormal Return<br>t-Statistic<br>Stat. Significant? | -0.52%<br>-0.46<br>No | -0.67%<br>-0.59<br>No |
| 3 | 7/7/21 3:56 PM | AG Google Play Complaint | Abnormal Return<br>t-Statistic<br>Stat. Significant? | 0.01%<br>0.01<br>No | 0.01%<br>0.01<br>No |

Notes: (1) Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater. (2) Despite the fact that the AG Search Complaint was not available on Pacer until after the market close on December 17, 2020, press articles published earlier that day quote allegations made in the complaint (*see* e.g., "States File Antitrust Lawsuit Against Google," *Dow Jones Institutional News*, December 17, 2020, 1:20 PM ("'As the gateway to the internet, Google has systematically degraded the ability of other companies to access consumers,' the states said in a wide-ranging complaint making allegations about Google's search and advertising businesses.")); however, as shown below in **Exhibit 5**, the abnormal return on this day also is not statistically significant. (3) Alphabet's stock price did not have statistically significant abnormal returns from 3:55 PM on July 7, 2021, the minute before AG Google Play Complaint was filed, to when the market opened at 9:30 AM on July 8, 2021. *See* **Appendix C**. (4) Time stamps from Pacer.

---

[104]    I reviewed contemporaneous news articles and analyst reports available to me for potentially value-relevant positive news that possibly could have offset any negative implications from the news of the complaint filings and prevented Alphabet's stock prices from decreasing for each of the three dates on **Exhibit 2**. I used the same search methodology as I did for the Alleged Misstatement and the Alleged Corrective Disclosures. *See* ¶ 57 n.107, ¶ 62 nn.114 and 115, ¶ 65 n.121, ¶ 70 n.125, ¶ 83 n.148147 and ¶ 89 n.154153. Based on my news search and analyst reports available to me, I found that before the market opened on October 20, 2022, Jefferies raised its price targets for several technology firms: Facebook, Alphabet, Snap, and Twitter. *See* "Q3 Digital Ad Preview: Favor FB And SNAP," Jefferies, October 20, 2020, 12:09 AM, p. 1. However, I did not find articles or analyst reports discussing this news as a positive catalyst for Alphabet stock prices. Moreover, Argus commented: "The Department of Justice antitrust complaint against the company, filed on October 20, has been hanging over GOOGL shares for many months, so the share price rebound following the announcement is no surprise. We think the DOJ's case is serious, though it will probably take years to play out and may be difficult to prove in court. While not good news for Alphabet, the DOJ complaint is now at least a fact rather than a rumor." "Analyst's Notes," Argus, October 20, 2020, p.1.

These results provide additional economic evidence that, given the known risks of regulatory antitrust actions across various Google businesses,[105] disclosures by regulatory agencies of specific details of antitrust allegations did not impact Alphabet's stock prices during the Class Period.

53.     Third, in the efficient market in which Dr. Nye opines Alphabet's stocks traded, the repetition of the principal claims from the first Alleged Corrective Disclosure (the AG Redacted Ad Tech Complaint) in later Alleged Corrective Disclosures would not be expected to have an impact on Alphabet's stock prices.

54.     I now turn to my analyses of the Alleged Misstatement and Alleged Corrective Disclosures.

### A.  Analysis of Price Impact Related to the Alleged Misstatement

55.     As explained below, Alphabet's stock prices did not increase significantly following the disclosure of the Alleged Misstatement, and I did not find any market participant discussions about the Alleged Misstatement. Consequently, the economic evidence demonstrates that the Alleged Misstatement did not revise the market's view of the known "heightened risk."

56.     Because the Alleged Misstatement—"**The channel through which a bid is received does not otherwise affect the determination of the winning bidder**" in a unified auction—occurred after hours on September 14, 2020,[106] I analyze the price reaction on September 15, 2020, i.e., from the closing price on September 14 to the closing price on September 15. **Exhibit 3** below presents the results of Dr. Nye's event study methodology for September 15, 2020.

---

[105]    *See* ¶¶ 9-11 above.
[106]    *See* ¶¶ 12 and 25 above.

30

**Exhibit 3**
**Stock Price Reactions of Alphabet on September 15, 2020**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | 1.74% | 1.46% |
| Predicted Return | [B] | 1.02% | 1.03% |
| Abnormal Return | [C = A - B] | 0.72% | 0.43% |
| t-Statistic | [D] | 0.73 | 0.43 |
| Statistically Significant? |  | No | No |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

57.     As shown, the results of Dr. Nye's event study methodology demonstratesdemonstrate that after controlling for market and industry factors, Alphabet's stock prices did not increase by statistically significant amounts. I reviewed contemporaneous news articles and analyst reports available to me[107] and found that none even mentioned the portion of Google's responses that contained the Alleged Misstatement, let alone its contents, which is consistent with the event study results that the Alleged Misstatement lacked value-relevance to investors when it was made.

58.     In an efficient market, the absence of statistically significant abnormal returns demonstrates that the Alleged Misstatement did not alter market participants' then-current

---

[107]     My news search includes over 1,000 articles from September 14, 2020 (the trading date before the disclosure) to September 16, 2020 (the trading date after the disclosure). I also looked for SEC filings but there were none from September 14, 2020 to September 16, 2020, This includes all sources in Factiva news search ("Google" or "Alphabet" in the headline or lead paragraph) including all major newspapers, newswires, and other major publications, all articles from Bloomberg (equity ticker=GOOGL), and Alphabet SEC filings. For analyst reports, I received reports from Counsel and also searched FactSet (identifier=GOOGL), LSEG (company=Alphabet), Capital IQ (primary company=GOOGL), and Bloomberg (equity ticker=GOOGL) from September 14 to September 28, 2020 (two weeks including the disclosure), resulting in 1415 analyst reports. I also searched for earnings transcripts from September 14 to September 28, 2020 and there were none.

understanding about the "risk of civil and regulatory investigations and lawsuits, regulatory enforcement actions, and reputational harm."[108] In particular, there is no economic evidence that the Alleged Misstatement reduced or otherwise revised market participants' understanding about the heightened risk that already was reflected in Alphabet's stock prices due to the earlier disclosures of regulatory actions.

59.    For all of the reasons above, there is no reliable economic basis to conclude that the Alleged Misstatement impacted Alphabet's stock prices when made.

### B. Analysis of the Price Impact of the Alleged Corrective Disclosures

#### a. Alleged Corrective Disclosure 1 on December 16, 2020

60.    Plaintiffs allege that the filing of the AG Redacted Ad Tech Complaint on December 16, 2020 is a corrective disclosure.[109] I understand that the Defendants disagree that the allegations made by third parties in this complaint are true and thus Defendants could not have disclosed the allegations, or any purported support for them contained therein, any earlier. In any event, given that the risks of a complaint being filed by the AGs alleging antitrust violations in Google's ad tech business were publicly well-documented beforehand, the filing reflects the materialization of known rather than concealed risks. Moreover, because I understand that under Plaintiffs' claims there were numerous allegations in the AG Redacted Ad Tech Complaint that are no longer at issue in this matter,[110] a substantial amount of negative

---

[108]    I reviewed contemporaneous news articles and analyst reports available to me for value-relevant negative news that possibly could have offset the Alleged Misstatement and prevented Alphabet's stock prices from increasing and found none. *See* ¶ 57 n.107 for search criteria. I note that a Google executive was questioned in a Congressional hearing during the day on September 15, 2020 but found no commentary demonstrating that the testimony had negative and value-relevant implications. *See*, e.g., "Google grilled on ad business dominance by U.S. Senate panel," *Reuters*, September 15, 2020, 6:25 PM."

[109]    *See* ¶ 23 above.

[110]    *See* ¶ 16 above.

confounding information unrelated to the Alleged Misstatement was released simultaneously.[111]

61.     The totality of the allegations contained in the AG Redacted Ad Tech Complaint, of which the Alleged Bidding Advantages was one part, did not cause Alphabet's stock prices to decrease by statistically significant amounts on December 16, 2020. As shown in **Exhibit 4**, the results of Dr. Nye's event study methodology demonstrates that after controlling for market and industry factors, Alphabet's stock prices did not decrease by statistically significant amounts. This result is consistent with the lack of market reaction to the filing of antitrust complaints unrelated to this matter discussed above.[112]

---

[111]     I note that market participants discussed the AG's privacy allegations and allegations about Google's advertising business that I understand are unrelated to the claims regarding the Alleged Bidding Advantages. *See* e.g., "Texas leads Republican attorneys general in new antitrust lawsuit against Google, targeting its advertising empire" *Washington Post.com*, December 16, 2020 ("Paxton and his peers also faulted Google for failing to protect the privacy of millions of Web users."); "Ten States Sue Google, Alleging Deal With Facebook to Rig Online Ad Market; Texas-led coalition accuses Alphabet unit of striking arrangement with rival tech giant to preserve its own dominance; legal action follows federal case," *The Wall Street Journal Online*, December 16, 2020, 6:25 PM ("The complaint also targets Google for allegedly influencing an initiative for developing mobile webpages, known as Accelerated Mobile Pages, to effectively force publishers to adopt a format that would make it harder to use alternative ad technologies on those pages."). According to the *2017 Litigation Services Handbook*, "Economists refer to information unrelated to the issue in question as *confounding events or confounding information*." *See* K.L Gold, E. Korman, and A. Nabi, 2017, "Federal Securities Acts and Areas of Economic Analysis," *Litigation Services Handbook: The Role of the Financial Expert*, John Wiley & Sons, Inc., p. 27.12.27.18 (emphasis in original).

[112]     *See* ¶ 52 above.

**Exhibit 4**
**Stock Price Reactions of Alphabet on December 16, 2020**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -0.22% | -0.27% |
| Predicted Return | [B] | 0.78% | 0.80% |
| Abnormal Return | [C = A - B] | -1.00% | -1.07% |
| t-Statistic | [D] | -0.89 | -0.94 |
| Statistically Significant? |  | No | No |

Notes: (1) Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater. (2) Alphabet's stock price did not have statistically significant abnormal returns from 3:34 PM on December 16, 2020, the minute before the AG Redacted Ad Tech Complaint was filed, to when the market opened at 9:30 AM on December 17, 2020.[113] *See* **Appendix C**.

62.     In an efficient market, the absence of statistically significant abnormal returns

demonstrates that the AG Redacted Ad Tech Complaint did not impact Alphabet's stock

prices.[114] Moreover, based on analyst reports available to me,[115] there was limited analyst

---

[113]   I note that although *The Wall Street Journal* reported a denial by Alphabet ("'Attorney General Paxton's ad tech claims are meritless, yet he's gone ahead in spite of all the facts. We've invested in state-of-the-art ad tech services that help businesses and benefit consumers,' a Google spokesperson said Wednesday [December 16, 2020]. 'We will strongly defend ourselves from his baseless claims in court.' The spokesperson said that the allegation about Facebook isn't accurate and that the company doesn't receive special data." "Ten States Sue Google, Alleging Deal With Facebook to Rig Online Ad Market; Texas-led coalition accuses Alphabet unit of striking arrangement with rival tech giant to preserve its own dominance; legal action follows federal case," *The Wall Street Journal*, December 16, 2020, 6:25 PM"),). I did not find any market commentary that this denial affected market participants' opinions about the AG Redacted Ad Tech Complaint or Alphabet's stock prices. *See* ¶ 62 nn.114 and 115 for search criteria.

[114]   I reviewed contemporaneous news articles and analyst reports available to me for potentially value-relevant positive news that possibly could have offset the Alleged Corrective Disclosure and prevented Alphabet's stock prices from decreasing and found none. My news search includes over 2,000 articles from December 15 (the trading date before the disclosure) to December 18, 2020 (thetwo trading datedates after the disclosure). This includes all sources in Factiva news search ("Google" or "Alphabet" in the headline or lead paragraph) including all major newspapers, newswires, and other major publications, all articles from Bloomberg (equity ticker=GOOGL) and Alphabet SEC filings.

[115]   For analyst reports, I received reports from Counsel and also searched FactSet (identifier=GOOGL), LSEG (company=Alphabet), Capital IQ (primary company=GOOGL), Bloomberg (equity ticker=GOOGL) for analyst reports from December 16 to December 29, 2020 (two weeks including the disclosure), and resulting in eleven analyst reports. I also searched for earnings transcripts from December 16 to December 29, 2020 and there were none.

commentary discussing this Alleged Corrective Disclosure. Eleven analyst reports on Alphabet

were issued during the two-week window from December 16, 2020 to December 29, 2020. None

of them mentioned the Alleged Misstatement. Four out of the eleven analyst reports

~~mentions~~mention the AG Redacted Ad Tech Complaint (one of which was a shorter version of

another with the same title issued by the same analyst),[116] and the only one of those four that

mentions the Alleged Bidding Advantages simply paraphrases an article in *The Wall Street*

*Journal* rather than ~~provide~~provides its own commentary, hence adding nothing to the total mix

of public information.[117] Rather than providing analysis or commentary about the allegations,

these reports simply repeated the news.

63.     Despite the fact that Plaintiffs do not identify any new allegedly corrective

information disclosed on December 17, 2020,[118] they claim that Alphabet stock prices declined

on that day in reaction to the alleged corrective information contained in the AG Redacted Ad

Tech Complaint.[119] The results of Dr. Nye's event study methodology demonstrate that after

controlling for market and industry factors, Alphabet's stock prices also did not decrease by

statistically significant amounts on December 17, 2020 as shown in **Exhibit 5**.

---

[116]    "States Targeting Alphabet's Search and Overall Digital Advertising in the Latest Google Hunt," Morningstar, December 18, 2020, p. 1; "States Targeting Alphabet's Search and Overall Digital Advertising in the Latest Google Hunt," Morningstar, December 18, 2020, pp. 1-2 (Morningstar issued two separate reports with the same title); "Weekly Wrap: Government Shutdown Watch Over Fiscal Stimulus Details," Raymond James, December 18, 2020, p. 2; "Daily MIC: FB/GOOGL Discuss Cooperation in Antitrust Suit; MGM Explores Sale; COVID Bill Cracks Down on Streaming Piracy," Guggenheim, December 22, 2020 p. 1.

[117]    *Compare* "Daily MIC: FB/GOOGL Discuss Cooperation in Antitrust Suit; MGM Explores Sale; COVID Bill Cracks Down on Streaming Piracy," Guggenheim, December 22, 2020, p.1 *with* "Google, Facebook Agreed to Team Up Against Possible Antitrust Action, Draft Lawsuit Says; Draft lawsuit quotes Facebook's Sandberg saying Google pact was a 'big deal strategically'," *The Wall Street Journal,* December 22, 2020, 12:25 AM.

[118]    Based on my review of news articles and analyst reports available to me, I found no mention of the Alleged Misstatement or of any new information regarding the Alleged Bidding Advantages on December 17, 2020. *See* ¶ 62 nn.114 and 115 for search criteria.

[119]    Second Amended Complaint ¶ 261.

**Exhibit 5**
**Stock Price Reactions of Alphabet on December 17, 2020**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -0.95% | -0.86% |
| Predicted Return | [B] | 0.66% | 0.66% |
| Abnormal Return | [C = A - B] | -1.61% | -1.51% |
| t-Statistic | [D] | -1.42 | -1.33 |
| Statistically Significant? |  | No | No |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

64.     Given the above, there is no reliable economic basis to conclude that the Alleged Corrective Disclosure on December 16, 2020 impacted Alphabet's stock prices, hence this disclosure provides no reliable economic basis to conclude that the Alleged Misstatement had a price impact.

### b.  Alleged Corrective Disclosure 2 on September 1, 2021

65.     Plaintiffs claim that news of the DOJ readying an antitrust lawsuit targeting Google's anticompetitive practices in the advertising technology business is a corrective disclosure,[120] but this is simply the materialization of known risks as explained above. Moreover, Plaintiffs fail to specify what new purported facts were revealed by this Alleged Corrective Disclosure showing the Alleged Misstatement was false; indeed, the news does not contain any discussion of the Alleged Misstatement or the Alleged Bidding Advantages. In my review of news articles and analyst reports available to me,[121] I did not find any analyst reports that

---

[120]   *See* ¶ 23 above.

[121]   My news search includes over 1,000 articles from September 1, 2021 (the trading date before the disclosure) to September 3, 2021 (the trading date after the disclosure). This includes all sources in Factiva news search ("Google" or "Alphabet" in the headline or lead paragraph) including all major newspapers, newswires, and other major publications, all articles from Bloomberg (equity

mentioned the September 1, 2021 Alleged Corrective Disclosure regarding the potential DOJ lawsuit, nor any commentary in the press discussing either the Alleged Misstatement or the Alleged Bidding Advantages.

66.    Because the Alleged Corrective Disclosure occurred on September 1, 2021 after the market closed,[122] I analyze the price reaction on September 2, 2021. As shown in **Exhibit 6**, the results of Dr. Nye's event study methodology demonstrates that after controlling for market and industry factors, Alphabet's stock prices did not decrease by statistically significant amounts.

**Exhibit 6**
**Stock Price Reactions of Alphabet on September 2, 2021**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -1.33% | -1.11% |
| Predicted Return | [B] | 0.28% | 0.30% |
| Abnormal Return | [C = A - B] | -1.61% | -1.41% |
| t-Statistic | [D] | -1.47 | -1.30 |
| Statistically Significant? |  | No | No |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

67.    In an efficient market, the absence of statistically significant abnormal returns demonstrates that this Alleged Corrective Disclosure did not impact Alphabet's stock prices.[123]

68.    Given the above, there is no reliable economic basis to conclude that the Alleged

---

ticker=~~Google~~GOOGL), and Alphabet SEC filings. For analyst reports, I received reports from Counsel and also searched FactSet (identifier=GOOGL), LSEG (company=Alphabet), Capital IQ (primary company=GOOGL), Bloomberg (equity ticker=GOOGL) for analyst reports from September 1, 2021 to September 15, 2021 (two weeks including the disclosure), and resulting in ~~16~~17 analyst reports.  I also searched for earnings call transcripts from September 1, 2021 to September 15, 2021 and there were none.

[122]    *See* ¶ 23 above.

[123]    I reviewed contemporaneous news articles and analyst reports available to me for potentially value-relevant positive news that possibly could have offset the Alleged Corrective Disclosure and prevented Alphabet's stock prices from declining and found none. *See* ¶ 65 n.121 for search criteria.

Corrective Disclosure on September 1, 2021 impacted Alphabet's stock prices, hence this disclosure provides no reliable economic basis to conclude that the Alleged Misstatement had a price impact.

### c.   Alleged Corrective Disclosure 3 on October 22, 2021

69.    Plaintiffs allege that the filing of the AG Unredacted and Amended Ad Tech Complaint on October 22, 2021 is a corrective disclosure.[124] I again understand that the Defendants disagree that any additional allegations made by third parties in this complaint are true and thus Defendants could not have disclosed the allegations, or any purported support for them contained therein, any earlier. In any event, the publication of the unredacted and any amended claims were the materialization of known risks, particularly since the AG Redacted Ad Tech Complaint and the allegations it contained, along with which portions had been redacted, were public. Plaintiffs fail to specify what new purported facts revealed the value-relevance of the allegedly concealed risks.

70.    Based on my review of news articles and analyst reports available to me,[125] I found no mention of the Alleged Misstatement or of any new information regarding the Alleged Bidding Advantages. Instead, market participants focused on other aspects of the AG's allegations such as the privacy allegations and advertising allegations that I understand are

---

[124]    *See* ¶ 23 above.

[125]    My news search includes approximately over 1,000 articles from October 21, 2021 (the trading date before disclosure) to October 25, 2021 (the trading date after disclosure). This includes all sources in Factiva news search ("Google" or "Alphabet" in the headline or lead paragraph) including all major newspapers, newswires, and other major publications and all articles from Bloomberg (equity ticker=GOOGL), and Alphabet SEC filings. For analyst reports, I received reports from Counsel and also searched FactSet (identifier=GOOGL), LSEG (company=Alphabet), Capital IQ (primary company=GOOGL), and Bloomberg (equity ticker=GOOGL) for analyst reports from October 22, 2021 to November 4, 2021 (two weeks including the disclosure), and resulting in 7664 analyst reports. I also searched for earnings call transcripts from October 22, 2021 to November 4, 2021 and there was one on October 26, 2021.

unrelated to the claims regarding the Alleged Bidding Advantages.[126]

71.    **Exhibit 7** reports the results of Dr. Nye's methodology applied to October 22, 2021 and shows that Alphabet's abnormal stock price movements were negative and statistically significant.

**Exhibit 7**
**Stock Price Reactions of Alphabet on October 22, 2021**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -3.04% | -2.91% |
| Predicted Return | [B] | -0.75% | -0.69% |
| Abnormal Return | [C = A - B] | -2.29% | -2.23% |
| t-Statistic | [D] | -2.17 | -2.14 |
| Statistically Significant? |  | Yes | Yes |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

72.    However, the economic evidence supports the conclusion that industry-related news rather than anything in the AG Unredacted and Amended Ad Tech Complaint fully explains Alphabet's stock price declines on October 22, 2021.

73.    First, the fact that the stock prices did not decline significantly following the initial publication of the AG's allegations regarding the Alleged Bidding Advantages, or to antitrust allegations regarding Google's other businesses specified in other complaints issued by AGs and the DOJ during the Class Period, indicates that any specific new information in the AG

---

[126]    *See,* e.g., "Google said it had successfully 'slowed down' European privacy rules, according to lawsuit," *New York Times*, October 22, 2021, 1:32 PM; "Google worked with Facebook to undermine Apple's attempts to offer its users great privacy protections, complaint alleges," *Business Insider*, October ~~22~~24, 2021, 1:59 PM.; "Google Charges More Than Twice Its Rivals in Ad Deals, Unredacted Suit Says; According to the suit by state attorneys general, one senior Google employee said the 'analogy would be if Goldman or Citibank owned the NYSE'" *The Wall Street Journal Online*, October 22, 2021, 3:11 PM; Google Takes Up to 42% From Ads, States Claim in Lawsuit (l), *Bloomberg News*, October 22, 2021, 2:50 PM.

Unredacted and Amended Complaint was not value-relevant. In fact, I found no market participant that attributed the declines in Alphabet's stock prices to the AG Unredacted and Amended Ad Tech Complaint, let alone to new details regarding the Alleged Bidding Advantages.[127]

74.     Second, after market close on October 21, 2021,[128] Snap Inc., a technology firm that, like Alphabet, relies on online advertising revenue,[129] announced lower-than-expected third quarter revenues and reduced expectations for its fourth quarter revenues, attributing the weakness to privacy changes implemented by Apple Inc. on iOS devices that "did not scale as [] expected, making it more difficult for our advertising partners to measure and manage their ad campaigns for iOS" (the "Snap Disclosure").[130] *The Associated Press* reported that Snap's "ad sales are being hurt by a privacy crackdown that rolled out on Apple's iPhones earlier this year," and that "[t]he change blocks online tracking on iPhones unless a user grants explicit permission to do so, making it more difficult for companies that sell ads based on the information they collect about people's interests and location."[131]

75.     The Snap Disclosure negatively impacted the stock prices of other technology firms dependent on digital advertising, including Alphabet, Meta, Pinterest, Trade Desk, and

---

[127]     *See* ¶ 70 n.125 for search criteria.

[128]     Because returns for a particular day are measured from the market close on the prior day to the market close on the day being analyzed, any value-relevant information disclosed during that 24-hour period will affect the return.

[129]     "Google Charges Higher Fees for Ads, Lawsuit Says. That's Not Why Alphabet's Stock Is Dropping," *Barron's Online*, October 22, 2021, 3:55 PM ("As a result, Snap stock has tumbled 26% in Friday trading, while other online advertisers have gotten hit too.").

[130]     "Snap Inc. Announces Third Quarter 2021 Financial Results," *Business Wire*, October 21, 2021, 4:10 PM; "Snap Inc. NYSE:SNAP FQ3 2021 Earnings Call Transcripts," S&P Global Market Intelligence, October 21, 2021, 5:00 PM.

[131]     "Snap's stock drops as iPhone privacy controls pinch ad sales," *Associated Press Newswires*, October 21, 2021, 7:24 PM.

Twitter.[132] I will refer to Snap, Meta, Pinterest, Trade Desk, and Twitter as the "Sub-Industry Firms." **Exhibit 8** presents charts comparing the returns for Alphabet and the other Sub-Industry Firms from market close on October 21, 2021 to market close on October 22, 2021. They show that the stock prices of Alphabet and the Sub-Industry Firms declined following the Snap Disclosure.

---

[132]      *See*, e.g., "Facebook and Alphabet Pummeled After Snap Warns on Ads (1)," *Bloomberg News*, October 21, 2021, 6:30 PM ("A collapse in shares of Snap Inc. dragged technology companies exposed to digital advertising lower late on Thursday after the owner of the Snapchat app warned that customers are cutting back on ad spending. Facebook Inc. and Twitter Inc. were among the biggest decliners, with each at one point sinking more than 6% in postmarket trading. Google-parent Alphabet Inc. slid 2.8%."); "Dow Jones Futures: Snap Crashes, Intel Tumbles On Earnings; Donald Trump Makes SPACs Great Again," *Investor's Business Daily*, October 22, 2021 ("Snap news also hit Facebook, Google parent Alphabet and Twitter, Pinterest and Trade Desk…."). These firms explain that the "substantial majority" or "substantially all" of their revenue stems from advertising. *See* Facebook, Inc. Form 10-K for the fiscal year ended December 31, 2020, p. 7; Pinterest, Inc. Form 10-K for the fiscal year ended December 31, 2020, p. 18.; Snap Inc. Form 10-K for the fiscal year ended December 31, 2020, p. 2; The Trade Desk, Inc. Form 10-K for the fiscal year ended December 31, 2020, p. 15; Twitter, Inc. Form 10-K for the fiscal year ended December 31, 2020, p. 15. While Trade Desk is not a search or social media firm, it provides "a self-service omnichannel software platform that enables our clients to purchase and manage data-driven digital advertising campaigns." *See* The Trade Desk, Inc. Form 10-K for the fiscal year ended December 31, 2020, p. 6.

**Exhibit 8**
**Alphabet and Sub-Industry Firms Stock Returns**
**October 21, 2021 4:00 PM to October 22, 2021 4:00 PM**

**Alphabet v. Snap**



Notes: Areas shaded grey indicate post-market and pre-market trading. Stock returns calculated using VWAP according to the definition in Appendix C.
Source: Tick Data.



Notes: Areas shaded grey indicate post-market and pre-market trading. Stock returns calculated using VWAP according to the definition in Appendix C.
Source: Tick Data.

**Alphabet v. Meta**

42



Notes: Areas shaded grey indicate post-market and pre-market trading. Stock returns calculated using VWAP according to the definition in Appendix C.
Source: Tick Data.



Notes: Areas shaded grey indicate post-market and pre-market trading. Stock returns calculated using VWAP according to the definition in Appendix C.
Source: Tick Data.

**Alphabet v. Pinterest**



Notes: Areas shaded grey indicate post-market and pre-market trading. Stock returns calculated using VWAP according to the definition in Appendix C.
Source: Tick Data.



Notes: Areas shaded grey indicate post-market and pre-market trading. Stock returns calculated using VWAP according to the definition in Appendix C.
Source: Tick Data.

**Alphabet v. Trade Desk**



Notes: Areas shaded grey indicate post-market and pre-market trading. Stock returns calculated using VWAP according to the definition in Appendix C.
Source: Tick Data.



Notes: Areas shaded grey indicate post-market and pre-market trading. Stock returns calculated using VWAP according to the definition in Appendix C.
Source: Tick Data.

**Alphabet v. Twitter**



Notes: Areas shaded grey indicate post-market and pre-market trading. Stock returns calculated using VWAP according to the definition in Appendix C.
Source: Tick Data.

76.    Market participants attributed these declines to the Snap Disclosure. For example:

a.    On October 22, 2021 at 3:55 PM, *Barron's Online* reported: [133]

> **Alphabet stock is down** on **Friday, but it's not because of antitrust headlines.** The spillover from Snap's warning

---

[133]    "Google Charges Higher Fees for Ads, Lawsuit Says. That's Not Why Alphabet's Stock Is Dropping," *Barron's Online*, October 22, 2021, 3:55 PM (emphasis added).

Thursday evening that its advertising growth would slow going forward is doing much more to pressure internet advertising stocks industrywide…. Google-parent Alphabet's (ticker: GOOGL) stock was down 3.1%, but **a quick glance around the market suggests it has more to do with Snapchat-parent Snap (SNAP) than the lawsuit**. On Thursday, Snap reported 57% revenue growth in the third quarter, but gave a weaker-than-expected fourth-quarter forecast. It blamed the weakness on recent changes by Apple (AAPL) that make it more difficult to track iPhone users' activity across apps and websites. That was taking a larger bite out of advertising revenue than it had expected. **As a result, Snap stock has tumbled 26% in Friday [October 22, 2021] trading, while other online advertisers have gotten hit too. Facebook (FB) has dropped 5.6%, while Twitter (TWTR) has fallen 4.6%, and Pinterest (PINS) has slumped 5.6%. The Snap news is an incremental negative for Google's advertising business, too, and investors are discounting the shares on Friday ~~[October 22, 2021]~~ for a potentially weaker third quarter for the search giant….**

But **one more antitrust headline doesn't really move the needle**. Both in the U.S. and abroad, investigators are looking into Google's antitrust and privacy practices. Those include the state AGs, the U.S. Department of Justice, and agencies of the European Union. Alphabet has already been hit by nearly $10 billion in fines globally in recent years. That's a big number, but essentially a rounding error for a company expected to do more than $250 billion in sales and to earn some $70 billion in 2021 alone. **Wall Street certainly isn't all that worried about antitrust when it comes to Google**.

Previous lawsuits against Google and other large tech companies have been dragged out for years—and largely ended with narrow rulings that hardly affected any of the giants' core businesses or profit machines. Congress hasn't shown it can get its act together on meaningful antitrust actions regarding Big Tech, either…. **Until proven otherwise and shown there will be an impact on these companies' bottom lines, investors will continue to look past seemingly negative antitrust headlines targeting tech giants**.

b.  On October 21, 2021 at 6:30 PM, *Bloomberg News* reported:[134]

---

[134]    "Facebook and Alphabet Pummeled After Snap Warns on Ads (1)," *Bloomberg News*, October 21, 2021, 6:30 PM~~.~~ (emphasis added).

> **A collapse in shares of Snap Inc. dragged technology companies exposed to digital advertising lower late on Thursday after the owner of the Snapchat app warned that customers are cutting back on ad spending. Facebook Inc. and Twitter Inc. were among the biggest decliners**, with each at one point sinking more than 6% in postmarket trading. **Google-parent Alphabet Inc. slid 2.8%.** Snap cited customers' supply chain problems and Apple lnc.'s data collection policies for a revenue forecast that fell short of the average analyst estimate.

c.  October 22, 2021, at 5:31 AM, *Theflyonthewall.com* reported: [135]

> Snap results raise uncertainty for digital advertising, says Piper Sandler Snap's (SNAP) Q3 results suggest a "more challenging earnings season," especially for names exposed to direct response advertisers, Piper Sandler analyst Thomas Champion tells investors in a research note. **The analyst believes Apple's data tracking changes flagged by Snap "raise the level of uncertainty and may worsen before workarounds take hold." Names in the digital advertising space include Facebook (FB), Pinterest (PINS), Twitter (TWTR) and Alphabet (GOOG, GOOGL).**

d.  On October 22, 2021, at 4:42 PM, *Dow Jones Institutional News* reported:[136]

> Quarterly results late Thursday [October 21, 2021] from Snapchat parent Snap Inc. (SNAP), which forecast a weaker-than-expected holiday season and **expressed concerns over digital advertising, prompted a decline in internet and social-media related stocks, including Google-parent Alphabet(GOOGL) and Facebook Inc. (FB).**

e.  On October 22, 2021, *Investor's Business Daily* reported: "Snap news also hit Facebook, Google parent Alphabet and Twitter, Pinterest and Trade Desk."[137]

f.  On October 22, 2021, at 4:52 PM, *Bloomberg News* reported: [138]

---

[135]  "05:31 EDT Snap results raise uncertainty for digital advertising, says Piper...," *Theflyonthewall.com*, October 22, 2021.

[136]  "Dow ends at all-time high, U.S. stocks book weekly gains despite tech under pressure," *Dow Jones Institutional News*, October 22, 2021, 4:42 PM. (emphasis added).

[137]  "Dow Jones Futures: Snap Crashes, Intel Tumbles On Earnings; Donald Trump Makes SPACs Great Again," *Investor's Business Daily*, October 22, 2021.

[138]  "Snap's Record Rout Leads $142 Billion Social-Media Selloff (1)," *Bloomberg News*, October 22, 2021, 4:52 PM. (emphasis added).

**Snap Inc. posted its biggest one-day drop on record after the Snapchat parent company warned that Apple Inc.'s data collection rules and global supply-chain bottlenecks are weighing on advertising spending.** The stock tumbled 27%, wiping out about $32 billion of a market value that now sits around $89 billion. **The cautious outlook cast a shadow over ad-dependent peers, including Google-owner Alphabet Inc., Facebook Inc., Twitter Inc. and Pinterest Inc., which fell between 3% and 5% each**.

77.    As further evidence of the negative impact of the Snap Disclosure on Alphabet's stock prices, note that Alphabet's stock prices increased five days later on October 27, 2021 after it announced its own financial results for the same quarter that Snap did,[139] and analysts commented that Apple's privacy changes did not have the effect on Alphabet that had been anticipated earlier. For example, in a report title "Search-ing for the iOS impact," UBS noted that "[t]he biggest highlight of Alphabet's results is that its advertising business looks largely unaffected by the iOS changes," while Canaccord Genuity commented that "[d]espite investor concerns following underwhelming results from Snap and Facebook over the past week, Google appears to be withstanding privacy changes more effectively as its ownership of the Android operating system and significant trove of first-party data largely insulate it from disruption."[140]

78.    Dr. Nye's event study methodology does not fully capture the sub-industry impact of the Snap disclosure because his diversified industry index includes 115 firms during the Class Period.[141] To test whether the Snap Disclosure can explain the statistical significance of

---

[139]    The first news reporting Alphabet's financial results on October 26, 2021 occurred at 4:04 PM. "*"Google-parent Alphabet beats revenue expectations," *Reuters*, October 26, 2021, 4:04 PM. Alphabet's Class A price increased by 4.96% while the Class C price increased by 4.84% on October 27, 2021, the next trading day. Nye Class Cert Report Exhibits 11B and 11D.

[140]    "Search-ing for the iOS impact," UBS, October 26, 2021, p. 1; "Advertising & Cloud momentum persist in Q3," Canaccord Genuity, October 26, 2021, p. 1.

[141]    Nye Class Cert Report Production (NYE0007002-7005, NYE0007008, and NYE0011890).

49

Alphabet's abnormal returns from Dr. Nye's event study methodology, I modified Dr. Nye's event study methodology by adding a value-weighted index using the Sub-Industry Firms.[142] As shown in **Exhibit 9**, Alphabet's stock prices did not decrease by statistically significant amounts.

**Exhibit 9**
**Stock Price Reactions of Alphabet on October 22, 2021**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -3.04% | -2.91% |
| Predicted Return | [B] | -1.83% | -1.69% |
| Abnormal Return | [C = A - B] | -1.21% | -1.22% |
| t-Statistic | [D] | -1.18 | -1.20 |
| Statistically Significant? |  | No | No |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

79.     As an additional test of whether the Snap Disclosure can explain the statistical significance of Alphabet's abnormal returns from Dr. Nye's event study methodology, I modified it by adding only Snap's stock return as an independent variable.[143] As shown in **Exhibit 10**, yet again, Alphabet's stock prices did not decrease by statistically significant amounts.

---

[142]    This modified model for Class A (Class C) stock on October 22, 2021 has an adjusted r-squared of 57.8% (56.8%) vs. 55.7% (54.9%) for the model shown in **Exhibit 7**.

[143]    This modified model for Class A (Class C) stock on October 22, 2021 has an adjusted r-squared of 55.8% (54.8%) vs. 55.7% (54.9%) for the model shown in **Exhibit 7**.

**Exhibit 10**
**Stock Price Reactions of Alphabet on October 22, 2021**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -3.04% | -2.91% |
| Predicted Return | [B] | -1.34% | -1.15% |
| Abnormal Return | [C = A - B] | -1.70% | -1.76% |
| t-Statistic | [D] | -1.62 | -1.69 |
| Statistically Significant? |  | No | No |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

80.    Finally, as explained above, the AG Unredacted and Amended Ad Tech Complaint was filed at 9:00 AM on October 22, 2021.[144] Counsel asked me to perform an event study for Alphabet's abnormal returns from 8:59 AM (i.e., the minute before the complaint was filed) to the market open that day (9:30 AM), and from 8:59 AM to the market close that day (4:00 PM). As shown in **Appendix C**, the abnormal returns in Alphabet's stock prices over these periods are not statistically significant.

81.    In an efficient market, the absence of statistically significant abnormal returns demonstrates that the disclosure of the Alleged Bidding Advantages in the AG Unredacted and Amended Ad Tech Complaint did not impact Alphabet's stock prices.[145]

82.    Given the above, there is no reliable economic basis to conclude that the Alleged Corrective Disclosure on October 22, 2021 impacted Alphabet's stock prices, hence this disclosure provides no reliable economic basis to conclude that the Alleged Misstatement had a price impact.

---

[144]    *See* ¶ 19 above.
[145]    I reviewed contemporaneous news articles and analyst reports available to me for potentially value-relevant positive news that possibly could have offset the Alleged Corrective Disclosure and prevented Alphabet's stock prices from increasing and found none. *See* ¶ 70 n.125 for search criteria.

### d. Alleged Corrective Disclosure 4 on February 11, 2022

83.    Plaintiffs allege that the filing of EPC's antitrust complaint against Google with the European Commission was a corrective disclosure,[146] but this is simply the materialization of known risks as explained above. Moreover, Plaintiffs fail to specify what new purported facts were revealed by this Alleged Corrective Disclosure showing the Alleged Misstatement was false because the public disclosures about the EPC's complaint do not contain any discussion of the Alleged Misstatement or the Alleged Bidding Advantages. My review of news articles and analyst reports available to me[147] did not find any analyst reports that mentioned the February 11, 2022 Alleged Corrective Disclosure regarding the EPC antitrust lawsuit, nor any commentary in the press discussing either the Alleged Misstatement or the Alleged Bidding Advantages.

84.    Furthermore, the results of Dr. Nye's event study methodology demonstrates that after controlling for market and industry factors, Alphabet's stock prices did not decrease by statistically significant amounts on February 11, 2022 as shown in **Exhibit 11**.

---

[146]    *See* ¶ 23 above.

[147]    My news search includes over 1,000 articles from February 10, 2022 (the trading date before the disclosure) to February 14, 2022 (the trading date after the disclosure). This includes all sources in Factiva news search ("Google" or "Alphabet" in the headline or lead paragraph) including all major newspapers, newswires, and other major publications, all articles from Bloomberg (equity ticker=GOOGL), and Alphabet SEC filings. For analyst reports, I received reports from Counsel and also searched FactSet (identifier=GOOGL), LSEG (company=Alphabet), Capital IQ (primary company=GOOGL), Bloomberg (equity ticker=GOOGL) for analyst reports from February 11, 2022 to February 24, 2022 (two weeks including the disclosure), and resulting in 13 analyst reports. I also searched for earnings transcripts from February 11, 2022 to February 24, 2022 and there were none.

**Exhibit 11**
**Stock Price Reactions of Alphabet on February 11, 2022**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -3.13% | -3.23% |
| Predicted Return | [B] | -2.44% | -2.41% |
| Abnormal Return | [C = A - B] | -0.69% | -0.82% |
| t-Statistic | [D] | -0.67 | -0.82 |
| Statistically Significant? |  | No | No |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

85.     In an efficient market, the absence of statistically significant abnormal returns demonstrates that this Alleged Corrective Disclosure did not impact Alphabet's stock prices.[148]

86.     Given the above, there is no reliable economic basis to conclude that the Alleged Corrective Disclosure on February 11, 2022 impacted Alphabet's stock prices, hence this disclosure provides no reliable economic basis to conclude that the Alleged Misstatement had a price impact.

### e.   Alleged Corrective Disclosure 5 on January 24, 2023

87.     Plaintiffs allege that the DOJ's press release about the filing of the DOJ Ad Tech Complaint on January 24, 2023 is a corrective disclosure.[149] As with the AG complaints, I understand that the Defendants disagree that any additional allegations made by third parties in this complaint are true and thus Defendants could not have disclosed the allegations, or the

---

[148]   I reviewed contemporaneous news articles and analyst reports available to me for potentially value-relevant positive news that possibly could have offset the Alleged Corrective Disclosure and prevented Alphabet's stock prices from decreasing. I found that before the market opened on February 11, 2022, the UK's competition regulator accepted a revised offer from Google regarding its plan to ban third-party cookies. *See* "UK regulator accepts Google's revised pledges on browser cookies," *Reuters*, February 11, 2022, 2:20 AM. I did not find articles or analyst reports that characterize this news as either positive or negative. *See* ¶ 83 n.~~148~~147 for search criteria.

[149]   *See* ¶ 23 above.

purported support for them contained therein, any earlier. In any event, the DOJ Ad Tech

Complaint and the claims it contains represent the materialization of known risks, particularly

since it was known before the Class Period that the DOJ was working with the AGs in

investigating Google's ad-tech business, which resulted in the prior AG complaints.[150] Moreover,

market participants commented that the totality of the allegations in the DOJ Ad Tech Complaint

"mirror[]" the allegations in the prior AG complaints.[151] Further, there are fewer purported facts

regarding the Alleged Bidding Advantages in the DOJ Ad Tech Complaint than in those prior

complaints.

88.     Plaintiffs fail to specify what new purported facts in this Alleged Corrective

Disclosure showed the Alleged Misstatement was false and revealed the value-relevance of the

allegedly concealed risks. Instead, Plaintiffs cite an analyst report from BNP Paribas about the

"highly disruptive interventionist measures the DoJ could impose on Google, including

divestiture of Google Ad Manager and 'breaking up' the AdTech stack," and "the fundamental

disruption to Google's business model, which has been integrated along the AdTech stack across

SSP (Supply Side), Ad servers, AdExchange and DSP (Demand Side)."[152] However, the remedy

sought by the DOJ is a decision that the Defendants could not have disclosed prior to the DOJ's

announcement of it.

89.     Moreover, based on my review of news articles and analyst reports available to

---

[150]    *See* ¶ 50 n.100 above.

[151]    *See* ¶ 21 above. *Also see MarketWatch* reported, "The nearly 150-page suit calls for busting up Google's [] ad-tech business because of alleged illegal monopolization of the digital-advertising market, mirroring a lawsuit led by Texas Attorney General Ken Paxton." *See* "Justice Department sues Google for antitrust in digital advertising, while Alphabet stock slides; Eight states join Attorney General Merrick Garland in suing Google for abusing market dominance in online advertising. The company claims it faces competition from the likes of Facebook and Amazon," *MarketWatch*, January 25, 2023, 8:19 AM.

[152]    "Death by a thousand cuts: Regulatory pressures intensify," BNP Paribas, January 24, 2023, p. 1.

me,[153] I found no mention of the Alleged Misstatement or of any new information regarding the

Alleged Bidding Advantages. Instead, analysts commented that the DOJ Ad Tech Complaint

would not have a "material" impact on Google. For example:

    a.  On January 24, 2023, Wells Fargo commented: [154]

> Today's **DOJ lawsuit vs. GOOGL for anticompetitive practices in ad tech is unlikely to have material financial consequences for GOOGL.**

    b.  On January 24, 2023, Evercore commented:[155]

> One distinct outcome is that this regulatory/legal pressure may force/entice GOOGL to spin off its Ad Network business, which accounts for approx. 15% of its Advertising Revenue, 12% of its Total Revenue, and perhaps a MSD% of its profits, given that approx. 70% of GOOGL's Ad Network business revenue is shared with partners. **Depending on how the spin is structured, this could well be a neutral event for GOOGL shareholders.**
>
> **This new case likely doesn't greatly increase the risk to Google because it's aimed at such similar targets to the Texas-led case brought by a coalition of state attorneys general.**

    c.  On January 25, 2023, Compass Point commented:[156]

---

[153]  My news search includes over 1,000 articles from January 23, 2023 (the trading date before the disclosure) to January 26, 2023 (~~the~~two trading ~~date~~dates after the disclosure). This includes all sources in Factiva news search ("Google" or "Alphabet" in the headline or lead paragraph) including all major newspapers, newswires, and other major publications, all articles from Bloomberg (equity ticker=GOOGL), and Alphabet SEC filings. For analyst reports, I received reports from Counsel and also searched FactSet (identifier=GOOGL), LSEG (company=Alphabet), Capital IQ (primary company=GOOGL), Bloomberg (equity ticker=GOOGL) for analyst reports from January 24, 2023 to February 6, 2023 (two weeks including the disclosure), resulting in ~~88~~87 analyst reports. I also searched for earnings transcripts from January 24, 2023 to February 6, 2023 and there was one on February 2, 2023.

[154]  "Initial Take on DOJ vs. Google Ad Tech Suit: Limited Potential Impact for GOOGL, Incremental Positive for TTD," Wells Fargo, January 24, 2023, p. ~~1.~~1 (emphasis added).

[155]  "Return Of The DoJ," Evercore, January 24, 2023, p. 1-2~~.~~ (emphasis added).

[156]  "TMT Policy — DOJ's GOOGL Ad Tech Suit Could Lead to Divestiture, but Presents Bargaining Opportunity," Compass Point, January 25, 2023, p. ~~1.~~1 (emphasis added).

At the end of the day, regardless of the outcome, **we do not see this lawsuit having a material impact on GOOGL's overall business.**

d. On January 27, 2023, Needham commented:[157]

**The good news is that we believe that a breakup of GOOGL would be good for shareholders**, and this appears to be a goal of the DOJ, by our reading…. We believe shareholder value would be maximized by spinning off all or parts of GOOGL's non-search businesses such as YouTube, Cloud, and Waymo, based on our quarterly sum-of-the-parts analysis. That is, if regulators broke up GOOGL, we believe it would be strongly additive to shareholder value.

90.    Furthermore, the results of Dr. Nye's event study methodology demonstrate that after controlling for market and industry factors, Alphabet's stock prices did not decrease by statistically significant amounts on January 24, 2023 as shown in **Exhibit 12**.

**Exhibit 12**
**Stock Price Reactions of Alphabet on January 24, 2023**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -2.09% | -1.98% |
| Predicted Return | [B] | -0.24% | -0.25% |
| Abnormal Return | [C = A - B] | -1.85% | -1.73% |
| t-Statistic | [D] | -1.41 | -1.30 |
| Statistically Significant? |  | No | No |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

91.    In an efficient market, the absence of statistically significant abnormal returns demonstrates that the DOJ Ad Tech Complaint did not impact Alphabet's stock prices.[158] The

---

[157]    "Expert Call this Monday: Implications of DOJ Lawsuit against GOOGL," Needham, January 27, 2023, pp. 1 and 4. (emphasis added).

[158]    I reviewed contemporaneous news articles and analyst reports available to me for potentially value-relevant positive news that possibly could have offset the Alleged Corrective Disclosure and prevented Alphabet's stock prices from decreasing and found none. *See* ¶ 89 n.154153 for search criteria.

56

lack of price impact is consistent with the fact that market participants did not consider this Alleged Corrective Disclosure value-relevant because the regulatory action was anticipated and market participants did not consider it to have a "material" impact on Google.

92.     Despite the fact that Plaintiffs do not identify any new allegedly corrective information disclosed on January 25, 2023,[159] they claim that Alphabet stock prices declined on that day in reaction to the alleged corrective information contained in the DOJ Ad Tech Complaint.[160] The results of Dr. Nye's event study methodology demonstrates that after controlling for market and industry factors, Alphabet's stock prices did not decrease by statistically significant amounts on January 25, 2023 as shown in **Exhibit 13.**

**Exhibit 13**
**Stock Price Reactions of Alphabet on January 25, 2023**

|  |  | Class A | Class C |
|---|---|---|---|
| Raw Return | [A] | -2.54% | -2.50% |
| Predicted Return | [B] | 0.00% | 0.01% |
| Abnormal Return | [C = A - B] | -2.54% | -2.51% |
| t-Statistic | [D] | -1.93 | -1.89 |
| Statistically Significant? |  | No | No |

Note: Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater.

93.     Given the above, there is no reliable economic basis to conclude that the Alleged Corrective Disclosure on January 24, 2023 impacted Alphabet's stock prices, hence this disclosure provides no reliable economic basis to conclude that the Alleged Misstatement had a price impact.

---

[159]    Based on my review of news articles and analyst reports available to me, I found no mention of the Alleged Misstatement or of any new information regarding the Alleged Bidding Advantages on January 25, 2023. *See* ¶ 89 n.~~154~~153 for search criteria.

[160]    Second Amended Complaint ¶ 273.

**VI.    Dr. Nye Has Not Demonstrated that Alleged Damages Can Be Calculated Subject to a Common and Reliable Methodology Consistent with Plaintiffs' Theory of Liability**

94.    Dr. Nye states that the "'out-of-pocket, or event study, method is the standard measurement of damages in Section 10(b) securities cases.'"[161] He explains that, under that method, "[a]n investor incurs damages when a security is acquired at a price that is inflated as a result of false or misleading statements or omissions, provided that a later corrective disclosure and/or the materialization of a concealed risk causes the price of that security to decline."[162] He further claims that "[a]fter isolating the price impact of the alleged misstatements and omissions, one can estimate the price inflation due to the alleged fraud for each day during the Class Period, and on a Class-wide basis for each member of the class."[163] Dr. Nye's proposed methodology to estimate alleged damages consistent with Plaintiffs' theory of liability is woefully deficient in this matter for several reasons.

95.    First, Dr. Nye's methodology begins with an event study analysis to determine statistical significance of the Alleged Corrective Disclosures because without such scientific evidence to associate the disclosures with declines in Alphabet's stock price, he cannot establish loss causation, a key requirement under Plaintiffs' theory of liability. As documented above, there is no such evidence. If Dr. Nye claims that statistical significance determined by an event study is not required to establish loss causation, he fails to provide an alternative methodology to reliably establish loss causation.

96.    Second, even if Dr. Nye somehow could establish a price decline following the subset of alleged corrective disclosures that mention the Alleged Bidding Advantages (i.e., the

---

[161]    *See* Nye Class Cert Report ¶ 70.
[162]    *See* Nye Class Cert Report ¶ 69.
[163]    *See* Nye Class Cert Report ¶ 70.

AG and DOJ complaints), he fails to explain how he could "isolate[e] the price impact of the alleged misstatements and omissions," if any, from the portions of that price decline caused by the numerous other allegations of wrongdoing made by the DOJ and AGs, which I understand were dismissed by the Court as viable bases for Plaintiffs' claims and thus are no longer a part of Plaintiffs' theory of liability in this case.

97.     Third, under Plaintiffs' theory of liability, the Alleged Corrective Disclosures reflect the materialization of both disclosed and allegedly undisclosed risks. If Dr. Nye somehow could establish loss causation, he fails to provide a methodology by which he would distinguish the price impact of the materialization of the known risk of regulatory antitrust allegations from the allegedly concealed risk.

98.     For all of these reasons, Dr. Nye has not demonstrated that alleged class-wide damages can be calculated subject to a common and reliable methodology consistent with Plaintiffs' theory of liability in this matter.

Dated: January 1326, 2026

_____
Allen Ferrell

59

**Appendix A**                                              January 2026

# Allen Ferrell

Harvard Law School
Cambridge, Massachusetts  02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

**CURRENT POSITIONS**

*Greenfield Professor of Securities Law*, Harvard Law School

*Visiting Professor,* Stanford Law School

*National Bureau of Economic Research,* Research Associate

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

**EDUCATION**

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

**PREVIOUS POSITIONS**

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

## COURSES TAUGHT

*Blockchain & Cryptocurrencies*
*Corporate Finance*
*Law and Finance*
*Securities Litigation & Regulation*
*Contracts*

## REFEREE FOR FOLLOWING JOURNALS

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

## CONSULTING AREAS

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions, Digital Assets

## Papers

"Are Star Law Firms Better Law Firms?" with Manconi, Neretina, Powley & Renneboog, forthcoming *Journal of Accounting Research* (2025)

"Hidden History of Securities Damages", 1 University of Chicago Business Law Review 97 (2022)

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley in SECURITIES MARKET ISSUES FOR THE 21ST CENTURY (2018) (editors Fox, Glosten, Greene and Patel)

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison" with Cremers, Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

"Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

A-4

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

TESTIMONY LAST FOUR YEARS

*Trustees of the Drywall Acoustic Lathing and Insulation Pension Fund v. Barrick Gold Corporation*, Court File No. CV-14-511677-00CP, Expert report and deposition on November 12, 2025

*San Antonio Fire and Police Pension Fund v. Dentsply*, Case No. 1:22-cv-06339-AS, Expert reports and deposition on October 22, 2025

*Oklahoma Firefighters Pension v. Elon Musk*, Case No. 1:22-cv-03026-ALC-GWG, Expert report and deposition on October 1, 2025

*Bitgo Holdings v. Galaxy Digital Holdings*, Case No. 2022-0808-KSJM, Expert report and deposition on August 14, 2025

*People of State of New York v. Gemini Trust Company*, Index No. 452784/2023, Expert report and deposition on August 5, 2025

*Yoshikawa v. Exxon*, C.A. No. 3:21-cv-00194-N, Expert report and deposition on July 18, 2025

*In re Anadarko Petroleum Corporation Securities Litigation*, C.A. No. 4:20-CV-00576, Expert report and deposition on March 2, 2023 and court hearing on May 12, 2025

*In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL, Expert report and deposition on April 29, 2025

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019, trial testimony June 7, 2022 and deposition on January 27, 2025

*Homyk v. ChemoCentryx*, Case No. 4:21-CV-03343-JST, Expert reports and depositions on January 6, 2024 and December 4, 2024

*Alesco Preferred Funding et al v. ACP re LTD et al,* Index Case No. 655881/2017, Expert reports and deposition on August 9, 2024

*BLST Northstar v. Santander*, Case No. 22-cv-2210, Expert reports and deposition on August 2, 2024

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert reports and depositions on August 26, 2021 and May 29, 2024

*Gelt Trading v. Co-Diagnostics*, Case No. 2:20-CV-00368-CMR, Expert report and deposition on March 1, 2024

A-5

*In re Ripple Labs Litigation*, Case No. 4:18-CV-06753-PJH, Expert report and deposition on October 16, 2023

*Chabot v. Walgreens*, Case No. 1:18-CV-02118-CCC-KM, Expert report and deposition on October 6, 2023

*XOG Litigation Trust v. Kelley*, Case No. 01-22-0002-3114, Expert report and deposition on August 31, 2023 and testimony on October 25, 2023

*CRCM v. Getty Images Holdings*, Case No. 1:23-CV-01074-JSR, Expert report and deposition on August 14, 2023

*Halperin & Davis, Co-Trustees of Appvion Liquidating Trust v. Richards et al.*, Case No. 17-12082, Expert report and deposition on August 9, 2023

*IBM v. GlobalFoundries U.S. Inc.*, Case Index No. 653625/2021, Expert report and deposition on June 27, 2023

*In Re Madison Square Garden Entertainment Corp. Stockholders Litigation*, C.A. No. 2021-0468-KSJM, Expert report and deposition on February 22, 2023

*Politan Capital Management v. Masimo Corporation et al*, C.A. No. 2022-0948-NAC, Expert report and deposition on February 5, 2023

*Restanca v. House of Lithium*, C.A. No. 2022-0690-PAF, Expert report and deposition on November 21, 2022 and testimony on December 7, 2022

*Roberts et al. v. Zuora*, Case No. 3:19-cv-03422-SI, Expert report and testimony on October 25, 2022

*United States v. Milton*, 21 Crim. 478, Expert testimony on September 30 & October 3, 2022

*FSG Services v. Flutter*, Ref. No. 1425034540, Expert report and testimony on June 29, 2022

*In re Kraft Heinz Securities Litigation*, Case No. 1:19-cv-01339, Expert report and deposition on June 23, 2022

*SEC v. AT&T Inc. et al,* 21 Civ. 1951, Expert report and deposition on April 15, 2022

*Securitized Asset Funding 2011-2 v. CIBC*, Case Index No. 653911/2015, Expert report and deposition on July 30, 2021 and trial testimony March 18 and 21, 2022

*SEC v. Ripple*, Case No.20-CV-10832, Expert report and deposition on February 23, 2022

A-6

*Chabot et al. v. Walgreens*, M.D. Pa 1:18-cv-02118, Expert report and deposition on January 18, 2022

## Appendix B

## Materials Considered

**Legal Documents**

1. United States of America et al. v. Google LLC, Complaint, Case 1:20-cv-03010, October 20, 2020
2. The State Of Texas, et al v. Google, LLC, Docket No. 4:20-cv-00957, December 16, 2020
3. State of Colorado et al. v. Google LLC, Complaint, Case 1:20-cv-03715-APM, December 17, 2020
4. State of Utah et al. v. Google LLC, Complaint, Case 3:21-cv-05227, July 7, 2021
5. The State of Texas, et al v. Google, LLC, Second Amended Complaint, Case 1:21-cv-06841-PKC, October 22, 2021
6. "Executive Summary Complaint of the European Publishers Council against Google LLC, Alphabet Inc., Google Ireland Ltd., and YouTube LLC ("Google") regarding Google's ad tech practices," European Publishers Council, February 11, 2022
7. United States of America et al. v. Google LLC, Case 1:23-cv-00108, Complaint, January 24, 2023
8. In re Alphabet, Inc. Securities Litigation, Second Amended Complaint for Violations of the Federal Securities Laws, Case No. 3:23-CV-01186-RFL, September 24, 2024
9. AMI - Government Employees Provident Fund Management Company LTD., et al., v. Alphabet Inc., et al., Order Granting in Part and Denying in Part Motion To Dismiss and Granting in Part Request for Judicial Notice, Case No. 3:23-cv-01186-RFL, March 24, 2025
10. In re Alphabet, Inc. Securities Litigation, Plaintiffs' Notice of Motion and Motion for Class Certification, Case No. 3:23-CV-01186-RFL, October 30, 2025

**Expert Reports**

1. Expert Report of Zachary Nye, Ph.D., October 30, 2025 and Dr. Nye's Production Materials

**Academic Sources**

1. E. Fama, et al., 1969 "The Adjustment of Stock Prices to New Information," *International Economic Review* 10, no. 1
2. G.W. Schwert, 1981, "Using Financial Data to Measure Effects of Regulation," *Journal of Law and Economics*, 24:121-158
3. P. Asquith and David W. Mullins, Jr., 1983 "The Impact of Initiating Dividend Payments on Shareholders' Wealth," *The Journal of Business* 56, no. 1

4.    P. Asquith, 1983 "Merger Bids, Uncertainty, and Stockholder Returns," *Journal of Financial Economics* 11, no. 1-4

5.    J.M. Patell and M. A. Wolfson, 1984, "The Intraday Speed of Adjustments of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics*, 13:223-252

6.    L. Ederington and J.H. Lee, 1995, "The Short-Run Dynamics of the Price Adjustment to New Information," *Journal of Financial and Quantitative Analysis,* 30:117-134

7.    R. Gilson and B. Black, 1995, "*The Law and Finance of Corporate Acquisitions*," Foundation Press

8.    C. Ghosh et al., 1995 "Gains from Corporate Headquarters Relocations: Evidence from the Stock Market," *Journal of Urban Economics* 38

9.    J. Campbell, A. Lo  & A.C. MacKinlay, 1997, *The Econometrics of Financial Markets*, Princeton University Press

10.   A.C. MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature,* 35:13-39

11.   A. McWilliams and D. Siegel, 1997, "Event Studies in Management Research: Theoretical and Empirical Issues," *The Academy of Management Journal* 40(3):626-657

12.   S.P. Kothari, 2001, "Capital Markets Research in Accounting," *Journal of Accounting and Economics*, 31:105-231

13.   R. Brealey, and S. Myers, 2003, *Principles of Corporate Finance*, McGraw-Hill/Irwin

14.   E. Elton, M. Gruber, S. Brown, and W. Goetzmann, 2003, *Modern Portfolio Theory and Investment Analysis*, John Wiley & Sons, Inc.

15.   R. Brealey, S. Myers and A. Marcus, 2004, *Fundamentals of Corporate Finance*, McGraw-Hill/Irwin

16.   D. Ruppert, 2004, *Statistics and Finance: An Introduction*, Springer

17.   A. Ferrell and A. Saha, 2007, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo," *The Business Lawyer,* 63: 163-186

18.   N. Visaltanachoti and T. Yang,  2010, "Speed of Convergence to Market Efficiency for NYSE-listed Foreign Stocks," *Journal of Banking and Finance*, 34:594-605

19.   C. Corrado, 2011, "Event Studies: A methodology review," *Accounting and Finance*, 51:207-234

20.   Federal Judicial Center, 2011, "Reference Manual on Scientific Evidence," *National Academies Press* (2011)

21.    J. Lee and J. Gerlach, 2011, "Is the Opening Price Efficient? Evidence from After-Hours Earnings Announcements," Available at SSRN: https://ssrn.com/abstract=1786880 or http://dx.doi.org/10.2139/ssrn.1786880J

22.   E. Kelley and P. Tetlock, 2012, "Round-the-Clock News, Trading, and Stock Returns," SSRN Electronic Journal. 10.2139/ssrn.2024462

23.   C. Jones, 2013, *Investments: Analysis and Management*, John Wiley & Sons, Inc. (2013)

24.   J. Wooldridge, 2013, *Introductory Econometrics: A Modern Approach*, Cengage Learning

25.    Li, Edward X., Ramesh, K. et. Al., 2015, "Do Analyst Stock Recommendations Piggyback on Recent Corporate News? An Analysis of regular-Hour and After-Hours Revisions", *Journal of Accounting Research,* Vol. 53 No. 4

26.    K.L Gold, E. Korman, and A. Nabi, 2017, "Federal Securities Acts and Areas of Economic Analysis," *Litigation Services Handbook: The Role of the Financial Expert,* John Wiley & Sons, Inc.

27.    R. Weil, et al., 2017*, Litigation Services Handbook: The Role of the Financial Expert*, John Wiley & Sons, Inc.

28.    Z. Bodie, A. Kane, and A. Marcus, 2018, *Investments*, McGraw-Hill

29.    D. Lou, C. Polk, S, Skouras, 2019, "A tug of war: Overnight versus intraday expected returns," *Journal of Financial Economics*, 134: 192–213.

29.30.    V. GregorieGregoire and C. Martineau, 2022, "How is Earnings News Transmitted to Stock Prices?", *Journal of Accounting Research,* Vol. 60 No. 1

30.31.    V. GregorieGregoire and C. Martineau, 2022, "Internet Appendix to How is Earnings News transmitted to Stock Prices?", *Journal of Accounting Research,* Vol. 60 No. 1

## Government Documents

1.    Alphabet Inc. Form 8-K, September 6, 2019
2.    Alphabet Inc. Form 8-K, December 4, 2019
3.    Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2019
4.    Hearing: Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google, *U.S. House of Representatives,* July 29, 2020
5.    Google's Submission in Response to Subcommittee Questions for the Record Following July 29, 2020 Hearing, September 14, 2020 (HHRG-116-JU05-20200729-QFR051-U1.pdf)
6.    Alphabet Inc. Form 8-K, October 20, 2020
7.    Alphabet Inc. Form 4 (O'Toole, Amie Thuener), December 16, 2020
8.    Alphabet Inc. Form 8-K, December 21, 2020
9.    Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2020
10.    Facebook, Inc. Form 10-K for the fiscal year ended December 31, 2020
11.    Pinterest, Inc. Form 10-K for the fiscal year ended December 31, 2020
12.    Snap Inc. Form 10-K for the fiscal year ended December 31, 2020
13.    The Trade Desk, Inc. Form 10-K for the fiscal year ended December 31, 2020
14.    Twitter, Inc. Form 10-K for the fiscal year ended December 31, 2020
15.    Alphabet Inc. Form 8-K, July 8, 2021
16.    Alphabet Inc. Form 4 (Hennessy, John L.), July 8, 2021
17.    Alphabet Inc. Form 4 (Brin, Sergey, Brian, Filed 6:27 PM), July 8, 2021
18.    Alphabet Inc. Form 4 (Brin, Sergey, Brian, Filed 6:28 PM), July 8, 2021
19.    Alphabet Inc. Form 4 (Sunder, Pichai, Sundar), July 8, 2021
20.    Alphabet Inc. Form 4 (Mather, Ann), September 2, 2021
21.    Alphabet Inc. Form 4 (O'Toole, Amie Thuener), September 2, 2021
22.    Alphabet Inc. Form 4 (Sunder, Pichai, Sundar), September 2, 2021

23. Alphabet Inc. Form 4 (Page, Lawrence, Page, Filed Oct. 19, 2021 8:30 PM), October 20, 2021

24. Alphabet Inc. Form 4 (Page, Lawrence, Page, Filed Oct. 19, 2021 8:48 PM), October 20, 2021

25. Alphabet Inc. Form 4 (Page, Lawrence, Page, Filed Oct. 20, 2021 8:05 AM), October 21, 2021

26. Alphabet Inc. Form 4 (Page, Lawrence, Page, Filed Oct. 20, 2021 8:15 AM), October 21, 2021

27. Alphabet Inc. Form 4 (Sunder, Pichai, Sundar), October 21, 2021

28. Facebook Inc. Form 8-K, October 25, 2021

29. Meta Platforms, Inc. Form 8-K, October 28, 2021

30. Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2021

31. Alphabet Inc. Form 4 (Brin, Sergey, Brian, Filed Feb. 8, 2022 5:03 PM), February 10, 2022

32. Alphabet Inc. Form 4 (Brin, Sergey, Brian, Filed Feb. 8, 2022 5:05 PM), February 10, 2022

33. Alphabet Inc. Form 4 (Brin, Sergey, Brian, Filed Feb. 8, 2022 5:10 PM), February 10, 2022

34. Alphabet Inc. Form 4 (Brin, Sergey, Brian, Filed Feb. 9, 2022 12:12 PM), February 11, 2022

35. Alphabet Inc. Form 4 (Brin, Sergey, Brian, Filed Feb. 9, 2022 12:14 PM), February 11, 2022

36. Alphabet Inc. Form 4 (Hennessy, John L. Filed Feb. 9, 2022 5:26 PM), February 11, 2022

37. Alphabet Inc. Form 4 (Hennessy, John L. Filed Feb. 9, 2022 6:17 PM), February 11, 2022

38. Alphabet Inc. Form 5 (Brin, Sergey, Brian), February 11, 2022

39. Alphabet Inc. Form 5 (Ferguson, Roger W. Jr.), February 11, 2022

40. Alphabet Inc. Form 5 (Mather, Ann), February 11, 2022

41. Alphabet Inc. Form 5 (Mulally, Alan R.), February 11, 2022

42. Alphabet Inc. Form 5 (Washington, Robin L.), February 11, 2022

43. Alphabet Inc. Schedule 13G-A (Brin, Sergey, Brian), February 11, 2022

44. Alphabet Inc. Schedule 13G-A (Page, Lawrence, Page), February 11, 2022

45. Alphabet Inc. Schedule 13G-A (Schmidt, Eric E.), February 14, 2022

46. Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2022

47. Alphabet Inc. Form 4 (((Walker, John Kent), January 25, 2023

48. Alphabet Inc. Form 8-K, January 25, 2023

49. Alphabet Inc. Form 10-K for the fiscal year ended December 31, 2023


**Analyst Reports on Alphabet and Alphabet Earnings Calls**

1.      "In Google We Trust? Antitrust Investigation Is the Beginning of a New Era in Big Tech vs. Govt.," MKM Partners, September 910, 2019

2.      "Alphabet Inc. (Googl) Bigger and Better in 2021; Initiate at Overweight & 1,955 PT," KeyBank, September 14, 2020

3.      "Themes MonitoMonitor Covid-19:  A Look at Mobility Trends from Google #10," Credit Suisse, September 15, 2020

4.      "PAI – Q3 progress-to-date, Topical Area of Investor Focus, and Updates on Recovery," Pivotal Research Group, September 16, 2020

5.      "Alphabet YouTube Steps Up Its Targeting Game," Credit Suisse, September 18, 2020

6.      "Alphabet Inc, Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, September 19, 2020

7.      "PAI: Retail/eCommerce Deep Dive – No Signs Of Slowdown In Our View - All Systems Go," Pivotal Research Group, September 20, 2020

8.      "Cloud Quarterly – 2Q20," Goldman Sachs, September 21, 2020

8.9.    "Daily MIC: NFL TV Ratings Decline Continues; DoJ Readies GOOGL Antitrust Suit; 3Q Wireless Preview; SMB Deep Dive," Guggenheim, September 22, 2020

9.10.   "Alphabet DOJ case Reported Ready to be Shared with States," BofA Global Research, September 23, 2020

10.11.  "SPOT, MTCH, GOOGL: Movement Against App Store Fees Grows; If Any Change Occurs, It Is Probably Around Payment Choice," Keybanc Capital Markets, September 24, 2020

11.12.  "Alphabet Inc. Is Google Search Still Top of the E-Commerce Funnel?," Morgan Stanley, September 24, 2020

12.13.  "Alphabet Inc. Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, September 26, 2020

13.14.  "Advertising Insights (PAI): CTV/TV Deep Dive – 3Q20 QTD," Pivotal Research Group, September 27, 2020

14.15.  "Updating Internet Valuations to Reflect Sustainable Strength in Technology and Talent Assets," Guggenheim, September 28, 2020

15.16.  "Alphabet Inc. YouTube Expert Call Recap: Pricing Rebounds on Ad Budget Flush," Jefferies, September 28, 2020

16.17.  "Alphabet Inc. Analyst's Notes," Argus, October 20, 2020

17.18.  "Alphabet DOJ Case Focus Not as Bad as Feared; Maintain Buy," BofA Global Research, October 20, 2020

18.19.  "Alphabet Inc. (GOOGL) DoJ Makes Its Move. But, Is the Case Weak?," Citi, October 20, 2020

19.20.  "Alphabet As Queries and Pricing Both Improve, Search Should See Sharper Cyclical Recovery," Credit Suisse, October 20, 2020

20.21.  "Internet Sharper Recovery for Those Who Saw the Biggest Cyclical Pain," Credit Suisse, October 20, 2020

21.22.  "3Q Preview: Raising Target Price for FB to $320 and SNAP to $35," Evercore ISI, October 20, 2020

22.23.  "Q3 Digital Ad Preview: Favor FB And SNAP," Jefferies, October 20, 2020

B-5

23.24. "Alphabet Inc. GOOGL - ALERT: Antitrust Case Finally Filed; Round One Goes to Google," Keybanc Capital Markets, October 20, 2020

24.25. "Alphabet Inc. CFRA Maintains Strong Buy Rating on Shares of Alphabet Inc.," CFRA, October 21, 2020

26. "Expect the recovery in digital ad trends to continue; 3Q20 Preview," Goldman Sachs, October 21, 2020

25.27. "Alphabet Inc. Long Awaited DOJ Action Focuses on Search Distribution, But Narrow in Scope & Lacks Clarity Around Remedy or Financials," J.P.Morgan, October 21, 2020

28. "The Department of Justice Is Coming After Alphabet, but Returning Ad Demand Is More Relevant," Morningstar, October 22, 2020

26.29. "Research Bulletin, The Quick Click Morphing Streaming Video from a Lean back to lean in experience," Credit Suisse, December 16, 2020

27.30. "Internet 2021 Outlook Updating Top Picks & Key Themes; Upgrading TWTR to Overweight w/$65 PT; Also Other PT Changes," J.P.Morgan, December 16, 2020

31. "Bull & Bear Wrestle 53% US M1 money growth versus Nasdaq P/BV ratio of 7.7x," Commerzbank, December 18, 2020

28.32. "Alphabet Inc Class C GOOG States Targeting Alphabet's Search and Overall Digital Advertising in the Latest Google Hunt," Morningstar, December 18, 2020

29.33. "Alphabet Inc States Targeting Alphabet's Search and Overall Digital Advertising in the Latest Google Hunt," Morningstar, December 18, 2020

30.34. "Weekly Wrap: Government Shutdown Watch Over Fiscal Stimulus Details," Raymond James, December 18, 2020

31. "Bull & Bear Wrestle 53% US M1 money growth versus Nasdaq P/BV ratio of 7.7x," Research Portal, December 18, 2020

32.35. "Alphabet Inc. Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, December 19, 2020

33.36. "Internet Positive Highlights From Conf Call On Cloud Spend Optimization & Forecasting," MKM Partners, December 21, 2020

37. "Americas Technology: Software: Changes in Coverage," Goldman Sachs, December 22, 2020

34.38. "Daily MIC: FB/GOOGL Discuss Cooperation in Antitrust Suit; MGM Explores Sale; COVID Bill Cracks Down on Streaming Piracy," Guggenheim, December 22, 2020

35.39. "Alphabet Inc. Key Stock Statistics (Source: CFRA)," S&P Global Market Intelligence (SPGMI), Company Reports), CFRA, December 26, 2020

36. "Alphabet A Another EMEA Push with Another SAP Executive Hire," Exane BNP Paribas, July 6, 2021

37.40. "HOLT® U.S. Specialist Team Q3 2021 Stock Ideas," Credit Suisse, July 7, 2021

38.41. "Equity Research Industry Update Daily Chip Clips," Oppenheimer, September 2, 2021

39.42. "Alphabet Inc. Compustat Company Research," S&P Global, September 2, 2021

40.43. "Alphabet Inc. Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, September 4, 2021

41.44. "In the Metaverse Question Bank For Wolfe TMT Conference; Thoughts On Regulatory Barrage (GOOGL, FB, UBER, DASH)," Wolfe Research, September 6, 2021

42.45. "What Did We Learn and What Matters Next: GOOGL and Gamer App Store Fee Math and Investor Feedback to UBER/ATVI/COMP | Ep. 30," Morgan Stanley, September 7, 2021

43.46. "North America Internet Robust Macro Trends Key Driver of Recent Digital Ad Strength," Citi, September 8, 2021

44.47. "GOOG/L – BUY – Raising Estimates and Price Target on Core Trend Strength, Multi-Product Opportunities," Guggenheim, September 8, 2021

45.48. "Alphabet Inc. Internet Initial Thoughts on Apple App Store Ruling Impact on Internet Names - GOOGL, NFLX, SPOT, MTCH, BMBL," J.P.Morgan, September 10, 2021

49. "Alphabet, Inc.," CFRA, September 11, 2021

46.50. "Alphabet Google App Store Fees in Focus After Apple App Store Ruling," BofA Global Securities, September 12, 2021

51. "Initiation: US Large Cap Internet: Framing Industry Growth, Margin Dynamics & Risk/Reward," Goldman Sachs, September 12, 2021

47.52. "Alphabet Thinking Through the Max Pain Scenario of Play Store Fees Going Away," Credit Suisse, September 13, 2021

48.53. "Alphabet Inc. Thoughts on Google Play Store and Sensitivity Analysis following Apple Ruling," Raymond James, September 13, 2021

49.54. "What Did We Learn and What Matters Next: AAPL and GOOGL App Store Fee Debate and Investor Feedback, AMZN Televisions Arrive | Ep. 31," Morgan Stanley, September 14, 2021

50.55. "Alphabet Inc Class A GOOGL," Morningstar, September 14, 2021

51.56. "Alphabet Inc (GOOGL.O) Citi Global Technology Conference Highlights Citi's Take," Citi, September 15, 2021

52.1. "Snap Inc. NYSE:SNAP FQ3 2021 Earnings Call Transcripts," S&P Global Market Intelligence, October 21, 2021, 5:00 PM

53.57. "Alphabet Inc Digital Advertising Stocks Are Underperforming, Time To Buy?," Trefis, September 15, 2021

54. "Bilibili US$82.10    OUTPERFORM Solid Top-Line Growth," CLSA, October 22, 2021

55.1. "Snap Inc. Not Getting Paid for the Value it is Generating, That will Change," Credit Suisse, October 22, 2021

56.58. "Alphabet, Inc. GOOGL | $2837.72 Outperform | Target Price/Base Case: $3160.00 Earnings Preview," Evercore ISI, October 22, 2021

57.1. "Snap Inc. (SNAP) iOS Challenges Create Near-Term Ad Headwinds but Multiple Growth Catalysts Remain Ahead Internet & Digital Media | Rating/Price Target Change," JMP, October 22, 2021

58.1. "Snap Inc. iOS Ad Changes & Supply/Labor Shortages Combine for Worst Case 4Q; But Still More Transitory Than Fundamental; Remain OW," J.P.Morgan, October 22, 2021

59.1. "Internet Ecosystem Impacts: What Do Snap's 3Q Results Signal to Digital Advertising," Piper Sandler, October 22, 2021

60.59. "Internet and Digital Media Internet - SNAP Kicks Off Earnings Season with Disappointing Results; Maintain +Ve Bias on FB/GOOGL Google Lowers App Store

Fees, Positive for MTCH, APP What's Incremental To Our View," Truist, October 22, 2021

61.1. ~~"Snap Inc. (SNAP) No More Denying Apple's ATT Privacy Impact; Supply Chain Issues Dampen Ad Spend," Wedbush, October 22, 2021~~

62.60. "Alphabet Inc. Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, October 23, 2021

63.61. "Alphabet 3Q Preview Search to decelerate, but still best positioned Online Media Stock," BofA Global Research, October 24, 2021

64.62. "Weekly Earnings Preview: AMZN, FB, GOOGL, SPOT, TWTR," Canaccord, October 24, 2021

65.63. "Google's Stock Unlikely To See Much Movement Post Q3 Earnings," Trefis, October 24, 2021

64. "Bilibili US$82.10 – OUTPERFORM Solid Top-Line Growth," CLSA, October 25, 2021

66.65. "Daily MIC: FB to Deliver Most Impactful Earnings Call Tonight; Updated Netflix International Model; PYPL Not Pursuing Acquisition of PINS," Guggenheim, October 25, 2021

67.66. "What Did We Learn and What Matters Next: SNAP Read Across to FB/GOOGL, The Macro State of The Ad Markets, JET's US Focus, Top EPS Picks | Ep. 37," Morgan Stanley, October 25, 2021

68.1. ~~"Facebook Inc. Facebook Misses on Q3 Revenue, but Upside Remains; New $404 FVE," Morningstar, October 25, 2021~~

69.67. "Internet Alphabet Q3 Highlights: Search Engine for Growth," Baird, October 26, 2021

70.68. "Advertising & Cloud momentum persist in Q3 ~~Google reported strong Q3 results, with ad revenue growth of 43% y/y, ~4% a~~," Canaccord, October 26, 2021

71.69. "Alphabet Inc (GOOGL.O) 3Q21 Results – Revenue and Margin Beat CITI'S TAKE," Citi, October 26, 2021

72.70. "Alphabet Moving To Neutral Rating," Elazar Advisors LLC, October 26, 2021

73.71. "Alphabet, Inc. GOOGL Fundamentally (Close To) Flawless," Evercore ISI, October 26, 2021

72. "Alphabet Inc. (GOOGL): Q3 '21 Earnings First Take," Goldman Sachs, October 26, 2021

74.73. "GOOG/L – BUY – Strong Core Trends, New Product Developments Continue to Power This Attractive Investment," Guggenheim, October 26, 2021

75.74. "Alphabet, Inc Q3 First Take: Nice Beat Across Most Items," Jefferies, October 26, 2021

76.75. "Alphabet, Inc Q3 Preview: High Expectations, High Performance, Reasonable Valuation," Jefferies, October 26, 2021

77.76. "Alphabet Inc. GOOGL: Earnings Recap / Estimates Change / Price Target Change," Keybanc Capital Markets, October 26, 2021

78.77. "Alphabet Inc. (GOOGL - $2,748.94) Post-call Thoughts from Loop," Loop Capital Markets, October 26, 2021

79.78. "Alphabet's Q3 Results Beat Expectations, Driven by Advertising and Cloud; Raising FVE to $3,400," Morningstar, October 26, 2021

80.79. "Alphabet Inc. Minimal IDFA Headwinds, Reopening and YouTube Sustain Growth; Mgmt Tone Optimistic; Raising Target to $3,500," Oppenheimer, October 26, 2021

81.80. "Alphabet, Inc. (GOOGL) 3Q21 Wrap: Smooth Sailing; Largely Unaffected by ATT & Supply Chain," Piper Sandler, October 26, 2021

82.81. "Alphabet Inc. Strong Advertising Momentum and Impressive Leverage; Outperform/PT to $3,400," Raymond James, October 26, 2021

83.82. "MSFT and GOOG Capex a Bit Light, Derivatives (ANET, CSCO, AAOI, CIEN)," Raymond James, October 26, 2021

84.83. "Alphabet Inc. Crowded for a Reason but Still Crowded; Adjusting Estimates," RBC Capital Markets, October 26, 2021

84. Alphabet Inc. NasdaqGS:GOOG.L FQ3 2021 Earnings Call Transcripts," S&P Global Market Intelligence, October 26, 2021

85. "Alphabet Inc. (GOOGL) First Look - Strong 3Q21 Results with No Material Headwinds from ATT/Supply Chain Issues," Truist Securities, October 26, 2021

86. "Alphabet Inc. (GOOGL) The Most Resilient Digital Ad Model; Reiterate Buy/PT to $3,400 Advances in AI/ML Making Search Advertising More Impactful, More Profitable for GOOGL What's Incremental To Our View," Truist Securities, October 26, 2021

87. "Search-ing for the iOS Impact," UBS, October 26, 2021

88. "Alphabet, Inc. Outperforms Expectations Despite Choppiness Across Digital Media Advertising Landscape," Wiliam BairBlair, October 26, 2021

89. "Alphabet Inc. (GOOGL – $2786.17 – Outperform) All Is Well In Search-Land," Wolfe Research, October 26, 2021

90. "Alphabet Inc. Standout Performance Among the Digital Ads FireckageWreckage," Barclays, October 27, 2021

91. "Alphabet Search & Margins Beat Again, YoutubeYouTube & Cloud Slight Miss vs Consensus," BMO Capital Markets, October 27, 2021

92. "Alphabet Search Drives 3Q Upside that Shines vs Peers, Cloud a Little Soft; Raising PO," BofA Global Research, October 27, 2021

93. "Alphabet Inc. Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, October 27, 2021

94. "CFRA Maintains Buy Rating On Shares Of Alphabet, Inc.," CFRA, October 27, 2021

95. "Alphabet Inc. 3Q21: Earnings Beat Amid a Challenging Industry Backdrop," China Renaissance, October 27, 2021

96. "Alphabet Inc (GOOGL.O) Model Update Citi's Take," Citi, October 27, 2021

97. "Alphabet GOOG 3Q21 Review: Small Topline & Huge Margin Beat; PT TO $3,360," Cowen, October 27, 2021

98. "Alphabet Focus and Investments in AI Confers Benefits in Unexpected Ways," Credit Suisse, October 27, 2021

99. "Takeaways From Programmatic I/O NY 2021," Evercore ISI, October 27, 2021

100. "Alphabet Company Analysis – New Analysis," FDA, October 27, 2021

101. "Alphabet Inc. (GOOGL): Q3'21 Review: Demonstrating Industry Leadership in AI," Goldman Sachs, October 27, 2021

B-9

100.102.    "Alphabet, Inc Q3: Another Strong Ad Quarter with Barely a Scratch," Jefferies, October 27, 2021

101.103.    "Alphabet Inc. (GOOGL) Strong Execution, Digital Tailwinds, and High Profitability All at a Reasonable Multiple," JMP, October 27, 2021

104.    "Solid 3Q, Less Upside Than Recent Qtrs; '22 Decel Though Well-Positioned for Increasingly Digital Economy; PT $3,250," J.P. Morgan, October 27, 2021

102.105.    "Alphabet, Inc. Limited Impact from iOS; Upside in Margins; Raise Estimates and PT," Mizuho, October 27, 2021

103.106.    "Alphabet Inc. YouTube Worth $640B, but Not Inside GOOGL, Clean Beat 3Q Results: Apple Can't Take A Bite Out Of Internet's Big G," MKM Partners, October 27, 2021

104.107.    "Alphabet Inc. The Power of Intent and Innovation," Morgan Stanley, October 27, 2021

105.108.    "Alphabet (GOOGL) YouTube Worth $640B, but Not Inside GOOGL," Needham, October 27, 2021

106.109.    "Alphabet: NT Growth Dynamics in Focus," Susquehanna Financial Group, October 27, 2021

107.110.    "Alphabet (GOOGL) Google Search is the Clear Winner in Digital Advertising Right Now," Wedbush, October 27, 2021

108.111.    "Internet Alphabet Inc. (GOOGL) GOOGL: Meeting the Moment; Maintain Overweight, Raise PT to $3,400," Wells Fargo, October 27, 2021

109.    " Alphabet Aces 3Q21, " Alphabet Aces, October 28, 2021

110.112.    "Alphabet Inc. Analyst's Notes," Argus, October 28, 2021

111.113.    "Teknikal Saham Harian Analisa & Rekomendasi, BNI Securities,"Alphabet Aces 3Q21," DCFStocks, October 28, 2021

112.114.    "Alphabet Model Update: Neutral Rating," Elazar Advisors, October 28, 2021

113.    "Alphabet Company Analysis—New Analysis," FDA, October 28, 2021

114.115.    "Snap Inc. (SNAP) SNAP vs FB vs GOOGL," Needham, October 28, 2021

115.116.    "Key Takeaways From 3Q21 AdTech Expert Call," Raymond James, October 28, 2021

116.117.    "Alphabet: Big Getting Bigger Alphabet Inc (GOOGL)," William O'Neil & Co, October 28, 2021

117.118.    "Alphabet Inc. Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, October 30, 2021

118.119.    "Alphabet Inc. Corporate Snapshot," Trefis, October 31, 2021

119.1.    "November Pain Our latest IG TMT Reference Sheet and Recent Views," J.P.Morgan, November 2, 2021

120.    "Alphabet Inc | North America More Scale = More FCF...Raise PT to $3,200," Morgan Stanley, November 21, 2021

121.    "November Pain Our latest IG TMT Reference Sheet and Recent Views," J.P.Morgan, November 2, 2021

121.122.    "Alphabet Inc NASDAQ: GOOGL," S&P Global, November 4, 2021

122.123.	"Alphabet Inc Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, February 12, 2022

123.124.	"Alphabet Model Update: Neutral Rating," Elazar Advisors, February 14, 2022

124.125.	"Pinpointing Key Topics for Digital Ad Players as They Tackle Challenges, Blitz Opportunities in 2022," Guggenheim, February 14, 2022

125.126.	"TTD, GOOGL, PUBM - Alert: The Trade Desk Continues Simplifying Supply Chain, Which We Believe Should Benefit Open Internet Ad Budgets and Drive SSP Consolidation," Keybanc Capital Markets, February 15, 2022

126.127.	"Holt® Tmt Insights Alphabet (GOOGL) in HOLT: Compounding Streak Continues; Valuation Remains Attractive," Credit Suisse, February 16, 2022

127.128.	"Digital Turbine, Inc. Google's Proposed Privacy Changes Would Make Digital Turbine's 1.6B Smart Phone Access More Valuable," Oppenheimer, February 16, 2022

128.129.	"Google Expands Aims For Privacy Sandbox to Android; At Least Two Years Away," Cowen, February 17, 2022

129.130.	"Proprietary Survey: Social Media Engagement And User Overlap Trends With Tiktok," Cowen, February 17, 2022

130.131.	"Alphabet Inc Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, February 19, 2022

131.132.	"Insight Series: Post-IDFA US Online and Expert Call Takeaways," China Renaissance, February 22, 2022

132.133.	"What Did We Learn and What Matters Next: GOOGL AAID vs IDFA; ETSY/FTCH/REAL EPS; RBLX vs U vs APP vs IS; Coachella | Ep. 52," Morgan Stanley, February 22, 2022

133.134.	"Daily 'Net Add: FB, GOOGL, PINS, SNAP, CARG," RBC Capital Markets, February 22, 2022

134.135.	"Digital Ad Stocks Drop Amid iOS Changes, Covid Reopening. Should You Buy?," Trefis, February 23, 2022

135.136.	"Death by a Thousand Cuts:  Regulatory Pressures Intensity," BNP Paribas, January 24, 2023

136.137.	"Alphabet Initial Thoughts on the DOJ's Lawsuit," Credit Suisse, January 24, 2023

137.138.	"Alphabet Inc. Return Of The DoJ," Evercore ISI, January 24, 2023

139.	"The DoJ Files an Antitrust Lawsuit to Divest Alphabet's AdTech Business," JMP Securities LLC, January 24, 2023

138.140.	"RBC 'Net Add: GOOGL, META, FVRR," RBC Capital Markets, January 24, 2023

141.	"RBC 'Net Add: AMZN, GOOGL, ZG, RDFN, ABNB, EXPE, BKNG," RBC Capital Markets, January 24, 2023

139.142.	"Initial Take on DOJ vs. Google Ad Tech Suit: Limited Potential Impact for GOOGL, Incremental Positive for TTD," Wells Fargo, January 24, 2023

140.143.	"Alphabet Additional Thoughts on DOJ Lawsuit Challenging Google's AD Exchange Business," BofA Global Securities, January 25, 2023

141.144.        "TMT Policy — DOJ's GOOGL Ad Tech Suit Could Lead to Divestiture, but Presents Bargaining Opportunity," Compass Point, January 25, 2023

142.145.        "Alphabet Cost Cuts Arrive to Help Navigate the Ad Market Downturn," Credit Suisse, January 25, 2023

143.146.        "AdTech Angle: DOJ Sues Google. What Does It Mean For TTD, PUBM, and MGNI?," Evercore ISI, January 25, 2023

144.147.        "Deep Dive: Multiple Near 15-Year Trough Serves Up Attractive Risk/Reward," Jefferies, January 25, 2023

148.        "ChatGPT Can Improve Bing, But It Is Unlikely To Change the Competitive Dynamics of Search," JMP Securities LLC, January 25, 2023

145.149.        "Alphabet, Inc. Ad Checks Show Inline Search; Recently Layoffs to Narrow the Consensus Gap," Mizuho, January 25, 2023

146.150.        "Alphabet Inc. (GOOGL, Buy, $120.00) Lowering Ests & PT; Regulatory Risks Rising? One More Antitrust Lawsuit by Justice Dept.," MKM Partners, January 25, 2023

147.151.        "Alphabet Inc. Reaction to DOJ Filling; Updating SOTP to More Conservative Mix; Lowering Target to $130," Oppenheimer, January 25, 2023

148.152.        "Internet and Experiential: Antitrust Tuesday Was More Bark Than Bite for LYV, GOOG and Tech," Rosenblatt Securities, January 25, 2023

149.153.        "All Dark Clouds Have a Silver Lining: Follow-on Public Cloud Thoughts After MSFT & IBM results," MKM Partners, January 26, 2023

150.154.        "Brian Nowak previews earnings for AMZN GOOGL META SNAP PINS UBER DASH | Episode 98," Morgan Stanley, January 26, 2023

151.155.        "SMB AD Checks are Marginally Better; META, PINS Continue Showing Well Internet EPS Preview for Next Week: META, GOOGL, AMZN, SNAP, MTCH, PINS," RBC Capital Markets, January 26, 2023

152.156.        "Expert Call this Monday: Implications of DOJ Lawsuit against GOOGL," Needham, January 27, 2023

153.157.        "PERI Benefits from DOJ Lawsuit Against GOOGL. Raising Ests and PT.," Needham, January 27, 2023

154.158.        "Internet Thoughts Ahead of 4Q22 Mega Cap Internet Earnings," Wells Fargo, January 27, 2023

155.159.        "Alphabet Inc. Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, January 28, 2023

156.160.        "Weekly Earnings Preview: AMZN, GOOGL, META, PENN, PTON, SNAP, SPOT," Canaccord, January 29, 2023

157.161.        "Q4 Preview: Cautious Setup With Margin Downside," Evercore ISI, January 29, 2023

158.162.        "Expert Download: AMZN, GOOGL, WIX, SONO + Invite to Upcoming AMZN Call," Jefferies, January 29, 2023

159.163.        "Metaverse Weekly: Closer Look At Drivers Of SBC Deceleration In FY23/FY24," Wolfe Research, January 29, 2023

160.164.        "Alphabet 4Q Preview: Updating Estimates for FX and Recent Cost Cutting," BofA Global Research, January 30, 2023

B-12

161.165.     "Online Advertising 4Q22 Preview & Top Picks," Raymond James, January 30, 2023

162.166.     "Internet Ahead of Internet Earnings Week, 4Q22 Previews," Rosenblatt Securities, January 30, 2023

163.167.     "Content Creators and Aggregators Alphabet (GOOGL) GOOGL: DOJ Expert Takeaways," Needham, January 31, 2023

168.     "Weekly Update: Bergman & Beving, Lagercrantz, Zoetis, Cogent, ONEW, Addlife, Essensys," In Practise, February 1, 2023

164.169.     "Internet Near-Term Ad Headwinds Distract from AI Innovations," Baird, February 2, 2023

165.170.     "Alphabet Inc. Skynet About To Be Turned On, Finally!," Barclays, February 2, 2023

166.171.     "Focus on AI & Cost Optimization as Advertising Slows," Canaccord, February 2, 2023

167.172.     "Alphabet Inc (GOOGL.O) 1st Impression: 4Q Results Relatively In-Line With Expectations with Macro Impacting Growth Across Search, YouTube, and GCP," Citi, February 2, 2023

168.173.     "Macro Overhang But A Positive Focus On Cost Structure," Evercore ISI, February 2, 2023

174.     "Alphabet Inc. (GOOGL): Q4 '22 Earnings First Take," Goldman Sachs, February 2, 2023

169.175.     "Daily MIC: GOOG/L 4Q Focus on Ad Strength, Cloud, and Expense Outlook; SNAP Jan Data Review; NFLX Tells Advertisers Sign-Ups to Ad Tier Doubled in Jan," Guggenheim, February 2, 2023

170.176.     "GOOG/L – BUY – All In on AI; Management Play the Long Game with Big Ideas, Durable Savings," Guggenheim, February 2, 2023

171.177.     "Alphabet Inc. Q4 First Take: Slight Miss; Streamlining Costs and Prioritizing AI," Jefferies, February 2, 2023

178.     "Light 4Q22 Results but Cost Discipline Now Here, While AI is a Growing Catalyst," JMP Securities LLC, February 2, 2023

172.179.     "Alphabet Inc. GOOGL: Alphabet's Learning the ABCs of Efficiency; Maintain $117 Price Target," Keybanc Capital Markets, February 2, 2023

173.180.     "Alphabet Inc. (GOOGL - $108) Post-call Thoughts from Loop," Loop Capital, February 2, 2023

174.181.     "Alphabet, Inc. Closing the Opex Consensus Gap with Optimized Cost Initiatives," Mizuho, February 2, 2023

175.182.     "TTD Benefits from DOJ Suit Against GOOGL," Needham, February 2, 2023

176.183.     "Alphabet Inc. Opex Reductions Should Offset Slower Search Growth; AI Products Coming Soon," Oppenheimer, February 2, 2023

177.184.     "Softer 4Q Though Positive on New AI Launches & Initiatives to Lower Opex; Outperform/$119 PT," Raymond James, February 2, 2023

185.     "Alphabet Inc.," S&P Global Market Intelligence, February 2, 2023

186.    Alphabet Inc. NasdaqGS:GOOG.L FQ4 2022 Earnings Call Transcripts," S&P Global Market Intelligence, February 2, 2023

178.187.    "Alphabet Inc. (GOOGL) First Look: Virtually Inline Revenue with EPS Miss; AI-Driven Initiatives Underway," Truist Securities, February 2, 2023

179.188.    "First Read Alphabet Inc. - Class A GOOG 4Q22 First Blush," UBS, February 2, 2023

180.189.    "Alphabet, Inc. Macro Weakness Impacts Quarter; AI and Cost Control a Focus Going Forward," William Blair, February 2, 2023

181.190.    "Alphabet Revenues Still Under Pressure, but Setting Stage for 2H Margin Leverage Reiterate Rating:  Buy/ PO:  125.00 USD/ Price:  107.74," BofA Global Securities, February 3, 2023

182.191.    "Alphabet Inc. Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports), CFRA," February 3, 2023

183.192.    "CFRA Maintains Buy Opinion On Shares Of Alphabet Inc.," CFRA, February 3, 2023

184.193.    "Alphabet Inc (GOOGL.O) Macro Continues to Impact Advertising, but Improving Expense Controls as AI Tools Improve Search," Citi, February 3, 2023

185.194.    "Alphabet GOOG 4Q Review: Ad Headwinds Remain; Focus On AI & Cost Savings," Cowen, February 3, 2023

186.195.    "Alphabet Additional AI-driven Products to be Unveiled," Credit Suisse, February 3, 2023

187.196.    "Striking A New Tone," Deutsche Bank, February 3, 2023

188.197.    "Alphabet Company Analysis – New Analysis," FDA, February 3, 2023

198.    "Q4'22 Review: Revenue Trends Weaken Alongside Industry/Macro; Cost Realignment & AI Leadership Positions Stock Well for Long-Term," Goldman Sachs, February 3, 2023

189.199.    "Daily MIC: AMZN's Ad Business Grew 19%, GOOGL, META Deal With Slowdowns; NFL Sunday Ticket Gets New Features In Move To YouTube; NLSN Streaming Top 10," Guggenheim, February 3, 2023

190.200.    "Alphabet, Inc Q4: Macro in Defense; Going on Offense in AI and Costs," Jefferies, February 3, 2023

191.201.    "Alphabet, Inc. Mixed 4Q w/Focus On AI Product Rollout & Reengineering of the Cost Structure for L-T; Maintain OW, $118 PT," J.P.Morgan, February 3, 2023

192.202.    "GOOGL: Small Miss 4Q: Searching for Growth With an AI-First Deep Mindset," MKM, February 3, 2023

193.203.    "Alphabet Inc. | North America (Still) AI-First, Remain OW," Morgan Stanley, February 3, 2023

194.204.    "Alphabet Inc Class A GOOGL Alphabet Q3 Misses Expectations as Macroeconomic Uncertainty Hits Ad Revenue; Shares Undervalued," Morningstar, February 3, 2023

195.205.    "Alphabet Inc Class A GOOGL Macroeconomic Headwinds Keep Pressure on Alphabet's Advertising; Cloud Remains Bright Spot; $154 FVE," Morningstar, February 3, 2023

196.206.    "Content Creators and Aggregators Alphabet (GOOGL) Does GOOGL Have a Product Problem?," Needham, February 3, 2023

197.207.    "Alphabet, Inc. (GOOGL) 4Q22 Wrap: Mixed Results; Transitioning the Cost Base for Slower Growth," Piper Sandler, February 3, 2023

198.208.    "Alphabet Inc. GOOGL Goes on the AI Offensive; Adjusting Estimates," RBC Capital Markets, February 3, 2023

199.209.    "Alphabet, Inc (GOOGL) GOOG: 4Q22 Was a Little Soft," Rosenblatt Securities, February 3, 2023

200.210.    "Alphabet: Overhangs Remain, but Business Should Be Relatively More Resilient," Susquehanna, February 3, 2023

201.211.    "Alphabet Inc. (GOOGL) Mixed 4Q22 Results But Outlook Points to Stricter Cost Discipline and Greater AI-Focus; PT to $120," Truist Securities, February 3, 2023

202.212.    "Alphabet Inc. - Class A Mixed 4Q22 but higher ests drive PT to $120 (from $110)," UBS, February 3, 2023

203.213.    "Internet Alphabet Inc. (GOOGL) GOOGL: Opening AI... Modest 4Q Miss, but New Era Ahead; Maintain OW, PT to $150," Wells Fargo, February 3, 2023

204.214.    "ALPHABET, INC. (GOOGL) GOOGL: Aiming To Improve Efficiencies During Uncertain Macro," Wolfe Research, February 3, 2023

205.215.    "Alphabet Inc. Key Stock Statistics (Source: CFRA, S&P Global Market Intelligence (SPGMI), Company Reports)," CFRA, February 4, 2023

206.216.    "Metaverse Weekly: Incremental Color On GOOGL & AMZNvRIFsAMZN RIFs; 10K Nuggets," Wolfe Research, February 5, 2023

207.217.    "Alphabet Inc. Analyst's Notes," Argus, February 6, 2023

208.218.    "Alphabet A FQ4'22 Postview:  Weak Ads Continue.  AI Launches Coming, Cost Saving Takes Time," BNP Paribas, February 6, 2023

209.219.    "Alphabet AI War is Heating up as Product Visibility Taking a Step Forward," BofA Global Research, February 6, 2023

210.220.    "Brian Nowak on Internet earnings for META AMZN GOOGL SNAP | Episode 100," Morgan Stanley, February 6, 2023

211.221.    "Internet - The IDM GP's Momentum Continues With +31% Performance YTD; GOOGL Gearing up to Compete with ChatGPT," Truist Securities, February 6, 2023

212.222.    "First Read Alphabet Inc. - Class A AI battle heating up b/w Google and Microsoft; Google formally announces Bard," UBS, February 6, 2023

213.223.    "Alphabet Inc. - Class A Bing's ChatGPT Integration Screenshot Leaks; 10K Key Takes," UBS, February 6, 2023

214.    "Alphabet Inc. (GOOGL - $108) Model Update; Nudging PT on EPS Leverage from Lower Spending," Loop Capital, February 7, 2023

## Analyst Reports on Facebook and Facebook Earnings Call

1.    "Zip Co Limited: Opening up the wallet," RBC Capital Markets, December 17, 2020

2.    "Vornado Realty Trust (VNO): Lowering FFO Estimates and Price Target; Maintaining Hold Rating - What's Incremental To Our View," Truist Securities, December 17, 2020

3.     "Washington policy: Weekly Wrap: Government Shutdown Watch Over Fiscal Stimulus Details," Raymond James, December 18, 2020

4.     "Internet and Digital Media: Internet - The IDM Grp is up 99% YTD; AMZN's Pushing into Healthcare While FB's Pursuing Services, 2020 Will be a Tough Act to Follow for the IDM Grp, What's Incremental To Our View," Truist Securities, December 18, 2020

5.     "Facebook, Inc.," CFRA, December 19, 2020

6.     "Facebook FB: Moving From Strong Buy To Buy Rating, " Elazar Advisors, LLC, December 21, 2020

7.     "Daily MIC: FB/GOOGL Discuss Cooperation in Antitrust Suit; MGM Explores Sale; COVID Bill Cracks Down on Streaming Piracy," Guggenheim Securities, LLC, December 22, 2020

8.     "Facebook: Lowering estimates on added IDFA and supply chain uncertainty," BofA Securities, October 22,  2021

9.     "Facebook Inc. -  Q3 Preview & Cheat Sheet," Evercore ISI, October 22, 2021

10.    "Internet and Digital Media: Internet - Internet - SNAP Kicks Off Earnings Season with Disappointing Results; Maintain +Ve Bias on FB/GOOGL,Google Lowers App Store Fees, Positive for MTCH, APP, What's Incremental To Our View," Truist Securities, October 22, 2021

11.    "Industry Update - Internet: Weekly Earnings Preview: AMZN, FB, GOOGL, SPOT, TWTR," Canaccord Genuity, October 24, 2021

12.    "Global Internet Tracker: Ad Risks; JD/BIDU Preview; JD PT to $95," Mizuho Securities, October 24, 2021

13.    "Quick final thoughts into FB's Q3 Report," RBC Capital Markets, LLC, October 24, 2021

14.    "Facebook, Inc. (FB): Q3 Results Highlights: We Can Work It Out," Baird Equity Research, October 25, 2021

15.    "Facebook, Inc.: A Little Squishy, But Outperforming Most of the Group," Barclays Capital Inc., October 25, 2021

16.    "Facebook - Internet: Near-term headwinds already reflected in the stock," Canaccord Genuity, October 25, 2021

17.    "Facebook, Inc. (FB.O): 3Q21 Results - CITI'S Take," Citi, October 25, 2021

18.    "China technology - Sector outlook: Connecting with the metaverse," CLSA, October 25, 2021

19.    "Daily MIC: FB to Deliver Most Impactful Earnings Call Tonight; Updated Netflix International Model; PYPL Not Pursuing Acquisition of PINS," Guggenheim Securities, LLC, October 25, 2021

20.    "Facebook, Inc.- Q3 First Look: Better Than Feared," Jefferies LLC, October 25, 2021

21.    "Facebook, Inc.-  Q3 Revenue Miss, But Plenty of Valuation Support," Jefferies LLC, October 25, 2021

22.    "Facebook, Inc.- FB: FB's New Reality – Disclosures Could Highlight Core EPS Power; Reiterate $420 PT," KeyBanc Capital Markets Inc., October 25, 2021

23.    "FLASH REPORT: Facebook, Inc. (FB - $328.69) Post-call Thoughts from Loop," Loop Capital Markets, October 25, 2021

B-16

24. "Facebook, Inc.- Investments in Workaround Solutions Mitigate IDFA/ATT Risks," Mizuho Securities USA LLC, October 25, 2021

25. "Facebook Inc. Facebook Misses on Q3 Revenue, but Upside Remains; New $404 FVE," Morningstar, October 25, 2021

~~25.~~26. "Facebook, Inc. - More Resilient than Feared, with Reasonable Core Valuation and Option Value Around Metaverse," Oppenheimer, October 25, 2021

~~26.~~27. "Facebook, Inc. (FB) - 3Q21 Wrap: Buyback Overshadows ATT Impact, 2022E Expense Guide Steps Up," Piper Sandler, October 25, 2021

~~27.~~28. "Facebook, Inc. (FB-NASDAQ) - IDFA Headwinds Though Not as Bad as Feared; Strong Buy; PT to $410," Raymond James, October 25, 2021

~~28.~~29. "Facebook, Inc. - Mostly dodging the Apple bullet; modestly lowering estimates and target," RBC Capital Markets, LLC, October 25, 2021

~~29.~~30. "Facebook Inc. NasdaqGS:FB FQ3 2021 Earnings Call Transcripts," S&P Global Market Intelligence, October 25, 2021, 4:00 PM

~~30.~~31. "Facebook, Inc. (FB) - First Look - 3Q21 Results/Outlook, Better than Feared! New Reporting Structure Highlighting AR/VR to be introduced in 4Q21," Truist Securities, Inc., October 25, 2021

~~31.~~32. "Facebook, Inc. (FB) - FB's Scale Shows Resiliency In the Face of Industry Challenges; Maintain Buy/PT to $400 (FY22), FB Announces $50B Increase in Share Buyback, What's Incremental To Our View," Truist Securities, Inc., October 25, 2021

~~32.~~33. "First Read - Facebook, Ramping investments in the metaverse," UBS Securities LLC, October 25, 2021

~~33.~~34. "Facebook (FB) - Apple Privacy Challenges Continue, Large Investments Impact Margins in '22," Wedbush Securities, October 25, 2021

~~34.~~35. "Facebook, Inc. - (FB – $328.69 – Outperform), Better Than Feared," Wolfe Research, October 25, 2021

~~35.~~36. "Facebook, Inc. - CFRA Maintains Hold Opinion On Shares Of Facebook, Inc.," CFRA Research, October 26, 2021

~~36.~~37. "Facebook, Inc. (FB.O) - Lowering Target Price; Maintain Neutral, CITI'S TAKE," Citi October 26, 2021

~~37.~~38. "Facebook, Inc. - Stepped Up OpEx and CapEx in the Model, Revenue/Product Benefit Remain Optionalities," Credit Suisse, October 26, 2021

~~38.~~39. "Facebook Inc. - IDFA Is No GDPR," Evercore ISI, October 26, 2021

~~39.~~40. "FB: iOS Change Causes FB Revenue Miss, but Lower Valuation and Lower Bar Creates Attractive Entry Point," FBN Securities, October 26, 2021

~~40.~~41. "Massive Investments in Experimental Metaverse Project; Change in Segment Reporting," Financiele Diensten Amsterdam BV, October 26, 2021

~~41.~~42. "FB – BUY – Calm Criticism Rebuttal and Privacy Impact Details Helpful; Higher Costs and Macro Uncertainty Remain Headwinds – 3Q21 Review," Guggenheim Securities LLC, October 26, 2021

~~42.~~43. "Earnings Flash," Hanwha, October 26, 2021

~~43.~~44. "Facebook, Inc. (FB) - Well Positioned to Take Share of Digital Ad Budgets Coming Out of 3Q21," JMP Securities LLC, October 26, 2021

B-17

44.45. "Facebook - iOS & Macro Impact on Ads Mostly as Expected; FB Focus Shifting More to Metaverse, Video, Young Adults; OW w/$390 PT," J.P. Morgan, October 26, 2021

45.46. "Facebook, Inc. - Better Than Feared Results: 4Cs of FB = Collaboration, Commerce, Creators, & Computing," MKM Partners LLC, October 26, 2021

46.47. "Facebook Missed on Q3 Revenue, but We Think Upside for the Stock Remains; New $404 FVE," Morningstar, October 26, 2021

47.48. "Facebook, Inc. (FB) - FB vs SNAP: Differences and Similarities," Needham & Company, LLC, October 26, 2021

48.49. "Facebook, Inc. (FB) -  FB: Stock Oversold Against Near-Term Reset; Upgrade to Buy from Neutral, Maintain $400 PT," Rosenblatt Securities Inc. October 26, 2021

49.50. "Facebook, Inc.: Navigating NT Headwinds," Susquehanna Financial Group, LLLP, October 26, 2021

50.51. "US Semiconductors and Semi Equipment: FB's Capex Commentary Could Signal A Widespread Compute Tailwind," UBS Securities LLC, October 26, 2021

51.52. "Internet: Facebook, Inc. (FB) - FB: A Better Day on the Horizon? 3Q, Guide Better than Feared; Reit OW, Lower PT to $425," Wells Fargo Securities, LLC, October 26, 2021

52.53. "Facebook, Inc. - Can't Escape iOS 14 Headwinds, but Continues to Build Tools to Work Around Changes," William Blair & Company, L.L.C., October 26, 2021

53.54. "Facebook Inc Cl A (FB) - Remove Buy Recommendation," William O'Neil + Co., Inc., October 26, 2021

54.55. "Facebook, Inc. - Analyst's Notes," Argus Research Company, October 27, 2021

55.56. "Facebook, Inc. (FB) - Q3 10-Q Review," Robert W. Baird & Co. Incorporated, October 27, 2021

56.57. "Facebook Inc. (FB US, BUY, TP: US$415.00) - 3Q21: Revenue headwinds persist; moving into the Metaverse,"  China Renaissance Securities (US) Inc., October 27, 2021

57.58. "Facebook Model Update: Neutral Rating," Elazar Advisors, LLC, October 27, 2021

58.59. "Technology | Internet - Takeaways From Programmatic I/O NY 2021," Evercore ISI, October 27, 2021

59.60. "Facebook, Inc. - Stable growth in the face of uncertainty," Phillip Securities Research Pte Ltd.,  October 27, 2021

60.61. "Facebook - ANALYSIS for NYSE : FB," Trefis, October 27, 2021

61.62. "Facebook, Inc. - Meta New Friend Today," Evercore ISI, October 28, 2021

62.63. "Meta Platforms, Inc. - FB - ALERT: Meta, the Company Formerly Known as Facebook – Connect Event Sheds Some Light on the Future State (No Little Red Corvettes, but Plenty of Hydrofoils)," KeyBanc Capital Markets Inc., October 28, 2021

63.64. "Facebook, Inc. (FB) - Beyond Facebook: 'Meta' Is Now the Company," Piper Sandler, October 28, 2021


**Analyst Reports on Snap and Snap Earnings Call**

1.      "Snap Inc. NYSE:SNAP FQ3 2021 Earnings Call Transcripts," S&P Global Market Intelligence, October 21, 2021, 5:00 PM

2.    "Snap Inc. Not Getting Paid for the Value it is Generating, That will Change," Credit Suisse, October 22, 2021

3.    "Snap Inc. (SNAP) iOS Challenges Create Near-Term Ad Headwinds but Multiple Growth Catalysts Remain Ahead Internet & Digital Media | Rating/Price Target Change," JMP, October 22, 2021

4.    "Snap Inc. iOS Ad Changes & Supply/Labor Shortages Combine for Worst Case 4Q; But Still More Transitory Than Fundamental; Remain OW," J.P.Morgan, October 22, 2021

5.    "Internet Ecosystem Impacts: What Do Snap's 3Q Results Signal to Digital Advertising," Piper Sandler, October 22, 2021

6.    "Snap Inc. (SNAP) No More Denying Apple's ATT Privacy Impact; Supply Chain Issues Dampen Ad Spend," Wedbush, October 22, 2021

**Press Releases and News Articles**

1.    "How Google is rewriting the rules of ad auctions," *Ad Age*, May 28, 2019

2.    "Justice Department Is Preparing Antitrust Investigation of Google," *Dow Jones Institutional News*, May 31, 2019, 8:45 PM

3.    "Justice Dept. Explores Google Antitrust Case," *NYTimes.com Feed*, May 31, 2019, 9:10 PM

4.    "Justice moves to begin antitrust probe of Google," *The Washington Post*, June 1, 2019 (Saturday)

5.    "UPDATE 1-Alphabet shares slide 6% on possible DoJ antitrust probe," *Reuters*, June 3, 2019, 5:29 PM

6.    "Justice Department to Open Broad, New Antitrust Review of Big Tech Companies—Update," *Dow Jones Institutional News*, July 23, 2019, 5:34 PM

7.    "50 state attorneys general have launched a formal probe into whether Google has engaged in anti-competitive practices in its ads business (GOOG, GOOGL)," *Business Insider*, September 9, 2019, 2:12 PM

8.    "Attorneys General Launch Probe of Google," *Dow Jones Institutional News*, September 9, 2019, 3:10 PM

9.    "Justice Department, State Attorneys General Likely to Bring Antitrust Lawsuits Against Google; Both the federal and state investigations are focused on Google's ad business," *The Wall Street Journal*, May 15, 2020, 4:32 PM

10.    "Lawmakers just raked Big Tech CEOs over the coals," *latimes.com*, July 29, 2020

11.    "Google grilled on ad business dominance by U.S. Senate panel," *Reuters*, September 15, 2020, 6:25 PM

12.    "Justice Department Files Long-Awaited Antitrust Suit Against Google -- 2nd Update," *Dow Jones Institutional News*, October 20, 2020, 2:22 PM

13.    "Texas hiring two law firms for Google probe team," *Reuters*, December 15, 2020, 7:20 PM

14.    "Texas leads lawsuit against Google, alleging anti-competitive advertising practices; Attorney General Ken Paxton, battling his own legal troubles, announced the long-

B-19

~~anticipated federal lawsuit in a video posted on social media,” CBS - 5 KFSM, December 16, 2020~~

15.14. "Texas leads Republican attorneys general in new antitrust lawsuit against Google, targeting its advertising empire" *Washington Post.com*, December 16, 2020

16.15. "Texas AG: Filing Lawsuit Vs. Google for Anticompetitive Conduct," *Bloomberg News*, December 16, 2020, 1:59 PM

~~17. "*Google, Facebook Had Illegal Deal To Rig Ad Auctions: Texas," Bloomberg News, December 16, 2020, 3:55 PM~~

~~18. "States Allege Google Cut Deal With Facebook to Rig Online Ad Market," Dow Jones Institutional News, December 16, 2020, 4:17 PM~~

~~19. "Google, Facebook Had Illegal Deal to Rig Ad Market, Texas Says," Bloomberg News, December 16, 2020, 4:36 PM~~

~~20. "How a U.S. lawsuit claims Google, Facebook cooperated to undermine ad competition," Reuters, December 16, 2020, 6:12 PM~~

21.16. "Ten States Sue Google, Alleging Deal With Facebook to Rig Online Ad Market; Texas-led coalition accuses Alphabet unit of striking arrangement with rival tech giant to preserve its own dominance; legal action follows federal case," *Wall Street Journal Online*, December 16, 2020, 6:25 PM

~~22. "Google secretly gave Facebook perks, data in ad deal, U.S. states allege," Reuters, December 17, 2020, 5:38 AM~~

23.17. "States File Antitrust Lawsuit Against Google," *Dow Jones Institutional News*, December 17, 2020, 1:20 PM

24.18. "Google, Facebook Agreed to Team Up Against Possible Antitrust Action, Draft Lawsuit Says; Draft lawsuit quotes Facebook's Sandberg saying Google pact was a 'big deal strategically'," *The Wall Street Journal*, December 22, 2020, 12:25 AM

25.19. "EU antitrust regulators to investigate Google's adtech business," *Reuters*, June 22, 2021, 5:45 AM

26.20. "States Target Google Play Store in Antitrust Suit," *Dow Jones Institutional News*, July 7, 2021, 6:10 PM

27.21. "U.S. DOJ Readies Google Antitrust Lawsuit over Ad-tech Business." *Bloomberg News*, September 1, 2021, 4:47 PM

28.22. "Justice Dept. Is Said to Accelerate Google Advertising Inquiry," *The New York Times*, September 1, 2021, 7:59 PM

29.23. "Snap Inc. Announces Third Quarter 2021 Financial Results," *Business Wire*, October 21, 2021, 4:10 PM

~~30. "*Alphabet Shares Follow Snap Lower with 3.4% Decline," Bloomberg News, October 21, 2021, 4:21 PM~~

31.24. "Facebook and Alphabet Pummeled After Snap Warns on Ads (1)," *Bloomberg News*, October 21, 2021, 6:30 PM

32.25. "Snap's stock drops as iPhone privacy controls pinch ad sales," *Associated Press Newswires*, October 21, 2021, 7:24 PM

33.26. "Google Charges More than Twice Its Rivals in Ad Deals, Unredacted Suit Says; According to the suit by state attorneys general, one senior Google employee said the

"analogy would be if Goldman or Citibank owned the NYSE," *The Wall Street Journal*, October 22, 2021, 3:11 PM

34.27. "05:31 EDT Snap results raise uncertainty for digital advertising, says Piper...," *Theflyonthewall.com*, October 22, 2021

35.28. "Dow Jones Futures: Snap Crashes, Intel Tumbles On Earnings; Donald Trump Makes SPACs Great Again," *Investor's Business Daily*, October 22, 2021

36. "Google worked with Facebook to undermine Apple's attempts to offer its users great privacy protections, complaint alleges," Business Insider, October 22, 2021, 1:59 PM

37.29. Google Takes Up to 42% From Ads, States Claim in Lawsuit (l), *Bloomberg News*, October 22, 2021, 2:50 PM

38.30. "Google Charges More than Twice Its Rivals in Ad Deals, Wins 80% of Its Own Auctions, Court Documents Say -- 4th Update," *Dow Jones Institutional News*, October 22, 2021, 3:11 PM

39.31. "Google said it had successfully 'slowed down' European privacy rules, according to lawsuit," *New York Times*, October 22, 2021, 1:32 PM

40.32. "Google Charges Higher Fees for Ads, Lawsuit Says. That's Not Why Alphabet's Stock Is Dropping," *Barron's Online*, October 22, 2021, 3:55 PM

41.33. "Dow ends at all-time high, U.S. stocks book weekly gains despite tech under pressure," *Dow Jones Institutional News*, October 22, 2021, 4:42 PM

42.34. "Snap's Record Rout Leads $142 Billion Social-Media Selloff (1)," *Bloomberg News*, October 22, 2021, 4:52 PM

35. "*"Google worked with Facebook to undermine Apple's attempts to offer its users great privacy protections, complaint alleges," *Business Insider*, October 24, 2021, 1:59 PM

43.36. "Google-parent Alphabet beats revenue expectations," *Reuters*, October 26, 2021, 4:04 PM

44.37. "UK regulator accepts Google's revised pledges on browser cookies," *Reuters*, February 11, 2022, 2:20 AM

45.38. "Google's advertising tech targeted in European publishers' complaint," *Reuters*, February 11, 2022, 3:00 AM

46.39. "Britain launches second probe into Google's ad practices," *Reuters*, May 26, 2022, 6:19 AM

47.40. "DOJ Poised to Sue Google over Digital Ad Market Dominance," *Bloomberg News*, January 23, 2023, 7:16 PM

48.41. "Justice Dept. Sues Google for Monopolizing Digital Advertising Technologies," DOJ Press Release, January 24, 2023

49. "Feds poised to file another antitrust suit against Google this week: report," MarketWatch, January 24, 2023, 7:22 AM

50.42. "Justice Department sues Google for antitrust in digital advertising, while Alphabet stock slides; Eight states join Attorney General Merrick Garland in suing Google for abusing market dominance in online advertising. The company claims it faces competition from the likes of Facebook and Amazon," *MarketWatch*, January 25, 2023, 8:19 AM

51.43. Factiva news search on "Google" or "Alphabet" in the headline or lead paragraph, September 14, 2020 to September 16, 2020

52.44.  Factiva news search on "Google" or "Alphabet" in the headline or lead paragraph, October 19, 2020 to October 21, 2020

53.45.  Factiva news search on "Google" or "Alphabet" in the headline or lead paragraph, December 15, 2020 to December 18, 2020

54.46.  Factiva news search on "Google" or "Alphabet" in the headline or lead paragraph, December 19, 2020 to December 21, 2020

55.47.  Factiva news search on "Google" or "Alphabet" in the headline or lead paragraph, July 6, 2021 to July 8, 2021

56.48.  Factiva news search on "Google" or "Alphabet" in the headline or lead paragraph, September 1, 2021 to September 3, 2021

57.49.  Factiva news search on "Google" or "Alphabet" in the headline or lead paragraph, October 21, 2021 to October 25, 2021

58.50.  Factiva news search on "Google" or "Alphabet" in the headline or lead paragraph, February 10, 2022 to February 14, 2022

59.51.  Factiva news search on "Google" or "Alphabet" in the headline or lead paragraph, January 23, 2023 to January 26, 2023

60.52.  Factiva news search on "Facebook" or "Meta" in the headline or lead paragraph, December 15, 2020 to December 18, 2020

61.53.  Factiva news search on "Facebook" or "Meta" in the headline or lead paragraph, October 21, 2021 to October 25, 2021

62.54.  Bloomberg article search for equity ticker=GOOGL, September 14, 2020 to September 16, 2020

63.55.  Bloomberg article search for equity ticker=GOOGL, October 19, 2020 to October 21, 2020

64.56.  Bloomberg article search for equity ticker=GOOGL, December 15, 2020 to December 18, 2020

65.57.  Bloomberg article search for equity ticker=GOOGL, December 19, 2020 to December 21, 2020

66.58.  Bloomberg article search for equity ticker=GOOGL, July 6, 2021 to July 8, 2021

67.59.  Bloomberg article search for equity ticker=GOOGL, September 1, 2021 to September 3, 2021

68.60.  Bloomberg article search for equity ticker=GOOGL, October 21, 2021 to October 25, 2021

69.61.  Bloomberg article search for equity ticker=GOOGL, February 10, 2022 to February 14, 2022

70.62.  Bloomberg article search for equity ticker=GOOGL, January 23, 2023 to January 26, 2023

71.63.  Bloomberg article search for equity ticker=META and search term=attorneys general, December 15, 2020 to December 18, 2020

72.64.  Bloomberg article search for equity ticker=META, and search term=attorneys general, October 21, 2021 to October 25, 2021

B-22

**Data Documentation**

1.      US Equity Trade, Quote and One-Minute Data File Format Document Version 4.0, Tick Data, LLC

**Website**

1.      https://www.epceurope.eu/

**Data Sources**

1.      Bloomberg L.P.
2.      Capital IQ
3.      CRSP US Stock and Index Databases ©2026 Center for Research in Security Prices ("CRSP"), The University of Chicago Booth School of Business
4.      FactSet
5.      Pacer
6.      TICK Data

**All other data and documents referenced in this report.**

## Appendix C
## Intraday Stock Price Reactions of Alphabet Stocks

| Event Window | Class A | | | | | Class C | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Raw Return | Predicted Return | Abnormal Return | t-Stat | Stat. Sig? | Raw Return | Predicted Return | Abnormal Return | t-Stat | Stat. Sig? |
| 1  12/16/20 3:34PM to 12/17/20 Open [1] | 0.24% | 0.32% | -0.08% | -0.09 | No | 0.16% | 0.27% | -0.12% | -0.13 | No |
| 2  7/7/21 3:55PM to 7/8/21 Open [2] | -1.98% | -1.67% | -0.31% | -0.19 | No | -1.45% | -1.62% | 0.18% | 0.21 | No |
| 3  10/22/21 8:59AM to 10/22/21 Open [3] | 0.00% | -0.13% | 0.12% | 0.44 | No | 0.14% | -0.13% | 0.27% | 1.08 | No |
| 4  10/22/21 8:59AM to 10/22/21 Close [4] | -1.14% | -0.45% | -0.69% | -0.80 | No | -1.09% | -0.36% | -0.73% | -0.84 | No |

[1] Event window is from the last available VWAP immediately preceding 3:35 p.m. on December 16, 2020 to the market opening price on December 17, 2020.

[2] Event window is from the last available VWAP immediately preceding 3:56 p.m. on July 7, 2021 to the market opening price on July 8, 2021.

[3] Event window is from the last available VWAP immediately preceding 9 a.m. on October 22, 2021 to the market opening price on the same date.

[4] Event window is from the last available VWAP immediately preceding 9 a.m. on October 22, 2021 to the market closing price on the same date.

Notes: Abnormal returns are estimated based on a regression model using the S&P 500 Index and corrected RDG Internet Composite Index excluding Google as explanatory variables. *See* ¶ 47 n 92 for corrected errors. The abnormal return on each event date is estimated using a one year period prior to each event date. Relevant event dates (*see* ¶ 47 n.95) are excluded from the estimation period. Statistical significance at the 5% level is denoted by a t-statistic with an absolute value of 1.96 or greater. When using intraday data, I removed trades flagged for exclusion via the "Exclude Record Flag" field, as recommended in the Tick Data Documentation. *See* , Tick Data, LLC, "US Equity Trade, Quote and One-Minute Data File Format Document (Version 4.0). I also excluded certain after-hours trades (i.e., those where the "Sales Condition" field contains "T") if they included any of the following additional Sales Condition codes: "L" (Sold Last – Late Reporting), "P" (Prior Reference Price), "U" (Extended Hours – Sold Out of Sequence), "Z" (Sold Out of Sequence), and "4" (Derivatively Priced). *See* Internet Appendix to V. Gregoire and C. Martineau, 2022, "How Is Earnings News Transmitted to Stock Prices," *Journal of Accounting Research* , Vol. 60, 261-297. In addition, for trades during regular trading hours (9:30 a.m. to 4:00 p.m.), I retained only those with one of the following Sales Condition codes: "@" (Regular Way), "E" (NYSE Direct+), and "F" (Intermarket Sweep Order). For trades during extended trading hours (i.e., before 9:30 a.m. or after 4:00 p.m.), I retained only those with the following codes: "@", "E", "F", and "T" (Pre- and Post-Market Close Trades). *See* E. Li, K. Ramesh, M. Shen, J. Wu, 2013, "Do Analyst Stock Recommendations Piggyback on Recent Corporate News? An Analysis of Regular-Hour and After-Hours Revisions," *Journal of Accounting Research* , Vol. 53, 821-861. I followed the literature and applied these filters to remove data entry errors in Tick Data and to exclude trades involving special settlement conditions. After excluding trades pursuant to the criteria described above, I calculated a volume-weighted average price ("VWAP") for each minute using all trades that occurred within that minute. *See* , e.g., Dong Lou, Christopher Polk, and Spyros Skouras, "A tug of war: Overnight versus intraday expected returns," *Journal of Financial Economics* , Vol. 134, 192-213. I used split-adjusted prices to calculate intraday returns. When an event window spans two consecutive trading days and the subsequent trading day is an ex-dividend date, the return calculation incorporates the effect of the dividend. I used Dr. Nye's data and programs to calculate the daily weights of the constituent stocks in the RDG Internet Composite Index. For each event window, I applied the constituent weights from the trading day immediately preceding the event window to calculate a weighted average return of the industry index over that event window.

Sources: TICK Data; CRSP; Bloomberg; Nye Production Materials: NYE0007002-7005, NYE0007008, and NYE0011890.