UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., et al.,<br><br>      Plaintiffs,<br><br>    v.<br><br>ALPHABET INC., et al.,<br><br>      Defendants. | Case No.  23-cv-01186-RFL<br><br>**NOTICE OF QUESTIONS FOR HEARING**<br><br>Re: Dkt. No. 134 |

The Court requests that the parties be prepared to provide their views on the following summary of its tentative views at the hearing on Plaintiffs' motion for class certification, set for April 14, 2026, at 10:00 a.m., in Courtroom 15 at the San Francisco Courthouse:

Defendants do not contest that Plaintiffs satisfy the Rule 23(a) prerequisites and Rule 23(b)(3)'s requirement of superiority.  Thus, the only requirement in dispute is predominance.

Plaintiffs have undisputedly satisfied their burden to show that the market for Alphabet's stock was efficient, triggering the presumption of reliance on the alleged misrepresentation under *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).  Defendants contend that they have rebutted that presumption by showing a lack of any price impact from the alleged misrepresentation. Defendants, however, fail to disprove price impact from at least two corrective disclosures.

As to the December 16, 2020 Texas lawsuit, filed at 3:35 p.m., Defendants do not appear to have shown a complete lack of price impact.  The lawsuit is closely related to the alleged misrepresentation.  It includes specific allegations about Google's use of its tools to advantage itself in advertising auctions, including that Google formed an agreement with Facebook "to

manipulate advertising auctions." (Dkt. No. 144-1 ¶ 2.)  That information is a partial disclosure that, in Google's advertising auctions, bidders using Google's favored channels were more likely to win bids.  The statute of limitations is not a problem since the lawsuit was only a partial corrective disclosure.

Professor Ferrell's model—evaluating either December 16 (with only 25 minutes of relevant trading) or only December 17 (excluding 25 minutes of relevant trading)—found no statistically significant impact at the 95% confidence level from this disclosure.  (Dkt. No. 146-1 ¶¶ 61–63.)  By contrast, Professor Nye's model, using a 24-hour intraday event window, found an abnormal price drop at just below the 95% confidence level.  (Dkt. No. 148-2 ¶ 48.)  Using a two-day event window, Nye's model shows an abnormal price drop at above the 95% confidence level.  (*Id.* ¶ 46.)  Nye's 24-hour intraday analysis is the most persuasive.[1]  It is not clear that a two-day event window is necessary, but the disclosure's complexity in the form of a hundred-page legal complaint suggests that some market participants took longer to digest the information than they would an earnings announcement coming out on an expected date.  (*See id.* ¶¶ 26–30.)  Moreover, while market participants may have expected some form of ad tech antitrust lawsuit, there is no evidence that they expected the disclosure of the Facebook agreement or the facts concerning Google's alleged manipulation of the auctions.  (*Cf.* Dkt. No. 150-3 ¶ 34.)  Ferrell's approach of either limiting the event window to less than half an hour or excluding 25 minutes of relevant trading right after the announcement is less persuasive in this context.  (*Cf. id.* ¶ 29 n.60.)

Though the intraday price drop from this disclosure was not abnormal at above the 95% confidence level, that failure is insufficient to demonstrate a lack of price impact.  A lack of statistical significance at that level could sometimes show a lack of price impact.  (*See id.* ¶¶ 15–21.)  But Defendants have not met their burden to make that showing here.  First, Nye's model

---

[1] It seems reasonable to exclude earnings days from the model, as by definition, earnings days are not typical days with unknown random price variation but instead are expected to have strong price volatility.  (*See* Dkt. No. 148-2 ¶¶ 17–21.)

indicates confidence levels of 94.9% and 93.4% for Alphabet's two classes of stock, respectively.  (Dkt. No. 148-2 ¶ 48.)  In other words, Nye's model shows greater than a 93% confidence level that a price drop was abnormal rather than random.  Though that is "obviously less comfort than a result that is statistically significant at a confidence level of 95%," that alone is insufficient to disprove by a preponderance that this price drop was random.  *See Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018).  Second, analysts and news outlets extensively reported on the lawsuit, and focused on the alleged auction manipulation scheme with Facebook.  (Dkt. No. 148-2 ¶¶ 55–59.)  For example, reports flagged allegations that Facebook received "special treatment" when using Google's ad auctions pursuant to its agreement and that Google used its tools "to manipulate" the auction process to "favor itself" over "rivals."  (*Id.*)  Third, the record does not indicate that there was other news about Alphabet at the time that would explain the price drop.  (*Id.* ¶ 50; Dkt. No. 146-1 ¶ 60 n.111 (noting only that the lawsuit itself contained allegations beyond auction manipulation).) Taken as a whole, Defendants have not carried their burden to disprove likely price impact.

It is a similar story for the January 24, 2023 DOJ lawsuit, filed at 12:18 p.m.  Even assuming the lawsuit's allegations completely overlap with those in the Texas lawsuit, it is still sufficiently related to the alleged misrepresentation.  First, when the DOJ under the Biden administration filed a lawsuit similar to the one filed by the Republican State Attorneys General, the market could have reasonably inferred from the bipartisan consensus that the evidence supporting the allegations must be somewhat strong.  Second, market participants learned that a break-up remedy was a realistic possibility.  That is directly related to the alleged misrepresentation in this case; Plaintiffs' theory is that investors would have already understood this risk if Google had been forthright that bidders using Google's own channels were more likely to win bids.

Additionally, Defendants have not shown a lack of price impact from this disclosure.  Nye's model, using a 24-hour intraday event window, shows a price drop at above the 95% confidence level.  (Dkt. No. 148-2 ¶ 92.)  Even Ferrell's model with a one-day close-to-close

event window, if earnings dates are excluded, shows a price drop just under the 95% confidence level.  (Dkt. No. 150-3 ¶ 26.)  Like the Texas lawsuit, analysts and news outlets extensively covered this complaint, and the record does not indicate other news about Alphabet that would explain the price movement.  (Dkt. No. 148-2 ¶¶ 93, 97–98.)  Accordingly, Defendants have not met their burden to show a lack of any price impact from this corrective disclosure.

In sum, Defendants have not disproven back-end price impact from the first and last corrective disclosures within the class period.  And those two incidents of back-end price impact support Plaintiffs' theory that the alleged misrepresentation maintained the initial stock price at the front end.  Some of the other corrective disclosures are similarly situated, while others have weaker evidence of a price impact.  But it is unnecessary to disentangle those disclosures at the class certification stage, given the back-end impact covering both ends of the class period.  Instead, those questions of loss causation and damages are properly reserved for the merits phase.

Plaintiffs have also proposed a sufficient model for calculating class-wide damages, and their expert has described the accepted methods for disaggregating non-fraud factors.  *See City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *2–4 (N.D. Cal. Oct. 11, 2018); *Junge v. Geron Corp.*, No. 20-CV-00547-WHA, 2022 WL 1002446, at *6 (N.D. Cal. Apr. 2, 2022) (collecting cases).

For those reasons, class certification appears appropriate.

In addition to providing their response to the Court's tentative view of the case, the parties should be prepared to address the following questions at the hearing:

1.  Do Plaintiffs agree that because the alleged misrepresentation was released after the close of trading on September 14, 2020, the class period should not start until September 15?

2.  Why must courts insist on statistical significance at the 95% confidence level in this context?  If price movement is found to be non-random at a 94% confidence level, how does that prove by a preponderance that the price movement was in

fact random?  Indeed, a law review article cited by Defendants persuasively argues that this choice is "not a matter of objective scientific truth" but instead "an implicit normative judgment about the appropriate level of difficulty required to establish a securities fraud claim."  Jill E. Fisch & Jonah B. Gelbach, *Power and Statistical Significance in Securities Fraud Litigation*, 11 Harv. Bus. L. Rev. 55, 58 (2021) (cited in Dkt. No. 142 at ECF Page 20).

3. Why is an intraday 24-hour event window inappropriate here, when the news was unexpected, came later in the trading day, and requires some expertise and background knowledge to fully appreciate?

At the hearing, each side will have an opportunity to provide their views on the Court's tentative opinion and questions.  They may also present additional argument that they wish the Court to hear.  The parties **shall not** file written responses to this Notice of Questions.

**IT IS SO ORDERED.**

Dated: April 10, 2026

_____

RITA F. LIN
United States District Judge