BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
ELENA HADJIMICHAEL, State Bar No. 355715
elena.hadjimichael@freshfields.com
CARL HUDSON, State Bar No. 317201
carl.hudson@freshfields.com
J. MIA TSUI, State Bar No. 344251
mia.tsui@freshfields.com
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALPHABET INC., et al.,<br><br>Defendants. | Case No.: 3:23-cv-01186-RFL (SK)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL**<br><br>Date:      August 25, 2026<br>Time:      10:00 AM<br>Location:  Courtroom 15 – 18th Floor<br>Judge:     The Hon. Rita F. Lin |

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................................... ii

TABLE OF ABBREVIATIONS................................................................................................ v

NOTICE OF MOTION AND MOTION.................................................................................. 1

STATEMENT OF ISSUES...................................................................................................... 1

INTRODUCTION................................................................................................................... 1

DISCOVERY CONFIRMS THE AUCTION FUNCTIONED AS DESCRIBED........................2

    A. Complex Technology Places Digital Ads Nearly Instantaneously........................2

        1. Google Offers Leading Adtech Products.................................................2

        2. Google's Adtech Products Optimize Value for Advertisers and Publishers.................... 3

        3. Google Improved the Marketplace as Ad Technology and Participants Evolved............ 4

    B. Google Entered Into a Partnership Agreement with Facebook in 2018...............5

    C. Google Responses to a Congressional Inquiry....................................................5

ARGUMENT........................................................................................................................... 6

    I. PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING SECURITIES FRAUD...... 7

    A. PLAINTIFFS CANNOT SHOW THE CHALLENGED STATEMENT WAS FALSE........ 7

        1. The UFPA Was Designed so That the Highest Bid Wins.................................... 8

        2. Ad Manager Permits Publishers to Set Preferences in Pre-UPFA Processes.................... 9

        3. The UFPA's Bidding Prerequisites Were Indifferent to the Bidder's Channel................ 11

        4. Google's NBA with Facebook Does Not Alter the Highest-Bidder-Wins Outcome...... 14

            a. The NBA Itself Is Silent on Choosing a Winning Bid in UFPA.............................. 14

            b. No NBA Terms Require Data to Be Shared........................................................... 15

            c. Facebook Only Received Data Shared with All Bidders.......................................... 16

    B. MR. PICHAI WAS NOT A MAKER OF THE CHALLENGED STATEMENT................ 18

    C. THE EVIDENCE SHOWS NO FRAUDULENT INTENT................................................ 19

        1. There Is No Evidence of Scienter as to Mr. Pichai........................................... 19

            a. The Evidence Shows Mr. Pichai Had No Involvement with the QFR Responses.... 19

            b. Mr. Pichai Had No Reason to Believe that the QFR 6 Response Was False............ 20

        2. Plaintiffs Cannot Show a Material Issue of Fact Concerning Corporate Scienter.......... 21

            a. The Ninth Circuit Does Not Permit Corporate Scienter on Plaintiffs' Theory......... 21

            b. The QFR 6 Response Aligns with Its Drafters' Understanding................................ 23

            c. No Evidence the QFR Response Drafters Knew of Any Contrary Information....... 23

    II. MR. PICHAI WAS NOT A CONTROL PERSON........................................................ 24

CONCLUSION...................................................................................................................... 25

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Abdo v. Fitzsimmons,*
  2021 WL 616324 (N.D. Cal. Feb. 17, 2021)................................................................ 18, 19, 20

*In re Alstom SA,*
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................................... 25

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)........................................................................................... 6

*Anshen v. Facebook,*
  2017 WL 5635021 (C.D. Cal. Oct. 4., 2017)................................................................ 24

*Ardolino v. Mannkind Corp.,*
  2016 WL 4505172 (C.D. Cal. Aug. 23, 2016)............................................................... 8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007).................................................................................... 25

*Brody v. Transitional Hosp. Corp.,*
  280 F.3d 997 (9th Cir. 2002)................................................................................. 15

*In re Celgene Corp., Inc. Sec. Litig.,*
  741 F. Supp. 3d 217 (D.N.J. 2024)......................................................................... 19, 20

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)........................................................................................... 6

*College Ret. Equities Fund v. Boeing Co.,*
  2023 WL 6065260 (N.D. Ill. Sept. 18, 2023)............................................................... 21

*In re Cypress Semiconductor,*
  891 F. Supp. 1369 (N.D. Cal. 1995)........................................................................ 11

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005)........................................................................................... 7

*Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.,*
  353 F.3d 1125 (9th Cir. 2004)................................................................................ 7

*Far Out Prods. v. Oskar,*
  247 F.3d 986 (9th Cir. 2001)................................................................................. 6

*Garcia v. J2 Global, Inc.,*
  2022 WL 22717936 (C.D. Cal. Aug. 8, 2022)............................................................... 23

*Glazer Cap. Mgmt., LP v. Magistri,*
  549 F.3d 736 (9th Cir. 2008)............................................................................... 22, 24

*Glickenhaus & Co. v. Household Int'l, Inc.,*
  787 F.3d 408 (7th Cir. 2015)................................................................................. 19

-ii-

| **Cases** | **Page(s)** |
|---|---|

*In re Google Digit. Advert. Antitrust Litig.,*
627 F. Supp. 3d 346, 376 (S.D.N.Y. 2022)..................................................................14, 16

*Hefler v. Wells Fargo & Co.,*
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018)....................................................................19

*Hernandez v. Spacelabs Med. Inc.,*
343 F.3d 1107 (9th Cir. 2003)........................................................................................ 20

*Holbrook v. Trivago N.V.,*
2019 WL 948809 (S.D.N.Y. Feb. 26, 2019).............................................................. 12, 13

*Howard v. Everex Sys., Inc.,*
228 F.3d 1057 (9th Cir. 2000).................................................................................. 24, 25

*IBEW Pension Fund v. Zendesk, Inc.,*
2022 WL 614235 (9th Cir. Mar. 2, 2022).................................................................. 21, 22

*Jackson v. Abernathy,*
960 F.3d 94 (2d Cir. 2020)........................................................................................... 23

*Janus Cap. Grp., Inc. v. First Deriv. Traders*
564 U.S. 135, 142 (2011)..........................................................................................18, 19

*In re JUUL Labs, Inc.,*
497 F. Supp. 3d 552 (N.D. Cal. 2020).............................................................................18

*Kaplan v. Rose,*
49 F.3d 1363 (9th Cir. 1994).......................................................................................... 25

*Lilley v. Charren,*
17 F. App'x 603 (9th Cir. 2001)........................................................................................7

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.,*
735 F. Supp. 2d 856 (N.D. Ill. 2010)...............................................................................13

*In re Merrill Lynch Auction Rate Sec. Litig.,*
851 F. Supp. 2d 512 (S.D.N.Y. 2012)..............................................................................15

*Navajo Nation v. U.S. Forest Serv.,*
535 F.3d 1058 (9th Cir. 2008)........................................................................................ 22

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,*
210 F.3d 1099 (9th Cir. 2000)...................................................................................... 6, 7

*In re NVIDIA Corp. Sec. Litig.,*
768 F.3d 1046 (9th Cir. 2014)................................................................................ 7, 21 24

*In re Ocera Therapeutics, Inc. Sec. Litig.,*
2018 WL 7019481 (N.D. Cal. Oct. 16, 2018)....................................................................8

*In re Oracle Corp. Sec. Litig.,*
627 F.3d 376 (9th Cir. 2010)................................................................................. 7, 8, 10

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

**Cases**                                                                  **Page(s)**

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.,*
    96 F.3d 1151 (9th Cir. 1996)...........................................................................24, 25

*Rahman v. Kid Brands, Inc.,*
    736 F.3d 237 (3rd Cir. 2013)....................................................................................23

*In re REMEC Inc. Sec. Litig.,*
    702 F. Supp. 2d 1202 (S.D. Cal. Apr. 21, 2010)..............................................19, 21, 23

**Cases**                                                                  **Page(s)**

*Roofers's Pension Fund v. Papa,*
    687 F. Supp. 3d 604 (D.N.J. 2023)...........................................................................22

*SEC v. Todd,*
    642 F.3d 1207 (9th Cir. 2011)..................................................................................24

*Shuster v. Symmetricom,*
    35 F. App'x 705 (9th Cir. 2002)................................................................................19

*Silvercreek Mgmt. v. Citigroup, Inc.,*
    248 F. Supp. 3d 428 (S.D.N.Y. 2017).......................................................................23

*Sneed v. Talphera,*
    147 F.4th 1123 (9th Cir. 2025).................................................................................21

*Sosa v. DIRECTV, Inc.,*
    437 F.3d 923 (9th Cir. 2006)....................................................................................18

*In re Tyson Foods, Inc.,*
    2004 WL 1396269 (D. Del. June 17, 2004)............................................................19, 20

*Veal v. LendingClub, Corp.,*
    423 F. Supp. 3d 785 (N.D. Cal. Nov. 4, 2019)...........................................................20

*In re Worlds of Wonder Sec. Litig.,*
    814 F. Supp. 850 (N.D. Cal. 1993), *aff'd in relevant part*, 35 F.3d 1407 (9th Cir. 1994)..............10

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009)....................................................................................23

**Other Authorities**

Fed. R. Civ. P. 56(a)......................................................................................................6

Rule 10b-5(b)................................................................................................................19

**TABLE OF ABBREVIATIONS**

| Abbreviation | Meaning |
| --- | --- |
| Ad Manager | Google Ad Manager |
| Adtech | Digital display advertising technology |
| Class Cert. Opp. | Defendants' Opposition to Plaintiffs' Motion for Class Certification, filed January 13, 2026 (ECF No. 142) |
| Complaint or ¶ or SAC | Second Amended Complaint for Violations of the Federal Securities Laws, filed Sept. 24, 2024 (ECF No. 87) |
| Defendants | Alphabet, Inc., Google LLC, and Sundar Pichai |
| DV360 | Display & Video 360 |
| Ex. | Exhibit to the concurrently filed Declaration of Carl Hudson in Support of Defendants' Motion for Summary Judgment |
| FAN | Facebook Audience Network |
| MTD Order | Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part request for Judicial Notice, filed Mar. 24, 2025 (ECF No. 108) |
| NBA | Network Bidding Agreement |
| Plaintiffs | Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., AMI - Government Employees Provident Fund Management Company Ltd., and City of Fort Lauderdale Police & Fire Retirement System |
| QFR | Questions for the Record |
| UFPA | Unified First-Price Auction |

Herein, emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

**NOTICE OF MOTION AND MOTION**

**TO THE COURT, ALL PARTIES, AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that at the time and place noted above, Defendants will and hereby move for summary judgment in favor of Defendants as to the elements of falsity and scienter of Plaintiffs' Section 10(b) claim and in whole with respect to their Section 20(a) claim. Defendants reserve the right to seek summary judgment on remaining elements of the claims, should any claim survive. This Motion is based on this Notice of Motion and Motion, the concurrently filed declarations and exhibits, all pleadings, files, and records in the above-captioned action, any matters subject to judicial notice, and such other evidence and arguments as may be presented at the hearing.

**STATEMENT OF ISSUES**

Are Defendants entitled to partial summary judgment on Plaintiffs' claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934?

**INTRODUCTION**

Plaintiffs have alleged securities fraud. Now they must prove it. The evidence already paints a clear picture negating two key elements of Plaintiffs' claim: falsity and scienter. While the facts in this motion are technically dense, they are not in dispute. They reveal a stark reality: the Complaint took liberties with how it described Google's business, technology, and statements. Summary judgment can now resolve this lawsuit.

*No falsity.* The only challenged statement remaining in the case is a single sentence in a written response by Google to congressional questions. It states that, as of September 2020, in the context of Google Ad Manager's unified first price auction for display ads, the highest bidder won irrespective of the channel through which the advertiser's bid was received and after accounting for publishers' existing deals and preferences. The evidence, including each technical step that is part of the auction, confirms this statement to be true. But an auction in which the highest bidder wins does not guarantee equality of outcome. As with any auction, bidders who bid higher win more often; bidders who bid more frequently win more often; bidders armed with better strategies win more often. That some bidders place the highest bid more frequently does not negate the statement that the highest bidder wins. Google's statement is correct: barring any pre-existing publisher deals or publisher preferences,

-1-

the highest bidding advertiser wins irrespective of the bidder's identity.

*No scienter*. The evidence also shows, through the contemporaneous documentary record, that the drafters of the challenged statement believed it to be true. Not only that, but Google to this day believes the statement to be true and affirms it on its website. In addition to the corporate entities, summary judgment is appropriate for Sundar Pichai. Contrary to the Complaint, the evidence readily shows that Mr. Pichai did not make the challenged statement, did not contribute to its drafting, was not aware of it, and had no reason to believe it to be wrong. He can face no liability as a result.

No additional discovery would change this picture. The challenged statement cannot somehow become false when its technical underpinnings are already clear. Mr. Pichai's lack of knowledge of or involvement with the challenged statement will remain the same. As a result, the case has reached its natural conclusion. Summary judgment is appropriate.

## DISCOVERY CONFIRMS THE AUCTION FUNCTIONED AS DESCRIBED

### A. Complex Technology Places Digital Ads Nearly Instantaneously

Digital display advertising technology (**adtech**) works by permitting advertisers to place text, graphic, and video advertisements alongside the content of a webpage, app, or video, each time a user navigates to that content.[1] Ex. 1, at -85. The space where one digital ad can be placed on a webpage being viewed by one user at one time is known as an **ad slot**. Ex. 2, at -78. An ad slot is a dynamic commodity, generated instantaneously and ephemerally only when a user clicks open a webpage. *Id.*

#### 1. Google Offers Leading Adtech Products

Many large and small technology companies offer software products that automate each step of display advertising. Ex. 3, at -89. Sell-side (or supply-side) platforms help **publishers** (e.g., website owners) manage their ad **inventory** and generate the highest possible revenue from ad sales. Ex. 1, at -81. Buy-side (or demand-side) platforms help **advertisers** bid on ad slots and run their advertising campaigns. *Id.* at -83. **Ad servers** perform the technical functions required to place an advertisement on a publisher's website. *Id.* at -79. Another essential component of the adtech ecosystem is the **ad exchange**, a real-time marketplace that auctions publisher inventory to advertisers. *Id.* at -80. All of these platforms run sequentially and simultaneously to match advertiser content to ad slots on a

---

[1] By way of illustration, this brief will refer to "webpage(s)" to discuss the functionality of adtech platforms across these media.

-2-

publisher's webpage in the amount of time it takes a website to load. Ex. 2, at -78–80.

Google's industry-leading products include both supply- and demand-side tools, as well as an ad auction. Ex. 27, at -44. **Google Ad Manager** serves both as a publisher ad server and ad exchange. Ex. 2, at -77. Ad Manager is designed for publishers to configure data and requirements for their inventory before it is offered to eligible advertisers in the form of ad slots. Ex. 3, at -58; *see infra* § I.A.2. Publishers place parameters on their ad slots to convey both requirements for advertising content they will accept alongside their own, such as brand or subject limitations, and technical information, such as whether the webpage can host video ads, or whether the user is accessing the publisher's content on a web browser or in an app. Ex. 2, at -78; *see also* Ex. 5, at -81. Publishers can use Ad Manager to sell ad slots directly to advertisers and also to auction off any remaining inventory "programmatically" to the highest bidder, subject to the publishers' chosen parameters. Ex. 28, at -75. These publisher-set parameters help buyers and sellers accurately calculate the ad slot's value based on their respective priorities. Ex. 2, at -78–79.

Google also offers separate **demand-side platforms**, including Display & Video 360 ("DV360"). Ex. 1, at -83. These demand-side platforms facilitate transactions for the advertisers that participate on Google's platforms; they do not place search ads or other advertising content for Google itself. *See, e.g.*, Ex. 43, at -94–95. At a high level, DV360 enables advertisers to set priorities for bidding, such as the desired quantity and quality of ad placements. Ex. 4, at -639. Advertisers can customize a large number of fields on DV360 with their own bidding parameters. *Id.* at -638–639. Once advertisers configure their ad-buying strategy within the platform, DV360 then runs an algorithm to place bids automatically in the ad auction according to those priorities. *Id.*

### 2.  Google's Adtech Products Optimize Value for Advertisers and Publishers

A user opening a website triggers the sequence of events required to place a display ad. For ad slots that a publisher has chosen to auction, Ad Manager first automatically converts the publisher's parameters into a request for bids. Ex. 1, at -01. The **bid request** Ad Manager generates also incorporates data such as the domain URL, ad size, and certain non-personally identifiable information about the user visiting the webpage. Ex. 6, at -595–598. Ad Manager next enters the bid request into the automated auction, and only then can advertisers begin to bid on that particular segment of

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

advertising space, on that particular webpage, viewed by that particular user, in that particular moment. Ex. 2, at -79–80.

To enter a bid into the auction, advertisers submit a **bid response** that includes both information about their advertisement, such as the display size and brand information, and "most importantly," the "bid value in $." *Id.* An advertiser's "bid value" for any given ad slot reflects how much that advertiser is willing to pay to place their content on that publisher's ad space. Ex. 7, at -07. The advertiser's marketing strategy determines this amount. *Id.* Common marketing strategies include targeting the number of ad views, Ex. 8, at -407, clicks on the ad (diverting a user to the advertiser's webpage), *id.* at -096, or conversions (sales of advertiser product that can be traced back to the click on the advertisement), *id.* at -415.

Once an ad is matched to an ad slot, the chosen ad is **served**, meaning it is displayed seamlessly alongside the publisher's content. Ex. 4, at -644. An ad must load properly on a website for an auction to be successful: otherwise the advertiser's content is never shown and the publisher does not get paid. *Id.* This means that the match must ensure the publisher's technical and substantive criteria are met so that an ad ultimately renders. Ex. 9, at -69.

When all goes well, this entire sequence of events takes place within "less than 100 milliseconds." Ex. 2, at -80. In 2020, Google served over 12,000,000,000,000 ads. *See* Ex. 10, at -36.

### 3. Google Improved the Marketplace as Ad Technology and Participants Evolved

Google rolled out the Unified First-Price Auction model ("UFPA") in 2019 to streamline programmatic transactions. Ex. 9, at -24. The system is "Unified" because it combines a series of auctions that historically ran in sequence into a single, real-time auction where the highest price wins and is paid to the publisher. Ex. 5, at -93; Ex. 11, at -31. It is "First-Price" because the "winning [advertisers] pay what they bid," in contrast to earlier second-price auction formats, in which the winning bidder paid only the amount of the second-highest bid. *Id.* at -37; *see* Ex. 3, at -48. Google shifted to the UFPA to maximize value for its customers by simplifying how bidding worked, Ex. 12, at -90, and to improve ultimate auction outcomes for both publishers and advertisers, Ex. 5, at -90.

Launching the new auction required Google to test, pilot, troubleshoot, and iterate numerous features across the entire auction, and across multiple advertiser and publisher products. *See, e.g.,* Ex.

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

13, at -57. As a result, the shift to the UFPA did not take place at one specific time, but rather as a series of rolling product launches. Ex. 11, at -42. Each of these launches required testing and troubleshooting within experimental and control groups of auction participants, before being extended to Google's full set of customers. *Id.* Google began deploying new features in the transition to the UFPA in September 2019, continuing to do so well beyond a year later. Ex. 14, at -28.

**B. Google Entered Into a Partnership Agreement with Facebook in 2018**

In early 2017, Facebook expressed an interest in transacting on Google's adtech platforms. Ex. 31, at -56. Facebook's main adtech product was called Facebook Audience Network ("FAN"). Ex. 32, at -53; Ex. 29, at -72. FAN, like other ad networks, selects and aggregates publisher inventory to sell to bidders, with fewer customizable options for advertisers than demand-side platforms like DV360. Ex. 33, at -77. To accommodate FAN and other ad networks, Google planned to launch a "network bidding model," which would expand the number of advertisers bidding on publisher inventory sold by Ad Manager. Ex. 34, at -94.

Engineering and business development teams at Google negotiated a partner agreement with Facebook throughout 2017 to 2018. *Id.* In August 2018, six members of Google's Business Council reviewed the Network Bidding Agreement ("NBA") that emerged from the negotiations. Ex. 35, at -99. The Business Council approved the deal on September 17, 2018. Ex. 38, at -41. Google's CEO, Sundar Pichai, received a summary of deal terms two days later, on September 19. *Id.*

The NBA was a partnership agreement designed to make it "easier for Facebook customers to buy third party publisher inventory through" Ad Manager. Ex. 30, at -39. This was the same objective as Google's partnerships with the "8 other ad networks and 18 ad exchanges" testing Google's network bidding model at the time the NBA was being negotiated. *Id.* By the time the deal was approved on September 17, 2018, Google had at least "5 networks and 25 exchanges" participating on its platforms. Ex. 35, at -01.

**C. Google Responses to a Congressional Inquiry**

Plaintiffs challenge one statement in a submission to Congress about Ad Manager's UFPA. MTD Order at 8–12. As relevant here, on June 3, 2019, Congress launched an antitrust inquiry into competition in digital markets. Class Cert. Opp. at 3. On July 29, 2020, the CEOs of Amazon, Apple,

-5-

Facebook, and Google testified before the House Judiciary Subcommittee on Antitrust, Commercial, and Administrative Law. *Id.* at 4. Mr. Pichai testified as Google's CEO. *Id.*

Following the July testimony, congressional staff sent Questions for the Record ("QFRs") to Google on August 14, 2020. Ex. 42, at -51–53. Six members of the Subcommittee submitted a total of 85 QFRs. Ex. 42; Ex. 43. The vast majority of the QFRs do not inquire about adtech, but about other topics ranging from Google's search platforms, to Google Maps, even to physical products sold by Google. Ex. 43. None mention FAN, or even mention Facebook. *Id.* The remaining challenged statement was made in response to one of the QFRs, specifically Former Representative David Cicilline's QFR 6. That QFR reads: "What percentage of bids does Google win on its own ad exchanges?" Ex. 44, at -19.

Google's legal and policy teams then drafted Google's responses, working to confirm accuracy and responsiveness. Ex. 48, ¶ 4; *infra* § I.C.1.a. Google's outside counsel emailed its QFR responses to Congress on September 11, 2020, entitled, "Google's Submission." Ex. 43, at -90. Congress posted the responses to its webpage three days later, on September 14, 2020. Class Cert Opp. at 4; Ex. 48, ¶ 13. Plaintiff's theory is that the last sentence of the QFR 6 Response is false. ¶¶ 165–166; *infra* § I.A.

## ARGUMENT

Defendants are entitled to summary "judgment as a matter of law" because Plaintiffs cannot carry their burden of proving a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Proving the existence of a genuine dispute would require Plaintiffs to present "significant probative evidence" supporting a determination in their favor on *every* element of their Sections 10(b) and 20(a) claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Far from carrying their burden on all elements, Plaintiffs cannot "set forth specific facts showing that there is a genuine issue for trial" on several. *Far Out Prods. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). Plaintiffs "bear the burden of proof" on *each* element of each claim, so Defendants need only show "that there is an absence of evidence to support the nonmoving party's case" as to *one* element to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986). Here, there is no evidence supporting multiple "essential element[s] of" Plaintiffs' claims. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

# I.    PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROVING SECURITIES FRAUD

Evidence "negating [any] essential element of" Plaintiffs' claims entitles Defendants to summary judgment on their Section 10(b) claim. *Fritz Cos.*, 210 F.3d at 1106 (affirming summary judgment for defendants; reversing for plaintiffs). This case is rife with such negating evidence, which disproves two elements of the six that Plaintiffs must prove for securities fraud, falsity and scienter. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).[2] The benefit of summary judgment at this stage of the proceedings is amplified by evidence confirming that Mr. Pichai—the only remaining Individual Defendant in this case—was not a maker of the challenged statement. *Infra* § I.B. Evidence warranting Mr. Pichai's dismissal from this case requires Plaintiffs to invoke corporate scienter, a theory never yet adopted in this Circuit, to pursue their claim. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014). Early summary judgment is appropriate where, as here, Plaintiffs cannot "show how [additional evidence] would preclude summary judgment." *Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1130 (9th Cir. 2004).

## A.    PLAINTIFFS CANNOT SHOW THE CHALLENGED STATEMENT WAS FALSE

Defendants are entitled to summary judgment unless Plaintiffs can corral evidence of "specific facts demonstrating" that the challenged statement is false. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). They cannot. No evidence proves the existence of "genuine issues of material fact regarding the" challenged statement, meriting summary judgment for Defendants on falsity. *Lilley v. Charren*, 17 F. App'x 603, 607 (9th Cir. 2001).

Challenged statements must be "read in light of all the information then available." *Oracle*, 627 F.3d at 390. The only remaining challenged statement is the last sentence in this paragraph:

> Publishers utilizing Google Ad Manager's auction to sell their ad inventory are able to solicit bids from Authorized Buyers (e.g., third-pay demand side platforms ("DSPs"), ad networks, and trading desks) and Open Bidders (third-pay ad networks and ad exchanges), as well as buyers utilizing Google-owned platforms such as Google Ads and Display & Video 360. These bidders compete in a unified auction against each other, the publisher's guaranteed sales, and other demand sources configured by the publisher. All participants in the unified auction, including those using Google-owned platforms, compete for each impression on a net basis, and no auction participant receives any information about any other party's bids prior to completion of the auction. The highest net bid wins. ***The channel through which a bid is received does not otherwise affect the determination of the winning bidder.***

---

[2] The elements of Section 10(b) are falsity, materiality, scienter, connection to a purchase or sale of securities, reliance, economic loss, and loss causation. *Id.*

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

Ex. 43, at -94–95 (emphasis added).

Plaintiffs claim the challenged statement was false because "the channel through which a bid was received did in fact affect the determination of the winning bidder." ¶ 170. Proving this would require Plaintiffs to show that both of two things were true: (1) the default outcome that the highest net bid wins the auction was disturbed (2) on the basis of the channel through which the bid was received. *Ardolino v. Mannkind Corp.*, 2016 WL 4505172, at *6 (C.D. Cal. Aug. 23, 2016) (plaintiffs must prove the falsity of "statements in their entirety"). The evidence proves the opposite.

For four reasons, Plaintiffs cannot prove falsity when "account[ing] for the entirety of" the challenged statement. *In re Ocera Therapeutics, Inc. Sec. Litig.*, 2018 WL 7019481, at *11 (N.D. Cal. Oct. 16, 2018). *First*, the auction, which "determined the winning bidder," was indifferent to the channel through which a bid was received. *Second*, publishers participating in Ad Manager's auction determined what advertising content could or could not appear on their webpages, but had no ability to affect the auction's "determination of the winning bidder." *Third*, the UFPA applied the same requirements to all advertisers submitting bids into the auction. All bidders had to satisfy the same prerequisites to enter a bid on a given ad slot. *Fourth*, none of this changed, contrary to Plaintiffs' allegations, on account of Google's NBA with Facebook.

No evidence demonstrates that both necessary components of Plaintiffs' theory are true. Summary judgment for Defendants is therefore warranted. *Oracle*, 627 F.3d at 387–88.

### 1.   The UFPA Was Designed so That the Highest Bid Wins

Google's UFPA was launched in September 2019, a year before the remaining challenged statement was made. *Supra* § A.3. The "structure of [the UFPA] in and of itself refutes Plaintiffs' argument." *Oracle*, 627 F.3d at 388 (granting summary judgment for defendants on falsity). The UFPA brought together sequential auctions into one unified "real time" auction, Ex. 5, at -92, in which all buyers submit their . . . "bids in unison" and "[t]he highest bidder wins," Ex. 15, at -92–93. No evidence suggests that Google could systematically bypass the UFPA's automated process for receiving and selecting bids to favor FAN or any other participant. To the contrary, the UFPA "[took] into account" publisher requirements and advertiser priorities using automated processes at each step—before, during, or after, selecting a winning bid. *Oracle*, 627 F.3d at 389.

-8-

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

## 2. Ad Manager Permits Publishers to Set Preferences in Pre-UPFA Processes

Evidence proves that the challenged statement cannot have been false on the basis that Ad Manager permitted publishers to express preferences for certain types of advertising content to be placed on their webpages prior to the auction of any ad slot. Before Ad Manager could conduct an auction, several steps had to take place, including: (1) applying publisher requirements for advertiser content, (2) configuring inventory with Dynamic Allocation to execute prior bilateral contracts, and (3) converting an ad slot into a biddable commodity. *See, e.g.*, Ex. 11, at -30, -36–37. Each of these steps occurred prior to the auction, and were therefore separate from UFPA's selection of a winning bid that the challenged statement describes.

***Publishers set requirements for inventory.*** Evidence proves that publishers, not Google, set requirements for the advertising content that would appear on their webpages. Ad Manager permitted publishers to place restrictions on their inventory based on self-defined goals, such as protecting brand reputation, managing exclusivity for direct sales, and maintaining publisher-set size, format, and quality standards. Ex. 5, at -27. Publisher restrictions could be as specific as blocks on certain advertisers to prevent "inappropriate [ads] that damage their brand" or "bad ads." *Id.* at -681, -723.

This functionality does not render the challenged statement false, for two reasons. First, publishers specified their requirements when initially configuring their inventory within Ad Manager. Ex. 5, at -34–35. Configuring publisher inventory was necessarily a precursor to Ad Manager being able to generate any ad slot, much less auction one. *Id.* It therefore had no bearing on the challenged statement's explanation of how the highest bid was selected *in the auction*.

Second, contrary to Plaintiffs' allegations that Google "afford[ed] Google or Facebook preferential treatment," ¶ 109, Ad Manager transmitted *publishers'* pre-set preferences into the auction to inform potential bidders. Ex. 16, at -991 ("Publishers have full control on how they set up their stack"). Publisher-set eligibility filters for an ad's content and source applied "consistent[ly]" across demand sources to "protect users, publishers, and advertisers." Ex. 5, at -27. None of Plaintiffs' vague references to the alleged utilization of "opaque auction programs to manipulate digital advertising auctions" account for publishers' own undisputed interest in maintaining content standards on their webpages. *E.g.*, ¶ 167.

***Ad Manager also facilitated publisher sales outside of the auction.*** The evidence also contradicts Plaintiffs' allegations, ¶¶ 11, 61, that Dynamic Allocation somehow distorted how Ad Manager offered inventory into the auction. Ex. 17, at -96. Dynamic Allocation is an Ad Manager feature that helps publishers fulfill their previously-agreed bilateral contracts, or "direct deals," with advertiser partners ("guaranteed demand"). Ex. 5, at -84.

Dynamic Allocation did not, as Plaintiffs allege, wrest inventory from would-be auction winners to hand over to less meritorious bidders. ¶ 61. Instead, it provided a mechanism to ensure that publishers could fulfill pre-existing contracts to provide a specific amount of inventory, such as a number of slots on the New York Times homepage, to specific advertisers, such as the 2020 Olympic Games. *See* Ex. 17, at -96. Dynamic Allocation operated by checking for direct deals and confirming they were satisfied, prior to offering an ad slot to other bidders. *Id.*; *see also* Ex. 28, at -76 ("all indirect demand competes on equal footing"). If a publisher had unfulfilled commitments to a guaranteed demand source, Ad Manager would automatically calculate a temporary bid value on the ad slot in order to bypass the auction and ensure the ad slot would satisfy the direct deal. Ex. 16, at -148. This functionality does not render the challenged statement false, because for it to apply, publishers and advertisers had to have already entered the direct deal with one another, independent from—and before—user activity on a publisher's webpage caused any individual ad slot to exist and the publisher needed to configure Ad Manager to execute on this deal. Ex. 16, at -146. Dynamic Allocation operated only to permit Ad Manager to implement the decisions and commitments to which publishers and advertisers had already agreed among themselves. *Id.*; *see In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 861 (N.D. Cal. 1993) (granting summary judgment when the evidence supports, rather than "contradict[s], the [challenged] statement."), *aff'd in relevant part*, 35 F.3d 1407, 1428 (9th Cir. 1994).

Dynamic Allocation also cannot create a factual dispute as to falsity because language preceding the challenged statement explicitly addresses exactly how the mechanism works in relation to the bids in the UFPA. *See Oracle*, 627 F.3d at 389 (no triable issue where the challenged statement was clarified by the surrounding context). The paragraph containing the challenged statement prefaces it with the sentence, "[B]idders compete in a unified auction against each other, *the publisher's*

-10-

*guaranteed sales*, and *other demand sources configured by the publisher.*" Ex. 43, at -94–95; *supra* § I.A. Nowhere does the challenged statement—nor anywhere does Google—assert that every potentially interested bidder would have the opportunity to bid on any given ad slot that becomes available on a publisher's webpage or app. Instead, language surrounding the challenged statement explicitly accounts for the fact that Dynamic Allocation and other publisher-driven commitments affect bidder eligibility. The statement, "[r]ead in [its] entirety" and in light of the information "made credibly available to the market," was accurate. *In re Cypress Semiconductor*, 891 F. Supp. 1369, 1375, 1379 (N.D. Cal. 1995) (granting summary judgment).

**Ad Manager automatically generated and offered auctionable inventory equally to bidders.**
The record also disproves Plaintiffs' allegations that Google gave certain auction bids priority access to select inventory. *See* ¶¶ 11, 74. Publisher inventory could not be auctioned until it was converted into an auctionable ad slot. That process was fully automated within Ad Manager, triggered by a user navigating to a publisher's webpage. Ex. 2, at -78. Once user activity caused an ad slot to "load[]" automatically, Ad Manager converted the ad slot into a bid request to enter into the auction. *Id.* Each bid request was characterized by a combination of basic user and "[p]ublisher [i]nformation" (e.g., IP address, website URL, user device type), and pre-set publisher preferences which Ad Manager executed. *Id.* Ad Manager formatted bid requests using standard protocols, and sent the same signals related to user characteristics (e.g., browser and geography) to all eligible demand-side platforms. Ex. 6, at -595. The resulting "auction [was] a completely level playing field for buyers, whichever door they come through." Ex. 7, at -04.

### 3. The UFPA's Bidding Prerequisites Were Indifferent to the Bidder's Channel

The evidence also negates Plaintiffs' allegations that any process related to bid selection once the auction had begun took a bidder's channel into account. To be eligible to bid on an ad slot, advertisers had to have (1) configured their bidding algorithm to value that type of inventory. Ex. 6, at -577. They also had to satisfy publisher and auction eligibility requirements, which included (2) suitability of proposed ad to ad slot, and (3) timeliness. *Id.* As the record proves, these requirements applied both equally across channels and separately from the auction's computation of which bid was highest. No prerequisite was determined on the basis of a bidder's channel. *See* Ex. 16, at -148.

-11-

***Advertisers determined their bids based on strategic priorities.*** Google's description of the UFPA's channel-agnostic functionality is not rendered false by differences between "advertisers' bidding behavior[s]." *See Holbrook v. Trivago NV*, 2019 WL 948809, at *15 (S.D.N.Y. Feb. 26, 2019) (statement describing auction functionality not alleged to be false). The evidence disproves the SAC's allegations that the auction unfairly favored Google-operated channels. Contrary to Plaintiffs' claims, *see* ¶¶ 74, 76, 79, 82, "Smart Bidding" was simply DV360's name for the collection of algorithms that demand-side platforms used to implement *advertisers'* campaign goals by determining whether and how much to bid on an ad slot, Ex. 11, at -38.

Sophisticated algorithms on demand-side platforms helped advertisers maximize ad spend value by determining whether and how much to bid on an ad slot based on the advertisers' own campaign goals. Ex. 4, at -685. Advertisers programmed the tools demand-side platforms offered with their own ad spending priorities, letting the algorithm perform a calculation based on the advertiser's bidding priorities, *id.* at -639, to determine the optimal bid price for a given impression based on the "user's likelihood to take the action of interest," *id.* at -637. As with other demand-side platforms, Smart Bidding's optimization actions occurred within the DV360 platform, before DV360 entered a bid into the UFPA. Ex. 19, at -23. No evidence supports Plaintiffs' allegation that "AdX . . . instruct[ed] Google buying tools to bid just slightly above . . . rival buyers," or even that Smart Bidding occurred within the auction the challenged statement describes. ¶ 79. Bidders had "no visibility into remnant prices before submitting bids," Ex. 28, at -75, and Ad Manager's auction logic remained blind to a bid's source once entered into the auction. Ex. 11, at -36 ("the highest eligible bid wins the auction.").

***Bid eligibility depended on meeting safety and technical standards.*** Ad Manager's application of safety and technical standards also does not make the challenged statement untrue. *Trivago*, 2019 WL 948809, at *15 (other factors relevant to auction functionality did not make statements about defendant's "competitive bidding process" false). Google enforced rigorous safety and quality control protocols to advance a "top priority": "maintaining trust in the digital advertising ecosystem." Ex. 9, at -64. For that reason, Ad Manager subjected all ads to an "automated review" process, including "policy checks" to verify "[m]alware; [l]anding page quality; . . . [c]rawlability [or] page

-12-

categorization," and other "technical" criteria on all ad content. Ex. 20, at -57. These automated checks screened out both non-human traffic, and also ads that failed basic technical requirements, such as size or format compatibility with the ad slot, that would prevent the ad from ever loading on the publisher's website. Ex. 9, at -69. Advertisers could not bid in the UFPA to place their ad until the ad passed these safety and quality standards. *Id.*

No evidence indicates that Google's quality control standards discriminated by channel. Ex. 5, at -26. Even if content from certain advertising sources failed Google's safety or quality standards more often than the content from others, the disparate impact of quality standards applied equally and neutrally to all content still would not render the challenged statement false. *Trivago*, 2019 WL 948809 at *15 (no falsity where auction requirements "appl[ied] equally to all advertisers").

***Technical considerations determined timeout periods.*** The evidence also disproves Plaintiffs' allegations that Google favored some bidders with timeout periods "nearly doubled" from others'. ¶¶ 100, 186, 194, 210. These allegations, which cherry-pick across different types of publisher inventory and different points in time, do not support falsity. *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 896–98 (N.D. Ill. 2010) (plaintiffs' critiques of defendants' business decisions do not render accurate statements about product's technical function false). In reality, timeout periods both increased over time for all bidders, and depended on a multitude of factors related to a user's interface and network capacity.

The bid request required all bidders to complete bid submission within a certain amount of time, the "timeout" period. Ex. 21, at -63. The record illustrates that timeout requirements were necessary to ensure that placing ad content on a webpage would not interfere with a user's experience of a publisher's webpage by increasing "latency and loading time," an issue "particularly when [timeout periods were] extended." Ex. 9, at -20. Timeout periods were therefore designed to provide sufficient time to conduct an auction, while still ensuring the auction would not delay the webpage loading. Ex. 36, at -16. Because Google prioritized ad rendering (and ensuring publishers would be paid for their ad slots and users would engage with advertisers' ads), Google historically had "one of the strictest" timeout periods in the industry, ███ in 2017. Ex. 22, at -12. Carefully evaluating and calibrating appropriate timeout windows permitted Google to continually "optimize [its] auction while

-13-

keeping the best interests of buyers, publishers, and users in mind." Ex. 21, at -63. Google continually increased its timeout period year over year. Timeout periods extended to ██████ by 2019, Ex. 23, at -51, and from "██████ to ██████ for" "Open Bidding . . . and interstitial traffic globally" by October 2020, Ex. 21, at -63.

A host of other factors also impacted webpage loading speeds, and were therefore factored into timeout period calculations. Ex. 5, at -15. Inventory type was one of these factors. For example, video advertising content would require a different website loading capacity depending on whether it would be placed before or simultaneously with webpage video content, interstitially (required) versus rewarded (user opt-in), or on a mobile versus web device. Ex. 24, at -24; Ex. 37, at -972. Timeout periods had to differ between these formats. Differences between network loading capabilities in geographic regions also impacted what timeout period would be appropriate in those locations. *See* Ex. 25, at -97. The bidding channel was not one of these considerations.

### 4. Google's NBA with Facebook Does Not Alter the Highest-Bidder-Wins Outcome

The evidence further disproves the SAC's theory that Google's NBA with Facebook led to differences in the application of any of the auction features described above. *Supra* § I.A. No evidence substantiates Plaintiffs' allegations that (1) FAN's bids were considered differently from other bidders, (2) Google shared different data with Facebook than it did with other bidders, or (3) Facebook received a special "match rate" benefit. ¶¶ 95–109. As Judge Castel held when evaluating the merits of underlying antitrust allegations involving Facebook in *In re Google Digital Advertising Antitrust Litigation*, the NBA's terms do not "predetermine the outcome of any auction." 627 F. Supp. 3d 346, 376 (S.D.N.Y. 2022) (dismissing all claims related to the NBA).

### a. The NBA Itself Is Silent on Choosing a Winning Bid in UFPA

Plaintiffs allege that the NBA disturbed the auction's bid selection mechanism by "help[ing] [FAN] win over other bidders." ¶ 170. The evidence proves the opposite.

On its face, the NBA contains no term addressing how the winning bid is selected in Ad Manager's ad auction. Ex. 32. It simply explains that Google will make publisher inventory available to Facebook in the ad auction, and that Facebook will bid on a certain amount of that inventory. *Id.* at -24–25, -44.

-14-

Contrary to Plaintiffs' allegations, Google understood the NBA's terms to *require* that "other than subject to pub[lisher] configurations, [the] highest bidder wins in the final auction." Ex. 35, at -04. The NBA cemented this reality by giving Facebook a termination right if the auction ever ceased to operate this way. *Id.*; *see* Ex. 32, at -21. In short, the NBA required, rather than disturbed, the auction's selection of the highest bidder as the winner. *See Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (no falsity where evidence confirmed the "impression of [the] state of affairs" that the challenged statement presented).

### b. No NBA Terms Require Data to Be Shared

***NBA data terms were purely restrictive.*** The evidence does not support Plaintiffs' allegations that Google shared unique data with Facebook. *See* Ex. 32, at -32–34. The NBA has only three provisions addressing data Google would share with Facebook. *Id.* None of them impose any data-sharing obligation. Instead, each impose a *restriction on Facebook* from using Google's data inappropriately to improve its own model and bidding logic. *Id.*

Restrictions limiting *Google's use* of *Facebook's data* mirror those. *Id.* at -31–32. The NBA's data use restrictions were designed to protect Facebook and Google—and the entire industry—from the other "reverse engineer[ing]" their "bidding logic" or otherwise "building . . . or enhancing" their own adtech tools based on information from the other. *Id.* at -52. No term in the NBA imposes an affirmative obligation on either Google or Facebook to *share* data—much less "unique" data—with the other. Ex. 35, at -06–07.

***Google shared the same data auction-wide.*** Plaintiffs' allegation that Google both knew bid value needed to win an auction in advance, and shared that information with preferred bidders, such as FAN, before an auction took place, ¶¶ 79–80, is also inaccurate because it collapses multiple distinct processes that in reality occurred in sequence. The evidence shows that Ad Manager shared the same data with all bidders to facilitate auction transactions, both before, and after—but not during—each ad auction. *Compare* Ex. 6, at -595–599, *with In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 525 (S.D.N.Y. 2012) (defendants' operation of and participation in the auction did not confer alleged advantages that plaintiffs alleged).

Prior to an auction, Ad Manager shared information about the inventory being offered, such as

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

publisher IDs, user geography, and device type, with bidders to help them decide whether to submit a bid. Ex. 2, at -78. Ad Manager also provided post-auction insights, such as the "highest_other_bid," or the minimum bid required to win the auction, to advertisers across *all* channels—including Open Bidders and Google's own DV360—to help bidders optimize future bidding strategies. Ex. 14, at -39. This protocol did not differ for FAN.

***Google did not, and could not, share information that did not exist.*** The evidence contradicts allegations that Google shared "advertising buyer's bid[s]" with other "buyer[s] before the auction." ¶ 80. Google could not have had access to any advertiser's bid "before the auction," because advertisers could not place bids until the auction began. Google therefore could not have shared such information with FAN or any other bidder for the simple reason that "we don't have this information before the auction." Ex. 14, at -38. Certainly, auction participants with different levels of sophistication had differing abilities to receive and to use data Google shared. *Id*. But "the NBA [did] not dictate which impressions [FAN could] bid on or at what price." *Google Digital Advertising*, 627 F. Supp. 3d at 376. And some data, like a "competitor's bid" in an auction, was not available even through Google's own ad-buying tools. *Id*. As a logical matter, Google could not share information that it did not have.

### c. Facebook Only Received Data Shared with All Bidders

Facebook also did "n[o]t receive special data" with respect to a piece of information from which FAN could compute a commonly-used metric called "match rate." Ex. 33, at -77; Ex. 32, at -44. Match rate measures the effectiveness with which an advertiser can match its own internal data to information in a bid request about the user to whom an ad would be shown. Ex. 26, at -24. Due to advertisers' universal attention to the match rate metric, Google continually worked to "improve match rates" and troubleshoot "drops in match rate" as an organizational "Objective and Key Result." Ex. 37, at -995.

Contrary to Plaintiffs' allegations, ¶¶ 101, 170, the NBA's target match rate of 60–80% for FAN did not differ dramatically from what Google sought, and achieved, for all auction participants. Ex. 32, at -44–45. Notes from weekly meetings regarding Google's Open Bidding interface demonstrate that discussants targeted increasing "hosted cookie match rates ███" for bidding

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

partners between February 2017 to January 2020. Ex. 37, at -081. And Google was successful, achieving "high" match rates "(███ on desktop web)" for Exchange Bidders in April 2019. *Id.* at -5995. Again match rates allow an advertiser to match information in a bid request to information the advertiser maintains; it does not refer to winning an auction for an ad slot.

Plaintiffs' portrayal also ignores that a particular target match percentage was not even the driving force behind the NBA's match rate term. Instead, it addressed a formatting issue: Facebook was concerned that Ad Manager's standard "cookie matching" format for communicating "identity match[ing]" to advertisers would not work on FAN platforms. Ex. 39, at -04. Google therefore agreed to use "commercially reasonable efforts," Ex. 32, at -44, to transmit match rate data in such a way that FAN could "still recognize FB cookies." Ex. 39, at -04. Both parties recognized that Facebook's ability "to identify the user on at least" a "[certain percentage] of [b]id [r]equests" (i.e., match rate) still would depend on FAN's own capabilities and the user's interface. Ex. 32, at -45. Recognizing the impact of external factors on match rate, Google and Facebook agreed to potential reductions in the "Match Rate target level" if the user's interface, such as "Safari . . . [or] other browser(s)," presented obstacles to effective transmission of match rate data between Ad Manager and FAN. *Id.*

The Court has already rejected another attempt by Plaintiffs to misconstrue the facts with a catchy allegation about "guaranteed win rate." MTD Order at 8 (noting that the NBA "does not guarantee Facebook a win or suggest that Google must do anything to make Facebook win a certain percentage of bids"). Plaintiffs' "match rate" allegation likewise attempts to reframe the bland reality of a standard technical metric as an illicit predetermination of the auction outcome. Ex. 39, at -04 ("[m]atch rate" does "not [mean] auction win rate.").[3]

* * *

"[T]he new auction" considered only "the highest offer" in determining which bid "[will] win[] the auction." Ex. 11, at -36. Consistent with the challenged statement, no other factors were considered in the UFPA's "determination of the winning bidder." Ex. 43, at -95. There was no falsity in Google's statement.

---

[3] Nor is "match rate" necessarily even correlative of "win rate": one Open Bidding partner had a win rate almost twice as high as its peers, despite having a match rate over 10% lower than the peer average. Ex. 26, at -24.

-17-

## B. MR. PICHAI WAS NOT A MAKER OF THE CHALLENGED STATEMENT

Undisputed evidence shows that Mr. Pichai was not the "maker" of the QFR responses and is therefore entitled to summary judgment pursuant to the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*. In *Janus*, the Supreme Court held that under Section 10(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. 135, 142 (2011). At summary judgment, Plaintiffs "must set forth specific facts showing that there is a genuine issue of fact" that Mr. Pichai was the maker of the QFR responses or had ultimate authority over their contents. *Abdo v. Fitzsimmons*, 2021 WL 616324, at *8 (N.D. Cal. Feb. 17, 2021). No such facts exist.

***Mr. Pichai neither drafted Google's response to QFR 6, nor is it attributed to him.*** Google's response to QFR 6 was drafted by members of its policy and legal teams. *Infra* § I.C.1.a. There is "no evidence of [Mr. Pichai] directing anyone as to the content of [the] statement[]" at issue, nor "any evidence showing any involvement by [Mr. Pichai] in the process of preparing and executing" the response to QFR 6. *Fitzsimmons*, 2021 WL 616324, at *9; Ex. 48, ¶ 11.

All of the evidence demonstrates that the challenged statement was attributed not to Mr. Pichai, but to the Company. Google's outside counsel submitted the QFR responses "[o]n behalf of our client Alphabet[,] Inc.," and at the request of Google, not Mr. Pichai. Ex. 41, at -88; *see infra* § I.C.1.a (as-submitted responses labeled as "Google's Submission").[4] The transmittal letter explicitly distinguished between Mr. Pichai's responsibility for his testimony and Google's responsibility for the QFR responses, writing that "Sundar Pichai used his best efforts to be as accurate and responsive as possible" in his "respon[ses] to the Subcommittee's questions at the July 29 hearing," whereas "Google has used its best efforts to be as accurate and responsive as possible" in its "respon[ses] to the Subcommittee's subsequent questions[.]" *Id* at -89. Because the QFR responses were "not issued in [Mr. Pichai's] name[,]" but "[r]ather, . . . in the name of the Company," Mr. Pichai is not a maker of

---

[4] That the QFR responses were submitted to Congress in connection with Alphabet's self-advocacy also confirms that the remaining challenged statement is protected under the *Noerr-Pennington* Doctrine. Under the doctrine, "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). As Judge Orrick explained in *In re JUUL Labs, Inc.*, where companies "genuinely s[eek] to influence the government through [their] statements (to defer regulation and allow them to keep [their products] on the market)," those statements are protected. 497 F. Supp. 3d 552, 613–14 (N.D. Cal. 2020).

-18-

the statements. *In re Celgene Corp., Inc. Sec. Litig.*, 741 F. Supp. 3d 217, 223–24 (D.N.J. 2024) (granting summary judgment for defendant COO); *Janus*, 564 U.S. at 144.

***Mr. Pichai did not have ultimate authority over the contents of the challenged statement.***

*Janus* requires some evidence that a corporate officer "actually exercised control over the content of the [statement] and whether and how [it was] communicated." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015). Here, no evidence suggests that Mr. Pichai received any drafts of the response to QFR 6, or "w[as] even provided with" a copy of the final responses "before their issuance." *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018).

"[I]n a case like this where the [challenged] statements were not attributed to" Mr. Pichai and other individuals "had actual final authority over the contents, [Mr. Pichai] cannot be [a] 'maker[]' of the statements for purposes of liability under Rule 10b-5(b)." *Fitzsimmons*, 2021 WL 616324, at *10.

## C. THE EVIDENCE SHOWS NO FRAUDULENT INTENT

The evidence disproves that any defendant acted "intentionally or with deliberate recklessness." *Shuster v. Symmetricom*, 35 F. App'x 705, 707 (9th Cir. 2002) (affirming summary judgment). As a result, there is no genuine issue of material fact as to (1) the scienter of Mr. Pichai, or (2) the "corporate scienter" of Alphabet or Google.

### 1. There Is No Evidence of Scienter as to Mr. Pichai

Section 10(b) requires "[a] plaintiff opposing summary judgment [to] present significant probative evidence of scienter." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1236 (S.D. Cal. Apr. 21, 2010) (partially granting summary judgment). Plaintiffs have no such evidence. To the contrary, the record refutes scienter as to Mr. Pichai for two reasons. First, it shows that Mr. Pichai was not involved with drafting Google's response to QFR 6. *See supra* § I.B. Second, the evidence proves that Mr. Pichai had no reason to believe the challenged statement was false.

#### a. The Evidence Shows Mr. Pichai Had No Involvement with the QFR Responses

In Section 10(b) cases, there can be no scienter when a defendant "had no involvement . . . actual[ly] crafting" a challenged statement. *In re Tyson Foods, Inc.*, 2004 WL 1396269, at *8 (D. Del. June 17, 2004) (granting summary judgment for defendants). In this situation, attempting to prove

-19-

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

"recklessness" or that a defendant "should have" had involvement in formulating a public statement does "not relieve [plaintiff] from the obligation to show participation in the conduct at issue." *Id.*

Summary judgment is appropriate here because the evidence shows Mr. Pichai was not involved with the QFR 6 Response. Ex. 48, ¶ 11. It was instead drafted by Google's internal and external counsel and policy teams. *Id.* ¶¶ 4, 8; *infra* § I.C.2.c. The evidence thus disproves the SAC's assumptions that Mr. Pichai would have been "expected" to have personally reviewed the challenged statement. ¶ 34; *see also* ¶¶ 287–289, 291. Plaintiffs' "allegations in the complaint" are no more than "unsupported conjecture or conclusory statements" that fail at summary judgment. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Whatever Plaintiffs think Mr. Pichai *should* have done does not establish scienter. *Tyson Foods*, 2004 WL 1396269, at *8.

Plaintiffs can "point to no proof that [Mr. Pichai] directed anyone about what to say or how to say it." *Celgene*, 741 F. Supp. 3d at 224 (summary judgment for defendant COO). Several distinctions confirm that Google deliberately distinguished between its own statements and Mr. Pichai's. Notably, Mr. Pichai submitted written testimony to Congress before his July 29, 2020 testimony, and labeled it "*Sundar Pichai*'s Written Testimony." Ex. 45, at 1. The QFR responses, by contrast, were designated as "*Google's* Submission." Ex. 43, at -90. Mr. Pichai cannot have scienter for a statement he did not make. He is therefore entitled to summary judgment. *Fitzsimmons*, 2021 WL 616324, at *8 (summary judgment for individual defendants who did not make challenged statement).

### b.  Mr. Pichai Had No Reason to Believe that the QFR 6 Response Was False

Nor is there evidence of "specific information that was either received or communicated by [Mr. Pichai] that would contradict [the challenged] statement at the time it was made." *Veal v. LendingClub, Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. Nov. 4, 2019) (dismissing on scienter).

There is no genuine issue of material fact concerning Mr. Pichai's knowledge of the NBA. The NBA was not, as Plaintiffs allege, contingent on Mr. Pichai's approval. Ex. 38, at -41; Ex. 40, at -48. Nor was such an approval ever issued. *Id.* Google employees that negotiated and approved the NBA were instead well below Mr. Pichai's level. *Infra* § I.C.2.c. Even the limited details shared with Mr. Pichai "for informational purposes only" regarding the NBA aligned with the challenged statement, noting it "ensure[d] Google compete[d] fairly with [a bidding] partner's demand." Ex. 38, at -41, -45.

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

Mr. Pichai's later, sworn deposition testimony fully aligns with this evidence, further supporting summary judgment in his favor. Mr. Pichai testified that he was "[n]ot directly involved with [Google's adtech] business," and "wasn't involved with the agreement with Facebook." Ex. 46, at 19:2–3; 134:23–135:3 ("I was aware there was an agreement, but I really couldn't tell you anything more about that agreement."). Additionally, Mr. Pichai confirmed that while he "periodically met Mr. Mark Zuckerberg in the course of doing business between the two companies . . . . [*Jedi Blue* (Google's code name for the NBA)] *was not a topic of discussion.*" *Id*. 115:3–116:1.

Mr. Pichai's distance from the NBA accords with the reality, known to courts that apply the securities laws, that "certain important decisions [a]re delegated below the corporate management level." *College Ret. Equities Fund v. Boeing Co.*, 2023 WL 6065260, at *10 (N.D. Ill. Sept. 18, 2023) (dismissing on scienter as to details CEO did not know). That Mr. Pichai "delegate[d] responsibility" and was "update[d] if [he] needed to know something in more detail," Ex. 46, at 149:8–14, is an "innocent alternative" negating scienter. *Sneed v. Talphera*, 147 F.4th 1123, 1134 (9th Cir. 2025).

Since the evidence does not indicate Mr. Pichai had knowledge of either the challenged statement, or any facts contradicting it, he is entitled to summary judgment on the element of scienter. *REMEC*, 702 F. Supp. 2d at 1236, 1238 (summary judgment for CEO where plaintiffs did "not produce[] evidence sufficient to raise a question of fact of an intent to deceive").

### 2. Plaintiffs Cannot Show a Material Issue of Fact Concerning Corporate Scienter

Having failed to show scienter as to Mr. Pichai, Plaintiffs are left with a discredited alternative theory: an amorphous construct known as corporate scienter. First, the Ninth Circuit does not recognize corporate scienter. Critically, Plaintiffs did not even plead it explicitly in the SAC. Second, the evidence confirms the QFR 6 Response aligned with its drafters' understanding. Third, these drafters' understanding remains accurate even if Plaintiffs tried to show, contrary to overwhelming evidence, *supra* § I.C.1, that someone else believed information contradicting the QFR 6 Response.

### a. The Ninth Circuit Does Not Permit Corporate Scienter on Plaintiffs' Theory

The evidence also does not support "a theory of collective scienter," or corporate scienter, because the Supreme Court and the Ninth Circuit have "not previously adopted" one. *In re NVIDIA*, 768 F.3d at 1063. The Ninth Circuit has rejected this theory several times, most recently, in *IBEW*

-21-

*Pension Fund v. Zendesk, Inc.*, 2022 WL 614235, at *2 (9th Cir. Mar. 2, 2022) (affirming dismissal).

Beyond the fact that the doctrine is not recognized in the Ninth Circuit, Plaintiffs are also foreclosed from corporate scienter because they did not plead it in their complaint. "Where [a] complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (affirming summary judgment). Here, Plaintiffs framed the SAC's scienter allegations exclusively with respect to the "Individual Defendants act[ing] with scienter," ¶ 279, of which only Mr. Pichai remains. MTD Order at 17. Plaintiffs continue that exclusive focus on individual scienter throughout the SAC. *See* ¶¶ 280, 287–292, 294–299, 305, 310, 321, 324, 326. At no point, conversely, do the terms "collective scienter" or "corporate scienter" appear, nor do any of the SAC's other allegations implicate the doctrine. The Court should foreclose this theory on summary judgment.

Plaintiffs' corporate scienter theory is especially improbable, since it depends on a hypertechnical argument that one sentence in the QFR 6 Response was marginally false. *Supra* § I.A. In *Zendesk*, the court held that plaintiffs would have "fail[ed] to adequately allege scienter under [the corporate scienter] doctrine," even had it been available, because the challenged statements "were not 'so dramatically false' that at least some corporate official must have known of their falsity upon publication."). 2022 WL 614235, at *2. On another occasion where the Ninth Circuit rejected corporate scienter, it did so for three statements "appear[ing] in a sixty-page legal document." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008). Charging all of Alphabet's 190,820 employees, Ex. 47, at 7, with knowing whether one sentence, within one response, to one of 85 QFRs, within a 58-page document, was true or false, would be even more illogical, *supra* § C.

Even in circuits that do recognize corporate scienter, courts do so only in "exceedingly rare" circumstances where falsity "is so dramatic that collective corporate scienter may be inferred'"—far from the reality here. *Roofers's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 632 (D.N.J. 2023). Plaintiffs' "argu[ment] that certain disclosures were not as detailed as they should have been," simply does not create material issue of a "dramatic falsehood that would warrant the application of the

corporate scienter doctrine." *Garcia v. J2 Global, Inc.*, 2022 WL 22717936, at *7 (C.D. Cal. Aug. 8, 2022) (dismissing corporate scienter argument).

### b.  The QFR 6 Response Aligns with Its Drafters' Understanding

Defendants are also entitled to summary judgment because the evidence shows the good-faith belief in the QFR 6 Response by its drafters, which is dispositive in negating corporate scienter.

"[F]acts indicating that [defendants] sincerely believed" the truth of their statements, and took steps to verify them, "[are] far from the deliberate, conscious recklessness required" to meet the burden of proof on scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009) (affirming dismissal on scienter). Here, the evidence demonstrates the qualification and diligence of outside experts hired to respond to the QFRs. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3rd Cir. 2013) (no corporate scienter where defendant hired outside counsel to conduct an internal investigation and disclosed the results). Google followed an appropriate process to draft and confirm the accuracy of the QFR responses, inclusive of the challenged statement. Ex. 48, ¶ 4. Alongside that process, several Google employees reviewed and approved the QFR responses, including the QFR 6 Response. *Id.* ¶¶ 4, 8. Plaintiffs cannot show any evidence that instead these drafters believed the challenged statement to be false. The "substantial, if not overwhelming evidence, that Defendants acted in good faith" merits summary judgment. *REMEC*, 702 F. Supp. 2d at 1238.

### c.  No Evidence the QFR Response Drafters Knew of Any Contrary Information

Even if Plaintiffs could establish that *someone else* at Google was aware of information contrary to the QFR Response—which they cannot, *supra* § I.C.2.b—they would still fail to prove that the drafters of the QFR Response were aware of that information.

A securities case cannot proceed based on asserted "misstatements by some individuals and knowledge belonging to some others [with]. . . no strong inference that, in fact, there was a connection between the two." *Silvercreek Mgmt. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017). Instead, there must be some "connective tissue between [knowledgeable] employees and the alleged misstatements." *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020). Here, there is a complete lack of "connective tissue." The drafters of the QFR Response, *supra* § I.C.2.b, and the negotiators and approvers of the NBA do not overlap, *compare* Ex. 34 *and* Ex. 40, *with* Ex. 48, ¶¶ 9–10. Multiple

-23-

documents detail Google personnel that *did* participate in drafting and negotiating the NBA. *E.g.*, Ex. 34 (noting NBA negotiators); Ex. 35 (same); Ex. 40 at -48 (noting NBA approvers). Mr. Pichai was not among them. Even if Plaintiffs argued that *some* employee had *some* "knowledge of the violation of [*some*] law"—which they cannot—they could not "imput[e] [scienter] to [Google] as a whole." *Glazer*, 549 F.3d at 745.

Based on the evidence, the Court may now reject the SAC's allegations attempting to infer scienter on the basis of no more than Google's purportedly "almost unlimited resources," ¶ 283, and the "highly qualified team," ¶ 284, working on its QFR responses. Securities fraud claims cannot simply "proceed against any company that made a mistake relating to an important portion of its business, because the plaintiff could always allege, in hindsight, that the company's talented employees must have known about the issue." *Anshen v. Facebook*, 2017 WL 5635021, at *3 (C.D. Cal. Oct. 4, 2017).

## II.    MR. PICHAI WAS NOT A CONTROL PERSON

Without a primary violation, Plaintiffs' Section 20(a) claims against Mr. Pichai also fail. *NVIDIA*, 768 F.3d at 1065 (affirming dismissal absent primary violation). Even *with* a primary violation, Plaintiffs cannot meet their burden of proving "that [Mr. Pichai] exercised actual power or control over the primary violator[.]" *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Nor can they refute that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

*Mr. Pichai is not a controller.* The Ninth Circuit rejects the notion that "[t]he fact that a person is a CEO . . . create[s] a presumption that he or she is a 'controlling person.'" *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011). For example, the Ninth Circuit affirmed summary judgment for a CEO who did not manage the company on a day-to-day basis and did not draft any challenged statement, even though he was "at least consulted on every major decision." *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996). If it were otherwise, Section 20(a) would amount to strict liability for executive officers, in violation of the Ninth Circuit's reminder that Section 20(a) is "an intensely factual question." *Howard*, 228 F.3d at 1065. This concern illustrates why Section 20(a) liability requires "that the defendant was, in some meaningful sense, a culpable participant in the

-24-

controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007); *see also In re Alstom SA*, 406 F. Supp. 2d 433, 496 (S.D.N.Y. 2005) (dismissing Section 20(a) claim against CEO because "no allegations support[ed] any reasonable inference that [she] knew or should have known about the [alleged fraud]").

Plaintiffs can offer no evidence to suggest that Mr. Pichai is directly involved in each task, taking place each day, with respect to adtech and all other businesses at Google. *Paracor*, 96 F.3d at 1163. To the contrary, Mr. Pichai testified that he is "*not* directly involved with [the buy-side ad] business," and "wasn't involved with the agreement with Facebook." Ex. 46, at 19:2–3, 134:23–135:3. Nor does any evidence show that Mr. Pichai has the unrestrained "power to control corporate actions," including the specific language of Google's QFR responses, that would be required to ground Section 20(a) liability. *Howard*, 228 F.3d at 1065. Mr. Pichai has testified that he "delegate[s] responsibility," including for "the ad tech business." Ex. 46, at 149:11–14. It is only natural given "the scale of [the] company," *id.* at 54:16–25, a $3.6 trillion enterprise that employs 75,000 people in the United States alone, that Mr. Pichai does not "make . . . decisions directly" on all issues and "rel[ies] on experts," *id.* at 55:9-10.

***Mr. Pichai is entitled to the good faith defense.*** "[A] defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." *Howard*, 228 F.3d at 1065; 15 U.S.C. § 78t(a). Here, no evidence supports a finding of scienter. *See supra* § I.C. Undisputed evidence also shows that Mr. Pichai had no direct or indirect involvement in drafting Google's response to QFR 6. *Supra* § I.C.1; *see Paracor*, 96 F.3d at 1164 (good faith defense applied where CEO "knew that there was a debenture offering," but no evidence suggested "he was involved in its workings in any significant way"). "Uncontradicted" evidence of good faith warrants summary judgment on Section 20(a). *Kaplan v. Rose*, 49 F.3d 1363, 1380 (9th Cir. 1994).

## CONCLUSION

The Court should grant Defendants summary judgment on the elements of falsity and scienter.

DEFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-CV-01186-RFL (SK)

Dated: April 20, 2026

FRESHFIELDS US LLP

By: /s/ Doru Gavril
     Doru Gavril

*Attorneys for Defendants*

-26-