# EXHIBIT 42

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Message

| | |
|---|---|
| **From:** | O'Brien, Alicia [aobrien@kslaw.com] |
| **Sent:** | 8/14/2020 3:59:37 PM |
| **To:** | ███████@google.com; ███████@google.com]; ███████@google.com]; ███████@google.com]; ███████google.com]; ███████@google.com]; ███████@google.com]; ███████@google.com; ███████@google.com]; ███████@google.com |
| **CC:** | Halse, Ehren [ehalse@kslaw.com]; Yates, Sally [SYates@KSLAW.com]; Hanson, Matthew [MHanson@KSLAW.com] |
| **Subject:** | FW: Thank You Letter from Chairman Nadler |
| **Attachments:** | Sundar Pichai - Thank You Letter.pdf; Chairman Nadler Thank You - Pichai.pdf; Pichai Transcript.pdf; 8.07.20 Jayapal QFRs Google.pdf; ACAL Big Tech Questions for the Record - Johnson - Google.pdf; ACAL Tech CEOs QFRs - Raskin - Google.pdf; Armstrong QFRs for Google - Antitrust Digital Markets Investigation - 8.7.2020.pdf; Online Platforms and Market Power Questions for the Record for Google - Buck.pdf; QFRs - Google - Cicilline.pdf |

FYI.

We'll get to work reviewing.  Happy to do a call later today to discuss further.

---

**From:** Van Wye, Joseph <Joseph.VanWye@mail.house.gov>
**Sent:** Friday, August 14, 2020 11:51 AM
**To:** ███████@google.com>
**Cc:** Bond, Slade <Slade.Bond@mail.house.gov>; Grimm, Tyler <tyler.grimm@mail.house.gov>; O'Brien, Alicia <aobrien@kslaw.com>
**Subject:** Thank You Letter from Chairman Nadler

**External Sender**


Please find attached a letter from Chairman Nadler expressing his appreciation for Mr. Pichai's participation at our July 29, 2020 hearing on "Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google."

Also attached for review are his excerpt from the hearing transcript and questions for the record.  Please send any edits to the excerpt and answers to the questions to me no later than **COB on August 28, 2020.** You will also find a letter with instructions on how to provide edits to the excerpt.

Additionally, as part of a new House-wide initiative to track the diversity of witnesses who testify in Congress, we ask that he consider taking this voluntary survey. All data remains anonymous and protected according to the United States House of Representatives' policy and data security practices. If you have additional questions or are having trouble accessing this survey, please contact Stephanie Palencia at stephanie.palencia@mail.house.gov.

Please confirm receipt of this email and let me know if you have any additional questions. Thank you.

---

Joseph Van Wye (He/Him/His)
Legislative Aide/Clerk
Subcommittee on Antitrust, Commercial and Administrative Law
U.S. House Committee on the Judiciary
6240 O'Neill House Office Building
6-3574

GOOG-AMI-000003651

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message. Click here to view our Privacy Notice.

GOOG-AMI-000003652

JERROLD NADLER, New York
CHAIRMAN

JIM JORDAN, Ohio
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Sixteenth Congress

August 14, 2020

Mr. Sundar Pichai
Chief Executive Officer
Alphabet Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

Dear Mr. Pichai:

On behalf of the Subcommittee on Antitrust, Commercial and Administrative Law, I want to express our sincere appreciation for your participation at the hearing on "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google." Your testimony was informative and will assist us in future deliberations on the important issues addressed during the hearing.

Also, please find enclosed for your review a verbatim transcript of your oral testimony at the hearing. Pursuant to House Rule XI, clause 2(e)(1)(A) and House Judiciary Committee Rule III(e), you have the opportunity to verify the accuracy of the transcript in advance of publication. Pursuant to this authority, you may make technical, grammatical, and typographical corrections. Any request by you to correct errors other than errors in the transcription, or disputed errors in transcription, will be appended to the hearing record, and the appropriate place where the change is requested will be footnoted.

Also enclosed for your review are questions for the record submitted by Members of our Committee. Please send your transcript edits and answers to the questions for the record **no later than** August 28, 2020 to the attention of Joseph Van Wye, Committee on the Judiciary, U.S. House of Representatives, 2138 Rayburn House Office Building, Washington, DC 20515 or email your transcript edits to joseph.vanwye@mail.house.gov.

Your prompt submission of your transcript edits and responses to the questions for the record would be much appreciated. Again, thank you for your participation.

Sincerely,

Jerrold Nadler
Chairman

Enclosure: Transcript Excerpts
                Questions for the Record

CONFIDENTIAL

GOOG-AMI-000003653



HOUSE OF REPRESENTATIVES
WASHINGTON, D.C. 20515

JERROLD L. NADLER
NEW YORK

August 10, 2020

Mr. Sundar Pichai
Chief Executive Officer
Alphabet Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

Dear Mr. Pichai:

On behalf of the Committee on the Judiciary, I want to express my sincere appreciation for your participation at the hearing on "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google." Your testimony was informative and will assist us in future deliberations on the important issues addressed during the hearing.

Sincerely,

Jerrold Nadler
Chairman

NOT PRINTED AT GOVERNMENT EXPENSE

CONFIDENTIAL

GOOG-AMI-000003654

Do you swear or affirm under penalty of perjury that the testimony you're about to give is true and correct to the best of your knowledge, information, and belief, so help you God?

Mr. Bezos.  Yes.

Mr. Pichai.  I do.

Mr. Zuckerberg.  Yes.

Mr. Cook.  I do.

Mr. Cicilline.  Let the record show the witnesses answered in the affirmative. Thank you, and you may remain seated.

Please note that your written statements will be entered into the record in their entirety.  Accordingly, I ask that you summarize your testimony in 5 minutes.  To help you stay within that time, there is a timing light in Webex.  When the light switches from green to yellow, you have 1 minute to conclude your testimony.  When the light turns red, it signals your 5 minutes have expired.

Mr. Bezos, you may begin.

CONFIDENTIAL

GOOG-AMI-000003655

Mr. Cicilline.    Thank you, Mr. Bezos.

Mr. Pichai, you are now recognized for 5 minutes.


**TESTIMONY OF SUNDAR PICHAI**


Mr. Pichai.    Thank you, Mr. Chairman, Ranking Member Sensenbrenner, and members of the subcommittee.

Before I start, I know this hearing was delayed because of the ceremonies to honor the life of your colleague, Representative John Lewis.    Because of his courage, this world is a better place.    He'll be deeply missed.

At its heart, a discussion about competition is a discussion about opportunity. This has never been more important, as the global pandemic poses dual challenges to our health and our economy.

Expanding access to opportunity through technology is personal to me.    I didn't have much access to a computer growing up in India, so you can imagine my amazement when I arrived in the U.S. for graduate school and saw an entire lab of computers to use whenever I wanted.

Accessing the internet for the first time set me on a path to bring technology to as many people as possible.    It inspired me to build Google's first browser, Chrome.    I'm proud that, 11 years later, so many people experience the web through Chrome for free.

Google takes pride in the number of people who choose our products.    We are even prouder of what they do with them.    From the 140 million students and teachers using G Suite for education to stay connected during the pandemic, to the 5 million Americans gaining digital skills through Grow with Google, to all the people who turn to

CONFIDENTIAL

GOOG-AMI-000003656

Google for help, from finding the fastest route home to learning how to cook a new dish on YouTube.

Google's work would not be possible without the long tradition of American innovation, and we are proud to contribute to its future.    We employ more than 75,000 people in the U.S. across 26 States.    The Progressive Policy Institute estimated that in 2018 we invested more than $20 billion in the U.S., citing us as the largest capital investor in America that year and one of the top five for the last 3 years.

One way we contribute is by building helpful products.    Research found that free services like Search, Gmail, Maps, and Photos provide thousands of dollars a year in value to the average American, and many are small businesses using our digital tools to grow.

Stone Dimensions, a family-owned stone company in Pewaukee, Wisconsin, uses Google My Business to draw more customers.    Gil's Appliances, a family-owned appliance store in Bristol, Rhode Island, credits Google Analytics with helping them reach customers online during the pandemic.    Nearly one-third of small-business owners say that without digital tools they would have had to close all or part of their business during COVID.

Another way we contribute is by being among the world's biggest investors in research and development.    At the end of 2019, our R&D spend had increased tenfold over 10 years, from $2.8 billion to $26 billion, and we have invested over $90 billion the last 5 years.    Our engineers are helping America remain a global leader in emerging technologies like artificial intelligence, self-driving cars, and quantum computing.

Just as America's technology leadership is not inevitable, Google's continued success is not guaranteed.    New competitors emerge every day, and, today, users have more access to information than ever before.    Competition drives us to innovate, and it also leads to better products, lower prices, and more choices for everyone.    For

CONFIDENTIAL

GOOG-AMI-000003657

example, competition helped lower online advertising costs by 40 percent over the last decade, with savings passed down to consumers.

Open platforms like Android also support the innovation of others.    Using Android, thousands of mobile operators build and sell their own devices without paying any licensing fees to us.    This has enabled billions of consumers to offer cutting-edge smartphones, some for less than $50.    Whether building tools for small businesses or platforms like Android, Google succeeds when others succeed.

Competition also sets higher standards for privacy and security.    I've always believed that privacy is a universal right.    And Google is committed to keeping your information safe, treating it responsibly, putting you in control.    And we've long supported the creation of comprehensive Federal privacy laws.

I've never forgotten how access to technology and innovation changed the course of my life.    Google aims to build products that increase access to opportunity for everyone, no matter where you live, what you believe, or how much money you earn. We are committed to doing this responsibly, in partnership with lawmakers, to ensure every American has access to the incredible opportunity technology creates.

Thank you.

[The statement of Mr. Pichai follows:]

\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

CONFIDENTIAL

Mr. Cicilline.    I will now recognize myself for 5 minutes.

Mr. Pichai, over 85 percent of all online searches go through Google.    Every online company in the United States depends on Google to reach users.    A business may sink or swim based on Google's decisions alone.

Numerous online businesses told us that Google steals their content and privileges its own sites in ways that profit Google but crush everyone else.    Most businesses asked to stay anonymous due to fears that Google would retaliate against them.

One entrepreneur, Brian Warner, told us his website was thriving until Google stole his content.    After Google's decision, traffic to his website dropped by 80 percent. He had to downsize his business and lay off half his staff.    He told us, and I quote, "If someone came to me with an idea for a website or a web service today, I'd tell then to run -- run as far away from the web as possible.    Launch a lawn-care business or a dog-grooming business, something Google can't take away as soon as he or she is thriving."

So my first question, Mr. Pichai, is, why does Google steal content from honest businesses?

Mr. Pichai.    Mr. Chairman, with respect, I disagree with that categorization.

Just last week, I met with many small businesses.    In fact, today, we support 1.4 million small businesses, supporting over $385 billion in economic activity.

We see many businesses thrive, particularly even during the pandemic.    An example:    Kettle Kings in Texas, which sells kettlebells, they've really expanded --

Mr. Cicilline.    Mr. Pichai, I have a limited amount of time, so I don't want to interrupt you, but my question is very specific.

We've heard throughout this investigation that Google has stolen content to build

                                                 GOOG-AMI-000003659

your own business.   These are consistent reports.   And so your testimony that that doesn't happen is really inconsistent with what we've learned during the course of the investigation.

But I'll move on to a new question.

Mr. Pichai, most Americans believe that when they enter a search query that what Google shows are the most relevant results.   But, increasingly, Google just shows whatever is most profitable for Google, be it Google Ads or Google's own sites.

And so my question, Mr. Pichai:   Isn't there a fundamental conflict of interest between serving users who want to access the best and most relevant information and Google's business model, which incentivizes Google to sell ads and keep users on Google's own sites?

Mr. Pichai.   We have always focused on providing users the most relevant information.   And we rely on that trust for users to come back to Google every day.

In fact, the vast majority of queries in Google, we don't show ads at all.   And we show ads only for a small subset of queries where the intent from users is highly commercial.   For example, they may be looking for something like TV sets or so on. So --

Mr. Cicilline.   But, Mr. Pichai, what is the value of the part that you do use the Google Ads for?   I mean, it's a substantial part of your business.   What's the actual value?   $200 billion?   $300 billion?

Mr. Pichai.   You know, in terms of revenue, it's around $100-plus billion.

Mr. Cicilline.   Okay.

Mr. Pichai.   But --

Mr. Cicilline.   That's a lot of money, Mr. Pichai.

Let me move on.

CONFIDENTIAL

GOOG-AMI-000003660

Really, Mr. Pichai, it's Google's business model that is the problem.    Our documents show that Google evolved from a turnstile to the rest of the web to a walled garden that increasingly keeps users within its sites.

Emails show that, over a decade ago, Google started to fear competition from certain websites, web pages that could divert search traffic and revenue from Google. These documents show that Google staff discussed the "proliferating threat," is how it was described, that these web pages posed to Google.    Any traffic lost to other sites was a loss in revenue.    One of Google's memos observed that certain websites were getting, and I quote, "too much traffic," so Google decided to put an end to that.

Mr. Pichai, you've been at Google since 2004.    Were you involved in these discussions about the threat from vertical search?

Mr. Pichai.    Congressman, without knowing the specifics, you know, I'm not really clear of the context.

But, definitely, when we look at vertical searches, it validates the competition we see.    For example, when users come looking to shop online, independent studies show that over 55 percent of product searches originate with Amazon and over 70 percent originate with the major e-commerce companies.

In the few categories which are commercial in nature, we see vigorous competition, be it travel, be it real estate.    And we are working hard for --

Mr. Cicilline.    Well, let me ask very specifically, Mr. Pichai:    The evidence that we collected shows that Google pursued a multipronged attack.

First, Google began to steal other web pages' content.    For example, in 2010, Google stole restaurant reviews from Yelp to bootstrap its own rival local search business.

Mr. Pichai, do you know how Google responded when Yelp asked you to stop stealing their reviews?

CONFIDENTIAL

GOOG-AMI-000003661

Well, I'll tell you.    Our investigation shows that Google's response was to threaten to delist Yelp entirely.    In other words, the choice Google gave Yelp was:    Let us steal your content, or effectively disappear from the web.

Mr. Pichai, isn't that anticompetitive?

Mr. Pichai.    Congressman, you know, when I run the company, I am really focused on giving users what they want.    We conduct ourselves to the highest standard. Happy to engage, understand the specifics, and answer your questions further.

Mr. Cicilline.    Thank you.

And I just have one final series of questions, Mr. Pichai.    Did Google ever use its surveillance over web traffic to identify competitive threats?

Mr. Pichai.    Congressman, just like other businesses, we try to understand trends from, you know, data which we can see, and we use it to improve our products for our users.    But we are really focused on improving our products, and that's how --

Mr. Cicilline.    I appreciate that, Mr. Pichai.

Google's own documents and numerous interviews with companies affected by this conduct show that Google did just that, which is very disturbing and very anticompetitive.

In addition to stealing content, Google also began to privilege its own sites.    An investigative report published just yesterday found that 63 percent of web searches that start on Google also end somewhere on Google's own websites.

And, to me, that's evidence that Google is increasingly a walled garden which keeps users on Google sites even if Google doesn't have the most relevant information. And it's economically catastrophic for other companies online.

And so my time is running out, but, Mr. Pichai, I'll just end by saying, the evidence seems very clear to me.    As Google became the gateway to the internet, it began to

GOOG-AMI-000003662

behavior, Genius created another experiment to determine the scope of the misappropriation.   It turns out that, out of 271 songs where the watermark was applied, 43 percent showed clear evidence of matching.   Your company, which advertises itself as a doorway to freedom, took advantage of this small company, all but extinguishing Genius' freedom to compete.

Google is supposed to connect people to information.   Your corporate values once stood for freedom, a platform that let capitalism flourish and helped bring countless people across the globe out of poverty.

My question to you, Mr. Pichai, do you think that Google could get away with following China's corporate espionage playbook if you didn't have a monopolistic advantage in the market?

Mr. Pichai.   Congressman, I want to be able to address the important concerns you raised.   First of all, we are proud to support the U.S. Government.   We recently signed a big project with the Department of Defense where we are bringing our world-class zero trust-based cybersecurity approach to help protect our networks from cybersecurity attacks.

We have projects underway with the Navy, with the Department of Veterans Affairs.   Happy to follow up and explain more.   We have a very limited presence in China.   We don't offer any of our services, Search, Maps, Gmail, YouTube, et cetera, in China.

And with respect to music, we license content fare, in fact, we license content from other companies, and so this is a dispute between Genius and the other companies in terms of where the source of the content is.   But, again, happy to engage and explain what we do here further.

Mr. Buck.   Thank you.   I yield back, Mr. Chairman.

CONFIDENTIAL

GOOG-AMI-000003663

great to see that none of you do.

Mr. Pichai, I'm worried about Google's market power how it concentrates that power and then ultimately how it wields it.    Project Maven was a collaboration between Google and the Department of Defense that Google pulled out of, citing ethical concerns, and you made the decision to pull out of that joint venture following receipt of a letter from thousands of your employees saying that Google should not be in the business of war.

My question, Mr. Pichai is, did you weigh the input from your employees when making the decision to abandon that project with the United States military?

Mr. Pichai.   Congressman, thanks for your concern.    As I said earlier, we are deeply committed to supporting the military and the U.S. Government.    We have undertaken several projects since then.    We do take our employees' input into.    But it's one input.    We make decisions based on a variety of factors.    As a company, we were new in the cloud space at that time.    Since then we have --

Mr. Gaetz.    Thank you.    That is a sufficient answer, that you did take their feedback into account.    And, in fact, some of your Googlers have recently sent you a letter where they've asked you to exit other partnerships as a consequence of ethical concerns.

They've asked you to stop doing business with American law enforcement, saying that police broadly uphold white supremacy and that Google should not be engaged in any services to police.    And as you well know, you provide some of the most basic services to police, like email, but you also provide services that help keep our cops safe when they're doing their job.

And so my question is here, in front of Congress and the American people, will you take the pledge that Google will not adopt the bigoted antipolice policy that is requested

GOOG-AMI-000003664

in the most recent letter?

Mr. Pichai.    Congressman, we have a long track record of working with law enforcement when it is supported by due process and the law.    We push back against over broad requests.    We are transparent about the requests we get.    But we have a long history of following the law and cooperating with law enforcement.

Mr. Gaetz.    I understand the history.    I'm asking about the future.    To the law enforcement that are watching today, can they rest assured that, under your leadership, Google will not adopt these bigoted antipolice policies?

Mr. Pichai.    Congressman, we have committed to continuing to work with law enforcement in a way that's consistent with law and due processes in the U.S.

Mr. Gaetz.    Well, I greatly appreciate that, and I know that will be very comforting to the police who utilize your services.

You mentioned earlier in the discussion about China that your engagement in China was very limited.    But yet Google has an AI China center.    The Chinese Academy of Sciences has published a paper that enhanced the targeting capabilities of China's J-20 fighter aircraft.

You collaborate with Chinese universities that take millions upon millions of dollars from the Chinese military.    As a matter of fact, one of your Googlers, Fei-Fei Li, while under your employ, was cited in Chinese state media saying, "China is like a sleeping giant; when she wakes, she will tremble the world."

The former Secretary of Defense, Mr. Shanahan, said that the lines have been blurred in China between commercial and military application.    And as Mr. Buck cited, General Dunford says that your company is directly aiding the Chinese military.    And Peter Teal, who actually serves on Mr. Zuckerberg's board at Facebook, said that Google's activities with China are treasonous.    He accused you of treason.

CONFIDENTIAL

So why would an American company with American values so directly aid the Chinese military but have ethical concerns about working alongside the U.S. military on Project Maven?   And I understand your point about cybersecurity and those things, but Project Maven was a specific way to ensure that our troops are safe on the battlefield. And if you have no problem making the J-20 Chinese fighter more effective in its targeting, why wouldn't you want to make America as effective?

Mr. Pichai.   Congressman, with respect, we are not working with the Chinese military.   It's absolutely false.   I had a chance to meet with General Dunford personally. We have clarified what we do in China compared to our peers.   It's very, very limited in nature.   Our AI work in China is limited to a handful of people working on open-source projects.   I'm happy to share and engage with your office to explain our work in China further.

Mr. Gaetz.   Gosh, I mean, when the Chairman of the Joint Chiefs of Staff says that an American company is directly aiding China, when you have an AI center, when you're working with universities, and when your employees are talking about China trembling the world, it seems to really call into question your commitment to our country and our values.

I see my time is expired.   I hope we have an additional round, Mr. Chairman.

Mr. Cicilline.   I thank the gentleman.

I now recognize the gentleman from Maryland, Mr. Raskin, for 5 minutes.

Mr. Raskin.   Thank you, Mr. Chairman.

Mr. Zuckerberg, as you know, the proliferation of fake Facebook accounts was a key tool in the strategy of Russian interference in the American election in 2016. American law enforcement, the Senate, the House, have all found that Vladimir Putin engaged in a sweeping and systematic campaign to undermine American democracy in

CONFIDENTIAL

GOOG-AMI-000003666

[2:49 p.m.]

Mr. Cicilline.    The committee will come back to order.

I now recognize the gentleman from North Dakota, Mr. Armstrong, for 5 minutes.

Mr. Armstrong.    Google has received criticism about bias against conservatives and content moderation.    There were threats of demonetizing the Federalist and numerous other complaints of viewpoint suppression.    As a result, a significant portion of the American public has lost trust in your company.

A lack of public confidence in a product usually means there is economic harm to the company, but that just isn't the case with Google.    So I think it's a legitimate question as to whether Google's market power insulates it from loss of revenue normally associated with offending half the people who use your product.    I also think it's a legitimate question to ask if other attempts to regulate your industries have worked.

So, Mr. Pichai, Google has restricted advertising analytics or the portability of user data related to advertising due to compliance with the general data protection regulation. Specifically, in 2018, Google restricted the ability to export the Double ID, a cookie-based identifier that compiles individual user data and creates profiles through Google data transfer.    Is that correct?

Mr. Pichai.    Congressman, I'm not familiar with the specifics of the particular issue, but happy to follow up more once I understand it better.

Mr. Armstrong.    So you're not particularly familiar with how you're complying with GDPR?

Mr. Pichai.    Congressman, we have long been working to comply with GDPR. We think it's an important regulation, and, you know, we have -- we are in full compliance, to the extent of my knowledge.    I just meant not aware of the specific issue

CONFIDENTIAL

with the identifier you mentioned there, but happy to understand it better and follow up.

Mr. Armstrong.    All right.    So, in order to comply with GDPR, Google must retain control over more user data and restrict the ability to combine this user data with other platforms to conduct cross-platform analysis.    It seems as if that ultimately limits the ability of advertisers to make comparisons between Google-based campaigns and non-Google-based campaigns.    Would you agree with that?

Mr. Pichai.    In all these ecosystems, we are balancing between users, advertisers, and publishers.    We deeply care about the privacy and security of our users, and so, when we serve these ecosystems, we have to take that into account.    We have to comply with important laws and regulations in every country we operate in.    And so that's the delicate balance we are constantly striking, but we are focused on our users and trying to do the best we can.

Mr. Armstrong.    And I just want to be perfectly clear, I personally believe that just the market power consolidation is significant, but I also want to be clear that when we're moving forward to regulate this, that we aren't actually squeezing out competition in our quest to do something, because I've said that before in this hearing and I'll say it again:    Usually in our quest to regulate big companies, we end up hurting small companies more.

And I'm a strong privacy advocate, but the consequences of GDPR have been to further entrench large established actors like Google leading to regulatory capture that exasperates competition concerns.    And Google's digital ad market share has increased since the implementation of GDPR.    Do you know that to be correct?

Mr. Pichai.    Congressman, to just give you a sense of the robust competition we see, ad prices have fallen down by 40 percent in the past 10 years.    And, in fact, in the U.S., advertising as a share of GDP has come down from 1.4 percent in 1992, less than

GOOG-AMI-000003668

1 percent today.

So we see robust competition in the marketplace.    And as I said earlier, you know, we have to comply with regulation, we have to interpret it strictly, and we have to balance the ecosystem.    But our utmost care is ensuring privacy and security of our users as we serve these markets.

Mr. Armstrong.    And I'm glad you mentioned privacy, because I would be remiss if I didn't deal with this issue because it is so relevant.    And I think, generally speaking, outside of the political issues and the biases with all of this, and this is for essentially all four of our witnesses, I think one of our bigger concerns when we talk about data and value -- and that data having value and privacy, which is where people really get concerned with how the digital age is moving forward.

And there are news reports that law enforcement has made increasing use of what are called geo-fence warrants, and these geo-fence warrants allow authorities to compel technology companies to disclose location records for any device in a certain area at a particular time.    Court filings suggest that Google received about 1,500-percent increase in geo-fence requests from 2017 to 2018 and a 500-percent increase from 2018 to 2019.

Unless -- and so the Fourth Amendment requires probable cause and specificity, and that's not what these are.    These warrants are essentially for any person in an area at a particular time, and geo-fence warrants require neither.    So, unless a company by particularized information and identifying a subject, geo-warrants are essentially general warrants.

I believe that the location information should be considered as a contents of the Electronic Communications Act under the historic Communications Act.    Do you agree?

Mr. Pichai.    You know, happy to understand more.    We deeply care about -- this

GOOG-AMI-000003669

is why we issue transparency reports because we think it's an important area for Congress to have oversight.    And we recently made a change by which we automatically delete location activity after a certain period of time by default for our users.    So we are happy to engage with your office, Congressman, and engage more.

Mr. Armstrong.    And I'm using you because these are going on in Virginia and New York, I think, right now, but, I mean, this equates for everything.    I think people would be terrified to know that law enforcement could grab general warrants and get everybody's information anyway.    So it requires Congress to act, and it requires everybody that is a witness in this hearing to be willing to work too because it is the single most important issue I think we are going to --

Mr. Cicilline.    The time of the gentleman is expired, but I believe he has a unanimous consent request.

Mr. Armstrong.    I do.    I have a unanimous consent request for Wall Street Journal article, "Police Requests for Google Users' Location Histories Face New Scrutiny."

Mr. Cicilline.    Without objection.

CONFIDENTIAL

GOOG-AMI-000003670

suddenly conservative websites are now at the top of the bar when you search for them.

So was there anything done at Google between a couple of months ago and last week or the week before you appearing today that has changed your approach to silencing conservative websites?

Mr. Pichai.    Congressman, we approach our work with a deep sense of responsibility without -- in a nonpartisan way.    We want to serve all our users, no matter where they are.    In fact, it's in our long-term business incentive to do so.    And I believe on our platforms, including YouTube, there are more conservative voices than ever before, and we believe in freedom of expression.

On the specific issue, you know, I will have to look into it.    You know, I obviously wasn't aware of it.    We do -- it could be a number of reasons.    We constantly get reports --

Mr. Steube.    So, if you're going to look into it for me, is there -- can I expect a response from you say in the next 2 weeks as to why that occurred?

Mr. Pichai.    Congressman, we'll do our best to follow up, and I'll engage with your office to respond on that

Mr. Steube.    Okay.    We'll follow up on that.    I've got a similar question.    So I've been in elected politics for almost 10 years, and when I was in the Florida Senate and the State Senate, I never had a problem with my campaign emails being marked as spam or going to junk folders or anything along those lines.    And we had 30,000, 40,000, 50,000 people on our email list.

And suddenly I get elected to Congress and I'm now up here in Washington, D.C., and my parents who have a Gmail account aren't getting my campaign emails.    My supporters, just last week, one of my supporters called me and said, "Hey, I just want you to know this, that my Gmail account suddenly is taking your campaign emails that I've

CONFIDENTIAL

received for almost 10 years and suddenly they're going to spam and junk folders." This appears to only be happening to conservative Republicans.

I don't see anything in the news or anything in the press or other Members on the other side of the aisle talking about their campaign emails getting thrown into junk folders in Gmail. So my question is, is why is this only happening to Republicans? And it's a fact it's happening, because I can have my supporters testify that they've received my emails for 8 years, 8, 9 years, and suddenly this last year all of their Gmail -- my campaign emails in their Gmail are going to their spam folder. So, if you could give me some clarification on that, I would appreciate it.

Mr. Pichai. In Gmail, we are focused on what users want, and users have indicated they want us to organize their personal emails, emails they receive from friends and family, separately. And so all we have done is we have a tabbed organization, and, you know, the primary tab has emails from friends and family and the secondary tab has other notifications and so on. These --

Mr. Steube. Okay. Well, it was my father who is not receiving now my campaign emails, so clearly that familial thing that you're talking about didn't apply to my emails.

Mr. Pichai. Our systems probably are not able to understand that your campaign -- I mean that it's your father. Obviously, we don't have that context there. We just apply it neutrally across, you know, all organizations and, you know --

Mr. Steube. Well, what assurances can you give me that there's -- my time is short. One last question. What assurances can you give me that any bias amongst your employees isn't influencing your spam folder algorithms?

Mr. Pichai. Congressman, there's nothing in the algorithm which has anything to do with political ideology, and, you know, we do get complaints across the aisle. For

CONFIDENTIAL

GOOG-AMI-000003672

example, the World Socialist Review complained in January of this year that, you know, their site wasn't found in Google Search results.

And so we get complaints.    We look into it, but, you know, we approach our work in a nonpartisan way, and it's in our long-term incentive to serve users across the country.    And today that's why we invest in our raters in 49 States across the U.S. so that we can capture all viewpoints.

Mr. Cicilline.    Thank you.    The gentleman's time is expired.

I now recognize the gentlelady from Florida, Mrs. Demings, for 5 minutes.

Mrs. Demings.    Thank you so much, Mr. Chairman.

And let me just say just for the record:    I'm a Democrat from Florida, and I've had -- heard complaints about my emails going into spam as well.    And I'm sure other Democratic Members have had the same experiences, unfortunately.

Mr. Pichai, in 2007 Google purchased DoubleClick, the leading provider of certain advertising tools.    Is that correct?

Mr. Pichai.    That is correct, Congresswoman.

Mrs. Demings.    When Google proposed the merger alarm bells were raised about the access to data Google would have, specifically the ability to connect to users' personal identity with their browsing activity.    Google, however, committed to Congress and to the antitrust enforcers that the deal would not reduce user privacy.

Google chief legal adviser testified before the Senate Antitrust Subcommittee that Google wouldn't be able to merge this data even if it wanted to, given contractual restrictions.    But in June of 2016, Google went ahead and merged its data anyway, effectively destroying anonymity on the internet.

Mr. Pichai, you became CEO of Google in 2015.    Is that correct?

Mr. Pichai.    That's right.

CONFIDENTIAL

GOOG-AMI-000003673

Mrs. Demings.    Okay.    And this change was made in 2016.    Is that correct?

Mr. Pichai.    That's my understanding.

Mrs. Demings.    Okay.    Thank you for that.    Did you sign off on this decision to combine the sets of data with -- that Google had told Congress would be kept separate?

Mr. Pichai.    Congresswoman, any changes we made, you know, we complied --

Mrs. Demings.    Mr. Pichai, with all due respect, please, did you sign off on the decision or not?

Mr. Pichai.    I review at a high level all important decisions we make.    We deeply care about privacy and security of our users, and we --

Mrs. Demings.    So you signed off on the decision?    Okay.    You signed off on the decision.

Practically, this decision meant that your company would not combine all of -- would now combine, for example, all of my data on Google, my search history, my location from Google Maps, information from my emails, from Gmail, as well as my personal identity with the record of almost all of the websites I visited.    That is absolutely staggering.

According to an email from a DoubleClick executive, that was exactly the type of reduction in user privacy that Google's founders had previously worried would lead to a backlash.    And I quote, they were unwavering on the policy due to philosophical reasons, which is Larry and Sergey's fundamentally not wanting users associated with a cross-site cookie.    They were also worried about a privacy storm as well as damage to Google's brand.    So, in 2007, Google's founders feared making this change because they knew it would upset their users, but in 2016, Google didn't seem to care.

Mr. Pichai, isn't it true that what changed between 2007 and 2016 is that Google gained enormous market power.    So.    While Google had to care about user privacy in

GOOG-AMI-000003674

2007.   It no longer had to in 2016?   Would you agree that what changed was Google gained enormous market power?

Mr. Pichai.   Congresswoman, this is an important issue, if I could explain.   You know, we today make it very easy for users to be in control of their data.   We have simplified their settings.   They can turn ad personalization on or off.   We have combined most of activity settings into three groupings.   We remind users to go do a privacy checkup.   1 billion users have done so, and 20 million people do it --

Mrs. Demings.   Okay, Mr. Pichai, thank you so much for that.   I am concerned that Google's bait and switch with DoubleClick is part of a broader pattern where Google buys up companies for the purposes of surveilling Americans, and because of Google's dominance users have no choice but to surrender.

In 2019, Google made over 80 percent of its total revenue through selling of ad placement.   Is that correct, Mr. Pichai?

Mr. Pichai.   A majority --

Mrs. Demings.   About 80 percent?   Yeah, okay.

And because Google sells behavioral ads, ads targeted to each of us as individuals, the more user data that Google collects, the more money Google can make.   More user data means more money.   Is that correct?

Mr. Pichai.   In general, that's not true.   For example --

Mrs. Demings.   More user data, not the more money Google collects?   I'm sorry, please.   So you're saying that the more user data does not mean the more money that Google can collect?

Mr. Pichai.   Congresswoman, most of the data today we collect is to help users and provide personal experiences back.   Ad data is not --

Mrs. Demings.   Okay.   Thank you so much, Mr. Pichai.

CONFIDENTIAL

GOOG-AMI-000003675

Mr. Chairman, I yield back.

Mr. Cicilline.    I thank the gentlelady.

The chair now recognizes the ranking member of the full committee, Mr. Jordan, for 5 minutes.

Mr. Jordan.    Thank you, Mr. Chairman.

Mr. Pichai, is Google going to tailor its features to help Joe Biden in the 2020 election?

Mr. Pichai.    Congressman, we approach our work -- you know, we support both campaign strategy.    We think political ads is an important part of free speech in democratic societies, and we engage with campaigns, you know, according to law, and we approach our work in a nonpartisan way.

Mr. Jordan.    It was a yes or no question.    Can you assure Americans today you won't tailor your features to help Joe Biden in the upcoming election?

Mr. Pichai.    You know, we support work that campaigns do.    I just want to make sure I am answering that clearly.

Mr. Jordan.    We understand that.    We all do all kinds of online social media, all kinds of that kind of -- that outreach, that communication.    This is a simple question: Can you today assure Americans you will not tailor your features in any way to help -- specifically help one candidate over another?    And what I'm concerned about is you helping Joe Biden over President Trump.

Mr. Pichai.    We won't do any work, you know, to politically tilt anything one way or another.    It's against our core values, Congressman.

Mr. Jordan.    But you did it in 2016.    There's an email in 2016 that was widely circulated amongst the executives at your company that got public where Ms. Eliana Murillo, head of your multicultural marketing, talks about the silent donation Google

GOOG-AMI-000003676

made to the Clinton campaign, and you applauded her work.    She points that out in the email.

I'm just curious, if you did it in 2016, I want to make -- and, you know, in spite of the fact you did it in 2016 President Trump won, I just want to make sure you're not going to do it again in 2020?

Mr. Pichai.    Congressman, I recall our conversation at that time, and I appreciate your concern.    We didn't find any evidence of such activity, and I took the opportunity after our conversation to reinforce to the company -- we realize even an appearance could be improper, so we have clearly communicated to our employees any personal political activity, while it's their right, needs to happen on their own time and resources and should avoid any use of company time.

Mr. Jordan.    Well, of course, everyone has got their First Amendment rights to campaign for who they want.    What they can't do is configure your features to help one candidate over the other.    So you might not have found any evidence, but here's what she wrote to the email to a number of key executives in your company, quote, "We push to get out the Latino vote with our features."    Second quote, "We push to get out the Latino vote with our features in key States."

It seems to me those last three words are the real qualifier here.    That is electioneering when you're trying to increase the Latino vote in key States.    And she'd already communicated that she was supporting Clinton, that she wanted Clinton to win.

So, when she talks about increasing the Latino vote, which she assumes is going to help candidate Clinton, and she's doing that in key States -- it's one thing if you're going to increase the Latino vote around the country.    If you're just a good, corporate citizen, you're urging people to vote.    It's quite another when you're focusing on in key States. And you know what those key States were?    Nevada and Florida, the swing States.    So,

GOOG-AMI-000003677

RPTR PANGBURN

EDTR HOFSTAD

[3:17 p.m.]

Mr. Pichai.    I can assure you that we complied with laws in 2016.    As a company, any work we do around elections is nonpartisan.    Users do come to us for understanding where polling places are, where to vote, which is the date to vote, what the voting hours are.    We have committed to providing that information, and I can assure you that we'll approach our work in a nonpartisan --

Mr. Jordan.    So, Mr. Pichai, here's the question I think's on so many Americans' minds.    They saw the list that we read here earlier on in our opening statements, all the things Google has done.    Google is siding with the World Health Organization over anyone who disagrees with them, even though the World Health Organization obviously lied to America, obviously shills for China.    Google's siding with them; YouTube is siding with them.

We have the history of all the things Google has done and the history of what happened in 2016 in the election, where they obviously, according to one -- your multicultural marketing executive tried to help Clinton.    And here we are, 97 days before the election, and we want to make sure it's not going to happen again.

Can you give us two assurances:    one, you're not going to try to tailor your features, configure your platform in a way to help Joe Biden; and, second, that you're not going to use your search engine to silence conservatives?    Can you give us those two assurances today?

Mr. Pichai.    Congressman, on our search engine, conservatives have more access to information than ever before --

CONFIDENTIAL

GOOG-AMI-000003678

Mr. Jordan.    And we appreciate that.    That wasn't the question.    Can you assure us today you're not going to try to silence conservatives?    And can you assure us today you're not going to try to configure your features, as Ms. Murillo said you did for Clinton in 2016 -- can you assure us today you're not going to do the same thing for Joe Biden in 2020?

Mr. Pichai.    You know, you have my commitment.    It's always been true, and we'll continue to conduct ourselves in a neutral way.

Mr. Jordan.    Appreciate it.

I yield back.

Mr. Cicilline.    The chair now recognizes the gentlelady from Pennsylvania, Ms. Scanlon.

Ms. Scanlon.    Thank you, gentlemen.    I'd like to redirect your attention to antitrust law rather than fringe conspiracy theories.

Mr. Bezos, our investigations --

Mr. Jordan.    Mr. Chairman, we have the email.    There is no fringe conspiracy --

Mr. Cicilline.    Excuse me.

Mr. Raskin.    It's not your time.

Mr. Cicilline.    Mr. Jordan, you do not have the time.

Mr. Jordan.    But -- but -- but --

Mr. Cicilline.    Please be respectful of your colleague.

Mr. Jordan.    -- when someone directly --

Mr. Cicilline.    She controls the time.

Mr. Jordan.    -- directly --

Mr. Raskin.    Put your mask on.    Put your mask on.

Mr. Jordan.    Mr. Raskin --

CONFIDENTIAL

GOOG-AMI-000003679

have to go to separate places for books or groceries or videos or electronics.    How are the consumers helped by that?

Mr. Bezos.    Sir, thank you.    They would not be.

Mr. Sensenbrenner.    Right.

Mr. Bezos.    That's very clear.

Mr. Sensenbrenner.    Now, Mr. Pichai, let me ask about Google.    If you were forced to split up your business lines, say, spin off ad tech and YouTube, can you describe what happens to consumers there?

Mr. Pichai.    Congressman, today, consumers in most of the areas we are dealing with, they see prices free or falling, and they get more choice than ever before.    So I think it serves them well.

Mr. Sensenbrenner.    And you're right there.

So, you know, I'm not going to be on this committee in the next Congress.    I am going to put my feet up and become a senior, quote/unquote, statesman.

But, you know, let me say that we have heard a whole lot of complaints about Big Tech.    Some of them are political in nature, and I share the complaints and the concern of Mr. Jordan and others.    And others talk about allegedly anticompetitive activity.

It seems to me that it's not for Congress that legislates to toss all of our antitrust laws and the precedent that has been established through litigation over the last 100-plus years, but it's something where we ought to go back to the regulators, to the enforcers, have them look at this stuff, and have them make a determination on whether or not the law has been violated.    I think the law is good on that, and we don't need to throw it all in the wastebasket.

But there are some matters of concern that we have heard from both sides of the aisle that I think need to be addressed.    And if it requires an agency like the FTC to say

GOOG-AMI-000003680

Mr. Cook.    I would love to engage on the legislation with you, Congressman. But let me be clear:    Forced labor is abhorrent, and we would not tolerate it in Apple. And so I would love to get with your office and engage on the legislation.

Mr. Buck.    Thank you.

Mr. Pichai?

Mr. Pichai.    Congressman, I share your concern in this area.    I find it abhorrent as well.    Happy to engage with your office and discuss this further.

Mr. Buck.    So I really don't want to even engage with my office half the time. Will you guys agree that slave labor is not something that you will tolerate in manufacturing your products or in products that are sold on your platforms?

Mr. Pichai.    I agree, Congressman.

Mr. Buck.    And Mr. Cook?

Mr. Cook.    We wouldn't tolerate it.    We would terminate a supplier relationship if it were found.

Mr. Buck.    Mr. Zuckerberg?

Mr. Zuckerberg.    I agree, we wouldn't tolerate this, and if we found anything like this, we would also terminate any relationship.

Mr. Buck.    And Mr. Bezos?

Mr. Bezos.    Yes, I agree completely.

Mr. Buck.    Great.    Thank you very much, gentlemen.

And I yield back.

Mr. Cicilline.    [Presiding.]    I thank the gentleman.

I now recognize the gentleman from Maryland, Mr. Raskin, for 5 minutes.

Mr. Raskin.    Thank you, Mr. Chairman.

I want to thank Mr. Buck for that excellent line of questioning and for the

GOOG-AMI-000003681

from this memo from The Daily Caller.    It says -- or that, I'm sorry, that The Daily Caller obtained from your company.

It says, "The beginning of the workflow starts when a website is placed on a watchlist."    It continues, "This watchlist is maintained and stored by Ares, with access restricted to policy and enforcement specialists."    It sort of does beg the question who these enforcement specialists are.

"Access to the listing can also be shared on a need-to-know basis to enforce or enrich the policy violations.    The investigation of the watchlist is done in the tool Athena, the Ares manual review tool."

So you said to Congresswoman Lofgren that there was no manual review tool, and then your documents indicate that there is a manual review tool.    So help us understand the inconsistency.

Mr. Pichai.    Congressman, there are two parts to this.

In general, you know, we algorithmically approach our search results.    We have robust policies to do so.    And we test it both with user feedback and we use raters to validate.    Last year alone, we ran over 300,000 experiments and launched around 3,000 improvements to Search.

And we don't manually tune.    The question last time was in the context of, is there someone behind the curtain manually tuning an individual search result?    We don't.    We generally approach it algorithmically.

We, however, in order to comply with the law in every country we operate in -- for example, there may be an actor or a website identified as interfering in elections, and we then have to put that site on a list so that that doesn't appear in our search results against queries.    So other examples would be violent extremism --

Mr. Gaetz.    And is that done manually, Mr. Pichai?    That process you described,

CONFIDENTIAL

GOOG-AMI-000003682

is that done manually?

Mr. Pichai.    And we could get reports from law enforcement agencies.    You know, we are complying with -- or it's a known --

Mr. Gaetz.    There is either a manual component or there is not a manual component.    Which is it?

Mr. Pichai.    For creating those lists, that process can involve a manual portion.

Mr. Gaetz.    Okay.    Great.    Well, that is sort of the concern that I have. You've now said something different today than you said to Ms. Lofgren, because you've confessed that there is a manual component to the way in which you blacklist content. And it seems to be no coincidence that sites like Gateway Pundit, The Western Journal, American Spectator, Daily Caller, and Breitbart receive the ire or the negative treatment as a consequence of your manual tooling.

And it also seems noteworthy that whistleblowers at your own company have spoken out.    You said that one of the reasons you maintain this manual tool is to stop election interference.    I believe it is, in fact, your company that is engaging in election interference.    And it's not just my view.    Mike Wacker came out and was a whistleblower, indicating that the manual blacklist targets that Google specifically goes after are those who support President Trump, who hold a conservative viewpoint.    And he left your company in 2019 because he was speaking out against these "outrage mobs."

So can you see how, when you empower individuals, some of the same individuals that Project Veritas has exposed as labeling people as terrorists who say "Make America Great Again" or who support the President, that that, in fact, can be the very election interference that we're concerned about and that you're using your market dominance in Search to accomplish that election interference?

Mr. Pichai.    Congressman, with respect, I strongly disagree with that

                                        GOOG-AMI-000003683

characterization.    We don't approach this work with any political viewpoint.    We do that to comply with law, known copyright violations, in very narrow circumstances.    And we have to do that to comply with the law.    And, in many cases, those requests can come from law enforcement agencies --

Mr. Gaetz.    Your own employees are saying --

Mr. Cicilline.    The time of the gentleman --

Mr. Gaetz.    -- you're doing it for a different reason.

Mr. Cicilline.    The time of the gentleman has expired.

Mr. Gaetz.    Your own employees are saying it's political bias.

I yield back.

Mr. Cicilline.    Thank you, Mr. --

Mr. Gaetz.    Oh, I'm sorry.    May I be recognized for a unanimous consent request?

Mr. Cicilline.    Yes.

Mr. Gaetz.    Mr. Chairman, just, given the productivity of our discussion, I'd request that we be permitted a third round of questioning.

Mr. Cicilline.    Without objection.

I now recognize the chairman of the full committee, Mr. Nadler.

Chairman Nadler.    Yeah.    You know, the documents prove -- the news and journalism industry in this country are in economic free fall.    Over 200 counties in America no longer have a local newspaper, and tens of thousands of journalists have been laid off in recent years.

The reason journalism is in free fall is that Google and Facebook now capture the vast majority of digital ad revenue.    Although news publishers produce valuable content, it is Google and Facebook that increasingly profit off their content.    Publishers have told

CONFIDENTIAL

GOOG-AMI-000003684

advertising or to develop and refine its algorithms?

Mr. Pichai.    Mr. Chairman, we do use data to improve our products and services for our users.    Anytime we do it, we believe in giving users choice, control, and transparency; we make it very clear.    And we give them simplified settings to choose how would they like their data to be used.

Chairman Nadler.    So you do use the data that you get from these companies for your purposes.

Mr. Pichai.    My understanding was whether we use data in general to improve our products and services.    And, you know, we do use data to show ads, but we give users a choice; they can turn ads personalization on or off.    And --

Chairman Nadler.    No, this -- obviously, the use of this data from all these companies gives you a tremendous advantage over them and over any competitor.

Does the ability to make money in any way affect Google's algorithm in terms of what news appears in a typical user's search results?

Mr. Pichai.    The way we rank our search results, you know, we don't take into account a commercial relationship that we have.

Chairman Nadler.    Okay.    But Facebook and Google have gravely threatened journalism in the United States.    Reporters have been fired.    Local newspapers have been shut down.    And now we hear that Google and Facebook are making money over what news they let the American people see.    This is a very dangerous situation.

And, unfortunately, my time has expired and I have to yield back.    --

Mr. Cicilline.    I thank the gentleman for yielding.

I now recognize the gentleman from Florida, Mr. Steube, for 5 minutes.

Mr. Steube.    Thank you, Mr. Chairman.    I'm just going to pick up where I left off.

Mr. Pichai, there are rioting groups that are going unchecked with the posting of

GOOG-AMI-000003685

what I would contend is very violent video.   Yet, yesterday, I was sent a YouTube video about doctors discussing hydroxychloroquine and discussing the not-dangers of children returning to school, and when I clicked on the link, it was taken down.

And then I was sent a different link on YouTube, and it was taken down.   I just checked again, just to make sure, and it says that this video has been removed for violating YouTube's community guidelines.

How can doctors giving their opinion on a drug that they think is effective for the treatment of COVID-19 and doctors who think it's appropriate for children to return back to school violate YouTube's community guidelines, when all of these videos of violence is all posted on YouTube?

Mr. Pichai.   Congressman, we believe in freedom of expression.   And there is a lot of debate on YouTube about effective ways to deal with COVID.   We allow robust debate.

But in the area, during a pandemic, we look to local health authorities -- so, for example, in the U.S., it would be CDC -- for guidelines around medical misinformation in a narrow way which could cause harm in the real world.

And so, for example, if there are aspects of a video and if it explicitly states something could be a proven cure, and that doesn't meet CDC guidelines, you know, we would remove that --

Mr. Steube.   But it's free expression of speech.   And you have these doctors who are giving their opinion as doctors.   And I don't understand why YouTube and, therefore, Google thinks it's appropriate to silence physicians and their opinion of what can help and cure people with COVID-19.

I'm going to switch quickly to Mr. Zuckerberg.

I think at this point it's fairly obvious that technology platforms have been stifling

GOOG-AMI-000003686

move forward there.

Mr. Bezos.   Yes, Congressman.   That is an important issue, and I understand it, and we will get -- I will get back to your office on that.

Mr. Armstrong.   All right.   Earlier this year, Google announced plans to retire third-party cookies that websites attached to users' browsers, and this allows users to be tracked across the internet.   A consequence of that change is that it will put other digital advertising market participants at a disadvantage because they can no longer track users.

And at the very, very danger of being pro-cookie, because I'm not when I use my computer as well, but -- and I understand that there are legitimate privacy concerns with third-party cookies, but I do want to focus on the competition aspect.

Did this asset -- action also place Google at a disadvantage, or does Google have alternative means of collecting that user data to inform its digital advertising activities, Mr. Pichai?

Mr. Pichai.   Congressman, as you rightly pointed out, this is an area where we have focused on user privacy, and users clearly don't want to be tracked with third-party cookies.   In fact, other browser vendors, including from Apple and Mozilla Foundation have also implemented these changes.

We are doing it thoughtfully, giving time for the industry to adapt because we know publishers depend on revenue in this area.   But it's an important change, and I think we have to be focused on privacy to drive the change forward.

Mr. Armstrong.   But you have other ways of collecting that information, correct?

Mr. Pichai.   On our first-party services, you know, we don't rely on cookies, and obviously when people come and type and do search --

Mr. Armstrong.   I'm not asking if you rely on cookies.   I'm asking you, do you have other ways of collecting it through Gmail or consumer facing platforms, right?

CONFIDENTIAL

GOOG-AMI-000003687

Mr. Pichai. We don't use data for Gmail for ads, Congressman. But to the extent on the services where we provide ads and if users have consented to ads personalization, yes, we do have data.

Mr. Armstrong. Thank you. I yield back.

Mr. Cicilline. The gentleman yields back.

I now recognize the gentlelady from Florida, Mrs. Demings, for 5 minutes.

Mrs. Demings. Thank you so much, Mr. Chairman.

Mr. Zuckerberg, during discussions of changing Facebook's platform policy in 2012, you said that, and I quote, in any model, I'm assuming we enforce our policies against competitors much more strongly. It sounds like Facebook weaponizes its policies to target competitors. Why would Facebook enforce its policies against competitors more strongly?

Mr. Zuckerberg. Congresswoman, when we were a much smaller company, we saw that --

Mrs. Demings. This is 2012 now. This was in 2012, so, please, go right ahead.

Mr. Zuckerberg. Sure. We've had policies in the past that have prevented our competitors, which at the time we were primarily worried about larger competitors from using our platforms to grow and compete with us. So we had some of those policies. We continually reviewed them over time and since then we've --

Mrs. Demings. Okay. Mr. Zuckerberg, in 2013, a senior Facebook employee identified MessageMe as a fast-growing app on Facebook and said that we will restrict their access. Was this another example of enforcing Facebook's policies against competitors much more strongly, MessageMe?

Mr. Zuckerberg. Congresswoman, I'm not familiar with that specific example, but we did have that policy. We evaluated it since then and changed our policies.

CONFIDENTIAL

GOOG-AMI-000003688

So I think both in the case of these content moderators and in the case of the testimony you just gave regarding Mr. Luckey and firing people over their politics, there is serious question as to whether or not you're giving truthful testimony here or whether it's lying before Congress.

I see my time is expired, and I'll yield back.

Mr. Cicilline.    The gentleman yields back.

I now recognize the gentlelady from Pennsylvania, Ms. Scanlon.

Ms. Scanlon.    Thank you, Mr. Chairman.

Mr. Pichai, I wanted to focus a little bit on Google's acquisition of YouTube and some of the consequences of that move for consumer privacy and competition.    Now, Google purchased YouTube in 2006 after identifying it as a potential rival that could eventually draw business away from Google, and it's my understanding Google paid $1.65 billion for that acquisition, nearly 30 times its original bid of $50 million.

So could you tell us why Google was willing to pay so much more beyond the initial proposed bid, and was this as the result of any analysis on the harm Google would suffer if a competitor had purchased YouTube?

Mr. Pichai.    Congresswoman, we acquired YouTube in 2006, and this was well before my time there as CEO, and I wasn't directly involved, but, you know, what I do recall at the time is that we saw it as a new emerging area, and we are -- our mission is to help users with information.    We saw an opportunity and it wasn't clear.    We only had 67 people.

Ms. Scanlon.    Okay.    Was Mr. Page in charge of that decision?

Mr. Pichai.    Congresswoman --

Ms. Scanlon.    You don't know, okay.

Mr. Pichai.    -- I wasn't directly involved, but I am pretty sure our senior

GOOG-AMI-000003689

leadership team at that time definitely looked into it.

Ms. Scanlon.   Okay.   I would encourage the subcommittee to take the steps necessary to have us hear from whoever it was in charge of that.

Moving on, Google is now by far the top online site where Americans watch videos, including children's videos.   And as I'm sure you're aware, Federal law prevents companies from collecting data on children under 13.   However, just last year, the Federal Trade Commission found that Google had spent years knowingly collecting data on children under 13 on YouTube and offering advertisers the ability to target those children directly.

Mr. Pichai, did YouTube use the data it illegally acquired to improve its ability to target ads to children?

Mr. Pichai.   We are -- you know, we are -- this is an area, you know, we take it very seriously.   I'm a parent too.   We have invested tremendously.   We have a dedicated product for kids in YouTube Kids on the main YouTube platform.   We make sure we have clear policies.   We enforce them rigorously.

Just in Q4 in 2019, we flagged and removed almost close to 1 million videos potentially for concerns around child safety.   So it is an area we are investing rigorously, and we'll continue to do so.

Ms. Scanlon.   Okay.   Well, I'm more concerned about the fact that you're investing rigorously in luring in advertisers like toy makers Mattel and Hasbro by telling them that YouTube is the number one website regularly visited by kids.   So that sounds like you're targeting the kids and then targeting advertisers to bring them on board.   Is that correct?

Mr. Pichai.   To date, in the main site of YouTube, we don't allow anyone under 13 to create accounts.   There are scenarios in which there could be family viewing, and

CONFIDENTIAL

GOOG-AMI-000003690

today there are creators who create content oriented to its families, and as part of that, there our advertisers which are interested in connecting with those users.    But everything we do here we obviously comply with all the applicable regulations and it's --

Ms. Scanlon.    Okay.    Well, let's look at some of the content that is specifically for children.    COPPA makes it illegal to target those kids, but we've got an issue where content creators are in a very difficult position now.    So, if a show like Sesame Street doesn't want to show ads for junk food on YouTube, does YouTube allow it to make that choice?

Mr. Pichai.    Today, we do -- you know, we have choices both for creators in terms of, you know, tools and preferences, and we have extensive tools for advertisers. And although while for users we give it choice, they can either use YouTube as a subscription service without seeing those types of ads, or, you know, they can use it for free with ads.

So we give choice, and, you know, for us it is a lot -- most importance that YouTube is a place where people come to learn, and, you know, we find increasingly small and medium businesses use YouTube to thrive especially even during COVID particularly many --

Ms. Scanlon.    Okay.    Let's go back to content that's designed for children.    So, you know, if there's an organization like Sesame Street that wants to provide child-centered content but they don't want that content to be sullied, shall we say, with junk food ads or something, my understanding is that you say that the content creators can do that.

But we've got a recent report from The Wall Street Journal that says YouTube hasn't been honoring those requests, and it's been making it difficult for independent auditing companies like OpenSlate to independently audit that and then report back to

those content creators about whether or not YouTube is honoring those.    Is that correct?

Mr. Pichai.    I'm not familiar with the particular report, but I'm happy to understand it better and, you know, have my office follow up with your staff, Congresswoman.

Ms. Scanlon.    I would appreciate that.    And my time is expired.    I yield back.

Mr. Neguse.    [Presiding.]    The gentlewoman yields back.

The chair will now recognize himself for 5 minutes.

Mr. Bezos, thank you for being here today.    In your opening statement, you -- reviewed your written testimony -- you indicated, and I'll just quote, that Amazon accounts for less than 1 percent of the $25 trillion global retail market and less than 4 percent of retail in the U.S., end quote.

When you refer to retail -- I take it based on the empirical studies I reviewed -- you're referring to a broad definition of retail that includes restaurants, bars, gas stations, it's a fairly all-encompassing view of retail.    I wonder if you know what percentage of Amazon's sales are represented in the terms of online retail sales, the e-commerce market stream?

Mr. Bezos.    The figures I've seen for -- you know, I don't -- with all respect, I don't accept that e-commerce is a different market, but as a different channel, what I've seen is sort of 30 to 40 percent is the outside studies that I've seen where Amazon's share of that e-commerce channel.

Mr. Neguse.    And that's consistent with the data that I have seen.

Mr. Bezos.    Okay.

Mr. Neguse.    The latest figure I saw was 40 percent.    And so, in terms of how we define it, whether it's a stream or a channel, nonetheless, I do think that factually it's

CONFIDENTIAL

GOOG-AMI-000003692

And Facebook gets away with it because you're the only game in town.    There's no competition forcing you to police your own platform.    Allowing this misinformation to spread can lead to violence, and, frankly, I believe it strikes at the very heart of the American democracy.

And, with that, I now recognize the gentleman from Florida, Mr. Gaetz, for 5 minutes.

Mr. Gaetz.    Thank you, Mr. Chairman.

Mr. Pichai, in 2016, there was an internal Google meeting.    You attended that meeting along with Sergey Brin.    A video of that meeting was leaked to Breitbart.    And at the meeting, top Google executives, including Kent Walker, lamented Trump's victory, they compared Trump voters to extremists, and it was discussed that there was an intent to make the Trump win a blip in the populous movement in American history.

Now, I know you've testified today in response to my questions and Mr. Jordan's questions that you don't intend this time to engage in electioneering on behalf of the former Vice President.    But given the video evidence of senior members of your team in your presence saying that they had the intent to make the Trump victory a blip, why should we believe that testimony today?

Mr. Pichai.    Congressman, we do not have a view on -- we respect the democratic process.    We are deeply committed to it.    As a company, we take pride in the information we provide to help people participate in free elections, and we are deeply committed to it, as I said to Congressman Jordan as well.

Mr. Gaetz.    Do you remember that meeting in 2016?

Mr. Pichai.    Congressman, yes, I do.    Yes, I do.    It was in the context of, you know, to the election across both sides, there was a lot of opinions.    And as you know, elections are kind of a polarizing moment generally in the country, and there was a lot of

CONFIDENTIAL

GOOG-AMI-000003693

rhetoric about certain issues which were protecting our employees and --

Mr. Gaetz.    Oh, I understand rhetoric.    I guess the question is, when the senior members of your team in your presence said that they did have the intent to change the outcome in a subsequent election and then, since that moment in time, where we've seen all of these conservative websites and conservative viewpoints censored, you can understand why people would be concerned.

So, after your employees and top executives said in your presence that they intended to make the Trump victory a blip, what action did you take as the CEO to protect and preserve the neutrality of your platform?

Mr. Pichai.    Congressman, no one had a view on, you know, ever interfering with elections or so on.    But what I can tell you is we have made it very clear -- about 2 years ago, we announced new community guidelines for within Google clearly making it clear that, you know, employees can -- obviously are free to have their political views.

But none of that should ever -- they shouldn't bring that as they work on any of our products, and if we found any evidence that people are using a political agenda to manipulate any of our content platforms, we will take strong enforcement action.

Mr. Gaetz.    Well, unfortunately, we have sort of a string of events here.    We have the 2016 meeting, where people demonstrated their intent to make changes to hurt the President.    Then we have your testimony today that's a little different than your testimony from December where you say people can manipulate blacklists.

And then you have the outcome, where sites like Breitbart and Gateway Pundit and others see that disparate treatment.    So it really doesn't take Sherlock Holmes here to connect the dots and see what Google is doing.

I'm going to move on with my final 90 seconds.    Mr. Bezos, I am deeply moved by your personal story.    I am not here accusing you as someone who would ever traffic in

GOOG-AMI-000003694

RPTR PANGBURN

EDTR HOFSTAD

[5:38 p.m.]

Mr. Cicilline.    The gentleman's time has expired.

I now recognize the gentleman from Florida, Mr. Steube.

Mr. Steube.    Thank you, Mr. Chairman.

I have a question for all four, a yes-or-no answer.    Do you believe that the Chinese Government steals technology from U.S. companies?

We'll start with Mr. Cook.

Mr. Cook.    I don't know of specific cases where we have been stolen from by the government.

Mr. Steube.    So you don't believe that the Chinese Government is stealing technology from U.S. companies?    Or you're just saying not from yours?

Mr. Cook.    I'm saying I know of no case, ours, where it occurred, which is -- I can only speak to firsthand knowledge.

Mr. Steube.    Mr. Pichai, do you believe that the Chinese Government steals technology from United States companies?

Mr. Pichai.    Congressman, I have no firsthand knowledge of any information stolen from Google.

Mr. Steube.    Mr. Zuckerberg?

Mr. Zuckerberg.    Congressman, I think it's well-documented that the Chinese Government steals technology from American companies.

Mr. Steube.    Yeah.    Thank you.

Mr. Bezos?

CONFIDENTIAL

GOOG-AMI-000003695

understanding is that Google cited a concern that third-party digital ad participants would develop user profiles based on this viewing.    It is also my understanding that, even under the GDPR, you allow users to provide consent which would authorize this type of activity.

It seems that this policy, regardless of the privacy concerns, reduced competition for demand-side platforms on YouTube.    Do you agree?

Mr. Pichai.    Congressman, we are always looking to improve the YouTube experience.    Part of being able to integrate the space while in YouTube, we've been able to innovate with something called TrueView ads.    So, for users, we give them skippable ads.    If they find the ads not to be relevant, they can skip past those ads.

And, you know, monetizing YouTube well is what allows -- today, we have many, literally hundreds of thousands of creators earning a livelihood.    And many of them are small and medium businesses.    So we want to support that well, and so we are focused on that.    Allowing this type of integration is what allows us to create that user experience.

Mr. Armstrong.    But after Google stopped allowing third parties to buy YouTube ads via AdX, Google limited the interoperability of third-party analytics on YouTube.    You now require the use of ads on Data Hub.

Again, the justification is based on user privacy.    Other ad market participants may not have access to that data, but it doesn't disappear, does it?

Mr. Pichai.    Congressman, this is consistent with how today many services, be it Facebook or Snapchat or Pinterest, you work with their ad tools to buy ads on their properties.    I think we are trying --

Mr. Armstrong.    Well, I understand that, but the excuse is privacy.    But the data doesn't disappear; you just have greater control over it, right?

CONFIDENTIAL

GOOG-AMI-000003696

Mr. Pichai.   Congressman, it's a service we provide to our users.   We obviously want to make sure we protect the privacy of users there.

We do monetize with ads.   We give users a choice of either consuming it as a subscription service or using it with ads.   And we've been very focused on making YouTube a great platform for creators, and I think the model is working well.   It's really helped many small and medium businesses to invest on the platform and grow their businesses.

Mr. Armstrong.   So, regardless if the intent was to lessen competition or not, the action resulted in smaller competitors unable to participate in placing ads on YouTube. Isn't that correct?

Mr. Pichai.   Congressman, we see robust choice for, you know, advertisers.   You know, there are several alternatives.   There is, obviously, Facebook's suite of products. There is Amazon with their ads marketplace.   There is companies like Snapchat, Pinterest, Twitter that are new competitors who have emerged.   And this is why we have seen advertising costs decline by 40 percent in the last 10 years.   And so we see dynamism in the marketplace.   We are focused on --

Mr. Armstrong.   Yeah, but here is my issue.   And there are policies that actually protect user privacy:   Apple's encryption policy.   Microsoft just came out on facial recognition policy.   My concern is that your -- the position is that, when we're using privacy, we're trying to use privacy and we're using privacy as a shield, but what we're really doing and what your company is really doing is using it as a cudgel to beat down the competition.

And when we're talking about privacy, it's a great word that people care about, but not when it's utilized to control more of the marketplace and squeeze out smaller competitors.

CONFIDENTIAL

GOOG-AMI-000003697

mob.

Are the rest of you concerned about the cancel culture mob and what it's up to?

Mr. Pichai?

Mr. Pichai.    Congressman, I'm sorry.    I had momentary difficulty hearing.

But, you know, I can -- we've built platforms which allow for freedom of expression.    And we take pride in the fact that, across our platforms, including YouTube, there are more diverse voices than ever before.    It is something we have committed --

Mr. Jordan.    That's fine.    That's fine.    I'm just saying, are you -- I'm concerned about it.    And, again, I'm concerned about it not just because conservatives get attacked.    I'm concerned when anyone gets attacked for expressing a viewpoint.    I thought we had a First Amendment, and yet they constantly get attacked.

How about you, Mr. Zuckerberg?

Mr. Zuckerberg.    Yes, Congressman, I believe strongly in free expression.    Giving people a voice is an important part of what our services do.    And I am very worried about some of the forces of illiberalism that I see in this country that are pushing against free expression.    I think that this is one of the fundamental democratic traditions that we have in our country, and it's how we make progress over the long term on a number of issues.    And our company is committed to doing what we can to --

Mr. Jordan.    Mr. Bezos?

Mr. Zuckerberg.    -- protect people's voice.

Mr. Jordan.    Thank you, Mr. Zuckerberg.

Mr. Bezos?

Mr. Bezos.    Yes, sir, I am concerned in general about that.    And what I find and I find a little discouraging is that it appears to me that social media is a nuance-destruction machine, and I don't think that's helpful for a democracy.

CONFIDENTIAL

GOOG-AMI-000003698

you're out there -- if you're out there criticizing what the cancel culture mob is doing to this country.   And people see it every single day.   And I hope you'll do it.   I hope you'll -- you all said you disagree with it.   I hope you'll really speak out against it and be fair with all viewpoints.

I yield back.

Mr. Cicilline.   The gentleman yields back.

I recognize the gentlelady from Washington, Ms. Jayapal.

Ms. Jayapal.   Thank you, Mr. Chairman.

Mr. Pichai, I direct my questions to you.   Many of us feel a deep urgency to protect independent journalism, and I wanted to talk a little bit about ad revenue and independent journalism.

Google makes most of its revenue through selling advertising.   And Google's advertising exchange is a, quote, "real-time marketplace to buy and sell display advertising space," correct?

Mr. Pichai.   Yes, Congressman, that's correct.

Ms. Jayapal.   And over 2 million websites, including online newspapers, use that exchange, correct?

Mr. Pichai.   We are very proud to support publishers, and I don't have the exact numbers, but, yes, that seems --

Ms. Jayapal.   Okay.   Well, that's an estimate put forth by tech expert Dina Srinivasan.   And your own website for Google Display Network says you have access to over 2 million sites.

What is Google's share of the ad exchange market?

Mr. Pichai.   Congressman, I'm not exactly familiar.   I've seen various reports, but, you know --

CONFIDENTIAL

GOOG-AMI-000003699

Ms. Jayapal.    Okay.

Mr. Pichai.    -- we are a popular choice.

Ms. Jayapal.    Great.    Let me put it up for you.    If you look at the screen, you will see that 50 to 60 percent -- Google has 50 to 60 percent, according to the online platforms and digital advertising CMA market study that was just released.

And, in order to buy and sell on these exchanges, websites and advertisers go through a middleman, like Google's DV360 and Google Ads.    If you look at the slide, Mr. Pichai, you can see that the share of this buy-side market that Google has is 50 to 90 percent, according to the same study.

And I just want to simplify how these exchanges work.    So, say, in Seattle, Dee's Electronics, a mom-and-pop business, wants to buy online ad space in The Seattle Times. Dee's Electronics would need to go to a middleman, like Google Ads, which would then bid for ad space on an ad exchange.

And the problem is that Google controls all of these entities.    So it's running the marketplace, it's acting on the buy side, and it's acting on the sell side at the same time, which is a major conflict of interest.    It allows you to set rates very low as a buyer of ad space from newspapers, depriving them of their ad revenue, and then also to sell high to small businesses who are very dependent on advertising on your platform.

It sounds a bit like a stock market, except, unlike a stock market, there's no regulation on your ad exchange market.    If there were regulation, it would actually prohibit insider trading, which means that the broker can't use the data in the broker division to buy and sell for their own interest.    Instead, brokers have to serve the clients, their clients.

Does Google have a similar obligation to serve its clients, the businesses that are selling and buying ad space?

CONFIDENTIAL

GOOG-AMI-000003700

Mr. Pichai.    Congresswoman, if I could explain this for a minute.    We paid over $14 billion to publishers.    We are deeply committed to journalism.    In this area, on an average, we pay out 69 percent of the revenue when publishers use Google's buy and sell side too.    And, you know, out of -- it's a low-margin business for us.    We do it because we want to help support publishers --

Ms. Jayapal.    Right.

Mr. Pichai.    -- in this area.

Ms. Jayapal.    No, I understand that, Mr. Pichai.    What I'm trying to get at is, when any company controls the buy and the sell side -- I worked on Wall Street a very long time ago.    There are reasons that insider trading is regulated.    And this ad exchange is essentially the same thing.    And without accountability, it isn't meaningful to just care about the newspapers.    We're seeing them die all over, and ad revenue is a big reason.

Let me put up a graph here that shows that Google's ad revenue is increasingly coming from ads on Google-owned sites and less so from other websites.    Can you explain that trend?

Mr. Pichai.    I can't quite see whether this is net revenue or gross revenue. Obviously, when it comes to non-Google properties, we share the majority of revenue back to publishers, whereas, on our own properties, we obviously -- you know, we have the inventory.

But I would need to understand more.    I just quickly looked at it.    I'm not sure I fully grasp the --

Ms. Jayapal.    Okay.    We can send it to you and make sure you have it.

You know, Google has not made its search traffic volumes public in years, so there's no way for us to know exactly what's happening here.    And there's no way for

GOOG-AMI-000003701

businesses to verify whether they've been treated fairly or left behind in favor of Google-owned companies.

Is Google steering advertising revenue to Google Search?

Mr. Pichai.    Congresswoman, users come to Google Search.    It is that traffic and -- you know, that's where our source of revenue comes from.

So we are focused on providing users the information they are looking for.    We work hard to earn that trust.    We know competition for information is just a click away --

Ms. Jayapal.    Thank you, Mr. Pichai.

I just want to make the point that independent journalism is incredibly necessary to our democracy, and we want to do what we can to protect it.

I want to just ask one last question of Mr. Zuckerberg.

Over 1,100 companies and organizations pulled their advertising business from Facebook as part of the Stop Hate for Profit campaign to protest the spread of hate speech and disinformation.    But you had a staff meeting earlier this month where you told employees, "We're not going to change our policies or approach because of a threat to any percent of our revenue.    My guess is all these advertisers will be back on the platform soon enough."

Mr. Zuckerberg, are you so big that you don't care how you're impacted by a major boycott of 1,100 advertisers?

Mr. Zuckerberg.    No, Congresswoman.    Of course we care.    But we're also not going to set our content policies because of advertisers.    I think that that would be the wrong thing for us to do.

We've cared about issues like fighting hate speech for a long time, and we've invested billions of dollars -- and I've talked about today how we have tens of thousands of content reviewers.    We've built AI systems that proactively identify the

GOOG-AMI-000003702

majority -- we're now at 89 percent of the hate speech that we remove before anyone even reports it to us.

We're going to continue getting better at that.    And I think that those investments over time and the results that we put up will be recognized by people, since I do believe that they are industry-leading.

And I think that our advertising also is, for a lot of small businesses, the most effective or among the most effective ways that they can find and reach new customers --

Ms. Jayapal.    Thank you -- thank you, Mr. Zuckerberg.

My time has expired, but I would just say that, I know you've commissioned your own civil rights audit.    I don't think that you've implemented all those recommendations yet.    I hope you will move quickly to implement those.    This is a critical time, as we watched the body of John Lewis leave us here in the Capitol, that we focus on civil rights.

Thank you, Mr. Chairman.    I yield back.

Mr. Cicilline.    Before I call on the next witness, I want to recognize Mr. Pichai, who I think wants to make a correction for the hearing.

Mr. Pichai.    The only correction -- thanks, Mr. Chairman.

There was a question earlier about information with respect to China.    I just wanted to acknowledge on record that I recall in 2009 we had a well-publicized cyber attack originating there, which did exfiltrate some code from there.    I just wanted to correct that.

Mr. Cicilline.    Thank you, Mr. Pichai.    The record will so reflect.

I recognize the gentlelady from Pennsylvania for 5 minutes.

Ms. Scanlon.    Thank you, Mr. Chairman.

In March 2020, Amazon announced that it was going to start delaying shipments of nonessential products in order to better serve customers and meet need while helping

CONFIDENTIAL

GOOG-AMI-000003703

hurt them.    We respect innovation.    It's what our company is built on.    We would never steal somebody's IP.

But I will follow up with your office on more detail on this.

Mr. Neguse.    Well, and I appreciate that, Mr. Cook.    Because I think, to the extent that Apple were willing to commit -- and I intend to ask Mr. Pichai a similar line of questioning, because I believe this is consistent across multiple different platforms.    To the extent Apple was willing to commit within the developer agreement to say that, while you have access to that data, that you are not going to use that data and are not permitted to use that data to replicate your own app, a copycat app, if you will, that would certainly, in my view, be a reflection of a step away from any type of anticompetitive conduct.    And it sounds like you'll follow up, and we can learn more with respect to that issue.

Mr. Pichai, similarly, there was an article just today, or, excuse me, yesterday, from The Verge.    The title is, "Google reportedly keeps tabs on usage of rival Android apps to develop competitors."

And I'll quote from the article.    Google said that the data doesn't give information about how people behave while they're using individual apps, but it wouldn't say whether it had been used to develop competing apps.

So I guess, first, I take it you would confirm that Google does have access to confidential information or, ultimately, competitively sensitive information about apps on the Android devices?

Mr. Pichai.    Congressman, if I could clarify this, today we have an API, which is available for other developers as long as users consent.    This gives us system health metrics.    This is how we can launch digital well-being features on Android.    This is how we understand which apps are using battery and we can give a dashboard which shows,

CONFIDENTIAL

GOOG-AMI-000003704

you know, maybe for crashing or quality control or for battery usage or for digital well-being.

So, at a high level, this data is available through a public API, and other developers can avail as long as the users give consent to it.

Mr. Neguse.    So, Mr. Pichai, I just want to clarify.    Again, I'll quote from this article.    The article refers to this data as "sensitive data about other apps, including how often they're opened and for how long they're used."

I'm not asking how you use that information.    I'm just asking whether or not, in fact, what the article alleges is correct, that you do have access to that data.

Mr. Pichai.    Yeah, with user consent, and the APIs exist.    Yes, we do.

Mr. Neguse.    And does Google --

Mr. Pichai.    And it's critical for us to have access to that so that we can maintain the -- you know, this is how we understand and we can, you know, improve resource usage of applications --

Mr. Neguse.    Understood.

Mr. Pichai.    -- just like --

Mr. Neguse.    My time's limited.    Sorry.    I just want to get to this core question: Given that Google does have access to that data, does Google use that data to develop competing apps?

And if your answer is no, will Google commit to making the necessary changes within its Android developer app agreements to ensure that developers have that sense of clarity that, in fact, the data will not be used for Google to be able to develop a competing application?

Mr. Pichai.    Congressman, like other businesses today, we do look at trends. And, you know, in fact, in Play Store, we do publish the number of installs of application,

GOOG-AMI-000003705

and we give ranges.    And so there's a wide variety of ways by which we try to understand what's happening in the market.    But I appreciate your concern about making sure there's clarity in this area, and we'll continue to invest and give more clarity.

Mr. Neguse.    Yeah, just I must, I guess -- I want to just follow up very quickly, Mr. Chairman, if you're willing.

So I guess I'm wondering if you can just answer that fundamental question:    Does Google use that information to develop competing apps?

I understand the purposes you've described in terms of how you use the information.    I'm just asking if one of those, in fact, is to develop competing apps.

Mr. Cicilline.    The gentleman's time has expired, but the witness may answer the question.

Mr. Pichai.    Congressman, because we try to understand what's going on in market and we are aware of, you know, popularity of apps, you know, I don't want to -- I want to be accurate in my answer.

But, in general, the primary use for that data is to improve the health of Android. But, you know, any data we get, we have user consent for it, and we make it available through an API to other developers as well.

Mr. Cicilline.    The gentleman's time has expired.

I now recognize the gentlelady from Georgia, Mrs. McBath.

Mrs. McBath.    Thank you, Mr. Chairman.

And, gentlemen, thank you so much for spending so much of your time with us today.    We really appreciate it.

And many of you have mentioned John Lewis today and his fight for equality and that I know that all my colleagues and I will carry on.

Very quickly, can each of you simply commit to improving racial and gender equity

CONFIDENTIAL

GOOG-AMI-000003706

at your companies, including Black leadership and women in your senior ranks?    Just a yes-or-no answer, please.

Mr. Zuckerberg?

Mr. Zuckerberg.    Yes.

Mrs. McBath.    Mr. Cook?

Mr. Cook.    Yes.    I am very personally committed.

Mrs. McBath.    Thank you.

Mr. Bezos?

Mr. Bezos.    Absolutely, yes.

Mrs. McBath.    Thank you.

Mr. Pichai?

Mr. Pichai.    Yes.    And we've made public commitments to this regard.

Mrs. McBath.    Thank you so much.

Mr. Zuckerberg, in 2004, there were dozens of social media companies. Facebook distinguished itself from the competitors by focusing specifically on privacy. You had a short, clear privacy policy; it was just 950 words.    It made a promise to users, and I quote, "We do not and will not use cookies to collect private information from any user."

And you said "will not."    That's a commitment about the future.    And that was 2004.    Mr. Zuckerberg, today, does Facebook use cookies to collect private information on users?

Mr. Zuckerberg.    Congresswoman, my understanding to that is, no, we're not using cookies to collect private information about people who use our services, and I believe we've upheld that commitment.

Mrs. McBath.    Okay.    Thank you.

CONFIDENTIAL

GOOG-AMI-000003707

**Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google**

**Questions for the Record from the Honorable Pramila Jayapal**

**Questions for Mr. Sundar Pichai, CEO, Alphabet**

1. What is Google's market share of the ad exchange?

2. What policies and practices does Google use to ensure that it is serving the interests of businesses selling and buying ad space?

3. According to Google's 2019 shareholder report, Search accounts for 73% of Google's share of advertising revenues. Please identify all factors that make it more likely that advertising revenue will go to Google properties rather than non-Google properties.

4. Does Google allow third party auditors to verify whether the company's metrics for third-party advertising Return on Investment (ROI) are accurate?[i]

---

[i] Competition and Markets Authority, *Digital Advertising Services: Qualitative Research Report* (June 2020), https://assets.publishing.service.gov.uk/media/5efb3fded3bf7f769d2695af/Digital_Advertising_Services_Research.pdf at 8 (Return on investment was seen as an issue by some respondents for both Facebook and Google. It was recognised that ROI was more difficult to calculate for display advertising, but some respondents mentioned that they needed to use third parties to help calculate it – and also that they felt both Facebook and Google's own metrics tended to overstate their effectiveness.)

GOOG-AMI-000003708

**Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google**

**Questions for the Record from the Honorable Henry "Hank" Johnson, Jr.**

**Questions for Sundar Pichai, CEO, Google and Alphabet:**

1. "Efficient infringement"—the use of another company's patents without authorization, based on the understanding that litigation will be too slow to meaningfully stop the infringement and will ultimately only result in the payment of a royalty if the suit is lost (approximately the same royalty that would be paid up front if a license were taken) is a way in which dominant companies currently may be stifling innovation and undermining competitors.

   As the Chairman of the subcommittee with responsibility for oversight of the patent system, I am concerned about the impact of efficient infringement on the ability of patents to spur innovation and allow startups to effectively compete against established companies.

   1.1 To me, these factors suggest that the Supreme Court's decision in *eBay v. MercExchange*, 547 U.S. 388 (2006), to reverse the presumption of awarding injunctive relief to a prevailing patent owner should be reevaluated to ensure that smaller patent owners are playing on a level playing field in patent disputes. Do you agree or disagree, and why?

   1.2 What steps does your company take to ensure that any intellectual property it gains access to during acquisition negotiations is not copied or used without authorization if those acquisition negotiations prove to be unfruitful?

CONFIDENTIAL

GOOG-AMI-000003709

**Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google**

**Questions for the Record from the Honorable Jamie Raskin**

**Questions For Sundar Pichai, CEO, Google**

A recent trend the online news space is that platforms, including Google via its search function and Google News product, can scrape news content from newspaper websites, host significant portions of news stories in their curated news service, and pass back none of the ad revenue they generate through Google News to the publishers who fund a crucially important public service. By some accounts, as much as 40% of Google News users never look beyond your site.

Professional news coverage is a costly and sometimes dangerous proposition that has seen enormous reductions in revenue from local and national news in the past decade. Between 2007 and 2017, newspapers' ad revenue shrank from $45 billion to $16 billion a year.  During the same period of time Google's ad revenue skyrocketed. And a recent study released by the News Media Alliance found that in 2018 Google received over $4 Billion in revenues from crawling and scraping news content without paying the publishers for that use.

Because of Google's dominance in Internet search, local news outlets need to design their websites in a way to maximize the prevalence of their content in search results. According to a 2018 study by Advance Web Rankings, Google's top three search results get 30%, 15%, and 10% of all desktop clicks respectively, with 75% of all clicks going to the first page of search results. Google has previously stated that the purpose of search was to connect the user out into the internet as quickly as possible.  However, the use of Accelerated Mobile Pages (AMP) within Google's mobile architecture upends that proposition by allowing Google to host newspaper content on their servers via its Content Delivery Network (CDN) so the reader remains inside the Google ecosystem when they click on a story.  This permits Google to further collect consumer data and determine how to monetize ad services.

Further, in January, Google announced a plan to phase out allowing third party cookies that allow marketers to target web advertising for its Chrome browser business, which accounts for 70 percent of desktop browsing and over 40 percent of mobile browsing. This will take away the tool that allows news websites to analyze user data, seriously hampering competitive engagement in the digital ad space with Google.

1. Does the acceptance of the use of AMP by a publisher affect the placement of the publisher in Google's search results on mobile devices?
2. Does Google require publishers to use AMP to appear in their News Carousel on Mobile devices?
3. What user data does Google collect when users access an AMP page?  Is any of that data shared with or sold to the news publishers whose reporting was accessed?  If not, why not; if so, what fees, if any, does Google charge to news publishers?  If the data collected through AMP and CDN is not shared with news publishers or is sold to them, please explain why this is not an anticompetitive practice levied against news publishers.

CONFIDENTIAL

GOOG-AMI-000003710

4. With the phase out of third-party cookies in Google Chrome, please describe that change that Google is making, when it will be implemented, and Google's justification for the change.

5. With the phase out of third-party cookies in Google Chrome, does Google plan also to cease data collection of user browsing activity within Chrome for both desktop and mobile?  If not, describe each category of data that Google will continue to gather.

6. Please describe why the phase out of third-party cookies in Google Chrome does not effectuate an anticompetitive practice given Google's share of the online search market and online targeted advertising market.

GOOG-AMI-000003711

**Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google**

**Questions for the Record from the Honorable Kelly Armstrong**

**Questions for Sundar Pichai, CEO, Alphabet**

1. In 2018, Google restricted export of the DoubleClick ID through Google Data Transfer, correct?.
   a. If correct, please explain the reasoning for this action.
   b. Did this action reduce competition from other digital advertising participants?

2. In 2015, Google prohibited third parties from buying YouTube advertisements via Google's AdX, which resulted in all YouTube demand-side activity being conducted through Google products, correct?
   a. If correct, please explain the reasoning for this action.
   b. Did this action reduce competition from other demand-side advertising participants?
   c. Google subsequently limited the interoperability of third-party analytics on YouTube and required the use of Google's Ads Data Hub, correct?
      i. If correct, please explain the reasoning for this action.
      ii. Did this action result in reduced competition for advertising analytics products?

3. Please list the first party services that Google uses to collect user information. Please include the first party services that only collect user information after the user consents to such collection.

4. Mr. Pichai testified that Google no longer collects user data on Gmail for advertising purposes. Does this include when the user consents to such collection?

5. Please lists the categories of information that Google collects on users (e.g., location, education level, search history, etc.)

6. At what frequency does an Android phone record a user's location? At what frequency is this information relayed back to Google?

CONFIDENTIAL

GOOG-AMI-000003712

**Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google**

**Questions for the Record from the Honorable Ken Buck**

**Questions for Sundar Pichai, CEO, Alphabet**

1. Mr. Pichai, Google's most popular products, each with more than one billion active users, including Search, Maps, YouTube and Gmail are supposedly free to use. Of course, most consumers don't necessarily understand they are in fact paying Google to use these products, but with another type of valuable asset – their data. Google has made repeated claims that you do not sell consumer data. Let's try to clear this up:
    a. Yes or no, does Google monetize – not sell, but otherwise monetize – consumer data?
    b. Does Google use consumer data in order to offer a targeted/behavioral advertising service to advertisers?
    c. What percentage of Google's revenue is comprised of Google's various advertising services?

2. Mr. Pichai, could you tell me all the types of data that Google collects on its users? I'm going to run through some categories.
    i. Gender identity
    ii. Sexual preference
    iii. Race
    iv. Age
    v. Marital status
    vi. Income
    vii. Location data
    viii. Education level
    ix. Health or fitness data
    x. Search history
    xi. Websites and locations visited including in Incognito Mode sessions of Chrome and Google Maps
    xii. Online purchases made

3. Mr. Pichai – is it fair to say that Google uses all of that data to create a profile on the user - even those without Google Accounts? Do you use that profile for the purposes of targeted advertising?

4. Mr. Pichai, two weeks ago, the Global Project Against Hate and Extremism found that campaign ads for both Joe Biden and President Trump ended up on Russian propaganda channels on YouTube. I assume neither campaign asked for their ads to be there, how did they end up on those channels?
    i. Can you guarantee all of us on this Committee that ads we purchase through Google will never be on an extremist, hateful, or exploitive video or web site?

                                    GOOG-AMI-000003713

    ii. If our ads do appear on extremist content, am I correct that if someone views or clicks on that ad a portion of the money Google takes from our campaign will go to the purveyors of that content? And Google gets paid as well, correct?

    iii. How can advertisers guarantee that their ads will remain brand safe? Do they just have to rely on Google?

    iv. To be clear, I pay Google to place my ad, my ad makes money for Google wherever it is placed, and I rely on Google to tell me how well Google performed. Is that a conflict of interest?

    v. Can I use another service to put my ad on YouTube?

5. Mr. Pichai, in a 2018 letter to Senators Markey and Blumenthal, Google's Vice President for Public Policy Susan Molinari explained that Google uses a phone's geolocation to "infer demographic information", certainly demographic information can mean things like race and income. How do these demographic inferences from where a phone is located impact the ads, offers, and opportunities a person might see?

    i. If there is a predominantly white neighborhood next to a predominantly Black neighborhood, would a Black person see different offers and opportunities on their phone than a white person a few streets away?

6. Mr. Pichai, I understand that in the advertising business, mobile ads served on people's phones are most valuable especially if they take into account that person's location. I know that Google through its Android operating system on phones knows where people using Android phones are located.

7. Please tell me how often does a Google Android phone check a user's location and communicate that back to Google and how accurate is that location data?

8. Does it check location so frequently as to be fair to say that it is continuous?

9. Does an Android phone know when its user is at home or at work? Does it for example know that when an Android phone is in the same location without moving for say 8 hours at night that its user is likely sleeping and at home? Or the same with if the user is in the same location for 8 hours during the day that the user is at work?

10. Does Google change the type of ads it sends to a user based on whether the user is at home or at work, or some other location?

11. Mr. Pichai if I use a Google Android phone to open Google Maps or Waze for directions while I'm driving, I understand that the phone must know my location to provide directions How else is my location data used within Google's products?

    i. Is my location data also used for advertising purposes or is it used to build an advertising profile of me that tells what businesses I have gone to or frequently visit?

    ii. If so, how long does Google keep that information about me?

    iii. Can I view this data as part of my Google takeout, and can I delete it?

CONFIDENTIAL

12. Mr. Pichai, in recent weeks we have seen massive protests all over our country. I assume most of these protestors carried a phone and based on Google's market share more than half of them carried Google Android phones.

    i. Is it possible for Google to use location to advertise to people at similar demonstrations?

    ii. Did this type of advertising occur? And if so, did Google receive premium bids for this kind of location-based advertising?

    iii. Are advertisers able to choose political affiliation as a filter for these types of ads?

    iv. Does Google note in a consumer's profile that they have likely attended political protests?

    v. Does Google create advertising audiences based on consumer protest activity or interest?

13. Mr. Pichai, throughout this pandemic mobile phone data has been used to show the movement, or non-movement of people. Did Google use location data of Android phone users to generate these type of maps?

    i. Did Google ask consumers to consent to their location data being used for potential COVID mapping for shelter in place orders or as states reopened?

    ii. Could this consumer location data be used to identify or target a business for being open even if it wasn't categorized as essential?

    iii. Could this user location data be used to find or target a large gathering of people?

    iv. Could this user location data be used to infer that an Android user was diagnosed with COVID because he or she spent time at a hospital or clinic, or went to a testing facility? Maybe not the location by itself but when Google combines the location data with information you have from the user's Search history or the text from their emails?

14. Mr. Pichai, Google has made a series of announcements over the last couple of years all framed as protecting consumer privacy. Some of those announcements restrict competitors in the advertising industry from collecting various types of consumer data. Yet, Google itself continues to collect more and more information. Please explain why in Google's view, consumers are better off if Google stops third-party cookies used by competitors, but still collects even more data on consumers for its own purposes?

    i. Does Google collect data- from anywhere online – about consumers who do not have a Google account? Can these consumers opt out of Google's data collection about them, and if so, how?

15. In June, you reorganized Google's reporting structure to have Google's Search team report into the Head of Ads and Commerce. In essence, the Google's search algorithm now answers to the monetization team. Why did you make this change?

CONFIDENTIAL

GOOG-AMI-000003715

16. We talked about Google's relationship with China during the hearing. What is the status of Google's work in China?
    i. Are you working with the Chinese government, or any government supported companies, in any way?
    ii. Are you in discussions to work with them? If so, what is the nature of your collaborations or the potential projects?

17. Does Google sell ad space?
    i. Does Google remarket ad space to advertisers?
    ii. Does Google run the auctions to determine which ad can fill a specific ad box?

18. Under Google's last-touch accounting, if I put in "running shoes" into a Google search, Google attributes to itself my purchase of new shoes when you show stats to Wall Street or to shoe company clients. Does this overstate the value of Google's contribution?

19. Would Google approve of advertisers working with other companies to judge the effectiveness of Google's advertising?

20. Google has said that when publishers earn less than they think they should from advertising, it's because the quality of their ad inventory isn't as high as they think. What are some examples of the highest quality ad inventory, with the best earning potential?
    i. Google's search and ad server site "tags" collect user data from thousands of websites. Is this data stored by Google and do Google's advertiser tools gain access to or benefit from this information?
    ii. I have heard reports that companies are under pressure by Google to buy more ads and ad services from you than they normally would in order to qualify for various incentives.

21. Does Google engage in any pressure tactics- such as incentive programs, ad placements, auction rigging or any other conduct- to facilitate ad purchases above and beyond what a given company may ordinarily spend?

22. Mr. Pichai, I am going to mention a Google product, for each one please describe in full detail what data that product collects from a user:
    i. The Google Android smartphone operating system -
    ii. The Chrome browser -
    iii. Google Search -
    iv. DoubleClick –
    v. YouTube viewing and search history
    vi. f. Google Analytics-

23. Earlier this year, Google announced that the Chrome browser would phase out third-party browser cookies. These so-called third-party cookies are how ad tech competitors and independent web sites understand consumer behavior. How are these competing browser cookies any different than Google's own tracking devices?

CONFIDENTIAL

GOOG-AMI-000003716

  i. Will Google's changes to Chrome have similar impacts on Google's and its rivals' data collection capabilities?

  ii. What data will Google collect from Chrome that will no longer be available to Google competitors?

  iii. Does Google treat different streams of consumer data differently? For instance, how many types of consumers' data are incorporated into Google's adtech products to generate audiences?

  iv. Are any types of consumer data more valuable to advertisers or Google?

  v. How does Google's advertising pricing change based on various types of consumer data?

24. Google just announced an investment into home security provider ADT. Google currently has a substantial position in the connected home market with the Nest line of products. What will the market share be of the combined Google-Nest-ADT collaboration?

  i. Will Google collect, process, analyze, or store data from currently installed ADT devices?

  ii. How about future devices?

  iii. How will Google integrate ADT data into its advertising technology?

CONFIDENTIAL

**Questions for Jeff Bezos, Tim Cook, and Sundar Pichai**

1) Do you employ end to end encryption for communications on your products in China?

2) Do you provide user enabled and controlled encryption on the communications devices you sell in China?

3) Do you provide China and the Chinese Communist Party access to users' information and content as required by Chinese law?

4) What user information or content do you provide the Chinese government under Chinese law?

5) If you deploy Artificial Intelligence to identify illegal content consistent with Chinese law:
    o   What data points does your AI examine?
    o   How is your AI trained to identify and keep up with the changing language, vocabulary and codes used by pedophiles and other criminals?

6) Does China require you to submit either your encryption of AI algorithms to Chinese authorities for technical evaluation before you are permitted to deploy them in China?

7) Does China require providers to back up the contents of all devices into the either the company's data center or a government data center in China?

8) Does China require information on any or all of your devices that access the Chinese cellular telephone infrastructure or Internet to backup their content and user information in Chinese datacenters?  Does this apply to tourists and business travelers, to include United States citizens?

CONFIDENTIAL

**Online Platforms and Market Power Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google**

**Questions for the Record from the Honorable David N. Cicilline, Chairman, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary**

**Questions for Mr. Sundar Pichai, CEO, Alphabet**

1. According to data from Jumpshot, more than half of desktop searches on Google keep users on Google's properties, rather than resulting in clicks to the rest of the web.[1] Do you agree that more than half of desktop searches on Google now result in users staying on Google's properties rather than clicking to a non-Google site? If not, please identify data supporting your view.

2. According to data from Jumpshot, more than 70% of mobile searches on Google keep users on Google's properties, rather than resulting in clicks to the rest of the web.[2] Do you agree that more than 70% of mobile searches on Google now result in users staying on Google's properties rather than clicking to a non-Google site? If not, please identify data supporting your view.

3. Has Google ever been approached by another business about giving access to its cache of web crawl data? If so, what was Google's response?

4. Google reviews no longer appear in Google's search index. Why did Google remove its reviews from its search index?[3]

5. Did Google.com see any decrease in usage after adding (a) a third ad to mobile search results, and (b) a fourth ad to mobile search results? [4]

6. What percentage of bids does Google win on its own ad exchanges?

---

[1] Rand Fishkin, *Less than Half of Google Searches Now Result in a Click*, SPARKTORO (Aug. 13, 2019), https://sparktoro.com/blog/less-than-half-of-google-searches-now-result-in-a-click/.

[2] *Id.*

[3] Ethan Wolff-Mann, *Google might be hiding the fact that its own reviews are shoddy*, YAHOO FINANCE (Aug. 23, 2018), https://finance.yahoo.com/news/google-might-hiding-fact-reviews-shoddy-135640955.html.

[4] Gerrit De Vynck, *Google Search Upgrades Make it Harder for Websites to Win Traffic*, BLOOMBERG (July 13, 2020), https://www.bloomberg.com/news/articles/2020-07-13/how-google-search-changes-make-it-more-expensive-to-win-traffic.

CONFIDENTIAL

7. Does Google leverage data from Android and Chrome while bidding on its ad exchanges? And does Google make this data from Android and Chrome data available to third parties?

8. Does Google in any way limit advertisers from working with non-Google parties to audit or assess the efficacy of Google's advertising and/or advertising tools?

9. Google's search and ad server site "tags" collect user data from thousands of websites. Please identify (a) whether Google stores this data; (b) how Google uses this data; and (c) whether Google's advertiser tools gain access to this information.

10. In 2019, how much did Google pay Apple for Google Search to be the default on iOS?

11. Does Google permit hardware device manufacturers to run Android and gain access to the Google Play Store *without* also making Google the default search engine on that device?

12. In its response to Questions for the Record sent Google on September 13, 2019, Google stated that since 2014 it had not changed in methods for determining which apps must use Google's in-app payment or purchasing services. Please identify: (a) If Google has changed its criteria since then; (b) what criterial Google applies when identifying which developers must use the Google Play credit card processing system; and (c) whether Google plans to expand the type of apps that must use its payment processing service.

13. What amount of notice does Google provide developers ahead of suspending their apps from the Google Play Store?

14. Please identify how often and at what level of precision Android registers an Android user's location when that user is not using an app that requires location services.

15. Please identify all purposes for which Google uses location data collected on Android users through Google Maps or Waze.

16. In July, the *Information* reported the existence of "Android Lockbox," which "for years tapped what the company has referred to as 'sensitive' data collected by Android to selectively monitor how users interact with non-Google apps."[5] Please identify: (a) All Google acquisitions or product decisions that were made based off or were informed by data from Android Lockbox; and (b) what steps developers of non-Google apps can take to prevent Google from collecting usage data on their Android apps.

---

[5] Alex Heath et al., *Internal Google Program Taps Data on Rival Android Apps*, THE INFORMATION (July 23, 2020), https://www.theinformation.com/articles/internal-google-program-taps-data-on-rival-android-apps.

CONFIDENTIAL

GOOG-AMI-000003720

17. In 2019, Google was fined $170 million by the FTC and New York Attorney General for violating the Children Online Privacy Protection Act (COPPA) by knowingly collecting the data of children under 13 without their parents' consent.

    a. Did YouTube use the data it illegally acquired from children to draw more advertisers to YouTube?

    b. Did YouTube feed the data it illegally acquired from children back into its YouTube algorithm?

18. Please identify all factors that determine how Google ranks videos, including whether YouTube videos are in any way favored by Google in search results.

19. The *Wall Street Journal* reported that Google has changed its algorithm to effectively privilege YouTube in search results.[6] Please identify these changes.

20. Over what time period did Google's homepage include the "Install Google Chrome" promotion (below) for Internet Explorer users?



21. Over this time period, how many users downloaded Chrome by clicking on this promotional button?

22. Chrome used "bundle partners" to package Chrome browser downloads with other downloadable software such as DivX player.[7] Please identify these bundle partners, the stipulations of these partnerships, the time frame in which the bundle partnerships were in place, and the number of Chrome downloads that resulted from the partnerships.

23. If a user is browsing through Chrome's "incognito mode," does Google have the ability to connect that user's browsing data and activity with the user's identity?

---

[6] Sam Schechner et al. *Searching for Video? Google Pushes YouTube Over Rivals*, WALL ST. J. (July 14, 2020), https://www.wsj.com/articles/google-steers-users-to-youtube-over-rivals-11594745232.

[7] See, e.g., DivX Inc., Form 10-K (2010), https://sec.report/Document/0001193125-10-055714/d10k.htm.

CONFIDENTIAL

GOOG-AMI-000003721

24. Please explain why Google now hides full URLs in the Chrome address bar.[8]

25. In January, Google announced its Chrome browser would phase out the use of third-party cookies.[9] Will Google designate Google Analytics as a first-party cookie?

   a. Will Google's changes to Chrome curb Google's own data collection to the same extent that these changes will curb data collection by non-Google firms?

   b. Will non-Google advertising technology services have the same access to Chrome data as Google's advertising technology services?

   c. Please identify all forms of data that Google will collect through Chrome that will no longer be available to non-Google firms.

   d. Please identify how competing browser cookies are any different than Google's own tracking devices.

   e. After Google retires third-party cookies in Chrome, will Google still be able to engage in cross-site tracking?

26. Please identify the total number of days in 2019 on which Google priced Nest smart speakers below-cost.

27. For the total number of Nest smart speakers sold in 2019, what percentage did Google sell below-cost?

28. Does Google require that automobile manufacturers seeking to use Google Maps also use Google Assistant?

29. When Google Assistant receives an implicit invocation or voice command, what factors does Google consider when determining which "Action" to invoke?

30. Are there instances in which voice application developers must pay to make their "Action" an available option to an implicit invocation?

31. When consumers order food directly through Google Search, Google Maps or Google Assistant, Google's services choose a delivery partner such as DoorDash or Postmates.

---

[8] Corbin Davenport, *Google resumes its senseless attack on the URL bar, hides full address on Chrome 85*, ANDROID POLICE (June 12, 2020), https://www.androidpolice.com/2020/06/12/google-resumes-its-senseless-attack-on-the-url-bar-hides-full-addresses-on-chrome-canary/.

[9] Dieter Bohn, *Google to 'phase out' third-party cookies in Chrome, but not for two years*, THE VERGE (Jan. 14, 2020), https://www.theverge.com/2020/1/14/21064698/google-third-party-cookies-chrome-two-years-privacy-safari-firefox.

CONFIDENTIAL

GOOG-AMI-000003722

a. How does Google determine which delivery partner is selected to complete the delivery? For example, does Google run a real-time auction or are delivery partners for specific vendors pre-selected?

b. What steps must a delivery company take to become a delivery partner?

c. How much does Google charge delivery companies who become delivery partners?

d. Does Google have similar programs in place for voice commands?

32. Would buying Fitbit enable Google to use a Fitbit user's heart rate to sell ads targeted to that user?

33. Google recently announced it is investing in home security provider ADT.  Please identify: (a) How Google will collect, process, analyze, or store data from currently installed ADT devices; and (b) How Google will integrate ADT data into its advertising technology.

GOOG-AMI-000003723