**No. 26-**

IN THE

# United States Court of Appeals for the Ninth Circuit

AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND
MANAGEMENT COMPANY LTD., ET AL.,
*Plaintiffs-Respondents,*

—v.—

ALPHABET, INC., ET AL.,
*Defendants-Petitioners.*

*On Petition for Review of Order Granting Certification of Class
from the United States District Court for the Northern District of California
Honorable Rita F. Lin
No. 3:23-cv-01186-RFL*

**DEFENDANTS' PETITION FOR
PERMISSION TO APPEAL UNDER RULE 23(f)**

BORIS FELDMAN
DORU GAVRIL
ELENA HADJIMICHAEL
CARL HUDSON
J. MIA TSUI
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
(650) 618-9250
boris.feldman@freshfields.com

*Counsel for Defendants-Petitioners Alphabet, Inc., Google LLC, and Sundar Pichai*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Petitioners state as follows: Defendant-Petitioner Alphabet, Inc. ("Alphabet") has no parent corporation, and no publicly held corporation owns 10% or more of its stock. Defendant-Petitioner Google LLC is a wholly owned subsidiary of Alphabet, and no other publicly held corporation owns 10% or more of its stock.

Dated: June 1, 2026                    Respectfully submitted,

                                       */s/ Boris Feldman*
                                          Boris Feldman

                                       *Counsel for Defendants-Petitioners*
                                       *Alphabet, Inc., Google LLC, and Sundar Pichai*

i

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................1

QUESTIONS PRESENTED................................................................................. 6

BACKGROUND..................................................................................................6

    A. This Lawsuit Challenges a Single Statement about Adtech Auctions.............. 6

    B. "Corrective Disclosures" Were Never Amended...................................................6

    C. At Class Certification, Defendants Show Absence of Price Impact................ 7

LEGAL STANDARDS.........................................................................................8

REASONS FOR GRANTING REVIEW.........................................................10

  I. To Certify a Class, the District Court Made Three Manifest Errors, Each Contradicting Supreme Court Authority........................................................... 10

    A. The District Court Imputed Price Impact from Corrective Disclosures Mismatched to the Challenged Statement, Contrary to *Goldman*..................10

      1. The District Court failed to analyze whether each disclosure corrected the challenged statement......................................................... 11

      2. The District Court failed to restrict its analysis to information new to the market....................................................................................... 14

    B. The District Court Disregarded *Halliburton* by Rejecting Defendants' Event Study.........................................................................................16

      1. The District Court relied on a subjective, unscientific sliding scale.......... 17

      2. The District Court credited an event study biased toward statistical significance................................................................................. 19

        a. The District Court endorsed an artificial baseline excluding data....... 19

        b. The District Court endorsed biased event windows........................... 21

      3. The District Court improperly mapped legal proof onto statistical significance................................................................................. 23

    C. Contrary to *Comcast*, the District Court Did Not Require a Class-Wide Damages Model..............................................................................24

      1. The District Court relied on a promise of a future model.........................24

      2. The District Court did not require Plaintiffs to isolate damages attributable to their claim.........................................................................26

CONCLUSION...................................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*In re Alum. Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ................................................................................26

*In re Apache Corp. Sec. Litig.*,
  2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ............................................................ 22

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) ..........................................................................2, 12, 13

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...........................................................................................*passim*

*Braun v. Lorillard Inc.*,
  84 F.3d 230 (7th Cir. 1996) .................................................................................. 21

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse*,
  853 F.Supp.2d 181 (D. Mass. 2012) ..................................................................... 20

*Brown v. China Integ. Energy, Inc.*,
  2014 WL 12576643 (C.D. Cal. Aug. 4, 2014) ....................................................... 20

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) ................................................................. 8, 9, 10, 16, 26

*Chavez v. Plan Benefit Servs., Inc.*,
  957 F.3d 542 (5th Cir. 2020) ................................................................................ 27

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .............................................................................................*passim*

*In re Enovix Corp. Sec. Litig.*,
  2026 WL 1078569 (N.D. Cal. Apr. 21, 2026) ....................................................... 14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ......................................................................... 18

**Page**

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. March 11, 2024)................................................11, 14

*In re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025)................................................................27

*Goldkrantz v. Griffin*,
1999 WL 191540 (S.D.N.Y. Apr. 6, 1999).................................................. 18

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021).......................................................................*passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).......................................................................*passim*

*Huberman v. Tag-It Pac. Inc.*,
314 F.App'x 59 (9th Cir. 2009)............................................................. 23

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016)............................................................... 15

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)............................................. 18

*Junge v. Geron Corp.*,
2022 WL 1002446 (N.D. Cal. Apr. 2, 2022)............................................... 26

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013)............................................................... 26

*Loritz v. Exide Techs.*,
2015 WL 6790247 (C.D. Cal. July 21, 2015)........................................ 24, 25

*Lytle v. Nutramax Lab'ys., Inc.*,
114 F.4th 1011 (9th Cir. 2024)..............................................................25

**Page**

*Miller v. Thane Int'l,*
   615 F.3d 1095 (9th Cir. 2010).................................................................... 22

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.,*
   332 F.R.D. 370 (N.D. Ga. 2019).............................................................. 22

*In re Moody's Corp. Sec. Litig.,*
   274 F.R.D. 480 (S.D.N.Y. 2011)......................................................... 11, 18

*O'Connor v. Uber Techs., Inc.,*
   904 F.3d 1087 (9th Cir. 2018).................................................................. 25

*Provenz v. Miller,*
   102 F.3d 1478 (9th Cir. 1996).................................................................. 14

*Ramirez v. Exxon Mobil Corp.,*
   2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)........................................23

*In re REMEC Inc. Sec. Litig.,*
   702 F.Supp.2d 1202 (S.D. Cal. 2010).......................................................20

*San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson,*
   2025 WL 2176586 (3d Cir. July 30, 2025)................................................14

*Shin v. Sanyo Foods Corp. of Am.,*
   348 F.R.D. 477 (C.D. Cal. 2025).............................................................24

*Vizcarra v. Unilever U.S., Inc.,*
   339 F.R.D. 530 (N.D. Cal. 2021)............................................................. 26

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011)...............................................................................9, 19

*Ward v. Apple Inc.,*
   784 F.App'x 539 (9th Cir. 2019)............................................................. 24

| Rules | Page |
|---|---|
| Fed. R. Evid. 401 | 23 |
| Fed. R. Civ. P. 23 | 9 |

**Other Authorities**

*Boeing Co. v. Pub. Emps. Ret. Sys. of Miss.*,
   No. 26-8007 (7th Cir. Apr. 22, 2026), Dkt. 23 ..................................................5, 25, 27

David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in*
   Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* (3d ed. 2011) ......................18

*In re Deloitte & Touche LLP*, No. 24-258 (4th Cir. Feb. 13, 2025), Dkt. 26 ..............25-26

*In re FirstEnergy Corp. Sec. Litig.*, No. 23-303 (6th Cir. Nov. 16, 2023), Dkt. 31 ..........26

*Stamps.com Inc. v. Karinski*, No. 20-80160 (9th Cir. Mar. 10, 2021), Dkt. 10 ...............25

## TABLE OF ABBREVIATIONS[1]

| Abbreviation | Meaning |
|---|---|
| ¶ or SAC | Plaintiffs' Second Amended Complaint for Violations of the Federal Securities Laws, Dkt. 87 |
| Adtech | Advertising technology |
| AG | Attorney General |
| Disclosure 1 | December 16, 2020 complaint filed by State AGs, Dkt. 144-1 |
| Disclosure 2 | September 1, 2021 Bloomberg article, Dkt. 145-10 |
| Disclosure 3 | October 22, 2021 unredacted amended complaint, Dkt. 144-3 |
| Disclosure 4 | February 11, 2022 complaint filed by the EPC |
| Disclosure 5 | January 24, 2023 complaint filed by the DOJ, Dkt. 144-4 |
| Disclosure 6 | April 17, 2023 joinder of nine State AGs to DOJ complaint |
| DOJ | United States Department of Justice |
| EPC | European Publishers Council |
| Ferrell | Amended Rebuttal Report of Professor Allen Ferrell, Dkt. 146-1 |
| Ferrell Reply | Sur-Reply Report of Professor Allen Ferrell, Dkt. 150-3 |
| Nye | Expert Report of Zachary Nye, Ph.D., Dkt. 134-2 |
| Nye Reply | Expert Reply Report of Zachary Nye, Ph.D., Dkt. 148-2 |
| Opp. | Defendants' Opposition to Plaintiffs' Motion for Class Certification, Dkt. 142 |
| Order | Order Granting Class Certification, Dkt. 168 |

---

[1] In the brief, some emphasis is added. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

## INTRODUCTION

This petition concerns standards for certifying securities class actions. Without clear standards, selected ex-ante, a district court can reach any conclusion. That is not just an abuse of discretion; it is an impermissible departure from Supreme Court precedent. Interlocutory review is necessary here to correct manifest legal errors, and to provide clear guidance on novel issues raised by recent Supreme Court decisions.

Over the last decade, the Supreme Court has dramatically altered the requirements for class certification of securities claims, focusing on predominance of class over individual issues. Reliance is typically individualized; the Supreme Court created a presumption of reliance that assumes stock price reflects all public information—accurate or false. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). In 2014, after years of nearly-automatic certification, the Supreme Court held that defendants may rebut the presumption through statistical event studies. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014). District courts continued to certify classes, deferring consideration of such evidence until later "merits" stages. That almost never happens: most securities class actions settle before summary judgment. In 2021, the Supreme Court revisited the issue, emphasizing that it meant what it said: district courts must consider all relevant evidence, even if it overlaps merits. *Goldman Sachs Grp., Inc.*

*v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021). Courts must determine if the challenged statement had an actual impact on stock price; if it did not, defendants have rebutted the presumption and certification is denied. But district courts have been reluctant to implement *Goldman*. In *Goldman* itself, the district court certified the class two more times *after* the Supreme Court's ruling. To implement the Supreme Court's direction, ultimately the Second Circuit had to reverse and instruct the district court to decertify the class. *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023).

The District Court likewise struggled to follow *Goldman* here. The sole remaining alleged misrepresentation is a technical statement about a particular auction in one advertising product, made in a 58-page Google response to Congress. Even though 37 of their challenged statements were dismissed, Plaintiffs kept all six of their alleged corrective disclosures, trying to retrofit them as correcting the only surviving statement. But Plaintiffs had a problem: the market did not react to the challenged statement. Niche as it was, a single sentence in a lengthy response, no wonder it had no impact on a $3.6 trillion company. That is where the inquiry should have stopped.

But that is not what happened. To certify the class, the District Court made several legal and logical leaps that ended in three legal errors. Each requires reversal.

***A bad case of mismatch.*** The first error was to reverse-engineer price impact for

2

the challenged statement. Both experts agreed that the challenged statement engendered no price reaction. So the District Court *inferred* price impact for the challenged statement from the (disputed) impact of the six alleged corrective disclosures. At Plaintiffs' urging, the District Court assumed the challenged statement "maintained" the stock price. But that is a theory reserved for omissions cases, not where, as here, Plaintiff challenges an affirmative statement. Moreover, imputing the price impact only works if the corrective disclosures match the challenged statement. Here, five of the six corrective disclosures do not speak to the falsity of the challenged statement. The District Court glossed over that fact, and relied on its own extemporaneous speculation about possible inferences by market participants. No evidence supported such speculation; Defendants' expert report—the only evidence on the issue—contradicts it. Contrary to *Goldman*, the District Court not only failed to consider *any* relevant evidence, but it ignored *all* available evidence in favor of ad hoc conjecture.

***The math does not add up.*** The second error was worse. As *Halliburton* held, to show absence of price impact with direct quantitative evidence, defendants' only tool is a statistical event study. 573 U.S. at 280-81. There is a simple reason: the stock price is always fluctuating, due to market and industry factors, and because of normal events in the life of the company, unrelated to the corrective disclosure. An event

3

study—well-established in economics—measures whether the stock price reacted relative to a normal baseline. But event studies can be manipulated. Depress the baseline to an artificially stable level, cherrypick the event window in which price reaction is measured, and accept even the smallest reaction and, voilà, price impact! If there is no ex-ante standard to which evidence is held, then Defendants can never prove absence of price impact. *Goldman* and *Halliburton* become meaningless.

That is what happened here. First, the District Court allowed Plaintiffs' expert to excise normal events in the life of the company, in order to make Alphabet's stock appear more stable. But that was not enough, so next the District Court endorsed inconsistent and exotic event windows, cherrypicked to coincide with stock movement. The District Court ended in a self-contradictory position: on one hand, to invoke the *Basic* presumption as it did, the District Court had to conclude that Alphabet trades in an efficient market where information gets folded nearly instantaneously into the price, but on the other hand, it ended up speculating that the market needed time to "digest" corrective disclosures. (To be clear, the evidence unequivocally shows market commentary processing disclosures within minutes.) But this too was not enough. So the Court asserted that a confidence level below the 95% used by economists is "good

enough" and evidences price impact. The District Court's contortions make it impossible to defend against class certification as *Halliburton* and *Goldman* allow.

***No class-wide damages.*** The third error was not requiring Plaintiffs' expert to specify a class-wide damages model, as the Supreme Court requires. *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). The District Court accepted Plaintiffs' expert's speculation that he could create such a model later. The District Court ignored that, when deposed, the expert admitted he never created such a model that stood up in court. Recently, the Seventh Circuit granted interlocutory review to remedy a similar error. *Boeing Co. v. Pub. Emps. Ret. Sys. of Miss.*, No. 26-8007 (7th Cir. Apr. 22, 2026), Dkt. 23.

To certify this class, the District Court daisy-chained inferences and conjectures. It ignored evidence and academic standards, leading to manifest legal error: the evisceration of the Supreme Court's rulings in *Goldman*, *Halliburton*, and *Comcast*. The decision also illustrates the immediate need for appellate intervention on important novel legal issues. Because the Supreme Court has asked district courts to wade into merits and evaluate economic evidence, appellate courts must clarify that these analyses are neither optional nor subjective. District courts cannot simply part with scientific standards and evidence to rely on intuition. Interlocutory review is needed.

5

## QUESTIONS PRESENTED

1.  Is interlocutory review necessary to correct manifest errors that violate Supreme Court authority?

2.  Is interlocutory review necessary to define unsettled standards for disproving price impact and specifying a class-wide model of damages?

## BACKGROUND

### A. This Lawsuit Challenges a Single Statement about Adtech Auctions

Plaintiffs' action rests on one sentence in a dense, 58-page submission to Congress. Order 2. The challenged statement—"The channel through which a bid is received does not otherwise affect the determination of the winning bidder"—describes an auction conducted by Google's Ad Manager. *Id.* Plaintiffs claim that bids made through channels owned by Google and Facebook were likelier to win. ¶¶167-170.

### B. "Corrective Disclosures" Were Never Amended

Two dismissals narrowed the scope of Plaintiffs' alleged misrepresentations from 37 to one. Yet, Plaintiffs allege the same "corrective" disclosures:

- **Disclosure 1 (Dec. 16, 2020):** Ten State AGs sued Google, alleging antitrust and privacy claims. ¶260.

- **Disclosure 2 (Sept. 1, 2021):** Bloomberg reported that DOJ was preparing an antitrust lawsuit against Google. ¶263.

- **Disclosure 3 (Oct. 22, 2021):** The State AGs filed an unredacted amended

6

complaint, also adding AGs from other states. ¶266.

- **Disclosure 4 (Feb. 11, 2022):** The EPC filed a nonpublic antitrust complaint against Google with the European Commission. ¶269.

- **Disclosure 5 (Jan. 24, 2023):** DOJ and eight AGs filed a complaint alleging that Google monopolized multiple adtech markets. DOJ threatened severe measures, including a breakup of Google's adtech stack and divestiture of Google Ad Manager. ¶¶271-272.

- **Disclosure 6 (Apr. 17, 2023):** Nine AGs joined the DOJ lawsuit. ¶275.

## C. At Class Certification, Defendants Show Absence of Price Impact

Plaintiffs moved for class certification, supported by expert opinions of Dr. Zachary Nye. Dkts. 134, 134-2, 148-2. Defendants opposed, supported by their own economic expert, Professor Allen Ferrell. Dkts. 142, 146-1, 150-3. Nye's methodology diverged from Ferrell's, and from the standard accepted in economics, in three key ways.

*Flatter baseline.* Nye removed all days on which Alphabet made earnings announcements from the set of historical stock prices used to create his model. Nye Reply ¶16. His model artificially flattened the baseline, omitting normal Google market statements. *Id*. ¶¶24-28. Ferrell's model considered these normal company events. Ferrell Reply ¶¶29-30.

*Looser confidence level.* Nye agreed that the 95% confidence level used by Ferrell is standard in economics, *id.* ¶17, yet argued for a 90% confidence level, Nye Reply ¶¶31-37.

7

***Non-standardized event windows.*** Ferrell used standard close-to-close event windows to calculate actual stock price returns. Ferrell Reply ¶37. Because he trained his model on close-to-close historical data, his approach measured the same trading cycle to generate both predicted and actual returns. *Id*. ¶27.

Nye deviated from this internally-consistent approach, using cherrypicked, intraday windows to calculate actual returns for two events. Nye Reply ¶¶48, 92. He did not create intraday baseline models against which to compare these returns. *Id.* ¶¶90-92. This incongruence created an analytical gap between his data and the model. Ferrell Reply ¶41.

As Ferrell showed, when applying standard statistical methodologies, none of the disclosures reflected statistically significant price movement attributable to the challenged statement. *Id.* ¶¶13, 26. The District Court accepted Nye's non-standard methods and certified the class. Order 7-9.

## LEGAL STANDARDS

***Rule 23(f) petitions.*** This Court has "unfettered discretion" to grant Rule 23(f) petitions. *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005). Rule 23(f) review is especially needed when class certification (1) "is manifestly erroneous" or (2) "presents an unsettled and fundamental issue of law relating to class actions,

important both to the specific litigation and generally, that is likely to evade end-of-the-case review." *Id.* at 959; Fed. R. Civ. P. 23(f). This petition implicates both bases.

***Certification under Rule 23(b)(3).*** Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Plaintiffs must "actually prove" their proposed class satisfies each requirement by a preponderance of the evidence. *Halliburton*, 573 U.S. at 275. This requires a "rigorous analysis." *Wal-Mart*, 564 U.S. at 350-51.

Rule 23(b)(3) certification requires plaintiffs to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The "fraud-on-the-market" presumption, which allows plaintiffs to demonstrate predominance by establishing class-wide reliance, is rebuttable. *Basic*, 485 U.S. at 250. "Any showing that severs the link" between alleged misrepresentation and stock price will suffice. *Id.* at 248; *Halliburton*, 573 U.S. at 281. Defendants must have the opportunity to prove the alleged misrepresentation did not impact stock price. *Halliburton*, 573 U.S. at 284; *Goldman*, 594 U.S. at 123.

9

## REASONS FOR GRANTING REVIEW

### I.  To Certify a Class, the District Court Made Three Manifest Errors, Each Contradicting Supreme Court Authority

An order granting class certification is "manifestly erroneous" if "the district court . . . ignores a directly controlling case." *Chamberlan*, 402 F.3d at 962. The District Court ignored three.

### A.  The District Court Imputed Price Impact from Corrective Disclosures Mismatched to the Challenged Statement, Contrary to *Goldman*

*Goldman* directs courts to consider all evidence—"qualitative as well as quantitative"—bearing on price impact. 594 U.S. at 122. In price-maintenance cases such as this one, that includes evidence of "mismatch." *Id.* at 123.

In the absence of observable front-end price impact of the challenged statement, plaintiffs can only demonstrate price impact indirectly—through a stock drop at the time of a corrective disclosure. *Id.* But that inference is warranted only if that disclosure matches, and is *corrective* of, the challenged statement. If that connection breaks down, so too does plaintiffs' theory that "back-end price drop equals front-end inflation." *Id.* For this reason, *Goldman* established that "mismatch" between the two presents "important evidence" that courts must weigh in their price impact assessment. *Id.*

The District Court shirked this requirement in two ways.

10

1. **The District Court failed to analyze whether each disclosure corrected the challenged statement**

Under *Goldman*, the District Court was required to examine "the contents" of each corrective disclosure to establish whether it "actually corrected" the challenged statement. 594 U.S. at 123; *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) (mismatch where disclosure was not "corrective of" challenged statement). It did not perform this comparison.

*Incomplete analysis.* The District Court performed no mismatch analysis whatsoever with respect to Disclosures 2-4. Order 10-11.[2] By failing to analyze mismatch as to each disclosure alleged by Plaintiffs, the District Court abandoned its duty to "consider[] *all* evidence relevant to price impact." *Goldman*, 594 U.S. at 122.

*Improper standard.* Although the District Court did purport to analyze Disclosures 1 and 5, its approach was misguided. Order 7. It inquired only whether the disclosures were "closely related" to the challenged statement. *Id.* Finding that they were, it treated Disclosures 1 and 5 as corrective and imputed their price movement to the challenged statement. *Id.* But *Goldman* never articulated the mismatch analysis in

---

[2] The District Court also conducted no mismatch analysis of Disclosure 6. Order 11. But that disclosure is irrelevant because it "fall[s] outside of the class period" and cannot "prov[e] a link between the misrepresentation and the price for the class." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011).

11

those terms. This is understandable: two things can be "closely related" without one being corrective of the other. The District Court's relaxed inquiry therefore falls short of the "searching price impact analysis" that *Goldman* requires. 77 F.4th at 102. Even under a "closely related" standard, however, the disclosures still would not meet the mark, as discussed below.

***Mismatched contents.*** Had the District Court engaged in a fulsome price impact analysis, as required, it would have discerned a mismatch: the challenged statement differs from Disclosures 1 and 5 in subject matter and specificity. Failing to assess the issue of specificity "necessarily infect[s] the ensuing mismatch inquiry" under *Goldman* by "proceed[ing] from the wrong starting point." *Id.* at 95.

As the District Court acknowledged, the challenged statement provides a technical description of one aspect of the ad auction's overall functionality: the selection of the winning bidder. Order 2. No alleged corrective disclosure "directly refer[s] . . . to the alleged misstatement," *Goldman*, 77 F.4th at 102, or even to the 58-page document in which the statement is found. Disclosures 1 and 5 instead discuss the breadth of multiple Google ad tech tools in the context of antitrust claims. Dkts. 144-1, 144-4. Each disclosure contains hundreds of allegations, the majority of which have nothing to do with, and pre-date by years the auction described in, the challenged statement. Dkts.

144-1, 144-4; Opp. 13-14, 21-22.

The District Court ignored unrebutted evidence of this mismatch in specificity. Ferrell ¶¶60, 65, 69, 83, 87-88. Despite the considerable divergence in subject matter, the District Court focused on a small subset of allegations—that Google gave itself and Facebook advantages in some ad auction (not necessarily the auction described in the challenged statement). Order 2. Based on those allegations, the District Court found a "close[] relat[ion]" between the disclosures and the challenged statement. Order 7. This conclusion rests on circular logic. The antitrust allegations do not match the challenged statement *itself*—they only match Plaintiffs' allegations about why the challenged statement is false. Opp. 13-14, 21-22. It is little wonder that these mirror each other, given that Plaintiffs drew their falsity allegations from the antitrust lawsuits. *Compare* ¶¶260, 271 *with* Dkts. 144-1, 144-4. Contrary to *Goldman*'s requirement to analyze hard evidence, 594 U.S. at 122, the District Court effectively reverted to the old ways: deciding class certification on the basis of the pleadings alone. Its deficient analysis "almost certainly require[s] remand." *Goldman*, 77 F.4th at 95 ("[e]rroneously assessing a misrepresentation's genericness" necessitates remand).

13

**2. The District Court failed to restrict its analysis to information new to the market**

*Goldman* also required the District Court to assess whether "*each* disclosure" contained information that was "newly publicly known." *San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*, 2025 WL 2176586, at \*12 (3d Cir. July 30, 2025). But the District Court ignored that information purportedly matching the challenged statement was already "[]known to the market." *In re Enovix Corp. Sec. Litig.*, 2026 WL 1078569, at \*11 (N.D. Cal. Apr. 21, 2026).

Stale information cannot be corrective of an earlier omission. Only information that is "new" or "unknown to the market" can support an inference of price impact. *FibroGen*, 2024 WL 1064665, at \*12. "If the market has become aware of the allegedly concealed information . . . [it] would already be reflected in the stock's price." *Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996). Defendants provided extensive evidence that Disclosures 2, 4, and 5 did not present the public with any new information bearing on the challenged statement. Ferrell ¶¶60, 65, 69, 83, 87-88. The District Court erred by failing to consider this evidence in its assessment of price impact.

***Disclosure 2.*** The District Court ignored that the September 1, 2021 article concerning the DOJ's potential antitrust lawsuit "added nothing to what was already

14

public." *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (reversing class certification); *see* Dkt. 145-10. The article merely (1) highlighted the DOJ's public scrutiny of Google and (2) rehashed the allegations of Disclosure 1, the State AG complaint. Ferrell ¶65. Because the article contained no new information, the District Court should have found mismatch. *Goldman*, 594 U.S. at 123.

**Disclosure 4.** The District Court also ignored that the February 11, 2022 EPC complaint did not share new information, for the simple fact that it was confidential and therefore "not publicly known." *Halliburton*, 573 U.S. at 278; *see* Ferrell ¶83.

**Disclosure 5.** The District Court noted that the January 24, 2023 DOJ complaint contained only information previously known to the market. Order 10 (DOJ allegations "completely overlapped" with State AG allegations); *see* Dkt. 144-4; Ferrell ¶¶87-89. The District Court nonetheless concluded that this disclosure could be evidence of price impact, positing that the DOJ lawsuit reflected a new "bipartisan consensus" in antitrust lawsuits against Google. Order 10-11. But the Democrat AG from Nevada and Puerto Rico's AG, also not a Republican, had already joined the State AG lawsuit. Opp. 5 n.2. This assertion also cited no evidence in the record, and ignored Defendants' evidence of mismatch. *Goldman*, 594 U.S. at 122. And the purportedly new "break-up remedy," Order 10, had no bearing on the challenged statement. Ferrell

15

¶¶87-89; Ferrell Reply ¶6.

Nor was the District Court's reliance on the "strength of th[e] allegations" appropriate. Order 10. *Goldman* does not examine a corrective disclosure's "strength"; rather, it examines whether there is a "[]match between [its contents and] the contents of the misrepresentation." 594 U.S. at 123. By supplying its own inferences rather than examining Disclosure 5 itself, the District Court misapplied *Goldman*. *See id.* (requiring that the "specific *disclosure* actually corrected the generic misrepresentation").

Despite extensive evidence showing no new matching information was revealed to the market, the District Court still concluded there was "no mismatch." Order 7, 10. That is "manifest error." *Chamberlan*, 402 F.3d at 955.

## B. The District Court Disregarded *Halliburton* by Rejecting Defendants' Event Study

*Halliburton* requires a meaningful opportunity to "defeat the presumption" of reliance by attacking price impact with quantitative evidence. 573 U.S. at 279. The District Court erred by denying Defendants this opportunity. Order 6-7.

Consistent with *Halliburton*, Defendants submitted an event study. Applying accepted standards for statistical analysis in economics, Ferrell found no abnormal return significant at the 95% confidence level. Ferrell ¶48. This should have defeated the

presumption of reliance. It did not.

The District Court erred by: (1) rejecting the objective standard required by *Halliburton*, (2) creating a subjective standard that rewards data manipulation, and (3) conflating preponderance, probativeness, and significance.

### 1. The District Court relied on a subjective, unscientific sliding scale

The District Court failed to apply the objective standard *Halliburton* requires.

***No objective standard.*** After scrapping the traditional 95% confidence level, the District Court disregarded Ferrell's evidence of no price impact. Order 6-11. Instead it credited Nye's "borderline" findings, rendering *Halliburton*'s right of rebuttal illusory. *Id.* at 6.

***No strict filter.*** In economics, the objective standard for event studies is the 95% confidence level. Ferrell ¶38. The District Court dismissed this standard as a "magic threshold" dividing "conclusive quantitative evidence" from "the opposite." Order 6. But that is how frequentist hypothesis testing operates: the strict, binary threshold is by design. Ferrell Reply ¶23. Otherwise, one could "create" statistical significance merely by adjusting the confidence level to meet the results.

***No protection from false positives.*** With no confidence level supplied by

17

*Halliburton*, most courts adhere to the economic standard: 95%.[3] This standard is not arbitrary. It reflects a normative judgment about the risk of false positives. Ferrell Reply ¶23. In securities actions, the 95% confidence level appropriately balances discouraging fraud and deterring extortionate lawsuits. *Halliburton*, 309 F.R.D. at 270 (requiring 95% confidence); *Moody's*, 274 F.R.D. at 493 n.11 (same). By refusing to apply the 95% standard, Order 6, the District Court increased the risk that securities class actions will proceed based on false positives.

***No protection from faulty math.*** The Order misunderstands statistics, suggesting a 94% confidence level equals a 94% likelihood of price impact, which is close enough to 95%. Order 6, 9. Incorrect. A 95% confidence level refers to how strictly the study filters out noise, not the probability that a specific event caused a price movement. Ferrell ¶¶36-42. This error is the infamous "inverse probability" fallacy. David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 211, 258 n.119 (3d ed. 2011).

Courts are not statisticians. Nor need they be; the solution is not to blunder

---

[3] *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14-15 (N.D. Cal. Dec. 22, 2016); *Goldkrantz v. Griffin*, 1999 WL 191540, at *4-5 (S.D.N.Y. Apr. 6, 1999); *Moody's*, 274 F.R.D. at 493 n.11.

ahead, but to adopt an objective standard, as *Halliburton* requires.

### 2. The District Court credited an event study biased toward statistical significance

The District Court's statistical significance inquiry was no "rigorous analysis." *Wal-Mart*, 564 U.S. at 351. It regarded Nye's event study as probative evidence, despite two fundamental flaws.

### a. The District Court endorsed an artificial baseline excluding data

Event studies assess whether a given stock movement relates to a specific event, instead of normal fluctuations in stock price. Ferrell Reply ¶27. They first predict the company's stock movement under normal conditions. *Id*. They then compare that prediction to actual movement on a disclosure date. *See Halliburton*, 573 U.S. at 280. The larger the normal movement in stock price, the more likely a studied movement will also be normal. Ferrell Reply ¶27.

The District Court endorsed an event study that excluded normal price movement. Order 8 n.3. Nye omitted the dates of Alphabet's earnings releases, artificially reducing "normal" movement, and inflating disclosure date movements relative to his baseline model of normal activity. Nye Reply ¶¶17-19.

The District Court held it "reasonable to exclude earnings days from the model" because they do not feature "unknown random price variation." Order 8 n.3 (citing Nye

Reply ¶¶17-21). This is the wrong inquiry. As Nye acknowledged, event studies instead adjust first for "normal" returns, before analyzing returns that are "abnormal." Nye Reply ¶17.

The District Court never analyzed whether Alphabet earnings releases prompted "normal" stock returns. It simply assumed that they did not. Order 8 n.3. Deposed, Nye admitted the absurd outcomes this approach creates. Dkt. 150-1 at 69:21-70:1. For a company like Alphabet that has frequent significant announcements, few if any trading dates can reflect only "random price variation." Order 8 n.3. Nye's approach could require "excluding all information dates" from an event study—*all* days, such that there would be no "normal" days at all to serve as a baseline. Dkt. 150-1 at 69:21-70:1.

Courts recognize that analyses, like Nye's, that omit "significant variables" quickly "become so incomplete" to be "inadmissible as irrelevant and unreliable." *In re REMEC Inc. Sec. Litig.*, 702 F.Supp.2d 1202, 1273 (S.D. Cal. 2010); *see also Brown v. China Integ. Energy, Inc.*, 2014 WL 12576643, at *7 (C.D. Cal. Aug. 4, 2014) (denying certification where expert made "subjective determination of which events to examine"); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse*, 853 F.Supp.2d 181, 189 (D. Mass. 2012) (rejecting omission of variables as "artificially deflat[ing] the baseline volatility of [company] stock price").

20

The District Court offered no justification for "depart[ing] from the generally accepted methodology" to "embark upon a sea of scientific uncertainty." *Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996). Nor did Nye. The only source he cites in defense of his approach does not actually encourage eliminating data from a window that includes earnings releases. Nye Reply ¶19. It simply recommends choosing "an estimation window free of such contaminating events"—meaning news about alleged fraud—which Nye did not do. *Id*. This offers no support for the District Court's "depart[ure] from . . . canonical methods." *Lorillard*, 84 F.3d at 234.

### b. The District Court endorsed biased event windows

The District Court also contorted efficient market theory by allowing Nye to cherrypick event windows to meet his desired results.

For the two disclosures the District Court analyzed, Nye abandoned the customary window measured from market close on the disclosure date to market close the following day, for a tailored, intraday window. Order 8-9, 11. By permitting this approach, the District Court selectively rejected Defendants' application of market efficiency in examining price reactions, after *endorsing* market efficiency to credit Plaintiffs' use of the *Basic* presumption. *Id.* at 5.

This Court recognizes that efficient markets "immediately reflect all publicly

available information." *Miller v. Thane Int'l*, 615 F.3d 1095, 1103 (9th Cir. 2010). Because the market for Alphabet securities is highly efficient, Alphabet's stock "promptly" reacts to important company events. Nye ¶52.

The District Court ignored the implications of that efficient market by concluding that Nye's non-standard "intraday analysis is the most persuasive." Order 8, 11. But Nye's earlier analysis demonstrated that intraday inquiries are not necessary to detect market reactions. Nye ¶¶55-57. If close-to-close windows can prove market efficiency, they must also allow Defendants to disprove price impact. *Halliburton*, 573 U.S. at 272. The goose's sauce cannot differ from the gander's.

The District Court offered no "sound conceptual and evidentiary basis" to deviate from standard close-to-close windows. *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *12 (S.D. Tex. Feb. 9, 2024) (rejecting "multi-day window[s]"). The only case it cited, *Monroe County Employees' Retirement System v. Southern Co.*, permits longer windows only where the market reacts to late, complex information. 332 F.R.D. 370, 392 (N.D. Ga. 2019). Here, extending the window does not reflect market processing but instead aggregates effects unrelated to any disclosure. Ferrell Reply ¶36.

The District Court discarded accepted methods to favor speculation. Order 8, 11. It endorsed Nye's intraday window for Disclosure 1 because the "complexity . . . of a

22

hundred-page legal complaint" "suggest[s]" the market would take "longer to digest the information." Order 8. This analysis is untethered to the law. "An efficient market is one that rapidly reflects new information in price, such that security prices fully reflect all available information." *Huberman v. Tag-It Pac. Inc.*, 314 F.App'x 59, 63 (9th Cir. 2009); *see also Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *13-14 (N.D. Tex. Aug. 21, 2023) (endorsing Ferrell criticism of two-day window as inconsistent with efficient markets).

### 3. The District Court improperly mapped legal proof onto statistical significance

To evaluate whether Defendants rebutted the *Basic* presumption, the District Court was tasked with applying the preponderance of evidence standard. It did so erroneously, transposing that standard onto the threshold for statistical significance.

The District Court concluded that a result statistically significant above 50% means a preponderance of evidence showing lack of price impact. Order 6-7. That is incorrect. A 50% confidence level is no better than a coin toss. Ferrell Reply ¶14. It does not translate to over 50% of probative evidence, which is what a preponderance requires. Fed. R. Evid. 401(a). Applying the standard accepted in economics, results below the 95% confidence level are not probative. Ferrell Reply ¶¶14-18. A statistician would

23

reject the conclusions of such a study. Courts assessing price impact may only weigh evidence that is probative according to scientific norms. *Haliburton*, 573 U.S. at 282 (courts must not ignore "a defendant's direct, more salient evidence" of no price impact).

### C. Contrary to *Comcast*, the District Court Did Not Require a Class-Wide Damages Model

The District Court erred by failing to require "evidentiary proof" that damages are measurable "on a classwide basis." *Comcast*, 569 U.S. at 33-35 (requiring evidence that class-wide damages are calculable "consistent with [plaintiff's] liability case"). Otherwise, "questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id*. at 34.

### 1. The District Court relied on a promise of a future model

Promises to "develop a model at some point in the future" are insufficient. *Ward v. Apple Inc.*, 784 F.App'x 539, 540 (9th Cir. 2019). Courts deny certification where experts "mere[ly] identif[y] . . . a *potential* damages model." *Shin v. Sanyo Foods Corp. of Am.*, 348 F.R.D. 477, 485 (C.D. Cal. 2025); *see also Loritz v. Exide Techs.*, 2015 WL 6790247, at *24 (C.D. Cal. July 21, 2015) (no predominance where plaintiff's expert failed "to tie the[ir] techniques together into one model").

24

The District Court contravened this precedent by misapplying *Lytle v. Nutramax Laboratories, Inc.*, 114 F.4th 1011 (9th Cir. 2024). It held that because an event study is a "well-accepted technique," a detailed plan was unnecessary. Order 12-13. This overlooks a crucial distinction in *Lytle*, which concerned a routine survey, not a "novel" or "complex[]" application. 114 F.4th at 1033. Here, the use of an event study is "particularly problematic" where "corrective information was allegedly disclosed at multiple times," creating significant confounding factors. *Loritz*, 2015 WL 6790247, at *22. Nye admitted that he "wasn't asked to" "calculate[] damages." Dkt. 150-1 at 100:1-8. Promising to "modif[y] to isolate confounding information" is simply "gesturing at a model" and fails *Comcast*. Order 13; *Nutramax*, 114 F.4th at 1032.

Interlocutory review is therefore appropriate, as this Court has recognized. *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094-95 (9th Cir. 2018) (granting 23(f) petition and reversing certification); *Stamps.com Inc. v. Karinski*, No. 20-80160 (9th Cir. Mar. 10, 2021), Dkt. 10 (granting 23(f) petition on whether class-wide damages model satisfied *Comcast*). Other circuits concur, granting review on this exact issue. *Boeing*, No. 26-8007, Dkt. 23 (granting 23(f) petition to determine whether expert's promise to later isolate damages satisfied *Comcast*); *In re Deloitte & Touche LLP*,

25

No. 24-258 (4th Cir. Feb. 13, 2025), Dkt. 26; *In re FirstEnergy Corp. Sec. Litig.*, No. 23-303 (6th Cir. Nov. 16, 2023), Dkt. 31.

The Ninth Circuit has not ruled on *Comcast* in the securities context. *Junge v. Geron Corp.*, 2022 WL 1002446, at *6 (N.D. Cal. Apr. 2, 2022). This "unsettled and fundamental issue" is ripe for immediate review. *Chamberlan*, 402 F.3d at 959.

### 2.  The District Court did not require Plaintiffs to isolate damages attributable to their claim

Under *Comcast*, courts may only certify a class where a damages model "measure[s] only th[e] damages attributable to th[e] theory [of liability]." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 554 (N.D. Cal. 2021) (denying certification where damages methodology "does not isolate the [challenged] [r]epresentations that form the basis of [plaintiff's] theory of liability"); *In re Alum. Warehousing Antitrust Litig.*, 336 F.R.D. 5, 66 (S.D.N.Y. 2020) (model failed to establish class-wide injury and required individualized inquiries).

The District Court departed from this requirement by stating that isolating damages is "properly reserved for the merits phase." Order 11. *Comcast* already rejected that excuse, requiring proof of a workable model even where the inquiry "overlap[s]

26

with the merits." 569 U.S. at 33-34. Nor is a "rigorous analysis" of damages "some pointless exercise." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 547 (5th Cir. 2020) (highlighting that class certification can "coerce a defendant into settling"). The Sixth Circuit vacated class certification where the district court "failed to conduct any [rigorous] analysis" of the model. *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 621 (6th Cir. 2025). The Seventh Circuit granted a 23(f) petition where the district court permitted damages to be calculated at "a later date." *Boeing*, No. 26-8007, Dkts. 1, 23. The same logic applies here.

## CONCLUSION

The Court should grant review.

Dated: June 1, 2026                     Respectfully submitted,

                                        FRESHFIELDS US LLP
                                        */s/ Boris Feldman*
                                            Boris Feldman

                                        *Counsel for Defendants-Petitioners*
                                        *Alphabet, Inc., Google LLC, and Sundar Pichai*

27

## CERTIFICATE OF COMPLIANCE

This petition complies with the word limit of Circuit Rules 5-2(b) and 32-3(2)

because it contains 5,575 words, excluding the portions exempted by Rules 5(b)(1)(E)

and 32(f) of the Federal Rules of Appellate Procedure.

The petition complies with the typeface and type-style requirements of Rule

32(a)(5)(A) and (a)(6) because it has been prepared in 14-point, Garamond font.


Dated: June 1, 2026                             FRESHFIELDS US LLP

                                                */s/ Boris Feldman*
                                                   Boris Feldman

                                                *Counsel for Defendants-Petitioners*
                                                *Alphabet, Inc., Google LLC, and Sundar Pichai*

28

## CERTIFICATE OF SERVICE

I, Robin A. Ramirez, declare:

I am employed in San Mateo County, State of California. I am over the age of 18 years and not a party to this action. My business address is Freshfields US LLP, 855 Main Street, Redwood City, California 94063.

On this date, I served:

**Petition for Permission to Appeal Under Rule 23(f)**

☒ By forwarding the document(s) by electronic transmission on this date to the email addresses listed below:

**Pomerantz LLP**

| | |
|---|---|
| Jeremy Lieberman | Email: jalieberman@pomlaw.com |
| Emma Gilmore | Email: egilmore@pomlaw.com |
| Villi Shteyn | Email: vshteyn@pomlaw.com |
| Jennifer Pafiti | Email: jpafiti@pomlaw.com |
| Orly Guy | Email: oguy@pomlaw.com |
| Eitan Lavie | Email: eitan@pomlaw.com |

**Klausner Kaufman Jensen & Levinson**

| | |
|---|---|
| Robert D. Klausner | Email: bob@robertdklausner.com |

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Redwood City, California, on June 1, 2026.

*/s/ Robin A. Ramirez*
Robin A. Ramirez

29

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMI - GOVERNMENT EMPLOYEES
PROVIDENT FUND MANAGEMENT
COMPANY LTD., et al.,

      Plaintiffs,

      v.

ALPHABET INC., et al.,

      Defendants.

Case No.  23-cv-01186-RFL

**ORDER GRANTING MOTION FOR
CLASS CERTIFICATION**

Re: Dkt. Nos. 134, 149

This is a securities case against Alphabet Inc., its subsidiary Google LLC, and Google CEO Sundar Pichai. Plaintiffs allege Defendants misrepresented that Google's digital advertising auctions were agnostic to the channel by which a bid was received. According to Plaintiffs, Google's advertising auctions actually favored bids submitted by the Facebook Advertising Network. Plaintiffs allege that Defendants' misrepresentation artificially maintained Alphabet's stock price, thereby violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs now move to certify a class of investors. After a minor tweak to the class definition, Plaintiffs' motion is **GRANTED**.[1]

## I.    BACKGROUND

A detailed description of Plaintiffs' allegations is contained in the order on Defendants' motion to dismiss. *AMI - Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, No. 23-

---

[1] Defendants' motion for leave to file a surreply is **GRANTED**. Plaintiffs appropriately raised additional information in their reply brief as to the issue of price impact to which Defendants were entitled to respond.

1

CV-01186-RFL, 2025 WL 899959, at *2–3 (N.D. Cal. Mar. 24, 2025).  To briefly summarize: Alphabet and its subsidiary Google (collectively, "Google") are in the digital advertising business.  (Dkt. No. 87 ("SAC") ¶¶ 51–57.)  Online media companies, alternatively called publishers, use ad servers to sell their ad space.  (*Id.* ¶¶ 39, 44.)  Google operates an ad server. (*Id.* ¶ 44.)  Ad servers can solicit bids to fill ad space through ad exchanges and ad networks. (*Id.* ¶¶ 45, 48.)  Facebook operates the Facebook Advertising Network ("FAN"), an ad network. (*Id.* ¶ 95.)  According to Plaintiffs, Google caused its ad server to give FAN preferential treatment, so bids submitted through FAN had a higher probability of winning.  (*Id.* ¶¶ 99–106.)

Plaintiffs contend that Defendants misrepresented that practice, thereby artificially maintaining Alphabet's stock price.  Only one of Defendants' statements has been found to give rise to a viable claim in this case.  *AMI*, 2025 WL 899959, at *1.  In response to Questions for the Record from the House Judiciary Committee, Pichai submitted an answer on September 14, 2020 that "[t]he channel through which a bid is received does not otherwise affect the determination of the winning bidder."  (SAC ¶¶ 165–66.)  Plaintiffs say that statement was false because bids submitted through FAN were more likely to win.  (*Id.* ¶ 167.)

Plaintiffs contend that six corrective disclosures revealed the falsity of Pichai's statement. First, on December 16, 2020, Texas and nine other states filed an antitrust lawsuit against Google concerning its advertising technology business.  (*Id.* ¶ 260.)  The lawsuit alleged that Google formed an agreement with Facebook to give it "information, speed, and other advantages" in mobile app advertising inventory auctions.  (Dkt. No. 144-1 ¶ 14.)  Second, on September 1, 2021, the news reported that the Department of Justice ("DOJ") was readying an antitrust lawsuit against Google concerning its advertising technology business.  (SAC ¶ 263.)  Third, on October 22, 2021, an unredacted copy of the Texas lawsuit was filed.  (*Id.* ¶ 266.)  Fourth, on February 11, 2022, the European Publishers Council filed an antitrust complaint with the European Commission against Google.  (*Id.* ¶ 269.)  Fifth, on January 24, 2023, the Department of Justice and eight states filed an antitrust lawsuit against Google concerning its advertising technology business.  (*Id.* ¶ 271.)  Finally, on April 17, 2023, nine more states joined the Department of

2

Justice lawsuit.  (*Id.* ¶ 275.)

Plaintiffs initially proposed to certify a class of persons or entities who acquired Alphabet's stock between September 14, 2020 and January 23, 2023.  (Dkt. No. 134 at 7–8.)[2]  At oral argument, Plaintiffs acknowledged that since the alleged misrepresentation was not released until after the close of trading on September 14, 2020, the class period should start on September 15, 2020.  In connection with this motion, Plaintiffs submitted two expert reports from Dr. Zachary Nye, a financial economist at Stanford Consulting Group.  (Dkt. No. 134-2 ("Nye Report") ¶ 1; Dkt. No. 148-2 ("Nye Reply Report").)  In opposition, Defendants submitted two expert reports from Professor Allen Ferrell, an economist and law professor at Harvard University.  (Dkt. No. 146-1 ("Ferrell Report") ¶ 1; Dkt. No. 150-3 ("Ferrell Surreply Report").)

## II.  LEGAL STANDARD

Class certification requires a plaintiff to show, by a preponderance of the evidence, that the four prerequisites of Federal Rule of Civil Procedure 23(a) and at least one of the bases for certification under Rule 23(b) are met.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc).  A class can be certified only if the court concludes, after a "rigorous analysis," that these requirements have been satisfied.  *Wal-Mart*, 564 U.S. at 351; *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).  The Rule 23(a) prerequisites are commonly referred to as "numerosity," "commonality," "typicality," and "adequacy."  That means: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

If those prerequisites are satisfied, the analysis turns to the three Rule 23(b) bases for certification.  Here, Plaintiffs invoke Rule 23(b)(3).  Rule 23(b)(3) requires plaintiffs to prove the

---

[2] All citations to page numbers in filings on the docket refer to ECF pagination.

3

elements of predominance and superiority, such that "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Predominance requires only "a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). A common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).

## III.     DISCUSSION

As Defendants do not contest, Plaintiffs satisfy the Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy. First, since Alphabet has "millions of shares trading on a national exchange," numerosity can be inferred. (*See In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 626 (N.D. Cal. 2018) (citation omitted); Nye Report ¶ 28.) Second, this case will involve several common questions of fact and law, including whether Defendants' statement was false or misleading, made with scienter, and artificially maintained Alphabet's stock price. Third, Plaintiffs are typical because, like all other class members, they purchased Alphabet stock at allegedly artificially inflated prices. Finally, Plaintiffs have no apparent conflicts of interest, have been actively involved in this litigation, and are represented by counsel with significant securities litigation experience.

Plaintiffs also satisfy the Rule 23(b)(3) requirement of superiority, as Defendants do not contest. *See In re Twitter*, 326 F.R.D. at 631. The only remaining requirement is predominance, which the parties dispute. Defendants contend that individualized questions of reliance and damages will predominate over common questions.

### A.     Reliance

Requiring a plaintiff to directly prove reliance "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market." *Basic*

4

*Inc. v. Levinson*, 485 U.S. 224, 245 (1988).  Thus, if stock trades in an efficient market, an investor is rebuttably presumed to have traded in reliance on public material misrepresentations. *Id.* at 246–48.  To invoke the *Basic* presumption, a plaintiff must prove: "(1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed."  *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) (citation omitted).  If they do so, the defendant can rebut that presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price."  *Id.* (quoting *Basic*, 485 U.S. at 248).  Courts must be "open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense."  *Id.* at 122 (citation omitted).  For instance, when there is a "mismatch" between the misrepresentation and corrective disclosure, like a generic misrepresentation but specific corrective disclosure, the inference that "back-end price drop equals front-end inflation . . . starts to break down."  *Id.* at 123.  Ultimately, defendants "bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence."  *Id.* at 117.

Plaintiffs have undisputedly satisfied their burden to trigger the *Basic* presumption of reliance.  The alleged misrepresentation was publicly posted on Congress' website.  (Ferrell Report ¶ 12.)  Alphabet's stock trades on the NASDAQ, a "quintessentially efficient market." *See Junge v. Geron Corp.*, No. 20-CV-00547-WHA, 2022 WL 1002446, at *4 (N.D. Cal. Apr. 2, 2022).  Plaintiffs and class members purchased Alphabet stock between the time the alleged misrepresentation was made and the time the truth was revealed.  And at this stage, Plaintiffs are not required to prove materiality.  *See Amgen*, 568 U.S. at 470.

The burden therefore shifts to Defendants to rebut the *Basic* presumption by showing a lack of any price impact from the alleged misrepresentation.  Defendants, however, fail to disprove price impact from at least two corrective disclosures.

5

### 1.    Statistical Evidence

As an initial matter, the parties dispute what statistical evidence is sufficient to prove price impact, or lack thereof.  The 95% confidence level is indisputably the "conventional[]" level used to classify a result as statistically significant.  (Ferrell Report ¶ 38; *see also* Nye Reply Report ¶ 34.)  But academics (including Ferrell) routinely note results that would be significant at a 90% confidence level.  (Nye Reply Report ¶¶ 33–34, 36.)  And it is sometimes appropriate to use sub-95% confidence levels to determine significance.  (*Id.* ¶ 34 (quoting the Reference Manual on Scientific Evidence as stating that "[o]ne might argue . . . when regression analysis is used in a price-fixing antitrust case to test a relatively specific alternative to the null hypothesis (*e.g.*, price fixing), a somewhat lower level of confidence (a higher level of significance, such as 10%) might be appropriate").)  Scholars note that if the fraud is relatively small in comparison to the stock's total market value, or if the stock has high price volatility, a confidence level of 95% can lead to "a high frequency of . . . finding there was no effect of an alleged corrective disclosure that really did reduce firm share price."  Jill E. Fisch & Jonah B. Gelbach, *Power and Statistical Significance in Securities Fraud Litigation*, 11 Harv. Bus. L. Rev. 55, 67, 82–84 (2021) (cited in Defendants' Opp., Dkt. No. 142 at 20).

Thus, statistical evidence can sometimes be probative of a price impact even if it is not significant at a 95% confidence level.  Borderline statistical results are still relevant to determining if there is a price impact, and courts must be open to "to *all* probative evidence on that question."  *See Goldman*, 594 U.S. at 122.  There is no good reason to treat the 95% confidence level as a magic threshold, such that a p-value of 0.0499 is conclusive quantitative evidence of a price impact and a p-value of 0.0501 is conclusive quantitative evidence of the opposite.  *See In re Tesla, Inc. Sec. Litig.*, No. 18-CV-04865-EMC, 2022 WL 7374936, at *13 (N.D. Cal. Oct. 13, 2022) (collecting cases denying *Daubert* motions); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-CV-01580, 2019 WL 5287980, at *13 & n.91 (S.D.N.Y. Oct. 18, 2019) ("A conclusion does not immediately become 'true' on one side of the divide and 'false' on the other . . . .").  To be sure, a result significant at a slightly lower confidence level is

"obviously less comfort than a result that is statistically significant at a confidence level of 95%." *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018). But that goes to the result's weight in favor of a price impact, not whether it is evidence of a price impact at all.

That does not mean that statistical evidence can never be evidence of a lack of price impact. For instance, a "finding" of price impact at a 50% confidence level could provide evidence of a lack of price impact. If half of such stock drops constitute an abnormal return but the other half would not, that could provide some indication of no price impact. (*Cf.* Ferrell Surreply Report ¶¶ 15, 19–21 (noting that "event study methodology has been used to draw conclusions of 'no effect' from lack of statistical significance").) Other intermediate results might similarly provide evidence of a lack of price impact. *See* Fisch & Gelbach, *supra*, at 104–09 (discussing potential considerations). But the precise contours need not be fleshed out in this case.

In sum, though weaker evidence, borderline statistical evidence of a price impact can still be evidence of a price impact. With that in mind, the analysis turns to the corrective disclosures.

### 2.    2020 Texas Lawsuit

Starting with the Texas lawsuit, Defendants have not shown a complete lack of price impact. The lawsuit was filed on December 16, 2020, at 3:35 p.m. (Nye Reply Report ¶ 45 n.124.) The statute of limitations does not bar considering this as a corrective disclosure since it only partially disclosed the facts needed to discover a securities violation. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010). There is also no mismatch, as it is closely related to the alleged misrepresentation. For instance, the lawsuit includes specific allegations about how Google advantaged bids submitted through Facebook in its advertising auctions, including that Google gave Facebook "information, speed, and other advantages" in its auctions. (Dkt. No. 144-1 ¶ 14.) That information is a partial disclosure that bidders using Google's favored channels were more likely to win. Defendants seemingly agree, as they do not contend that there is a mismatch between this corrective disclosure and the alleged misrepresentation.

The parties' statistical evidence weighs in favor of finding a price impact. Nye's model,

using a 24-hour intraday event window (that is, for the 24 hours following the filing of the Texas lawsuit), found an abnormal price drop with a confidence level of 94.92% and 93.49% for Alphabet's two classes of stock, respectively.  (Nye Reply Report ¶ 48.)  Using a two-day event window, Nye's model shows an abnormal price drop at the 97.13% and 96.47% confidence levels, respectively.  (*Id.* ¶ 46.)  Ferrell's model—evaluating either December 16 (with only 25 minutes of relevant trading) or only December 17 (excluding 25 minutes of relevant trading)— found no statistically significant impact at the 95% confidence level from this disclosure.  (Ferrell Report ¶¶ 61–63.)  The model demonstrates a similar result when considering December 16 at 3:34 p.m. through open on December 17.  (*Id.* at 88.)

Nye's 24-hour intraday analysis is the most persuasive.[3]  The lawsuit was filed late in the trading day.  (*See* Nye Reply Report ¶ 45 n.124; *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 392 (N.D. Ga. 2019) (approving a two-day event window when information was released late in the trading day).)  And the disclosure's complexity in the form of a hundred-page legal complaint suggests that market participants would take longer to digest its information than an earnings announcement coming out on an expected date.  (*See* Nye Reply Report ¶¶ 24–30.)  That is particularly so because understanding the full impact of the disclosure for purposes of Google's antitrust liability requires some specialized knowledge from legal professionals.  Moreover, while market participants may have expected some form of ad tech antitrust lawsuit, there is no evidence that they expected the disclosure of the Facebook agreement or the facts concerning Google's alleged manipulation of the auctions.  (*Cf.* Ferrell Surreply Report ¶ 34.)  Ferrell's approach of either limiting the event window to less than half an hour or excluding 25 minutes of relevant trading right after the announcement is less persuasive in this context.  (*Cf. id.* ¶ 29 n.60.)  Nevertheless, it is not clear that a two-day event window is necessary, since that would include nearly an entire day of irrelevant trading on December 16 while adding less than a

---

[3] It is reasonable to exclude earnings days from the model, as by definition, earnings days are not typical days with unknown random price variation but instead are expected to have strong price volatility.  (*See* Nye Reply Report ¶¶ 17–21.)

half hour of relevant trading on December 17.

Though the intraday price drop from this disclosure was not statistically significant at the 95% confidence level, it reflects an abnormal price drop at confidence levels of 94.92% and 93.49%, which still provides some evidence of a price impact. (*See* Nye Reply Report ¶ 48.) Furthermore, there appears to be a strong connection between the disclosure's correction of the alleged misrepresentation in this case and the price impact. Analysts and news outlets extensively reported on the lawsuit, focusing on the alleged auction manipulation scheme with Facebook. (*Id.* ¶¶ 55–59.) For example, reports flagged allegations that Facebook received "special treatment" when using Google's ad auctions pursuant to its agreement and that Google used its tools "to manipulate" the auction process to "favor itself" over "rivals." (*Id.*) And the record does not indicate that there was other news about Alphabet at the time that would explain the price drop. (*Id.* ¶ 50; Ferrell Report ¶ 60 n.111 (noting only that the lawsuit itself contained allegations beyond auction manipulation).)

At oral argument, Defendants contended that a December 17 Colorado antitrust lawsuit against Google was confounding information that severed the link between the misrepresentation and price decline. (*See* Ferrell Report ¶ 17.) That argument was never raised in Defendants' papers, so it has been waived. Even if it was considered on the merits, the Colorado lawsuit would not provide sufficient evidence to sever the link. First, it was filed after the close of trading on December 17, which is after the 24-hour intraday window ended. (*See id.*) Though a news source reported some of its allegations two hours before market close, the extent of that reporting is not clear. (*See id.* ¶ 17 n.32.) Presumably because of that, Ferrell treated December 18 as the "reaction date" to the Colorado lawsuit. (*Id.* ¶¶ 47 n.95, 52.) Second, the antitrust lawsuit was reported as concerning both Google's "search *and advertising* businesses," which suggests it is not confounding after all but instead relates to similar allegations. (*Id.* ¶ 17 n.32. (emphasis added).) Finally, unlike with other potentially confounding information, Ferrell did not attempt to test whether it explained any of the stock price decline. (*See id.* ¶¶ 74–79.)

Taken as a whole, Defendants have not carried their burden to disprove price impact from

9

the 2020 Texas lawsuit.

### 3. 2023 DOJ Lawsuit

It is a similar story for the January 24, 2023 DOJ lawsuit. To start, there is no mismatch because the lawsuit disclosed new information to the market, even assuming its allegations completely overlapped with those in the Texas lawsuit. First, a truth-on-the-market defense requires information to be available "with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989) (citing *Basic*, 485 U.S. at 249). For that reason, when a statement reveals the truth about a matter after an investigation is announced, both the statement and the announcement are treated as partial corrective disclosures. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Similarly, even some information "nominally available to the public" is still new "if the market has not previously understood its significance." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). After both the DOJ under the Biden administration and a group of Republican-led states filed substantially similar lawsuits against Google, there was a bipartisan consensus that Google rigged its advertising auctions in favor of Facebook. That provided additional information to the market about the strength of those allegations. Prior articles generically reporting that the DOJ was "[r]eadying" such a lawsuit did not fully reveal that information. (*See* Dkt. No. 145-10 at 2; *Lloyd*, 811 F.3d at 1210.)

Second, an event can be corrective "when it merely discloses a consequence of concealed information (for example, an earnings miss), even if the connection between the cause and the consequence is not made explicitly in the disclosure." *Jaeger v. Zillow Grp., Inc.*, 746 F. Supp. 3d 1025, 1036 (W.D. Wash. 2024) (citing *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753–54 (9th Cir. 2018)), *aff'd*, No. 24-6605, 2025 WL 2741642 (9th Cir. Sept. 26, 2025). When the DOJ filed suit, market participants learned that a break-up remedy was significantly more likely. Plaintiffs' theory is that investors would have already understood the level of this risk if Google had been forthright that bidders using certain channels were more likely to win bids. Accordingly, when the lawsuit revealed a break-up remedy was on the table,

10

it disclosed a consequence of the alleged misrepresentation in this case.

Additionally, Defendants have not shown other evidence of a lack of price impact from this disclosure. Nye's model, using a 24-hour intraday event window, shows a statistically significant price drop when using the 95% confidence level. (Nye Reply Report ¶ 92.) The lawsuit was filed in the middle of the trading day at 12:18 p.m., so it is reasonable to use an intraday event window to fully capture the price impact, for the same reasons as applied to the Texas lawsuit. (*See id.* ¶¶ 24–30, 92.) Even Ferrell's model with a one-day close-to-close event window, if earnings dates are excluded, shows an abnormal price drop at a confidence level slightly lower than 95%. (*See* Ferrell Surreply Report ¶ 26.) Like the Texas lawsuit, analysts and news outlets extensively covered this complaint, and the record does not indicate other news about Alphabet that would explain the price movement. (Nye Reply Report ¶¶ 93, 97–98.) Accordingly, Defendants have not met their burden to show a lack of any price impact from this corrective disclosure.

* * *

Defendants have not disproven back-end price impact from the first and last corrective disclosures within the class period. And those two incidents of back-end price impact support Plaintiffs' theory that the alleged misrepresentation maintained the initial stock price at the front end. Some of the other corrective disclosures are similarly situated, while others have weaker evidence of a price impact. But it is unnecessary to disentangle those disclosures at the class certification stage, given the back-end impact covering both ends of the class period. *See Pardi v. Tricida, Inc.*, No. 21-CV-00076-HSG, 2024 WL 4336627, at *8 & n.6 (N.D. Cal. Sept. 27, 2024). Instead, those questions of loss causation and damages are properly reserved for the merits phase.

### B. Damages

To gain certification of a Rule 23(b)(3) class, a plaintiff must generally show that "damages are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 35. "Calculations need not be exact" at this stage. *Id.* Instead, "plaintiffs must show that they will

11

be able to prove their case through common proof *at trial*." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025). So "plaintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof so long as the district court finds, by a preponderance of the evidence, that the model will be able to reliably calculate damages in a manner common to the class at trial." *Id.*

Plaintiffs have made such a showing. Nye proposes using the "out-of-pocket" method, which uses an event study to calculate classwide damages. (Nye Report ¶¶ 68–73.) This is the "standard measurement of damages in Section 10(b) securities cases." *City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (citations omitted). It "isolate[s] Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors." (Nye Report ¶ 70.) If any confounding information was released on the same day as the corrective disclosures, "it is widely recognized that an event study can be fashioned . . . to isolate the effects of such information." (Nye Reply Report ¶ 108.) After calculating the total price inflation caused by the misrepresentation, "a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis." (Nye Report ¶ 72.) Courts routinely accept such an outline of the out-of-pocket method as sufficient to show damages are susceptible of classwide calculation. *See Junge*, 2022 WL 1002446, at *6 (collecting cases); *City of Mia.*, 2018 WL 4931543, at *3–4.

Defendants protest that Plaintiffs are only inadequately "gesturing at a model." *See Lytle*, 114 F.4th at 1032. But the Ninth Circuit's decision in *Lytle* demonstrates the opposite. There, plaintiffs in a false advertising case sought class certification. *Id.* at 1019. Their expert proposed measuring classwide damages with a conjoint survey. *Id.* at 1021. The survey hadn't been conducted yet. *Id.* Instead, the expert explained the process of conducting a conjoint survey and his opinion that it was "well-suited to the facts of this case." *Id.* The Ninth Circuit found that explanation was sufficient for class certification. *Id.* at 1034. It noted that "conjoint analysis is a well-accepted technique" in false advertising cases. *Id.* at 1033. Novel techniques "demand a

12

greater degree of specificity and completeness." *Id.* But that was unnecessary for a well-accepted technique. *Id.* Additionally, the "speculative possibility that [plaintiffs' expert] might slip up in executing his model, standing alone, is insufficient to defeat class certification." *Id.*

The situation here is analogous. Nye proposes to use the standard out-of-pocket method to calculate damages. He is clearly familiar with conducting event studies, having done so for this motion to show market efficiency and price impact. (*See* Nye Report ¶ 52; Nye Reply Report ¶ 16.) As detailed above, his event study was able to associate the corrective disclosures with declines in Alphabet's stock price. (*Cf.* Ferrell Report ¶ 95.) And the model can be modified to isolate confounding information. (*See* Nye Reply Report ¶ 108; *cf.* Ferrell Report ¶¶ 96–97.) The possibility that Nye will "slip up in executing his model" is purely speculative. *See Lytle*, 114 F.4th at 1033. In sum, Plaintiffs have sufficiently shown that Nye's model will be able to reliably calculate classwide damages.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is **GRANTED** subject to the modified class definition agreed to at oral argument. Thus, the following class is certified:

> All persons and entities other than Defendants, members of the immediate family of the Individual Defendant, Alphabet Inc.'s ("Alphabet" or the "Company") subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity, who purchased or otherwise acquired Alphabet's Class A and/or Class C shares between September 15, 2020 and January 23, 2023, both dates inclusive (the "Class Period") on (i) any stock exchanges located in the United States, (ii) on any alternative trading systems located in the United States, or (iii) pursuant to other domestic transactions, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Alphabet, Google LLC ("Google"), and Sundar Pichai.

(*See* Dkt. No. 134 at 7–8.)

Plaintiffs (AMI - Government Employees Provident Fund Management Company Ltd.;

City of Fort Lauderdale Police & Fire Retirement System; Menora Mivtachim Insurance Ltd.;

and Menora Mivtachim Pensions and Gemel Ltd.) are appointed as class representatives.

Pomerantz LLP is appointed as class counsel.

**IT IS SO ORDERED.**

Dated: May 18, 2026

RITA F. LIN
United States District Judge

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

| Alphabet, Inc., Google LLC, Sundar Pichai |
| --- |

Name(s) of counsel (if any):

| Boris Feldman, Doru Gavril, Elena Hadjimichael, Carl Hudson, J. Mia Tsui |
| --- |

Address: | 855 Main Street Redwood City, CA 94063 |
| --- | --- |

Telephone number(s): | (650) 618-9250 |
| --- | --- |

Email(s): | boris.feldman@freshfields.com; doru.gavril@freshfields.com; elena.hadjimichael@freshfields.com; carl.hudson@freshfields.com; mia.tsui@freshfields.com |
| --- | --- |

Is counsel registered for Electronic Filing in the 9th Circuit?   ⦿ Yes   ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

| Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., AMI - Government Employees Provident Fund Management Company Ltd. |
| --- |

Name(s) of counsel (if any):

| Jeremy Lieberman, Emma Gilmore, Villi Shteyn, Jennifer Pafiti, Orly Guy, Eitan Lavie |
| --- |

Address: | 600 Third Avenue, 20th Floor, New York, New York 10016 |
| --- | --- |

Telephone number(s): | (212) 661-1100 |
| --- | --- |

Email(s): | jalieberman@pomlaw.com; egilmore@pomlaw.com; vshteyn@pomlaw.com; jpafiti@pomlaw.com; oguy@pomlaw.com; eitan@pomlaw.com |
| --- | --- |

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 6**                    *1*                    *New 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?    ○ Yes    ○ No

**Appellees**

Name(s) of party/parties:

City of Fort Lauderdale Police & Fire Retirement System

Name(s) of counsel (if any):

Robert D. Klausner

Address: 7080 NW 4th Street Plantation, FL 33317

Telephone number(s): (954) 916-1202

Email(s): bob@robertdklausner.com

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                    *2*                    *New 12/01/2018*