BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
ELENA HADJIMICHAEL, State Bar No. 355715
elena.hadjimichael@freshfields.com
CARL HUDSON, State Bar No. 317201
carl.hudson@freshfields.com
J. MIA TSUI, State Bar No. 344251
mia.tsui@freshfields.com
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br><br>ALPHABET INC., et al.,<br><br>Defendants. | Case No.: 3:23-cv-01186-RFL (SK)<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL**<br><br>Date: September 22, 2026<br>Time: 10:00 AM<br>Location: Courtroom 4 – 17th Floor<br>Judge: The Hon. Rita F. Lin |

# TABLE OF CONTENTS


Page

INTRODUCTION.......... 1
ARGUMENT.......... 2
I. SUMMARY JUDGMENT FOR DEFENDANTS IS APPROPRIATE ON FALSITY.......... 2
A. Plaintiffs Cite No Law Supporting Their Falsity Theories.......... 2
B. Plaintiffs' Broad Construction of the Challenged Statement Lacks a Legal Basis.......... 2
C. Plaintiffs Fail to Raise a Genuine Factual Issue on Falsity.......... 4
1. Plaintiffs Do Not Dispute that the Highest Net Bid Wins Regardless of Channel.......... 4
2. No Alleged Advantage Creates a Genuine Issue as to Falsity.......... 5
a. No Triable Issue on Falsity as to Any Alleged Advantage to Google.......... 5
b. No Triable Issue on Falsity as to Any Alleged NBA Advantage.......... 6
3. Header Bidding Is Irrelevant to Falsity.......... 9
II. SUMMARY JUDGMENT FOR MR. PICHAI IS APPROPRIATE BECAUSE HE DID NOT MAKE THE CHALLENGED STATEMENT.......... 9
III. SUMMARY JUDGMENT IS APPROPRIATE ON SCIENTER.......... 10
A. Plaintiffs Apply the Wrong Scienter Standard.......... 10
B. Plaintiffs Fail to Show Any Evidence of Mr. Pichai's Scienter.......... 11
1. Plaintiffs Show No Evidence Mr. Pichai Knew the Contents of the QFR 6 Response.......... 11
2. Plaintiffs Fail to Show Mr. Pichai Knew or Must Have Known the Challenged Statement Was False.......... 11
C. Plaintiffs Fail to Show Any Evidence of Corporate Scienter.......... 14
1. Plaintiffs' Theory Is Incompatible with Corporate Scienter.......... 14
2. Plaintiffs' Corporate Scienter Theory Does Not Survive Textual Analysis of the Challenged Statement.......... 14
3. Plaintiffs Show No Employee Scienter that Could Be Imputed to Google.......... 15
CONCLUSION.......... 15

## TABLE OF AUTHORITIES

**Case** **Page**

*Abdo v. Fitzsimmons*,
2021 WL 616324 (N.D. Cal. Feb. 17, 2021)........ 9, 10

*In re Adobe Sys., Inc. Sec. Litig.*,
787 F. Supp. 912 (N.D. Cal. 1992), *aff'd*, 5 F.3d 535 (9th Cir. 1993)........ 2

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........ 2, 6

*Baker v. SeaWorld Ent. Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019)........ 10

*Barker v. Am. Express Co.*,
719 F. App'x 717 (9th Cir. 2018)........ 8

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020)........ 15

*Coleman v. Quaker Oats Co.*,
232 F.3d 1271 (9th Cir. 2000)........ 5, 6, 7

*Coll. Ret. Equities Fund v. Boeing Co.*,
2023 WL 6065260 (N.D. Ill. Sept. 18, 2023)........ 12

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991)........ 3

*In re Cypress Semiconductor*,
891 F. Supp. 1369 (N.D. Cal. 1995)........ 3

*Devereaux v. Abbey*,
263 F.3d 1070 (9th Cir. 2001)........ 2

*Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004)........ 5

*Garcia v. J2 Global, Inc.*,
2022 WL 2271936 (C.D. Cal. Aug. 8, 2022)........ 14

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008)........ 14

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015)........ 10

*In re Google Digital Advertising Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022)........ 4

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)........ 9, 10

**Case** **Page**

*Keenan v. Allan*,
91 F.3d 1275 (9th Cir. 1996)........................................ 2, 9

*Lilley v. Charren*,
17 F. App'x 603 (9th Cir. 2001)........................................4

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000)........................................ 2

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014)........................................ 14

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
2018 WL 7019481 (N.D. Cal. Oct. 16, 2018)........................................3, 6

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010)........................................ 2, 3

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021)........................................ 11, 12

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996)........................................ 10

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)........................................ 11

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ........................................ 5

*S. Cal. Edison Co. v. Orange Cnty. Transp. Auth.*,
96 F.4th 1099 (9th Cir. 2024)........................................ 3

*SEC v. Rind*,
991 F.2d 1486 (9th Cir. 1993)........................................ 2

*SEC v. Sripetch*,
154 F.4th 980 (9th Cir. 2025)........................................ 2

*Sneed v. Talphera, Inc.*,
147 F.4th 1123 (9th Cir. 2025)........................................ 3

*Stewart v. Koreker*,
2006 WL 167938 (W.D. Wash. 2006)........................................2

*Texas v. Google LLC*,
764 F.Supp.3d 500 (E.D. Tex. 2025)........................................4

*In re Twitter*,
2020 WL 4187915 (N.D. Cal. Apr. 17, 2020)........................................ 10

*In re Twitter, Inc.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020)....................4

**Case** **Page**

*Valenti v. Dfinity USA Rsch. LLC*,
2025 WL 902031 (N.D. Cal. Mar. 25, 2025).................... 11, 12

*In re Verifone*,
11 F.3d 865 (9th Cir. 1993).................... 3

*Wasco Prods. v. Southwall Techs., Inc.*,
435 F.3d 989 (9th Cir. 2006)....................8, 9

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994).................... 4

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009).................... 14, 15

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024).................... 6

## TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| 56(d) Opp. | Concurrently filed Defendants' Opposition to Plaintiffs' Rule 56(d) Motion |
| Adtech | Digital display advertising technology |
| AdX | Ad Exchange |
| Defendants | Alphabet, Inc., Google LLC, and Sundar Pichai |
| DEx. 1–48 | Exhibit to Declaration of Carl Hudson in Support of Defendants' Motion for Summary Judgment, filed on April 20, 2026 (Dkt. 162) |
| DEx. 49–56 | Exhibit to the concurrently filed Declaration of Carl Hudson in Support of Defendants' Reply in Support of Defendants' Motion for Partial Summary Judgment |
| DSP | Demand-Side Platform |
| DV360 | Display & Video 360 |
| FAC | First Amended Complaint for Violations of the Federal Securities Laws, filed August 7, 2023 (Dkt. 46) |
| FAN | Facebook Audience Network |
| HOB | Highest Other Bid |
| Motion or Mot. | Defendants' Notice of Motion and Motion for Partial Summary Judgment, filed April 20, 2026 (Dkt. 160) |
| MTD FAC Opp. | Plaintiffs' Opposition to Defendants' Motion to Dismiss Amended Complaint, filed November 6, 2023 (Dkt. 60) |
| MTD FAC Order | Order Granting Motion to Dismiss and Denying Requests for Judicial Notice as Moot, filed September 3, 2024 (Dkt. 86) |
| MTD SAC Opp. | Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Amended Complaint, filed December 23, 2025 (Dkt. 98) |
| MTD SAC Order | Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part Request for Judicial Notice, filed March 24, 2025 (Dkt. 108) |
| NBA | September 2018 Network Bidding Agreement |

| Abbreviation | Meaning |
|---|---|
| Opposition or Opp. | Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment, filed June 26, 2026 (Dkt. 179) |
| PEx. | Exhibit to Declaration of Emma Gilmore in Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(a), filed on June 26, 2026 (Dkt. 186) |
| Plaintiffs | Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., AMI - Government Employees Provident Fund Management Company Ltd., and City of Fort Lauderdale Police & Fire Retirement System |
| QFR | Questions for the Record, sent by Congress |
| QFR Responses | Google's Responses to Congressional Questions for the Record, published September 14, 2020 |
| QFR 6 Response | Google's Responses to Congressional Questions for the Record, Response to Question No. 6, published September 14, 2020 |
| RTB | Real-Time Bidding |
| SAC | Second Amended Complaint for Violations of the Federal Securities Law, filed September 24, 2024 (Dkt. 87) |
| UFPA | Unified First-Price Auction |

Herein, emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

## INTRODUCTION

The Opposition makes it clear why Plaintiffs' claim fails on both scienter and falsity.

**No Scienter.** The evidence has established that Sundar Pichai had no involvement nor percipient knowledge of the challenged statement. The Opposition cites no evidence to the contrary. By itself, this requires dismissal of Mr. Pichai. Mr. Pichai was not a maker of the challenged statement, also requiring dismissal. The Opposition also concedes there is no evidence—much less an amount of evidence sufficient to create a genuine issue of material fact—that shows any scienter on the part of the drafters of the challenged statement. A selection of in-house and outside counsel, the drafters believed and had every reason to believe their text accurately reflected how the UFPA worked. Plaintiffs' suggestion that it was reckless of Mr. Pichai not to be involved in something he did not know about or that the drafters themselves were reckless is absurd. Opp. 18–20. To the contrary, nothing could be more reasonable than entrusting the formulation of Google's response to Congress to legal experts. Since the Opposition identifies no evidence showing that Alphabet and Google acted with scienter, the entire claim should be dismissed.

**No Falsity.** To be clear, the challenged statement was correct then and is correct now. To this day, Google's website maintains the same statement. The Opposition fails to identify any evidence that the UFPA favored any bids based on the channel through which they were submitted. The Opposition argues that bids submitted through some channels were more likely to win than others. Yes, absolutely. This is not a secret. It also does not render the challenged statement false. Google did not tell Congress that all channels were equal, but merely that they were treated equally by the UFPA. Of course some bidders enter the auction with advantages: some have more money, others have more sophisticated tools, others have stronger motivation to win, and others have more information about users, either through their own tools, or those they buy from third-parties. The UFPA did not guarantee equality of outcome, merely equality of opportunity to win. There was no thumb on the scale: no dollar was added to any channel, no millisecond added to any bidder's time. Bidders with more money, more will, and better data would of course win more often. That is how auctions are supposed to work. Their goal is perfect price discrimination, not equality of outcome.

No evidence shows a genuine issue of material fact with respect to either scienter or falsity.

## ARGUMENT

The Opposition fails to show "enough evidence to create a genuine issue of material fact." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). Plaintiffs have no more than a mere "scintilla of evidence" to offer, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), so they ask the Court to substitute "inferences" in place of fact. Opp. 2. That is not how summary judgment works. *In re Adobe Sys., Inc. Sec. Litig.*, 787 F. Supp. 912, 918–19 (N.D. Cal. 1992), *aff'd*, 5 F.3d 535 (9th Cir. 1993) ("strained or inconclusive inferences alone should not defeat a motion for summary judgment"); *Devereaux v. Abbey*, 263 F.3d 1070, 1081 n.3 (9th Cir. 2001) ("tenuous inferences, standing alone, do not constitute sufficient evidence to survive summary judgment"). The Court's task "is not . . . to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (affirming summary judgment for defendants). Summary judgment is appropriate on the elements Defendants raised in the Motion.

### I. SUMMARY JUDGMENT FOR DEFENDANTS IS APPROPRIATE ON FALSITY

Plaintiffs cannot survive "this stage of the litigation" with "very little actual evidence and almost no legal authority" to support their claims. *Stewart v. Koreker*, 2006 WL 167938, at *1 (W.D. Wash. 2006). Yet their falsity claims depend on (1) a single case unrelated to any legal theory, (2) their own rewrite of the challenged statement, and (3) unsupported assertions. Plaintiffs fail to establish "genuine issues" on falsity. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

#### A. Plaintiffs Cite No Law Supporting Their Falsity Theories

The single case in Plaintiffs' falsity section does not support or relate to cognizable theory. Opp. 2 (citing 642 F.3d 1207 (9th Cir. 2011)). Plaintiffs argue that case requires falsity to "be decided by the trier of fact." Opp. 2. Their own authority recognizes that is clearly wrong, *Todd*, 642 F.3d at 1220, or there would never be summary judgment in securities cases. There is "no reason to assume" an inapplicable SEC enforcement case applies to Plaintiffs' "private [10(b)] claims." *SEC v. Rind*, 991 F.2d 1486, 1490 (9th Cir. 1993); *SEC v. Sripetch*, 154 F.4th 980, 988–89 (9th Cir. 2025) ("th[e] asymmetry between private securities actions and SEC civil enforcement actions is by design").

#### B. Plaintiffs' Broad Construction of the Challenged Statement Lacks a Legal Basis

Plaintiffs propound an overly broad reading of the challenged statement that is at odds with

both its language and context. But courts uniformly require that challenged statements be read in light of their "surrounding text." *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025); *Oracle*, 627 F.3d at 390; *In re Cypress Semiconductor*, 891 F. Supp. 1369, 1375, 1379 (N.D. Cal. 1995); *In re Ocera Therapeutics, Inc. Sec. Litig.*, 2018 WL 7019481, at *11 (N.D. Cal. Oct. 16, 2018); *see* Mot. 7.

Read in context, the challenged statement is clearly scoped (Google's "unified auction" (the UFPA)) and narrowly circumscribed. DEx. 43, at -94–95. The paragraph containing the challenged statement first explains that the UFPA receives bids from multiple demand sources, subject to publishers' configurations and exclusions. *See* Mot. 7–11. The following two sentences establish that the UPFA (1) receives each "net bid"—that is, the final bid with **channel-specific fees** deducted, *infra* 4–5—and (2) identifies which "net bid" is "highest." DEx. 43, at -94–95. The last sentence of the paragraph—the only challenged statement in this action—then offers an additional piece of information: aside from inherently channel-specific publisher exclusions, bid eligibility requirements, and net bid computation that the first four sentences of the paragraph describe, the "channel through which a bid is received does not ***otherwise*** affect the determination of the winning bidder." *Id.*

The evidentiary record overwhelmingly confirms the challenged statement. Mot. 8–17; *see, e.g.*, DEx. 5, 11, 15, 16 (describing UFPA). The Opposition dislodges the statement from its context and construes it to mean that no characteristics "tied to certain channels from which bids originated" ever "influenced the winning bidder." Opp. 8. This interpretation is wrong, for two reasons.

First, Plaintiffs' interpretation renders parts of the sentence superfluous, which is not permitted. *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 509, 512 (9th Cir. 1991) ("issuer's public statements cannot be analyzed in complete isolation"); *S. Cal. Edison Co. v. Orange Cnty. Transp. Auth.*, 96 F.4th 1099, 1110 (9th Cir. 2024) ("courts should . . . avoid constructions that make any word surplusage"). The word "otherwise" has meaning only when the sentence is read with the rest of the paragraph. And the phrase "***determination of the*** winning bidder"—a mechanical process that occurs for every auction—is not synonymous with "outcomes concerning" winning bidders.

Second, no "reasonable investor" would believe that Google intended to convey Plaintiffs' version of the challenged statement. *In re Verifone*, 11 F.3d 865, 869 (9th Cir. 1993). Innumerable channel-specific considerations outside of Google's control would naturally "influence" the winning

bidder, automatically rendering the statement false. If an advertiser subjectively values an ad slot more and bids higher, it will affect the outcome. That is inherent to an auction. *See In re Twitter, Inc.*, 506 F. Supp. 3d 867, 876 (N.D. Cal. 2020) (an ad auction selects the "highest bidder," whose "personalized advertisement . . . is then shown to the user"); *Texas v. Google LLC*, 764 F. Supp. 3d 500, 514 (E.D. Tex. 2025) (regardless of "auction protocol, the winner of the auction is the advertiser who bid the highest"). No investor would interpret Google as promising equal outcomes in auctions.

### C. Plaintiffs Fail to Raise a Genuine Factual Issue on Falsity

The record demonstrates that the UFPA worked the way the challenged statement says it did. Mot. 7–16. For three reasons, Plaintiffs are unable to identify evidence showing otherwise.

#### 1. Plaintiffs Do Not Dispute that the Highest Net Bid Wins Regardless of Channel

Plaintiffs may not establish falsity through "tortured reasoning[] [and] convolution of the issues." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1420–21 (9th Cir. 1994). With no evidence to show that the UFPA did, or even could, favor any bid over another, Mot. 8, 11–17, Plaintiffs fail to show a "genuine issue[] of material fact." *Lilley v. Charren*, 17 F. App'x 603, 607 (9th Cir. 2001).

Plaintiffs do not dispute, Opp. 15, that the UFPA considered all bids equally once submitted. *See* Mot. 8. Plaintiffs also cannot contest that Judge Castel's finding in *In re Google Digital Advertising Antitrust Litigation* confirms the integrity of the UFPA's bid selection mechanism. 627 F. Supp. 3d 346, 387 (S.D.N.Y. 2022). Facing the fact that the NBA did not "predetermine the outcome of any auction," Mot. 14, Plaintiffs assert that Judge Castel's finding is "irrelevant" to falsity, Opp. 15. If true, as Plaintiffs now claim, that antitrust findings are not relevant to their securities lawsuit, *id.*, all of the Opposition's citations to *United States v. Google LLC*, *Texas v. Google LLC*, and *In re Google*, may be discredited as a basis both for falsity, and for the SAC's allegations that the "truth" was revealed by these lawsuits, ¶¶ 259–278. Opp. 3, 8–11, 14 (citing 778 F. Supp. 3d 797 (E.D. Va. 2025)); Opp. 15 (citing 627 F. Supp. 3d 346); Opp. 16 (citing, *e.g.*, 347 F.R.D. 490 (E.D. Tex. 2024)).

Because they cannot challenge the UFPA's "determination of the winning bidder," Plaintiffs incredibly claim that "the format of the UFPA is irrelevant." Opp. 9. That cannot be correct in a lawsuit challenging a statement about how the UFPA "determined the winning bidder." Mot. 8.

**2. No Alleged Advantage Creates a Genuine Issue as to Falsity**

Plaintiffs also fail to establish that any supposed advantage existed, much less affected the UFPA's identification of highest net bid. Unable to argue that the UFPA treated any bid differently from others—it did not—Plaintiffs argue the challenged statement is false because channels operated by Facebook or Google were better at submitting bids. Opp. 2–16. Even if true, which Plaintiffs fail to prove, that still would not render the challenged statement false. Mot. 8, 11–16.

**a. No Triable Issue on Falsity as to Any Alleged Advantage to Google**

Plaintiffs cannot establish that any of three alleged advantages to Google bidding channels renders the challenged statement false or misleading. *Compare* Mot. 11–14, *with* Opp. 8–11, 14–15.

***Market scale does not contradict the challenged statement.*** Plaintiffs' claims that Google had "scale advantages," Opp. 3, are untethered to any "facts explaining [that the challenged statement is] the result of a falsehood." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (affirming dismissal). Plaintiffs remove quotes from their context to argue that Google had "significant advantages," but do not establish that these "advantages" had anything to do with the UFPA at all. Opp. 3; App'x A 11. Plaintiffs may not conflate any advantage a business could have with an advantage to a bidder in a particular digital ad auction. Plaintiffs' arguments are "not relevant" to the challenged statement. *Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1131 (9th Cir. 2004) (affirming summary judgment for defendants).

***Publisher price floor requirements do not contradict the challenged statement.*** Plaintiffs' arguments about the UFPA's Unified Pricing Rules ("UPR") are also unrelated to falsity. The Opposition concedes, Opp. 14, that publisher settings and configurations cannot render the challenged statement false. Mot. 7–9. Admitting that "publisher choices are not relevant to" bidding channel, Opp. 10, Plaintiffs attempt to argue that UPR somehow "*increased* [Google's] likelihood of winning," *id*. at 10–11. This assertion is contradicted by Plaintiffs' own assertion that the UPR caused AdX to win *fewer* auctions than it would have otherwise. *Id*. Tellingly, Plaintiffs cite no evidence in support of either proposition. App'x A 11–12. Plaintiffs cannot have it both ways.

Besides, Plaintiffs did not allege UPR as a basis for falsity in their complaint. SAC ¶¶ 110–120, 159, 162, 164. Their "new theory of liability," is barred. *Coleman v. Quaker Oats Co.*, 232

F.3d 1271, 1292 (9th Cir. 2000) (affirming summary judgment for defendants).

***Bidder strategy and optimization does not contradict the challenged statement.*** Plaintiffs never prove a core premise of their theory: that "Google" had "bidding advantages" to begin with. Opp. 3, 8. Plaintiffs misrepresent documents to claim otherwise, App'x A 16, conflating "Google," the business, with its ad exchange AdX and with its ad-buying tools DV360 and Google Ads. *See* Opp. 11. Generic statements about "Google" and its platforms are not evidence that its *ad-buying tools* "received benefits over other[s]." *Id.*; *see* App'x A 16.[1] Google was not required to give all buyers an equal ability to perform, nor does the challenged statement say that Google would. Assertions about "bidding advantages" over undefined "ordinary third-party bidders" amount to accusations that Google and Facebook operated sophisticated platforms. Opp. 8. Auctions only work when different buyers have differing buying power, budgets, tools, and advertising spend priorities. *Supra* 1.[2] If all bidders performed equally in an auction, no one would win.

**b. No Triable Issue on Falsity as to Any Alleged NBA Advantage**

Plaintiffs also fail to establish that any of five alleged Facebook advantages stemming from the NBA renders the challenged statement false or misleading. Mot. 14–16.

***Revenue share terms do not contradict the challenged statement.*** Plaintiffs fail to prove that Facebook's bidding "economics" are relevant, Opp. 5. The challenged statement refers to "net" bids. DEx. 43, at 95. Black's Law Dictionary defines "net" as an "amount remaining after all other amounts have been taken away," such as "deductions for expenses." *Net* (12th ed. 2024); *accord* DEx. 56. "[N]et bid" means the same as the challenged statement describes it: bid value after deducting revenue share. *See* DEx. 49, at -200 (bids "ranked based on the *post-revshare* bid value"). This is intuitive, as the UFPA evaluated bids based on the "expected publisher payout," *id.*, focusing on "net values" to "yield the publisher the most money (i.e. not Google)." DEx. 6, at -578. Plaintiffs may not "selective[ly]" read "net" out of the sentence. *Ocera*, 2018 WL 7019481, at *11.

---

[1] Plaintiffs rely on the Court's pleading-stage opinion rather than evidence, required at summary judgment. Opp. 9 n.38; *see Anderson*, 477 U.S. at 256 ("a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations . . . of his pleading").

[2] Plaintiffs abandon their allegations that Dynamic Allocation impacted bid selection, shifting to a "new theory" about Dynamic Allocation impacting Google's market scale. Opp. 10–11. This is neither relevant, *supra* 5, nor permitted, *Quaker Oats*, 232 F.3d at 1292. In fact, Plaintiffs concede that bidder behavior "has nothing to do with the challenged statement." Opp. 11; *see* Mot. 11–14.

***Data-sharing terms do not contradict the challenged statement.*** Plaintiffs fail to establish that Facebook received data not shared with other auction participants, or that data-sharing has any bearing on the challenged statement. Mot. 15–17. No evidence supports, App'x A 3–5, Plaintiffs' repeated, but unproven, references to "informational advantages." *See* Opp. 4–8. Plaintiffs ignore the fact that the NBA on its face did not require Google to share any data with Facebook, disproving their assertion that it did. Mot. 15; Opp. 14. Claiming that "Google shared at least some of its bidding advantages with Facebook," Plaintiffs do not identify a single such advantage in the first place, much less proving what was shared with Facebook, or how. Opp. 4. *See* App'x A 4, 11–13.[3] Besides, Plaintiffs' claims about data-sharing have nothing to do with how the UFPA identified the highest net bid, the topic of the challenged statement. Mot. 14–17.

***Data storage terms do not contradict the challenged statement.*** No evidence supports Plaintiffs' contention that the UPFA treated Facebook's data differently from any other bidder's or that data storage has any bearing on the challenged statement's accuracy. App'x A 17–18. Regardless, this "new theory of liability" was never pleaded and is now barred. *Quaker Oats*, 232 F.3d at 1292.

Plaintiffs ignore that the NBA prevented sharing FAN data across Google platforms, so that Google's ad-buying tools could not use it to improve bidding. Mot. 15; *see* DEx. 32; PEx. 60. This benefitted all competing bidders. Mot. 15. Google applied the same data protections for all buyers, App'x A 17–18, disproving Plaintiffs' claim that "other buyers did not have the[m]." Opp. 14.

***The match rate term does not contradict the challenged statement.*** Match rate is irrelevant. Mot. 16–17. "Match rate" refers to the effectiveness with which a bidder can process a piece of data Google shares with all bidders, to compare it to the bidder's own customer or targeting list. Mot. 16–17; DEx. 32; DEx. 39. Documents Plaintiffs cite undermine their own assertions, App'x A 22, that a higher match rate necessarily "influence[s] who wins the auction." Opp. 13.[4]

---

[3] Plaintiffs ignore that Google shared the same "pre and post auction data" with all bidders. Mot. 15–16; DEx. 52, at -12; PEx. 35, at -65 ("All auction participants will be eligible to receive this [minimum_bid_to_win] data"); DEx. 14, at -39 ("AdX shares highest_other_bid (HOB) post auction with every buyer"); DEx. 15, at -92 ("no unfair advantage for AdX" due to removal of "last look"); DEx. 30, at -39 ("Google is sharing the same data with all bidders"); App'x A 13.

[4] Plaintiffs' arguments about "the effort Google and Facebook spent on engineering" to improve match rates, Opp. 13, do not relate to the challenged statement, which has nothing to do with engineering resources. App'x A 20. Plaintiffs did not plead any legal theory based on any investment Google made in engineering their adtech products. *Compare* SAC ¶¶ 154–258, *with* Opp. 13. They

The record demonstrates that Facebook's 60–80% match rate target was akin to that which Google implemented across the auction. *See* Mot. 16–17. Plaintiffs mischaracterize three documents, cherry-picked from more than 84,000 documents Defendants produced, to claim otherwise. App'x A 22.[5] Plaintiffs cannot raise a triable issue by ignoring evidence that "blatantly contradict[s]" their position. *Barker v. Am. Express Co.*, 719 F. App'x 717, 718 (9th Cir. 2018).

***Auction-wide timeout periods do not contradict the challenged statement.*** Plaintiffs fail to show any evidence that Facebook received a timeout advantage over other auction participants. Opp. 6–8, 11–12. Plaintiffs concede, Opp. 6–8, that the same timeout period applied across relevant traffic segments as of September 2020, Mot. 13–14.[6] Regardless, timeout periods do not bear on the UFPA's determination of the winning bid. Mot. 13–14. Unlike an auction where the highest bid constantly updates publicly, UFPA bidding is blind. *See* DEx. 43, at -94–95. More time to bid in the blind auction is not substantively different from considering one's bidding strategy for longer before the auction begins. Both fall outside the challenged statement's scope.

With their timeout theory disproven, Plaintiffs now assert that "Google changed timeouts to meet Facebook's requests." Opp. 11. Incorrect. Plaintiffs ignore the key fact that Facebook requested an even greater timeout period, [redacted]. PEx. 22. Google did not oblige. PEx. 30. Plaintiffs also ignore, App'x A 28, that the timeout extension resulted from Google's years-long efforts to optimize "appropriate timeout values . . . to ensure that all demand"—not just Facebook—"that can meet the bid deadline is activated," benefitting advertisers and publishers alike. PEx. 31 at -06; *see* Mot. 13. Google's historically strict timeout periods balanced providing auction participants with sufficient bidding time, and reducing latency to avoid disrupting user experience with delays and page loading errors. Mot. 13–14; *see* PEx. 31 at -06; PEx. 30; PEx. 11. Google's increased timeout periods brought it closer in line with other ad exchanges that already applied [redacted] timeout periods. *Id.* at -61; PEx. 21 at -64. Other bidders' requests for increased timeout periods disprove Plaintiffs' claims that "only

---

are too late to do so. *Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.").

[5] The record confirms the reality that Google both targeted and achieved "match rates [redacted]." Mot. 16–17 (citing DEx. 37); App'x A 6–8, 20–23.

[6] Every document Plaintiffs cite establishes the same. App'x A 26–28. The extended [redacted] timeout was brand new when the challenged statement was made, with testing and launch completed by October 2020. DEx. 21.

Facebook" benefitted from the longer timeout. *See* PEx. 11 at -61; App'x A 25–27.

### 3. Header Bidding Is Irrelevant to Falsity

Plaintiffs repeat their assertions that Google adapted its auction format to adjust for header bidding. Opp. 3–4; *see* FAC ¶¶ 72–81, MTD FAC Opp. 3, SAC ¶¶ 83–93, MTD SAC Opp. 5–6. The Court has already rejected the notion that header bidding has any bearing on falsity in this case—twice. MTD FAC Order at 9–10; MTD SAC Order at 4, 8–9, 9 n.4. Plaintiffs may not relitigate claims dismissed in the pleading stage at summary judgment. *Wasco*, 435 F.3d at 992.

Header bidding is a publisher preference that publishers set by placing a piece of code in a website's header. DEx. 9, at -75.008. Plaintiffs do not dispute that a "publisher's choices are not relevant to the channel through which bids were received," Opp. 10, and header bidding is therefore irrelevant to the challenged statement's accuracy. While Plaintiffs "argue many irrelevant details, the material facts are not disputed." *Allan*, 91 F.3d at 1276.

## II. SUMMARY JUDGMENT FOR MR. PICHAI IS APPROPRIATE BECAUSE HE DID NOT MAKE THE CHALLENGED STATEMENT

Plaintiffs show no evidence that Mr. Pichai made or had "ultimate authority" over the QFR Responses. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

***Plaintiffs Do Not Rebut Evidence that Google Was the Maker.*** "[A]ttribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 142–43. The QFR Response's "title . . . make[s] clear that [Google] was speaking." *Handal v. Innovative Indus. Props.*, Inc., 157 F.4th 279, 301 (3d Cir. 2025); PEx. 45 ("GOOGLE'S SUBMISSION"). Google's outside counsel submitted the responses "[o]n behalf of our client Alphabet, Inc." and confirmed that "Google has asked me to formally submit information responsive to the Subcommittee's questions." DEx. 41.

Plaintiffs fail to "dispute that nothing in the text of the [QFR Responses] explicitly attributed any statements to" Mr. Pichai. *Abdo v. Fitzsimmons*, 2021 WL 616324, at *6 (N.D. Cal. Feb. 17, 2021) (summary judgment for individual defendants). It is irrelevant that Mr. Pichai provided oral testimony on a separate date and that House members addressed the QFRs to him. Opp. 16–18. "[T]he maker of a statement is the person or entity with ultimate authority over the statement," not the maker of a prior statement, or the recipient of a question following that statement. *Janus*, 564

U.S. at 142. Indeed, Mr. Pichai certified his testimony on the "Hearing Date" of "July 29, 2020," not later written submissions. PEx. 43. Nor is it relevant that Congress's website stated that "Mr. Pichai submitted" the QFR Responses. Opp. 16–17. A third party's attribution is not "strong evidence" an individual made a statement under *Janus*. 564 U.S. at 142–43. Similarly, *In re Cirrus Logic Securities Litigation*, the court granted summary judgment where "analyst reports" and "notes" failed to "prove that [the defendant] made the statements attributed to it." 946 F. Supp. 1446, 1470 (N.D. Cal. 1996).

***Mr. Pichai Did Not Have Ultimate Control of the QFR Responses.*** To make a statement, one must "actually exercise[] control over the content of the [statement] and whether and how [it was] communicated." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015). Plaintiffs cite "no evidence of [Mr. Pichai] directing anyone as to the content of" the QFR Responses or his "involvement . . . in . . . preparing and executing" them. *Abdo*, 2021 WL 616324, at *9.

## III. SUMMARY JUDGMENT IS APPROPRIATE ON SCIENTER

Plaintiffs fail to show a genuine dispute as to any material fact regarding scienter. They apply a lower standard for summary judgment than the Ninth Circuit requires, fail to show any evidence of scienter for Mr. Pichai, and fail to show any evidence of corporate scienter.

### A. Plaintiffs Apply the Wrong Scienter Standard

Plaintiffs argue that, for scienter, their "burden of showing a genuine issue of material fact at summary judgment is lower than at the pleading stage." Opp. 19. This misstates the law. Even Plaintiffs' own cases acknowledge that "in opposing a motion for summary judgment[,] the plaintiff ***must present significant probative evidence*** relevant to the issue of intent," and "mere ***conclusionary allegations are insufficient*** to require the motion for summary judgment be denied."[7] *Provenz v. Miller*, 102 F.3d 1478, 1489–90 (9th Cir. 1996) (granting summary judgment for two defendants).[8]

Plaintiffs try to stretch what "[t]his Court held" at the pleadings stage to summary judgment.

[7] All of the cases Plaintiffs cite likewise require evidence of scienter. Opp. 19; *see In re Twitter*, 2020 WL 4187915, at *12 (N.D. Cal. Apr. 17, 2020) (binders and emails sent to individual defendant); *Baker v. SeaWorld Ent. Inc.*, 423 F. Supp. 3d 878, 943–45 (S.D. Cal. 2019) (*admission* of scienter). From *In re Novatel, Inc. Wireless Securities Litigation,* Plaintiffs cite *dicta* not since endorsed by any other district court, but even that case compared what plaintiffs "must prove" at trial, versus what plaintiffs must "plead" in a complaint. 830 F. Supp. 2d 996, 1017–18 (S.D. Cal. 2011).

[8] Nor does *Provenz* prohibit summary judgment on scienter. Opp. 18–19. It endorses summary judgment "where," as here, "there is no rational basis in the record for concluding that any of the challenged statements was made with requisite scienter." *Provenz*, 102 F.3d at 1490; *infra* 11–15.

Opp. 19. That is inappropriate. In *REMEC*, a complaint survived dismissal "in large part because [it] quoted several Confidential Witnesses." 702 F. Supp. 2d 1202, 1237. But the court ultimately granted summary judgment for defendants because the plaintiffs provided no proof "to substantiate the [complaint]'s allegations regarding the executives' knowledge or personal involvement." *Id.*

**B. Plaintiffs Fail to Show Any Evidence of Mr. Pichai's Scienter**

Plaintiffs fail to show Mr. Pichai's scienter. First, they cite no evidence Mr. Pichai was aware of the contents of the challenged statement, the last sentence of the QFR 6 Response. Second, they cite no evidence that Mr. Pichai would believe the QFR 6 Response was false.

**1. Plaintiffs Show No Evidence Mr. Pichai Knew the Contents of the QFR 6 Response**

The evidence shows Mr. Pichai was not involved in drafting the QFR 6 Response. Mot. 19–20. Instead, Plaintiffs claim Mr. Pichai had some knowledge of some aspects of negotiations with Facebook. Opp. 19–22. Importantly, those documents fail to address "the ultimate question": "whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Valenti v. Dfinity USA Rsch. LLC*, 2025 WL 902031, at *2 (N.D. Cal. Mar. 25, 2025).

Finally, Plaintiffs cannot show "deliberate recklessness" by Mr. Pichai, an "*extreme* departure from the standards of ordinary care . . . either known to the defendant or . . . so obvious that the actor must have been aware of it." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021). As the Motion detailed, seven Google in-house attorneys and policy advisors, and two law firms, ensured the QFR 6 Response was "accurate and responsive based on the information reasonably available." DEx 48, ¶¶ 4, 9–11. If such delegation is reckless, it is hard to think of what process would *not* be. *REMEC*, 702 F. Supp. 2d at 1241 (not reckless for executives to rely on the "competence and expertise" of advisors). Plaintiffs do not dispute this common corporate reality.

All this confirms there is no "rational basis" to find Mr. Pichai's knowledge or recklessness regarding the challenged statement, meriting summary judgment on scienter. *Id.* at 1236–38.

**2. Plaintiffs Fail to Show Mr. Pichai Knew or Must Have Known the Challenged Statement Was False**

Defendants' Motion also demonstrated that all information available to Mr. Pichai would have made him believe the challenged statement was accurate, had he known about it. Mot. 20–21. Plaintiffs cite Google internal documents to argue Mr. Pichai was informed of details regarding

Facebook and the NBA. Opp. 19–22. But Plaintiffs fail to deliver on their theory that Mr Pichai knew so much about these topics that he *knew* the challenged statement was false, SAC ¶¶ 154–258, 279–327, deciding the "ultimate question" of scienter against them. *Valenti*, 2025 WL 902031, at *2. Plaintiffs show no proof of scienter because the documents they cite (1) confirm Mr. Pichai's high level awareness of the NBA; (2) fail to evidence any auction advantage or Mr. Pichai's awareness of such; and (3) fail to show the relevance of purported meetings with Facebook executives.

***High Level Knowledge Only.*** Plaintiffs infer that Mr. Pichai was "micromanaging" Google from his *opposite* statement to Congress that he "review[s], *at a high level*, all the important decisions we make." Opp. 22. Mr. Pichai's statement is backed by contemporaneous evidence: following the summary of the NBA sent to Mr. Pichai, other executives noted it was too detailed a summary for Mr. Pichai, who had historically not received such briefing documents PEx. 4, at -20.

Plaintiffs argue that Mr. Pichai "routinely received deal summaries, reviews, and overviews," regarding the NBA, Opp. 21, but only show evidence of one such update. PEx. 4, at -21; App'x A 10. Other documents note only that Mr. Pichai was to be updated, given a "heads up," or asked if he was "ok with" sending a "network bidding pilot." *Id.*; PEx. 48, at -59; PEx. 49, at -97; PEx. 50, at -15-16; PEx. 51, at -89. No evidence shows Mr. Pichai "green-lighted the negotiations with Facebook." Opp. 20. Instead, there are unconfirmed indications "the J4N engagement ha[d] gone up the chain to," Mr. Pichai, PEx. 52, at -58, and that he and other executives were notified of a working session for "a test to include FAN into Google's Network Bidding" among other product developments. PEx. 53, at -95. Finally, Plaintiffs argue Mr. Pichai received "regular updates via weekly strategic partnership reports," Opp. 1, 20, but only cite two, both from November 2017—hardly "regular." PEx. 53, at -95, -97–98; PEx. 54, at -95–96. But none of this shows that Mr. Pichai knew the intimate details of the UFPA, let alone that he would believe the challenged statement was false.

As to Plaintiffs' conclusory cry of "recklessness," Opp. 18, Mr. Pichai's high level involvement does not show an "*extreme* departure from the standards of ordinary care." *Prodanova*, 993 F.3d at 1106. Rather, it reflects the reality that "certain important decisions [a]re delegated below the corporate management level." *Coll. Ret. Equities Fund v. Boeing Co.*, 2023 WL 6065260, at *10 (N.D. Ill. Sept. 18, 2023) (dismissing on scienter as to CEO); Mot. 21.

***No Evidence of Alleged "Advantages."*** Plaintiffs also offer no evidence that Mr. Pichai was aware of any advantages they allege either Google had or shared with Facebook. *Supra* 4-8; App'x A 30–33. Plaintiffs intimate that certain exhibits reflect unfair advantages. Opp. 9–21. Rather, Plaintiffs show their continued misunderstanding of the UFPA, and Mr. Pichai's lack of scienter. *Supra* 4–5, 12.

For all but one of the eight auction advantages alleged, Plaintiffs fail to cite any evidence to support scienter, let alone that of Mr. Pichai. *Supra* 5–8; App'x A 30–33. Only three documents Plaintiffs cite vaguely connect to one alleged Facebook advantage, match rate. *Id*. 31–33. Plaintiffs reference "match rate" targets, PEx. 4, at -21, "cookie matching," PEx. 48, at -02, and a Facebook request to "test" "available inventory, win rate, viewability and conversion rate in advance of making a commitment." PEx. 52 at -57. But as already described, these targets were consistent with those sought for all exchange bidders, and did not measure how often a bidder won an auction. *Supra* 7.

These documents bear little connection to Mr. Pichai. *See* App'x A 30–31. There is no evidence he engaged with the deal review summary in September 2018. PEx. 4, at -21; App'x A 32. The April 2017 email thread was never sent to Mr. Pichai. PEx. 48, at -02; App'x A 30. An email that Mr. Pichai never received is not evidence that he could "scuttle the NBA." Opp. 18–19. The August 18, 2017 email was not sent to Mr. Pichai. PEx. 52 at -57; App'x A 30–31. Tangential connections between Mr. Pichai and the NBA miss the point: the challenged statement concerns UFPA winning bid identification, of which Plaintiffs fail to show Mr. Pichai had any knowledge. Mot. 8.

***Unsupported Meeting Allegations.*** Plaintiffs fail to show Mr. Pichai discussed the NBA with Facebook executives, let alone in terms suggesting fraud. Plaintiffs cite documents referring to future meetings, rather than meetings confirmed to have occurred. Opp. 21.

More importantly, nothing about these meetings would have informed Mr. Pichai that a statement Google would make *years in the future* would be false. App'x A 30–32. Talking points for a July 2017 meeting suggest that Mr. Pichai *might attend* the discussion, not lead it. *Id.* For meetings in September 2018, May and July 2019, and September 2020, "Ads" was one general topic within a broader background on the relationship with Facebook. App'x A 31–32. And the May 2019 meeting between Ms. Sandberg and Mr. Pichai was a "social visit," with a "light touch" on "business topics." PEx. 57, at -59. In the Ninth Circuit, "top executives ha[ving] several meetings" does not support

scienter if no details relate to the alleged fraud. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009). Even details of the NBA do not relate to the challenged statement, which describes bid selection in the UFPA. The NBA does not address bid selection at all. Mot. at 14–15.

**C. Plaintiffs Fail to Show Any Evidence of Corporate Scienter**

Plaintiffs fail to show evidence of corporate scienter because 1) they cannot show a "dramatic" falsehood; 2) their reading of the challenged statement is incompatible with a simple, textual analysis; and 3) they fail to show any drafter or approver of the QFR 6 Response had scienter.

**1. Plaintiffs' Theory Is Incompatible with Corporate Scienter**

The Ninth Circuit has yet to endorse corporate scienter. Mot. 21–22. Plaintiffs' protestations that it "could" or "might" apply the theory miss the point. Opp. 22 & n.69. Plaintiffs cannot prove corporate scienter on *their* theory. Mot. 22–23. Corporate scienter could apply only to statements "so dramatically false . . . [they] create an inference of scienter that at least some corporate officials knew of the falsity upon publication." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (rejecting corporate scienter). Several cases Defendants cited show that the one sentence in a 58-page document challenged here cannot possibly establish corporate scienter. Mot. 22–23.

Plaintiffs do not address that one such case rejected scienter for three statements "appear[ing] in a sixty-page legal document." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008). Plaintiffs also fail to address *Garcia v. J2 Global, Inc.*, where an "argu[ment] that certain disclosures were not as detailed as they should have been," did not create a "dramatic falsehood" to trigger the "corporate scienter doctrine." 2022 WL 22717936, at *7 (C.D. Cal. Aug. 8, 2022).

**2. Plaintiffs' Corporate Scienter Theory Does Not Survive Textual Analysis of the Challenged Statement**

Plaintiffs also cannot show corporate scienter because the drafters of the QFR 6 Response viewed it as contextually and technically accurate. Plaintiffs clearly only view the challenged statement as being true if any bidder, agnostic of all other factors, had an equal chance to win an auction. *Supra* 1; But that is not how the drafters of the QFR 6 Response intended it to read. They wrote, "[t]he channel through which a bid is received does not ***otherwise*** affect the determination of the winning bidder," clearly referring back to the full QFR 6 Response. DEx. 43, at -95

Plaintiffs seek to read "otherwise" out of the challenged statement. *Supra* 3. The Supreme

Court holds that courts must respect language where a drafter "could have chosen different language," but "did not." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 823 (2024) (no departure from "statute's clear text" used by Congress). "Normal[] interpre[ation]" of language must also "accord with the ordinary [] meaning of its terms." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). "Otherwise" in the challenged statement incorporates nuance that Plaintiffs ignore. In referencing the full QFR 6 Response, the drafters of the statement reflected that, in the UFPA, the highest net bid wins, *supra* 3–4, bidders and publishers pre-arrange sales through Dynamic Allocation, Mot. 10–11, and publishers set their own preferences, Mot. 3, 9. Plaintiffs fail to show that any QFR 6 Response drafter would believe the challenged statement false in this context.

**3. Plaintiffs Show No Employee Scienter that Could Be Imputed to Google**

Plaintiffs argue scienter for only *two of eight* QFR drafters or approvers: an associate competition counsel, and a senior product counsel for display advertising. DEx. 48, ¶¶ 8-9. Plaintiffs fail to support this argument with evidence, much less to impute scienter to Google. Opp. 23–24.

First, the evidence Plaintiffs cite has nothing to do with the UFPA, the topic of the challenged statement. App'x A 29–30. Instead, it enumerates NBA terms discussed two years prior. *Id.* A"Jedi Blue Deal Review" listing an associate competition counsel as one of seven points of contact for "Competition related PR Risk" does not show he was involved with "match rate commitments," much less that they affected how the UFPA identified the highest bid. PEx. 64, at -19; App'x A 33.

Second, Plaintiffs cite a 2018 email describing testing milestones for "Facebook Integration," which a senior product counsel, thirteen other people, and a distribution list received. PEx. 65, at -21. Plaintiffs argue that in this email, a mention of "cookie matching" in relation to "FB bidder[s]" shows scienter. Opp. 24. There is nothing nefarious about cookie matching, and a blip of text in 2018 does not show a statement drafted in 2020 was knowingly misrepresented. App'x A 33. Plaintiffs cite a list of meetings identifying the legal "point of contact" for a "Facebook on Open Bidding Phase 2 Update" and a "required attendee" for "Facebook Jedi Blue: Phase 2 approvals," both in April 2020. *Id.*; PEx. 66; Opp. 24. Nothing indicates the challenged statement is false. *Zucco*, 552 F.3d at 1000.

**CONCLUSION**

The Court should enter summary judgment for Defendants.

Dated: July 27, 2026

FRESHFIELDS US LLP

By: */s/ Doru Gavril*
Doru Gavril

*Attorneys for Defendants*