**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALPHABET INC., et al.,<br><br>Defendants. | Case No. 3:23-CV-01186-RFL-KAW<br><br>**DISCOVERY DISPUTE LETTER: PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION** |

The parties submit this joint discovery dispute letter pursuant to Your Honor's Civil Standing Order. To ensure the Court's ease of review, the parties present their respective positions separately and attach the disputed Requests for Production ("RFPs") as an exhibit to this filing.

On July 28, 2026, a joint discovery dispute letter addressing these issues was submitted before Magistrate Judge Sallie Kim. Dkts. 206–208. In advance of that filing, the parties met and conferred on June 30, 2026, July 8, 2026, July 10, 2026, July 20, 2026, and July 24, 2026, in a good faith attempt to resolve their disputes. On August 7, 2026, Judge Kim recused herself and the case was subsequently re-referred to Your Honor. Dkt. 215. In accordance with Your Honor's Civil Standing Order, on August 14, 2026, the parties met and conferred over videoconference because an in-person meeting was not practical given counsels' locations in different parts of the country.

The parties have agreed to exchange their positions simultaneously and file the joint letter promptly after that exchange. Accordingly, to the extent any party addresses another party's arguments, they do so in anticipation that the same or similar arguments made in the submission before Magistrate Judge Kim are being made in this submission.

The parties have complied with Section 9 of the Northern District's Guidelines for Professional Conduct regarding discovery. Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that all signatories concur in the filing of this joint discovery dispute letter.

Respectfully submitted,

| | |
|---|---|
| **POMERANTZ LLP**<br>*/s/ Emma Gilmore*<br>Emma Gilmore<br><br>*Counsel for Plaintiffs and the Class* | **FRESHFIELDS US LLP**<br>*/s/ Doru Gavril*<br>Doru Gavril<br><br>*Attorneys for Defendants* |

# I. Plaintiffs' Position

## A. Factual Background and Discovery Disputes

This securities fraud class action seeking to recover damages for defrauded Alphabet investors centers on Defendants' false statement that the channel (*e.g.*, Google ad buying tools such as DV360, and Facebook's FAN) through which advertising bids were received in auctions run by Google did not affect the determination of the winning bidder. Dkt. 87 ¶166 (complaint). Plaintiffs allege that Defendants' representation was false because Google and Facebook submitted bids through channels that had advantages over other bidding participants, such as higher match rates, better information and scale advantages, and advantageous timing. ¶¶99-101. Critical to Plaintiffs' ability to prove the falsity of Defendants' statement are two interrelated sets of information that are the subject of this dispute (Ex. 1): (1) documents concerning ***match and win rates***, Dkt. 94-2 at 32–33 (RFPs 10 & 11); and (2) ***source code***, which reflects the actual implementation of promised perks, like match and win rates (RFPs 13 & 14). Defendants have refused to produce this crucial information.

## B. Match and Win Rates (RFPs 10 and 11)

Google is the dominant player in the field of digital advertising, controlling the technology and leading tools used by publishers and advertisers, as well as the largest ad exchange that matches publishers with advertisers each time an ad space is sold. Dkt. 87 ¶3. Google identified Facebook, one of the biggest ad buyers on the internet, as a potential threat to its dominance, and planned to secure Facebook's participation away from other bidding auctions and into auctions run by Google. ¶¶95-98. But it acknowledged that such feat "require[d] special deal terms" not afforded to other bidders. ¶99. To clinch Facebook's participation, Google extended it unusually high match rates. Dkt. 87 ¶101 (80% for mobile and 60% for web). Match rate is the effectiveness with which a demand-side platform can match its own internal data about a user to the information in a bid request. Plaintiffs suspect that Google had the same or even higher match rates than those it afforded Facebook. These predetermined, high match rates affected the determination of the winning bidder. By being able to match the ad impression to an existing user profile, Google and Facebook could leverage their first-party data about users to make well-informed, winning bids. Google did not provide these high match rates to all third-party bidders. GOOG-DOJ-AT-01534581 at 603.

For its part, Facebook expressly committed to win at least 10% of the bids in the auctions in which it participated. Dkt. 94-2 at 32–33. This commitment demonstrates that the channel impacted the outcome of the auctions because Facebook was promising certain auction outcomes. If all bidders were on equal footing, then no bidder could predict the outcome with complete certainty because they would not know what others were willing to pay. Contrary to Defendants' contention, the allegation that ***Facebook*** **committed** to win at least 10% of bids was ***not*** dismissed by the District Court. Dkt. 108 at 8 ("Order") (finding only that Plaintiffs did not plausibly allege that ***Google*** **committed** to a certain minimum win rates ***for Facebook***). Nor could it have been dismissed, as ***Facebook's*** **commitment** to win at least 10% of the bids is an express term of the Facebook-Google agreement cited in the complaint. Dkt. 87 ¶108; Dkt. 94-2 at 33 ("Facebook will ensure that the Win Rate is at least 10%.").

Defendants also argue by misdirection that Judge Castel in *In re Google Digit. Advert. Antitrust Litig.*, 627 F.Supp.3d 346 (S.D.N.Y. 2022) dismissed some claims related to Facebook, but that is an *antitrust* case and the complaint there did not purport to describe that Facebook was constrained from bidding outside Google's auctions—an element of the antitrust claim. *Id.* at 373. Here, Plaintiffs bring *securities fraud* claims based on a misleading statement that the District Court *sustained*. Relevant to this case, Defendants neglect to mention that Judge Castel expressly acknowledged that Google secured Facebook's participation "***by offering it favorable terms***": "By threatening to disrupt and then cutting a deal with Google, ***Facebook was able to achieve <u>what others could not</u>***: an ***opportunity to compete against Google*** for publishers' and developers' [ad] inventory ***on equal terms***." *Id.* at 373, 376.

Google internally tracked match and win rates across all bidding exchanges and demand-side

platforms. GOOG-DOJ-AT-01534581 at 603. Defendants refuse to provide match/win rate documents despite their recent ***admission*** that channels with greater information were advantaged in the auction. In a prior iteration of this discovery letter, Defendants conceded that "***Bidders with more resources*** (monetary or ***informational***) or motivation ***win more auctions***—not by cheating but by ***bidding higher***, ***or more often***—and ***so the channels they use to bid will win at different rates***." Dkt. 207 at 7.

**C. Source Code (RFPs 13 and 14)**

Source code is the ultimate source of the practices at issue in this case: it reflects the actual implementation of Google and Facebook's advantages over other participants and fills in gaps left by written documentation. The full functionality of the software systems that implemented the mechanics to achieve promised metrics like match rates is not documented anywhere except through the actual code that implements that functionality. While technical documents, design specifications, and internal correspondence are helpful in understanding the broader context of that technology, they are often incomplete or outdated, and the associated metadata is frequently missing or inaccurate, rendering it difficult to determine whether a document reflects final implementation or an early-stage proposal.

Defendants' offer to provide only limited source code sufficient *to show that the highest bid wins* is practically useless because, as the District Court made clear in sustaining the misstatement, its falsity hinges not on whether the highest bid wins, but on whether the channels through which bids were received affected winning bids:

> In other words, Defendants argue that so long as the highest bid wins, the statement is true, and the Court should simply disregard the alleged benefits that FAN and Google received. But taking Plaintiffs' specific factual allegations as true, they support a plausible inference that the statement is false. Plaintiffs have alleged that FAN and DV360, armed with better information and more time than other third-party channels, would have been able to submit winning bids to the unified auction at a far higher rate than would have been possible without their timing and informational advantages. On a bid-by-bid basis, this would plausibly 'affect' the determination of the winning bidder because—without these advantages—FAN or DV360 would often have been outbid by a competitor.

Dkt. 108 (Order) at 10. Plaintiffs' more comprehensive source code request will reveal the data Google does and does not share with each bidding channel, and how imbalances in data sharing affect the determination of the winning bidder. While Defendants argue that source code should be restricted to the auction in the case, *i.e.*, the unified auction, it is impossible to limit source code review to the unified auction because the information Google shared with different channels ***can only be captured by analyzing the source code of Google's full advertising infrastructure.***

Notably, ***Google made the source code of a significant portion of Google's advertising infrastructure (e.g., the source code of its bidding, auction algorithms and ad tech products) available in the advertising technology lawsuit brought by the Attorneys General*** of over a dozen U.S. states against Google, *The State of Texas, et al. v. Google LLC*, No. 20-cv-00957 (E.D. Tex.) ("*State AGs*"), Dkt. 156 at 1; Dkt. 745-1 at 16; *see also* GOOG-AMI-000291013 ("Expert Report" or "ER") ¶¶3, 14, 25(b). The State AGs' expert relied heavily on his analysis of the source code to conclude that "***Google maintains an information advantage over all other parties participating in the Google ad ecosystem, whether they be advertisers, publishers, or third-party exchanges***." ER ¶14. Source code review allowed the expert to see that "more publisher and user data is communicated to auctions involving Google's first-party tools [*e.g.*, DV360] than to auctions involving third-party tools," "[redacted]." ¶15. That "information imbalance could affect how the winning bid and advertisement are determined in the auction." ¶21. The source code showed that "Google's ad buying tools [*e.g.*, DV360 channel] have access to more granular targeting information than do third-party buyers." *Id*. pg. 9.

For example, [redacted]

[redacted] ¶34 and Table 2, [redacted] " ¶38 and Table 3. [redacted] (¶39 and Table 4) [redacted] " ¶43 and pgs. 20-22.[1] While this evidence is helpful to the complaint's allegations, Plaintiffs need their own access to the source code in order to litigate their case and have an expert opine on whether Google and Facebook had bid advantages.

Accordingly, Plaintiffs respectfully request an order compelling Defendants to provide access to source code review (RFPs 13 and 14) and to produce all documents related to match and win rates (RFPs 10 and 11).

**<u>Defendants' Position</u>:** This lawsuit started with the bold assertion that Defendants engaged in securities fraud by making 38 false statements. Most of the allegations attempted to capitalize on several antitrust lawsuits filed by private parties, the DOJ, and various state AGs. Judge Lin dismissed those allegations, allowing the case to proceed with respect to just one sentence made in written responses Google gave to written questions from Members of Congress in a 58-page submission. Dkt. 108 at 1-2. It concerns how Google auctioned off ad space submitted by publishers seeking buyers. The response explains that "All participants in the unified [ad] auction, including those using Google-owned platforms, compete for each impression on a net basis, and no auction participant receives any information about any other party's bids prior to completion of the auction. The highest net bid wins." Dkt. 162-43 at 7.

The statement alleged to be false then follows: "**The channel through which a bid is received does not otherwise affect the determination of the winning bidder**." *Id.* Plaintiffs alleged that Sundar Pichai, Alphabet's CEO, made the statement, and that the statement was false because Google favored bids submitted by clients of Facebook and of Google itself. Dkt. 87 ¶¶166-170. Discovery has revealed that the statement was not made by Mr. Pichai, but by Google, Alphabet's subsidiary. Dkt. 161 at 18-19. Further, that description is correct and remains, to this day, on Google's website—a telling irony in a case that claims that the stock dropped because the market somehow found out the statement was false. *Id.* at 2. Consistent with the statement, the highest bidder wins the auction. *Id.* at 8, 15. There is no thumb on the scale: not for Facebook, nor for Google clients. The outcome of the auction does, of course, vary across channels: some bidders place higher bids because they have more money, they value the ad more, or they have previously negotiated agreements with publishers. Dkt. 202 at 1, 3-8.

After nearly a year of discovery, and after producing over 83,000 documents dedicated to just that one challenged statement, Defendants moved for summary judgment. Dkt. 161. They had previewed their intention to do so for many months. Dkt. 200 at 3. Briefing on the summary judgment

---

[1] [redacted]. *U.S. v. Google LLC*, 23-cv-108 (E.D. Va. 2023); GOOG-AT-MDL-C-000019017 ¶¶9, 11-12; 778 F. Supp. 3d 797, 873 (E.D. Va. 2025). Google was compelled to produce source code in other matters relating to advertising technology. *B.E. Tech., L.L.C. v. Google LLC*, 2025 WL 1019430, at *3 (D. Del. Apr. 4, 2025).

motion is complete. Seeing their case unravel under the weight of evidence, Plaintiffs sought to pivot to new claims. At the last minute, Plaintiffs now seek access to irrelevant and sensitive data. They ask for unfettered access to Google's source code—one of its most sensitive assets, for obvious reasons—for multiple irrelevant products. Ex. 1 at RFPs 13-14. They also seek data showing the rates at which various bidders won auctions and, bizarrely, the ability of ad buyers to match an ad to their own information about who the viewer of the ad may be. *Id.* RFPs 10-11. Such data have nothing to do with the remaining statement in the case, and represent a last-minute escalation in discovery.

In an effort to compromise and put an end to these distractions, Defendants offered, exceptionally, an opportunity for Plaintiffs to inspect source code sufficient to show that the auction worked as described in the challenged statement. Incredibly, Plaintiffs *refused*. Instead, they openly seek information that goes beyond the present scope of their case. There is no basis to reopen discovery at this stage, on topics far removed from the remaining allegations.

***Source Code.*** Without even limiting their request to the auction in the case (Google's "UFPA"), Plaintiffs demand the source code underlying the ***entirety*** of Google's display advertising business and even more, all related to products and services that are not sold through the auction at issue. Ex. 1 RFPs 13-14. That is both irrelevant and burdensome.

With respect to relevance, in some cases (perhaps an IP dispute, or an antitrust lawsuit), a targeted version of this exercise might make sense. But this is a securities fraud case: what the actual code does or does not do matters less than what the authors of the specific statement thought the code did. *In re CrowdStrike Holdings, Inc. Sec. Litig.*, 816 F. Supp. 3d 683, 701 (W.D. Tex. 2026) (refusing to analyze falsity through a hindsight assessment of software's underlying functionality). The documents produced show that Googlers—and certainly the drafters—uniformly understood that the code underlying the UFPA automatically selected the highest net bid as the winner, just as the statement describes. Dkt. 161 at 8, 15; Dkt. 162-15 at 5. And because documents describing how the UFPA actually operated were already produced, unbounded inspection of source code is unnecessary and disproportionate.

The burden is also extraordinary. The risk Google incurs by providing access to its very valuable source code, by contrast, is considerable. In meet and confer, Plaintiffs revealed that they will only be satisfied if an unnamed "expert" is permitted to roam through the vast repository of Google code, including the code that facilitates other Google businesses, to see what might be dredged up. This is unnecessary and wasteful. *Campos v. Big Fish Games, Inc.*, 2023 WL 4936183, at *3 (W.D. Wash. Aug. 2, 2023) (denying access to source code where plaintiff's request was "unreasonable and disproportionate" and based on "mere speculation"). To avoid wasting the Court's time with avoidable disputes, Defendants offered access to code sufficient to show that the UFPA automatically selected the highest net bid as the winner. Plaintiffs declined, insisting their expert must be able to explore alternative theories. Fishing expeditions are a familiar tactic of parties staring down summary judgment. *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 888 (9th Cir. 1996) (no continuance to pursue additional discovery prior to summary judgment); *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1443 (5th Cir. 1993) (same). Google's source code is the last place where such an adventure should be permitted to unfold.

***Match Rates/Win Rates.*** Aware their only surviving claim has no support in the evidence, Plaintiffs demand documents reflecting metrics not limited to the UFPA: win rates and match rates, Ex. 1 RFPs 10-11. They try to test a new theory: even if the challenged statement is accurate, perhaps the channel somehow "*influenced*" the outcome. *Supra* 1-3. But of course the outcome differed by channel: Bidders with more resources (monetary or informational) or motivation win more auctions—not by cheating but by bidding higher, or more often—and so the channels they use to bid will win at different rates. That is completely irrelevant to the accuracy of the challenged statement, or to the narrower issue of what its drafters understood it to be.

Crucially, Plaintiffs' allegations about win rates were ***expressly dismissed from this lawsuit***. Dkt. 108 at 8 ("Plaintiffs allege that Facebook was 'guaranteed' a ten percent win rate . . . but the Court does not find this allegation plausibly pled."). The Court explicitly rejected Plaintiffs' allegations that Facebook had a "guaranteed" or "guaranteed fixed win rate," Dkt. 87 ¶¶5, 99, 170, 183, 186, 191, 194, 207, 210; Dkt. 108 at 8. Judge Lin likewise rejected Plaintiffs' allegation that win rate was "predetermined," Dkt. 87 ¶105, recognizing that the NBA's win rate provision "does not guarantee Facebook a win or suggest that Google must do anything to make Facebook win a certain percentage of bids," Dkt. 108 at 8—just as Judge Castel found in a merits decision in *In re Google Digit. Advert. Antitrust Litig.*, 627 F.Supp.3d 346, 376 (S.D.N.Y. 2022). Plaintiffs now attempt to rephrase their allegations, arguing that "the allegation that *Facebook* committed to win at least 10% of bids was not expressly dismissed." *Supra* 1-3. But that is not the allegation that Plaintiffs pleaded in the Second Amended Complaint, where they "expressly" alleged that "Facebook was given a minimum guaranteed fixed 'win rate' *by Google*." Dkt. 87 ¶170 (emphasis added). Regardless, Judge Lin explicitly held that *because* the win rate provision "obligates Facebook to use 'commercially reasonable efforts' to win a certain percentage of bids," "[a]ccordingly, Plaintiffs fail[ed] to plead that [the challenged] statement was untrue." Dkt. 108 at 8. Plaintiffs now attempt to use discovery as a back door to circumvent Judge Lin's dismissal and reopen one of their early dismissed theories.

Plaintiffs' argument fares no better on the "match rate," which measures a platform's ability to use ***its own information*** to identify the user to whom an ad would be displayed. Dkt. 162-32 at 33. Plaintiffs provide no basis for their belief that Facebook necessarily "had more information than other bidders" because it could match ads "to an existing user profile." *Supra* 1-3. The existing extensive evidence already produced demonstrates that Google provides data for user-matching to all auction participants, Dkt. 162-2 at 4. Plaintiffs have had these documents for months, Dkt. 182-7 at 3, although as of June 2026, Plaintiffs had not yet reviewed all the information produced to them, Dkt. 182-10. Plaintiffs' opposition to summary judgment cites to multiple documents that describe match rates in the auction—confirming they were produced—only to now insist that "Defendants are impermissibly resisting [these documents'] production." Dkt. 183 at 23-24; *supra* 1-3. Beyond these documents, Plaintiffs seek "compliance reports" that do not exist, and information outside of Google's custody or control, such as how third-parties "match[ed] user profile identifiers in a user's browser or mobile device." *Supra* 1-3.

Match rates are irrelevant to the allegations remaining in this case. The challenged statement only says that bids are evaluated on a net basis, subject to preferences selected by the publisher (not by Google), and that *otherwise* the identity of the channel placing the bid does not affect how the UFPA determined the winning bidder. Google did not make, and could not have made, the unqualified statement that the channel does not affect the auction outcome. Not all channels are equal in resources or in motivation, so naturally they will win at different rates. No reasonable person would imagine that the identity of the bidder has nothing to do with the outcome of the auction. Defendants respectfully request a hearing on these disputes.

Respectfully submitted,

/s/ *Emma Gilmore*
Emma Gilmore

/s/ *Doru Gavril*
Doru Gavril

cc: All Counsel of Record (via ECF)