United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMI - GOVERNMENT EMPLOYEES PROVIDENT FUND MANAGEMENT COMPANY LTD., et al.,

Plaintiffs,

v.

ALPHABET INC., et al.,

Defendants.

Case No. 23-cv-01186-RFL (KAW)

**ORDER REGARDING 8/21/2026 DISCOVERY LETTER**

Re: Dkt. No. 228

[Discovery Letter No. 1]

Plaintiffs filed this securities class action against Defendants Alphabet Inc., Sundar Pichai, and Google LLC ("Google"), alleging that Defendants violated the Securities Exchange Act by making certain statements relating to Defendant Google's digital advertising technology business. (Second Amend. Compl. ("SAC"), Dkt. No. 87; Dismissal Order, Dkt. No. 108.) The only remaining allegation of fraud concerns Defendant Pichai's written testimony to Congress, in which he represented that in Google's ad auction platform, the "channel through which a bid is received does not otherwise affect the determination of the winning bidder." (Dismissal Order at 1-2.) The presiding judge articulated Plaintiff's theory of falsity as follows:

> Plaintiffs allege that Google's ad auctions in fact favored bids submitted through Google-owned platforms or the Facebook Advertising Network ("FAN"), which had a special agreement with Google. Allegedly, bidders operating through those channels received extra time, additional nonpublic information, and other advantages. Plaintiffs have further adequately alleged that Pichai was sufficiently involved in the negotiation regarding FAN that he was well-aware of these advantages when he represented otherwise in his September 2020 statement.

(*Id.* at 2.) On August 21, 2026, the parties filed a discovery letter concerning whether Defendants must produce: (1) documents concerning match and win rates, and (2) source code. (Discovery

Letter, Dkt. No. 228.)

**A. Match and Win Rates**

As explained by the presiding judge, "[p]ublisher ad servers will often solicit bids from advertisers through an ad exchange. The exchange matches advertisers and publishers using an instantaneous electronic auction known as 'real time bidding.'" (Dismissal Order at 3.) Defendant Google owns DV360, the leading demand side platform in which advertisers control when and how they bid for ad inventory and decide which users to target. (*Id.*) Facebook owns Facebook Advertising Network ("FAN"), another channel. (*Id.* at 3, 8.) Plaintiffs assert that bids placed through FAN were more likely to win a unified auction than a bid placed through other third-party platforms because Facebook received benefits, including "greater access to information about the consumer to whom the impression was targeted," "a process that significantly improved the match rates for Facebook." (*Id.* at 9; SAC ¶ 101.) Such benefits "meant that FAN's more timely, more informed, and better shielded bids were significantly more likely to win valuable impressions at the unified auction." (Dismissal Order at 10.) Thus, contrary to the alleged false statement, "Plaintiffs allege that 'the channel through which a bid is received' *did* 'affect the determination of the winning bidder.'" (*Id.*)

Here, Plaintiffs seek documents concerning the match and win rates. (Discovery Letter at 1.) Such discovery appears to be directly related to Plaintiff's theory of the case as explained by the presiding judge, namely that different channels received different benefits including better match rates, which in turn was one of a number of advantages that affected win rates.

In opposition, Defendants argue that match and win rates are irrelevant to the accuracy of the challenged statement because the theory that "the channel somehow '*influenced*' the outcome" is a new theory. (Discovery Letter at 4.) Defendants contend that they have never made "the unqualified statement that the channel does not affect the auction outcome," and that of course bidders with more resources or motivation will win more auctions by bidding higher or more often. (*Id.* at 4, 5.) Defendants' argument, however, appears to not only be on the merits of the claim, but is also directly contradictory to the presiding judge's understanding of Plaintiff's theory, which is that the FAN and DV360 channels, "armed with better information and more time

than other third-party channels, would have been able to submit winning bids to the unified auction at a far higher rate than would have been possible without their timing and informational advantages." (Dismissal Order at 10.)

Alternatively, Defendants point out that Plaintiffs are seeking match and win rates for all auctions, not just the unified auctions. (Discovery Letter at 4.) Plaintiffs do not appear to address this point. As the case is limited to how the different channels allegedly affected the determination of the winning bidder in a unified auction, discovery should also be so limited.

Accordingly, the Court ORDERS Defendants to produce documents related to match and win rates in unified auctions within **21 days** of the date of this order.

### B. Source Code

Plaintiffs also seek source code so that they can "have an expert opine on whether Google and Facebook had bid advantages." (Discovery Letter at 3.)

Courts have set a high standard for production of source code, going so far as to find that "Plaintiffs must prove that it is relevant and necessary to the action." *Congoo, LLC v. Revcontent LLC*, Civil Action No. 16-401 (MAS), 2017 U.S. Dist. LEXIS 130731, at *7 (D.N.J. Aug. 10, 2017) (emphasis added); *In re Apple & AT&TM Antitrust Litig.*, No. C-07-05152 JW (PVT), 2010 U.S. Dist. LEXIS 39637, at *7 (N.D. Cal. Mar. 26, 2010). The necessity requirement is a recognition that "source code is inherently sensitive" and "source code production is . . . incredibly burdensome." *Xinuos, Inc. v. IBM Corp.*, No. 22-cv-09777-CS-VR, 2024 U.S. Dist. LEXIS 207128, at *8 (S.D.N.Y. Nov. 13, 2024); *see also In re Apple & AT&TM Antitrust Litig.*, 2010 U.S. Dist. LEXIS 39637, at *7. Thus, while production of the source code is often found necessary in infringement cases, courts have declined to require production of source code where "unlike in a patent case alleging infringement, [the plaintiff's] interest is in the specific functionalities of the software, not the underlying code." *Congoo, LLC*, 2017 U.S. Dist. LEXIS 130731, at *7; *see Xinuos, Inc.*, 2024 U.S. Dist. LEXIS 207128, at *9 ("Of course, production of source code may be commonplace in patent or copyright infringement, where parties routinely produce code under extremely controlled conditions and undergo the requisite burden in doing so. But this is not a patent or copyright case[.]").

Plaintiffs fail to demonstrate necessity. The instant case does not concern patent or copyright infringement where the source code is directly at issue; rather, it concerns the functionalities of the source code, *i.e.*, the alleged advantages of the channels that affected the determination of a winning bidder. *See Congoo, LLC*, 2017 U.S. Dist. LEXIS 130731, at *8 (denying request for source code where the case concerned the defendants' alleged use of false and misleading representations in creating ads or influencing the creation or content of the ads). While Plaintiffs assert that review of the source code may "fill in gaps left by written documentation," it is not clear what gaps exist or why alternative methods of discovery will not suffice, such as interrogatories or deposition testimony. *See id.* at *9 (finding that witness testimony could suffice to address the functionality of the software algorithm); *Xinuos, Inc.*, 2024 U.S. Dist. LEXIS 207128, at *8 ("When, as here, the party seeking source code intends to obtain information about functionality, courts have determined that other discovery tools like interrogatories and depositions may achieve that goal"); *Saleh v. Nike, Inc.*, No. CV 20-09581-FLA (RAOx), 2021 U.S. Dist. LEXIS 190346, at *5 (C.D. Cal. Aug. 16, 2021) (declining to require production of source code because "Plaintiff has not established why he cannot obtain the information he needs by alternative means"). The fact that Defendants have been required to provide the source code in other cases -- including a patent case -- does not mean that Plaintiffs are entitled to the source code without a clear demonstration of why it is necessary to *this* case. (*See* Discovery Letter at 2-3, n.3.) Accordingly, Defendants are not required to produce the source code.

This order disposes of Dkt. No. 228.

IT IS SO ORDERED.

Dated: September 23, 2026

KANDIS A. WESTMORE
United States Magistrate Judge